# Volume 12-a

# Exhibit L-2

the current survey, cited under F755, revealed that the facility's QAPI committee was ineffective in correcting deficient practices related to the accountability of controlled medications.

Cross refer to F641, F656, F697, F755.

42 CFR 483.75(g)(2)(ii) QAPI/QAA Improvement Activities.

Previously cited 9/6/18.

28 Pa. Code 201.14(a) Responsibility of licensee.

Previously cited 9/6/18.

28 Pa. Code 201.18(e)(1) Management.

Previously cited 9/6/18.

| | | | |
|---|---|---|---|
| Exit Date: 10/17/18  2020  Scope/ Severity: none | § 211.12(i) LICENSURE Nursing services.: (i) A minimum number of general nursing care hours shall be provided for each 24-hour period. The total number of hours of general nursing care provided in each 24-hour period shall, when totaled for the entire facility, be a minimum of 2.7 hours of direct resident care for each resident. **Observations:**  Based on review of nursing staffing schedules and payroll records, as well as staff interviews, it was determined that the facility failed to provide the required minimum number of nursing care hours of 2.7 hours of direct resident care for each resident for one of 21 days reviewed.  Findings include: | **Plan of Correction:** 1. The facility cannot correct the identified situation of not meeting daily staffing hours on 9/22/18. Failure noted to be on a weekend day that 3 call offs occurred, and then the hours per patient day (PPD) was miscalculated. Re-education by Administrator to licensed staff and leadership management on calculating ppd and policy on Act 102 Mandating Overtime.  2. The facility will maintain the minimum 2.7 hours direct nursing care for each resident.  3. The Director of Nursing/Designee will re-educate Department Managers, Scheduler and RN Supervisors on calculating and maintaining required 2.7 nursing hours and notifying the Administrator and or Director of Nursing if hours are | **Completion Date:**  11/01/2018  **Status:**  Approved  **Date:**  10/31/18 |

The facility's nursing schedules and payroll records for the weeks of September 16, September 30, and October 7, 2018, revealed that the facility provided only 2.67 hours of direct nursing care per resident on September 22, 2018.

Interview with the Nursing Home Administrator on October 17, 2018, at 2:21 p.m. confirmed that nursing staffing was below the required minimum number of nursing care hours on September 22, 2018.

not being maintained due to call offs or change in census.

4. The Director of Nursing/Designee will complete an audit five times a week for four weeks and monthly for two months to validate facility is meeting required daily minimum hours of 2.7. Results of these audits will be reported to the Quality Assurance Performance Improvement Committee team for review, recommendations and frequency of audits.

# Exhibit L-3

*Pennsylvania Department of Health*

# MURRYSVILLE REHABILITATION AND WELLNESS CENTER
## Deficiency Listing

[ Return To Add Response Page ] [ Message Board ] [ Print ]

Back to Survey Selection

| Exit Date: | Initial Comments: | Plan of Correction: | Completion Date: |
|---|---|---|---|
| 12/09/19 | Based on an Abbreviated Survey in response to two complaints completed on December 9, 2019, it was determined that Murrysville Rehabilitation and Wellness Center was not in compliance with the following Requirements of 42 CFR Part 483, Subpart B, Requirements for Long Term Care Facilities and the 28 Pa. Code, Commonwealth of Pennsylvania Long Term Care Licensure Regulations. | | |
| **Exit Date:** 12/09/19 0585 Scope/ Severity: E | **483.10(j)(1)-(4) REQUIREMENT Grievances:** §483.10(j) Grievances. §483.10(j)(1) The resident has the right to voice grievances to the facility or other agency or entity that hears grievances without discrimination or reprisal and without fear of discrimination or reprisal. Such grievances include those with respect to care and treatment which has been furnished as well as that which has not been furnished, the behavior of staff and of other residents, and other concerns regarding their LTC facility stay. §483.10(j)(2) The resident has the right to and the facility must make prompt efforts by the facility to resolve grievances the resident may have, in accordance with this paragraph. §483.10(j)(3) The facility must make information on | **Plan of Correction:** F0585 The facility will provide documented evidence of resolution to concerns/issues voiced by family members and residents promptly. The facility cannot retroactively correct the concerns identified with grievance resolution process during the survey process. The facility Nursing Home Administrator or designee will complete an audit of the grievances/concerns voiced by residents and or family members in the last 30 days to validate that prompt efforts were made by the facility to resolve grievances to the satisfaction of the complainant. | **Completion Date:** 01/07/2020 **Status:** Approved **Date:** 12/19/19 |

how to file a grievance or complaint available to the resident. §483.10(j)(4) The facility must establish a grievance policy to ensure the prompt resolution of all grievances regarding the residents' rights contained in this paragraph. Upon request, the provider must give a copy of the grievance policy to the resident. The grievance policy must include: (i) Notifying resident individually or through postings in prominent locations throughout the facility of the right to file grievances orally (meaning spoken) or in writing; the right to file grievances anonymously; the contact information of the grievance official with whom a grievance can be filed, that is, his or her name, business address (mailing and email) and business phone number; a reasonable expected time frame for completing the review of the grievance; the right to obtain a written decision regarding his or her grievance; and the contact information of independent entities with whom grievances may be filed, that is, the pertinent State agency, Quality Improvement Organization, State Survey Agency and State Long-Term Care Ombudsman program or protection and advocacy system; (ii) Identifying a Grievance Official who is responsible for overseeing the grievance process, receiving and tracking grievances through to their conclusions; leading any necessary investigations by the facility; maintaining the confidentiality of all information associated with grievances, for example, the identity of the resident for those grievances submitted anonymously, issuing written grievance decisions to the resident; and coordinating

The Nursing Home Administrator or Designee will re-educate the Social Service Director and Department managers on the facility policy and procedures for grievance resolution and completing documented evidence that grievances have been resolved.

The daily start up process will be enhanced to include the review of grievances to ensure that a resolution has been made and documented evidence is completed.

The Nursing Home Administrator or Designee will complete an audit weekly for four weeks then monthly for three months to validate that there is documented evidence of resolutions to concerns/issues voiced by family members or residents.

The results of these audits will be reported to the monthly Quality Assurance and Performance Improvement Committee for review and frequency of audits.

with state and federal agencies as necessary in light of specific allegations; (iii) As necessary, taking immediate action to prevent further potential violations of any resident right while the alleged violation is being investigated; (iv) Consistent with §483.12(c)(1), immediately reporting all alleged violations involving neglect, abuse, including injuries of unknown source, and/or misappropriation of resident property, by anyone furnishing services on behalf of the provider, to the administrator of the provider; and as required by State law; (v) Ensuring that all written grievance decisions include the date the grievance was received, a summary statement of the resident's grievance, the steps taken to investigate the grievance, a summary of the pertinent findings or conclusions regarding the resident's concerns(s), a statement as to whether the grievance was confirmed or not confirmed, any corrective action taken or to be taken by the facility as a result of the grievance, and the date the written decision was issued; (vi) Taking appropriate corrective action in accordance with State law if the alleged violation of the residents' rights is confirmed by the facility or if an outside entity having jurisdiction, such as the State Survey Agency, Quality Improvement Organization, or local law enforcement agency confirms a violation for any of these residents' rights within its area of responsibility; and (vii) Maintaining evidence demonstrating the result of all grievances for a period of no less than 3 years from the issuance of the grievance decision.

**Observations:**

Based on review of facility policies and grievances and resident and staff interviews it was determined that the facility failed to provide documented evidence of resolution to concerns/issues voiced by family members and residents for five of seven months (5/19, 7/19, 9/19, 10/19, and 11/19).

Findings include:

A review of facility policy "Grievances" dated 3/28/19, indicated that residents have the right to prompt efforts by the facility to resolve grievances that are voiced by the resident or their responsible party.

A review of the facility grievance forms dated 5/19, through 11/19, revealed that the facility failed to provide documented evidence that grievances had been resolved to the satisfaction of the complaintant as follows:

- 5/4/19, a family member voiced the concern that the resident was not being toileted and that she smelled of urine,

7/1/19, a resident voiced a concern that she was being treated "roughly" while being assisted during transfers to the toilet.

7/7/19, a family member voiced a concern regarding the resident wearing the same clothing for several days, being soaked and having the smell of urine.

7/12/19, a resident voiced a concern that she had not been showered the prior day.

7/12/19, a family member voiced a concern that the resident was

soaked in urine, and this continued to be an ongoing issue.

7/15/19, a resident voiced a concern that she was left on the toilet for 20 minutes after activating the call bell for assistance and call bell response had been delayed at times for up to 45 minutes.

7/16/19, a resident's roommate voiced a concern that the resident had not received a shower for weeks.

7/25/19, a family member voiced a concern that on weekends the resident was not transferred out of bed until after noon.

9/11/19, a resident voiced a concern regarding that she was being transferred out of bed inappropriately.

10/6/19, a resident voiced a concern that a staff member was rude to her and stated that the resident was not the only resident that the staff member was providing care for and that the resident needs to take her turn.

11/5/19, a family member voiced a concern that the resident had not been out of bed all week,

the above listed grievance forms did not have a documented resolution.

During an interview on 12/9/19, at 9:20 a.m. the Nursing Home Administrator confirmed that the facility failed to document the resolution for the grievances.

28 Pa. Code: 201.29(i) Resident rights.

| Exit | 483.35(a)(1)(2) | Plan of Correction: | Completion |
|------|-----------------|---------------------|------------|

| Date: | REQUIREMENT | | Date: |
|---|---|---|---|
| 12/09/19 | **Sufficient Nursing Staff:** | The facility will maintain sufficient staff to meet the needs of residents. The facility cannot retroactively correct the concerns identified for Resident R5 and R10. | 01/07/2020 |
| 0725 | §483.35(a) Sufficient Staff. The facility must have sufficient nursing staff with the appropriate competencies and skills sets to provide nursing and related services to assure resident safety and attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care and considering the number, acuity and diagnoses of the facility's resident population in accordance with the facility assessment required at §483.70(e). | | **Status:** |
| Scope/ Severity: E | | | Approved |
| | | The Director of Nursing or designee will complete house surveillance rounds to ensure care is provided as needed. | **Date:** |
| | | | 12/20/19 |
| | | The Director of Nursing or Designee will re-educate the nursing department on the facility policy regarding incontinent care, following the care plans and orders, and answering call bells timely to meet the needs of the resident. | |
| | §483.35(a)(1) The facility must provide services by sufficient numbers of each of the following types of personnel on a 24-hour basis to provide nursing care to all residents in accordance with resident care plans: (i) Except when waived under paragraph (e) of this section, licensed nurses; and (ii) Other nursing personnel, including but not limited to nurse aides. §483.35(a)(2) Except when waived under paragraph (e) of this section, the facility must designate a licensed nurse to serve as a charge nurse on each tour of duty. | The Nursing Home Administrator or Designee will complete an audit of 10 residents weekly for four weeks then monthly for three months to validate that incontinence care is being provided timely and incontinence care plans and orders are followed, and call bells are answered timely to meet the needs of the residents. | |
| | **Observations:** | The results of these audits will be reported to the monthly Quality Assurance and Performance Improvement Committee for review and frequency of audits. | |
| | Based review of facility policies, clinical records and grievances, and resident and staff interviews it was determined that the facility failed to maintain sufficient staff to meet the needs of two of 10 residents (Resident R5, and R10). | | |
| | Findings include: | | |
| | A review of facility policy "Nursing Department Staff" dated 3/28/19, indicated that the facility will | | |

provide services by sufficient numbers of nursing staff in accordance with the resident's care plan. Nursing staff are assigned the nursing care of each resident in accordance of the resident's need.

