**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| R. ALEXANDER ACOSTA, Secretary of Labor, United States Department of Labor, | ) ) | |
| | ) | Civil Action No. 2:18-cv-01608-WSS |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| COMPREHENSIVE HEALTHCARE MANAGEMENT SERVICES, LLC; *et al.,* | ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANTS' BRIEF IN OPPOSITION TO
PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT**

## I.     INTRODUCTION

While the Department of Labor's ("DOL") motion and accompanying brief portray Defendants as perpetuating a widespread, purposeful scheme to defraud its employees of their hard-earned pay, that is simply not the truth. Defendants have taken great care to ensure that their legal obligations to their most valuable commodity—their employees—are met. This includes Defendants' duties and responsibilities under the Fair Labor Standards Act ("FLSA") to pay employees appropriately. While the DOL has suggested from the onset that Defendants have recklessly disregarded their obligations, discovery has shown this suggestion to be unfounded.

The record evidence shows that Defendants acted in good faith, and that if any violations occurred, they were not willful or reckless. Defendants' meal break and overtime policies— policies that employees bargained for, acknowledged, and followed—are unquestionably lawful. Indeed, the record conclusively shows that Defendants took numerous and significant affirmative steps to ensure their compliance with the FLSA, including retaining a third-party payroll provider to check-and-balance their practices. The record also shows that each of the Defendant Facilities had numerous channels for employees to bring forward any pay-related complaints. Finally, in

every instance of which Defendants are aware, when an employee followed these reporting channels, any pay discrepancy or inadvertent mistake was immediately rectified.  Defendants did not act egregiously or recklessly.  Defendants did not live in blissful ignorance.

The DOL's reliance on bareboned allegations supported by contradictory evidence and gross mischaracterizations to prove its farfetched claims falls short of the mark.  Its own facts and citations prove just how much there is in dispute and that there are genuine issues of material fact that preclude this Court from entering judgment in the DOL's favor. Because of these genuine issues of material fact, the DOL's motion for summary judgment must be denied.

## II.    ARGUMENT

### A.  Defendants are not a covered, single enterprise, and are not jointly or severally liable.

With minimal analysis, the DOL concludes that Defendants are a single enterprise under the FLSA, and "therefore, are jointly and severally liable for all FLSA violations." *See* Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment ("Plaintiff's Memo."), p. 15 [Dkt. 181.]  The DOL then argues Defendants are also joint employers of every employee identified in the Second Revised Schedule A. *Id.* The DOL's argument fails because: (1) it has not established Defendants are a single enterprise and enterprise coverage determines coverage, not liability; and, (2) there are material issues of fact regarding whether each Defendant is a joint employer of all employees in Schedule A.

#### a.  The DOL has not established that Defendants are one "enterprise" and enterprise coverage does not inform liability.

While each Defendant entity[1] admits it is covered under the FLSA, the DOL inaccurately claims Defendants "admit" they are a single enterprise. The evidence upon which the DOL relies

---

[1] Not to include Defendant Sam Halper.

does not support this conclusion. For example, the exhibits cited in the DOL's SOF 10 consist of discovery responses from each Defendant entity confirming its individual annual gross revenue in 2017 and 2018. It is unclear how a facility's *individual* gross annual revenue shows that Defendants acted as a single enterprise.

The DOL further claims Defendants' business activities are related and "performed through unified operation or common control for a common business purpose," but offers no support for this conclusion beyond an assertion that each Defendant allegedly owns or operates a facility serving a similar purpose or population. *See* Plaintiff's Memo, p. 15. There is nothing remarkable about the services offered by the Defendant Facilities[2] or their respective classifications of employees. Many aspects of the operations are dictated by federal or state regulations. For example, long-term care facilities are legally required to employ certain positions. *See e.g.,* 42 C.F.R Part 483, Subpart B. And, CHMS Group is not even in the health care field—it provides back office support for health care clients, including Defendant Facilities. *See* Concise Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment ("Def. SOF") at ¶ 1. These services include payroll, finance, accounts payable, and accounts receivable. Def. SOF at ¶ 3.

However, even if the DOL could establish that some or all Defendants are an "enterprise," that does not make them jointly and severally liable to each other's employees. In *Patel v. Wargo*, the Eleventh Circuit explained that "showing that two entities constitute an enterprise can be the first step in establishing <u>coverage</u> under the FLSA." 803 F.2d 632, 635 (11th Cir. 1986) (emphasis added). However, "[t]here is no case holding that the individual entities which make up an enterprise should be jointly and severally liable for another entity's employees solely because they

---

[2] As defined by Plaintiff in its Motion for Summary Judgment.

are members of the enterprise." *Id.* The court reasoned the analyses must be different because the FLSA "premises liability on an employer-employee relationship." *Id.*; *see also* 29 U.S.C. § 206(a). Additionally, the Eleventh Circuit observed that the criteria for establishing an enterprise are "much broader than the criteria necessary to establish liability." *Id.* at 636. Thus, it held that the "finding of an enterprise is relevant to only the issue of coverage," and liability must be based on an employment relationship. *Id.* at 637; *see* 29 C.F.R. § 779.203 ("As defined in the Act, the term *enterprise* is roughly descriptive of a business rather than an establishment or of an employer although on occasion the three may coincide.")

In sum, the DOL has not provided sufficient evidence that Defendants are an "enterprise" under the FLSA, and such finding would not warrant joint and several liability.

### b. There are material issues of fact regarding the alleged joint employment relationship between the Schedule A employees and Defendants.

It is undisputed that most of the employees listed in the DOL's Second Revised Schedule A worked for one of Defendant Facilities. However, the DOL argues that each (and every) Defendant should be liable to *each* of the nearly 5,000 allegedly aggrieved employees. Neither the law nor the record in this case support the DOL's position.

In the Third Circuit, courts consider the following factors when analyzing a potential joint employment relationship:

> 1) the alleged employer's authority to hire and fire the relevant employees; 2) the alleged employer's authority to promulgate work rules and assignments and to set the employees' conditions of employment: compensation, benefits, and work schedules, including the rate and method of pay; 3) the alleged employer's involvement in day-to-day employee supervision, including employee discipline; and 4) the alleged employer's actual control of employee records, such as payroll, insurance, or taxes.

*In re Enterprise Rent-A-Care Wage & Hour Employment Practices Litigation*, 683 F.3d 462, 469-470. (3d Cir. 2012). While the DOL discusses some of the *Enterprise* factors with respect to Halper

and CHMS Group, it entirely avoids any analysis of the *Enterprise* factors as they pertain to the other Defendants and the employees.

Instead, the DOL alleges that Halper and CHMS Group exercise control over the other Defendants and "each Facility Defendant is strongly interrelated to the others." *See* Plaintiff's Memo. p., 17. In other words, the DOL asks this Court to impose liability on each facility without regard to the *Enterprise* factors or the actual relationship between the applicable facility and individual (or lack thereof). However, as discussed below, the DOL's position lacks both factual and legal support.

> **(i)   There are material issues of fact regarding the alleged strong interrelationship between Defendants.**

First, Defendants deny they are "strongly interrelated" to each other. The DOL specifically claims Defendants share a "common pool of employees" and that employee schedules are "coordinated" by regional representatives. Notably, none of DOL's evidence involves CHMS Group. CHMS Group has no overlapping employees with the other Defendants and is not involved with scheduling Defendant Facilities' employees. *See* Defendant's Response to DOL SOF ¶¶ 16, 53-54 ("DRSOF ¶ ___").

Further, the DOL's evidence does not show "common pool" employees among Defendant Facilities. For example, the DOL's purported evidence that Defendants used "pool employees" includes a declaration from a Dietary Manager who resigned her position at Murrysville and accepted a position at the Grove at Irwin. (N-5, ¶ 1-2). The declaration <u>does not</u> allege the individual worked for both facilities simultaneously. The Dietary Manager states that she had the same job duties at both facilities and was supervised by the same Food Services Director who did not work onsite. (N-5, ¶ 9). This is less than compelling evidence—long-term care facilities are legally required to employ certain staff for purposes of dietary services and many job

responsibilities are dictated by law. *See* 42 C.F.R. § 483.60. Further, the regulations allow facilities to employ certain roles (e.g., a clinically qualified nutrition professional) on a part-time or consultant basis, which makes it common in the long-term care industry for specialized employees to work for multiple facilities.

