**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MARTIN J. WALSH, | ) | |
| SECRETARY OF LABOR, | ) | |
| UNITED STATES DEPARTMENT OF LABOR, | ) | Civil Action No. 2:18-cv-01608-WSS |
| | ) | |
| Plaintiff, | ) | |
| | ) | Honorable William S. Stickman |
| v. | ) | |
| | ) | |
| COMPREHENSIVE HEALTHCARE | ) | |
| MANAGEMENT SERVICES, LLC, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**
**MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  FACTUAL & PROCEDURAL BACKGROUND ................................................ 2

  A.  The Settlement Negotiations ....................................................................... 3

  B.  The Parties' Settlement in Principle ........................................................... 4

  C.  Defendants Cease Negotiations and Attempt to Renege ............................. 6

III. ARGUMENT ..................................................................................................... 8

  A.  The Parties Reached an Enforceable Agreement ........................................ 8

    1.  The Parties Manifested an Objective Intent to Be Bound ........................... 10

    2.  A Written Document and Agreement on Additional Terms Are Not Required ............ 12

    3.  The Terms Are Definite and Enforceable ................................................. 15

    4.  The Agreement is Supported by Consideration ......................................... 16

    5.  Defendants Cannot Walk Away From the Bargain ...................................... 17

  B.  The Parties' Settlement is Enforceable Through Estoppel .......................... 18

    1.  Defendants Induced the Court and the Secretary to Stay this Action ........... 20

    2.  Defendants' Actions Demonstrate Bad Faith and Gamesmanship ................ 22

IV.  CONCLUSION ................................................................................................. 26

i

# TABLE OF AUTHORITIES

**Cases**                                                                                         **Page(s)**

*A.P. ex. rel. Phinisee v. U.S.*,
   556 F. App'x 132 (3d Cir. 2014) ........................................................................ 14

*American Eagle Outfitters v. Lyle & Scott Ltd.*,
   584 F.3d 575 (3d Cir. 2009) ............................................................. 8, 10, 13, 15

*ATACS Corp. v. Trans World Comm's, Inc.*,
   155 F.3d, 659 (3d Cir. 1998) .............................................................................. 14

*Bayer v. CitiMortgage, Inc.*,
   No. 3:11-cv-02105, 2014 WL 4187556 (M.D. Pa. Aug. 22, 2014) .................................... 18

*Bergeron v. Benton Energy Service Co.*,
   No. 15-cv-1006, 2017 WL 498506 (W.D. Pa. Feb. 7, 2017) ................................. 9

*Bethlehem Area Sch. Dist. v. Zhou*,
   No. 09-cv-03493, 2012 WL 930998 (E.D. Pa. Mar. 20, 2012) ........................... 16

*Blair v. Scott Specialty Gases*,
   283 F.3d 595 (3d Cir. 2002) ................................................................................ 16

*California Sun Tanning USA, Inc. v. Electric Beach, Inc.*,
   369 F. App'x 340 (3d Cir. 2010) ......................................................................... 11

*CDL Nuclear Technologies, Inc. v. Five Towns Heart Imaging, Medical, PC*,
   No. 20-cv-783, 2022 WL 409489 (W.D. Pa. Feb. 10, 2022).. ......................... 8, 13

*Channel Home Ctrs., Div. of Grace Retail Corp. v. Grossman*,
   795 F.2d 291 (3d Cir. 1986) ............................................................................ 9, 15

*Columbia Gas Transmission, LLC v. 520.32 Acres*,
   188 F. Supp. 3d 500 (W.D. Pa. 2016) ................................................................ 10

*Compu Forms Control, Inc. v. Altus Grp., Inc.*,
   574 A.2d 618 (Pa. Superior Ct. Apr. 17, 1990) .................................................. 13

*Cyber Champion Int'l, Ltd. v. Falchi*,
   No. 07-cv-9503, 2008 WL 11399076 (S.D.N.Y. Oct. 10, 2008) ........................ 25

*Dugan v. O'Hara*,
   125 F. Supp. 3d 527 (E.D. Pa. 2015)................................................... 1, 8, 21, 22

*Echols v. Williams*,
   267 F. Supp. 2d 865 (S.D. Ohio 2003) ............................................................... 17

*Ehrheart v. Verizon Wireless*,
   609 F.3d 590 (3d Cir. 2010) ....................................................................... 14

*Estate of Szafara v. Appeal of Szafara*,
   264 A.3d 351 (Pa. Super. Ct. Sept. 8, 2021) .......................................................... 9

*Field v. Golden Triangle Broadcasting, Inc.*,
   451 Pa. 410 (Pa. 1973) ............................................................................... 14

*Financial Cas. & Surety, Inc. v. Bonino*,
   No. 11-cv-4316, 2015 WL 5167082 (D.N.J. Sept. 3, 2015) ................................. 21

*Forba v. Thomas Jefferson Univ. Hosp.*,
   No. 15-cv-1722, 2016 WL 3661760 (E.D. Pa. July 8, 2016) ............................... 17

*Garba v. Fresh Exp., Inc.*,
   No. 1:13-cv-2497, 2014 WL 4976269 (M.D. Pa. Sept. 30, 2014) ....................... 17

*Green v. John H. Lewis & Co.*,
   436 F.2d 389 (3d Cir. 1970) ......................................................................... 13

*Heckler v. Community Health Servs. Of Crawford Cnty., Inc.*,
   467 U.S. 51 (1984) ............................................................................... 18, 25

*Hydrojet Servs., Inc. v. Reading Area Water Authority*,
   220 A.3d 1199 (Pa. Comm. Ct. Nov. 14, 2019) ......................................... 12, 16

*I.K. ex rel. B.K. v. Haverford Sch. Dist.*,
   567 Fed. App'x. 135 (3d Cir. 2014) ............................................................... 19

*In re Butko*,
   584 B.R. 97 (Bankr W.D. Pa. 2018) .......................................................... 19, 22

*In re Drexel Burnham Lambert Grp., Inc.*,
   159 B.R. 420 (S.D.N.Y. 1993) ....................................................................... 17

*Innovative Polymer Technologies, LLC v. Innovation Works, Inc.*,
   No. 17-cv-1385, 2019 WL 13195522 (W.D. Pa. Oct. 23, 2019) ..................... 17, 18

*Ismail v. Interstate Res. Inc.*,
   842 F. App'x 821 (3d Cir. 2021) ..................................................................... 9

*Joy Tech. Inc. v. North American Rebuild Co., Inc.*,
   No. 12-cv-0144, 2012 WL 1802023 (W.D. Pa. May 15, 2012) ........................... 19

*Kristel, Inc. v. Cenveo Corp.*,
   No. 3:16-cv-181, 2017 WL 3842860 (W.D. Pa. Sept. 1, 2017) ....................... 8, 9

*Lexington Nat. Bail Serv's, Inc. v. Spence*,
No. 1:03-cv-2904, 2007 WL 951767 (N.D. Ga. Mar. 28, 2007)................................... 23, 25

*Malascalza v. National R.R. Passenger Corp.*,
No. 93-cv-474, 1996 WL 159650 (D. Del. Mar. 12, 1996), *aff'd*, 118 F.3d 1576 (3d. Cir.
1997). ....................................................................................................... 1, 19, 21, 24

*Mastroni-Mucker v. Allstate Ins. Co.*,
976 A.2d 510 (Pa. Super. Ct. May 29, 2009) ...................................................... 16

*McCune v. First Judicial Dist. of PA Probation Dept.*,
99 F. Supp. 2d 565 (E.D. Pa. 2000)................................................................... 18

*Myers v. AutoZoners, LLC*,
No. 16-cv-1312, 2017 WL 6316586 (W.D. Pa. Dec. 11, 2017)........................... 9

*Omega Engineering, Inc. v. Omega, SA*,
No. 3:98-cv-2464, 2004 WL 2191588 (D. Conn. Aug. 12, 2004) ...................... 18

