**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JULIE A. SU,
ACTING SECRETARY OF LABOR,
UNITED STATES DEPARTMENT OF LABOR,

Plaintiff,

v.

COMPREHENSIVE HEALTHCARE
MANAGEMENT SERVICES, LLC, et al.

Defendants.

Civil Action No. 2:18-cv-01608-WSS

Honorable William S. Stickman

**ACTING SECRETARY'S PRE-HEARING MEMORANDUM**
**REGARDING REQUEST FOR PRELIMINARY INJUNCTION**

In accordance with the Court's Order (Dkt. 382), Plaintiff Julie A. Su, Acting Secretary of Labor, U.S. Department of Labor (the "Acting Secretary"), files this pre-hearing memorandum in support of her request for a preliminary injunction (*see* Dkt. 361).

The Acting Secretary completed expedited discovery. She also subpoenaed three witnesses to testify at the September 27, 2023 hearing, each with specific personal knowledge regarding Defendants' attempt to sell seven Facility Defendants for $56 million to principals of Kadima Healthcare Management, Inc. by September 1, 2023. These efforts confirmed, *inter alia*, the following critical facts: (1) Defendant Sam Halper and his co-owners acted with a specific intent to frustrate the Acting Secretary's ability to recover under the FLSA; (2) Sam Halper and his co-owners stand to receive an enormous benefit from the sale of the Facility Defendants' assets, *viz.*, the elimination of over $20 million in personal liability to their bank, CIBC, and; (3) Defendants and the purchasers do not have an arm's-length relationship. Considering this

record, and the legal authority entitling the Acting Secretary to relief, she respectfully requests that the Court enter a preliminary injunction as reflected in the proposed order. *See* Dkt. 390.

## I. A Preliminary Injunction Will Preserve the Acting Secretary's Equitable Relief

At the September 6, 2023 hearing, the parties addressed the Supreme Court's decision in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Funds, Inc.,* 527 U.S. 308, 318–19 (1999). The Acting Secretary responded to the Court's concerns regarding *Grupo Mexicano* and believes that, as a preliminary matter, she has demonstrated that it supports issuance of injunction to maintain the status quo. *Compare* Exhibit ("Ex.") 1 at 12:1–2, 12–13 *with* Ex. 1 at 44:24–45:10 ("There is a request for equitable relief both the one that is pointed out in Paragraph 3 and the other equitable relief here and arguably, one of Judge Scalia's big carve-outs in the *Grupo* opinion was if we do this under Rule 65, it rights Rule 64 out of the rule book. . . . So it does strike the Court that there is a strong basis to continue the injunction . . . ."). In addition to her prior briefing (Dkt. 362 at 5–7), the following authorities support her position.

"[T]he relief obtainable under Section 17 [of the FLSA] . . . is derived from equity and is not limited to restitutory sustenance." *E.E.O.C. v. American Tel. & Tel. Co.*, 365 F. Supp. 1105, 1122 (E.D. Pa. 1973), *aff'd*, 506 F.2d 735 (3d Cir. 1974). The equitable nature of this relief is an essential feature of the Acting Secretary's enforcement obligation. *See id*. ("The Congressional framers felt compelled to deputize only the Secretary of Labor for ultimately determining when there should be an invocation of equitable relief in championing and safeguarding the public interest."). The Third Circuit has confirmed that FLSA Section 17 creates equitable relief, notwithstanding that it may compel the transfer of money. *See, e.g.*, *Marshall v. Board of Ed., Bergenfield, N.J.*, 575 F.2d 417, 427 (3d Cir. 1978) ("The Secretary is seeking to secure future compliance with the law, which is in the public interest, and he is seeking by means of a negative

order to compel the defendants to make reparations for alleged past violations of the law, which likewise is in the public interest. The relief sought is equitable and it is no less so because compliance with the decree which plaintiff seeks may require the defendants to pay out money."). As such, the Court can issue an injunction to preserve a meaningful remedy.[1]

## II. The Transaction is Properly Enjoined Because it is a Fraudulent Conveyance Under Both Federal Law and Pennsylvania Law

The Acting Secretary will prove Defendants are seeking to fraudulently dissipate assets to curtail—or effectively eliminate—judgment enforcement. These facts relate principally to the first and fourth factors of the preliminary injunction analysis. *See* Dkt. 362 at 11–13 (Acting Secretary's prior arguments as to likelihood of success in proving that transfer should be enjoined under Fed. R. Civ. P. 64 and 65 because of Defendants' fraudulent motives and lack of arms-length); *id*. at 18 ("[I]t serves the public interest to prevent Defendants' fraudulent transfer of assets."). The most important facts concern: (1) specific evidence of intent to close the sale prior to the Phase II trial; (2) the multi-million dollar benefit to Defendant Sam Halper and the other Facility Defendant owners, and; (3) the absence of arm's length.

