IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JULIE A. SU, *Secretary of Labor, United States Department of Labor*, <br><br> *Plaintiff*, <br><br> v. <br><br> COMPREHENSIVE HEALTHCARE MANAGEMENT SERVICES, LLC, *et al*, <br><br> *Defendants*. | Civil Action No. 2:18-cv-1608 <br><br> Hon. William S. Stickman IV |

## MEMORANDUM OPINION

WILLIAM S. STICKMAN IV, United States District Judge

Plaintiff, Julie A. Su, Acting Secretary of Labor for the United States Department of Labor ("the Acting Secretary"), asks the Court to enter a preliminary injunction enjoining Defendants[1] from the sale of seven Facility Defendants set to close prior to the adjudication of the Phase II bench trial. (ECF No. 361). The Acting Secretary asserts that Defendants are seeking to opportunistically offload assets to an "insider" in order to frustrate, if not fully thwart, the Acting Secretary's ability to recover a judgment. (*See* ECF No. 391, pp. 1-2). For the

---

[1] Defendants in this case are Comprehensive Healthcare Management Services, LLC d/b/a Brighton Rehabilitation and Wellness Center ("CHMS"); Maybrook-C Briarcliff Opco, LLC, d/b/a The Grove at Irwin or The Grove at North Huntingdon; Maybrook-C Evergreen Opco, LLC, d/b/a The Grove at Harmony; Maybrook-C Kade Opco, LLC, d/b/a The Grove at Washington; Maybrook-C Latrobe Opco, LLC, d/b/a The Grove at Latrobe; Maybrook-C Overlook Opco, LLC, d/b/a The Grove at New Wilmington; Maybrook-C Silver Oaks Opco, LLC, d/b/a The Grove at New Castle; Maybrook-C Whitecliff Opco, LLC, d/b/a The Grove at Greenville; Monroeville Operations LLC, d/b/a Monroeville Rehabilitation & Wellness Center; Cheswick Rehabilitation and Wellness Center, LLC; Mt. Lebanon Rehabilitation and Wellness Center, LLC; Murrysville Operation, d/b/a Murrysville Rehabilitation & Wellness Center; North Strabane Rehabilitation and Wellness Center, LLC; North Strabane Retirement Village, LLC; South Hills Operations LLC, d/b/a South Hills Rehabilitation and Wellness (collectively, "Facility Defendants"), and Sam Halper ("Halper") (collectively, "Defendants").

1

reasons explained below, the Court holds that the Acting Secretary did not meet her burden in demonstrating that she is entitled to the preliminary injunctive relief requested.

## I.   STANDARD OF REVIEW

The grant or denial of a preliminary injunction is within the sound discretion of a district court. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 178–79 (3d Cir. 2017) ("District courts have the freedom to fashion preliminary equitable relief so long as they do so by 'exercising their sound discretion.'" (citation omitted)). The primary purpose of preliminary injunctive relief is "maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 647 (3d Cir. 1994). The "status quo" refers to "the last, peaceable, noncontested status of the parties." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). Rather, such relief "should be granted only in limited circumstances." *Kos Pharms.*, 369 F.3d at 708 (citation omitted). A moving party "must establish entitlement to relief by clear evidence." *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 526 (3d Cir. 2018). Specifically, the movant must demonstrate:

> (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief.

*Kos Pharms.*, 369 F.3d at 708; *see also Winter*, 555 U.S. at 20. The first two factors are "the most critical," and the moving party bears the burden of making the requisite showings. *Reilly*, 858 F.3d at 176, 179 (citations omitted). Once those "gateway factors" are met, a court should "consider[] the remaining two factors" and then "determine[] in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179.