A review of Resident R5's Admission Record indicated that the resident was admitted to the facility on 11/12/19, with the diagnosis of quadriplegia (the inability to move arms and legs), high blood pressure, and overactive bladder.

A review of Resident R5's Physician orders revealed orders for catherization every four to six hours as needed (PRN) for urine retention, transfer with an assist of two, and the resident is to be fed for all meals.

A review of Resident R5's plan of care revealed the following focus care areas and implemented interventions:

- urine retention - Interventions implemented use of briefs and PRN straight catheterization every four to six hours.

- impaired neurological status related to quadriplegia - Interventions implemented assistance with activities of daily living (ADL) and provide care as needed, monitor bladder function.

During an interview on 11/26/19, at 12:10 p.m. Resident R5 confirmed that he had concerns/issues regarding the timely care he was being provided. He stated that he often had to urinate in his pants when staff did not respond to him in a timely fashion and he would have to sit in urine soaked briefs

until staff had the opportunity to provide care. He also stated I am a young man and I do not like "peeing" my pants.

During an interview on 11/26/19, at 1:30 p.m. Resident R6 voiced a concern that his room mate Resident R10 was often urine soaked and that he had to get staff to provide care to Resident R10.

During an interview on 12/9/19, at 9:20 a.m. the Nursing Home Administrator confirmed that the facility failed to meet the needs of the residents in a timely manner, and that the facility was experiencing inadequate staffing level concerns.

28 Pa Code:201.14(a) Responsibility of licensee

28 Pa. Code: 211.12(a)(d)(4)(l) Nursing services.

*Pennsylvania Department of Health*

## MURRYSVILLE REHABILITATION AND WELLNESS CENTER
### Deficiency Listing

| Return To Add Response Page | Message Board | Print |

Back to Survey Selection

| Exit Date: 06/30/17 | Initial Comments: | Plan of Correction: | Completion Date: |
|---|---|---|---|
| | Based on an Abbreviated survey in response to a complaint, completed on June 30, 2017 for Murrysville Rehabilitation & Wellness Center, it was determined that there were no federal deficiencies related to the reported complaint allegations, identified under the requirements of 42 CFR Part 483, Subpart B, Requirements for Long Term Care; however, the facility was not in compliance with the 28 PA Code, Commonwealth of Pennsylvania Long Term Care Licensure Regulations. | | |
| **Exit Date:** 06/30/17 2020 Scope/ Severity: none | **§ 211.12(i) LICENSURE Nursing services.:** (i) A minimum number of general nursing care hours shall be provided for each 24-hour period. The total number of hours of general nursing care provided in each 24-hour period shall, when totaled for the entire facility, be a minimum of 2.7 hours of direct resident care for each resident. **Observations:** Based on a review of facility staffing records and staff interviews, it was determined that the facility failed to maintain a minimum of 2.7 hours of direct nursing care for each resident for four of 21 days (6/3/17, 6/4/17, 6/10/17, and 6/18/17) . | **Plan of Correction:** The Facility submits this Plan of Correction under procedures established by the Department of Health in order to comply with the Department's directive to change conditions which the Department alleges is deficient under State and/or Federal Long Term Care Regulations. This Plan of Correction should not be construed as either a waiver of the facility's right to appeal or challenge the accuracy or severity of the alleged deficiencies or an admission of past or ongoing violation of State or Federal regulatory requirements. Please accept this plan of correction as the facility's written credible allegation of compliance | **Completion Date:** 08/02/2017 **Status:** Approved **Date:** 07/12/17 |

Findings include:

During a review of facility staff records dated 6/2/17 through 6/22/17, it was revealed that the facility's direct nursing care hours per resident per day were as follows:

6/3/17: 2.52 hours

6/4/17: 2.44 hours

6/10/17: 2.69 hours

6/18/17: 2.57 hours

During a interview on June 23, 2017, at 2:00 p.m., the Nursing Home Administrator indicated that there were several days the facility did not meet the required nursing hours.

During a interview on June 30, 2017, at 9:45 a.m., Clinical Regional Nurse Employee E1 confirmed that on 6/3/17, 6/4/17, 6/10/17, and 6/18/17, the facility failed to maintain the minimum 2.7 hours direct nursing care for each resident as required.

such that all alleged deficiencies cited have been or will be corrected by the date or dates indicated. To remain in compliance with all federal and state regulations, the facility has taken or will take the actions set forth in the following plan of correction.

State Tag

The facility will maintain the minimum 2.7 hours direct nursing care for each resident.

The facility will monitor nursing hours daily with staffing meeting, and by RN Supervisor and Managers on Duty on the weekends to validate we are maintaining the minimum required 2.7 hours for each resident. Daily hours are reviewed by ED and DON daily and reviewed prior to next days schedule posting.

DNS and/or Designee will re educate Department Managers and RN Supervisor on calculating and maintaining required 2.7 Nursing hours and notifying ED and or DNS if hours are not being maintained due to call offs or change in census.

DNS and/or Designee will complete an audit 3X week for four weeks to validate facility is meeting required daily minimum hours of 2.7. Results of the audit will be presented to the Quality Assurance Performance Committee for review and recommendations.

# Exhibit M-1

# HR Assistant/Payroll Clerk

Job Description/Competency/Evaluation (Annual & Probationary)

Name: _____ _                Date of Hire: _____

Department Assigned: _____                Reports To;  Human Resources Director_____

Shift Assignment _____                Duty Hours _____

Exempt ☐        Non-Exempt ☐        Salary ☐        Hourly ☐        Supervisory Position ☐        Circle: FT  PT  T  D

## Purpose of Your Job Position

The primary purpose of the job position is to assist with the day to day human resource operations of the HR Department in accordance with current acceptance policies and procedures. Ensuring that all regulations and Labor Laws are followed and that payroll is processed in a timely accurate manner.

## Delegation of Authority

As HR Assistant/Payroll Clerk, you are delegated the authority, responsibility, and accountability necessary for carrying out your assigned duties.

## Job Functions

Every effort has been made to identify the essential functions of this position. However, it in no way states or implies that these are the only duties you will be required to perform. The omission of specific statement of duties does not exclude them from the position if the work is similar, related, or is an essential function of the position.

| Duties and Responsibilities | Fill in column(s) that apply | | | | |
|---|---|---|---|---|---|
| Miscellaneous Information<br><br>Information explaining the columns to the right is provided on the last page of this job description in the "Analysis" section. | Self Evaluation | Competency Testing Needed | Date Competency Completed | 90 day Evaluation | Annual Evaluation |
| **Administrative Functions – Total Weight 15%** | **1** | **2** | **3** | **4** | **5** |
| Evaluate the payroll system needs of the facility and report such information to the Human Resources Director | | | | | |
| Responsible for processing all facility payrolls after it has been verified and signed by the supervisor or department head | | | | | |
| Assist in standardizing the methods in which files and documentation is processed and kept | | | | | |
| Assist Human Resources in planning, developing, organizing, implementing, evaluating, , maintaining, supervising, and directing all administrative procedures related to the HR department | | | | | |
| Complete, type, proofread, correct, maintain and provide forms, reports, statistical data, financial reports, and reports as well as correspondence | | | | | |
| Maintain filing system, schedule appointments/interviews, coordinate and plan activities and staff meetings | | | | | |
| Maintain schedules and keep Human Resources Director informed of all meetings, appointments, etc. | | | | | |
| Perform secretarial functions as necessary or directed | | | | | |
| Miscellaneous Tasks as assigned by Human Resources Director | | | | | |
| Participates and cooperates in any auditing process | | | | | |

ACOSTA- 000168

# HR Assistant/Payroll Clerk

## Working Conditions

- Works throughout the facility and recreational therapy areas.
- Moves intermittently during work hours.
- Sits, stands, pushes, bends, stoops and walks intermittently through the workday.
- May lift and move equipment
- Is subject to frequent interruptions.
- Is involved with residents, personnel, visitors, government agencies, etc., under all conditions and circumstances.
- Is subject to hostile and emotionally upset residents, family members, personnel, and visitors.
- Communicates with nursing personnel and other department personnel.
- Works beyond normal working hours, and in other positions temporarily, when necessary.
- Is subject to callback during emergency conditions (e.g., severe weather, evacuation, post – disaster, etc.).
- Attends and participants in continuing education programs.
- Is subject to injury from falls, burns from equipment, bruise, scratches and odors, etc throughout the work day, as well as to reactions from dust, disinfectants, tobacco smoke and the air contaminants.
- Is subject to exposure to infectious waste, diseases, conditions, etc., including but not limited to TB AIDS and Hepatitis B. Bloodborne Pathogen Exposure – Category One (High Exposure Risk).
- May be subject to the handling of and exposure to hazardous chemicals.

## Education & Qualifications

- Graduate of an accredited high school or GED preferred.
- 2 years of college or a degree in accounting preferred.
- A physical examination and/or evidence from a physician indicating freedom of communicable disease to be available upon employment.
- Must be in good physical and mental health.
- Ability to work independently or part of a group.
- Effectively communicate with others.

## Experience

- Previous Human Resources and Payroll experience is desirable

## Specific Requirements

- Must possess the ability to make independent decision when circumstances warrant such action.
- Must possess the ability to deal tactfully with personnel, resident, family members, visitors, government agencies/personnel, and the general public.
- Knowledge of elderly ill and/or disabled.
- Must have patience, tact, a cheerful disposition and enthusiasm, as well as the willingness to handle difficult residents.
- Basic understanding of following step-by-step procedures.
- Follows and understands written and oral directions.
- Knowledge of equipment used in long-term care (e.g., lifts, wheelchairs, Geri chairs, and scales).
- Must not pose a direct threat to the health or safety of other individuals in the workplace.

ACOSTA- 000173

# Exhibit M-2

# Human Resources Director

Job Description/Competency/Evaluation (Annual & Probationary)

Name: _____ _        Date of Hire: _____

Department Assigned: _____        Reports To;  Administrator_____

Shift Assignment _____        Duty Hours _____

Exempt ☐        Non-Exempt ☐        Salary ☐        Hourly ☐        Supervisory Position ☐        Circle: FT  PT  T  D

### Purpose of Your Job Position

The primary purpose of the job position is to manage the Human Resource department in accordance with current applicable federal, state, and local standards, guidelines, and regulations. To follow all company policies and apply them uniformly to all employees as directed by your Administrator and the Director of Human Resources. To assure that qualified personnel are interviewed, trained and employed. To timely perform all administrative tasks with regards to personnel actions.

### Delegation of Authority

As Human Resources Director, you are delegated the authority, responsibility, and accountability necessary for carrying out your assigned duties.