Therapists are also specialized employees who sometimes worked at multiple facilities on an "as needed" or "PRN" basis. *See* DRSOF ¶ 29. And on occasion, employees assisted another facility due to an emergency. *See* DRSOF ¶ 25. These situations were sporadic and generally limited to facilities that were previously owned by a single organization (e.g., the Golden Living or Reliant Healthcare chains).  However, these limited circumstances of overlap do not lead to a conclusion that *all* Defendants shared employees. In fact, there is evidence that in some instances Defendant Facilities actually *competed* for the same staff. (Halper005571-005572).[3]

There is also an absence of evidence that regional representatives "coordinated" employee schedules. The DOL cites to three email chains and an employee declaration to support this broad assertion. But the DOL grossly mischaracterizes the content of the emails. One chain generally discusses an interest in using the same CNA instructor at three facilities, as a way to increase staffing levels (CNA training programs are used a hiring pipelines). Another chain discusses the possibility of asking a Brighton employee about her potential interest in a position at a different facility. (Halper005736). The final email chain discusses staffing models – not determining schedules. (Halper017311). None of these emails demonstrate that regional representatives actually determined employee schedules or that regional representatives routinely dictated where employees worked.

---

[3] "Halper" documents were attached to the DOL's Concise Statement of Material Facts, Ex. F-3.

The declaration is similarly unconvincing. The former HR Director of Mt. Lebanon claims it was "common practice" for  employees to pick up shifts at multiple facilities due to staffing deficiencies and clinical needs. (N-2, ¶ 6).  However, she provides only one example, which purportedly involved South Hills and Mt. Lebanon, hardly an example of a common practice.[4] (N-2, Ex. 5).

At best, the DOL has shown that some Defendant Facilities had overlap in specialized employees or positions offering administrative support (e.g., a regional consultant). However, there are unquestionably material issues of fact regarding whether *all* Defendants collectively operated in a unified fashion.

> **(ii)   The DOL has failed to establish an employment relationship between Defendants and the employees.**

In support of its argument that common control and "interrelated operations" establishes a joint employment relationship, the DOL cites to a Third Circuit Court of Appeals decision and two non-binding decisions, one from within this circuit and another by a different circuit court of appeals. The Third Circuit has *not* determined that common control and "interrelated" operations establishes a joint employment relationship. The Third Circuit decision cited by the DOL involved a motion to dismiss in a case where an employee had been employed by two separate entities. *Thompson v. Real Estate Mortg. Network*, 748 F.3d 142 (3d Cir. 2014). There, the court determined the employee plead sufficient allegations to support a joint employment relationship, because the complaint asserted that the *alleged* joint employer had some authority over the employee with respect to work rules and hiring and firing practices. *Id.* at 149.  Surely the motion to dismiss standard under Rule 12(b)(6) cannot guide this Court's analysis here.

---

[4] Given that only the nursing department is subject to regulations dictating staffing levels, it is telling that the declarations DOL has provided from nursing department employees make no mention of this alleged practice.

In *Jackson v. Art of Life, Inc.*, the court applied the "integrated enterprise test" to impose liability for FLSA overtime violations but admitted there was a lack of authority permitting its holding.  836 F.Supp.2d 226, 236 (E.D. Pa. 2011). This lack of precedent renders the *Jackson* decision nothing but an outlier. Rather, courts in this circuit consistently find that the proper focus of joint employer liability is the relationship between the plaintiff/aggrieved employee and the alleged joint employer. *See Davis v. Abington Mem'l Hosp.*, Nos. 09-5520, 09-5533, 09-5548, 09-5549, 09-5550, 09-5551, 2012 U.S. Dist. LEXIS 111160 (E.D. Pa. Aug. 7, 2012) (merely showing "common ownership" or that entities are part of a common enterprise is insufficient to establish an employment relationship); *Mackereth v. Kooma, Inc.*, Civ. Action No. 14-04824, 2015 U.S. Dist. LEXIS 63143 (E.D. Pa. May 14, 2015) ("Common ownership or membership in a common enterprise is insufficient to show that an entity is a joint employer."); *Richardson v. Bezar*, Civil Act No. 15-0772,  2015 U.S. Dist. LEXIS 135294, at *5-6 (E.D. Pa. Oct. 5, 2015)(granting defendant-employer's motion to dismiss holding that common ownership was not enough to satisfy that an entity is a joint employer).  As such, the Court should assess whether the DOL has established that each Defendant was an "employer" with respect to the employees.

> **(iii)  There are factual disputes regarding who controlled conditions for the employees.**

The DOL glosses over the history and ownership of each facility, simply asserting that Halper owns a business interest in and exerted control over policies at each facility. This is because the DOL's case unravels when the evidence regarding each facility is considered individually. In 2014, Comprehensive Healthcare Management Services, LLC acquired Brighton Rehab & Wellness. *See* Exhibit B to the DOL's Motion for Partial Summary Judgment. The LLC has 20 members, and Halper owns only a 12% interest. *Id.*

The remaining facilities were acquired over the course of approximately three and a half years, and each is owned by a different set of investors:

- August 15, 2016 – Opco Holdings, LLC acquired six facilities (The Grove at Greenville, The Grove at Harmony, The Grove at Latrobe, The Grove at New Castle, The Grove at New Wilmington, The Grove at North Huntingdon and The Grove at Washington). Prior to the acquisition, these facilities were owned and operated by Reliant Healthcare.

- February 1, 2017 – SHGL, LLC, GL1 LLC and LME Family Holdings acquired four facilities (Monroeville Rehabilitation and Wellness Center, Murrysville Rehabilitation and Wellness Center, Mt. Lebanon Rehabilitation and Wellness Center, and South Hills Rehabilitation and Wellness Center). Prior to the acquisition, these facilities were owned and operated by Golden Living.

- September 18, 2017 – SHCO LLC, EL Buckeye West, LLC, CL1 LLC, and three individual investors acquired Cheswick Rehabilitation and Wellness Center, North Strabane Rehabilitation and Wellness, and North Strabane Retirement Village. Prior to the acquisition, these facilities were owned and operated by Consulate.

Given that some facilities were under common ownership *prior* to the relevant acquisitions and long-term care facilities are heavily regulated, it is not surprising that that some facilities' policies overlap. In addition, most facilities have unionized employees and collective bargaining agreements (CBAs). The DOL further claims that CHMS Group and Halper "negotiated and developed" all CBAs and employee handbooks and determined final interpretations of their meanings. In reality, there were existing CBAs in place when each facility was acquired and were not subject to much change after the acquisitions. *See e.g.,* Exhibits C-1, 2. This is significant because the CBAs dictate the terms and conditions of employment for union employees—not Halper and certainly not CHMS Group.

The DOL cites to hundreds of emails to support its allegation that CHMS Group and Halper exerted control over the facilities. Yet, a substantial portion of the emails relate to a single facility (Brighton) with little to no impact on other facilities. The time frame of many Brighton-related

emails (i.e., 2014 – August 2016) also cut against the broad joint employer finding the DOL seeks. Every facility except Brighton was under different ownership during this period.

Further, many of the emails undermine the DOL's argument that Halper and/or CHMS Group made all decisions. Halper is CEO of the facilities, but he routinely relied on the applicable management team, and each Administrator specifically, to make decisions or provide a recommended course of action. For example, in a December 2015 email exchange, Halper indicated that while he would ultimately approve changes in pay, he was clear that he could not (and would not) provide approval until he vetted the changes with the Administrator and HR Director. (Halper001913-001915). There are also countless emails from Brighton's payroll director (and not Halper) to CHMS Group directing them to issue checks for missed punches (Halper001997-001999, 002061-002067). Other emails demonstrate that HR and payroll employees at each facility provided direction on interpretation of the CBA—not Halper as the DOL suggests. (Halper002040-002043)

The DOL also ignores the distinction between CHMS Group (a payroll and back office support company) and CHMS (the entity that operates Brighton). There was a time period where CHMS employed individuals to provide regional, operational support for multiple facilities. DRSOF ¶ 55. Both CHMS Group and CHMS provided employees with email addresses "@chmsgroup.com," which has apparently caused the DOL some confusion. *See* e.g., N-3, Ex. 2; CHMS Group Dep. (Aug. 12, 2020) 102:18-103:16. However, CHMS Group has never employed John Reichard, David Ferrero, Thomas Lowden, or Margaret Zapor. CHMS Group Dep. (Aug. 12, 2020) 99:21-100:3. The regional consulting services previously provided through CHMS are now offered by Western PA Consultants, which is not a party to this dispute. DRSOF ¶ 55.