*ProtoComm Corp. v. Fluent, Inc.*,
No. 93-cv-0518, 1995 WL 3671 (E.D. Pa. Jan. 4, 1995) .................................... 13

*Right Way Nutrition, LLC v. General Nutrition Corp.*,
421 F. Supp. 3d 78 (W.D. Pa. 2019) .................................................................. 16

*Sang Koo Park v. Evanston Ins. Co.*,
No. 19-cv-4384, 2021 WL 5399908 (E.D. Pa. Nov. 18, 2021)........................... 16

*Scarano v. Central R. Co. of N.J.*,
203 F.2d 510 (3d Cir. 1953) ............................................................................. 19, 21

*Schaffer v. Litton Loan Servicing, LP*,
No. 05-cv-07673, 2012 WL 10274678 (C.D. Cal. Nov. 13, 2012)...................... 12

*Shell's Disposal and Recycling, Inc. v. City of Lancaster*¸
504 F. App'x 194 (3d Cir. 2012)................................................................... 10, 15

*Shelley v. Somerset Cnty. Jail*,
581 F. App'x 126 (3d Cir. 2014) ....................................................................... 10

*Stewart v. Greyhound Lines, Inc.*,
No. 09-cv-2977, 2012 WL 15320 (D.N.J. Jan. 4, 2012) ..................................... 21

*Sweat, Inc. v. VF-PA, LLC*,
No. 11-cv-1958, 2011 WL 2685587 (E.D. Pa. June 24, 2011) ........................... 13

*Techinomics, Inc. v. Forest Power & Energy Holding, Inc.*,
No. 2:16-cv-1859, 2017 WL 2536969 (W.D. Pa. May 11, 2017)........................ 13

*Teva Pharmaceutical Indus., Ltd., v. UnitedHealthcare Servs., Inc.,*
  No. 16-cv-4870, 2018 WL 1898911 (E.D. Pa. Apr. 20, 2018) ..................................... 11, 13

*Thompson v. Real Estate Mortgage Network, Inc.,*
  822 F. App'x 136 (3d Cir. 2020) .......................................................................... 25

*Tiernan v. Devoe,*
  923 F.2d 1024 (3d Cir. 1991) ............................................................................ 9, 10

*Transport Intern. Pool, Inc. v. Alternative Transport, Inc.,*
  No. 07-2895, 2008 WL 2550598 (E.D. Pa. June 25, 2008) ..................................... 9, 11, 17

*U.S. v. Halper, et al.,*
  No. 2:21-cr-00079 (W.D. Pa. Aug. 5, 2022) ........................................................ 3, 7, 24

*Vacco v. Harrah's Operating Co., Inc.,*
  661 F. Supp. 2d 186 (N.D.N.Y. 2009) ....................................................................... 25

*Village Beer and Beverage, Inc. v. Vernon D. Cox and Co., Inc.,*
  475 A.2d 117 (Pa. Sup. Ct. Mar. 23, 1984) ................................................................ 14

*Wells v. Envoy Medical, Inc.,*
  No. 11-cv-1572, 2012 WL 4009435 (D. Minn. Sept. 12, 2012) ........................................ 22

*Westinghouse Elec. Corp. v. U.S. Dep't of Navy,*
  894 F. Supp. 204 (W.D. Pa. 1995) ........................................................................... 20

## Statutes

29 U.S.C. § 201 ................................................................................................... 2

29 U.S.C. § 216 .................................................................................................. 16

## I.    INTRODUCTION

The parties reached an enforceable agreement to settle this action: the Secretary would discontinue his action in exchange for Defendants' payment of $15 million. The factual record establishes an objective intent to be bound: extensive negotiations conducted via several calls, videoconferences, and emails, multiple confirmations of the agreement and the specific material terms, and a joint representation to the Court that an agreement had been reached. It also shows that the terms are definite and supported by mutual consideration. It is of no moment that there is no final, signed document, or that the parties expected that additional terms would be negotiated and entered through a consent judgment. And, given the harm Defendants have caused through their bad faith delay tactics and opportunism, the Secretary seeks only to enforce the parties' settlement in principle. The Court has inherent authority over settlements, and it can enforce the parties' bargain. *Dugan v. O'Hara*, 125 F. Supp. 3d 527, 534 (E.D. Pa. 2015).

Alternatively, the Court can enforce the parties' agreement through estoppel. *See, e.g.*, *Malascalza v. National R.R. Passenger Corp.*, No. 93-cv-474, 1996 WL 159650, at *4 (D. Del. Mar. 12, 1996), *aff'd*, 118 F.3d 1576 (3d Cir. 1997). Defendants repeatedly represented that an agreement existed and then waited until the eleventh hour to switch course. The Secretary and the Court relied on these representations to their detriment, as the Phase II trial is now delayed. Whether viewed as buyer's remorse or an elaborate ruse, notions of justice and fair play demand that Defendants not be allowed to profit from their conduct. The Court should exercise its authority to enforce the parties' compromise, which will finally compensate the thousands of employees—some of whom have been waiting nearly ten years—for the work they performed for Defendants' benefit.

## II.    FACTUAL & PROCEDURAL BACKGROUND

The Secretary filed this action under the Fair Labor Standards Act ("FLSA" or "Act") on November 30, 2018. Dkt. 1. The Complaint alleges that Defendants violated the overtime and recordkeeping requirements of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*., by willfully and repeatedly failing to pay certain employees a premium for overtime hours worked since at least December 14, 2014. After denying the parties' respective motions for summary judgment, the Court bifurcated the trial into two phases. *See* Dkt. 237. Phase I concerned joint and several liability and the Section 203(d) liability of Defendants Sam Halper and CHMS Group, LLC. Phase I was scheduled to begin on January 31, 2022. *Id*. In the weeks leading up to the Phase I trial, Defendants made multiple requests to hold a second mediation, which the Secretary declined. Declaration of Ryma Lewis ("Lewis Decl."), ¶ 2.

On the first day of the Phase I trial, Defendants conceded joint and several liability and Section 203(d) liability. *See* Dkt. 268. At Defendants' urging, and Plaintiff's agreement, the Court thereafter referred the case to a second mandatory mediation. Dkt. 269; Lewis Decl., ¶ 2.[1] That mediation was unsuccessful. Dkt. 275; Lewis Decl. ¶ 2. The Court also scheduled a trial for Phase II, which it previously made clear would resolve all remaining issues, including Defendants' liability under Sections 7, 11(c), and 15 of the FLSA, damages, liquidated damages, willfulness, and injunctive relief. Dkt. 237; Dkt. 272.

On or around August 8, 2022, Defendants' counsel contacted the Secretary to request another mediation. Lewis Decl., ¶ 3. The Secretary declined, but he invited Defendants to propose a comprehensive settlement. *Id*. On or around August 9, 2022, the Secretary learned from public sources that the United States Attorney for the Western District of Pennsylvania

---

[1] The first mediation, on June 10, 2019, was unsuccessful. Dkt. 119.

indicted Defendants Sam Halper, certain Facility Defendants, and/or other Defendants senior managers on several charges, including conspiracy to defraud the United States, falsification of records related to health care matters, falsification of records in a federal investigation, health care fraud, and conspiracy to commit health care fraud. *Id.*, ¶ 4; *see also U.S. v. Halper, et al.*, No. 2:21-cr-00079, ECF No. 49 (W.D. Pa. Aug. 5, 2022); Exhibit ("Ex.") 1.

On August 10, 2022, the Secretary contacted Defendants to ascertain if their settlement position had changed, as well as to establish dates for exchange of Phase II trial exhibits. Lewis Decl., ¶ 5. The parties spoke the next day and agreed to settlement discussions with the understanding that the Secretary had a firm cut-off date of August 26, 2022, as he would not agree to stay the trial and would continue trial preparations during the negotiations. *Id.*, ¶ 6.