### a. Defendants' Specific Intent to Avoid FLSA Liability

The Acting Secretary has subpoenaed Martha Stillwagon and Lisa Baldi to testify at the preliminary injunction hearing on September 27, 2023. Mrs. Stillwagon is the former Human Resources Director for Facility Defendant Mt. Lebanon. Mrs. Baldi is a former Regional Consultant with Defendant CHMS Group, Inc. and also served as the Director of Nursing for

[1] *See also Berger v. Weinstein*, No. 07-cv-994, 2008 WL 191172, at *10 n. 9 (E.D. Pa. Jan. 23, 2008) (granting preliminary injunction "to ensure Defendant's ability to either satisfy a money judgment" or satisfy equitable relief where plaintiff "sought to invoke both the legal and equitable powers of this Court"); *In re Team Systems Int'l LLC*, No. 22-br-10066, 2023 WL 1428572, at *8 (Bankr. D. Del. Jan. 31, 2023). ("[A] plaintiff seeking equitable relief need not show that the specific asset it seeks to freeze is one in which the plaintiff has an interest.").

Facility Defendant the Grove at Washington. The Acting Secretary anticipates both witnesses will testify, *inter alia*, that: (1) on or around August 30, 2023, both were present for a conversation with a current Regional Consultant for Defendants; (2) during the conversation, the Regional Consultant stated directly that Sam Halper and the other owners wanted to close the sale by August or September 2023 with the specific intent to minimize liability from a judgment in this matter; (3) the Regional Consultant learned this from direct statements by Sam Halper and other owners and through information conveyed by other current Regional Consultants.[2] This testimony will confirm that, despite whatever other motivations they may have, Defendants are acting with fraudulent intent. *In re Blatstein*, 192 F.3d 88, 97 (3d Cir. 1999) (applying "principle" under PUVTA that, where a debtor "intended to hinder or delay a creditor," he "had the intent penalized by the statute notwithstanding any other motivation he may have had for the transfer") (citations and quotations omitted); *see also* Sept. 11, 2023 E. Lahasky Dep. Tr. ("Lahasky Dep. Tr.") 87:15–19 ("To say that the DOL is immaterial . . . and is of non-consequence and is completely something that I – doesn't even factor into any of my decisions would be -- that would not be a correct thing to say, okay?"); *id.* at 88:4–6 ("Can I tell you that I'm not concerned about the DOL? Of course I'm concerned about the DOL."). This confirms the need for an injunction. The evidentiary rules concerning hearsay do not bar consideration of this evidence. *See Kos v. Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir. 2004) ("It is well established that a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. In keeping with this principle, many of our sister Circuits have recognized that [a]ffidavits and

[2] Messrs. Lahasky and Halper confirmed that the Facility Defendant owners have discussed the sale to Kadima with their Regional Consultants. Lahasky Dep. Tr. at 126:2–7; Sept. 14, 2023 Halper Dep. Tr. ("Halper Dep. Tr.) at 71:10–14.

other hearsay materials are often received in preliminary injunction proceedings.") (citations and quotations omitted) (alteration in original); *R.B. ex rel. Parent v. Mastery Charter Sch.*, No. 2:10–cv–06722, 2010 WL 5464892, *1 n. 3 (E.D. Pa. Dec. 29, 2010) ("Courts have consistently held that the Federal Rules of Evidence do not apply at preliminary injunction hearings. Accordingly, at the preliminary injunction stage, a court may rely on hearsay evidence that would not be admissible at trial.") (citations omitted).[3]

b. Sam Halper and the Other Sellers Will Receive Millions in Personal Debt Relief