In reaching its decision on a request for injunctive relief, a district court sits as both the trier of fact and the arbiter of legal disputes. A court must, therefore, make "findings of fact and conclusions of law upon the granting or refusing of a preliminary injunction." *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1178 (3d Cir. 1990) (citing Fed. R. Civ. P. 52(a)(2)). This "mandatory" requirement of Federal Rule of Civil Procedure Rule 52(a)(2) must be met "even when there has been no evidentiary hearing on the motion." *Id.* Nevertheless, at the preliminary injunction stage, "procedures [] are less formal and evidence [] is less complete than in a trial on the merits." *Kos Pharms.*, 369 F.3d at 718; *see also AT&T Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994) ("[T]he grant or denial of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing [that] is the responsibility of the district judge." (citations omitted)). Accordingly, a court "may rely on affidavits and hearsay materials which would not be admissible evidence." *Kos Pharms.*, 369 F.3d at 718 (quoting in parenthetical *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995)). But the weight given to such materials will "vary greatly depending on the facts and circumstances of a given case." *Id.* at 719. A court is also tasked with assessing the credibility of witness testimony and may base the decision to grant or deny a preliminary injunction on credibility determinations. *See, e.g., Hudson Glob. Res. Holdings, Inc. v. Hill*, 2007 WL 1545678, at *8 (W.D. Pa. May 25, 2007).

## II. Factual Background

This case has been pending since 2018. It concerns the allegedly unlawful compensation practices of numerous nursing and personal care facilities. The Acting Secretary filed a collective action on behalf of thousands of employees working for these facilities, alleging that the facilities and some of their leadership individually and collectively violated various

3

provisions of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201–219, by under-compensating their employees and failing to maintain accurate pay records.

Within the nearly five years that this suit has been pending before the Court, Defendants have admitted joint and several liability under the FLSA, and thus, the only issue left for the Court to determine is the allocation of liability and amount of damages to be awarded. (*See* ECF No. 268). On February 7, 2023, the Court scheduled a bench trial to begin on September 11, 2023. (ECF No. 334). Four weeks before trial was to commence, the Acting Secretary learned from a non-party source that at least four Facility Defendants were to be sold by September 1, 2023. (ECF No. 350, p. 1). An emergency status conference occurred on August 22, 2023. (ECF No. 357). Defendants confirmed that they had a plan to sell seven Facility Defendants with an official closing date of October 1, 2023, but discussed the possibility that the transaction may close on an earlier date. (*Id.*).

On August 29, 2023, the Acting Secretary filed a Motion for Temporary Restraining Order and Order to Show Cause Why Preliminary Injunction Should Not Issue ("Motion"). (ECF No. 361). The Court granted the initial temporary restraining order ("TRO") on August 30, 2023, and issued its modified version on September 2, 2023, to preserve the status quo pending a decision on the Motion. (ECF Nos. 364, 366). Due to emergent circumstances, the case was transferred to Chief Judge Mark R. Hornak, who presided over the September 6, 2023, injunction hearing. (ECF Nos. 368, 370, 373). Chief Judge Hornak extended the TRO, in its amended form, to end on September 27, 2023 at 5:00 p.m. (ECF No. 374). In light of parties' difficulties in completing expedited discovery within the initial timeline set forth, Chief Judge Hornak extended the TRO to remain in place until October 5, 2023. (ECF No. 382). Upon the

4

transfer of the case back from Chief Judge Hornak, the Court presided over the preliminary injunction hearing on September 27, 2023 ("the Hearing").[2] (ECF No. 386).

Facility Defendants' financial resources and ability to keep their doors open to patients is uncertain but looks bleak. (ECF No. 391-2, pp. 11-12); (ECF No. 392, p. 2); (9/13/23 Sam Halper Deposition Transcript ("Halper Dep."), p. 86); (9/11/23 Ephram "Mordy" Lahasky Deposition Transcript ("Lahasky Dep."), pp. 70-73, 88); (9/27/23 Hearing Transcript ("Tr."), p. 153).[3] They have been losing money for some time, and the facilities seemingly do not have substantial funds remaining to continue operations. (Halper Dep., pp. 86-87); (Lahasky Dep., p. 88); (Tr., p. 153). Additionally, Defendants have defaulted on their approximately $46 million-dollar loan with CIBC, even though the bank has not exercised its default rights. (Lahasky Dep., pp. 117-18); (ECF No. 372-2); (Tr., p. 150).