### Job Functions

Every effort has been made to identify the essential functions of this position. However, it in no way states or implies that these are the only duties you will be required to perform. The omission of specific statement of duties does not exclude them from the position if the work is similar, related, or is an essential function of the position.

| Duties and Responsibilities | Fill in column(s) that apply | | | | |
|---|---|---|---|---|---|
| Miscellaneous Information<br><br>Information explaining the columns to the right is provided on the last page of this job description in the "Analysis" section. | Self Evaluation | Competency Testing Needed | Date Competency Completed | 90 day Evaluation | Annual Evaluation |
| **Administrative Functions – Total Weight 15%** | **1** | **2** | **3** | **4** | **5** |
| Maintains written job descriptions and performance evaluations for each staff member in accordance with the Americans with Disabilities Act, OSHA and other pertinent laws pertinent laws governing job positions | | | | | |
| Review all requests from department heads for new and replacement personnel, fill requests as approved, and arrange interview, appointments, etc. | | | | | |
| Check applications and references of prospective employees and arrange for interview with department managers as required or requested. | | | | | |
| Compiles statistical data for the Administrator and the corporate office. | | | | | |
| Maintain job application files for individuals interested in employment within the facility | | | | | |
| Also files applications for positions, by position or alphabetically to include job applications, resume, reference checks, etc. of that person meeting the eligibility requirements for the position to which they applied. | | | | | |
| Maintains data base log of all applicant names, job applied for and action taken. | | | | | |
| Maintain **Confidentiality** of all pertinent personnel information in accordance with the Privacy Act, as well as our established personnel policies governing the release of information. | | | | | |

ACOSTA- 000176

# Human Resources Director

## Working Conditions

- Works throughout the facility and recreational therapy areas.
- Moves intermittently during work hours.
- Sits, stands, pushes, bends, stoops and walks intermittently through the workday.
- Is subject to frequent interruptions.
- Is involved with residents, personnel, visitors, government agencies/personnel, etc., under all conditions and circumstances.
- Is subject to hostile and emotionally upset residents, family members, personnel, and visitors.
- Communicates with nursing personnel and other department personnel.
- Works beyond normal working hours, and in other positions temporarily, when necessary.
- Is subject to callback during emergency conditions (e.g., severe weather, evacuation, post – disaster, etc.).
- Attends and participates in continuing education programs.
- Is subject to injury from falls, burns from equipment, bruise, scratches and odors, etc throughout the work day, as well as to reactions from dust, disinfectants, tobacco smoke and the air contaminants.
- Is subject to exposure to infectious waste, diseases, conditions, etc., including but not limited to TB AIDS and Hepatitis B. Bloodborne Pathogen Exposure – Category One (High Exposure Risk).
- May be subject to the handling of and exposure to hazardous chemicals.

## Education & Qualifications

- Graduate of an accredited high school or GED preferred.
- 2 years of college or a degree in accounting preferred.
- Computer knowledge desirable
- A physical examination and/or evidence from a physician indicating freedom of communicable disease to be available upon employment.
- Must be in good physical and mental health.
- Ability to work independently or part of a group.
- Effectively communicate with others.

## Experience

- 1 year supervisory experience required. Previous long-term care experience is desirable.
- 2 years business office and/or accounting experience required.

## Specific Requirements

- Must possess the ability to make independent decision when circumstances warrant such action.
- Must possess the ability to deal tactfully with personnel, resident, family members, visitors, government agencies/personnel, and the general public.
- Knowledge of elderly ill and/or disabled.
- Must have patience, tact, a cheerful disposition and enthusiasm, as well as the willingness to handle difficult residents.
- Basic understanding of following step-by-step procedures.
- Follows and understands written and oral directions.
- Knowledge of equipment used in long-term care (e.g., lifts, wheelchairs, Geri chairs, and scales).
- Must not pose a direct threat to the health or safety of other individuals in the workplace.

ACOSTA- 000183

# Exhibit M-3

# MDS Nurse

Job Description/Competency/Evaluation (Annual & Probationary)

Name: _____ _

Date of Hire: _____

Department Assigned: _____Nursing Department_____

Reports To: _____Administrator_____

Shift Assignment _____

Duty Hours _____

Exempt ☐      Non-Exempt ☐      Salary ☐      Hourly ☐      Supervisory Position ☐      Circle: FT  PT  T  D

### Purpose of Your Job Position

The primary purpose of the job position is to provide professional nursing experience in performing assessments an completing the MDS in accordance with established nursing standards, the policies, procedures, and practices of this facility, and the requirement of current federal, state, and local standards governing the facility. Coordinates and participates in care planning sessions. Determine levels of care for reimbursement purposes.

### Delegation of Authority

As MDS Nurse, you are delegated the authority, responsibility, and accountability necessary for carrying out your assigned duties.

### Job Functions

Every effort has been made to identify the essential functions of this position. However, it in no way states or implies that these are the only duties you will be required to perform. The omission of specific statement of duties does not exclude them from the position if the work is similar, related, or is an essential function of the position.

| Duties and Responsibilities | \multicolumn | | | | |
|---|---|---|---|---|---|
| Miscellaneous Information<br><br>Information explaining the columns to the right is provided on the last page of this job description in the "Analysis" section. | Self Evaluation | Competency Testing Needed | Date Competency Completed | 90 day Evaluation | Annual Evaluation |
| **Administrative Functions – Total Weight 5%** | **1** | **2** | **3** | **4** | **5** |
| Adheres to federal, state, and local regulations | | | | | |
| Upholds facility goals and objectives | | | | | |
| Utilizes facility policies and procedures in planning, implementing, and evaluating the care needs of the residents | | | | | |
| Keeps appraised of changes and updates in nursing practice | | | | | |
| Functions as a member of the nursing team | | | | | |
| Make written or oral reports/recommendations to the Director as necessary/required, concerning the operation of the nursing service department | | | | | |
| Periodically review the department's policies and procedures manuals and make recommendations for revisions to DON | | | | | |
| Participates in facility surveys and audits made by authorized governmental agencies as requested by the Administrator or DON | | | | | |
| Knowledgeable of, at a minimum, the last 3 years of Plans of Correction (2567) and actively participate in the facilities ongoing plan to correct and prevent occurrences | | | | | |
| Assumes responsibilities of MDC Coordinator as assigned, or in his/her absence | | | | | |
| | | | | | |

The "Fill in column(s) that apply" header spans columns 1–5.

# MDS Nurse

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
| A  Total all points given for either column 4 or 5 |  |  |  |  |  |  |
| B  Put total number of job duties evaluated from above in columns 4 or 5 |  |  |  |  |  |  |

## Working Conditions

- Works in office and throughout the nursing service area.
- Moves intermittently during work hours.
- Sits, stands, pushes, bends, stoops and walks intermittently through the workday.
- May lift and move patients and equipment.
- Is subject to frequent interruptions.
- Is involved with residents, personnel, visitors, government agencies/personnel, etc., under all conditions and circumstances.
- Is subject to hostile and emotionally upset residents, family members, personnel, and visitors.
- Communicates with medical staff, nursing personnel and other department personnel.
- Works beyond normal working hours, and in other positions temporarily, when necessary.
- Is subject to callback during emergency conditions (e.g., severe weather, evacuation, post – disaster, etc.).
- Attends and participates in continuing education programs.
- Is subject to injury from falls, burns from equipment, bruise, scratches and odors, etc throughout the work day, as well as to reactions from dust, disinfectants, tobacco smoke and the air contaminants.
- Is subject to exposure to infectious waste, diseases, conditions, etc., including but not limited to TB AIDS and Hepatitis B. Bloodborne Pathogen Exposure – Category One (High Exposure Risk).
- May be subject to the handling of and exposure to hazardous chemicals.

## Education & Qualifications

- Must possess, as a minimum, a degree in Nursing from an accredited school.
- Must possess a current, unencumbered, active license to practice as a RN or LPN in Pennsylvania.
- A working knowledge of the needs of the aging and chronically ill requiring long-term care, the principles of management, supervision, organizational behavior and structure, and communication systems.
- A physical examination and/or evidence from a physician indicating freedom of communicable disease to be available upon employment.
- Must be in good physical and mental health.
- Ability to work independently or part of a group.
- Effectively communicates with others.

## Experience

- Previous long-term care experience is desirable. Computers desirable

## Specific Requirements

- Must possess the ability to make independent decision when circumstances warrant such action.
- Must possess the ability to deal tactfully with personnel, resident, family members, visitors, government agencies/personnel, and the general public.
- Must have patience, tact, a cheerful disposition an enthusiasm, as well as the willingness to handle difficult residents.

ACOSTA- 000271

# Exhibit M-4

# Registered Nursing Assessment Coordinator

Job Description/Competency/Evaluation (Annual & Probationary)

Name: _____ _           Date of Hire: _____

Department Assigned: _____Nursing Department_____           Reports To: _____Director of Nursing_____

Shift Assignment _____           Duty Hours _____

Exempt ☐      Non-Exempt ☐      Salary ☐      Hourly ☐      Supervisory Position ☐        Circle: FT  PT  T  D

### Purpose of Your Job Position

The primary purpose of the job position is to conduct and coordinate the development and completion of the resident assessment in accordance with the requirements of Pennsylvania and the policies and goals of this facility.

### Delegation of Authority

As Registered Nursing Assessment Coordinator, you are delegated the authority, responsibility, and accountability necessary for carrying out your assigned duties.

### Job Functions

Every effort has been made to identify the essential functions of this position. However, it in no way states or implies that these are the only duties you will be required to perform. The omission of specific statement of duties does not exclude them from the position if the work is similar, related, or is an essential function of the position.

| Duties and Responsibilities | Fill in column(s) that apply | | | | |
|---|---|---|---|---|---|
| Miscellaneous Information<br><br>Information explaining the columns to the right is provided on the last page of this job description in the "Analysis" section. | Self Evaluation | Competency Testing Needed | Date Competency Completed | 90 day Evaluation | Annual Evaluation |
| **Administrative Functions – Total Weight 5%** | **1** | **2** | **3** | **4** | **5** |
| Conduct and coordinate the development and completion of the resident assessment (MDS) in accordance with current rules, regulations, and guidelines that govern the resident assessment, including the implementation of RAP's and Triggers. | | | | | |
| Maintains and periodically update written policies and procedures that govern the development, use, and implementation of the resident assessment (MDS) and care plan. | | | | | |
| Perform administrative duties such as completing medical forms, reports, evaluations, studies, etc., as necessary | | | | | |
| Participate in facility surveys made by authorized government agencies | | | | | |
| Knowledgeable of, at a minimum, the last 3 years of Plans of Correction (2567) and actively participate in the facilities ongoing plan to correct and prevent occurrences | | | | | |
| May participate in facility call rotation as required | | | | | |
| Understands and complies with Corporate Compliance plan | | | | | |
| | | | | | |
| | | | | | |
| A  Total all points given for either column 4 or 5 | | | | | |