By contrast, CHMS Group, LLC is a New York limited liability company that was registered in 2015. CHMS Group Dep. (Feb. 4, 2020) 276:8-13. CHMS Group has approximately

20 employees. CHMS Group Dep. (Feb. 4, 2020) 48:25-49:3. CHMS Group has four departments: Accounts Payable, Accounts Receivable, Finance, and Payroll. CHMS Group Dep. (Feb. 4, 2020) 49:17-22.

When a review of the DOL's evidence is focused on employees of CHMS Group instead of CHMS, it is evident that CHMS Group acted as one would expect from a payroll company—it took direction from management of the facilities. (Halper001905-001906, Halper077761-07762). CHMS Group does not make payroll policies or practices for the facilities. Rather, CHMS Group uses the facilities' individual handbooks and CBAs to create pay rules for purposes of processing payroll. DRSOF ¶ 53. As CHMS Group's corporate representative explained, "We didn't write the handbook. We didn't write the CBA. We had no involvement in creating them. We use them in the context of processing payrolls, but we don't have any involvement in writing them or setting them up." CHMS Group Dep. (Feb. 4, 2020) 286:2-4, 6-9. CHMS Group, thus, is not a joint employer of the Schedule A employees as a matter of law. *Blake v. Batmasian,* No. 15-cv-81222, 2016 U.S. Dist. LEXIS 82734, at *1 (S.D. Fla. June 13, 2016) (the fact that a third-party payroll provider pays the at-issue employees is inadequate to plausibly allege that it is the employer for purposes of joint-employer liability under the FLSA).

And Halper is no different. He too was not involved in creating any of the pay policies or practices at issue here, he does not have to approve hiring decisions, or pay decisions, he is not involved in the day-to-day operations of the facilities, and is not involved in routine performance management and employee performance. (DRSOF ¶¶ 61 – 65). Despite the DOL's arguments that control is clear and undisputed, that is far from accurate. Accordingly, this Court must deny the DOL's summary judgment on this issue as too many genuine issues of material fact exist for summary judgment to be at all appropriate.

### B. Sam Halper is not an employer.

The DOL claims that Sam Halper is an "employer" under the FLSA based on the sole fact that Halper is CEO and a partial owner of all the facilities. But the DOL knows well that Halper's relationship to the facilities, in and of itself, is insufficient to confer individual liability under the FLSA. *See Irizarry v. Catsimatidis*, 722 F.3d 99, 109 (2d Cir. 2013) ("Evidence that an individual is an owner or officer of a company, or otherwise makes corporate decisions that have nothing to do with an employee's function, is insufficient to demonstrate 'employer' status. Instead, to be an 'employer,' an individual defendant must possess control over a company's actual 'operations' in a manner that relates to a plaintiff's employment."); *see also Shim v. Millennium Group*, No. 08-4022, 2009 U.S. Dist. LEXIS 124107, at **25-27 (E.D.N.Y. Oct. 2, 2009) (holding that allegations that an individual is the President and CEO of the company are insufficient to establish liability under the FLSA). The DOL has failed to establish that Halper is liable under the circumstances as a matter of law. *See Crossley v. Elliot,* No. 07-0017, 2011 U.S. Dist. LEXIS 31785, at *7 (D.V.I. Mar. 25, 2011) ("individuals can be held liable for FLSA violations only when they have control over compensation or payroll functions and are personally involved in decisions which ultimately violate the FLSA").

This Court need only look to Halper's own testimony, which refutes that he had the discretion and responsibilities that he *must* have for there to be individual liability.  To illustrate, Halper was not involved in the creation of the handbook policies or the CBA provisions. (DRSOF ¶¶ 61 – 65).  Halper was not involved in the creation or implementation of any of the pay policies, including the shift-differentials and bonuses. *Id.* The Administrator at each facility, not Halper, had the discretion to make decisions regarding rates of pay, hiring, firing, and other personnel decisions. *Id.* Halper was not involved in offer letters nor did he approve offers of employment. *Id.* Most critically, Halper is not involved in the day-to-day operations of the facility, and is not

involved, nor consulted, when it comes to individual employee performance or discipline. *Id.* While the DOL has characterized the facts as black and white, it remains in dispute whether Halper possessed control over the actual operations, as required. *See Wirtz v. Pure Ice Co.,* 322 F.2d 259, 262-63 (8th Cir. 1963) (individual liability for FLSA violations is only appropriate where the particular individual was so involved with the day-to-day operations of the business that he or she, personally, was the plaintiff's employer).

It is because of these genuine issues of material fact that this Court must deny the DOL's summary judgment argument as to Halper's individual liability under the FLSA. *See Bowe v. Enviro Pro Basement Sys.,* No. 12-2099, 2015 U.S. Dist. LEXIS 170496, at *21 (denying the plaintiff's motion for summary judgment as to the owner's individual liability under the FLSA where questions of fact existed as to whether the owner was personally responsible for failing to pay the plaintiffs appropriate compensation).[5]

### C. There is no evidence that Defendants failed to comply with the FLSA's recordkeeping requirements.

The DOL urges the Court to find Defendants guilty of recordkeeping violations while reserving the issue of damages for trial. This would relieve the DOL of its obligation to prove that the employees at issue performed work without proper compensation and require it only to provide "enough evidence to support a reasonable inference of hours worked." *Martin v. Selker Bros, Inc.*, 949 F.2d 1286, 1297 (3d Cir. 1991).

---

[5] A close reading of the cases cited by the DOL demonstrate the opposite conclusion that the DOL urges this Court to reach. For example, in *Gusdonovich v. Bus. Info.,* corporate officers were only deemed to be "employers" under the FLSA because they managed the operations day-to-day affairs. Halper specifically testified that he is not involved in the day-to-day operations of the facilities. (DRSOF ¶¶ 61 – 65). And, in *Art of Life, Inc.,* the court only found a corporate officer to be an "employer" where the officer was personally responsible for the practice that violated the law. Again, Halper testified that he was not involved in creating or implementing any of the pay policies and practices at issues here. *Id.* While the DOL alleges that Halper had "significant operational control," those allegations are directly controverted by Halper's own testimony precluding this Court from granting the DOL's motion for summary judgment.

This is significant, given the breadth of the DOL's claims—the DOL asserts nearly 5,000 employees were improperly compensated. The claims involve more than a dozen individual facilities and employees in many roles ranging from nursing home administrators to cooks to nursing assistants. The DOL specifically claims Defendants violated the recordkeeping obligations by allegedly failing to accurately record the length of employee lunch breaks and premium pay for overtime hours.  However, the DOL has not established liability and there are issues of material fact regarding these issues.

Defendants do not dispute that the regulations require them to keep accurate records of *hours worked* each workday. 29 C.F.R. § 516.2(a)(7). The DOL argues that Defendants records "should show four punches for each employee." While Defendants' policies state that employees should punch out for meal breaks, the law does not impose such requirement. A bona fide meal break does not count toward "hours worked." It is only the compensable hours that must be recorded. According to the DOL's "Fact Sheet" addressing recordkeeping, "Employers may use any timekeeping method they choose. For example, they may use a time clock, have a timekeeper keep track of employee's work hours, or tell their employees to write their own times on the records." *See* https://www.dol.gov/agencies/whd/fact-sheets/21-flsa-recordkeeping.