### A. The Settlement Negotiations

The parties began discussions on August 19, 2022. Lewis Decl., ¶ 7. Multiple Defendant representatives appeared, including attorneys Catherine Cano, Jeffrey Schwartz, and Marla Presley from Jackson Lewis, attorney David E. Schwartz from Skadden, bankruptcy attorney Glenn B. Rose from Bass, Berry & Sims, and Mordy Lahasky, a member of Defendants' ownership group. *Id.*, ¶¶ 2, 7. Defendants stated that they wanted a settlement so they could focus on the criminal proceedings and also suggested a "quick payment" (within 30 days) as part of a settlement. *Id.*, ¶ 8. The parties exchanged proposals but did not agree on terms. Defendants agreed to consider the Secretary's closing proposal and reconvene the following week. *Id.*

The parties met again and exchanged proposals during the week of August 22, 2022. Lewis Decl., ¶ 9–10; *see also* Ex. 2. In light of their progress, the Secretary asked Defendants to review his standard consent judgment by consulting a recent judgment in another matter, and the

parties jointly requested (and received, *see* Dkt. 281) an extension of the Phase II deadlines.

Lewis Decl., ¶ 9–10. The parties agreed to continue discussions the following week. *Id.*, ¶ 10.

At Defendants' request, the Secretary and David Schwartz spoke on August 31, 2022.

Lewis Decl., ¶¶ 11–12. During this conference, Mr. Schwartz made an offer on Defendants'

behalf that the Secretary agreed to consider as a potential agreement in principle. *Id.*, ¶ 12. The

parties confirmed the terms of Defendants' offer via email. *Id.*; *see also* Ex. 3 at pp. 3–5. They

then discussed Defendants' offer over the next two days. Lewis Decl., ¶¶ 13–14. The Secretary

also provided Defendants with financial disclosure forms to support a payment plan. *Id.*, ¶ 13.

### B.  The Parties' Settlement in Principle

At 1:23 p.m. EST on September 2, 2022, the Secretary emailed David Schwartz to accept

Defendants' settlement terms. Lewis Decl., ¶ 14; *see also* Ex. 4 at pp. 3–4. Those terms were

Defendants' payment of $15,000,000 over the course of several years, through agreed-upon dates

and amounts, and the Secretary's agreement to remove Defendant Sam Halper from his conceded

liability as a Section 203(d) employer. Ex. 4 at pp. 3–4. The Secretary accepted this offer with

the expectation that: (1) the parties would separately negotiate and seek entry of his standard

consent judgment; (2) Defendants would provide completed financial disclosures, and;

(3) interest would be applied to monies received under the payment plan. *Id*. Mr. Schwartz

initially rejected the application of interest, but he relented after the Secretary pushed back. *See*

*id*. at p. 2 ("The 1.0% per annum interest is fine."). Defendants did not otherwise contest the

Secretary's summary of the parties' agreed-to terms, and David Schwartz suggested a call on

September 6, 2022 to discuss next steps. *Id.*; *see also* Lewis Decl., ¶ 14.

The Secretary spoke with David Schwartz and Ms. Cano on September 6, 2022. Lewis

Decl., ¶ 15. The parties confirmed the deal terms and modified the due date for Defendants'

initial payment of $10 million (required within 60 days after entry of the consent judgment

instead of between 60–90 days after entry). *Id*. Defendants ended the call by saying it was

equivalent to an in-person "hand shake," and confirmed that there was an agreement. *Id*.

The following day, the Secretary emailed David Schwartz and Ms. Cano a proposed joint

motion and order to temporarily stay the Phase II trial deadlines, which would enable the parties

to focus on finalizing and submitting their settlement agreement. Lewis Decl., ¶ 16; Ex. 5 at

pp. 5–6. Ms. Cano responded later that day with proposed revisions and stated that Defendants

did "not feel comfortable representing that we have an agreement since [they] have not yet seen

the proposed Consent Judgment." Ex. 5 at p. 5. The Secretary responded with further revisions to

the joint motion and the following statement:

> Based upon our discussion yesterday and negotiations with David Schwartz,
> last week, it has been DOL's understanding that we have a settlement in
> principle as we have agreed to the basic terms. Specifically, the parties have
> agreed to the following settlement terms which would be reflected in a
> Consent Judgment: $15 million settlement for back wages, liquidated
> damages, and CMPs
>
> a. $10 million – due within 60 days entry of CJ
> b. Payment Plan on Balance due of $5 million, subject to interest
>     1. 8 quarterly payments of $50K, beginning first quarter of
>        2023
>     2. 4 quarterly payments of $1.2 million, concluding at year 3
> c. Removal of Sam Halper as 203(d) employer.

Ex. 5. at p. 4. The Secretary continued:

> If this is incorrect, we need to schedule a call immediately to discuss the
> status of this matter and how we will proceed moving forward. To be clear,
> we are unwilling to request an indefinite stay on Pre-trial deadlines without
> (1) the assurance, in writing, at the very least that we have an agreement in
> principle and (2) a deadline by which we will reconvene/update the Court
> on the progress of finalizing terms that does not frustrate our current trial
> date should an agreement not be promptly finalized. Accordingly, please
> advise of Defendants position and if they agree to the attached joint filing
> no later than 6:30 p.m.

*Id*.; *see also* Lewis Decl., ¶ 16.

Defendants did not contest the deal terms or that an agreement existed. Instead, they proposed additional edits to the joint motion. *Id*. at pp. 3–4; Lewis Decl., ¶ 17. The parties exchanged additional proposals until agreeing on—and filing—a joint statement to the Court that they had "agreed to a monetary settlement, but need time to come to terms on a Consent Judgment." Dkt. 282; Ex. 5 at pp. 1–3. The Court granted the joint motion and stayed the Phase II pre-trial deadlines until September 21, 2022. Dkt. 283.

### C.  Defendants Cease Negotiations and Attempt to Renege

On September 8, 2022, the Secretary emailed Defendants a draft consent judgment. Ex. 6 at p. 10; Ex. 7; Lewis Decl., ¶ 18.[2] He invited Defendants to "review and comment" on the draft by September 14, 2022, with the caveat that some provisions were non-negotiable. Ex. 6 at p. 10; Lewis Decl., ¶ 18. Defendants replied on September 13, 2022 that they would not have a response before September 19, 2022 and requested that the Secretary identify the non-negotiable language. Ex. 6 at p. 9; Lewis Decl. ¶ 19. The Secretary responded by re-emphasizing the quick timeline for finalizing the settlement terms and that he was not willing to stay or modify the Phase II trial date. Ex. 6 at p. 8; Lewis Decl., ¶ 19. Defendants replied the following day to request that the Secretary either identify the non-negotiable consent judgment language or confirm that providing such information would "not help Defendants" in their review and mark-up of the draft consent judgment. Ex. 6 at pp. 7–8; Lewis Decl., ¶ 19. The Secretary provided that confirmation. *See* Ex. 6 at p. 6 ("It will not help in resolving any potential issues Defendants may have with language as we would need to review proposed changes to get a wholistic

---

[2] As explained in the Lewis Declaration, the draft consent judgment submitted with this Motion (Ex. 7) does not include Attachment A/Exhibit A, a list of approximately 5,000 current and former employees of Defendants to whom the consent judgment would relate. The Secretary will provide the full draft consent judgment sent to Defendants on September 8, 2022 upon request.

understanding of the basis for the proposed changes."); *see also* Lewis Decl., ¶ 19. Defendants

did not respond further until the Secretary reached out again. Ex. 6 at pp. 5–6; Lewis Decl., ¶ 20.

After receiving no word, the Secretary followed up with Defendants on September 16,

2022, September 19, 2022, and September 20, 2022. Ex. 6 at p. 4–5; Lewis Decl., ¶ 20. The

Secretary also contacted David Schwartz on September 19, 2022 to express concern as to

Defendants' silence. Ex. 8 at p. 1; Lewis Decl., ¶ 20. Mr. Schwartz responded shortly after that

he was "coordinating with Jackson Lewis to get a call scheduled," and that the call would

"probably by in window you suggested for tomorrow." Ex. 8 at p. 1. While referencing the

potential need for a status conference given Defendants' silence, the Secretary continued to

invite Defendants to edit the consent judgment. Ex. 6 at p. 4–5.