Defendants and the buyers insist that the Facility Defendant owners will not profit from this sale. *See, e.g.*, Ex. 1 at 32:23–24. That is false. The sellers stand to gain an enormous benefit: elimination of tens of millions of dollars in personal liability to CIBC. When Mr. Lahasky and his partners purchased the seven Facility Defendants in 2016, they financed that purchase with a Loan and Security Agreement from CIBC. Dkt. 372-2; Lahasky Dep. Tr. at 83:9–18. The current liability on that loan is approximately $46 million. *Id*. at 114:14–17. When they executed the loan, the sellers—including Benjamin Landa, Ephram Lahasky, Joshua Farkovits, David Gast, and Sam Halper (*id.* at 43:10–20, 44:3–15, 45:1–3, 49:5–9)—executed guarantees that rendered them personally liable, a fact which CIBC expressly refers to in its notice of default. Dkt. 372-2 at 1. Mr. Lahasky estimated that, through these guarantees, CIBC has recourse against the individual owners up to least $23 million. Lahasky Dep. Tr. 115:13–116:11. If the sellers are able to close the deal, they would be relieved of this obligation. *Id*. at 116:12–18 ("Q. So if the deal closes and the $56 million is wired, the portion that needs to go to the bank goes to the bank. Would that relieve you and the other people you just mentioned of the guarantees, the recourse? A. Oh. Absolutely. At that point, once the loan is paid off, it's all gone.").

[3] Even if the FRE applied, the Court can consider the statements. Fed. R. Evid. 801(d)(2).

This extinguishment of debt is only one part the effort to extract as much value as possible before the assets are impaired by the Acting Secretary's multi-million dollar judgment. It strains credulity to believe that CIBC—a sophisticated, multi-national bank that has been involved with these seven Facility Defendants since 2016 and has over 40 million dollars at stake—would not be aware of the Acting Secretary's FLSA claims. *See* Halper Dep. Tr. at 75:9–12.[4] CIBC is surely aware that a judgment in the Acting Secretary's favor—which is all but assured because of Defendants' concessions (Dkt. 362 at 9–11)—will create a new, significant liability that will affect both the value of their collateral and their and the seller's ability to find a buyer. *See, e.g.*, Lahasky Dep. Tr. at 121:11–15 ("[T]hey're obviously very nervous now about this contingent liability, because especially if they're going to give the loan, they don't want to give a loan on an asset that's staring down that kind of potential liability."); *see also id.* at 122:5–9. This helps explain CIBC's urgency. *See, e.g.*, Ex. 7 (Buyers' counsel: "Can you confirm that we can close on or about 9/1 – a few days later is fine – but your clients lender CIBC – won't wait much beyond that. (which I don't really understand since they're your lender – what's the issue waiting a few more days)."); Ex. 8 ("Were trying to close this as close to the 1st as possible – as CIBC wants your client out of this loan."). At bottom, Defendant Sam Halper and his partners will reap millions of dollars in immediate debt relief from this sale.

c. The Parties Are Not Arm's Length[5]

At the initial conference regarding this matter, Defendants' transaction attorney confirmed that, "if you peel the layers away," Ephram Lahasky—a Facility Defendant owner and

[4] It is also hard to believe that Kadima, a sophisticated buyer, represented by counsel, would invest thousands of dollars to pursue an acquisition and spend months negotiating without doing the basic diligence necessary to discovery the Acting Secretary's FLSA enforcement action.

[5] "An authoritative legal dictionary defines 'arm's-length' as '[o]f or relating to dealings between two parties who are not related or not on close terms and who are presumed to have roughly

lead negotiator for the sale—had "an interest" with the buyers. Ex. 2 at 9:2–6. The Acting Secretary's discovery revealed a significantly closer connection. Mr. Lahasky has known Jonathan Strauss, one of the Kadima principals, for two decades. Lahasky Dep. Tr. at 13:3–18; *see also id*. at 23:20–24:12. Sam Halper also has a longstanding relationship with Mr. Strauss, from their time as colleagues in another nursing home. *Id*. at 15:16–16:2, 16:12–17; Halper Dep. Tr. at 9:14–10:4. As Daniel Morris, the second Kadima principal, put it, these connections are common in the nursing home industry because it is "a very small industry" and "a lot of us are, you know, quote/unquote, family . . . ." Sept. 20, 2023 D. Morris Dep. Tr. ("Morris Dep. Tr.") at 11:14–17; *see also* Lahasky Dep. Tr. at 25:4–10.

Mr. Lahasky was part of the group that sold the six Kadima East buildings to Messrs. Strauss and Morris in 2018. Lahasky Dep. Tr. 12:10–13:2; Ex. 3. Through that transaction, he retained between a 5% to 20% interest in the new operating entities for the six homes, which he maintains[6] to this day. *Id*. at 59:15–21; Morris Dep. Tr. at 48:14–17; Ex. 4 (2023 DOH filing for Kadima Rehabilitation and Nursing at Lakeside showing 20% ownership interest).