Since February 2023, at the latest, sales of Facility Defendants have been in the works with potential buyers. (Halper Dep., pp. 37, 42-43, 48, 58, 64, 69, 84); (Morris Dep., pp. 44, 47-48, 84); (Lahasky Dep., pp. 66-67, 76, 94); (9/19/23 David Gast Deposition Transcript ("Gast Dep."), p. 45); (Tr., p. 138). The sale of seven Facility Defendants was largely orchestrated in order to allow Facility Defendants to remain in operation and not displace hundreds of patients. (Halper Dep., pp. 86-87). The transaction included both the real estate on which the facilities sit as well as a transfer of the license for the operational aspects of the businesses for a total of $56 million. (Morris Dep., pp. 57-60, 65-66, 75-76); (Lahasky Dep., pp. 92-93, 123-24). Ephram Lahasky, one of the owners of CHMS, introduced the company to a potential buyer, Kadima Healthcare Management, Inc. ("Kadima"). (Lahasky Dep., pp. 68, 73 82-83). While Lahasky

---

[2] The following summarizes the Court's findings of fact.

[3] Deposition transcripts were submitted to the Court via email on September 25, 2023.

owns a 5% interest in some of the limited liability companies ("LLCs") that make up the larger Kadima entity, he has no direct equity interest in any of the purchasing LLCs. (Morris Dep., pp. 25-26, 41, 93-94); (Lahasky Dep., pp. 9-10, 27, 37-38, 54-55, 59, 61, 138).

### III. ANALYSIS

**A. The Court has the power to grant the requested injunction if it is otherwise warranted.**

A threshold question for the Court—one that is hotly contested between the parties—is whether the Court has the equitable power to grant the requested relief under Article III of the Constitution, as interpreted by *Grupo Mexicano de Desarrollo, S.A., et al. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999). The Court holds that it does.

In *Grupo Mexicano*, the Supreme Court addressed "whether, in an action for money damages, a United States District Court has the power to issue a preliminary injunction preventing the defendant from transferring assets in which no lien or equitable interest is claimed." (*Id.* at 310). The Court explained that the extent of federal equity jurisdiction is coterminous with that of the English Court of Chancery at the time of ratification. (*Id.* at 318-19). ("[T]he equity jurisdiction of the federal courts is the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act, 1789 (1 Stat. 73).") (citation omitted)). The Supreme Court explored, therefore, whether federal equity authority—as it has existed from the ratification of the Constitution—included the right to enjoin the transfer of assets in an action seeking only money damages. It concluded that it does not. (*Id.* at 322-23). No such authority was exercised by the Court of Chancery, or any court of equity in England or America, at the time of the framing, nor at any time long after. (*Id.*).

6

The Supreme Court's holding in *Grupo Mexicano* was, however, narrow. The Court's own language announcing its decision was careful to specify that it was addressing the discrete question of whether a court could enjoin the transfer of assets in an action for monetary damages. (*Id.* at 333). Accordingly, it does not foreclose the exercise of such authority where equitable relief is sought. Courts interpreting *Grupo Mexicano* have held that a district court may enjoin the dissipation of assets where a claim for equitable relief is asserted. In *United States ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 489, 496 (4th Cir. 1999), the United States Court of Appeals for the Fourth Circuit explained that "*Grupo Mexicano*'s holding is carefully circumscribed, providing specifically that the general equitable powers of the federal courts do not include the authority to issue preliminary injunctions in actions solely at law." It observed that "[t]he Court was not presented with, nor did it choose to address, a situation in which equitable remedies were claimed." (*Id.*). The Fourth Circuit persuasively held that an injunction may issue to bar the transfer of assets when there is a claim of equitable relief:

> [W]here a plaintiff creditor has no lien or equitable interest in the assets of a defendant debtor, the creditor may not interfere with the debtor's use of his property before obtaining judgment. A debt claim leads only to a money judgment and does not in its own right constitute an interest in specific property. Accordingly, a debt claim does not, before reduction to judgment, authorize prejudgment execution against the debtor's assets.
>
> On the other hand, when the plaintiff creditor asserts a cognizable claim to specific assets of the defendant or seeks a remedy involving those assets, a court may in the interim invoke equity to preserve the *status quo* pending judgment where the legal remedy might prove inadequate and the preliminary relief furthers the court's ability to grant the final relief requested. This nexus between the assets sought to be frozen through an interim order and the ultimate relief requested in the lawsuit is essential to the authority of a district court in equity to enter a preliminary injunction freezing assets.