# Registered Nursing Assessment Coordinator

| | | | | | | |
|---|---|---|---|---|---|---|
| Acts as a positive representative of facility. | | | | | | |
| Contributes to team effort, may float to other positions as assigned. | | | | | | |
| Communicates with employees in all departments. | | | | | | |
| Keeps all resident and employee information confidential. | | | | | | |
| Reports all complaints/grievances to the Manager or Supervisor on duty. | | | | | | |
| Reports actions detrimental to resident welfare to Manager or Supervisor on duty. | | | | | | |
| Ensures that all care is provided in privacy and personnel knocks before entering the resident's room. | | | | | | |
| Reports incidents' or suspected incidents or resident abuse to the DON/Designee's immediately. | | | | | | |
| Honor the resident's refusal of treatments or medication requests. Report refusal to Nurse Supervisor/Charge Nurse | | | | | | |
| Ensures that all residents are treated fairly, and with kindness, dignity and respect. | | | | | | |
| Knowledgeable of all residents' rights according to facility policy and regulations, including the right for a resident to refuse treatment. | | | | | | |
| Understands and follows fairly Abuse Prohibition policy & procedure. | | | | | | |
| Understands that call lights are answered by all employees of the facility regardless of department. If you are not trained to assist with request/need then inform resident that you will seek appropriate personnel immediately, then do so. | | | | | | |
| | | | | | | |
| | | | | | | |
| A  Total all points given for either column 4 or 5 | | | | | | |
| B  Put total number of job duties evaluated from above in columns 4 or 5 | | | | | | |

## Working Conditions

- Works in office and throughout the nursing service area.
- Moves intermittently during work hours.
- Sits, stands, pushes, bends, stoops and walks intermittently through the workday.
- May lift and move patients and equipment.
- Is subject to frequent interruptions.
- Is involved with residents, personnel, visitors, government agencies, etc., under all conditions and circumstances.
- Is subject to hostile and emotionally upset residents, family members, personnel, and visitors.
- Communicates with medical staff, nursing personnel and other department personnel.
- Works beyond normal working hours, and in other positions temporarily, when necessary.
- Is subject to callback during emergency conditions (e.g., severe weather, evacuation, post – disaster, etc.).
- Attends and participates in continuing education programs.
- Is subject to injury from falls, burns from equipment, bruise, scratches and odors, etc throughout the work day, as well as to reactions from dust, disinfectants, tobacco smoke and the air contaminants.
- Is subject to exposure to infectious waste, diseases, conditions, etc., including but not limited to TB AIDS and Hepatitis B. Bloodborne Pathogen Exposure – Category One (High Exposure Risk).
- May be subject to the handling of and exposure to hazardous chemicals.

## Education & Qualifications

- Graduate of an accredited school of nursing.
- Must possess a current, unencumbered, active license to practice as a RN in Pennsylvania.

ACOSTA- 000405

# Registered Nursing Assessment Coordinator

- A physical examination and/or evidence from a physician indicating freedom of communicable disease to be available upon employment.
- Must be in good physical and mental health.
- Must be knowledgeable of nursing and medical practices and procedures and laws, regulations and guidelines governing long-term care.
- Ability to work independently or part of a group.
- Effectively communicate with others.

## Experience

- Previous long-term care experience desirable. Computer knowledge preferred.

## Specific Requirements

- Must possess the ability to make independent decision when circumstances warrant such action.
- Must possess the ability to deal tactfully with personnel, resident, family members, visitors, government agencies/personnel, and the general public.
- Knowledge of elderly, ill, and/or disabled.
- Must have patience, tact, a cheerful disposition an enthusiasm, as well as the willingness to handle difficult residents.
- Must be able to relate information concerning a resident's condition.
- Basic understanding of following step-by-step procedures.
- Follows and understands written and oral directions.
- Knowledge of equipment used in long-term care (e.g., lifts, wheelchairs, Geri chairs, and scales).
- Must not pose a direct threat to the health or safety of other individuals in the workplace.

## Physical and Sensory Requirements
(With or without the aid of mechanical devices)

- Must be able to move intermittently throughout the workday.
- Must be able to speak and write the English language in an understandable manner.
- Must be able to cope with the mental and emotional stress of the position.
- Must be able to see and hear or use prosthetics that will enable these senses to function adequately to ensure that the requirements of this position can be fully met.
- Must function independently and have flexibility, personal integrity, and the ability to work effectively with resident personnel, and support agencies.
- Must meet the general health requirements set forth by the policies of this facility, which include a medical and physical examination.
- Must be able to push, pull, move, and/or lift a minimum of 50 (fifty) pounds to a minimum height of 4 (four) feet and be able to push, move, and/or carry such weight a minimum distance of 2 (two) feet.
- May be necessary to assist in the evacuation of residents during emergency situations.

## Acknowledgement

I have read this job description and fully understand the risks and requirements set forth therein. I hereby accept the position of Registered Nursing Assessment Coordinator and agree to perform the identified essential functions in a safe manner and in accordance with the facility's established procedures.

I further understand that the duties listed above may change at any time, either verbally or in writing according to the needs of the facility. I understand that I may be required to work weekends, holidays and may be temporarily assigned to other positions as needed.

ACOSTA- 000406

# Exhibit N-1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EUGENE SCALIA,<br>SECRETARY OF LABOR,<br>UNITED STATES DEPARTMENT OF LABOR,<br><br>Plaintiff,<br><br>v.<br><br>COMPREHENSIVE HEALTHCARE<br>MANAGEMENT SERVICES, LLC, et al.<br>Defendants. | ) Civil Action No.2:18-cv-01608-WSS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF ASHLEY IFFT

I, Ashley Ifft, declare under penalty of perjury that the following facts are true and correct:

1.      I worked at Comprehensive Healthcare Management Services, LLC from June 2018, through November 2019. This facility is known as Brighton Rehab & Wellness ("Brighton"). Brighton is located at 9704, 246 Friendship Cir, Beaver, PA 15009.

2.      I was a Human Resource Director ("HRD") at Brighton. My primary duties were processing hiring and firing documents for new employees, communicating with payroll, submitting employees' time adjustment sheets to payroll for corrections, and consulting with Mr. Sam Halper on human resources issues.

3.      I do not supervise the work of two or more other full-time employees and I had no supervisor. The system at Brighton was nothing like I have seen before in my career as a Human Resource Director. I mostly communicated with Sam Halper and two individuals from the payroll company, CHMS Group. The CHMS Group individuals I communicated with were Susie Levy and Avi Peckman

4.      I know that Sam Halper is a partner in the company and owns Brighton, I have met Sam Halper several times and e-mailed or copied him in the majority of my e-mails dealing with hiring, firing, and payroll matters.

5.      Mr. Halper was involved in all hiring and firing decisions at Brighton, he set the pay rate, and made the Fair Labor Standards Act exemption determinations. For new hires, I was required to send the name, prior wage history, job title, and who the new employee would be replacing to Mr. Halper. I had to wait for Mr. Halper's approval for each hire via e-mail. If Mr. Halper missed an e-mail about a new hire, he would require me to send him a copy of his response approving the new hire if there was an issue later. I had no discretion in hiring and firing employees. In July of 2018, less than a month after I was retained, I hired an Admission employee, without notifying Mr. Halper as it was my experience as HRD to hire individuals without approval from the owner of the Facility. Mr. Halper instructed me to fire the new employee after she quit her other job and started working for us. I tried to get one of Mr. Halper family members and associate to intervene and allow the new employee to continue to work, but Mr. Halper insisted that I fire the new employee.

6.      I had to carbon copy Mr. Halper on e-mails to the payroll company as Mr. Halper wanted to be involved in all hiring, firing, and payroll activities. When I sent Mr. Halper emails regarding hiring, firing, and payroll, he would typically respond with comments, feedback, or simply state "looks good to me" as a way of approval.

7.      In July of 2018 I examined the biweekly payroll and immediately noticed that several employees were improperly classified as exempt when they didn't meet the requirements to be exempt. I noticed at least 98 employees at Brighton who were classified as exempt and determined that half of them should not have been exempt under the FLSA. As a Human

Resource Director, I was trained on how to determine if an employee is exempt under the FLSA as part of my training. For example, two dieticians didn't manage any employees, make management decisions, or have special certifications or advanced degrees, but they were labeled as exempt. Similarly, there were administrative and kitchen staff that were labeled as exempt. I used the DOL's factsheets and employee's data in making my exemption determination.

8.      I notified Susie and Avi from CHMS Group, and Mr. Sam Halper of my exemption findings via e-mail and attached the exemptions factsheets, which I obtained from the Department of Labor's website. Susie told me that this is a matter for Mr. Halper to dictate to them. They ignored my notice and continued to label and pay employees as exempt. I spoke with Mr. Halper in person at least four times about the exemption labels. He was dismissive in his answers.  He would laugh and tell me, for example, "that's not how it works." Mr. Tom Lowden, who was at one point the Administrator at Brighton and is now a consultant for Mr. Halper, told me that I stepped on a political land mine and that I need to play by Mr. Halper's rules if I wanted to keep my job.

9.      Brighton fired the facility's Administrator, Bob, after he started asking questions about the exemption issue and employees' pay. Tom Lowden, told me that Bob was fired because he stepped on too many political land mines. I know Bob was asking questions about exemptions and employee pay because he showed me e-mails from Mr. Halper.

10.      I was paid a salary for my work, but my paycheck was docked for leaving the office during the day. I didn't get paid overtime I worked more than 40 hours a week, but my pay was docked per hour if I worked less than 40 hours a week. I complained to CHMS and Mr. Halper, but they never paid me my full salary. My check was not always consistent although I was salaried.

11.     I finally decided to leave because of all the issues the employees were having with their paychecks and because of the clock-in system issues. Employees were complaining to me daily about the time clock and I spent a good amount of my day trying to figure it out and running to the clock to see what was wrong.

12.     The employees were required to use a biometric clock system to clock in and out. At the beginning of the shift, they used the clock to punch in by using their fingerprint and employee ID. They were required to use the same system to clock out at the end of their shifts. The facility bought the time clock's system from eBay, which was in a poor condition. I had to research the user's manual online in order to learn how to fix it. I notified Mr. Halper and CHMS Group about the issues, but they didn't want to get a new system. They would often tell me to wipe down the machine, tell the employees to wash their hands and don't wear nail polish.

13.     When there was an issue with employees clocking in or out, they would be required to fill a time adjustment sheet, which required a signature from management before it was sent to payroll processing at CHMS Group. Sometime the time adjustment sheets would be approved, but sometimes they wouldn't be approved. There was no clear answer I could give employees about why their times sheets were not approved. CHMS Group often asked me why employees missed time, although I already told them the employees were having daily issues with the clock-in system. When there was an issue with the clinicians' time, CHMS would resort to the medical records system to verify the hours, which did not fairly represent the actual hours worked.

14.     Employees would often work during their lunchbreak and would submit time adjustment sheets in order to get paid. The timesheets were not always approved and employees would not be paid for time they worked during their lunchbreak.

15.     I had several employees complain to me about not being paid overtime, which I communicated to Mr. Halper and Susie. Sometimes they paid the overtime and sometimes they wouldn't pay it.

Executed this _17_ day of _July_, 2020 in the City/County of _____ under the penalty of perjury.