The DOL claims that, despite its policies, Defendants knew employees worked through their lunch breaks, and that most employees' timesheets did not reflect punches for lunch breaks. The DOL's argument is undermined by the fact that many employees confirmed that they clocked in and out for lunches and that they always received a full meal break—the DOL cited this very testimony in its own brief.  The following are just a few examples from employee declarations the DOL submitted in support of its motion:

- Exhibit N-46: "I clock in/out at the beginning and end of my work day; clock in/out for my lunch breaks; and indicate that 'yes' I took a lunch break at the end of each

day when clocking out. I have only seen one of my timesheets and the punch times were accurate." (Mt. Lebanon, LPN)

- Exhibit N-48: "I usually take a 30 minute lunch break that is free from duty and recorded. I clock in/out at the beginning and end of my work day; clock in/out for my lunch breaks if I take a lunch." (Mt. Lebanon, CNA)

- Ex. N-56: "When clocking out, the time clock prompts employees with the question 'Did you take a lunch?' and we respond yes or no. I do not ever take a bona fide lunch break; however all of my employees working daylight take a full 30 minute, uninterrupted lunch break." (Mt. Lebanon, Director of Dietary Services)

- Exhibit N-59: "I normally take a 30 minute lunch break. I punch in and out for my lunch breaks as well at the beginning and end of my shift. I also indicate 'yes' that I took lunch when clocking out at the end of the day. I am confident that the punch times recorded on my time sheets are accurately recorded." (Monroeville, Occupational Therapist Assistant)

- Exhibit N-64: "I always take a 30 minute lunch break that is free from duty. I punch in and out on the timeclock that this company installed on February 1, 2019." (Murrysville, Nurse's Aide)

- Exhibit N-51: "I always take a 30 minute lunch break that is completely free from duty." (Kade, Housekeeper)

- Exhibit N-73: "I always take at least 50-60 minutes for my breaks, which includes a 30 minute unpaid lunch. When I'm on break, I am always completely free from duty." (Kade, Cook)

- Exhibit N-82: "I was required to clock out and back in before and after my lunch break, which I did." (Monroeville, CNA)

The DOL concedes that Defendants each required employees to report missed lunch breaks, but claims the policy was not enforced and that Defendants disregarded time adjustment requests by employees. However, Defendants collectively produced hundreds of pages of time adjustment request forms ("Payroll Error Reports") from employees during discovery—most of which were produced by the DOL with its Summary Judgment brief. Employee declarations

15

submitted by the DOL also demonstrate that many employees submitted time adjustment forms. (Exhibit N-4, ¶ 14; Exhibit N-24, ¶ 8; Exhibit N-16, ¶ 10).[6]

In addition, the DOL's argument sweeps too broadly. The DOL largely relies on declarations of 84 current or former employees of Defendants' facilities. Setting aside the fact that many of these declarations are at odds with the DOL's own position, the declarations do not show that *each* Defendant failed to keep required records. For example, the DOL obtained numerous declarations from employees at certain facilities (e.g., Mt. Lebanon, Murrysville). However, there are only one or two declarations related to other facilities and there are *no* employee statements regarding lunch break practices at Latrobe or Harmony. The DOL's creation of its own factual issues should be enough to preclude summary judgment on the issue.

The DOL also included numerous declarations from employees who are classified as exempt. The regulations impose different recordkeeping requirements depending on whether an employee is exempt from minimum wage and overtime or nonexempt. *See* 29 C.F.R. § 516.2, 516.3. Employers are *not* required to maintain many of the records at issue for exempt employees (i.e., hours worked per day, premium pay, starting and stopping times). *See* 29 C.F.R. § 516.3. Yet, the DOL attempts to show Defendants violated their recordkeeping obligations through declarations from exempt employees. *See, e.g.,* (N-6 (Nursing Supervisor); N-11 (Nurse Supervisor); N-14 (Social Services Coordinator); N-23 (Speech Pathologist). Simply put, the DOL puts the cart before the horse. The lack of records regarding lunch breaks is only problematic to the extent it resulted in the failure to record compensable time, which the DOL has not established.

The DOL next claims that Defendants violated the recordkeeping requirements by *miscalculating* the overtime rate (e.g., failing to include certain compensation in the regular rate

---

[6] Although some employees claimed their facility did not accept all time adjustment requests, the records at issue were nevertheless maintained.

for purposes of overtime), thereby rendering their records "inaccurate." To be clear, it is undisputed that Defendants provided payroll records and time records, which show hours worked and the amount Defendants attributed as overtime. The DOL's position would result in a recordkeeping violation any time an employer miscalculated the overtime rate but maintained sufficient records to determine whether the employer complied with the FLSA and what additional compensation may be owed. Because the DOL has failed to meet its burden to prove a violation and because issues of material fact exist, summary judgment should be denied on this claim.

### D. FLSA Overtime Violations

#### a. Salaried Employees were not paid under a "fluctuating pay scheme."

The DOL next claims that Defendants altered the compensation structure for their salaried employees if they worked less than 40 hours per week. This is just another example of where the DOL makes boilerplate allegations and over exaggerates the record evidence, to attempt to show that Defendants violated the law. But the evidence of record disputes this alleged pay scheme that the DOL contends existed. In fact, the evidence is *not* that salaried employees had their pay unlawfully deducted, but rather, as is permitted under the FLSA,[7] if a salaried employee worked less than 5 hours, they were required to supplement those hours with paid time off, or if the employee was absent from work for one or more full days, their pay was deducted. (DRSOF ¶ 35). The DOL has put forward no evidence that any deductions from a salaried employee's pay was for an impermissible reason (other than the DOL merely stating as much). The Defendants' pay

---

[7] Under the FLSA, an employer may deduct from an exempt employee's pay when the exempt employee is: absent from work for one or more full days for personal reasons other than sickness or disability; for absences of one or more full days due to sickness or disability if the deduction is made in accordance with a bona fide plan, policy, or practice of providing compensation for salary lost due to illness; to offset amounts employees receive as a jury or witness fees, or for military pay; for penalties imposed in good faith for infractions of safety rules of major significant; or for unpaid disciplinary suspensions of one or more full days imposed in good faith for workplace conduct rule infractions. An employer is also not required to pay the full salary in the initial or terminal week of employment, or for weeks in which an exempt employee takes unpaid leave under the Family and Medical Leave Act.

structure for salaried employees was, and still is, legally compliant. Thus, the DOL's claim is without merit and summary judgment must also be denied on liability.

### b. Employees were not paid solely according to a pre-determined schedule.

Next, the DOL claims that Defendants only paid its employees for hours worked according to their schedule. For example, if an employee was scheduled to work 7 – 3, but worked 6 – 4, the facility paid the employee 8 hours, instead of 10 hours. While, at one point, it is true that the system was calibrated to an employee's pre-determined schedule, there is no evidence that Defendants failed to pay employees for any time worked outside of their schedule. In fact, the record evidence shows that: (1) Defendants have long since changed this practice, and (2) even when this practice *was* in place, Defendants had a process and procedure for employees to record, and report any hours worked (regardless of whether those hours were inside or outside their originally scheduled shift). (DRSOF ¶ 90). And, so long as Defendants were aware of the hours worked by its employees, the employees were always paid for their hours worked, regardless of where those hours fell. *Id.* This claim by the DOL is another example where the Department over exaggerates the testimony and evidence in the record, to make a boilerplate allegation about Defendants' pay practices. Rather, when viewing the record as a whole, there are significant, and material, factual disputes about not just the pay practices, but whether the Second Revised Schedule A employees are actually owed any compensation. At this juncture, the DOL merely alleges that Second Revised Schedule A employees worked hours for which they were not paid, without any evidence. *See Myers v. Copper Cellar Corp,.* 192 F.3d 546, 551 (6th Cir. 1999) (the FLSA places the onus on the plaintiffs to prove by a preponderance of the evidence that they performed work and were not properly compensated).

### c.   Defendant Facilities' meal break policy and practice is not a violation of the law.

The DOL's argument that Defendants' meal break policies violate the FLSA is toothless. While the DOL attempts to claim that Defendants' policies run afoul of the FLSA's overtime requirements, it does nothing to demonstrate how or when this specifically occurred.[8]  Instead, the DOL appears to operate on the illogical—and unsupported—argument that the policies mere existence is an FLSA violation because they had the *potential* to result in overtime violations. However, the potential for a violation is not a violation, and federal courts across the country have recognized that policies like those at the Defendant Facilities are, in fact, FLSA-compliant.

Defendant Facilities' policies mandate that all employees who work more than five hours take a 30-minute unpaid meal break, and some facilities' CBAs contractually obligate them to provide these breaks. (Defendants' Concise Statement of Fact ("CSOF"), ¶¶ 77, 105, 133, 160, 223, 257, 290, 329, 356, 390, 420, 451, 477). While employees ideally clock-out and in for their 30-minute meal breaks, (CSOF ¶ 19), to facilitate and encourage compliance with the policies and CBAs, Defendants' payroll system automatically deducts the breaks. (CSOF ¶ 22).