The next day, David Schwartz informed the Secretary that Defendants were not willing

"to move forward with a settlement at this time." Ex. 6 at p. 3. They took this position "in light

of information recently produced by the Department of Justice in the related criminal

proceedings" and signaled their intent to have the case stayed "until the conclusion of the

criminal proceedings." *Id*. Mr. Schwartz then elaborated on Defendants' new position, including

by disclosing specific, quoted information from the materials produced in the criminal action.

*Id*.[3] Based on this information, Defendants came to believe, erroneously, that a referral from the

Secretary spawned the criminal investigation and subsequent indictments. *Id*. They also alleged

that the Secretary "leverage[d] the very existence of that prosecution[,] initiated by [his] own

action (rather than happenstance),[]" to pressure Defendants into agreeing to terms. *Id*. at pp. 3–

---

[3] It is the Secretary's understanding that the information Mr. Schwartz disclosed in this email
was produced to Defendants' criminal counsel on August 23, 2022 and designated as
confidential under the protective order in that matter. Lewis Decl., ¶ 22; *see also U.S. v. Halper,
et al*,. No. 2:21-cr-79, ECF No. 132 (W.D. Pa. Aug 22, 2022). Judge Colville has not yet allowed
Defendants to use the confidential information in this action. *Id*.; *see also* Dkt. 290, ¶ 7.

4. Defendants claimed further "[a]s an aside" that they had not "agree[ed] to anything" without having seen "a draft of the proposed consent judgment." *Id*. at p. 4. They referred to the Secretary's refusal to specify non-negotiable terms and, for the first time, provided substantive feedback on the draft and new, additional terms that they "would have also required." *Id*.

The Secretary responded later that same day to contest Defendants' assertions. Ex. 6 at pp. 1–2. He also notified Defendants that he would request a status conference to re-set the Phase II pre-trial deadlines. *Id*. at 2. The Secretary filed the motion. Dkt. 284. The Court held a status conference on September 27, 2022, during which it set the deadline for this Motion. Dkt. 289.

## III.   ARGUMENT

### A.  The Parties Reached an Enforceable Agreement

The Court has "'inherent power to enforce and to consider challenges to settlements entered into in cases originally filed therein.'" *Dugan*, 125 F. Supp. 3d at 534 (citation omitted); *see also CDL Nuclear Technologies, Inc. v. Five Towns Heart Imaging, Medical, PC*., No. 20-cv-783, 2022 WL 409489, at *1–2 (W.D. Pa. Feb. 10, 2022). This includes authority to "summarily to enforce a settlement agreement when the practical effect is merely to enter a judgment by consent." *Dugan*, 125 F. Supp. 3d at 535 (citations and quotations omitted). Enforcement of settlement agreements is favored "'because they promote the amicable resolution of disputes and lighten the increasing load of litigation faced by courts.'" *Kristel, Inc. v. Cenveo Corp.*, No. 3:16-cv-181, 2017 WL 3842860, at *2 (W.D. Pa. Sept. 1, 2017) (citation omitted).

The relevant procedure on a motion to enforce is akin to a motion for summary judgment. *Dugan*, 125 F. Supp. 3d at 535; *see also American Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009). In other words, a party seeking enforcement "must satisfy the court that there are no disputed issues of material fact, and the court must treat all factual assertions in the

light most favorable to the non-moving party." *Kristel*, 2017 WL 3842860, at *2 (citing *Tiernan v. Devoe*, 923 F.2d 1024 (3d Cir. 1991)). The opposing party "must provide evidentiary support for any assertions on which it wishes to rely in opposing a motion to enforce settlement." *Dugan*, 125 F. Supp. 3d at 535 (citation omitted). "'Where material facts concerning the *existence* or *terms* of an agreement to settle are in dispute, the parties must be allowed an evidentiary hearing[.]'" *Kristel*, 2017 WL 3842860, at *2 (quoting *Tiernan*) (emphases in original). At a hearing, the Court can "make factual findings and credibility determinations based on the evidence presented by the parties." *Myers v. AutoZoners, LLC*, No. 16-cv-1312, 2017 WL 6316586, at *9 (W.D. Pa. Dec. 11, 2017) (citations omitted).

State law determines whether an enforceable agreement exists. *Ismail v. Interstate Res. Inc.*, 842 F. App'x 821, 823–24 (3d Cir. 2021). Under Pennsylvania law,[4] the issue turns on: "'(1) whether both parties manifested an intention to be bound by the agreement; (2) whether the terms of the agreement are sufficiently definite to be enforced; and (3) whether there was consideration.'" *Id.* at 824 (quoting *Channel Home Ctrs., Div. of Grace Retail Corp. v. Grossman*, 795 F.2d 291, 299 (3d Cir. 1986)); *see also Estate of Szafara v. Appeal of Szafara*, 264 A.3d 351, at *3 (Pa. Super. Ct. Sept. 8, 2021). "'Where a settlement agreement contains all of the requisites for a valid contract, a court must enforce the terms of the agreement.'" *Bergeron v. Benton Energy Service Co.*, No. 15-cv-1006, 2017 WL 498506, at *2 (W.D. Pa. Feb. 7, 2017).

---

[4] *See Tiernan*, 924 F.2d at 1033 ("Pennsylvania's choice of law rules . . . provide that the applicable law is that of the place with the most significant relationship to the parties and the transaction.") (citations omitted); *see also Transport Intern. Pool, Inc. v. Alternative Transport, Inc.*, No. 07-2895, 2008 WL 2550598, at *5 (E.D. Pa. June 25, 2008) (applying Pennsylvania law where "[t]he lawsuit was filed in Pennsylvania, a settlement conference was held in Pennsylvania, emails discussing the alleged settlement were received by an attorney in Pennsylvania, and a letter to the court announcing the alleged settlement was received in Pennsylvania") (citation omitted).

1.  <u>The Parties Manifested an Objective Intent to Be Bound</u>

The parties' manifestation of "an intention to be bound" is measured objectively, *i.e.*, whether a "reasonable person would apprehend that [the party] intends to be bound by the terms of the agreement . . . ." *Shell's Disposal and Recycling, Inc. v. City of Lancaster*, 504 F. App'x 194, 201 (3d Cir. 2012) (citation omitted). As such, a party's subjective intent is irrelevant—"[a] *true* and *actual* meeting of the minds is not necessary to form a contract" because "it is parties' outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter." *Columbia Gas Transmission, LLC v. 520.32 Acres*, 188 F. Supp. 3d 500, 506–07 (W.D. Pa. 2016) (citations and quotations omitted) (alteration and emphases in original); *see also American Eagle Outfitters*, 584 F.3d at 582. This is a question of fact. *Shelley v. Somerset Cnty. Jail*, 581 F. App'x 126, 128 (3d Cir. 2014) (citing *Tiernan*).

The factual record shows that there can be no genuine dispute of material fact that the parties manifested an objective intent to be bound.[5] The parties intensely negotiated over the course of two weeks. Lewis Decl., ¶¶ 7–16. Senior representatives for both sides—including a member of Defendants' ownership group—negotiated the accord. *Id*. The parties exchanged numerous proposals, culminating in the Secretary's acceptance of terms confirmed via email. *Id*. The parties then further refined that agreement and confirmed that the September 6, 2022 was the equivalent of an in-person "hand shake," meaning that a deal had been reached. *Id*., ¶ 15.