Through this history and ongoing connection, Mr. Lahasky hand-picked the Kadima principals as the buyers for this new deal. Lahasky Dep. Tr. at 38:1–4, 53:7–14, 68:14–18; *see also id*. at 74:7–9 ("As a matter of fact, Kadima is one of the few groups I have sold to, so I kind of knew them to bring them in here, you know?"); Morris Dep. Tr. at 48:1–11. This was based

---

equal bargaining power; not involving a confidential transaction.'" *Allegheny Ludlum Corp. v. U.S.*, 367 F.3d 1339, 1348 (Fed. Cir. 2004) (quoting Black's Law Dictionary).

[6] The deponents and transaction counsel provided conflicting information regarding Mr. Lahasky's ownership interest in the six Kadima East buildings. While Messrs. Morris and Lahasky averred that it was only 5%, notwithstanding their contrary filings with PA Department of Health (*see, e.g.*, Morris Dep. Tr. 37:3–19), Allen Koss, Kadima's transaction counsel represented at one point that Mr. Lahasky's ownership was 20%, "not 5." Ex. 5 at DOL/CHMS TRO 000232. Because of the other circumstances, the true amount of ownership is immaterial.

on Mr. Lahasky's belief, *inter alia*, that Kadima could successfully close. *Id*. at 111:11–112:2. This, in turn, was dependent on whether the proposed buyer would satisfy CIBC, the bank holding a multi-million dollar note for the seven Facility Defendants, financing the purchase, and insisting that the buyer must be able to successfully operate the homes going forward.[7] Lahasky Dep. Tr. 68:14–18, 81:10–83:6, 114:8–11; *see also* Morris Dep. Tr. 47:20–22 ("Q. . . . Mordy [Lahasky] is the one who brought this deal to you and Mr. Strauss? A. I believe so."), 94:4–9, 95: 2–5. Mr. Lahasky was certain in Kadima's merit as a buyer, based on his first-hand experience with them, and he did not engage in serious efforts to locate an alternate. Lahasky Dep. Tr. at 111:18–21 ("But no. . . . I didn't go to an outside -- why? Why would I go to an outside broker if I had a very -- who I felt was a very serious buyer here?"). These circumstances bear the hallmarks of insider status. *See, e.g.*, *In re Crawford*, 454 B.R. 262, 275 (Bankr. D. Mass. 2011) ("[C]ourts have held that an insider may be any person or entity whose relationship with the debtor is sufficiently close to as to subject the relationship to careful scrutiny.") (citations and quotations omitted); *In re Harold*, 611 B.R. 835, 848 (Bankr. E.D. Mich. 2020) ("The Debtor's sale of the . . . property . . . was not an arm's-length sale. The Debtor did not hire a realtor. The Debtor did not market the property. The Debtor did not obtain an appraisal for the property. Instead, the Debtor and Barrow hand-picked Watkins, an old friend of Barrow . . . .").

The close relationship also helps explain the parties' unusual behavior in describing the consideration and the buyer's response to the Acting Secretary. Messrs. Lahasky and Halper take the position that the Facility Defendants' operating assets have "no value," and that the entire purchase price of $56 million is attributable to the property. Lahasky Dep. Tr. 89:16–90:14; Halper

[7] As a further demonstration of the contracting parties' close ties, Kadima is considering keeping Defendant CHMS Group, Inc. on as the payroll processor for the seven Facility Defendants after the sale. Morris Dep. Tr. at 105:9–106:9.

Dep. Tr. at 58:9–16. Mr. Morris, in contrast, testified inconsistently about the Facility Defendants' operating asset value, but ultimately stated that those assets were an integral part of the $56 million price. Morris Dep. Tr. at 69:5–12; 71:7–14. Mr. Morris and his counsel later stated that, without transfer of both the operating and property assets, the property was "worthless." *Id*. at 74:10–75:19. These contradicting views of price—which, in reality, stems from the sellers' and CIBC's interests in closing the non-performing loan (Lahasky Dep. Tr. at 97:3–22, 120:6–7)—reflect the lack of arm's length in determining fair value for the assets subject to the Acting Secretary's claims.