(*Id.* at 496-97). A number of district courts have reached the same conclusion, including courts within the Third Circuit. *See Berger v. Weinstein*, Civil Action No. 07-994, 2008 WL 191172, at

*9 (E.D. Pa. Jan. 23, 2008); *Bradley v. Amazon.com, Inc.*, Civil Action No. 17-1587, 2021 WL 5631754, at *2 (E.D. Pa. Dec. 1, 2021). The Court believes that these cases accurately address the scope of its equitable authority.

Thus, the Court's authority to grant the relief the Acting Secretary seeks hinges on whether she has sought equitable relief that has a nexus with the assets whose transfer she seeks to enjoin. This is a point of dispute between the parties. The Acting Secretary has pled claims for both back pay and front pay under Section 17 of the FLSA. (ECF No. 1, p. 7).

Section 17 provides:

> The district courts, together with the United States District Court for the District of the Canal Zone, the District Court of the Virgin Islands, and the District Court of Guam shall have jurisdiction, for cause shown, to restrain violations of section 215 of this title, including in the case of violations of section 215(a)(2) of this title the restraint of any withholding of payment of minimum wages or overtime compensation found by the court to be due to employees under this chapter (except sums which employees are barred from recovering, at the time of the commencement of the action to restrain the violations, by virtue of the provisions of section 255 of this title).

29 U.S.C.A. § 217. Courts have interpreted claims for back pay and front pay under Section 17 to be equitable in nature. *Dole v. Haulaway Inc.*, 723 F.Supp. 274, 288 (D.N.J. 1989) ("Section 17 of the Act, 29 U.S.C. § 217, provides for equitable relief in the form of injunctions to restrain future violations of the Act and to restrain the continued withholding of back wages due."); *see also Blair v. Comprehensive Healthcare Mgmt. Servs., LLC*, Civil Action No. 2:18-cv-254, 2020 WL 6743513, at *6 (W.D. Pa. Nov. 17, 2020) (quoting *EEOC v. Am. Tel. & Tel Co.*, 365 F. Supp. 1105, 1121 (E.D. Pa. 1973) ("Additionally 'the relief obtainable under [§] 17, as distinguished from that allowable under [§§] 16(b) or (c), is derived from equity and is not limited to restitutory sustenance. Rather an action under [§] 17 is one for the vindication of the public interest.'").

The Acting Secretary has pled claims for equitable relief. Those claims have a close nexus with the facilities whose sale she seeks to enjoin. The Court holds that the impediment to the exercise of the Court's equitable authority addressed by *Grupo Mexicano* is not implicated in this case. The Court has the authority to enjoin the sale if the generally applicable standards for issuing a preliminary injunction are met.

**B.    The Acting Secretary has sufficiently demonstrated that she is likely to succeed on the merits of her underlying FLSA claims.**

In order to obtain the requested preliminary injunctive relief, the Acting Secretary must demonstrate "[she] can win on the merits." *Reilly*, 858 F.3d at 179. At this preliminary stage, the Acting Secretary need not make "a more-likely-than-not showing of success on the merits." (*Id.* at 179, n.3). Instead, she must "show a *likelihood* of success on the merits (that is, a reasonable chance, or probability, of winning)." *Singer Mgmt. Consultants v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (*en banc*) (emphasis in original). This "requires a showing significantly better than negligible but not necessarily more likely than not." *Reilly*, 858 F.3d at 179.