_Ashley Ifft_
Ashley Ifft

# Exhibit N-2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| EUGENE SCALIA,<br>SECRETARY OF LABOR,<br>UNITED STATES DEPARTMENT OF LABOR,<br><br>Plaintiff,<br><br>v.<br><br>COMPREHENSIVE HEALTHCARE<br>MANAGEMENT SERVICES, LLC, et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)  Civil Action No.2:18-cv-01608-WSS<br>)<br>)<br>)<br>)<br>)<br>) |

**DECLARATION OF MARTHA STILLWAGON**

I, Martha Stillwagon, declare under penalty of perjury that the following facts are true and correct:

1.      From December 2014 until January 2020, I worked as the Human Resources Director at Mt. Lebanon Operations LLC, also known as Mt. Lebanon Rehabilitation and Wellness Center ("Mt. Lebanon"). Mt. Lebanon is located at 350 Old Gilkeson Road, Pittsburgh, PA, 15228.

2.      Mt. Lebanon was formally known as Golden Living Center. The name changed in February 2017, after Sam Halper and his company, Comprehensive Healthcare Management Services, LLC ("CHMS"), purchased it. I learned after the acquisition that CHMS owned and operated numerous long-term-care facilities in the area.

3.      I worked at multiple facilities owned by Sam Halper and his companies during my tenure. As such, I am aware that there is a substantial amount of overlap between the facilities that Sam Halper and CHMS owned and operated.

1

4.      In or around 2019, Sam Halper and CHMS reorganized the regional management

team into a separate entity known as Western Pennsylvania Consultants. Their roles and

responsibilities did not change, even though they were re-classified to consultants. Western

Pennsylvania Consultants served as a bridge between multiple CHMS facilities and actively

supported and required communications between each facility's administrators and department

heads to ensure successful operations of the company as a whole.

5.      In my role as Human Resources Director, my superiors required me to train and

provide support to human resources staff at other CHMS facilities, including Maybrook-C Kade

Opco, LLC (aka The Grove at Washington) ("The Grove at Washington"), and South Hills

Operations (aka South Hills Rehabilitation and Wellness Center) ("South Hills"). These duties

were in addition to my responsibilities at Mt. Lebanon.

6.      It was common practice to staff different kinds of employees at multiple facilities.

I regularly assisted other facilities to fill staffing deficiencies of clinical staff to, when possible,

avoid understaffing. I was often praised by corporate on my ability to support and satisfy staffing

needs at sister facilities.

7.      In addition, Administrators and other Human Resources personnel at different

facilities routinely consulted with each other. *See*, *e.g.*, Exhibit 1 (excerpt from my discussion

with Regional Director of Operations Margaret Zapor regarding initiatives and priorities at

multiple facilities); Exhibit 2 (thanks from Ms. Zapor for my assistance to multiple facilities);

Exhibit 3 (excerpt from my discussion with Ms. Zapor regarding a staffing model for

Mt. Lebanon); Exhibit 4 (thanks from Ms. Zapor regarding my work on the staffing model).

8.      This coordination included, for instance, Administrators requesting that

employees at one facility come to another facility to pick up shifts. One example is reflected in

2

Exhibit 5 to my Declaration, which is an excerpt from a text-message conversation with my supervisor—Administrator, Susan Gilbert. In that message, Ms. Gilbert relayed a request from Ms. Zapor to fill registered nurse openings at South Hills with staff from Mt. Lebanon. *See* Exhibit 5.

9.    Senior personnel at CHMS also centralized control over non-routine disciplinary actions against employees, the approach to union contracts, and supply purchases. *See* Exhibit 6 (excerpt from my discussion with Ms. Gilbert regarding disciplinary action against an employee, which had to be elevated to the Regional Registered Nurse Assessment Coordinator and Regional Licensed Practical Nurse Assessment Coordinator).

10.    Sam Halper maintained close control over CHMS. This control encompassed facility-specific and employee-specific decisions, particularly those that affected company finances. In my experience, Sam Halper required that his express permission be given before any change to an employee's pay rate or status could go to Payroll.

11.    An example is an excerpt from a text-message conversation with Ms. Gilbert, attached as Exhibit 7. She and I were discussing the pay rate for a proposed new hire. I stated that I was "not sure what Sam would approve" for the pay rate and that, "[w]ith the way Sam reacts [to registered nurses,] I would want to get her pay rate approved before she leaves her other job." Exhibit 7.

12.    Sam Halper exercised his authority by requiring company personnel to e-mail him, including the Regional Director of Operations, to obtain permission to take an action. I would not be permitted to move forward unless I received approval.

13.    As the Human Resources Director, I was tasked with submitting payroll data for processing, fielding employee complaints, and attempting to resolve other human resource

3

issues. I worked 60–70 hours per week, which included the time I was required to work from home. I was required to be on call 7 days a week, 24 hours a day. Corporate—*i.e.*, CHMS, CHMS Group, and Western Pennsylvania Consultants, collectively—required me to punch in and out using a biometric time clock.

14.     I do not recall problems with payroll before Sam Halper purchased Mt. Lebanon in February 2017. After Sam Halper and CHMS took over, payroll errors and irregularities became common. This included, for instance, work hours missing from payroll records, employees not being compensated at the correct rate (*e.g.*, missing shift differentials and/or bonuses), employees being paid their regular rate for overtime hours worked, and the pay rate used to calculate overtime not including shift differentials.

15.     If an employee worked shifts at multiple CHMS locations, he or she would be paid on separate payrolls for each facility rather than having their work hours aggregated on a single payroll sheet. In order to support this practice, company personnel modified the employee's new-hire paperwork or prepared new paperwork for the facility the employee was going to work in. This practice began after Sam Halper and CHMS purchased Mt. Lebanon.

16.     The company was inconsistent in correcting these errors. In my experience, it was difficult, if not impossible, to get payroll errors corrected. When I contacted Payroll about these frequent, recurring errors, I was verbally reprimanded.

17.     Multiple CHMS senior personnel told me that I would be fired if I spoke with the Wage and Hour Division after CHMS employees learned of potential bases to contact the Wage and Hour Division to complain about the base pay rates, omitted shift differentials, bonus issues, and misclassification of employees as exempt from overtime.

4

18.     CHMS routinely deducted 30 minutes of break time from each shift, which the company identified as a lunch break. I saw many instances of employees being unable to take a 30 minute break because they were too busy. This occurred at Mt. Lebanon and other facilities I supported, including South Hills and The Grove at Washington.

19.     On days when staff hours were low and the facility was not going to meet the required state minimum 2.7 per-patient-day ratio, facility personnel would tell employees not to punch out for their 30 minute break, regardless of whether they took it.

20.     Many employees complained that break deductions were applied to shifts where they did not have time to take a break. CHMS's response was inconsistent—sometimes it would credit the time back, but mostly it would ignore the request to credit time back for interrupted lunch breaks.

21.     CHMS routinely classified employees as exempt from overtime, even though the company required and expected them to function like hourly workers. This occurred for positions such as facility Administrators, Human Resource Directors, Activity Directors, Admissions Directors, Dietary Managers, Registered Dieticians, Social Services Directors, Directors of Nursing, Medical Records Directors, Environmental Services/Housekeeping Directors, Maintenance Directors, Business Office Managers, Registered Nurse Assessment Coordinators, Licensed Practical Nurse Assessment Coordinators, Therapy Department personnel, some Nursing Supervisors, and receptionists. Salaried employees were required to punch in and out using a time clock.

22.     If a salaried employee did not work a full forty-hour week, CHMS frequently deducted hours from their vacation time to make up the difference. Employees complained about

5

the practice. The company was inconsistent in whether it would credit the vacation time back after a complaint.

23.    CHMS required salaried employees to work a certain number of weekends a month as Manager on Duty. Instead of receiving extra compensation for this additional work, employees were supposed to be given another paid day off during the week. This regularly did not happen, however. The time-tracking system did not recognize weekend hours because they fell outside of the employee's normal Monday through Friday schedule.

24.    CHMS frequently reduced that salaried employee's pay if they worked less than forty hours between Monday and Friday. For example, if the salaried employee tried to offset the weekend hours they worked with their regular hours, CHMS would regularly deduct the salaried employee's pay or use their PTO.

Executed this 5th day of October, 2020 in the City/County of Philadelphia, PA under the penalty of perjury.

*/s/ Alejandro Herrera on behalf of Martha Stillwagon via E-Mail Approval*

| | |
|---|---|
| **From:** | VINCE STILLWAGON |
| **To:** | Herrera, Alejandro A - SOL |
| **Cc:** | Lewis, Ryma N - SOL; Seifeldein, Mohamed E - SOL |
| **Subject:** | Re: CHMS - Legal Declaration |
| **Date:** | Monday, October 5, 2020 6:28:43 PM |

Hello Alex,

I have reviewed the final proposed version of my declaration, as well as the supporting exhibits, attached to this email.

I give you my personal permission for you and or your office to sign this declaration on my behalf. This email gives you my approval and permission to sign the declaration.

Many thanks,

Martha Stillwagon

> On 10/05/2020 5:13 PM Herrera, Alejandro A - SOL <herrera.alejandro.a@dol.gov> wrote:
>
>
> Ms. Stillwagon,
>
>
> A proposed final version of your Declaration, as well as the supporting exhibits, is attached to this email. Please review it and confirm whether you have any edits.
>
>
> I understand that your preference is for our office to sign this Declaration on your behalf. When you are prepared to finalize it, please let me know via email approval if we have your permission to sign the Declaration on your behalf.
>
>
> Best regards,
>
> Alex
>
>
> **Alejandro (Alex) A. Herrera**

Trial Attorney

U.S. Department of Labor

Office of the Regional Solicitor

170 S. Independence Mall West, Suite 630 E

Philadelphia, PA 19106

215-861-5136

herrera.alejandro.a@dol.gov


PLEASE NOTE, as of October 10, 2020, the Philadelphia Regional Solictor's office is moving.  Please continue to send all filings and other correspondence by e-mail, not mail.  The new address will be:


U.S. Department of Labor

Office of the Regional Solicitor

1835 Market Street

Mailstop SOL/22

Philadelphia, PA 19103-2968


CONFIDENTIAL:  This message may contain information that is privileged and exempt from disclosure under applicable law. Do not disclose without consulting the Office of the Solicitor. If you think you have received this e-mail in error, please notify me immediately by e-mail or by phone.

# Exhibit 1

Margaret

Jun 21, 2562 BE, 9:17 PM

Hi there Miss Margaret,

Emailed my schedule for next week a few minutes ago. Of course it is subject to change based upon the needs of the facility administrators and your direction.

Main focus has been recruitment, employee payroll, new hires/benefit enrollment and setting up South Hills CNA class. Renee gave me the list of needs for the 11 P to seven a shift in South Hills. Have been working on it but no additional takers just yet-getting the word out!

Moving forward the I-9 forms, Worker's Compensation employee incident reports, OSHA logs and previous new hire file audits need serious attention.
Getting the hot potatoes off

# Exhibit 2

**New iMessage** Can

To: Margaret, |

Hi Miss Marti - Thank you so much for all of your assistance. We can not tell you how much your support has meant to the facilities. I will review the schedule and we can touch base on Wednesday. Doug is so thankful for your support and any support you can "muster" for 11-7 us greatly appreciated! 😎 Also, thabks for the follow up at WA as well. I hope you have a relaxing weekend.... you deserve it. Talk soon. Thanks again, Margaret



iMessage

# Exhibit 3

No Service 📶      1:31 PM      46% 🔋

**New iMessage**      Cancel

To: Margaret

Jun 17, 2562 BE, 11:58 AM

R U on your way to WA?