If an employee cannot take, or is interrupted during, his or her meal break, Defendants have policies and practices in place to ensure that the employee's pay is adjusted accordingly. (*See* CSOF ¶¶ 20–21). In the acute health care field, employees may occasionally be unable to take a lunch break because of staffing issues or may need to return to the floor in the middle of his or her break. (*See, e.g.,* CSOF ¶ 392). In these instances, employees are required to submit a payroll

---

[8] The DOL must allege that the meal breaks amounted to an overtime violation because otherwise it has no jurisdiction. To pursue federal wage and hour claims, the DOL needs a minimum wage or overtime violation. For example, if the allegation was that an employee was not paid for all hours worked, but those alleged failures did not result in overtime violations, the DOL lacks jurisdiction to pursue those claims. Here, the DOL makes the blanket assertion that the unpaid meal break hours result in overtime violations—with no actual evidence of such. In fact, in performing its own wage computation, the DOL only counted 15% of the break time hours recorded, resulting in a $5.8M swing in the calculation. The fact that the DOL removed 85% of the meal break data and included it into its calculation of what wages are allegedly owed further demonstrates that the DOL failed to consider whether those hours truly resulted in overtime and instead applied an arbitrary methodology to its calculation.

correction form to their supervisor detailing the work performed during their meal break. (CSOF ¶¶ 21–22). Those forms are then supplied to HR and payroll, and then to CHMS Group, who makes the proper adjustments. *Id.*

There are also many remedial channels available if employees have issues with their paychecks (for instance, if they were deducted for a lunch break that they did not take). (*See, e.g.,* CSOF ¶¶ 43–44). Contrary to the DOL's assertion, in every instance where employees believe that they were paid incorrectly, they are encouraged to report the alleged error to their facility's HR and payroll, who communicate the issue to CHMS Group. (CSOF ¶ 20). After reviewing and confirming, CHMS Group cures any errors by either immediately issuing another paycheck or including the missed time (and pay) in the employees' next paycheck (CSOF ¶ 44).

Defendants' auto-deduction policies make sense. The facilities are heavily regulated and must keep accurate hours reports. In the nursing department, for example, the facilities are required to submit data to Centers for Medicaid Services ("CMS") through the Payroll-Based Journal ("PBJ"). The reports confirm the facilities' compliance with requirements such as nursing hours per patient, per day, amongst others. As a result, CMS *mandates* that facilities deduct a 30-minute meal break regardless of whether employees take a break.[9] The agency's rationale is simple, "there is no way to verify (e.g., from payroll) the portion of [the employee's] meal break that was spent working vs. eating."

Automatic meal deductions are not only required under the PBJ—they are lawful under the FLSA. *See Kuzynyetsov v. West Penn Allegheny Sys.,* No. 10-cv-948, 2011 U.S. Dist. LEXIS 146056, at **13-14 (W.D. Pa. Dec. 20, 2011) (recognizing that "standing alone, an employer

---

[9] See https://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-Instruments/NursingHomeQualityInits/Downloads/PBJ-Policy-Manual-FAQ-11-19-2018.pdf (discussing the PBJ's requirements that all facilities deduct 30-minutes per shift for meal breaks per PBJ Policy Manual Section 2.2.c).

policy providing automatic deductions for meal breaks does not violate the FLSA"); *see also, Hill v. United States,* 751 F.2d 810 (6th Cir. 1984); *Dinkel v. Medstar Health, Inc.,* 880 F. Supp. 2d 49, 55 (D.D.C. 2012); *see also, White v. Baptist Mem'l Health Care Corp.,* No. 08-cv-2478, 2011 U.S. Dist. LEXIS 52928, at *8 (W.D. Tenn. May 17, 2011).

The FLSA places the onus on plaintiffs to prove by a preponderance of the evidence that they performed work and were not properly compensated.[10] *See Myers v. Copper Cellar Corp.,* 192 F.3d 546, 551 (6th Cir. 1999). "As long as the employee can pursue his or her mealtime adequately and comfortably, is not engaged in the performance of any substantial duties, and does not spend time predominantly for the employer's benefit, the employee is relieved of duty and is not entitled to compensation under the FLSA." *See Hill,* 751 F.2d at 814. If, however, the employer "knows or has reason to believe that [an employee] is continuing to work [then] the time is working time." 29 C.F.R. § 785.11. Thus, the central inquiry is whether Defendants knew, or had reason to know, they were not compensating their employees for working during meal breaks.

The DOL has not put forward evidence to support its contention that Defendants engaged in widespread, across-the-board failure to compensate employees for working through their meal breaks.  While the DOL has introduced statements by several employees stating that they regularly worked through their breaks, it has also included *many* statements by employees who state that they <u>always</u> had  a full, uninterrupted, 30-minute meal break, or that they were paid if they did not. (DRSOF ¶ 100). This—the DOL's own evidence—flies in the face of its claim that <u>all</u> employees were affected by Defendants' policies, and as a result disproves its own claim.

---

[10] Employees are in the best position to prove that they were working during mealtimes. To require the employer to prove a negative, that an employee was not performing "work" during a time reserved for meals, would perversely incentivize employers to keep closer tabs on employees. *Newton v. City of Henderson,* 47 F.3d 746, 748 (5th Cir. 1995) (analyzing a plaintiff-employee's unpaid meal break claim under the FLSA).

Further, employers must be given every opportunity to comply with the provisions of the FLSA. *See Forrester v. Roth's I.G.A. Foodliner, Inc.,* 646 F.2d 413, 414-15 (9th Cir. 1981). Where an employee's actions—not reporting that they had worked through a lunch or did not receive a lunch break—prevent the employer from acquiring knowledge, it cannot be said to have suffered or permitted the employee to work in violation of the FLSA. *Id.* The employee—and the DOL in its representative capacity—bears some responsibility to report the issue. *Id.* Defendants cannot satisfy an obligation that they had no reason to think existed. *Wood v. Mid-American Mgmt. Corp.,* 192 Fed. App'x 378, 381 (6th Cir. 2006).

What's more, if an employer establishes a reasonable process for an employee to report uncompensated work time, the employer is not liable for non-payment under the FLSA if the employee fails to follow that process. *See Hertz v. Woodbury County,* 566 F.3d 775, 781-82 (8th Cir. 2009). When an employee fails to follow reasonable time reporting procedures—like Defendants'—it prevents the employer from knowing its obligation to compensate the employee and thwarts its ability to comply with the FLSA. *Id.; see also, White v. Baptist Mem'l Health Care Corp.,* 699 F. 3d 869, 876 (6th Cir. 2012) (noting that each time the employee followed the procedures for being compensated for interrupted meal breaks or for payroll errors, she was compensated and granting summary judgment holding that there was no evidence that the employer had knowledge that she was working during meal breaks). Like in *Forrester* and *Hertz,* it is undisputed that Defendants had channels in place for employees to either communicate that they worked through their breaks or that they were not paid appropriately—channels that the employees often utilized.[11] (*See, e.g.,* CSOF ¶¶ 43–44). And, in every instance that Defendants are

---

[11] *See Newton,* 47 F.3d at 749 (granting summary judgment to employer on unpaid meal breaks claim where the employer had "specific procedures" for the employee to follow to be paid for overtime for working through lunch breaks butignored those procedures).

aware of, where employees followed the reporting process, they were immediately compensated. (CSOF ¶ 20). However, if employees did not report their missed breaks, Defendants never knew (nor could they have) that the breaks were not taken.

The DOL's motion has not shown beyond a mere hypothetical possibility that Defendants' auto-deduction policy for meal breaks resulted in uncompensated overtime—or any other FLSA violation.  Further, to the extent that the DOL claims that employees did indeed work through meal breaks and were not compensated, that claim is contradicted not only by Defendants' testimony, but also by the DOL's own evidence. Because the DOL has not put forward undisputed evidence, there is a genuine issue of material fact, and the DOL's summary judgment motion as it relates to the meal break issue must be denied.