The events of September 7, 2022 prove the parties' objective intent. After Defendants questioned the agreement, the Secretary again set forth the specific terms and demanded that Defendants confirm an agreement in principle as a precondition to a joint request to stay the Phase II deadlines. Ex. 5 at p. 4; Lewis Decl., ¶ 16. Instead of contesting the terms or the

---

[5] If the Court concludes the factual record on this Motion is insufficient, the Secretary respectfully requests that the Court convene an evidentiary hearing.

Secretary's understanding that there was a settlement in principle, Defendants negotiated and finalized a joint representation to the Court that the parties had "agreed to a monetary settlement." Dkt 28; Ex. 5 at pp. 1–4; Lewis Decl., ¶ 16; *see also Transport Intern. Pool, Inc.*, 2008 WL 2550598, at *6 ("It is illogical that an attorney would send a letter to the court stating settlement terms were reached if settlement terms were merely being negotiated."); *California Sun Tanning USA, Inc. v. Electric Beach, Inc.*, 369 F. App'x 340, 347 (3d Cir. 2010) (enforcing agreement where parties confirmed the "essential terms of the agreement" via email and represented to the court both that an "agreement-in-principle had been reached" and that the parties "anticipate[d] that they w[ould] be able to reduce their agreement to writing and consummate all aspects of that agreement") (citations and quotations omitted) (alterations in original). During the weeks following the joint filing, Defendants did not suggest any understanding or belief that there was no agreement. They instead proceeded (at least initially) with the Secretary's expectation of good faith negotiations as to a consent judgment.

The fact that the parties' terms resolve this action also objectively establishes an intent to be bound. *See Teva Pharmaceutical Indus., Ltd., v. UnitedHealthcare Servs., Inc.*, No. 16-cv-4870, 2018 WL 1898911, at *15 (E.D. Pa. Apr. 20, 2018) ("A contract is enforceable and contains all essential terms when it establishes the heart of the agreement.") (citation and quotations omitted). Defendants concede that they violated the Act in at least some respects. *See, e.g.*, Dkt. 197 at p. 27 (Defendants' MSJ Opposition: "Unfortunately, for some reason, the payroll software did not include [bonuses and shift differentials] in calculating employees' regular rates."). They also concede that they owe back wages. *Id*. at p. 28 ("And while the DOL makes much of Defendants waiting to fully resolve the issues at stake in this matter (i.e. pay any back wages), it is wholly reasonable for Defendants to wait and comprehensively resolve all

11

issues as opposed to acting in a patchwork fashion that would be very confusing to all parties

involved.") (footnote omitted). Given these (and other) concessions, the focus of the Phase II

trial will be the extent of Defendants' liability under the Act. *See* Dkt. 237. The parties'

settlement definitively answers that question: $15 million. No further terms were necessary to

resolve that core dispute. *See Hydrojet Servs., Inc. v. Reading Area Water Authority*, 220 A.3d

1199, 1205–06 (Pa. Comm. Ct. Nov. 14, 2019) (identifying "the actual material and essential

terms of the settlement agreement" as "the total amount to be paid, the timeframe in which the

payment would be made, and the amount of each installment payment"); *see also Schaffer v.

Litton Loan Servicing, LP*, No. 05-cv-07673, 2012 WL 10274678, at *9 (C.D. Cal. Nov. 13,

2012) ("Generally speaking, provisions that require payment in exchange for a release of claims

constitute material terms of the settlement agreement.") (citing sources).

      The context and circumstances of the parties' negotiations and agreement further support

the existence of a binding deal. Throughout this matter, Defendants repeatedly pursued

mediations and settlement discussions. Lewis Decl., ¶¶ 2–3. Defendants increased those efforts

after the filing of criminal indictments and as the Phase II trial in this matter approached. *Id.*,

¶¶ 6, 8. For his part, the Secretary agreed to settlement discussions only if they did not upset the

Phase II trial schedule and insisted throughout that time was of the essence. *Id.*, ¶¶ 6, 19–21. The

parties' focus and assent on essential terms on this quick timeline, and their subsequent

announcement to the Court that an agreement had been reached, demonstrate that the parties

intended to resolve this action through their agreement.

      2.  <u>A Written Document and Agreement on Additional Terms Are Not Required</u>

      Defendants' refusal to finalize a consent judgment and additional terms, does not change

the score. A settlement is enforceable even if it is never signed or reduced to writing. *Green v.*

*John H. Lewis & Co.*, 436 F.2d 389, 390 (3d Cir. 1970); *American Eagle Outfitters*, 584 F.3d at 582 ("'[P]arties may bind themselves contractually although they intend, at some later date, to draft a more formal document.'") (citation omitted). "It is well established that [a] settlement agreement is enforceable if it contains all essential terms, even though it expressly leaves other matters for future negotiation." *Teva Pharmaceutical Indus., Ltd.*, 2018 WL 1898911, at *15 (citations and quotations omitted) (alteration in original); *see also Compu Forms Control, Inc. v. Altus Grp., Inc.*, 574 A.2d 618, 622 (Pa. Superior Ct. Apr. 17, 1990) ("'[I]f the parties agree on essential terms and intend them to be mutually binding, a contract is formed even though the parties intend to adopt a formal document later which will include additional terms.'"); *ProtoComm Corp. v. Fluent, Inc.*, No. 93-cv-0518, 1995 WL 3671, at *14 (E.D. Pa. Jan. 4, 1995) ("'[A] contract can be formed even if many of the particulars or specifics have not been discussed or *agreed upon*.'") (citation omitted) (emphasis in original); *CDL Nuclear Technologies, Inc.*, 2022 WL 409489, at *2 (same).

Here, the unexecuted consent judgment does not "alter the underlying agreement of the parties." *Sweat, Inc. v. VF-PA, LLC*, No. 11-cv-1958, 2011 WL 2685587, at *6 (E.D. Pa. June 24, 2011). It contains the agreed-upon settlement amount of $15 million. Ex. 7, ¶¶ 7–9. It also refers to the payment plan and requires Defendants to provide financial disclosures. *Id.*, ¶¶ 10, 12. The remaining provisions address other matters incidental to this settlement, such as injunctive relief, distribution of settlement funds, and contingencies in the event Defendants fail to pay or provide financial disclosures. *Id.*, ¶¶ 3–6, 10–11, 13. And, notably, the draft agreement does not contain a merger or integration clause that would "supersede[] any prior or contemporaneous written or oral agreements." *Techinomics, Inc. v. Forest Power & Energy Holding, Inc.*, No. 2:16-cv-1859, 2017 WL 2536969, at *4 (W.D. Pa. May 11, 2017). In short,

the draft confirms that the parties' bargain to resolve this action—payment of a sum certain in exchange for discontinuance—is enforceable and definite standing alone. *See, e.g.*, *Field v. Golden Triangle Broadcasting, Inc.*, 451 Pa. 410, 419 (Pa. 1973) ("[T]he fact that additional provisions would enhance the position of both parties is not controlling. What is necessary is that the parties agree to all the essential terms and intend the letter to be binding upon them.").

The parties' expectation of discussing additional terms and memorializing their agreement in a consent judgment is best characterized as an agreement to work together in good faith to conclude a signed agreement, which does not undermine enforceability. *See, e.g.*, *A.P. ex. rel. Phinisee v. U.S.*, 556 F. App'x 132, 136 (3d Cir. 2014) ("An implied obligation to use good faith is enough to avoid the finding of an illusory promise.") (citation and quotations omitted). And even if the parties considered entry of a consent judgment essential here—which would still not preclude an enforceable agreement (*see ATACS Corp. v. Trans World Comm's, Inc.*, 155 F.3d, 659, 667 (3d Cir. 1998) ("omission of an essential term in a contract . . . does not vitiate contract formation" if agreement is otherwise enforceable"))—that was a condition subsequent, *i.e.*, a future event that, if unfulfilled, could allow the parties to "discharge [their] contractual duty after it has already occurred." *Village Beer and Beverage, Inc. v. Vernon D. Cox and Co., Inc.*, 475 A.2d 117, 122 (Pa. Sup. Ct. Mar. 23, 1984) (citation omitted); *see also Ehrheart v. Verizon Wireless*, 609 F.3d 590, 593 (3d Cir. 2010) ("The requirement that a district court review and approve a class action settlement before it binds all class members does not affect the binding nature of the parties' underlying agreement. . . . Put another way, judicial approval of a class action settlement is a condition subsequent to the contract and does not affect the legality of the proposed settlement agreement.") (citations omitted).