Finally, the close affiliation helps explain why the buyers insist on remaining in the deal despite both sides agreeing that the sellers did not disclose the Acting Secretary's multi-million dollar enforcement action. *See* Lahasky Dep. Tr. 102:6–13 ("The DOL . . . I just assumed that was our problem. . . . [T]hey're saying I didn't tell them, and I believe them. Q. Are they mad? A. They're upset, yes. They -- they think I tried to con them, you know, like I was trying to pull a fast one on them, you know."); Morris Dep. Tr. 82:17–19 ("I'm upset I didn't know about it sooner, but now that I know about it, I just don't understand how that changes any position."); *see also id*. at 5:16–17 (Mr. Morris referring to Mr. Lahasky as a "great guy"). A buyer with an arm's length relationship with a seller would not ordinarily remain in a transaction after being deceived regarding such a sizeable contingent liability—a point which the buyer's counsel expressly made: "[N]o buyer in his right mind would pull the trigger here and purchase without there being a release of the properties." Ex. 6. So far as the Acting Secretary is aware, the sellers have not, and will not, offer any such release or indemnity. The Court should view Kadima's unwillingness to walk away as a deviation "from the behavior one would expect in an arms-length deal." *S3 Graphics Co., Ltd. v. ATI Technologies, ULC*, No. 11-cv-1298, 2015 WL 7307241, at *20. (D. Del. Oct. 21, 2015) (citation and quotations omitted).

## III. An Injunction Requiring Notice of Future Transfers is Justified

Defendants and their owners are attempting to transfer the remaining eight Facility Defendants. Lahasky Dep. Tr. at 83:19–84:11. As to four Facility Defendants, Mr. Lahasky testified that the transfers "are pretty far along." *Id*. at 85:1–5. However, he refused to identify the counter-party, citing a specific fear of the Acting Secretary. *Id*. at 86:3–10.

Given their history of bad faith, and their specific intent to harm the Acting Secretary with this transaction, the Court should limit Defendants' ability to dissipate assets. In the past year, they have: (1) represented a settlement to the Court, only to renege and delay the Phase II trial; (2) filed a motion to stay, which the Court found difficult "not to view . . . as anything other than a delay tactic" (Dkt. 320 at 7); (3) filed another motion to stay, which the Court properly denied (Dkt. 383), and; (4) attempted to unload assets on before trial through an insider deal, a primary purpose of which was to evade FLSA liability. These efforts pose a grave risk to the Acting Secretary, the employees, and the public. *See* Dkt. 383 at 3 ("The Court remains firm in its previous decision that further delay of this case, especially given that only the Phase II bench trial remains, presents the risk of significant harm and is extremely prejudicial to the Secretary and not in the best interest of serving the public or the employees of Facility Defendants.").

The Acting Secretary respectfully submits that it is appropriate to require at least fourteen days' notice of any future sales or transfers of Facility Defendant assets. This should include disclosure of the persons or entities to whom the transfers would be made. A limited notification requirement does not imperil Defendants' rights to conduct an arms-length transaction, and it provides the Acting Secretary enough opportunity to determine what steps, if any, are necessary to protect her enforcement interests. This would also protect the Court and its interest in adjudicating this dispute and ensuring that it can afford complete relief.

Respectfully Submitted,

**UNITED STATES DEPARTMENT OF LABOR**

Seema Nanda
Solicitor of Labor

Samantha N. Thomas
Acting Regional Solicitor

Adam Welsh
Wage and Hour Counsel

*/s/ Alejandro A. Herrera*
Alejandro A. Herrera
Senior Trial Attorney
PA 326897; NY 5235601

*/s/ Mohamed Seifeldein*
Mohamed Seifeldein
Trial Attorney
*Pro Hac Vice*

*/s/ Erik Unger*
Erik Unger
Trial Attorney
*Pro Hac Vice*

Mailing Address:

U.S. Department of Labor
Office of the Regional Solicitor
1835 Market Street
Mailstop SOL/22
Philadelphia, PA 19103-2968

(215) 861-5136 (voice)
(215) 861-5162 (fax)

herrera.alejandro.a@dol.gov

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 26, 2023, I electronically filed the foregoing Acting Secretary's Pre-Hearing Memorandum Regarding Request for Preliminary Injunction by using the CM/ECF system.

Date: September 26, 2023

*/s/ Alejandro A. Herrera*

Alejandro A. Herrera
Senior Trial Attorney
PA 326897; NY 5235601

U.S. Department of Labor
Office of the Regional Solicitor
1835 Market Street
Mailstop SOL/22
Philadelphia, PA 19103-2968
herrera.alejandro.a@dol.gov
(215) 861-5136 (voice)
(215) 861-5162 (fax)