The Acting Secretary need only demonstrate that she will succeed at least on *some* of her claims *in part*. Put another way, she need not demonstrate that she is likely to succeed in whole on each claim brought against Defendants. At this stage of the litigation, Defendants have conceded joint and several liability for FLSA violations. (ECF No. 268). The remaining issue to be resolved in the Phase II trial is the amount of relief that the Acting Secretary is entitled to—anywhere from zero to $41 million (the total amount the Acting Secretary seeks). While the ultimate judgment amount remains unknown, the Acting Secretary has sufficiently demonstrated that she is likely to recover at least some of the requested relief. (Tr., pp. 78-79 ("When it comes to the question of whether there is a likelihood of success to some extent on the merits and there will be a judgment, I think there is pretty strong likelihood there is going to be a judgment.")).

Thus, the Court finds that the Acting Secretary has demonstrated a reasonable likelihood of success on the merits.

> **C. The Acting Secretary has not shown that she will suffer irreparable harm absent the Court granting her requested preliminary injunction nor that the transaction is a fraudulent conveyance under Pennsylvania law.**

      a. <u>Irreparable and Immediate Harm</u>

The Acting Secretary must next show that "[she] is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly*, 858 F.3d at 179. In other words, she must "demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Acierno*, 40 F.3d at 653. This potential harm must be "immediate"— it is insufficient to warrant preliminary injunctive relief "if the harm will occur only in the indefinite future." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) (citation omitted).

Here, the harm that the Acting Secretary claims will occur if the Court denies her request for injunctive relief is both repairable and speculative. Considering irreparability first, in the Hearing, the Acting Secretary acknowledged that she has two remedies available, should she be unable to recover on whatever judgment the Court enters in her favor: (1) successor liability under the FLSA, and (2) clawback measures under the Pennsylvania Uniform Voidable Transactions Act ("PUVTA"), 12 Pa. Cons. Stat. Ann. § 5101, *et seq.* (Tr., p. 128-30). It follows that even though the Acting Secretary's recovery might be "at stake," she may seek redress under either of these statutory protections and thus the harm that the Acting Secretary alleges is not irreparable. (*Id.* at 130; *see Acierno*, 40 F.3d at 653).

The potential harm of not being able to recover a judgment from the Phase II trial is also not immediate. In order for the Court to find that the Acting Secretary's harm is immediate, it

10

would require the Court to make two presumptions. The first is that a substantially sized judgment will be entered in the Acting Secretary's favor at the conclusion of the Phase II trial. (*See* Tr., pp. 136-37). The second is that the collectability of that judgment will be impossible if the transaction for seven of the fifteen Facility Defendants was consummated. (*Id.*). The Court cannot rely on such speculations. The Acting Secretary's uncertainty as to the value of the Facility Defendants to be sold as well as those that would remain fails to demonstrate that the sale would exceed the ability of Defendants' joint and several liability to pay a Phase II judgment. (*See id.* at 127, 133-34). Therefore, the Court finds that the Acting Secretary has not met her burden that, but for this transaction, she has no other remedy at law or in equity and that she will be immediately harmed by the sale of seven Facility Defendants.

### b. Fraudulent Conveyance

The Acting Secretary acknowledges that there is some degree of speculation involved in the irreparable and immediate harm analysis but argues that she does not need to show such harm if the transaction at issue is a fraudulent conveyance under PUVTA. (Tr., pp. 137-38). The statute states "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay or defraud any creditor of the debtor . . . ." 12 Pa. C.S.A. § 5104(a). To determine an actor's "actual intent," a court considers the circumstances of the transaction, such as whether the transfer was to an insider and the timing of the transfer, particularly as related to any legal action pending against the transacting party as well as any impending liabilities or obligations. (*Id.* § 5104(b)).

At the Hearing, the Court asked the Acting Secretary what factual findings it would need to make, given the evidence presented, in order to grant the preliminary injunctive relief that she seeks. (Tr., p. 138). Counsel directed the Court to consider: (1) the witnesses' testimony at the Hearing, particularly Martha Stillwagon's and Lisa Baldi's, as to Defendants' actual, expressly stated, fraudulent intent regarding the sale; (2) the timing of the transaction in relation to the scheduled Phase II trial and impending bank loan default; and (3) that the sale was to an insider. (Tr., pp. 138-40); (*see also* ECF No. 391, p. 3). The Court considers each in turn.