Jun 17, 2562 BE, 12:59 PM

No, finishing the Mount Lebanon staffing model. Sorry I just saw your message. I emailed Caroline and explained the situation. I promise to make tomorrow very productive for her. Almost done with the staffing model so that Susan can get to you by the end of the day. Begging forgiveness and understanding— thank you.

# Exhibit 4

To: Margaret

Marti -We appreciate all you do! The staffing model is critical thanks for the attention. thank you so much for supporting Carolyn we look forward to having your expertise tomorrow at WA. Have a good one 😎

Thank you Margaret! I was so worried that I couldn't get the staffing model done faster. I am going to Washinton straight from home in the morning that way I won't have any detours! Thank you so much again for your understanding.

No worries!! We are a team .... it has been quite the Monday ....whew... hang in there 👍

# Exhibit 5



Susan Gilbert >

Thanks

Just sent one more. It may be a repeat but I wanted to be certain I sent all three that I received. Please check your email. Please let me know if I can help in anyway. Thank you.

Tue, Aug 6, 11:15 AM

From Margaret:
South Hills  is in need of a daylight RN supervisor and you have a lot of RNs. Do you think there's anyone that might be interested in going there without it adversely affecting you.  Also of your current RNs can we backfill 11 to 7 position with a nine Rn you currently have?

I will check and get back to you promptly

# Exhibit 6

S

Susan Gilbert >

Jun 20, 2562 BE, 8:28 AM

Hi there, I hope you don't mind that I go straight to South Hills so I can get out of there early and come back to the building. I'll be at our building all day tomorrow too. Checked with Yochi about the Mary Ann and Danielle situation Mary Ann was a no call no show today. That is for the 7 to 3 shift. She had asked both myself and Melinda to be taken off for 3 to 7 today because she had a doctors appointment. Now she's saying that was never the case. However we are very prudent about getting request her time off in writing so she's lying. Yochi saidIt would be fine if we addressed the disciplines later. Hope to be out of South Hills by noon or 1230 and back at our building. Thank you Susan PS this all dogs getting tired LOL

I need Janis' approval form and do u

No Service

Susan Gilbert                    Cancel

To: Susan Gilbert

both myself and Melinda to be taken off for 3 to 7 today because she had a doctors appointment. Now she's saying that was never the case. However we are very prudent about getting request her time off in writing so she's lying. Yochi saidIt would be fine if we addressed the disciplines later. Hope to be out of South Hills by noon or 1230 and back at our building. Thank you Susan PS this all dogs getting tired LOL

I need Janis' approval form and do u have Daniel' statement. I am meeting with Michelle and Chris this morning

Yochi has all the statements on t

# Exhibit 7

Susan Gilbert >

What would be her pay rate.

Well I'm not certain with an RN, if she came on casual we could probably give her $28 an hour–part time with two years experience I'm not sure what Sam would approve.

we bring her on 7-3

Yes

With the way Sam reacts two RNs I would want to get her pay rate approved before she leaves her other job. I would just need a little bit of information to process it

# Exhibit N-3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

EUGENE SCALIA,                                    )
SECRETARY OF LABOR,                               )
UNITED STATES DEPARTMENT OF LABOR,                )
                                                  )
                    Plaintiff,                    )
                                                  )   Civil Action No.2:18-cv-01608-WSS
          v.                                      )
                                                  )
COMPREHENSIVE HEALTHCARE                          )
MANAGEMENT SERVICES, LLC, et al.,                 )
                                                  )
                    Defendants.                   )
                                                  )

### DECLARATION OF CATHERINE MATLACK

I, Catherine Matlack, declare under penalty of perjury that the following facts are true and correct:

1. From March 2018 until January 2019, I worked as the Regional Director of Human Resources for fifteen Sam Halper-owned facilities. The principal company that Sam Halper operated through was Comprehensive Healthcare Management Services, LLC ("CHMS").

2. I did not have an assigned work location. CHMS required me to support the following locations: (1) CHMS, aka Brighton Rehabilitation and Wellness Center ("Brighton"), located at 246 Friendship Cir., Beaver, PA 15009; (2) Cheswick Rehabilitation and Wellness Center, LLC ("Cheswick"), located at 3876 Saxonburg Blvd., Cheswick, PA 15024; (3) Maybrook-C Briarcliff Opco, LLC, aka The Grove at Irwin, located at 249 Maus Dr., Irwin, PA 15642; (4) Maybrook-C Kade Opco, LLC, aka The Grove at Washington ("Washington"), located at 1198 West Wylie Ave., Washington, PA 15301;

1

(5) Maybrook-C Latrobe Opco, LLC, aka The Grove at Latrobe, located at 576 Fred Rogers Dr., Latrobe, PA 15650; (6) Maybrook-C Overlook Opco, LLC, aka The Grove at New Wilmington ("New Wilmington"), located at 520 New Castle St., New Wilmington, PA 16142; (7) Maybrook-C Silver Oaks Opco, LLC, aka The Grove at New Castle ("New Castle"), located at 715 Harbor St., New Castle, PA 16101; (8) Maybrook-C Whitecliff Opco, LLC, aka The Grove at Greenville, located at 110 Fredonia Rd., Greenville, PA 16125; (9) Monroeville Operations, aka Monroeville Rehabilitation & Wellness Center ("Monroeville"), located at 4142 Monroeville Blvd., Monroeville, PA 15146; (10) Mt. Lebanon Operations, aka Mt. Lebanon Rehabilitation and Wellness Center ("Mt. Lebanon"), located at 350 Old Gilkeson Rd., Pittsburgh, PA 15228; (11) Murrysville Operations, aka Murrysville Rehabilitation and Wellness Center, located at 3300 Logan Ferry Rd., Murrysville, PA 15668; (12) North Strabane Rehabilitation and Wellness Center, LLC ("North Strabane Rehabilitation"), located at 100 Tandem Village Rd., Canonsburg, PA 15317; (13) North Strabane Retirement Village ("North Strabane Retirement"), located at 200 Tandem Village Rd., Canonsburg, PA 15317; (14) South Hills Operations, aka South Hills Rehabilitation and Wellness Center ("South Hills"), located at 201 Village Dr., Canonsburg, PA 15317, and; (15) Maybrook-C Evergreen Opco, LLC, aka The Grove at Harmony, located at 191 Evergreen Mill Rd., Harmony, PA 16037.

3. Sam Halper, the CEO of CHMS, directly controlled the day-to-day decisions within the company, including in Human Resources and Payroll. For example, Sam Halper decided the circumstances under which salaried employees would be required to use PTO. *See* Exhibit 1 at 1 ("A salaried employee cannot work additional hours before and/or after the

day they take off in order not to use PTO on a full day off unless it has been **pre**-approved by Sam.") (emphasis in original).

4. I had very little insight as to what CHMS actually expected or required me to do as the Regional Director. Because of Mr. Halper's control, I did not have the opportunity to perform many functions. Unlike other senior personnel, Mr. Halper used a personal email account instead of a company-issued email account to conduct company business. *Id.*

5. My role and authority were so circumscribed that I often provided only limited support to Human Resources staff within particular facilities. This included, for example, helping to respond to repeated employee complaints about payroll. I did not have independent authority or discretion in my role. I did not have the authority to hire or fire personnel. If there was an opening for a Human Resources position, Mr. Halper alone determined whether to hire, as well as the pay rate and title for the position.

6. I have 25 years of experience in human resources, most of which is in the healthcare industry. I found that the majority of Human Resource Directors at CHMS facilities were not formally trained in human resources; they instead operated more like clerical workers. These employees were promoted from within a facility, usually out of non-human resource positions. Out of the fifteen facilities I worked with, I believe three or four Human Resources personnel had training in that area.

7. Some Human Resource Directors simultaneously worked at more than one CHMS facility. I recall that the following facilities had overlapping Directors: New Castle and New Wilmington, South Hills and Washington, and North Strabane Retirement and North Strabane Rehabilitation.

8. I interacted with Mr. Halper during my time with the Company, mostly through e-mail.

3

In my experience, Mr. Halper responded to communication from subordinates (like me) by ignoring it or with anger. These related to areas such as recruiting, payroll, or my concerns about potential unlawful labor practices.

9.  Mr. Halper often rebuffed or ignored me when I persisted in trying to resolve a problem, such as payroll errors or improper employee classifications. When I followed up with my superiors, they told me that there was nothing they could do and that it was "Sam's company."

10. My primary duties were to advise and support CHMS facilities and their Human Resources staff; this included interpretation and implementation of company policies, fielding and responding to employee complaints, and interpretation of union contracts.

11. I spent the most time on-site at Brighton, North Strabane Rehabilitation, South Hills, and Cheswick. I found that those facilities often had the most employee complaints and other problems.

12. During my tenure, I saw that CHMS and Mr. Halper routinely failed to credit employee hours worked. This was reflected by the substantial number of employee payroll complaints, which I tried as much as I could to resolve—often unsuccessfully. In my experience, this occurred at every CHMS facility that I supported.

13. Payroll issues arose for both hourly and salaried employees. The most common issue with hourly workers was that payroll hours were less than the number of hours the employees worked. One example was Brighton's treatment of Admissions Clerks. CHMS required these employees to be on call during the evenings and weekends to take admissions, and it issued them phones and computers to complete this work. I learned that CHMS was not paying for these hours worked and brought it to the attention of

senior company personnel. *See* Exhibit 2.

14. For salaried workers, I saw that CHMS required salaried workers to use PTO if they did not work 80 hours in a 2-week pay period. *See* Exhibit 3. The company required some salaried workers, such as a Director of Nursing and a Dietary Manager, to work extra hours—sometimes as much as sixteen hours in a day—but then reduced their vacation time if those additional hours caused them to be absent during their normally scheduled working hours. *See* Exhibit 4.

15. If a salaried employee did not have PTO, CHMS would nonetheless charge them to create "negative PTO," against which it would "recapture" the time as it accrued. *See* Exhibit 5. This practice was contrary to the exemption notice that salaried employees received and signed when they were hired. *See* Exhibit 6.

16. Salaried employees were required to punch in and out using a time clock. The company did not compensate salaried employees for hours worked over 80 in a pay period.

17. Understaffing was endemic at CHMS facilities. I found that, because of the company's poor reputation with employees, especially in regard to payroll, it was difficult to recruit staff. *See* Exhibit 7. The worst facilities for understaffing were Monroeville, Mt. Lebanon, and South Hills.

18. In order to make up for understaffing, CHMS offered shift bonuses to employees. These were usually between $50 and $100. Company payroll processed this extra compensation as a bonus, not as part of the employee's base pay.