> **d.  There is no evidence that any individual on Schedule A was not paid his or her shift differential or bonus.**

The DOL is right—the FLSA requires that all renumeration paid to an employee must be included in the regular rate *for purposes of calculating overtime.* 29 C.F.R. § 778.109. Defendants do not dispute that this is precisely how the regular rate must be calculated. But the DOL's argument on liability as several fatal flaws. First, there is no evidence that Defendant Facilities failed to pay its employees his or her shift differential. That is because the evidence is undisputed that Defendant Facilities consistently payed the shift differential to their employees, where appropriate. The evidence also shows that CHMS Group had pay rules in place for each Defendant Facility that directly addressed the inclusion of shift differentials in employee pay. Second, there is no evidence—other than the DOL saying so—that any alleged failure that occurred regarding the computation of the regular rate resulted in an underpayment to the employees on Second Revised Schedule A. And such a showing is required as a matter of law, as the DOL does not have jurisdiction to pursue violations outside of overtime and minimum wage violations. *See Lundy v.*

*Catholic Health System of Long Island,* 711 F.3d 106 (2d Cir. 2013) ("An employee who has not worked overtime has no claim under the FLSA for hours worked below the 40-hour overtime threshold, unless the average hourly wage falls before the federal minimum wage." The only effort that the DOL put into their argument is to merely recite the *legal requirements* coupled with a boilerplate allegation that the law was violated. What the DOL failed to address, however, is how any alleged failures regarding shift-differential pay or bonuses resulted in wages owed to the Second Revised Schedule A employees. Without more, that is a question of fact that is not suited for summary judgment.

> **e.  Defendant Facilities were not under any obligation to combine hours as alleged by the DOL.**

Finally, the DOL alleges that Defendants failed to combine all hours worked for individuals who performed work at multiple facilities. For the DOL's argument to result in legal liability, Defendants must first be joint employers under the FLSA. As discussed at length in Section A herein, the DOL has failed to make such a showing. Without joint employment, Defendants were under no obligation to "combine" hours.[12]

**E.  Defendants' conduct was not willful.**

The DOL's argument that this is a case containing willful violations of the FLSA is unsupported by either law or facts.  The DOL's reliance on "reckless disregard" confirms that it knows that Defendants did not act with any specific knowledge they were violating the FLSA. Rather, what the DOL suggests to this Court is that the DOL should have had a premonition that

---

[12] The employees at issue are known as "Pro Re Nata" nurses (or "PRNs"). (DRSOF ¶ 27). A PRN, by definition, is an employee who performs work on an as-needed basis. *Id.* For example, a PRN works when called, to fill in for an absent employee or to cover in a special situation. *Id.* PRNs are common in this industry and are utilized to assist with staffing shortages that may arise. PRNs are employed directly by the facility for whom they work, independently. They are paid for the hours worked at each facility, by that facility directly.

violations were occurring. But no such requirement exists under the FLSA, or any law for that matter.

A willful FLSA violation occurs if an employer knew—at the time of its challenged conduct—its actions were prohibited by the FLSA or showed reckless disregard for whether its conduct was prohibited by the FLSA. *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 135 (1988); *Stone v. Troy Construction,* 935 F.3d 141, 149 (3d Cir. 2019) (finding that the requisite mental intent must occur "at the time of its FLSA violation"). If a plaintiff cannot show that a defendant believed, or had information, that it was violating the FLSA, it is instead appropriate to award summary judgment for *the employer* finding it did not act willfully. *Hanscom v. Carteret Mortg. Corp.,* No. 06-cv-2483, 2008 U.S. Dist. LEXIS 89706, at **14–15 (M.D. Pa. Nov. 5, 2008).

An employer's mistakenness about the FLSA's requirements does not show willfulness. *Reich v. Gateway Press, Inc.,* 13 F.3d 685, 702-03 (3d Cir. 1995) (citing *Hilbert v. District of Columbia,* 784 F. Supp. 992, 925 (D.D.C. 1992)) ("[a]lthough [the defendant] ultimately acted on the basis of an erroneous legal interpretation, it did not thwart settled law or recklessly disregard pertinent legal questions" when it instructed employees to not fill out more than forty hours on their weekly time cards and reprimanded employees who did); *see also, Souryavong v. Lackawanna County,* 872 F.3d 122, 125-27 (3d Cir. 2017) (affirming the lower court's grant of judgment as a matter of law for the defendants where the defendants only learned of a potential overtime violation well after the violation occurred). Further, an employer's reasonable belief that it was complying with the law is enough to defeat a willfulness claim. *See Oakes v. Penn.*, 871 F. Supp. 797, 801 (M.D. Pa. 1995).

Rather, whether a FLSA violation was willful is a question of law on which *the plaintiff* bears the burden of proof. *Adams v. United States,* 350 F.3d 1216, 1229 (Fed. Cir. 2003); *see also, Martin v. Selker Bros. Inc.,* 949 F.2d 1286, 1292 (3d Cir. 1991). As it is plaintiffs' obligation to

prove willfulness at trial, defendants can discharge their burden on summary judgment "by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325 (1986). Here, a finding of willfulness is not appropriate because the DOL fails to carry its burden to show that Defendants acted intentionally or with reckless disregard of their legal obligations under the FLSA.

Defendants took consistent and diligent measures to ensure that they complied with the FLSA and that they compensated each of their employees for all worked time. Indeed, Defendants had many channels in place for employees to raise any wage discrepancies—such as HR, payroll, and their Union (where applicable). Each and every time an employee alerted a facility of a purported pay discrepancy, the issue was reviewed, investigated, and reconciled. CHMS Group and the facilities also thoroughly reviewed each and every payroll before it was finalized and conducted audits, when necessary, to ensure that the payroll pay rules, created according to each facility's CBA and/or handbook, were appropriately implemented. It is also important to note that each individual facility's pay structure is uniquely complicated. Facilities have different bargaining units, varying wage scales, and a number of individualized pay rules—including situations where multiple rules applicable at once. Even with these complicated pay structures, Defendants have, at all times, acted reasonably. Though the DOL may have, in its all-knowingness, acted differently, that Defendants did not act in that same manner does not mean their actions were reckless, or even unreasonable.

Additionally, the point of failure for the alleged overtime violations is not in Defendants' lack of knowledge of the FLSA or a brazen attempt to avoid paying employees' overtime, but rather was a software problem.  The Middle District of Pennsylvania has said that such a violation based upon a similar software problem was not a willful FLSA violation. *Souryavong v. Lackawanna Cty.*, No. 3:CV-13-1534, 2015 U.S. Dist. LEXIS 68087, at *18 (M.D. Pa. May 27,

2015) ("While Defendant should have had a payroll system in place that accounted for employees' overtime hours worked in different departments, its use of a computer system that did not do so does not appear to be 'reckless.'") *aff'd* 872 F.3d 122, 127 (3d Cir. 2017) (finding no willful violation where defendant lacked specific awareness of an ongoing FLSA violation); *see also Flores v. City of San Gabriel*, 824 F.3d 890, 907 (9th Cir. 2016) (emphasizing that Supreme Court "willfulness" precedents require a showing of some degree of subjective actual awareness of an FLSA violation and that mere negligence will not do). As CHMS Group's representative testified, and the DOL can verify through the data in its possession, Defendants were not trying to hide anything—the bonuses and shift differentials were in the payroll system. Unfortunately, for some reason, the payroll software did not include these numbers in calculating employees' regular rates. CHMS Group did not create the specialized payroll software and had no reason to think it would not do its job.

To satisfy its burden and show a "willful" violation, the DOL must show more than Defendants acted "unreasonably"—it must put forward at least some evidence that Defendants had awareness of a violation of the FLSA overtime mandate. *Souryavong,* 872 F.3d at 126 ("Acting only 'unreasonably' is insufficient—some degree of actual awareness is necessary."). Here, the DOL has not identified any undisputed evidence that Defendants knew or should have known that (1) their employees were working through their lunch breaks and were not being compensated or (2) that the pick-up bonuses and shift differentials were not being added into the regular rate by the third-party payroll processor or payroll software. Indeed, the undisputed evidence contained in the record lands at the opposite conclusion. Defendants took affirmative steps to track and stay abreast of the FLSA's requirements, to ensure that their pay practices were compliant, to make sure their employees had avenues in place for reporting errors, and to act in accordance with their understanding of the FLSA. (*See* CSOF ¶¶ 32–58, 233, 339, 487).