3.   <u>The Terms Are Definite and Enforceable</u>

 "To be enforceable, an agreement must be certain about 'the nature and extent of its obligation[s].'" *Shell's Disposal and Recycling, Inc.*, 504 F. App'x at 202 (quoting *American Eagle Outfitters*, 584 F.3d at 585) (alteration in original). "[A] contract fails for indefiniteness when it is 'impossible to understand' what the parties agreed to because the essential terms are ambiguous or poorly defined." *Id*. (quoting *American Eagle Outfitters*, 584 F.3d at 586). In addition, courts distinguish between "ambiguity [that] goes to the details of performance" and "not to the 'nature and extent of [the parties'] obligation[s].'" *Id*. (quoting *American Eagle Outfitters*, 584 F.3d at 585) (second and third alterations in original). This is a question of law. *American Eagle Outfitters*, 584 F.3d at 585 (citation omitted).

The parties' terms are definite—they impose specific obligations on both sides. The Secretary agreed to discontinue his action and release Sam Halper from his conceded Section 203(d) liability. Ex. 5 at p. 4. In exchange, Defendants must pay their employees the bulk of the $15 million that the Secretary will distribute. *Id*. $10 million of that is due within 60 days of entry of the parties' agreement. *Id*. The remainder is due in set installments: "8 quarterly payments of $50K, beginning first quarter of 2023" and "4 quarterly payments of $1.2 million, concluding at year 3." *Id*. In other words, Defendants must pay $50,000 each quarter in 2023 and 2024 (totaling $200,000), and then pay $1,200,000 million each quarter for 2025 (totaling $4.8 million). Defendants' payment of the $5 million between 2023 and 2025 would be subject to interest. *Id*. Ex. 4 at p. 2 ("The 1.0% per annum interest is fine."). The deal's specific, mutual obligations are clear. *See, e.g.*, *Grossman*, 795 F.2d at 300 (finding promise to "withdraw the Store from the rental market and only negotiate the above described leasing transaction to completion" in exchange for "sufficient legal consideration" was "sufficiently definite to be

specifically enforced"); *Sang Koo Park v. Evanston Ins. Co.*, No. 19-cv-4384, 2021 WL

5399908, at *5 (E.D. Pa. Nov. 18, 2021), *appeal docketed*, No. 21-3161 (3d Cir.) (agreement

enforced where parties did not agree on specific settlement amount and instead "agreed to a

range of numbers where both parties would be comfortable resolving the case").

    4.  <u>The Agreement is Supported by Consideration</u>

The Secretary's agreement to resolve his allegations and claims in this action[6] and release

Sam Halper's personal liability in exchange for $15 million over the course of several years is a

classic example of consideration. *See generally Right Way Nutrition, LLC v. General Nutrition

Corp.,* 421 F. Supp. 3d 78, 88 (W.D. Pa. 2019); *see also Bethlehem Area Sch. Dist. v. Zhou*, No.

09-cv-03493, 2012 WL 930998, at *2 (E.D. Pa. Mar. 20, 2012) ("It is a general principle of

contract law that mutual promises are valid consideration."). "Consideration 'confers a benefit

upon the promisor or causes a detriment to the promisee and must be an act, forbearance or

return promise bargained for and given in exchange for the original promise.'" *Blair v. Scott

Specialty Gases*, 283 F.3d 595, 603 (3d Cir. 2002) (citation omitted).

The parties' compromise as to an amount to resolve the remaining central dispute is

valuable consideration. *See, e.g.*, *Mastroni-Mucker v. Allstate Ins. Co.*, 976 A.2d 510, 518 (Pa.

Super. Ct. May 29, 2009) ("There is an offer (the settlement figure), acceptance, and

consideration (in exchange for the plaintiff terminating his lawsuit, the defendant will pay the

plaintiff the agreed upon sum).") (citation and quotations omitted); *Hydrojet Servs., Inc.*, 220

A.3d at 1205 (finding adequate consideration for verbal agreement where parties agreed to

settlement amount paid through "lump sum" and "98 monthly payments" in exchange for

"release . . . from any claims"); *In re Drexel Burnham Lambert Grp., Inc.*, 159 B.R. 420, 426 n. 3

---

[6] The parties' settlement of this action would also relieve Defendants from lawsuits by the
affected employees under Section 16(b) of the Act. *See* 29 U.S.C. § 216(b)-(c).

(S.D.N.Y. 1993) ("The surrender of even a doubtful claim provides adequate consideration for an agreement . . . .") (citation omitted).

5. <u>Defendants Cannot Walk Away From the Bargain</u>

There is no basis to void or invalidate the agreement. "It is well established that a settlement agreement is binding even if [it's] clear that a party had a change of heart between the time he agreed to the terms of the settlement and when those terms were reduced to writing." *Innovative Polymer Technologies, LLC v. Innovation Works, Inc.*, No. 17-cv-1385, 2019 WL 13195522, at *5 (W.D. Pa. Oct. 23, 2019) (citing sources); *see also Echols v. Williams*, 267 F. Supp. 2d 865, 867 (S.D. Ohio 2003) ("There is no basis to rescind a contract in the mere emotional regret of having agreed to its terms."). A court "cannot allow parties to reach settlement agreements and then change their mind with buyer's remorse." *Forba v. Thomas Jefferson Univ. Hosp.*, No. 15-cv-1722, 2016 WL 3661760, at *4 (E.D. Pa. July 8, 2016).

Both sides were represented by sophisticated counsel during negotiations, and neither side can credibly claim misunderstanding or mistake as to the agreed terms. Defendants made virtually no attempt to negotiate the consent judgment even though the Secretary referred them to the standard consent judgment as early as August 22, 2022. Lewis Dec., ¶ 9. Their refusal to substantively respond for weeks is "strongly suggestive of buyer's remorse," not "confusion regarding the terms of the settlement." *Garba v. Fresh Exp., Inc.*, No. 1:13-cv-2497, 2014 WL 4976269, at *5 (M.D. Pa. Sept. 30, 2014). Defendants' passing objection ("[a]s an aside") to certain provisions after the fact is merely a self-serving, self-contradicting attempt to inject doubt into a factual record that otherwise conclusively establishes a binding accord. *Compare* Dkt. 282 (joint motion: "[t]he parties have agreed to a monetary settlement") *with* Ex. 6 at p. 4 (David Schwartz claiming that Defendants had not "agree[d] to anything"); *see also Transport Intern.*

17

*Pool, Inc.*, 2008 WL 2550598, at *6 (where party did not question the existence of a settlement "more than a month after assenting" to it, finding that its "true motivation" was a "change of heart" based on changed economic circumstances). Finally, even if their grievances as to the Secretary's role in igniting the criminal proceedings were true—they are not—that would still fail as a matter of law. *Innovative Polymer Technologies, LLC*, 2019 WL 13195522, at *5.

Allowing Defendants to void the parties' settlement "on a whim because the agreement becomes unpalatable" would be "contrary to the federal policy of encouraging settlement agreements." *Bayer v. CitiMortgage, Inc.*, No. 3:11-cv-02105, 2014 WL 4187556, at *3 (M.D. Pa. Aug. 22, 2014) (citations and quotations omitted). It would also unfairly reward their decision to reverse course on the eve of trial. *See McCune v. First Judicial Dist. of PA Probation Dept.*, 99 F. Supp. 2d 565, 566 (E.D. Pa. 2000) ("We can only presume, that Plaintiff agreed to the settlement when trial was imminent, and now that that crisis has passed, Plaintiff, for a second time, wishes to avoid the settlement. This not only disrupts the business of this Court, it comes too late, the bargain had already been struck."); *Omega Engineering, Inc. v. Omega, SA*, No. 3:98-cv-2464, 2004 WL 2191588, at *10 (D. Conn. Aug. 12, 2004) (enforcing settlement where party took itself "out from 'under the gun' of imminent trial" and then "promptly broke its word, reneged on the contract," and used the broken contract "as a springboard from which to negotiate an even better deal").