First, the Acting Secretary called three witnesses to testify at the Hearing: Denise Cox ("Cox"), Martha Stillwagon ("Stillwagon"), and Lisa Baldi ("Baldi"). The Court does not find that their testimony is sufficient to carry the Secretary's burden of showing that the proposed sale is an overt attempt to offload assets to avoid liability. The Court finds that, when taken as a whole, the witnesses' testimony was less than reliable.

First, having carefully listened to their testimony, the Court finds that the witnesses were all quite biased. Cox is a representative of the Service Employees International Union (SEIU), the union that represents employees of four Facility Defendants. (Tr., pp. 11-12, 24). Stillwagon and Baldi are both former employees of Facility Defendants. (*Id.* at 31, 33, 91-92). Stillwagon is directly involved in a number of other lawsuits against either the individual owners of, or the entities that comprise, Defendant CHMS. (*Id.* at 56-60, 80-81). She is a defendant in an action brought by one of the Defendants and has received cash payments for testimony offered in the related criminal proceeding. (*Id.*). Each of these witnesses—but especially Stillwagon—have an ax to grind against Defendants. The Court considered this in its assessment of the weight to give to their testimony.

Additionally, weight afforded to the witnesses' testimony was further diminished because they were not witnesses best positioned to testify about the subject matter they addressed. In other words, the Court questions the reliability of their testimony. Each of the witnesses testified to communications where the information discussed was relayed to them by a third party. Cox recounted what John Reichart ("Reichart") told her what he heard was the reason for the sale of the subject facilities. (*Id.* at 5-6). Stillwagon and Baldi testified about what Jim Schmerbeck ("Schmerbeck") allegedly told them about what he heard from Halper. (*Id.* at 39-40, 45, 99-101). The Acting Secretary did not call Reichart or Schmerbeck. As such, all information the witnesses testified about having pertaining to the sale was second-, if not third-hand knowledge. The witnesses did not (and could not) offer any specific details about the context and circumstances of the alleged declarations of Defendants. Baldi's testimony, where she stated that her knowledge of the sale of Facility Defendants was based on what Schmerbeck told her, best illustrates the lack of reliability of her testimony (as well as that of Cox and Stillwagon). She claimed that Schmerbeck told her that "Sam [Halper] said" it was his intent to sell the Facility Defendants at issue in order to avoid paying a judgment rendered in the Phase II trial. (Tr., pp. 102, 106-09, 112). Baldi could not testify as to whether Halper specifically stated this intent to Schmerbeck, whether Schmerbeck overheard Halper say this to another, or if this was just something that Schmerbeck believed was how Halper felt about the situation. (*Id.*). Taken altogether, the witnesses offered by the Acting Secretary did not reliably establish that this transaction is an expressly fraudulent conveyance based on Defendants' purported statements.

The second point the Acting Secretary urges the Court to give weight to is the timing of and circumstances surrounding this sale. The Acting Secretary, however, concedes that Defendants' attempts to sell seven Facility Defendants began earlier than when she first learned

of the transaction, dating back to at least February of this year. (Tr., p. 138). Such information also pervades the exhibits and depositions the parties submitted. (*See* Halper Dep., pp. 37, 42-43, 48, 58, 64, 69, 84); (Morris Dep., pp. 44, 47-48, 84); (Lahasky Dep., pp. 66-67, 76, 94) (CHMS Elliot Lee Emails, Ex. 4). While the timing pertaining to the closing of the sale does look opportunistic, the record provides more context and clarity to the negotiations and other circumstances that occurred leading up to the transaction. Accordingly, the timing of the transaction does not demonstrate that eluding judgment in this case was Defendants' actual intent and thus the overall persuasiveness of these circumstances is greatly diminished.