19. I also saw that CHMS and Mr. Halper were aggressive in categorizing employees as exempt from overtime pay requirements. I am familiar with employee exemptions because, prior to joining CHMS, I had a significant amount of training and experience in

5

Fair Labor Standards Act compliance. This includes my Master's Degree in Human

Resources and Labor Relations from St. Francis University, certification as a Senior

Professional in Human Resources ("SPHR") from the HR Certification Institute,

certification as a Senior Certified Professional from the Society for Human Resources

Management ("SHRM-SCP"), and 25 years' experience as a human resource professional

in the health care industry. My work experience included navigating prior U.S.

Department of Labor audits conducted to determine compliance with the Fair Labor

Standards Act.

20. There were numerous positions at CHMS facilities that I believe were improperly

classified as exempt. This included, for example, business office managers, maintenance

staff, social workers, admissions clerks, receptionists, assistant nursing directors, medical

records directors, and others. There was no protocol for determining whether to classify

an employee as exempt; Mr. Halper decided unilaterally.

21. My colleagues and I repeatedly raised objections about exemption classifications to

company personnel. *See* Exhibits 8–9. This included an email to Mr. Halper, who did not

respond.

22. I was concerned with Mr. Halper's tactics of underpaying employees. I discussed these

concerns with my colleagues in Human Resources and others. An example of an

employee I spoke to about this subject is Doug Hoffman, the Administrator of South

Hills. *See* Exhibit 4.

23. As part of our discussions, Mr. Hoffman showed me evidence of the tactics that

Mr. Halper and company management were using to dock salaried staff's PTO and

classify employees as exempt from overtime. The evidence included payroll printouts and

6

time clock records. This evidence was consistent with the impression I formed based on my tenure, which is that underpayment of wages, including overtime, and misclassification of employees was endemic at CHMS.

Executed this _6th_ day of _October_, 2020 in the City/County of _Wexford / Allegheny_ under the penalty of perjury.

_Catherine Matlack_

Catherine Matlack

# Exhibit 1

**From:** Yedidya Greenbaum
**Sent:** Thursday, March 29, 2018 3:42 PM
**To:** Shana Dubin <SDdubin@chmsgroup.com>; David Lopus <DLopus@chmsgroup.com>
**Subject:** FW: Payroll Memo

See below. This was sent out to the payroll department.

**From:** David Bernstein
**Sent:** Thursday, March 22, 2018 11:59 AM
**To:** Mendy Katz <MKatz@chmsgroup.com>; Tuli Reinhold <TReinhold@chmsgroup.com>; Ilona Nadjari <INadjari@chmsgroup.com>; Mordechai Singer <msinger@chmsgroup.com>; Susie Levy <SLevy@chmsgroup.com>; Yedidya Greenbaum <YGreenbaum@chmsgroup.com>; Shua Rapps <SRapps@chmsgroup.com>
**Cc:** Michael Neufeld <MNeufeld@chmsgroup.com>; Sam Halper (Gmail) <samhalper@gmail.com>; Yoni Nagler <YNagler@chmsgroup.com>; Israel Zeiger <IZeiger@chmsgroup.com>
**Subject:** RE: Payroll Memo

All,

Please make not of the following guidelines which are effective immediately.

**Salaried Employees** – in order to be compliant with FLSA rules salaried employees need to receive the same base gross pay every pay period regardless of actual hours worked. However, an employee/employer may use PTO (or any other variation of benefit time) to make the person whole. Therefore;

- If an employee works at least 5 hours day you should ensure that the employee receives 7.5/8 reg.
- If the employee works less than 5 hours in a day or doesn't work at all on a day you **must** use PTO to make the employee reach 75/80 hours for the period. You can allow these employees to go into the negative in order to make them whole, however if it's a significant amount please let me know.
- If a salaried employee is asked to work a double shift and/or is promised a "pick-up" bonus in lieu of hourly rate you most first determine if this person has already completed their allotted weekly hours 37.5/40. i.e. If the employee has already worked five days then continue to process the bonus "in lieu of" however, if the employee has only worked four days that week then just pay them 7.5/8 reg for that fifth day.
- A salaried employee cannot work additional hours before and/or after the day they take off in order not to use PTO on a full day off unless it has been **pre**-approved by Sam.

Generally speaking  people in the following departments are considered salaried; Administrators, Admissions Director, ADON, Business Office, Dietary Supervisor, Director of Activities, Housekeeping, Maintenance, DON, MDS, Office (depends on the position), Rehab Coordinator, RN Supervisor (ADN) Social Service Directors (and Social workers if they require a Masters degree to obtain the job), and Wound Care Nurse.

**Pick Up Bonus (PU) –** we've noticed that although employees may get paid what's owed to them for additional hours worked using the "PU" bonus, we're presently not capturing those hours in SBV for PPD and PBJ purposes. To remedy that we've created a new pay type in SBV named "PBJ (Paid as PU)" which

correlates to code 21 in Charts "PBJ/PU." Going forward when entering a PU bonus you will also need to determine the actual amount of additional hours the employee worked and add that as, for example, "8 PBJ" in the "Other Hours" screen in SBV. These informational hours will also get transferred to Charts when you do your regular export (You will need to remember to check off this new pay type on your saved SBV pivot grid and Charts export reports the first time you run them after you read this email.) Once brought into Charts an employees check might look something like the this;

```
REG     42.50   22.5300   957.53
PU       1.00  100.0000   100.00
PBJ/PU   8.00
```

Note how there is no rate or monetary effect on the PBJ/PU line as this being covered by the PU line. **IMPORTANT –** do not add hours to code 21 in Charts manually as it will pay the employee based on their base rate. For the time being this setup only works when importing the hours from SBV.

**Matching systems –** it is imperative, and I can't stress this point enough, that hours in SBV and Charts always match. If you ever make any adjustment please ensure that you remember to record it in SBV and if entered in SBV to actually have it paid out of Charts. Leave comments and save as much backup as possible.

In other news, there will be some changes in whom you deal with at the facility level.
Jason – will be the Admin at Washington and Sherri will be covering at Brighton until another person joins the Brighton team.
Shana – will go back to recruiting Relos and other regional work.
David Lopus will be replacing Shana in Cheswick & taking on Terri Such's payroll responsibilities until a permanent replacement is found.
Cathy Matlak will be the new regional HRD.

**David Bernstein**
**CHMS Group LLC**

1800 Rockaway Ave, Suite 200
Hewlett, NY 11557
**Phone:** 516.561.1800, ext. 123
**Email:** DBernstein@chmsgroup.com

CONFIDENTIALITY NOTICE: The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information and may be legally protected from disclosure. If you are not the intended recipient of this message or their agent, or if this message has been addressed to you in error, please immediately alert the sender by reply email and then delete this message and any attachments. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is strictly prohibited.

# Exhibit 2

**From:** Catherine Matlack
**Sent:** Thursday, June 21, 2018 3:11 PM
**To:** Abraham Pechman <APechman@chmsgroup.com>; Benjamin Halper <BHalper@chmsgroup.com>
**Subject:** Brighton - Hourly Admissions Staff

Hello Avi and Ben—
I am at Brighton today and was looking over some things with the new HR Director.  We have some new Admissions Clerks starting and I am told they are on call in the evenings and weekends.  They take calls on an assigned cell phone and do computer work on a company laptop to support the admissions process.  This is compensable time as they are performing these duties at the behest of the employer.  We should look at making sure we are handling this appropriately as they are hourly and I am told they are not currently receiving compensation for this on call time.
Thanks,

**Catherine H. Matlack, MA, SPHR, SHRM-SCP | Regional Director of Human Resources**
**Comprehensive Healthcare Management Services, LLC**
199 Evergreen Mill Road, Harmony PA 16037
Mobile: 724.480.2551 | Fax: 724.452.3272 | CMatlack@chmsgroup.com



This message and any attachments may contain confidential or privileged information and are only for the use of the intended recipient of this message. If you are not the intended recipient, please notify the sender by return email, and delete or destroy this and all copies of this message and all attachments. Any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be unlawful.

# Exhibit 3

**From:** Abraham Pechman
**Sent:** Monday, July 9, 2018 4:36 PM
**To:** Catherine Matlack <CMatlack@chmsgroup.com>
**Cc:** Margaret Ann Zapor <MZapor@chmsgroup.com>
**Subject:** RE: Renea Jordan

It's only when they miss a half a day or more that PTO is used to fill out the pay period. If an exempt employee works 5 hours, they get paid for the full 8 hours. Hourly employees do not get that.

**From:** Catherine Matlack
**Sent:** Monday, July 09, 2018 4:32 PM
**To:** Abraham Pechman <APechman@chmsgroup.com>
**Cc:** Margaret Ann Zapor <MZapor@chmsgroup.com>
**Subject:** RE: Renea Jordan

Thanks, but if we are taking PTO to make up hours, we are essentially treating exempt staff like hourly employees.  This could be a concern.

**From:** Abraham Pechman
**Sent:** Monday, July 9, 2018 4:31 PM
**To:** Catherine Matlack <CMatlack@chmsgroup.com>
**Cc:** Margaret Ann Zapor <MZapor@chmsgroup.com>
**Subject:** RE: Renea Jordan

I checked her hours history in time and attendance and found the following:

Vacation taken to date:

| Emplo... ▲ | Pay Period... ▲ | Vac |
|---|---|---|
| ⊟ 210170 -... | 03/17/2018 | 8.00 |
| | 03/31/2018 | 4.00 |
| | 04/14/2018 | 8.00 |
| | 04/28/2018 | 8.00 |
| | 05/12/2018 | 3.25 |
| | 05/26/2018 | (3.25) |
| | 07/07/2018 | 40.00 |
| 210170 - Jordan, Renea Total | | **68.00** |

The policy has been that exempt employees are paid their full salary. If the employee did not work the full 80 hours, vacation days would be used to make up the hours.

Looking at the pay periods in total:

| Pay Period... ▲ | Reg | Vac | Hol | Grand Total |
|---|---|---|---|---|
| 12/23/2017 | 80.00 | | | *80.00* |
| 01/06/2018 | 32.00 | | | *32.00* |
| 01/20/2018 | 80.00 | | | *80.00* |
| 02/03/2018 | 72.00 | | | *72.00* |
| 02/17/2018 | 80.00 | | | *80.00* |
| 03/03/2018 | 80.00 | | | *80.00* |
| 03/17/2018 | 71.50 | 8.00 | | *79.50* |
| 03/31/2018 | 76.00 | 4.00 | | *80.00* |
| 04/14/2018 | 64.00 | 8.00 | 8.00 | *80.00* |
| 04/28/2018 | 72.00 | 8.00 | | *80.00* |
| 05/12/2018 | 76.75 | 3.25 | | *80.00* |
| 05/26/2018 | 83.25 | (3.25) | | *80.00* |
| 06/09/2018 | 80.00 | | 0.00 | *80.00* |
| 06/23/2018 | 80.00 | | 8.00 | *88.00* |

28 hours of vacation were used to fill out her pay periods.

The Notice to Exempt Employees does contain the following caveat:

You will be required to use PTO for full or partial day absences for personal reasons, sickness or disability.

**From:** Catherine Matlack
**Sent:** Monday, July 09, 2018 11:15 AM
**To:** Abraham Pechman <APechman@chmsgroup.com>
**Cc:** Margaret Ann Zapor <MZapor@chmsgroup.com>
**Subject:** Renea Jordan

Hi Avi—
I am at South Hills today and Renea is showing me her pay stub with 6 hours or so of vacation.  I thought we were current on her with her pay and PTO time.  Could you let me know?  I am not sure where the HRD is today, but Renea has also told me that there are some new employees who need to be paid.  Confidentially, I have the HRD on an action plan and it is not going well.