Further, Defendants absolutely did not ignore their legal obligations. While Defendants were generally aware of the FLSA and its requirements, they were not aware of any specific challenges to their practices or any potential FLSA violations until this lawsuit and the related investigation. And while the DOL makes much of Defendants waiting to fully resolve the issues at stake in this matter (i.e. pay any back wages), it is wholly reasonable for Defendants to wait and comprehensively resolve all issues as opposed to acting in a patchwork fashion that would be very confusing to all parties involved.[13] Therefore, as discussed above, the DOL has not met its burden to show that Defendants acted recklessly and/or deliberately chose to avoid their legal obligations under the FLSA. Even more, as discussed in Defendants' Motion for Summary Judgment, (ECF 182, *et al.*), the DOL's allegation that Defendants "willfully" violated the FLSA has no factual foundation and should be dismissed as a matter of law. *See Acosta v. Heart II Heart, LLC,* No. 2:17-cv-1242, 2019 U.S. Dist. LEXIS 178260, at *27 (W.D. Pa. Oct. 15, 2019) (denying summary judgment to the DOL citing that it could not say, at that juncture, that no reasonable jury could find that the action of the defendants were not willful, but rather, resulted from inexperience, incompetence, or some other cause that did not rise to the level of willful misconduct).

Because Defendants did not know, and had no reason to know, that any of their actions or practices were in violation of the FLSA, the DOL cannot carry its burden to show that Defendants acted willfully.  As such, the DOL's motion for summary judgment on its willfulness claim must be denied.

### F.  The DOL is not entitled to liquidated damages.

The DOL's argument that it should be awarded liquidated damages on each and every one of its claims is exceptionally broad and at odds with the facts and evidence presented by

---

[13] It is well worth nothing that the DOL has stopped short of any allegation that Defendants have declined or refused to address any issues, because it knows such a statement would be false.  Should they be found liable by this Court, Defendants, as a whole or individually, will abide by any orders this Court issues.

Defendants.  Indeed, just like Defendants arguments in response to each of the DOL's other claims, there are issues of material fact that prevent a finding that the DOL is entitled to liquidated damages under the FLSA. As such, there are genuine issues of material fact rendering summary judgment inappropriate.

Though the FLSA allows for liquidated damages to plaintiffs, it does not guarantee them. Indeed, a court has discretion to <u>not</u> award liquidated damages "[i]f the employer shows . . . that the act or omission giving rise to such action **was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation** of the Fair Labor Standards Act." 29 U.S.C. § 260 (emphasis added). It is the employer-defendant's burden to prove it is entitled to discretionary relief from liquidated damages. *Brooks v. Village of Ridgefield Park,* 185 F.3d 130, 137 (3d Cir. 1999). This burden requires only a showing that an employer took "affirmative steps to ascertain the Act's requirements, but nonetheless, violated it provisions." *Martin v. Cooper Elec. Supply Co.,* 940 F.2d 896, 908 (3d Cir. 1991).

The good faith requirement subjectively "requires that the employer have an honest intention to ascertain and follow the dictates of the Act." *Id.* at 907. To determine this intent, courts look to the defendant's affirmative steps taken to understand the law. *Id* at 908. Reasonableness, however, is an objective standard, *Martin,* at 907-908, and to satisfy this standard, "the employer should act 'as a reasonably prudent man would have acted under the same circumstances.'" *Brooks,* 185 F.3d at 137, quoting *Addison v. Huron Stevedoring Corp.,* 204 F.2d 88, 92 (2d Cir. 1953).

### a.  Defendants had the honest intention to comply with the FLSA and took affirmative steps to comply with the law's obligations.

The DOL's one-size-fits-all claim that Defendants made no good faith effort whatsoever to comply with the FLSA across any of their claimed violations is untrue. Defendants had honest intentions of complying with their legal obligations under the FLSA, and no reason to believe their

conduct violated the law. Further, even if violations did occur, any liquidated damages determination should be done on a claim-by-claim basis once those claims have been adjudicated based upon their individualized circumstances.

> **b. Defendants took affirmative steps to ascertain the requirements of the FLSA.**

As a general matter, Defendants did not rest in blissful ignorance with regard to their pay practices. Rather, each facility and CHMS Group took steps to ensure that they were complying with the FLSA. For example:

- The facilities directly hired a third-party provider, CHMS Group, to not only provide back-office support, but to also provide them with industry expertise and a checks-and-balances system to the payroll processes (*See generally* CSOF, ¶¶ 1–58);

- The facilities relied heavily on their Administrators, all of whom undergo training on the FLSA during their credentialing and licensing process (*See* CSOF, ¶¶ 233, 339, 487);

- CHMS Group conducted audits and reviewed payroll regularly to ensure that all employees were being paid appropriately (CSOF, ¶¶ 27, 32, 39–42);

- Facilities required supervisors and HR to audit every payroll before finalized, to ensure that employees were being paid properly, and often times the Administrator conducted an additional review (*See* CSOF, ¶¶ 99, 122, 148, 177, 245, 281, 319, 349, 379, 413, 439, 468);

- The payroll review included taking steps to confirm the accuracy of the hours report, such as comparing the hours report to employee schedules (*See id.*);

- CHMS Group held training on the FLSA for its internal payroll processors (CSOF, ¶ 55);

- CHMS Group relied on the handbook and CBA for each facility, both of which were reviewed and approved by counsel, in establishing the pay rules that governed employee pay (CSOF, ¶¶ 9, 32);

- CHMS Group and the facilities made changes to various exempt-employee status after the FLSA regulations changed in 2019 (CSOF, ¶ 35);

- The facilities regularly consulted with their regional consultants, each of whom have over 20 years of experience in the nursing home and long-term care space (CSOF, ¶ 12);

- Each facility had its own robust policies and procedures in place to ensure that it complied not only with its handbook and CBA in compensating employees, but also to ensure that all employees had multiple channels to report any pay discrepancies (CSOF, ¶¶ 81–87, 108–16, 137–38, 162–68, 193–97, 225–230, 259–64, 292–97, 331–36, 361–64, 396–99, 421–23, 452–54);

- The facilities held Quality Assurance meetings, where, if necessary, facility-wide pay practices could be discussed (*See* CSOF, ¶¶ 108, 228). One CBA in particular even provides for bargaining unit employee from the nursing department to be present at every QA meeting;

Measures just like these have previously been found to constitute evidence of good faith. *See Acosta v. Mezcal, Inc.,* No. 17-cv-0931, 2019 U.S. Dist. LEXIS 103834, at **26-28 (D. Md. June 20, 2019) (denying the DOL's summary judgment motion on liquidated damages finding that evidence that the defendant relied on an external payroll company was sufficient to overcome summary judgment, leaving the question for the jury); *see also Acosta v. Cty. of Northumberland,* No. 16-cv-00827, 2018 U.S. Dist. 66415, at **11-12 (M.D. Pa. Apr. 19, 2018) (denying the DOL's summary judgment motion on liquidated damages based on the defendant-employer's evidence that the employee's union acquiesced to the pay policy and practice at issue and the employer attempted to follow industry standards).  Defendants did not negligently ignore their obligations, but instead took affirmative steps to be compliant.

Courts routinely decline to award liquidated damages where the employer (1) did not attempt to remain blissfully ignorant of its compliance with the law; (2) made no attempt to conceal its pay practices; or (3) sought advice of third-party experts. *See, e.g., Mezcal, supra; see also Acosta v. KDE Equine, LLC,* No. 15-cv-00562, 2018 U.S. Dist. LEXIS 53923, at **31-33 (W.D. Ky., Mar. 30, 2018) (denying the DOL's summary judgment on liquidated damages, finding that though the defendant-employer took affirmative steps to ensure compliance with the FLSA, those failed efforts could only amount to, at most, mere negligence); *see also Cucu v. 861 Rest. Inc.,* No. 14-cv-1235, 2017 U.S. Dist. LEXIS 84196, at **12-16 (S.D.N.Y. June 1, 2017) (denying summary

judgment on liquidated damages where the defendants were routinely producing its payroll records to third party bookkeepers, which was evidence that the defendants were not attempting to conceal the way in which they were compensating employees); *Roy v. County of Lexington,* 141 F. 3d 533, 548-49 (2d Cir. 1997) (explaining that an employer will not be liable for liquidated damages where there is no evidence that the employer's actions were purposeful or intentionally designed to circumvent the law).