### B.  The Parties' Settlement is Enforceable Through Estoppel

Estoppel is a separate, independent basis for the Court to enforce a settlement. This doctrine vests the Court with broad equitable authority to "avoid injustice in particular cases." *Heckler v. Community Health Servs. Of Crawford Cnty., Inc.*, 467 U.S. 51, 59 (1984). There are various forms: (1) judicial estoppel; (2) promissory estoppel, and; (3) equitable estoppel.

"The doctrine of judicial estoppel, also referred to as 'preclusion by inconsistent positions,' is an equitable doctrine which precludes a party from assuming a position in a legal proceeding that contradicts or is inconsistent with a previously asserted position." *Malascalza*, 1996 WL 159650, at *3 (citation omitted). It exists to prevent parties from "playing fast and loose with the courts," an "evil the courts should not tolerate." *Scarano v. Central R. Co. of N.J.*, 203 F.2d 510, 513 (3d Cir. 1953) (citation and quotations omitted); *see also In re Butko*, 584 B.R. 97, 105 (Bankr. W.D. Pa. 2018) ("The doctrine of judicial estoppel 'uphold[s] the integrity of the courts by preventing parties from abusing the judicial process by changing positions as the moment requires.'") (citation omitted) (alteration in original). Judicial estoppel turns on: "(1) whether the two positions are irreconcilably inconsistent; (2) whether the party changed his position in bad faith, *i.e.*, with the intent to play fast and loose with the court; and (3) whether a lesser sanction would remedy the damage done." *Joy Tech. Inc. v. North American Rebuild Co., Inc.*, No. 12-cv-0144, 2012 WL 1802023, at *5 (W.D. Pa. May 15, 2012) (citation omitted).

"Promissory estoppel is an equitable doctrine that may be invoked to enforce a promise made by one party to another when there is no enforceable agreement between those parties." *I.K. ex rel. B.K. v. Haverford Sch. Dist.*, 567 Fed. App'x. 135, 137 (3d Cir. 2014) (citation omitted). Pennsylvania law requires a showing that "'1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; 2) the promisee actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise.'" *Id.* (citation omitted). Equitable estoppel "focuses on the relationship between the parties, requiring representation, reliance and prejudice." *Malascalza*, 1996 WL 159650, at *3 (citation omitted). This requires proof that a party "misrepresented a material fact" and that the counter party "reasonably relied on that

misrepresentation to his detriment." *Westinghouse Elec. Corp. v. U.S. Dep't of Navy*, 894 F.

Supp. 204, 209 (W.D. Pa. 1995) (citation omitted).

Irrespective of whether a binding deal was reached—it was—the Court can use its

estoppel authority to ensure that Defendants cannot profit from their opportunistic delay of the

Phase II trial. After inducing the Secretary to seek, and the Court to grant, a temporary stay,

Defendants waited until the last minute to reverse course. This upended the Phase II trial

schedule is allowing Defendants to focus on litigating an indefinite stay. Defendants' avowed

justifications for reneging confirm their bad faith. After refusing to substantively negotiate a

consent judgment, Defendants, without warning, used a pre-textual justification walk away. To

do this, they use confidential information that they had for weeks (if not months) to baselessly

accuse the Secretary of improper conduct. Defendants also contradicted their representations to

the Court and the Secretary about the existence of an agreement. These tactics have inflicted

substantial prejudice on the Court, the Secretary, and the thousands of employees who are due

millions of dollars in back wages. Justice demands that the Court enforce the parties' bargain.

### 1. Defendants Induced the Court and the Secretary to Stay this Action

The predicates for multiple forms of estoppel are present here. Defendants represented to

this Court and to the Secretary that an agreement on a monetary settlement existed, and that the

parties would work to finalize their agreement. Dkt. 282; Exs. 3–5, 7; Lewis Decl., ¶¶ 14–20, 23.

Those representations induced the Secretary to jointly request a temporary stay and the Court to

grant that request. Ex. 5 at p. 4; Lewis Decl., ¶¶ 16, 23; Dkt. 283. Without these assurances—*i.e.*,

repeated confirmation that a settlement in principle on material terms existed, which would be

finalized—the Secretary would have never agreed to a further stay of the Phase II deadlines.

Ex. 5 at p. 4; Lewis Decl., ¶ 23. Similarly, there is no indication that the Court would have *sua*

*sponte* delayed the Phase II pre-trial deadlines or the trial itself absent the parties' joint filing. In claiming after the fact that they had never "agree[ed] to anything" (Ex. 6. at p. 2), Defendants are advancing "irreconcilably inconsistent" positions. *See* Dkt. 282.

Estoppel exists to prevent "intentional self-contradiction" as a "means of obtaining unfair advantage in a forum provided for suitors seeking justice." *Scarano*, 203 F.2d at 513. The appropriate remedy is to hold Defendants to the deal, particularly given their intent to delay this matter even further. *See, e.g.*, *Financial Cas. & Surety, Inc. v. Bonino*, No. 11-cv-4316, 2015 WL 5167082, at *3 (D.N.J. Sept. 3, 2015) (holding that "enforcing the settlement agreement [was] a narrowly tailored way to address the harm at issue" under doctrine of judicial estoppel). Under comparable circumstances, courts have used judicial estoppel to enforce settlement agreements. *See, e.g.*, *Malascalza*, 1996 WL 159650, at *4–5 (using judicial estoppel to enforce agreement where plaintiff deployed "self-contradiction" to play "fast and loose" by denying a settlement term) (citations and quotations). Courts have also used promissory estoppel or equitable estoppel to reject ex post repudiations and prevent harm from detrimental reliance. *See Dugan*, 125 F. Supp. 3d at 539 (concluding that, even assuming the settlement agreement was "not enforceable," it was "appropriate to enforce the settlement agreement . . . on a theory of promissory estoppel" because the plaintiff's representations induced a defendant to act to its detriment and "only by enforcing [the] promise" could the defendant "avoid the substantial injustice that would otherwise befall it as a result of its reasonable reliance on [that] promise"); *Stewart v. Greyhound Lines, Inc.*, No. 09-cv-2977, 2012 WL 15320, at *4 (D.N.J. Jan. 4, 2012) (applying New Jersey law and enforcing settlement agreement through promissory estoppel where defendant was induced by, and reasonably relied on, its communications with plaintiff to believe that he "had promised to abide by an agreed-upon settlement" and where "the detriment

21

that would befall Defendant in the absence of Plaintiff's adherence to his agreement (namely, the collapse of Defendant's entire global settlement) [was] definite and substantial") (citations and quotations omitted); *Wells v. Envoy Medical, Inc.*, No. 11-cv-1572, 2012 WL 4009435, at *5 (D. Minn. Sept. 12, 2012) (applying Minnesota law and finding that, even if a binding settlement agreement did not exist, the court would enforce the agreement "under the principles of equitable estoppel" to prevent a party from "reneging on its promise to settle this case" because of the harm to the counter-party that "reasonably relied" on that promise).