Finally, the Court finds that the Acting Secretary failed to demonstrate that Lahasky is an "insider" to the extent necessary to establish that the sale at issue is a fraudulent transaction. At the Hearing, the Acting Secretary conceded that Lahasky does not hold a direct ownership interest in the entities within Kadima that are transacting with Defendants. (Tr., p. 141); (*see also* Lahasky Dep., pp. 9-10, 27, 37-38, 54-55, 59, 61, 138); (Morris Dep., pp. 25-26, 41, 93-94). Rather, the 5% interest that the Acting Secretary takes issues with is in tangential businesses that are not part of the sales transaction between CHMS and Kadima. Though the parties dispute whether Lahasky owns 5%, 20%, or somewhere in between in some of the LLCs within Kadima, the exact number is collateral to the fact that whatever amount of ownership it is, it is not in the purchasing LLCs themselves. (Tr., pp. 148-49) (*see also* Lahasky Dep., pp. 10, 37-38, 54-55).

Taking all of these considerations into account, the Court does not find that the Acting Secretary has met her burden in establishing that the sale of the Facility Defendants at issue is a fraudulent conveyance that would warrant the Court to enjoin this transaction.

### D. Both parties and the public have competing important interests which neutralize the final two factors.

"[T]he balance of equities and consideration of the public interest [] are pertinent in assessing the propriety of any injunctive relief." *Winter*, 555 U.S. at 32. The third factor requires consideration of whether, and to what extent, Defendants will suffer irreparable harm from the grant of a preliminary injunction. *See Kos Pharms.*, 369 F.3d at 727. The Court must then "balance the hardships" likely to be suffered by the Acting Secretary (if an injunction is denied) and by Defendants (if an injunction is granted), *id.* (citation omitted), and determine whether the "equities tip[] in [the Acting Secretary's] favor," *Winter*, 555 U.S. at 20. "[T]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in [her] favor." *Kos Pharms.*, 369 F.3d at 729 (citation omitted).

It is uncertain what would happen if the sale were to proceed. Facility Defendants' ability to remain in business has been called into question, and to compound that, their lender bank is in a position to foreclose on a multi-million-dollar loan. If the Court were to grant the requested injunctive relief, Defendants may face a more dire financial situation than they already find themselves in now, but absent more information as to the impending nature of their financial future, the Court cannot find this to be true. Conversely, the Acting Secretary has an interest in recovering the judgment imposed against Defendants at the conclusion of the Phase II trial. If the injunction is denied, the Acting Secretary may be harmed by Defendants' future inability to pay this judgment. As discussed above, however, such injury is too speculative for the Court to give substantial weight to when balancing. Thus, the Court finds that the balance of equities here is neutral, where both parties may or may not be harmed by the imposition of an injunction, and there is not enough information in the record to definitively tip the scales in either parties' favor.

The fourth factor asks whether "an injunction is in the public interest." *Winter*, 555 U.S. at 20. "In exercising their sound discretion, courts of equity should pay particular regard [to] the public consequences in employing the extraordinary remedy of injunction." (*Id.* at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982))). Nevertheless, "[w]eighing the public interest in preliminary relief is often fairly routine." *Kos Pharms.*, 369 F.3d at 730. "As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *AT&T*, 42 F.3d at 1427 n.8.

Since the Acting Secretary has not met her burden regarding irreparable injury, the Court cannot assume this final factor weighs in her favor. (*See id.*). The public's interest in granting this injunction does not loom so large that it requires the Court to enjoin the sale at issue. Additionally, the public also has an interest in the denial of this injunction, such that the Court's refusal to grant injunctive relief would not forestall Defendants' attempts to keep Facility Defendants open to provide the necessary services for their patients without interruption. Thus, the Court finds that this final factor is also neutral.

## IV. Conclusion

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. In this case, after balancing all four factors, the Court finds that the Acting Secretary has failed to carry her burden of demonstrating that she is entitled to the extraordinary relief of an injunction because the harm imposed by the denial of injunctive relief is neither irreparable nor immediate. The Acting Secretary's Motion will be denied by Order of Court to follow.

BY THE COURT:

/s/ William S. Stickman IV

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

10-5-2023
Date