**Catherine H. Matlack, MA, SPHR, SHRM-SCP | Regional Director of Human Resources**
**Comprehensive Healthcare Management Services, LLC**
199 Evergreen Mill Road, Harmony PA 16037
Mobile: 724.480.2551 | Fax: 724.452.3272 | CMatlack@chmsgroup.com



This message and any attachments may contain confidential or privileged information and are only for the use of the intended recipient of this message. If you are not the intended recipient, please notify the sender by return email, and delete or destroy this and all copies of this message and all attachments. Any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be unlawful.

# Exhibit 4

**From:** Catherine Matlack
**Sent:** Thursday, July 19, 2018 12:40 PM
**To:** Doug Hoffman <dhoffman@Southhillsrehab.com>
**Subject:** RE: Vicki Carlisle

I need to look into something before weighing in…….what he states about DOL opinion letters is true, but there is something still that goes back to "counting hours" and affecting exempt status.

**From:** Doug Hoffman
**Sent:** Thursday, July 19, 2018 12:37 PM
**To:** Abraham Pechman <APechman@chmsgroup.com>; Catherine Matlack <CMatlack@chmsgroup.com>
**Subject:** Re: Vicki Carlisle

Avi
Thanks for the response.  I am going to let Cathy take that from here as she is the expert.  What I am used to.   If, in advance, the employee plans for a 1/2 day off or to leave a few hours early, they put in for the time and it comes out of their bank. Being salary is to allow for flexibility with the hours.  There are days when they have to work late and days when they can leave early as long as their tasks are done. Most people do not abuse this privilege. If they have to work 12 hours one day, they deserve the flexibility of leaving early the next day.

What you said below--pull from the bank if they have it, but if they don't  they get paid anyway.  That logic rewards those who spend their time and punishes those that save it.

Perhaps there is a difference from what is "right" by law and what is "the right thing" to do for the employees.

Doug

**From:** Abraham Pechman
**Sent:** Thursday, July 19, 2018 11:59 AM
**To:** Doug Hoffman; Catherine Matlack
**Subject:** RE: Vicki Carlisle

This is my understanding:

Based on US DOL opinion letters I have seen, an exempt employee
who has a partial day absence must be paid for the day, but the
employer can charge the employee's PTO bank for the missing hours
(although if there are no hours in the PTO bank, the employee will be
paid in full in any case). In the case of full day absences, the
employer can deduct pay for those absences (or pay them using
available PTO).

As an exempt employee, each day is cut off at 8 hours and is viewed
separately from other days.

So in this week:

| Week Ending ▲ | Actual Date ▲ | Reg | | Vac | | Grand Total | |
|---|---|---|---|---|---|---|---|
| | | Hours | Actual Hours | Hours | Actual Hours | Hours | Actual Hours |
| ⊟ 07/07/2018 | 07/01/2018 | 2.00 | 2.12 | 6.00 | 0.00 | **8.00** | *2.12* |
| | 07/02/2018 | 8.00 | 11.78 | | | **8.00** | *11.78* |
| | 07/03/2018 | 8.00 | 8.58 | | | **8.00** | *8.58* |
| | 07/05/2018 | 8.00 | 8.30 | | | **8.00** | *8.30* |
| | 07/07/2018 | 8.00 | 10.08 | | | **8.00** | *10.08* |
| 07/07/2018 Total | | 34.00 | 40.87 | 6.00 | 0.00 | 40.00 | 40.87 |

The amounts over 8 hours for 7/2 through 7/7 are unpaid, due to her
exempt status. 7/1 is partial day absence, which must be paid as 8
hours, but we were permitted to charge her PTO for the missing
hours.

That's federal; I was assuming state law would follow suit.

That said, there's no law (federal or state) which prevents us from
giving her back the hours (which we've done already) for free. From
an institutional standpoint, we do not want to make it common
practice, so we would want an approval process in place.

**From:** Doug Hoffman
**Sent:** Wednesday, July 18, 2018 2:05 PM
**To:** Abraham Pechman <APechman@chmsgroup.com>; Catherine Matlack <CMatlack@chmsgroup.com>
**Subject:** Fw: Vicki Carlisle

Avi

This continues to come up.  I do fear it is going to be a wage an hour issue if it continues. BUT if I am wrong, set , me straight. PA law talks about a person showing up for the day and getting paid for the day. Therefore on the day when she worked 2 hours, that should be considered a "day" of work.  Vickie worked 5 different days that week.  Therefore we are not counting hours, but her days. IF she did not show up for a full day, worked only 32 hours  BUT MISSING A FULL 8 HOUR DAY, then we can use vacation time to fill in her hours.

I just do not understand--either I am incorrect, or our payroll system is incorrect.  If I am incorrect, then set me straight and all will be good.  If I am correct, then we are doing wage an hour violations and this will come back and be detrimental to the company.

Doug

**From:** Abraham Pechman
**Sent:** Wednesday, July 18, 2018 1:39 PM
**To:** Mary Pratt; Doug Hoffman; Ilona Nadjari
**Subject:** Re: Vicki Carlisle

Her pay rule limits to 8 hours per day to a maximum of 80 hours per pay period. That being the case, we wouldn't ordinarily allow for time to be shifted from one day to the next.

Was she preapproved to modify her schedule for that week?

**From:** Mary Pratt
**Sent:** Tuesday, July 17, 2018 4:02 PM
**To:** Doug Hoffman; Ilona Nadjari; Abraham Pechman
**Cc:** Mary Pratt
**Subject:** Vicki Carlisle

Why did we take her vacation time for a day?
She is the kitchen manager working all hours due to short
staffing.

She has worked over 40 hours per week totally over 80 hours for
the two week period. Please put back in her bank. thank you.

Mary J. Pratt, NRCCS, MBCSI
Human Resource Director
South Hills Rehabilitation and Wellness Center
and The Grove Washington
201 Village Drive, Canonsburg, PA 15317
Main: 724.746.1300 Ext. 107
Mobile: 724.998.5764|Fax: 724-746-0522l


Email: mailto:mpratt@southhillsrehab.com

**From:** scanner@southhillsrehab.com
<scanner@southhillsrehab.com>
**Sent:** Tuesday, July 17, 2018 3:06 PM
**To:** Mary Pratt
**Subject:** Message from KM_308

# Exhibit 5

**From:** Michael Neufeld
**Sent:** Thursday, October 11, 2018 7:19 PM
**To:** Abraham Pechman <APechman@chmsgroup.com>
**Cc:** Catherine Matlack <CMatlack@chmsgroup.com>
**Subject:** Re: salaried employees

Yes that is correct

On Oct 11, 2018 6:04 PM, Abraham Pechman <APechman@chmsgroup.com> wrote:
Cathy –

When a salaried employee does not work a full day, we are allowed to charge PTO to make up the shortage if the employee has a balance. If not, we must pay the employee in full regardless.

In those cases, are we allowed to charge them PTO so they'll go negative, and we'll recapture that as they accrue?

Best regards,

Avi

# Exhibit 6

**From:** Kayla Kozminski
**Sent:** Sunday, January 13, 2019 2:24 PM
**To:** Catherine Matlack <CMatlack@chmsgroup.com>
**Subject:** PTO for Salaried Employees

Hello,

I spoke with John today regarding salaried employees and payroll automatically adding PTO to their time. He said they can count up to 5 hours and that's why it's being adding to anyone who works under 5 hours.
I am concerned with this issue because For example, April Clark, is a new employee at New Castle and she is already going to be in the negatives when she becomes eligible to receive and use PTO and I do not want to upset her.
The exempt notice letter that April signed states "You will be required to use PTO for full or partial day absences for personal reasons, sickness or disability. **However, your salary will not be reduced for partial day absences if you do not have accrued paid time off.**"

April's hire date was 10/15 so she is not eligible to start accruing PTO until 1/15. I am not sure what to do. I didn't know if I should send directly to Avi since I already spoke with John about this and don't want to go around or over him but I am concerned still

Thank you

Kayla Kozminski
Human Resource Manager
The Grove at New Wilmington and
The Grove at New Castle
520 S New Castle St
New Wilmington, PA 16142
Main: 724-946-3511   Fax: 724-946-8244
kkozminski@thegrove.net

# Exhibit 7

**From:** Catherine Matlack
**Sent:** Wednesday, April 11, 2018 2:04 PM
**To:** Margaret Ann Zapor <MZapor@chmsgroup.com>; John Reichard <JReichard@chmsgroup.com>
**Subject:** Barriers

To follow up on your question about recruitment, the payroll glitches and now recent benefit (Guardian) problem is not helping with retaining staff. While the HRDs can get corrected checks, it is a problem that checks continue to be incorrect on the first pass. I feel like payroll is an adversarial process and making the corrections and smoothing over employee relations issues takes away time the HRDs could be focusing on recruitment.

Over the weekend, an employee at South Hills started a post on Facebook about payroll being incorrect. This is protected speech, but it is in a negative light and doesn't help with people feeling good about where they work. Word is both past and present employees were on FB and commenting.

We are also losing the RN, Janet Thomas, at Mt. Lebanon since she was made exempt for some reason, while her co-workers (other similarly situated employees, as I understand it) are non-exempt. This was brought up while we were there, but I wasn't sure if there was any movement on changing this.

I think the scuttlebutt about payroll is hurting overall.

# Exhibit 8

**From:** Catherine Matlack
**Sent:** Wednesday, May 9, 2018 1:09 PM
**To:** David Bernstein <DBernstein@chmsgroup.com>
**Subject:** Receptionists

Hello David,

I am being told about half of our facility receptionists are classified as exempt.  A receptionist would not satisfy an exemption requirement and I'm not sure why they would be classified this way.  Could you shed some light on this?

Thanks,
CM

# Exhibit 9

**From:** Catherine Matlack
**Sent:** Wednesday, June 6, 2018 2:11 PM
**To:** Abraham Pechman <APechman@chmsgroup.com>
**Subject:** Classifications

Hello,

As I mentioned yesterday, we will probably email/converse often.  We have a number of positions that are mis-classified.  For example, about half of the facility receptionists are exempt and they should not be.  There are some others that are also problematic, such as maintenance workers listed as exempt.  I brought this up to David Bernstein about a month ago and I think he was working on this, but I just heard about another facility employee who was just made exempt.  This one is also one that will likely not satisfy an exemption status.  I wanted you to be aware as this is a serious concern of mine.

**Catherine H. Matlack, MA, SPHR, SHRM-SCP | Regional Director of Human Resources**
**Comprehensive Healthcare Management Services, LLC**
199 Evergreen Mill Road, Harmony PA 16037
Mobile: 724.480.2551 | Fax: 724.452.3272 | CMatlack@chmsgroup.com



This message and any attachments may contain confidential or privileged information and are only for the use of the intended recipient of this message. If you are not the intended recipient, please notify the sender by return email, and delete or destroy this and all copies of this message and all attachments. Any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be unlawful.