In *Mezcal,* the defendant produced evidence that it relied on a payroll company—Payee Payroll—to properly pay employees when the restaurant submitted the records reflecting hours worked. *Mezcal,* 2019 U.S. Dist. LEXIS at *22. The defendant further testified that it did not become aware that payroll was not being processed to pay for the overtime premium until the DOL's investigation. *Id.* Finally, the defendant produced evidence during litigation that it took immediate steps to remedy the errors. *Id.* On summary judgment, the Court denied the DOL's motion on both liquidated damages and willfulness, finding reasonable reliance on a third-party payroll provider or prompt action to correct violations weigh against a finding of liquidated damages and willfulness. *Id.* at *23.

Here, like in *Mezcal*, the Facility Defendants relied on a third-party payroll provider—CHMS Group—to administer pay. In addition to providing back-office support, like accounts receivable and accounts payable, CHMS Group's payroll and legal compliance services were part of their value. CHMS Group provided quality control, ran audits, reviewed the handbooks and CBAs, and created pay rules based on those requirements. Because the facilities are in the business of health care and not wage and hour laws, the facilities relied on CHMS Group and their regional consultants at Western PA Consultants to provide expert guidance. Just as in *Mezcal,* so here should the Court reject the DOL's request for liquidated damages. To the contrary, the evidence suggests that the opposite finding should be made—that Defendants took affirmative steps to

32

ensure compliance with the FLSA and always acted in good faith. This opposition and Defendants'
Brief in Support of its Motion for Summary Judgment are filled with specific examples where
Defendants took those kinds of affirmative steps recognized under the FLSA.

Here, there is no evidence that Defendants chose to take an "ostrich like" approach to the
FLSA by remaining ignorant of the FLSA's requirements. *See Garcia v. Frog Island Seafood, Inc.,*
644 F. Supp. 2d 696, 712-13 (E.D. N.C. 2009) (refusing to award liquidated damages on summary
judgment where the defendant-employer hired a manager with significant employment experience
that it relied upon in constructing its policies and practices).

There is also no evidence that Defendants were "blissfully ignorant" of their legal
obligations when it comes to the shift-differential and pick-up shift bonuses claim by the DOL.
That is because Defendants knew of their legal and contractual obligations. For instance, they paid
overtime for all hours worked over forty in a workweek; they paid employees the shift differentials
negotiated by the union; and, they paid the employees for all pick-up shift bonuses as promised.
Contrary to the DOL's position, the reality is that Defendants believed that they were complying
with their legal obligations in all respects. Defendants knew that shift-differentials and pick-up
bonuses were to be included in the overtime regular rate calculation and believed that the payroll
system was properly including them. Defendants—and specifically CHMS Group—had no reason
to believe the payroll software was not calibrated properly to comply with the FLSA.

This matter is not like *Souryavong v. Lackawanna Cty.*, 159 F. Supp. 3d 514 (M.D. Pa.
2016),[14] where an employer's reliance on a computer program was found not to constitute good
faith for liquidated damages purposes.  There, the plaintiffs worked multiple jobs for the same

---

[14] This case has a long litigation history and several iterations of cases are cited, *infra*, to present facts not included in
the cited matter which contains the liquidated damages discussion.

employer, and as a result worked more than 40 hours in a week.[15]  However, in that matter, the defendant-employer did not take *any* steps to determine whether its practices of separating the employees jobs was FLSA compliant, even though it identified that it might be an issue.  Rather, the employer in *Souryavong* seemingly claimed that the computer system by itself should have caught the particular overtime issue.  *Id.* at 519.

*Souryavong* is much different than the situations Defendants found themselves in. Defendants *were* aware of their obligations under the FLSA and did not turn a blind eye to those obligations like the *Souryavong* defendant.  Defendants knowledge of, and attempts to comply with, the FLSA are evident by their actions like conducting training, and their logging of shift premiums and bonuses within its pay system.  Defendants had every reason to believe, in good faith, that their payroll software would take this information and perform the proper calculations.[16]

### c. Defendants' actions were objectively reasonable.

The second part of the objective standard is that "the employer must act 'as a reasonably prudent man would have acted under the same circumstances.'" *Brooks*, 185 F.3d at 137. Defendants have met their burden to establish a good faith defense under the objective standard.

Defendants' reasonableness is evidenced through their taking affirmative steps to ascertain their FLSA obligations and CHMS Group's awareness of the regular rate requirements.  They then acted as any "reasonably prudent man would have." The facilities audited and verified employees' time each week prior to sending it to CHMS Group.  CHMS Group then took this verified time and inputted it, along with shift premiums and bonuses, into its payroll system. They then trusted this specialized payroll software to use this information and calculate the proper pay, including

---

[15] Souryavong v. Lackawanna Cty., No. 3:CV-13-1534, 2015 U.S. Dist. LEXIS 68087, at *2-3 (M.D. Pa. May 27, 2015)
[16] In fact, it is Defendants' good faith attempts to comply with the FLSA by including shift premiums and bonuses that has allowed the DOL to perform its calculations in this matter.

overtime pay at the proper regular rate taking into account the employees' shift premiums and opt-in bonuses. Defendants did not know that the software that they reasonably entrusted miscalculated these amounts.

Under the circumstances, and for those same reasons noted above, Defendants' actions were reasonable. Based on the record evidence before this Court, Defendants have a strong argument that liquidated damages *should not* be awarded.  Because the parties' positions on the material facts are at odds, there is a genuine dispute and summary judgment on liquidated damages is not appropriate.

### G.  The DOL is not entitled to injunctive relief.

District courts have the ability to grant injunctive relief, "for cause shown," to restrain violations of the FLSA. *See* 29 U.S.C. § 217. In evaluating a request for injunctive relief, courts have considered "the employer's past conduct, current conduct, and most importantly, whether the employer can be counted on to comply with the FLSA in the future." *Solis v. A-1 Mortg. Corp.*, 934 F.Supp.2d 778, 815 (W.D. Pa. 2013). As discussed herein, the DOL is not entitled to summary judgment on any of its claims for liability, rendering injunctive relief inappropriate. Further, Defendants' past and current conduct both demonstrate intent to comply with the FLSA as outlined in Sections E and F herein.

Further, the procedural posture of the DOL's request warrants denial of the request for injunctive relief.  Multiple courts in this circuit have refused to grant prospective injunctive relief on the basis of the summary judgment record alone and in the absence of a hearing. *See Acosta v. Osaka Japan Rest., Inc.*, Civ. Action No. 17-1018, 2018 U.S. Dist. LEXIS 115960, at *48 (E.D. Pa. July 12, 2018) ("Plaintiff has cited no authority from this Court or the Third Circuit in which a court has done so."); *Acosta v. Heart II Heart, LLC*, Civ. Action No. 2:17-cv-1242, 2019 U.S.

Dist. LEXIS 178260, at *30 (W.D. Pa. Oct. 15, 2019). Accordingly, the Secretary's request for injunctive relief should be denied.

## III.     CONCLUSION

The standard for summary judgment is unbending—for a court to grant a party summary judgment, there must exist no genuine issues of material fact. And here, while the DOL contends that there are no genuine disputes, the record evidence—which must be viewed in favor of the non-moving party—paints an entirely different outcome than that sought by the DOL. The record is rife with genuine issues—on joint employment, individual liability, liability as a whole, willfulness, and liquidated damages. In light of the above, Defendants request that this Court deny the DOL's Partial Motion for Summary Judgment in its entirety.

Respectfully submitted,

**JACKSON LEWIS P.C.**

*/s/ Marla N. Presley*
Marla N. Presley, Esq. (PA I.D. No. 91020)
marla.presley@jacksonlewis.com
Joanna M. Rodriguez, Esq. (PA I.D. No. 318853)
joanna.rodriguez@jacksonlewis.com
1001 Liberty Avenue, Suite 1000
Pittsburgh, PA 15222
Telephone: (412) 232-0404
Facsimile: (412) 232-3441

*Attorneys for Defendants*

Dated:  November 25, 2020