2. <u>Defendants' Actions Demonstrate Bad Faith and Gamesmanship</u>

Defendants' tactics confirm that judicial estoppel and promissory estoppel are warranted. *See, e.g.*, *In re Butko*, 584 B.R. at 105–06 (discussing role of "bad faith" in application of judicial estoppel); *Dugan*, 125 F. Supp. 3d at 539 (enforcing settlement through promissory estoppel because it would be "manifestly unjust" for the reneging party to "benefit from his representations" and then pursue a contrary position). Virtually all of Defendants' actions following the Court's entry of the temporary stay reflect a bad faith strategy to double-back on the agreement as late as possible, thus upsetting the trial schedule and teeing up their motion to stay. First, Defendants, without explanation, rejected the Secretary's repeated invitations to negotiate and finalize the consent judgment. Ex. 6 at pp. 5–9; Lewis Decl., ¶¶ 18–21. Contrary to their later claim, Defendants never stated that the Secretary's refusal to identify non-negotiable clauses was a deal-breaker. Ex. 6 at pp. 7–8 (Ms. Cano stating Secretary's identification of non-negotiable terms would "greatly assist" Defendants and "possibly narrow" their "proposed revisions"). Even though they subsequently claimed to have numerous objections and required insertions, Defendants did not negotiate them. Their abrupt "unresponsiveness" to the

Secretary's communications "reeks of bad faith." *Lexington Nat. Bail Serv's, Inc. v. Spence*, No. 1:03-cv-2904, 2007 WL 951767, at *7 (N.D. Ga. Mar. 28, 2007).

Second, Defendants' justifications for reneging are facially pretextual. Their principal complaint does not relate to the settlement terms, or to the consent judgment, but instead to their belief that the Secretary brought about the criminal indictments and then leveraged those indictments to coerce Defendants' agreement. Ex. 6 at pp. 3–4. This claim is false, baseless, and irrelevant. The Secretary did not initiate the criminal investigation, nor was he involved in the referral of this matter for criminal prosecution. *See* Ex. 1 (identifying law enforcement partners as The Federal Bureau of Investigation, the U.S. Department of Health & Human Services – Office of Inspector General, the Pennsylvania Office of Attorney General, and the Internal Revenue Service – Criminal Investigation). The claim is also belied by the fact that Defendants, not the Secretary, have repeatedly pursued a settlement. Lewis Decl., ¶¶ 2–3. Tellingly, Defendants concede that their accusation is hollow in that the Secretary has discretion to "refer civil matters for criminal proceedings." Ex. 6 at p. 3. And, at bottom, these claims do nothing to undermine that an enforceable settlement was reached. Only after elaborating their groundless theory did Defendants, "[a]s an aside," aver that they never actually "agree[d] to anything" (*id.* at p. 4), which directly contradicts their statement to the Court that they had "agreed to a monetary settlement" (Dkt. 282).

Third, Defendants' timing raises significant concerns. According to the United States' counsel in the criminal action, Defendants' criminal attorneys have had the confidential information that seems to have caused Defendants to reverse course since at least August 23, 2022, shortly after settlement discussions began. Lewis Decl., ¶ 22. In addition, Defendants have not explained why, despite being aware of the consent judgment's standard language as early as

August 22, 2022 (*id*., ¶ 9), and despite the Secretary's multiple requests for comment and insistence that time was of the essence, they did not raise any issue with the consent judgment until the last minute. It is also notable that, when the Secretary expressed concerns about Defendants' failure to negotiate, David Schwartz assured him that a call was forthcoming. Ex. 8 at p. 1. The next day, without warning, Defendants backed out. Ex. 6 at p. 3.

Considered as a whole, Defendants' conduct reflects a deliberate plan to force a delay. Defendants have long signaled a desire to have this action stayed, which increased as the criminal action advanced. Ex. 6 at p. 1; *see also* Dkt. 150 (Defendants' emergency motion to stay). Faced with criminal indictments and the Phase II deadlines, they undertook serious negotiations with the Secretary and made the representations necessary to obtain a temporary stay. Thereafter, they refused to memorialize the agreed upon terms. Then, just as the stay was about to expire, Defendants rejected the deal based on irrelevant, baseless claims grounded in information that they had at the start of negotiations and that was confidential.[7] In the short term, this strategy was successful—the Court indicated that the Phase II trial must now be delayed. As the final piece, Defendants, now free of the pre-trial deadlines, will seek to convert this temporary delay into what is, effectively, a permanent one.

The Court should not countenance Defendants' attempt to play "fast and loose" with the Court and the Secretary, particularly with respect to settlement negotiations. *Malascalza*, 1996 WL 159650, at *5 (enforcing settlement to avoid making the court an "ally to plaintiff in

---

[7] Defendants' unauthorized use of confidential information highlights their misconduct. The information Defendants quoted to the Secretary (and which is redacted and filed under seal) was designated as confidential in the criminal matter. Lewis Decl., ¶ 22. Even assuming that Defendants' civil counsel was permitted to receive this information, Defendants violated the criminal protective order by using that confidential information without permission. *Id.*; *U.S. v. Halper, et al*,. No. 2:21-cr-79, ECF No. 132, ¶ 3 (W.D. Pa. Aug 22, 2022) ("Under no circumstances shall such confidential information be used for any purpose other than in the Criminal Case absent an order from this Court."); Dkt. 290, ¶ 7.

conferring upon him an unfair advantage" because "[c]ourts are not [to] be used as a mechanism to knowingly produce an unjust result"); *see also Vacco v. Harrah's Operating Co., Inc.*, 661 F. Supp. 2d 186, 200 (N.D.N.Y. 2009) ("[T]he Court must be careful to guard against the possibility that parties will seek to manipulate settlements to gain strategic advantage, settling and unsettling litigation to suit their immediate purposes.") (citation and quotations omitted) (alteration in original). It undoubtedly benefits Defendants to delay this action as much as possible. *See, e.g.*, *Cyber Champion Int'l, Ltd. v. Falchi*, No. 07-cv-9503, 2008 WL 11399076, at *5 (S.D.N.Y. Oct. 10, 2008) (recognizing that, when a "defendant repudiates a settlement agreement," he "saves himself money in the short term, and he benefits from a delay of the trial") (citation omitted); *Lexington Nat. Bail Serv's, Inc.*, 2007 WL 951767, at *7 (noting that the defendant's inconsistent statements as to a settlement "appear[ed] more dubious" considering that he both "avoided the previously-scheduled trial" and "remain[ed] unsaddled by settlement obligations"). This advantage will only grow if Defendants successfully move to stay this action.

Justice demands that Defendants not be allowed to "derive an unfair advantage or impose an unfair detriment" through their actions. *Thompson v. Real Estate Mortgage Network, Inc.*, 822 F. App'x 136, 137 (3d Cir. 2020) (citations and quotations omitted). Their strategic decision to reach a settlement agreement and induce a temporary stay, only then to suddenly and baselessly reject the deal, was a bad-faith effort to stall the resolution of this matter. Under these circumstances, enforcement of the parties' agreement in principle is the only outcome that will "avoid injustice" (*Heckler*, 467 U.S. at 59). Enforcement will prevent Defendants from benefiting from the delay they engineered at the Court's and the Secretary's expense, as well as promote the parties' fair and reasonable compromise to compensate the employees who have been waiting far too long for the wages they earned.

## IV.   CONCLUSION

The Secretary respectfully requests that the Court grant his motion and enforce the

parties' agreement in principle to settle this action.


Respectfully submitted,

Post Office Address                                Seema Nanda
                                                   Solicitor of Labor
U.S. Department of Labor
Office of the Regional Solicitor                   Oscar L. Hampton III
201 12th Street South, Suite 401                   Regional Solicitor
Arlington, VA 22202
                                                   Adam Welsh
                                                   Wage and Hour Counsel
202.693.9393 (voice)
202.693.9392 (fax)
lewis.ryma@dol.gov                                 /s/ Ryma Lewis
                                                   Ryma Lewis
                                                   Senior Trial Attorney
                                                   *Pro Hac Vice*
October 7, 2022
                                                   /s/ Mohamed Seifeldein
                                                   Mohamed Seifeldein
                                                   Trial Attorney
                                                   *Pro Hac Vice*

                                                   /s/ Alejandro A. Herrera
                                                   Alejandro Herrera
                                                   Trial Attorney

26