IN THE UNITED STATES DISTRICT COURT

OF WESTERN PENNSYLVANIA


| | |
|---|---|
| JULIE A. SU, Secretary of Labor, United States Department of Labor,<br><br>          Plaintiff,<br><br>      vs.<br><br>COMPREHENSIVE HEALTHCARE MANAGEMENT SERVICES, LLC, et al.<br><br>          Defendants. | CIVIL DIVISION<br><br>No. 18-1608 |

————————————————

 Transcript of BENCH TRIAL held on JANUARY 11, 2024
United States District Court, Pittsburgh, Pennsylvania
BEFORE: HONORABLE WILLIAM S. STICKMAN, IV, DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | Alejandro Alfonso Herrera, Esq.<br>Mohamed E. Seifeldein, Esq.<br>Eric Unger, Esq.<br>U.S. Department of Labor |
| For the Defendant: | Jeffrey Schwartz, Esq.<br>Marla N. Presley, Esq.<br>Ann Zebrowski, Esq. |
| Court Reporter: | Karen M. Earley, RDR-CRR<br>Joseph F. Weis, Jr.<br>U.S. Courthouse<br>Room 6260<br>700 Grant Street<br>Pittsburgh, PA 15219<br>412-201-2660 |

Proceedings reported by mechanical stenography.
Transcript produced by computer-aided transcription.

I N D E X

- - -

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| PLAINTIFF'S WITNESSES: | | | | |
| Michael Murray | 4 | 161 | 184 | -- |
| Thomas Slagle | 186 | 208 | -- | -- |

```
 1                   P R O C E E D I N G S
 2    (January 11, 2024, 9:30 a.m.  In open court.)
 3             THE COURT:  I understand there is discussion
 4    about early dismissal on Friday.  What's the general
 5    consensus?  Is there a general consensus?
 6             MR. SCHWARTZ:  I say between 3:00 and 3:30
 7    should be fine.
 8             THE COURT:  That's more than reasonable on a
 9    holiday weekend.  I assume some of you are taking
10    flights.  No worries at all.
11             MR. SCHWARTZ:  Thank you.
12             THE COURT:  Are you ready to go, Mr. Herrera?
13             MR. HERRERA:  Yes, Your Honor.
14             THE COURT:  You can call your next witness.
15             MR. HERRERA:  We will call Michael Murray.  I
16    will go and collect him from the witness room.
17             THE COURT:  Okay.  Approach and raise your
18    right hand.
19             MICHAEL MURRAY, a witness herein,
20    having been duly sworn, testified as follows:
21             THE COURT:  Have a seat.  Adjust the
22    microphone so it's where you need it to be.  Please
23    state your name for our court reporter.
24             THE WITNESS:  My name is Michael Murray,
25    M-i-c-h-a-e-l, M-u-r-r-a-y.
```

**Michael Murray - Direct by Mr. Herrera**

1          <u>DIRECT EXAMINATION</u>

2    <u>BY MR. HERRERA:</u>

3    Q.    Good morning, Mr. Murray.  First question for you

4    sir, are you currently employed?

5    A.    I'm employed by the U.S. Department of Labor.

6    Q.    What do you do with the U.S. Department of Labor?

7    A.    Security IT specialist.  I work with the Office of

8    the Chief Information Officer.

9    Q.    What is the Office of the Chief Information

10   Officer?

11   A.    Basically the technology support office for the

12   Department of Labor.

13   Q.    What does that office do just in general terms tell

14   us, please?

15   A.    Well, we manage all the IT hardware and software

16   that is used by the department.

17   Q.    What is your role, specifically, as an IT

18   specialist?

19   A.    Specifically I work on information security, just

20   making sure the Department of Labor's information

21   systems are meeting the security requirements.

22   Q.    Did you have employment prior to working with what

23   I'll all OCIO?

24   A.    Yes.

25   Q.    What was that?

**Michael Murray - Direct by Mr. Herrera**

1   A.   I was a contractor for a company called

2   GovernmentCIO, and that's all one word, and we had a

3   contract with the Department of Labor solicitor's

4   office.

5   Q.   What is the business of GovernmentCIO?

6   A.   It does a lot of contracting services for the

7   federal government.  It focuses on information

8   technology.

9   Q.   What was your role within GovernmentCIO?

10  A.   So I was an IT specialist.  I did some database

11  work and some security work.

12  Q.   What do you mean by database work?

13  A.   For the solicitor's office, one of our tasks was to

14  support a system we use.  It has a database.  We create

15  reports for that and managed the database for that and

16  we also provided litigation support services.

17  Q.   What kind of litigation support services?

18  A.   We would help them with large data files.

19  Q.   What kind of files?  Describe them for me, please.

20  A.   They could be an Excel spreadsheet or a text file

21  called comma-separated value or CSV for short.  In some

22  cases, we would get files that were exported from

23  database systems.

24  Q.   What was the nature of the support you provided

25  with respect to litigation and large files as you

**Michael Murray - Direct by Mr. Herrera**

1  described them?

2  A.   We would help just open the files.  Often they

3  didn't have the tools -- the solicitor's office didn't

4  have the tools to open the files and view the data

5  inside them.  So we would first take a look at the data

6  and tell them what was in there.

7  Q.   What was the technical issue, why couldn't they

8  open them?

9  A.   Typically, they would use Microsoft Excel to open

10  these files and if there is more than one million rows

11  in the data file, then Excel will not display them all.

12  It will cut them off.

13  Q.   Why not?

14  A.   It's just a limitation in Excel with over a million

15  rows of data and it doesn't go beyond that.

16  Q.   Mr. Murray, how long did you work for

17  GovernmentCIO?

18  A.   I started 2012, started my new job in 2022, so it

19  was ten years total.

20  Q.   Can you just describe or summarize for us your

21  education, please.

22  A.   I have a bachelor's degree from Johns Hopkins

23  University and I have a master's degree from George

24  Mason University in Virginia.

25  Q.   When did you obtain your master's degree?

**Michael Murray - Direct by Mr. Herrera**

1  A.   It was in 2010.

2  Q.   What is that degree in?

3  A.   It's information systems.

4  Q.   Mr. Murray, do you have any familiarity with the

5  Fair Labor Standards Act?

6  A.   I've heard of it.

7  Q.   What is your general understanding of it, if any?

8  A.   My understanding is that it governs wage loss.  So

9  for people who work over 40 hours, they have to get paid

10  time and a half if they are nonexempt and also minimum

11  wage I believe is covered by it.

12  Q.   Mr. Murray, are you an attorney?

13  A.   I am not.

14  Q.   Have you ever been an attorney?

15  A.   No, I haven't.

16  Q.   Do you conduct legal research, sir?

17  A.   I do not.

18  Q.   Have you ever worked on a matter involving the

19  FLSA, Fair Labor Standards Act, either within

20  GovernmentCIO or the OCIO office you described?

21  A.   Yes.

22  Q.   Tell me about that work, please.

23  A.   So these cases come from the Wage and Hour Division

24  in the Department of Labor and they involve the

25  solicitor's office I guess when they go to trial.

**Michael Murray - Direct by Mr. Herrera**

1              So, typically the Wage and Hour investigators

2    will look at the data and do their back wage

3    computations, but if the files are too big, then my

4    company at the time was asked to assist with the large

5    files.

6    Q.   What data are they looking at, what are you

7    referring to?

8    A.   Typically payroll data, cases involving payment to

9    employees.

10   Q.   Where does this payroll data come from?

11   A.   Provided by the companies that are involved in the

12   case.

13   Q.   If the data is so voluminous that Microsoft Excel

14   cannot access it because it has more than a million

15   rows, are there any options to access that data with a

16   different program?

17   A.   Yes.

18   Q.   Tell me about that, please.

19   A.   So we can use Microsoft Access.  It's a different

20   Microsoft application for databases.  For very really

21   large data sets, we can use Microsoft SQL server.  It's

22   a more robust enterprise scale database tool.

23   Q.   In general terms with someone who is not familiar

24   with the software, can you explain what Microsoft Access

25   is?

**Michael Murray - Direct by Mr. Herrera**

1   A.   It's a desktop database application meaning it's

2   not installed on the server.  So it's just running off

3   your laptop or your desktop.

4        It can contain more data or display more data

5   than Excel can and it also allows you to store data in

6   different tables.  It's kind of a container for data

7   that consists of columns and rows and you can work with

8   the different tables.

9   Q.   What do you mean by tables?

10  A.   So a table is just a structure for storing the

11  data.  You can think of it as columns across the top,

12  which are the fields, and rows, and each row is a unique

13  instance of data within that table.  You can have one or

14  more millions of rows.

15  Q.   So I have seen in Microsoft Access they refer to

16  them as individual sheets within an Excel file.  Is that

17  what you are describing?

18  A.   It's similar.  It would look the same if you opened

19  them up but Microsoft Access allows you to do more

20  easily work with the tables together than Excel does.

21  Q.   What specifically you, Mr. Murray, in these FLSA

22  cases you had involvement with, why were you asked to

23  get involved?

24  A.   Initially because I had familiarity with the tools

25  like Microsoft Access and Microsoft SQL server.

**Michael Murray - Direct by Mr. Herrera**

1   Q.   What is your familiarity?

2   A.   As part of my studies I learned about databases and

3   also the rest of our work with the solicitor's office

4   was supporting the database, part of the application

5   that we operated for them.

6   Q.   Within your regular duties, sir, either at

7   GovernmentCIO or OCIO, do you use Microsoft Access?

8   A.   I do.

9   Q.   For what purposes?

10  A.   Any time I have some data I want to work with and

11  create reports for, I find it easy to use because I have

12  used it quite a bit.

13  Q.   Were these FLSA matters, Mr. Murray, what is the

14  objective of importing this data into Microsoft Access,

15  what is the point of doing that?

16  A.   Once we have it in Access, then I can work with the

17  attorneys to determine what they want to know about the

18  data.  They'll ask me questions, how many employees,

19  typical question they'll ask.  So I can run a query in

20  the database to tell me how many unique employees are in

21  the data.

22  Q.   What is this term "query?"

23  A.   So query is a term that's standard for databases in

24  general, not just Microsoft Access, but when there's a

25  formal language called structure query language or SQL

1   and that is used to convert questions into a language

2   that the database can understand and it can return

3   results from the data.

4   Q.   When you're asked to assist in these matters,

5   Mr. Murray, who determines your role, if anyone?

6   A.   I guess at the time it was the solicitor's office,

7   leadership, their managers would determine I should

8   assist with the case.

9   Q.   Did they give you directives as part of determining

10  the role?

11  A.   They would tell me to work -- who to work with.  I

12  work with the attorneys involved in the matter and we

13  would meet fairly regularly to discuss the data and to

14  find out their requirements.

15  Q.   What are some examples of some requirements they

16  have given you in the past?

17  A.   So they'll want to know beyond simple stuff like

18  how many employees, they would like to know how many

19  hours the employees worked in each day or week or month

20  or year.  It could be any time period.  How much they

21  were paid, what their pay rate was, those are common

22  questions.

23  Q.   At any point in these processes, are you asked to

24  provide some kind of output?

25  A.   Yes.  Typically, they ask for reports.  Most often

**Michael Murray - Direct by Mr. Herrera**

1   that would be in the form of an Excel spreadsheet and

2   formatted for viewing purposes, easier to read.

3   Q.   What do these reports show?

4   A.   They may show a list of employees and work dates,

5   how many hours they worked, how much they were paid for

6   a particular period.

7          Sometimes it's summed up so the total amounts

8   earned for an employee or for an entire year or for the

9   entire period in question.

10  Q.   Has anyone within the DOL ever directed you to

11  compute back wages in an FLSA matter that you have been

12  involved in?

13  A.   Yes.

14  Q.   In general terms can you please explain for the

15  Court the process you undertake when you are directed to

16  compute back wages in an FLSA matter or the Department

17  of Labor?

18  A.   Generally we receive the data from the attorneys.

19  They acquired it from the defendants in the case.  I'll

20  look at the data, try to understand it, what's in there,

21  how the tables are structured, where the different types

22  of information are and then going on in the process, the

23  attorneys will ask for me to compute hours worked and

24  determine if there are any back wages due that they

25  weren't paid for or overtime hours.

**Michael Murray - Direct by Mr. Herrera**

1  Q.   How were you able to determine that?

2  A.   They give me criteria for determining -- the data

3  is different for every company.  So the criteria can be

4  a little bit different.  It fits the data.

5       They'll tell me add up the hours for week,

6  hours over 40 would be overtime hours and to look at the

7  pay data to see if they were paid for those hours.

8  Q.   When you do this, Mr. Murray, do you conduct your

9  own analysis to determine what payrolls should be

10 applied to the data you receive?

11 A.   No.  The attorneys tell me the rules and I just

12 convert them into SQL queries that the database can

13 understand.

14 Q.   What kind of format is this data in that the

15 solicitor's office sends you to examine?

16 A.   Frequently it's the CSV, comma-separated value, and

17 that stores if you open it up using Notepad on your

18 desktop, it would show a bunch of text separated by

19 commas and the commas indicate different fields within a

20 kind of table structure.

21       Each row in the file, each line in the file is

22 a record.  So it's a way of storing tabular data.

23 Q.   Just to be clear, Mr. Murray, where does this data

24 come from?

25 A.   Typically it's coming from a company's payroll

**Michael Murray - Direct by Mr. Herrera**

1   system.  They can export it.  CSV is a very universal

2   standard for exporting data.  It can be shared with

3   other systems.

4   Q.   When you receive data that you understand to be

5   from an employer's payroll system, at any point do you

6   modify the substantive values in that data?

7   A.   No.

8   Q.   How is the data sent to you?

9   A.   If the file is very large, it might be through a

10  tool called Excel Unit, it's kind of like Dropbox.  The

11  Department of Labor uses that to transfer large files.

12          I also received files some years ago on CDs,

13  DVDs, on that kind of median but not recently.

14  Q.   After you received data that you understand to be

15  payroll data, what is the first thing you do with it, if

16  anything?

17  A.   Well, the first thing I want to do is open it up.

18  So whatever tool that will allow me to view the data.

19  Then I'll kind of make an inventory.  I will look at how

20  many tables or different files there are, what fields

21  are in those files, what their names are, how many rows

22  and records each file might have, could be thousands or

23  millions.

24          I also look at the data types of each field

25  because when data is stored in a database, it usually

**Michael Murray - Direct by Mr. Herrera**

1   has a type associated with, a date, date type, numbers

2   are numerical.  Probably the most common is just text

3   which can be anything.

4   Q.   After you have reviewed the data, what, if

5   anything, do you do next?

6   A.   So, I'll arrange to meet with the attorneys.  I'll

7   discuss what the data looks like, what's in there.  And

8   then they'll give me a little information about what the

9   case is about and what they're looking for.

10   Q.   At any point if you are directed to compute back

11   wages for an FLSA case, do you create any methodology or

12   written summary of the process you have undertaken?

13   A.   Yes.

14   Q.   Tell me about that, please.

15   A.   So, as I'm creating these queries and going through

16   the different steps of importing the data and writing

17   the queries, I'm basically documenting what I'm doing.

18   I describe what the queries are, roughly how they work

19   and then -- so, it's a summary from beginning to the end

20   of how the data was imported, query, and then the back

21   wage reports are produced.

22   Q.   Do you determine the methodology on your own?

23   A.   Yes, depending on the tool.  So the queries are

24   based on the questions that the attorneys have but I

25   have to convert all that into Microsoft Access or SQL

**Michael Murray - Direct by Mr. Herrera**

1  server queries.

2  Q.   Can you give us an example of some of the

3  methodological steps you would take when dealing with

4  data?

5  A.   Often we need to -- if you have different tables,

6  you want to be able to join those tables.  They have to

7  be key field.  Key field is something that is common in

8  both tables that can relate to data.

9        So there is a methodology to determine what

10  the key is and how to join them.  If we're working with

11  dates and we need to aggregate or summarize the data by

12  dates, we talk about what date was used.  Sometimes the

13  date is in a text format so it has to be converted into

14  a date format and I do that by creating a new field

15  because I don't want to change the original data.

16        I just use the original data to create a new

17  field that in a date format.  That makes it easier to

18  summarize the data by date.

19  Q.   The process you described, Mr. Murray, on this

20  methodology, at any step in it do you modify the

21  substantive values in the underlying data you've

22  received?

23  A.   No, I don't.

24  Q.   In your experience with FLSA matters, Mr. Murray,

25  have you ever dealt with a situation where there is data

**Michael Murray - Direct by Mr. Herrera**

1  missing from an employer's payroll data?

2  A.   Yes.

3  Q.   What happens when there is data missing from

4  payroll?

5  A.   So if I find some data missing, it could be either

6  values in a field, the fields are blank, or maybe

7  there's a time period that's not accounted for, maybe

8  some weeks missing.  In either case, I'll describe what

9  is missing and I'll provide that to the attorneys and

10  ask them for their assistance.

11  Q.   From examining the data on your own, can you tell

12  why the data is missing?

13  A.   No.  I just see that it's missing.

14  Q.   Have you ever had an instance where the missing

15  data affected your ability to summarize the payroll data

16  from the employer?

17  A.   Yes.  So if there's certain time periods missing,

18  obviously, you can't summarize the data for those time

19  periods but even if the field level -- let's say I have

20  been asked to determine how many hours an employee was

21  on the clock for a shift, if I'm missing one of the

22  clock times, then I can't determine how many hours total

23  that they were working.

24  Q.   So this example you're saying you see instances in

25  payroll data at times where there's been an in punch but

**Michael Murray - Direct by Mr. Herrera**

1  no out punch?

2  A.   Correct or vice versa.

3  Q.   So you say may consult with solicitors.  Why,

4  what's the purpose of asking them?

5  A.   Well, they've asked me to summarize how many hours

6  were worked on a day for each employee.  If I can't do

7  that, then I need direction from them how they want me

8  to proceed.

9  Q.   When this has occurred in the past, a missing value

10  or missing set, is there any follow-up with the

11  employer?

12  A.   My understanding is yes.  They'll ask the employer

13  if they can provide the missing data.

14  Q.   In these instances where there's missing data, have

15  you ever been involved in a matter where the data never

16  arrives, it's permanently missing?

17  A.   Yes.

18  Q.   What happens then?

19  A.   The attorneys may tell me to take an alternative

20  approach.  Say a person is missing a time punch, we

21  could either may say just put eight hours in, assume

22  they worked eight hours, or we can work.  Determine some

23  kind of average, what is an average workday for an

24  employee and use that to substitute.

25  Q.   Who makes those determinations, Mr. Murray?

**Michael Murray - Direct by Mr. Herrera**

 1   A.   It's up to the attorney.

 2   Q.   Do you ever independently decide on your own how to

 3   account for missing data in payroll information?

 4   A.   No.  I don't proceed until the attorneys give me

 5   some kind of direction or instruction.

 6   Q.   Mr. Murray, have you ever testified in an FLSA

 7   litigation on behalf of the Department of Labor?

 8   A.   Yes.

 9   Q.   How often has that happened?

10   A.   I've testified in court at least four or five

11   times, including this.

12   Q.   For what purpose did you testify?

13   A.   I did in each case I had assisted with creating

14   back wages computations for large data sets.  So I

15   described the methodology.

16   Q.   Is that why you're here today, sir?

17   A.   Yes.

18   Q.   I am going to switch gears now to this case,

19   Mr. Murray.

20           Have you ever heard of an entity called

21   Comprehensive Healthcare Management Services?

22   A.   Yes.

23   Q.   What, if anything, do you know about that entity?

24   A.   I understand it's a company that runs a number of

25   nursing home and rehabilitation facilities in

**Michael Murray - Direct by Mr. Herrera**

1    Pennsylvania.

2    Q.    What's that understanding based on?

3    A.    When I first learned about CHMS in 2018, an

4    attorney at the Department of Labor was working with me

5    on that case and described basically the background of

6    it.  Before that, I had not heard of CHMS.

7    Q.    Why is it that you became involved?

8    A.    For this case, they had some files that were too

9    large to open.  So they were asking for my assistance in

10   processing the data.

11   Q.    As a general matter, Mr. Murray, did you provide

12   any assistance in this case?

13   A.    Yes, I did.

14   Q.    What did you do?

15   A.    So the standard kind of assistance.  I helped

16   import the data into a tool, in this case, Microsoft

17   Access, which allowed us to work with it over a million

18   rows of data and then created the queries and I used the

19   queries to create back wages to report.

20   Q.    When you say "the data," what data are you

21   referring to?

22   A.    I'm referring to all the files that were provided

23   to me from the attorney, from CHMS through the attorney.

24   Q.    What were these files?

25   A.    They were a set of Excel and CSV files

**Michael Murray - Direct by Mr. Herrera**

1   contained -- some of them contained pay data information

2   and other files contained timestamps or time data.  I

3   called them pay data and time data.

4           There were multiple files for each of the

5   facilities that CHMS operates.  Each facility would have

6   at least one time data file and one pay data file.

7   Q.   Do you know how many facilities are involved in

8   this case?

9   A.   15.

10  Q.   Are all 15 within the data you're describing,

11  described depicted?

12  A.   Yes.

13  Q.   Do you have any knowledge as to how these 15

14  buildings conducted their payroll?

15  A.   I understand they had collected their data and sent

16  it to I guess the corporate headquarters for payroll

17  processing.

18  Q.   Can you tell me anything, for instance, about the

19  schedule for payroll, how often it was run?

20  A.   So their work schedules were two weeks.  They got

21  paid every two weeks but each facility had -- could have

22  different schedules for payment.

23  Q.   Through your work in this matter, did you gain any

24  understanding as to the types of compensation the

25  employees of these 15 buildings received?

**Michael Murray - Direct by Mr. Herrera**

1  A.   Looking at the payroll data, I could see that they

2  were paid different categories of pay for each pay

3  period.

4  Q.   Mr. Murray, are you familiar with the idea of the

5  hourly versus a salaried employee?

6  A.   Yes.

7  Q.   What is your understanding of that?

8  A.   My understanding is that if you are a salaried

9  employee, you are exempt from the FLSA requirements.  If

10  you are an hourly worker, then FLSA applies.

11  Q.   What do you mean it applies, if you know?

12  A.   My understanding mostly for overtime.  That if you

13  are a salaried exempt employee, then if you work over 40

14  hours a week, you don't get extra pay for that time.

15  But if you are an hourly employee, you would be paid a

16  premium for the hours over 40.

17  Q.   Do you know what that premium is?

18  A.   One and a half times the regular rate.

19  Q.   What's the regular rate?

20  A.   That would be the base rate for what you are

21  normally paid per hour.

22  Q.   Just to clarify, Mr. Murray, when you received this

23  pay and time data that was represented to you from the

24  defendants, what, if anything, did you do to sort the

25  data, categorize the data, after receiving it?

**Michael Murray - Direct by Mr. Herrera**

1   A.   You mean to describe it or to import and start

2   working with it?

3   Q.   We'll start there.   To import it.

4   A.   So Microsoft Access has tools built into it that

5   will allow you to import data from different formats

6   including Excel and CSV.

7             So I used that tool to create two tables in

8   Microsoft Access, two primary tables one for payroll

9   data and the other time data and file by file, I had to

10  import into the respective table.

11  Q.   How did you import it?

12  A.   So Microsoft Access has a wizard.   You say I want

13  to import an Excel file and the wizard pops up and asks

14  you where the file is, what's the name of it and then

15  where do you want to save it to.   You basically push a

16  button and it imports the data and appends it to that

17  table.

18  Q.   Did you personally do this imported data?

19  A.   I had an assistant help with importing the data.

20  Q.   Who is that?

21  A.   Elsa, she was a contractor for the solicitor's

22  office that I provided an SOP I had used previous,

23  receive the data more than once.

24  Q.   What is SOP?

25  A.   Standard operating procedure.   So it's kind of step

**Michael Murray - Direct by Mr. Herrera**

1   by step which files to import and where to save them.

2   Q.   Did you oversee Ms. Reed's import of the data?

3   A.   Yes.  I verified it.  We actually worked together

4   online much of it.

5   Q.   Mr. Murray, what is the first time you received pay

6   or time data for the CHMS buildings?

7   A.   I'm sorry.  What kind of data?

8   Q.   Pay or time data.

9   A.   It was towards the end of 2018.  I would say around

10  October, September or October.

11  Q.   Where did you get it from?

12  A.   The solicitor's office.  At the time, I was a

13  contractor so we had managers from the solicitor's

14  office that directed our activities.

15         There's a group in the solicitor's office

16  called the Litigation Support Unit and they're

17  responsible for receiving data and then providing it to

18  us, kind of a go between.

19  Q.   Do you know where that data came from?

20  A.   My understanding it came from CHMS.

21  Q.   What is the volume of the data you received in

22  2018?

23  A.   It was -- I forget the number of gigabytes or

24  megabytes but it was several dozens files and probably

25  the largest files had over a million rows or all

**Michael Murray - Direct by Mr. Herrera**

1  together they would have a million rows.

2  Q.   Was it possible to aggregate those files you

3  receive in 2018 within Excel?

4  A.   Not all of them, not that one million row limit for

5  the time data.  The payroll data was for a two-week

6  period, so there were less rows.

7  Q.   What format was the data in that you received in

8  2018 from CHMS?

9  A.   Some files were in Microsoft Excel.  The time data

10  may have been, but they had many files.  Then CSV, the

11  payroll data.

12          MR. SCHWARTZ:  Your Honor, if I may, I

13  certainly don't want to prevent counsel from making

14  whatever record he wants to make.  We don't intend to

15  cross Mr. Murray on a lot of this foundational stuff.

16          We believe the only issue that really is going

17  to be something we're going to want to address to the

18  Court in terms of cross-examination is his conclusions

19  and how the information came through.

20          It's up to them.  I just want to make --

21          THE COURT:  Am I correctly summarizing your

22  position that you are not challenging the integrity of

23  his methodology?  You are only calling into question

24  some of his conclusions?

25          MR. SCHWARTZ:  That's exactly right.

**Michael Murray - Direct by Mr. Herrera**

1          THE COURT:  Mr. Herrera, does that in any

2   way -- I really didn't read this as an objections.  This

3   is more or less a housekeeping matter.

4          I think they are willing to stipulate as to

5   the foundation of how the method he used to get to his

6   conclusion, while they might quibble with those

7   conclusions, I think they will vigorously, does that

8   alleviate any concern you would have about the need to

9   foundation this?

10          MR. HERRERA:  Only if they're willing to also

11   agree that the written methodology that Mr. Murray

12   created and the reports are not going to be the subject

13   to a hearsay challenge or something to that effect.

14          I'm going through this to lay foundation in

15   case there is a hearsay objection to these reports.

16          THE COURT:  What is your response to that?

17          MR. SCHWARTZ:  No objection.

18          THE COURT:  They're not going to raise that

19   objection.

20          MR. HERRERA:  Then, Your Honor, I will move

21   more quickly through this but I think, and, of course, I

22   will do it whatever way you wish, Your Honor, but I

23   think because of the complexity as to what is happening

24   here, I think it is beneficial for the Court to walk

25   through this.

**Michael Murray - Direct by Mr. Herrera**

1            THE COURT:  I understand.  Look, this is your
2    case.  You make the record you want to make for your
3    case.
4            I would just ask you in light of the fact they
5    are not challenging his methodology, I think that it's
6    probably more effective for our time as quickly as you
7    feel comfortable doing, to get to his ultimate
8    conclusions and what you are really substantively
9    raising him for.
10           I never want to tell a lawyer how to try his
11   or her case.  So that's entirely you and your
12   preparation.
13           They have given you that offer and I'm willing
14   to take them up on that word and I'll hold that against
15   them if later today they want to revisit that, I'll hold
16   them to what they say, you can rest assured to that.
17           So, it's ultimately your call but I just want
18   you to know you have that option.  I encourage you to
19   take it to the extent you can get in a more efficient
20   way to your conclusions, but, again, I'm not going to
21   micromanage how you try your case.
22           MR. HERRERA:  Understood, Your Honor, and I
23   will move through this more quickly.
24           If at any own point you think I am belaboring
25   it, please tell me.  The approach because this is so

Michael Murray - Direct by Mr. Herrera

1  complected, I have had a hard time understanding it so I

2  want to make sure Your Honor understands it.  That's why

3  I am taking the time but I will move it along if Your

4  Honor feels like I am not being productive.

5          THE COURT:  That might be a high order.  I'm a

6  classics major, so I'll do my best.

7          MR. HERRERA:  Yes, Your Honor.

8  Q.  Mr. Murray, as a general nature of the data, the

9  pay and time data, for example, how many employees were

10 in the data you received in 2018?

11 A.  I can't recall the exact number.  Probably around

12 five or six thousand at that time.

13 Q.  Was this across the 15 buildings you mentioned?

14 A.  Yes, total.

15 Q.  What was the time period of the data you received?

16 A.  The time data started in August of 2015 and then at

17 the time, it went through August of 2018, about three

18 years.

19 Q.  At any point, Mr. Murray, after 2018, did you ever

20 receive any additional data relating to CHMS?

21 A.  Yes.

22 Q.  When did that happen?

23 A.  Every few months, in some cases to a year, we

24 received supplemental data.

25 Q.  What was the supplemental data?

**Michael Murray - Direct by Mr. Herrera**

1  A.   It would be more files that would bring the data

2  more up to date.  So after three years, six months, they

3  would provide three or six months more data.

4  Q.   Do you know how many supplements in total you

5  received relating to CHMS' time and pay data?

6  A.   I recall six.

7  Q.   What formats were these supplements in?

8  A.   They are all in Excel or CSV format.

9  Q.   These additional data, did they continue to reflect

10  data from all 15 buildings?

11  A.   Yes.

12  Q.   Other than providing data for new periods, at any

13  point during the supplements did prior data change?

14  A.   For the most recent supplement we received, they

15  provided updates to the time data for the entire period

16  going back to August 2015.

17  Q.   Explain what that means, please.

18  A.   So, my understanding is that they manually entered

19  some of the missing time punches from I guess another

20  source they had and so that filled in some of the

21  missing time punches that were in the previous

22  provisions of data.

23  Q.   Let's talk about that for a minute.  There were

24  missing time punches in the earlier sets of data?

25  A.   Correct.

**Michael Murray - Direct by Mr. Herrera**

1  Q.   How often did that happen or did you see it?

2  A.   It was about two percent of the records.

3  Q.   Just as a general matter, how many -- first of all,

4  what do you mean by record?

5  A.   A record is a row on a table.  For time data, we

6  had about two million records.  Now it's up to 2.6

7  million.  Each record of the time data would be a shift

8  or a set of punch times, actually.  You can have more

9  than one set of punch times for a shift that an employee

10  made when they were working.

11  Q.   So prior to the most recent set, how many of these

12  records you had of a missing punch, if you know,

13  approximately?

14  A.   It would be before the most current one, it was

15  around 46,000 records that were missing one or the other

16  punch.  There were some cases where the records were

17  missing both, there was about 150,000 of those.

18  Q.   How many missing punches are there in the most

19  recent time set?

20  A.   So where there's both missing time punches, there

21  is over 200,000 and then for this one or the other time

22  punch missing is about 26,000.

23  Q.   Where the new data provided what was previously

24  missing a punch, for purposes of your summary, did you

25  just take that inserted data at face value?

**Michael Murray - Direct by Mr. Herrera**

1   A.   Yes.

2   Q.   For these records you're describing that have no

3   punches, are they reflected in your summary of back

4   wages due?

5   A.   No.

6   Q.   I want to spend some time walking through the data

7   now, Mr. Murray.

8            MR. HERRERA:  Your Honor, we're going to bring

9   up an electronic copy that was entered as JX52 through

10  JX58.  Mr. Murray described this as voluminous.  The

11  only way I can reasonably do it is through the laptop.

12           I am going to speak clearly in describing the

13  files and the row numbers so that the record is clear

14  which portions of the JXs I am talking about.

15           THE COURT:  Okay.

16           MR. HERRERA:  Your Honor, let the record

17  reflect I'm going to access what the parties have

18  entered as JX58.

19           THE COURT:  Okay.

20  Q.   While my computer loads, Mr. Murray, I'm going to

21  show you on the screen a copy of a file that is labeled

22  2020A.  Do you recognize what I am showing you on the

23  screen, Mr. Murray?

24  A.   Yes.

25  Q.   What is it?

Michael Murray - Direct by Mr. Herrera

1  A.   That is one of the files I received from the

2  employer.  It's a time data file.

3           MR. HERRERA:  Your Honor, now my computer is

4  working, I am going to for the record, perhaps we'll see

5  if this will allow me to try to identify where within

6  JX58 this specific file is from.

7           Let the record reflect I am opening the folder

8  labeled JX58.  There are two folders within that.  One

9  is labeled pay data.  The other is labeled time data.

10 I'm going to now access time data.

11          THE COURT:  This is within JX58 itself?

12          MR. HERRERA:  Yes.

13          THE COURT:  Okay.

14 Q.   Mr. Murray, the file that I have opened for you in

15 Excel that is labeled 2020A, I am going to now click on

16 a file within the time data folder of JX58 to attempt to

17 open it.

18          It is now opened or referred back to the file

19 that is on the screen.  The process that I just did, to

20 your understanding, the file that is labeled on your

21 screen as 2020A, did that come from JX58 time data?

22 A.   Yes.

23 Q.   Okay.  If you need me to zoom in, Mr. Murray, so

24 you can see better, tell me.

25 A.   That's fine.

**Michael Murray - Direct by Mr. Herrera**

1    Q.   In general terms, can you tell me what we're

2    looking at please.

3    A.   The time data file will have a set of columns

4    running from A -- I'm not sure how far -- down to Z and

5    then each row is a record of an employee punching in

6    and/or out for a facility.  You can see the facility in

7    the column F there, company, C and D, sorry.  I

8    generally went with facility.

9    Q.   Mr. Murray, this file, 2020A, did this come to your

10   understanding from the defendants?  Is this the file

11   they sent over?

12   A.   Yes.

13   Q.   At any point after receiving this file, did you

14   modify any of the values within this Excel sheet?

15   A.   No, I didn't.

16   Q.   Let's begin talking through some of these headers,

17   Mr. Murray, so we can understand your later testimony

18   accurately.  What does the name column B refer to in

19   2020A?

20   A.   Employee name.

21   Q.   What does the facility column D refer to, sir?

22   A.   That is where they punched in that day.

23   Q.   I'm going to scroll over to column I, Mr. Murray.

24   What, if anything, do you know what D-E-P-T means within

25   this data?

**Michael Murray - Direct by Mr. Herrera**

1  A.   That is short for department.  It's a code number

2  for the departments which are kind of like positions or

3  roles that the employee performed.

4  Q.   At any point in your work on this matter,

5  Mr. Murray, did you use this column, the dept column?

6  A.   Yes.

7  Q.   For what purpose?

8  A.   The attorney provided a list of the departments

9  they said should be excluded from back wage

10  calculations.

11 Q.   What do you mean by that?

12 A.   She said it was -- they were exempt.  They should

13 be excluded from the work.  So administrator is one of

14 those departments.

15 Q.   Are you saying, sir, that your summary does not

16 include any back wages for an administrator position

17 within this data?

18 A.   Yes.

19 Q.   Why did you exclude it?

20 A.   The attorney in the case instructed me to remove

21 those departments from the back wage calculations.

22 Q.   Let's continue going through this sheet,

23 Mr. Murray.  I'm going to zoom in slightly.

24        Can you tell me what column O date refers to,

25 please.

**Michael Murray - Direct by Mr. Herrera**

1   A.    That's a workday or a shift day, shift date.

2   Q.    Do you know what column P means?

3   A.    That's a time stamp.  It you actually click on it,

4   you can actually see a full date and time and it's when

5   the employee clocked in for the day or for the shift.

6   Q.    Mr. Murray, what I highlighted here on row 8, it

7   says 9:18 a.m. on January 9, 2020.  Is that a punch in

8   for this employee on that date?

9   A.    Yes.

10  Q.    What is column Q, hours?

11  A.    That is the out time.  So when they punched out at

12  the end of their shift or end of the period worked,

13  there would be a date time in that field.

14  Q.    What does column R exceptions refer to, if you

15  know?

16  A.    The first set of data this was called rate

17  deduction or BD.  It contains a number of minutes that

18  were for the employee's break time where they would be

19  off the clock, supposed to be off the clock.

20  Q.    Mr. Murray, you see here in row 8, for example,

21  there is a punch in for Ronald Challey on January 9,

22  2020 at 9:18 a.m.  The file here of the record appears

23  to be underlined.  What, if anything, does that signify?

24  A.    The most recent data supplement, the missing

25  punches I referenced earlier that the employer filled in

1   had an underline kind of identifying them.

2   Q.   So, Mr. Murray, is it the case or tell me if a

3   punch value, column P or column Q is underlined, what

4   does it signify?

5   A.   My understanding it was manually entered by the

6   employer that was previously missing from the files.

7   Q.   For purposes of your summary, Mr. Murray, did you

8   take these underline punches at face value?

9   A.   I did.

10  Q.   I'm going to scroll further down in this sheet,

11  Mr. Murray.  I'm now in row 88 for an employee named

12  Dana Wittnan, W-i-t-t-n-a-n.

13  A.   It's actually on row 87.

14  Q.   87.  Thank you for correcting me.

15          On row 87 within 2020A the Excel file, we see

16  here a punch in at 7:30 a.m. on April 30, 2020 and a

17  punch out at eight p.m.  Is that accurate?

18  A.   That's correct.

19  Q.   Can you tell me anything about what is included in

20  row 87, column R?

21  A.   So there's different codes.  BD is very common.  My

22  understanding it stands for break deduction and then the

23  30 is referring to a number of minutes.  So there will

24  be a code and a number in this field.

25  Q.   What is the significance of this BD30, what does it

**Michael Murray - Direct by Mr. Herrera**

1  mean?

2  A.   It means for the purpose of the payroll, the

3  employer deducted 30 minutes from the shift for that

4  day.

5  Q.   So it appeared based on the punches, Mr. Murray,

6  this person worked for 12 and a half hours, is that

7  right?

8  A.   They punched in -- between the punch in and punch

9  out is 12 and a half hours.

10  Q.   What impact does the BD30 have on the amount of

11  hours credited for this employee for this day?

12  A.   It would reduce it by 30 minutes, 12 hours instead

13  of 12 and a half.

14  Q.   I'm going to scroll further down the sheet.  We'll

15  see here, Mr. Murray, now we are in rows 293 to 311 or

16  so in 2020A.

17        What significance, if any, is there for the

18  BD30 to appear on each of the records we are seeing now

19  on the screen?

20  A.   So for each one of these shifts or dates, there are

21  30 minutes subtracted for break deduction.

22  Q.   Have you ever heard of something referred to

23  sometimes as automatic deduction?

24  A.   Yes.

25  Q.   Do you have any understanding of what it may mean

Michael Murray - Direct by Mr. Herrera

1    for this case?

2    A.   It means the BD30 was an automatic deduction.

3    Q.   What do you understand automatic to mean?

4    A.   The computer program will do it rather than the

5    employee indicating when they took a break.

6    Q.   From what you saw in this time data, Mr. Murray,

7    did the payroll system of pay data indicates that 30

8    minutes was automatically being deducted regardless of

9    the punches?

10   A.   Can you rephrase the question, please.

11   Q.   Yes.  From what you saw of the time data and these

12   BD30 values, did you see within this time data the

13   phenomenon or the occurrence of an automatic deduction

14   of 30 minutes of work time irrespective of what the

15   punches showed?

16   A.   Yes.

17   Q.   I'm going to scroll down and see if I can find an

18   example.  Here is one.  This is row 349 of 2020A.

19   Mr. Murray, here in column R we see BD15.  Do you know

20   what that means?

21   A.   In this case, the 15 minutes was deducted instead

22   of 30.

23   Q.   Let me scroll a little further down to see if I can

24   find an example.  Here is one.

25          We're now in row 557 in column R.  I see here

**Michael Murray - Direct by Mr. Herrera**

1  MPBD30.  Do you know what that means?

2  A.    MP to my understanding is missed punch.  BD30 is a

3  break deduction of 30 minutes.

4  Q.    All right, Mr. Murray.  We're going to put this

5  sheet aside for the moment.

6          Do you know, Mr. Murray, do you have any

7  awareness of the employment policies for these

8  buildings, the rules that govern the employees work?

9  A.    Not in detail.

10  Q.    Do you have any awareness of rules that they may or

11  may not have had with respect to punching?

12  A.    I heard they were to punch or the attorney informed

13  me they were supposed to punch out for breaks.

14  Q.    What do you mean by that?

15  A.    So if you went to go to lunch, you would punch out

16  on your way out to get lunch and punch back in when you

17  came back to give you an example.

18  Q.    Mr. Murray, did you see instances in the time data

19  where an employee did punch out for lunch?

20  A.    Yes.

21  Q.    Did you see instances where an employee did not

22  punch out for lunch?

23  A.    Yes.

24  Q.    Can you give us a general sense at all about how

25  much is in each category about how many employees

Michael Murray - Direct by Mr. Herrera

1  punched for lunch and about how many employees did not?

2  A.   So about most of the employees did not.  I can't

3  recall the exact numbers.

4  Q.   If I showed you a document, Mr. Murray, would it

5  assist you in recollecting that information?

6  A.   Yes, it could.

7           MR. HERRERA:  Your Honor, how do you want me

8  to handle this?  I have some documents for opposing

9  counsel and the Court and I can ask him to read it

10  silently and ask it again.

11           THE COURT:  Are you refreshing his

12  recollection?

13           MR. HERRERA:  Yes.  Would you like a copy?

14           THE COURT:  Look, there is present

15  recollection refreshed and past recollection recorded.

16           Past recollection recorded, you're going to

17  ultimately substantively use it.  If you can't refresh

18  his recollection first, then I will need a copy of it.

19  If this is just refreshing his recollection currently,

20  you can show him and exchange documents if need be.

21           I think it's important you show opposing

22  counsel what you are showing him.

23           MR. SCHWARTZ:  Before that, I might have

24  missed it.  I didn't hear what we are refreshing.

25           MR. HERRERA:  I asked Mr. Murray if he could

**Michael Murray - Direct by Mr. Herrera**

1  tell us how many employees are in each category, those

2  that punched for lunch and those that did not and he

3  said he could not recall.

4        MR. SCHWARTZ:  And there is a document that

5  will refresh.  Okay.

6  Q.   Mr. Murray, I'm going to hand you a one-page

7  document.  Read it silently to yourself.

8  A.   Okay.

9        (Pause in the proceedings.)

10 Q.   I'm going to take the document back from you now.

11       Can you recall, Mr. Murray, approximately how

12 many employees were in each category, specifically those

13 that punched for lunch and those that did not?

14       MR. SCHWARTZ:  I'm sorry, Your Honor.  I don't

15 think the predicate was laid whether this document

16 refreshed his recollection and then I have concerns

17 about the document.

18       THE COURT:  Okay.  Let's address the concerns

19 about the document first and then we'll go into whether

20 the predicate has been laid.  That's as simple as asking

21 him did that refresh his recollection.

22       Go ahead.

23       MR. SCHWARTZ:  So this document contains

24 conclusory information.  If he isn't the preparer of

25 this document, then he is being -- his recollection is

**Michael Murray - Direct by Mr. Herrera**

 1   being refreshed by data summaries that weren't his and

 2   that is --

 3         THE COURT:  That's right.  He doesn't have to

 4   be the preparer in order to refresh his recollection.

 5   Maybe that is a foundational issue.

 6         You can ask him if -- one can have one's

 7   recollection refreshed, true recollection as opposed to

 8   learning something new.  Did you know this at one point.

 9   Did you forget.  Did this document help you remember

10   what you once knew, et cetera.

11         MR. SCHWARTZ:  Unless this document is the

12   source of his information, not that it's something he

13   had seen somewhere else.  If this is a lawyer-prepared

14   document --

15         THE COURT:  If he looked at that before and

16   that was not your understanding, then that goes to your

17   impeachment of the testimony.  It doesn't go to his

18   recollection of it.

19         MR. SCHWARTZ:  Okay.

20         THE COURT:  Why don't you lay that foundation.

21   BY MR. HERRERA:

22   Q.   Mr. Murray, the document I showed you, do you know

23   who wrote the words on the page?

24   A.   I did.

25   Q.   Having now seen this document, sir, can you

**Michael Murray - Direct by Mr. Herrera**

1  recollect the answer to my question?

2  A.   Yes.   About 4,800 employees never recorded a punch

3  time for a break, about 3,100 employees punched at least

4  once during their employment history for a break.

5  Q.   I want to ask you, sir, about the files within

6  JX58.   Just to make the record clear, sir, on the screen

7  here there are 14 items or Excel files within JX58 time

8  data.   Do you see that some of these Excel files have an

9  A and a B within their file name?

10  A.   Yes.

11  Q.   Do you know what that means?

12  A.   So there's an A and B for each of the years from

13  2017 to 2022.   A is for January to June of that year and

14  B is July through December of that year.

15  Q.   Thank you, Mr. Murray.   I would like now to spend

16  some time walking through some pay data.   Let's go to

17  within JX58, the second folder pay data.

18         While that opens, I'm going to open a

19  different Excel file and tell me if you recognize it,

20  please.

21         MR. HERRERA:   For the record, Your Honor, this

22  is an Excel file labeled frinds, f-r-i-n-d-s, PR totals,

23  t-o-t-a-l-s.

24         THE COURT:   Is this part of or one of -- let

25  me orient myself.   Is this part of or one of the

Michael Murray - Direct by Mr. Herrera

1  exhibits?

2          MR. HERRERA:  This is part of JX58.  I can

3  bring it up now.

4          THE COURT:  That's fine.  As long as you

5  specify when you are opening something and what it

6  relates to, what joint exhibit it's part of.  That helps

7  the record be clear what we are talking about.

8          So it's friends PR totals, is that what it is?

9          MR. HERRERA:  Yes, Your Honor.  Let me open a

10 different one.  I want to be precise on what I'm

11 actually showing the Court.  I am opening a different

12 Excel and I will make the record clear about where it

13 comes from.

14 Q.   Now that my computer is functioning again, I'm

15 going to go to JX58 and open the pay data folder.

16         Specifically the document I'm going to open in

17 a moment, Mr. Murray, is labeled friends, D-O-L,

18 parenthesis, no SSN, close parenthesis.

19         I will attempt to show the Court where within

20 JX58 this specific file is.  Now opening JX58, JX58 pay

21 data.  While I wait for that to happen, Mr. Murray, can

22 you tell me do you recognize the Excel file that is

23 labeled friends DOL, no SSN?

24 A.   This is actually a CSV file but by default, Windows

25 machine will use Excel to open CSV.

**Michael Murray - Direct by Mr. Herrera**

1  Q.   I am now going to try to open a file within JX58,

2  pay data with the same name as the Excel file on the

3  screen, sir.  Did it just open the same file I clicked?

4  A.   Yes.

5  Q.   Okay.  Mr. Murray, tell me what is this document?

6  A.   It's a CSV file containing pay data records for

7  CHMS.

8  Q.   Is this one of the files that you received in your

9  work in this case?

10  A.   The original file had a Social Security number but

11  that has been removed for privacy purposes.

12  Q.   All right, Mr. Murray.  Let's spend some time with

13  this document.  Can you tell me what column A is,

14  E-I-P-I-D?

15  A.   It's the identification number each employee

16  received from the facility they worked at.  If they

17  worked at different facilities, they would have a

18  different ID number.

19  Q.   Were the facility IDs, the employee IDs, were the

20  same between the pay data and time data in this case?

21  A.   Yes.

22  Q.   Were you able to accurately match employee time

23  data to the same exact employee within the pay data?

24  A.   Because some of the employees worked at different

25  facilities, so I wasn't able to uniquely identify just

Michael Murray - Direct by Mr. Herrera

1    to one employee name on all the records.  For most cases

2    it would work but not for all of them.

3    Q.   Did you do anything to account for those instances

4    where an employee would not have the same ID across all

5    the data?

6    A.   So what I did in the end was to create a new field

7    in my database that had a unique employee name.  My

8    understanding is these names were validated by the

9    attorneys and the employer.

10            So I would kind of have two steps.  I would

11   relate the ID to the name and then use the name to join

12   the pay data to the time data.

13   Q.   Mr. Murray, I want to talk to you about employee.

14   What does that mean, column B?

15   A.   It's the name of the employee who was paid.

16   Q.   How about column C, pay period?

17   A.   This was the pay period date stored as not a date.

18   It's stored as a string of numbers with the four digit

19   year first followed by two digit month and then two

20   digit day.

21   Q.   Let's go to column E, capital R-E-G, do you know

22   what that is?

23   A.   Stands for regular.

24   Q.   What is regular for purposes of this spreadsheet?

25   A.   This is the column of the hours of regular time

**Michael Murray - Direct by Mr. Herrera**

1   they were paid for.

2   Q.   Just explain for me, if you can, how, if at all,

3   you can compare the hours in the time data and the hours

4   in the pay data?

5   A.   The time data would have to be summed or aggregated

6   for the pay period.  So you had to identify which pay

7   period each time data record belongs to and depending on

8   the facility and then we can compare kind of apples to

9   apples instead of apples to oranges.

10  Q.   Mr. Murray, at any point in your involvement in

11  this case did you see an instance where the hours in the

12  time data did not match the hours in the pay data?

13  A.   Yes.

14  Q.   How often did you see that?

15  A.   Most of the records.

16  Q.   Let's go to column F, _ pay.  Do you know what

17  column F is?

18  A.   It's a per dollar so it's regular pay.  It's the

19  amount of money that was paid to the employee for their

20  regular hours.

21  Q.   Is there any connection between column E and column

22  F?

23  A.   Yes.  So regular pay reflects total dollar amounts

24  for the total regular hours work.

25  Q.   Mr. Murray, if I were to divide the values in

**Michael Murray - Direct by Mr. Herrera**

1   column F by column E, would it give me that employee's
2   pay rate?
3   A.   Yes.  It would be their regular pay rate.
4   Q.   What is column G, Mr. Murray?
5   A.   That was the number of overtime hours.  OT stands
6   for overtime.
7   Q.   How about column H?
8   A.   That would be overtime pay.
9   Q.   Is there the same relationship between columns H
10  and G --
11  A.   Yes.
12  Q.   -- as F to E.  Forgive me.
13  A.   If you divide the OT pay by the OT hours, it would
14  provide you the overtime rate that was used.
15  Q.   What is column I, Mr. Murray?
16  A.   That is holiday.  So when an employee took an
17  holiday off, it was reported the number of hours and
18  what they were paid.
19  Q.   Holiday for column I, is that pay for work
20  performed, Mr. Murray?
21  A.   No.  It would be for time off.
22  Q.   What role, if any, did column I play in your
23  summary of the employer's payroll data in this case?
24  A.   It didn't play a role.
25  Q.   Why not?

**Michael Murray - Direct by Mr. Herrera**

1   A.   I was instructed only to look at fields that were

2   related to work performed.

3   Q.   I want to walk through and not belabor the point a

4   few more of these, Mr. Murray.  How about column N,

5   sick, what is that?

6   A.   That would be for payment for sick days that the

7   employees took off.

8   Q.   I should have asked you this before, Mr. Murray.

9   How do you know what any of these columns mean?

10  A.   So toward the beginning of the case, 2018 or early

11  2019, one of the first things I do is make a list of the

12  columns and all the tables.

13          I provided those to the attorney asking if

14  there was any more description for them.  My

15  understanding is the attorney provided the list to the

16  employer and received back some basic descriptions.  I

17  recall not all the fields but most of them.

18  Q.   Are you saying your understanding of what all these

19  columns mean, did it come from the employers in this

20  case?

21  A.   Yes.

22  Q.   Did you independently do an analysis to determine

23  what these columns mean?

24  A.   No.

25  Q.   Let's go now to column Q, Mr. Murray, d-i-f-f-e-r.

**Michael Murray - Direct by Mr. Herrera**

1   What is column Q?

2   A.   That would be differ which stands for differential.

3   So Q is just the number of hours for which differential

4   pay rate was added to their regular pay rate.

5   Q.   What is a differential pay rate?

6   A.   My understanding is employees would receive a

7   differential rate as kind of an incentive to work

8   something like an overnight shift or unpopular shift.

9   Q.   Are you referring to something that is called a

10  shift differential?

11  A.   Yes.

12  Q.   How about column R, what is that?

13  A.   So column R is the total dollar amount that was

14  received for the differential pay for the hours

15  recorded.

16  Q.   If I were to divide column R by column Q, would it

17  give me the differential rate?

18  A.   Yes, it would.

19  Q.   What role, if any, did columns Q and R play in the

20  summary of your back wages in this matter?

21  A.   So I was instructed to use the differential columns

22  to calculate the computed rate for purposes of

23  determining the premium overtime rate.

24  Q.   Why?  Why this column and not say column N?

25  A.   I was provided a list of the columns.  So like M

**Michael Murray - Direct by Mr. Herrera**

1  and N are for time that wasn't worked.  It was not

2  working time.  The differentials is for time that was

3  worked.

4  Q.  Let's go through just a few more of these,

5  Mr. Murray.  What is column U?

6  A.  It stands for evening differential.

7  Q.  Is that another category of pay for work performed?

8  A.  Yes.

9  Q.  Is that part of your summary in terms of money paid

10 for work performed?

11 A.  Yes.

12 Q.  Let's go to a different one here.  We'll try column

13 AA, H-Z-R-D?  Do you know what that is, Mr. Murray?

14 A.  As I recall, it stands for hazard.  I'm not sure

15 what the "RD" stands for.

16 Q.  Is this to your understanding reflecting data for

17 work performed?

18 A.  Yes.

19 Q.  Is that based on the information you received from

20 the defendants in this case?

21 A.  Through the attorney, yes.

22 Q.  Mr. Murray, are you able to say that you understand

23 which columns in Friendship, friends DOL:  Parenthesis,

24 no SSN, close parenthesis, are you able to rely and

25 distinguish between columns reflecting pay for hours

**Michael Murray - Direct by Mr. Herrera**

1  worked and columns reflecting pay for unrelated hours

2  worked?

3  A.   I did record which hours were to be considered as

4  pay work.  So if there was any question I can't

5  recognize because there's about a hundred of these, then

6  I refer back to my methodology to determine whether or

7  not it is to be included as time worked.

8  Q.   Your understanding of which columns to identify as

9  work performed or columns unrelated to work, it's

10  written in your methodology for this matter?

11  A.   Yes.

12  Q.   One more column, Mr. Murray.  Can you tell me if

13  you know what column AO means, PU?

14  A.   PU stands for pick up.  My understanding this would

15  be kind of an unscheduled shift.  They would ask an

16  employee to come in for a shift that wasn't scheduled

17  and they would get a bonus for doing so.

18  Q.   What is column AP?

19  A.   This is a bonus, dollars that were paid for working

20  the shift or could be multiple shifts.

21  Q.   So, Mr. Murray, explain for me, do I have this

22  right, if we take row 7 of this file in columns AO and

23  AP, is this saying this employee worked 13 hours of a

24  pick-up shift and was paid $1,300 for that work?

25  A.   I don't believe that's an hours column.  It may

**Michael Murray - Direct by Mr. Herrera**

1  have been used for something else.  I'm not sure how the

2  company used it.  I was told not to include it in the

3  hours.

4  Q.   But the pay, Mr. Murray --

5  A.   The pay, that was to be included in computing the

6  overtime premium rate.

7           MR. HERRERA:  Unless Your Honor has any

8  questions, I can move on from this sheet.

9           THE COURT:  I don't have any questions.  In

10 fact, let's take our midmorning break right now as you

11 move on to another sheet.  We'll take ten and convene

12 back here in ten minutes.

13           (Whereupon, a break was taken.)

14           THE COURT:  Okay.  Let's get to it.

15 Q.   Mr. Murray, the spreadsheet we just went through,

16 can you tell me is the data, all pay data for all 15

17 facilities in the same format?

18 A.   No.

19 Q.   How is it different?

20 A.   So different facilities used different column

21 names, had different fields.

22 Q.   So other than the inclusion of additional fields,

23 is it in the same structure, the pay data sheets you

24 received for those other facilities?

25 A.   Yes, other than that they were similar.

**Michael Murray - Direct by Mr. Herrera**

1  Q.   What are some of the differences for pay categories

2  across the buildings?

3  A.   Mostly in the differentials and the bonuses they

4  would have different kinds, I guess, depends on the

5  facilities or maybe used different names for the same

6  thing.

7  Q.   Did the buildings have different schedules for

8  processing payroll?

9  A.   Yes.  So there were three different pay dates, pay

10  date schedules.  So that's just in the methodology.

11  Q.   The time data we reviewed, Mr. Murray, the 2020A

12  sheet, is the date for all 15 facilities in the same

13  format?

14  A.   Well, the sheet we just looked at was for Brighton,

15  so other facilities might have additional fields or

16  different fields.

17  Q.   Mr. Murray, I'm referring -- I'll bring it back up,

18  2020A, the time data.

19  A.   Time data, sorry.  I'm still thinking pay data.

20  Q.   Is the time data for the 15 facilities in the same

21  format as to what is now on the screen in 2020A?

22  A.   Yes.

23  Q.   We were talking earlier today about gaps,

24  Mr. Murray.  Within these spreadsheets for pay time for

25  15 buildings, was there enough information in them to

1   summarize how much time the employees worked?

2   A.   Yes.

3   Q.   Within those same data, Mr. Murray, was there

4   enough information to summarize how much those employees

5   were paid?

6   A.   Yes.

7   Q.   What, if anything, did you do after importing the

8   data within JX52 through JX58 into the program you used?

9   A.   The next step would be to the additional fields I

10  think I mentioned were added to reformat data or provide

11  dates into the time data for the pay date so we could

12  match up the two sets of data.  I would insert those

13  fields.

14  Q.   What do you mean insert those fields?

15  A.   Or update them because they already exist in the

16  tables.  For instance, the time data doesn't have a pay

17  period.  So I inserted a date that would tie back to the

18  pay date and the pay data.

19  Q.   Let's speak to that for a minute, Mr. Murray.  So

20  what do you mean the time data didn't have a pay period?

21  A.   So the time data would just show when an employee

22  worked.  It didn't show what pay period they were going

23  to be paid for that work.

24  Q.   Was there a gap between the time the employee

25  worked and when they were paid?

**Michael Murray - Direct by Mr. Herrera**

1   A.   Yes.  Typically, it would be a few days at the end

2   of the pay period or up to a week and a half after the

3   pay period ended.

4   Q.   Did it just vary from the facility?

5   A.   Yes.  I was able to group them into three

6   different.  One is the second Tuesday after the pay

7   period ends, one is the second Wednesday after the pay

8   period ends and the third is the first Thursday after

9   the pay period ends but on that one, I would check the

10  methodology on that to be sure.

11  Q.   Where did you get that information for the

12  scheduling for the payments from the pay period and the

13  time data?

14  A.   I had to ask the attorney to verify what the pay

15  schedule dates were, when the workweek was and the

16  workweek goes from Saturday to Sunday -- I'm sorry --

17  Sunday to Saturday and then when the pay dates would

18  come after the pay period ended.

19  Q.   Do you know if the defendants were consulted to

20  ensure that the correct time periods for each facility

21  were used?

22  A.   My understanding is they verified it.

23  Q.   In the import through Microsoft Access I believe of

24  the Excel files within JX52 through JX58, in that import

25  process, did you modify any of the substantive values

**Michael Murray - Direct by Mr. Herrera**

1    within any of those sheets?

2    A.    No.

3    Q.    To your understanding, Mr. Murray, the data within

4    JX52 through JX58, does it reflect how defendants

5    calculated the wages they paid to the employees

6    identified in those files?

7    A.    As far as I know, yes.

8    Q.    Can you summarize for me how did you actually use

9    Microsoft Access to aggregate these Excel sheets?

10   A.    So the standard query language has certain

11   operators or functions -- I'm sorry, they're called

12   functions.  So you can provide the function for sum.

13   You provide the column name and it would sum up all the

14   numbers in that column and give you a total.

15          It can also apply some grouping to that data.

16   So if you just picked a column, it would give you one

17   sum for the entire data set, the whole table.

18          If you say sum by employee name, it will give

19   you the sum of that number for each employee.  Each time

20   that employee value changes will have a new sum.  That's

21   how that works.

22   Q.    At any point, Mr. Murray, did you create a written

23   document to describe how you summarized the defendants'

24   pay and time data?

25   A.    Yes.

1          MR. HERRERA:  Your Honor, I'm going to hand

2  the Court a copy of what is marked PX5.

3          THE COURT:  Okay.

4  Q.  I'm going to display a document for you on the

5  screen, Mr. Murray.  This document is 12 pages marked

6  PX5.  Do you see that, Mr. Murray?

7  A.  Yes.

8  Q.  Do you know what this document is?

9  A.  This is the methodology I wrote.

10  Q.  Why did you write it?

11  A.  To record the steps I took to create the back wages

12  and also to explain to any other interested parties the

13  steps that I took.

14          MR. HERRERA:  Your Honor, based on defendants'

15  comments earlier about hearsay, we request that PX5 be

16  admitted into the record.

17          THE COURT:  Any objection?

18          MR. SCHWARTZ:  No, sir.

19          THE COURT:  Admitted.

20  Q.  Mr. Murray, does this document contain the specific

21  means by which you summarized the defendants' pay and

22  time data to determine if any back wages are due?

23  A.  Yes.

24  Q.  Mr. Murray, is this document a fair and accurate

25  explanation of that process?

**Michael Murray - Direct by Mr. Herrera**

1    A.   Yes, it is.

2    Q.   Mr. Murray, is the methodology contained within

3    this document, is any of it based on a legal opinion you

4    have reached?

5    A.   No.

6    Q.   Other than defendants' explanations of the data

7    that we've talked about, what certain columns meant for

8    pay, are there any other areas where you needed guidance

9    to complete the process depicted in PX5?

10   A.   Yes.  I needed from the attorneys an explanation of

11   how to compute back wages, what overtime was owed for

12   each pay period.  They provided me some rules.

13   Q.   What rules?

14   A.   For instance, how to calculate the regular rate

15   that would then be used to calculate the premium owed

16   for overtime.

17          They also told me to compute or instructed me

18   to compute a credit for each pay period and then to

19   balance that against the overtime -- an overtime credit

20   and balance that against the overtime owed for that pay

21   period.

22   Q.   What do you mean credit?

23   A.   The pay data shows that the employees were paid

24   overtime, additional money for overtime, and so I was

25   instructed to compute how much of that -- how much they

**Michael Murray - Direct by Mr. Herrera**

1   were paid for overtime already and to credit that

2   against what we were calculating as owed overtime from

3   the time data.

4   Q.   Let's go through some of the documents, sir.

5   There's a section of the document on Page 1 that says

6   data imports.   Does that summarize what you were

7   describing earlier in terms of how you enter the data

8   within JX52 through JX58 into the Microsoft Access

9   program you described?

10  A.   Yes.

11  Q.   I want to focus you now on this next section

12  further down on Page 1, additional fields.   Can you just

13  explain in simple terms what is an additional field for

14  purposes of this document?

15  A.   These fields doesn't exist in the source data.   I

16  created them in the Microsoft Access database to

17  facilitate joining the pay data and time data together.

18  Q.   Why was that necessary?

19  A.   Well, if you have hours and the time data, you want

20  to know how much was paid for those particular hours

21  specifically, you would need to know which record and

22  pay data matches which records in the time data.

23          The first field name added applied 8/80.   That

24  is kind of a special case.   Some employees had different

25  rules for earning overtime.   That's an example of a

**Michael Murray - Direct by Mr. Herrera**

1  field that was added to identify records that were

2  applied where that rule would apply.

3  Q.   Let's spend a moment talking about that for a

4  moment.

5       Your Honor, I prepared a demonstrative

6  PowerPoint to assist us today in understanding

7  Mr. Murray's testimony.  I provided it to opposing

8  counsel.  I'm not seeking entry into evidence in, but I

9  would like to hand the Court a copy for its reference.

10      THE COURT:  Okay.  The PowerPoint is not going

11  to be proffered as an exhibit, you are just using it to

12  guide us through your evidence?

13      MR. HERRERA:  Precisely.  I'm going to hand a

14  copy to Mr. Murray as well, if you don't mind.

15      THE COURT:  Sure.

16  Q.   Mr. Murray, could you please turn to slide 2.  I

17  want to spend some time talking to you about this.

18      There's an 8/80 rule referred to in PX5 on

19  page 1.  What is your understanding of what that rule

20  is, if any?

21  A.   So certain facilities for certain departments, it

22  was explained to me employees instead of earning

23  overtime premium for hours worked over 40 in one week,

24  they would sum up the total number of hours that they

25  worked past eight hours each day and also sum up the

**Michael Murray - Direct by Mr. Herrera**

1    total number of hours over 80 in the pay period, compare

2    those two numbers and the larger number would be used

3    for computing overtime.

4    Q.   Let's spend a little time talking about this,

5    Mr. Murray.  Are you saying that in some buildings the

6    rule was hours over 40 would be overtime hours?

7    A.   Correct.

8    Q.   Are you saying there were different rules at

9    certain buildings for what an overtime hour is?

10   A.   Correct.

11   Q.   What are those rules, those different rules?

12   A.   They were called the 8/80 rule.  I only know of the

13   one.

14   Q.   So how would an overtime hour be determined in a

15   building with an 8/80 rule?

16   A.   You would have to account for each day how many

17   hours over eight the employee worked and then the total

18   number of hours over 80 for the pay period and then

19   compare the two and then select the larger number for

20   purposes of determining overtime owed or earned.

21   Q.   You reference here in the applied 8/80 row of PX5,

22   appendix A.  I want to direct your attention to it now,

23   sir.  Is it within this document?

24   A.   Yes.

25   Q.   I am going to scroll down.  Is this the appendix A

1   referred to above?

2   A.   Yes, it is.

3   Q.   Can you tell me what this appendix is, please?

4   A.   This is describing the rules that were used to

5   determine whether a time record would be subjected to

6   the 8/80 rule.

7   Q.   Where did this information come from, Mr. Murray?

8   A.   The attorney provided it to me.

9   Q.   Do you know if any of the information that was

10  provided to you came from the defendants?

11  A.   That's my understanding.

12  Q.   These dept row, does that match the dept row we saw

13  earlier in the time data?

14  A.   Yes.   That's that code.

15  Q.   Just tell me in general terms, Mr. Murray, I'm

16  looking at Brighton where an employee is in central

17  supply.   What is this appendix telling me about, if

18  anything?

19  A.   You would have to look at the paragraph above for

20  Brighton.   They only applied these rules through April

21  1, 2017.   So if a time data record occurred before that

22  date and the person or the employee worked in central

23  supply at Brighton, then they would be subjected to the

24  8/80 rule for purposes of determining overtime.

25  Q.   For the facilities and departments that are not

1   listed within appendix A, what is the rule for

2   determining whether an overtime hour is worked?

3   A.   That would be hours over 40 hours worked in one

4   week.

5   Q.   Let's go back up to page 1, Mr. Murray.  I want to

6   ask you now about a few of these other additional

7   fields.

8            Let's talk about pay period date.  Can you

9   tell us what that means, please.

10  A.   If you recall, the time data, the date was in a

11  text format, two digit year, two digit month and two

12  digit day.  Microsoft Access wouldn't recognize that as

13  a date, so I created this field to convert that date

14  into a date format that Microsoft Access recognizes.

15  Q.   Did that conversion at all modify the substantive

16  value in the date field?

17  A.   No.  It leaves it the same.

18  Q.   Does the reference in this row pay period added

19  underscore pay period date to appendix E, what is that?

20  A.   So each facility would have a different pay period

21  date.  One being the first Thursday after the end of the

22  pay period when the employees were paid for their work.

23  Q.   Is appendix E contained within this document,

24  Mr. Murray?

25  A.   Yes, it is.

1  Q.   Let me scroll down.  Can you tell us what we're

2  looking at on page 10 of 12 of PX5?

3  A.   These are the rules.  There's three of them.

4  Depends on the facility.  It would be the facilities

5  would fall under one of these three rules when they pay

6  people.

7  Q.   Where did this data come from, Mr. Murray?

8  A.   It was provided to me by the attorney from the

9  employer.

10  Q.   Directly or through --

11  A.   Well, not directly.  The attorney provided it to

12  me.  My understanding is it was the employer confirmed

13  this information.

14  Q.   Let's go back to page 1 and go through just a few

15  more of these.

16         You mentioned earlier, Mr. Murray, the

17  occurrence of an employee working in more than one

18  facility and having a distinct employee ID.  I want to

19  ask you about the row here added underscore employee

20  name unique.  Can you tell me what this row is referring

21  to?

22  A.   Here we tried -- I tried -- if an employee had more

23  than one employee ID and sometimes their name would be a

24  little bit different, too.  They might have a middle

25  initial and might not.  So I created this field so there

**Michael Murray - Direct by Mr. Herrera**

1  would just be one unique uniform name for that person.

2  Might have multiple employee IDs or multiple other

3  spellings of their name.

4  Q.   Why was it necessary to do that?

5  A.   Well, the end goal would be to have some back wages

6  for each employee.  So the goal was to have just one

7  number for one employee, unique employee.

8  Q.   Was it necessary to create this additional field in

9  order to accomplish that goal?

10  A.   Yes.

11  Q.   Why was it necessary?

12  A.   Most important for when an employee worked at

13  different facilities so we want to be able to sum up the

14  hours accurately for the week where they may have worked

15  at two different places.

16         The employee ID would be two different

17  numbers.  The way Microsoft Access works, it won't give

18  you one number.  It will give you two rows and sum the

19  number for each employee ID.

20         So I had to remove the employee ID from the

21  query and just have that unique name and at that point,

22  we would have one sum of hours for the week, let's say,

23  for that employee.

24  Q.   There's a row up here at the top of Page 2 of PX5,

25  added underscore duplicates.  What does this row

1  address?

2  A.   There were a few records which were duplicates in

3  every single field in two rows was the exact same value

4  including date in time, out time.

5         So in order to avoid double counting that

6  record, this is a yes-no field.  There is a query you

7  can use to identify duplicate records and then use that

8  to mark one of them as a duplicate and filter it out as

9  back wages so it wouldn't be counted twice.

10 Q.   What would happen to back wages if you did not fill

11 out these duplicate, Mr. Murray?

12 A.   It would increase the amount of time computed for

13 the week and that would increase the back wages.

14 Q.   So, Mr. Murray, by removing the duplicates, did it

15 necessarily lower the amount of back wages due in this

16 case?

17 A.   Yes, it would lower the number.

18 Q.   Why did you remove the duplicates, sir?

19 A.   Standard practice but also the attorneys agreed

20 they should be removed.

21 Q.   Last one for now, Mr. Murray.  This row added

22 underscore multiple underscore capital W-E underscore

23 groups.  What does this row mean?

24 A.   We noticed people worked at different facilities

25 and I discovered a problem with the different facilities

1  would have a different pay cycle.  So just pick a date

2  and say one facility A, their pay period went from

3  January 1 to January 15 for two weeks.  Facility B would

4  be January 8 to the 22.  That would complicate it then

5  to determine how to relate the pay from the time data to

6  these two different records in the pay data for those

7  employees who were working at different facilities.

8          I created this field to identify those records

9  that were harder to compute and treated them separately.

10          So basically there's two sets of back wage

11  computations.  One for most of the records where people

12  just worked at one facility or if they worked at two

13  facilities but they happened to have the same pay cycle,

14  it wouldn't matter.  These oddballs had to be treated

15  differently were a separate set of queries.

16  Q.   Do you know how many people were in this separate

17  set, employees who worked in more than one facility with

18  distinct pay schedules?

19  A.   I don't know the number of employees.  There was

20  about 17,000 time data records that were involved as pay

21  data.  It's a small number, less than one percent of the

22  total number of records.

23  Q.   I'm going to go down now to the bottom of Page 2,

24  Mr. Murray.  This section says hour and wage computation

25  queries.  Can you tell us what that means, please?

**Michael Murray - Direct by Mr. Herrera**

1  A.   So I created a set of queries kind of go step by

2  step setting hours by days, hours by week, pay period,

3  applying different rules like the 8/80 rule.

4           I numbered the queries one through nine, each

5  having a unique name and this section describes what the

6  purpose of each query is.

7  Q.   If you could, Mr. Murray -- before we dive into

8  this, could you look at page one of the PowerPoint,

9  please?

10  A.   Yes.

11  Q.   Do you see there on this slide there are three

12  lines first addressing queries one through seven, query

13  eight, query nine.

14           Does this in essence summarize what the

15  purpose of these queries are in this document are?

16  A.   Yes, at the highest level.

17  Q.   So just at the highest level, what do queries one

18  through seven in PX5 do?

19  A.   They look at the time data primarily to determine

20  how many hours employees worked.

21  Q.   Within that process is there an identification of

22  which of those hours are overtime hours?

23  A.   Yes.

24  Q.   As part of that process, do you draw the

25  distinction that you mentioned earlier between

**Michael Murray - Direct by Mr. Herrera**

1    facilities that have a 40 hour OT rule and the

2    facilities that had the 8 and 80 OT rule?

3    A.   Yes, that's addressed.

4    Q.   Can you tell me what is happening in query eight,

5    please?

6    A.   Query eight primarily looks at the pay data to

7    determine the pay rates that the employees were paid.

8    Q.   Why not just use the employee's stated pay rate in

9    the data the defendants produced?

10   A.   Well, the rule is for adding up the various

11   differential fields to determine the premium portion of

12   the overtime rate.  So query eight takes care of all

13   that logic.

14   Q.   Did you see in the pay data for these 15 buildings,

15   Mr. Murray, instances where the defendants did not

16   appear to include all compensation for work performed in

17   the employees' regular rate?

18   A.   You mean including the differential fields?

19   Q.   Yes.

20   A.   Yes.

21   Q.   How often did that happen?

22   A.   I can't recall how frequent it was.  It was most of

23   the records where there was time differentials not

24   employees always paid a differential or a bonus.

25   Q.   So for those employees that received different

1  categories of pay, was that additional pay consistently

2  included in the employees regular rate?

3  A.   No.

4  Q.   What is query nine, Mr. Murray?

5  A.   Query nine kind of ties it all together, uses the

6  hours from the first seven queries and then the pay rate

7  information on query eight to determine back wages.

8  Q.   Mr. Murray, let's spend some time walking through

9  these queries.  I'm going to scroll down to page 3 of 12

10 in PX5.  In as basic terms as you can, Mr. Murray, what

11 is query one doing?

12 A.   Query one simply is for each employee for each day

13 that they worked.  It adds up the total amount of time

14 in between the in time and out time stamps.  It excludes

15 records where either of those punches are missing.  You

16 wouldn't be able to calculate that.

17 Q.   So this first query, the output you are saying is

18 just trying to determine hours where you have, as it

19 said here, a complete set?

20 A.   Yes.

21 Q.   What is happening in query two, Mr. Murray?

22 A.   So query two takes the results of query one and

23 averages for each employee essentially how many hours

24 they would work on average per day.

25 Q.   Why is it necessary to have an average number of

**Michael Murray - Direct by Mr. Herrera**

1  hours worked per day per employee?

2  A.    This number was going to be used in a later query

3  for days where a time punch is missing, it can't be

4  determined exactly how many hours the employee worked,

5  the average is going to be used to replace that.

6  Q.    Mr. Murray, if there are missing punches, why is an

7  average being applied?

8  A.    When I noticed these missing punches, I asked the

9  attorney how to address them and this is the solution

10  that was provided to use an average probability for

11  missing time punches.

12  Q.    Do you know who made the decision to use an average

13  to account for missing time punches?

14  A.    It was the attorney at the time.

15  Q.    Did you independently determine that you would use

16  an average to account for missing punches for employees?

17  A.    No.

18  Q.    Do you know how many employees or how many records

19  to be precise ultimately relied on the average that was

20  produced in query two?

21  A.    So, in the current set of data we received about

22  one percent of the records would have an in or out time

23  missing that would be required and we would then use the

24  average to replace the hours for that day.

25  Q.    For the other 99 percent of the records, is it just

1    relying on the punch times?

2    A.    Correct.

3    Q.    Can you describe in basic terms for me, Mr. Murray,

4    what is query three?

5    A.    So this step takes the -- goes kind of back to the

6    time data.  Again, sums the number of hours per day and

7    if it finds that the in or out time is missing, it puts

8    in a blank, no value for total hours for that day.

9          There also is a rule there if a record has

10   absolutely no in or out time or rate deduction value, it

11   will exclude those records.

12   Q.    So for records, Mr. Murray, where all facility

13   fields and all the in and out rate deduction fields are

14   missing, do they enter your back wage summary at any

15   point?

16   A.    No.  At this point they are filtered out.

17   Q.    There is no average applied to those missing

18   punches?

19   A.    No, there's not.

20   Q.    You mentioned that it create a cell where there is

21   no value?

22   A.    Null value.

23   Q.    A null, N-u-l-l?

24   A.    Yes.

25   Q.    Why does that happen?

**Michael Murray - Direct by Mr. Herrera**

1  A.   In this case I'm using it for the next query

2  because when the next query sees that null value, it is

3  going to substitute the average number of hours in place

4  of the null.

5  Q.   Is this the operation by which query two is used

6  where there is a missing in or a missing out punch?

7  A.   Correct.

8  Q.   Describe for me in basic term what is query four

9  doing?

10  A.   Now with the hours we're missing because of a

11  missing punch, it uses the average and it also computes

12  the number of hours over eight for the day and that's

13  going to be used for 8/80 instances.

14  Q.   It says here, the reference to, quote, also uses a

15  sub query to compute a list of employees who punched out

16  for a break at least once.  What does that mean?

17  A.   I was instructed for employees who at least once

18  punched out for a break, to compute the average amount

19  of time that they were punched out across that group of

20  people.

21       And the other group of employees are employees

22  that never punched out for a break.  I was instructed to

23  use the number computed of the first group, which is

24  about five minutes of break time, I would subtract for

25  those people who never punched out.

**Michael Murray - Direct by Mr. Herrera**

1    Q.   Are those the same categories we talked about

2    earlier, I forgot what number you said?

3    A.   The 3,100 and 4,800.

4    Q.   So for those 4,800 employees who never punched out

5    for a break, what impact, if any, did this sub query

6    have on their working time?

7    A.   So this would reduce the total hours per day by

8    five minutes roughly, approximately five minutes.

9    Q.   Why is that happening?

10   A.   The reason to do it?  The attorney instructed me.

11   I'm not entirely clear why but there's logic in the

12   query that says, uses a sub query to identify which

13   employees punched out versus never punched out.

14            There is just logic in there that says

15   employee never punched out, subtract this average number

16   from the total hours for that day.

17   Q.   So an attorney within the DOL instructed you to

18   reduce by five minutes the working time of these 4,800

19   employees?

20   A.   Yes.

21   Q.   What impact, if any, on the back wages did the

22   reduction of these five minutes of these employees have?

23   A.   Overall, this would reduce the total back wages for

24   those employees.

25   Q.   If you can, Mr. Murray, explain for me in basic

1   terms what is happening in query five?

2   A.   So at this point the queries are feeding into each

3   other.   The result of query four is used in query five,

4   now sum up by week rather than just day.   It picks up

5   the number of hours over 40 and this is for those

6   employees who are not 8/80.   Overtime will be determined

7   by hours worked over 40 for the week.

8   Q.   So what's happening here, Mr. Murray, you have the

9   hours by day in the earlier queries.   Now you are

10  collecting hours by week.   Why?

11  A.   For purpose of determining the overtime for those

12  employees not subject to the 8/80 rule.   So we have to

13  keep track of the hours over 40 each week they worked.

14  Q.   There is information here about or it says at least

15  sub query to compute unpaid regular hours per week.

16          Mr. Murray, what are unpaid regular hours per

17  week?

18  A.   So there's an attorney instructing me that if

19  there's a week where the time data shows an employee as

20  overtime, they worked over 40 hours but they were paid

21  for less than 40 regular hours, say it's 39 hours, throw

22  a number out there, then they would receive pay for that

23  one hour between 39 and 40.   So this would be added to

24  back pages as unpaid regular time.

25          This query had to address the fact that the

**Michael Murray - Direct by Mr. Herrera**

1   pay data is in two-week increments, not one-week

2   increments and there is a total of number of regular

3   hours paid for two weeks.  It is not clear usually to

4   determine how many of the regular hours were in the

5   first week of the pay period versus the second week of

6   the pay period.

7          So the solution for that the attorney

8   instructed me to go was to compute a ratio.  This is

9   using the time data.  So if they worked -- if the time

10  data shows they worked 35 hours in one week and 40 hours

11  in another week, you would have a ratio of a total of

12  75.

13         For the first week of ratio hours work is 35

14  over 75 and the second week would be 40 over 75.  That

15  is going to give you a decimal of less than one.  That

16  ratio is going to apply to the regular hours in the pay

17  data to kind of divvy them up the regular hours between

18  the two weeks.

19  Q.   Why did you do that?

20  A.   So the purpose here is if it's a case where it's a

21  week where you're owed or they earned overtime, they

22  worked over 40 hours but this formula is showing they

23  were paid less than 40 hours for that week, they would

24  be entitled to time difference between what they were

25  paid for under 40.

**Michael Murray - Direct by Mr. Herrera**

1           The attorney referred to it as a gap time.  I

2    don't know if that's an official name.  That's the name

3    I used.

4    Q.   Mr. Murray, if you have an instance where an

5    employee, say, works for 75 hours but then they are paid

6    for 70 and because of the 8/80 rule there is overtime

7    owed, why not just split the pay according to how the

8    time data is organized?

9    A.   I mean that's possible but it doesn't take into

10   account how many hours they actually worked each pay

11   period which allows more accuracy in determining how to

12   divide the hours.

13   Q.   Just to be clear, Mr. Murray, the hours worked in

14   the pay data, does it specifically attribute which days

15   those hours were worked?

16   A.   No, not in the pay data.

17   Q.   Let's move on to query six, Mr. Murray.  What is

18   happening in query six?

19   A.   So, the next step here is to take the weekly hours

20   and now total them up for the two-week pay period.  This

21   is the second half of the 8/80 rule.  We can compute

22   then how many hours over 80 they worked.

23   Q.   What is the difference between the hours per week

24   and the hours per pay period, query six, query five?

25   A.   Well, query five is one week of data from the time

**Michael Murray - Direct by Mr. Herrera**

1   data.  Query six would total up two weeks of time from

2   the time data.

3   Q.   How about query seven, Mr. Murray, what is

4   happening here?

5   A.   So query seven looks at that field I created, the

6   8/80 added field and then it determines the total number

7   of overtime hours that the employee earned considering

8   the 8/80 rule.

9          So it has different columns now.  It has

10  columns for hours over 80 total for the two-week period,

11  total hours over 40 for the two-week period, for each of

12  the two weeks and then total hours over 80 and it is

13  just using some logic.

14         If it is the 8/80 rule, it would look hours

15  over eight versus hours over 80, whichever two is the

16  largest number it uses as overtime hours earned.

17         If the employee is not under the 8/80 rule, it

18  is just going to look at the hours over 40 totaled up

19  for the two-week period and uses that for overtime

20  earned hours.

21  Q.   Can you describe what's happening in query eight if

22  you are able to?

23  A.   Query eight is now looking at the pay data table

24  for each pay period.  It's going to compute a regular

25  rate and that's kind of complicated so there is an

1  appendix C that describes that policy.

2  Q.   We'll go through that appendix in a moment,

3  Mr. Murray.   What is the overall goal here for query

4  eight?

5  A.   So you see it also computes base regular rate just

6  by dividing pay the regular pay by regular hours.   So I

7  was instructed when an employee has an hour of overtime,

8  the pay for that overtime hour is determined by kind of

9  splitting up the -- it should be one hour times one and

10  a half for premium times a rate.

11        We are looking at two rates.   The query uses

12  the regular rate, that regular pay divided by regular

13  hours field, uses that for I think they call it the

14  straight time component of the overtime hour, which is

15  the one and the 1.5 and then the premium portion of that

16  overtime pay, the .5, it is going to use the computed

17  regular rate -- I apologize if the terminology is

18  confusing -- the computed regular rate.

19        In addition to regular pay, it's also looking

20  at all the other differentials and bonus fields that are

21  in the pay data.   The intensity is a little bit higher.

22  Q.   Mr. Murray, the computed regular rate, is that done

23  on a global basis or is it done on an employee basis?

24  A.   It's done on an employee pay data basis.   It's

25  computed for each pay record and pay period.

1   Q.   So you're saying each employee and each pay period

2   has a unique computed regular rate?

3   A.   Yes.

4   Q.   What is that based on?

5   A.   So partly it's based on their regular pay rate and

6   partly it's based on adding up all the differentials

7   they received for that pay period plus the money they

8   were paid for regular and overtime and there's a formula

9   for it.  I'm leaving some details out.  It divides that

10  by the totals number of hours worked in a pay period to

11  create this regulate.

12  Q.   Mr. Murray, would an employee's regular rate,

13  computed regular rate, would it fluctuate depending on

14  the hours they worked and the kind of pay they received

15  each week?

16  A.   Yes, it would.

17  Q.   Does this summary account for those variances in

18  time worked and types of pay received?

19  A.   The methodology or the whole back wage?

20  Q.   The whole back wage.

21  A.   Yes, it does.

22  Q.   Let's talk about query nine.  Can you describe for

23  me in simple terms, if possible, what is happening in

24  query nine?

25  A.   Query nine is taking the results of query seven and

1  eight, so we have total overtime hours earned coming out

2  of query seven.  Query eight also provides the overtime

3  credit.

4        It is coming out of the pay data anyway

5  because it takes into account the overtime hours that

6  already have been compensated for each employee each pay

7  period.

8        Then it computes overtime pay earned by using

9  the overtime hours query seven times the rate in query

10 eight and subtracts out the overtime credit of what's

11 left over.  If there is a positive number left over,

12 then that's the back wages that are left.

13       If it's a negative number meaning the credit

14 was larger than the overtime earned, it zeros it out.

15 So it's zero back wages.

16 Q.   So are you saying an employer paid enough overtime

17 to meet your computations as to the hours and rates,

18 there would be no back wages owed for that employee for

19 that pay period?

20 A.   Correct.

21 Q.   Mr. Murray, I want to try to go through some simple

22 examples.  Let's go to the PowerPoint and just talk me

23 through the best of your ability what is happening here.

24 Let's start with slide 3.

25 A.   I have it.

1   Q.   You have an example, here, Mr. Murray, total

2   hypothetical.   You have an employee at one of these

3   buildings who works for 100 hours in a pay period.   The

4   40-hour rule is applied here.   The regular rate is $10

5   an hour.   Just an example.

6          Can you explain for me based on what's on this

7   slide how is their overtime due calculated?

8   A.   Okay.   So it kind of breaks it up.   It's going to

9   have two rates computed.   One is the regular rate and

10  the other rate is the computed regular rate, the premium

11  portion.

12         So the premium rate here because there is no

13  differentials and no bonuses paid, it's just the same as

14  the regular base rate.   The premium portion is now going

15  to be half of that, so $5 an hour.

16         Then for the regular straight portion of the

17  overtime, we are using the regular rate.   In this case,

18  the rates are both the same.   One is cut in half because

19  it's .5 overtime premium.

20         We have 20 overtime hours.   The premium

21  portion is paid $5 an hour.   So it's $100 earned.

22         Then for the regular time portion, straight

23  time portion of that paid $10 an hour the regular rate

24  for 20 hours and that's $200.

25         We combine these two for the total amount of

**Michael Murray - Direct by Mr. Herrera**

1    overtime earned is $300.

2    Q.   Mr. Murray, why not just multiply $10 times 1.5?

3    A.   In this case, that would work but in other cases

4    where there's pay differentials or bonuses that need to

5    be included in the premium part but not the regular

6    part, it wouldn't work.

7         Because the query is going to run across all

8    the records, it's just easier to make it apply this same

9    logic to every record even if the rates are the same.

10   It will work either way.

11   Q.   So are you saying, Mr. Murray, there are distinct

12   rules that apply to a person's premium pay and a

13   person's regular pay for an overtime hour?

14   A.   Correct.

15   Q.   So the $10 versus the $5 in that $15 an hour

16   example?

17   A.   Correct.  There are different rules.

18   Q.   Is that why your summary splits out the calculation

19   of the regular part of overtime and the premium part of

20   overtime?

21   A.   Yes, just to show how the information -- where it

22   came from.

23   Q.   Let's spend a moment before we go to slide four

24   going to appendix C, then we will go to appendix D.

25        You mentioned the regular rates.  I want to

**Michael Murray - Direct by Mr. Herrera**

1  talk about this briefly, Mr. Murray.  What is appendix

2  C.

3  A.   This is laying out all the rules or which fields

4  are used to determine the premium portion of what we're

5  calling the computed regular rate.

6  Q.   Why is this split up in this document on Page 8 of

7  12 of PX5 to numerator fields and denominator fields?

8  A.   The numerator fields are the pay fields, the dollar

9  amounts paid for the pay period total.

10         The denominator fields are the hour fields

11  that were for hours worked as opposed to sick leave,

12  vacation.

13         You take everything that was paid for work

14  divided by the hours worked to get this computed regular

15  rate.

16  Q.   Where do these bracketed values, where do they come

17  from?

18  A.   So the brackets are from Microsoft Access.

19  Essentially if you have a space and a column name, then

20  Access will recognize it as a column.  You have to put

21  the brackets around it.  I just copied them from

22  Microsoft Access.  Column names are there and pasted in

23  the table.

24  Q.   What is the original source of these values?

25  A.   These are column names from the pay table, from the

1    pay records.

2    Q.   Mr. Murray, if I were to bring the pay table back

3    up and I'm not going to, are you saying that you would

4    find these brackets within that pay data summary?

5    A.   Yes.  Again, depending on the facility, some

6    facilities might not have every single one of these

7    fields but across all of them, they would be.

8    Q.   For example, we saw earlier PU pay?

9    A.   Correct.

10   Q.   Does that correspond exactly to the PU pay column

11   we reviewed earlier today?

12   A.   Yes.

13   Q.   How did you know, Mr. Murray, which of the pay data

14   fields to include in the numerator?

15   A.   This was a list provided by the attorneys.

16   Q.   What is being captured in these specific rows?

17   A.   It's my understanding it's pay that was received

18   for work done, not like vacation pay or sick pay.

19   Q.   So this list of numerators, is it limited

20   exclusively to pay for hours worked?

21   A.   Yes.

22   Q.   There's no vacation time or sick time?

23   A.   Correct.

24   Q.   Why was it necessary to not include those?

25   A.   My understanding is that's how the rules are with

Michael Murray - Direct by Mr. Herrera

1   the instructions.

2   Q.   Now, there is in this page OT pay.  Does that

3   correspond to the OT pay column we saw in the pay data

4   sheet earlier today?

5   A.   Yes.

6   Q.   Mr. Murray, why is the OT pay numerator being

7   multiplied by two-thirds?

8   A.   That's to remove the premium part of the OT

9   computation.

10  Q.   Why is that being done?

11  A.   We are trying to compute the regular rates so if

12  you leave the premium part of the OT pay in there, it is

13  going to inflate the computed regular rate.  So only the

14  portion of the OT pay that was paid for the regular

15  portion of the overtime hours.

16  Q.   Going back to slide three, Mr. Murray, is what you

17  are saying that by multiplying by two-thirds, you are

18  just isolating the regular pay of the overtime hour that

19  is in the defendants' pay data?

20  A.   Correct.

21  Q.   Let's go to the denominators, Mr. Murray.  What are

22  these?

23  A.   So these are hour fields from the pay data.  These

24  are for hours worked.

25  Q.   So is the idea here, Mr. Murray, pay over hours

**Michael Murray - Direct by Mr. Herrera**

1  paid for?

2  A.  Correct.

3  Q.  How did you know to use these fields in the

4  denominator?

5  A.  This was the same instruction from the attorney for

6  calculating the computed regular rate.

7  Q.  What do these values, these categories, as I'll

8  call them, what do they reflect in terms of hours?

9  A.  They reflect hours worked.

10  Q.  So, again --

11  A.  For a pay period.

12  Q.  Forgive me.  I did not mean to interrupt you.

13  Again, not vacation hours?

14  A.  Correct.

15  Q.  Not leave hours?

16  A.  Correct.

17  Q.  So what's the points of this appendix?  What is end

18  goal here?

19  A.  So the query eight is using these fields to compute

20  the computed regular rate and subsequently it is used to

21  determine back wages.  So it's just showing, documenting

22  what fields were used to make that calculation.

23  Q.  In this appendix does your summary accurately

24  capture for each employee each pay period and each

25  building, the amount of pay they received over the

Michael Murray - Direct by Mr. Herrera

1  number of hours they worked to receive that pay?

2  A.   Yes.

3  Q.   Let's go to appendix D, Mr. Murray.  You mentioned

4  earlier, correct me if I'm wrong, in determining if a

5  back wage was due, did you account for overtime payments

6  that the employer did, in fact, make?

7  A.   Yes.

8  Q.   How so?

9  A.   We looked at the overtime pay fields and also other

10  fields that were provided to me as HOT, which I think is

11  holiday pay for working on the holiday, not for taking a

12  holiday.  Then there was a holiday double pay for

13  working on a holiday.  These were included in the

14  overtime credit.

15       The last row there, the regular over 80 is for

16  instances where they were paid for more than 80 hours in

17  a two-week pay period.  This was to account for they

18  should have been paid in overtime hours.  My

19  understanding is you still want to credit the regular

20  part that was paid.  It's just the premium part that was

21  not paid.  That is added to the credit.

22  Q.   So let's now go to slide four, Mr. Murray.

23  A.   Okay.

24  Q.   We have our same example from earlier.  The

25  employee is working 100 hours in the pay period.  Simple

**Michael Murray - Direct by Mr. Herrera**

1  rule here, 40 hours of those 100 hours, 80 is regular,

2  20 OT, same rate, $10 an hour.

3          Now we are going to introduce the factor, and

4  this is a hypothetical, of course.  The pay data is

5  telling you that this employee was, in fact, paid

6  $1,100.  Just assume that for purposes of this example.

7          Can you walk me through in this set of

8  circumstances how your summary accounted for that $1,100

9  as compared to its determination as to how much money is

10  due?

11 A.   So the first -- there's two $1,100 figures here.

12 The first one is representing overtime earned based on

13 all the queries and then the $1,100, the second one is

14 credit the employer paid and it subtracts the credit

15 from the OT earned and in this case, there are zero

16 dollars left in back wages.

17 Q.   So if your summary saw that an employee was due

18 $1,100 for working 80 regular hours and 20 overtime

19 hours and the pay data said that person was paid $1,100,

20 would there be any back wages owed?

21 A.   No.

22 Q.   Does your model account, as far as you can tell,

23 for the amounts the employers paid to the employees each

24 pay period for overtime compensation?

25 A.   Yes.

**Michael Murray - Direct by Mr. Herrera**

1  Q.   Does it include the compensation for regular time?

2  A.   Yes, it does.

3  Q.   Let's go to a harder example.

4         MR. HERRERA:  And then, Your Honor, when do

5  you want to break for lunch?

6         THE COURT:  Noon, if possible.  If you are at

7  a breaking point slightly before or slightly after.

8         MR. HERRERA:  I think it's beneficial to go

9  through another example.

10  Q.   Let's go to slide five, Mr. Murray.  Still trying

11  to stick with some of the same basic facts here.   We

12  have our employee.  They work 100 hours, 80 regular, 20

13  OT.   Regular rate is $10 an hour.

14         This time the pay data is telling you they

15  were paid $1,050.  $1,000 in regular pay and $50 in OT

16  pay.

17         First off I should ask you, Mr. Murray, did

18  you see instances where the employer in this case

19  overpaid for regular hours worked?

20  A.   There were instances where the credit was larger

21  than the overtime earned is that what you mean?

22  Q.   In this example, for instance, here this employee

23  worked 80 regular hours but in my hypothetical, they

24  were paid a thousand dollars for those 80 hours even

25  though are at $10.

**Michael Murray - Direct by Mr. Herrera**

1           So I would imagine if this was done correctly,

2    this employee would get $800 for working 80 regular

3    hours but in the hypothetical I'm giving you, they are

4    paid a thousand?

5    A.   Yes.   There were instances where employees were

6    paid for more than 80 regular hours.   This could be one

7    of these.

8    Q.   When that happened, Mr. Murray, does your summary

9    account for those overpayments?

10   A.   Yes.

11   Q.   Are they part of the credit given to the employer

12   against the back wage owed?

13   A.   Yes, they are.

14   Q.   Talk me through what is happening in this slide,

15   please.

16   A.   So the OT credit, in this case, a thousand.   So we

17   are going to have to assume they were paid for 100

18   regular hours.   So the regular field in the pay data

19   says 100, they were paid a thousand.   The 200, the time

20   over the 80, so the $200 is applied to the credit.

21           You don't see that in the slide but OT credit

22   would be this $50 that was paid for overtime.   Also, the

23   $200 that was paid for the additional regular hours over

24   80.   So a total of $250 credit.   The $300 overtime

25   earned, there is $50 left in back wages.

**Michael Murray - Direct by Mr. Herrera**

1   Q.   Let's go to slide six, Mr. Murray.  We are going to

2   change the variable slightly here.

3            Now we have the employee.  They were working

4   100 hours, so 80 regular, 20 overtime.  The rate is the

5   same.  This time they receive $900 in regular pay

6   according to the pay data for 90 regular hours and no

7   overtime.

8            Can you walk me through what happened in this

9   scenario in your summary.

10  A.   This is a little similar to the previous one but

11  without the overtime being paid.

12           In this case, the overtime premium credit is

13  zero but there is still $100 credit for the regular time

14  that was paid over 80.  So we have a total credit of

15  $100 and they have 20 overtime hours which would be $300

16  earned.

17           So in this case, the back wages is $1,100

18  minus the $900 or you can say 300 minus the 100, same

19  number, you end up with $200 back wages.

20  Q.   So in this instance, Mr. Murray, even though there

21  is no overtime pay at all?

22  A.   Correct.

23  Q.   Would your summary account for the amount of

24  regular time paid?

25  A.   Yes.

**Michael Murray - Direct by Mr. Herrera**

1  Q.   Even if it does not match the amount of regular

2  hours worked in the time data?

3  A.   So the time data saying they worked 100 hours?

4  Q.   Yes.

5  A.   It should be 80 hours of regular time, 20 hours of

6  overtime, yes.  The fact they said there was 90 hours in

7  pay data, it accounts for that and applies it to the

8  credit.

9  Q.   Your summary would still see that credit?

10  A.   Yes.

11       MR. HERRERA:  This is a decent place to break,

12  Your Honor.

13       THE COURT:  Okay.  We will reconvene at 1:00.

14       (Whereupon, a luncheon recess was taken.)

15  (Afternoon session, 1:00 p.m.  In open court.)

16       THE COURT:  Mr. Herrera, are you ready?

17       MR. HERRERA:  Yes.

18       THE COURT:  You may proceed.

19  BY MR. HERRERA:

20  Q.   Welcome back, Mr. Murray.

21       I want to return to appendix D within PX5

22  which is on Page 9.  We had discussed before the

23  explanation for the multiplication of OT pay by

24  two-thirds.  What is the purpose of that?

25  A.   To split the OT pay up into a straight time credit

**Michael Murray - Direct by Mr. Herrera**

1  portion and a premium credit portion.  Two-thirds is

2  essentially the regular rate and the premium portion is

3  that .5 part.  Multiply by two-thirds to get one done at

4  regular rate and one-third at the premium rate.

5  Q.  Can you help me understand why for HOT-DBLA, it's a

6  multiplication of one-half as opposed to two-thirds?

7  A.  My understanding is that pay rate is two times the

8  regular rate.  So divided by half to get the premium

9  rate and half to get the regular rate.

10 Q.  So is it for HOT-DBLA pay, the overtime hour is not

11 1.5 but two?

12 A.  Yes.

13 Q.  Can you help me understand the reg-80, parenthesis

14 440 if only one workweek, close parenthesis, times paid

15 a regular rate?

16 A.  This is some of the records that will have more

17 than 80 hours for a two-week pay period or more than 40

18 regular hours for a week.  In those cases, the hours

19 over 80 are 40 should have been overtime.  They were

20 paid at the regular rate.

21        So I'm capturing the regular rate portion for

22 the credit field with the premium time portion which

23 would be zero in this case.

24 Q.  Is that one of the examples we saw in the slides

25 earlier where they overpaid the number of regular hours?

**Michael Murray - Direct by Mr. Herrera**

1  A.   Correct.

2  Q.   Mr. Murray, there is a line here in appendix D at

3  the end of the first paragraph.  Can you read it for me,

4  please.

5  A.   It says, note that if any of the overtime fields

6  used to compute credit are negative, then they are

7  counted as zero.

8  Q.   Mr. Murray, to the best of your ability, what does

9  it mean if an overtime field used to compute credit is

10  negative?

11  A.   My understanding is that would be a correction for

12  a previous pay period, when overtime was paid and it

13  shouldn't have been.  So I was asked to not use those

14  for purposes of credit or determining the credit.

15  Q.   Did you see instances within the pay data or if an

16  employee at least on the face of the record was paid

17  negative money?

18  A.   Yes.

19  Q.   How often did that happen?

20  A.   Not very often.

21  Q.   Why did you count it as zero?

22  A.   If I included the negative number, it would reduce

23  the credit for that pay period.

24  Q.   So by using a zero instead of a negative, what

25  effect, if any, did it have on the amount of back wages

**Michael Murray - Direct by Mr. Herrera**

1  in this case?

2  A.   It would -- well, it would decrease the back wages

3  relative to it including the negative amount.

4  Q.   Did it --

5  A.   The negative --

6  Q.   I'm so sorry.  Please continue.

7  A.   If I included the negative number, it would

8  increase the back wages.

9  Q.   By removing it or creating a zero, did it decrease

10  the back wages in this case?

11  A.   Yes.

12  Q.   I want to return now, Mr. Murray, to Page 2 of PX5.

13  I want you to, if you can, explain, you don't have to

14  read this, just explain what does this language mean

15  that I'm highlighting beginning with the words note DEP?

16  A.   These are the subset of records where employees are

17  working at different facilities and have overlapping pay

18  periods.  It's more difficult to relate the time data to

19  the pay data.

20          So these are -- I indicated them with a yes/no

21  field for the main queries.  That field is used to

22  exclude them.  There's a set of queries described in

23  appendix F where these records are computed, used to

24  getting back wages separately.

25  Q.   Why were they calculated separately?

**Michael Murray - Direct by Mr. Herrera**

1    A.   I had to use slightly different logic for

2    determining the weeks and also we couldn't find a way of

3    to consider the 8/80 rule for these records, so didn't

4    address that.  So that query doesn't exist in the

5    appendix.

6    Q.   Why couldn't you consider the 8/80 rule for these

7    employees?

8    A.   Because different facilities, they might

9    have -- some might be using the 8/80 rule, some might

10   not.  So it's too complicated.

11   Q.   Let's go to appendix F, Mr. Murray.  Well, I should

12   ask.  Is it within this document?

13   A.   Yes.

14   Q.   Just in general terms, could you describe what

15   appendix F is, please?

16   A.   Here at the beginning it states:  It is reusing

17   queries one, two from the previous back wage

18   computations.  Then it describes a set of new queries

19   that roughly do the same thing, sum data by day and

20   week.  If they are missing punches, they use the average

21   time.

22          It covers a lot of the steps from the original

23   set of queries.  It just ends up not looking at a pay

24   period but at individual weeks.

25   Q.   Why did it look at individual weeks?

**Michael Murray - Direct by Mr. Herrera**

1  A.   Just the way the pay periods overlapped, it was too

2  complicated to bring it up to a pay period level.

3  Q.   Do you know, Mr. Murray, about how many records

4  within the data set are subject to the appendix F

5  process?

6  A.   I think it was around, between 15,000 and 30,000.

7  I can't recall the exact number.  It was no more than

8  30,000 records out of two million.

9  Q.   Was it a relatively small number of the total

10  records?

11  A.   Yes.

12  Q.   Can you explain to me what is the principle

13  difference between the queries in appendix F and the

14  queries we saw earlier in this document.  What is the

15  mechanical difference, if you could explain that?

16  A.   Mechanically the biggest difference is that there's

17  no query for pay period for 80-hour period.  It

18  goes -- summarizes the hours for the week, determines

19  overtime due based on that and then it does the back

20  wage computations.

21  Q.   Other than to address the issue of an employee

22  working in multiple facilities with distinct payroll

23  rules, is the process here otherwise the same as the

24  queries that are above in PX5?

25  A.   Yes.

**Michael Murray - Direct by Mr. Herrera**

1  Q.   Let's talk about A6, query A6.  Can you walk me

2  through how query A6 is computing the regular rates,

3  please?

4  A.   So the data in the pay table is in two-week

5  increments.  So some of the time data might be related

6  to two or more of these pay records.  The only way to

7  compute overtime was to take the pay data and break it

8  into a weekly basis from the two-week basis that it's in

9  and then sum up by those weeks.

10            For that we are using the ratio like we did as

11  we discussed earlier in the time data.  We used the time

12  for a week, two weeks in a pay period to create a ratio

13  to kind of split that, split that pay data up.

14            So you'll have pay data from two different

15  facilities over a period of weeks and we sum it by the

16  weeks.  Also a way to reassemble the data based on a

17  weekly basis.

18  Q.   Let's go to query A7 for just a moment, Mr. Murray.

19  Can you just explain why here the total hours are

20  computed by subtracting 40 for the total weekly hours

21  computed here in A6?

22  A.   A6 would have hours worked for a week and we're not

23  considering the 8/80 rule.  So we only look at the rule

24  if you work over 40 hours, you are owed overtime.

25  Q.   Let's go to the last sentence of A7.  Can you

**Michael Murray - Direct by Mr. Herrera**

1  explain to me -- first, I'll ask you to read the

2  sentence, please.

3  A.   It says use the sub queries to determine the

4  primary facility and department and employee worked at

5  each week by choosing the facility and department as the

6  most time data records for each week.

7           So this set of logic in the other set of

8  queries because employees could work in different

9  departments or facilities within a week.  When you're

10  summing up these records in Microsoft Access, what will

11  happen is the sum will be grouped on the facility where

12  the department.

13          Let's say within one week they worked in two

14  departments.  It will return two records instead of just

15  one total for the week.  There will be two totals and

16  that won't work.  I need to have just one number for

17  that week.

18          So the sub queries look at the time data for

19  each week the employee worked, determines what was the

20  predominant department and predominant facility they

21  worked at and if it happens to be a tie, they worked the

22  same number of days in each, it just takes alphabetical,

23  sorts it and takes the first one.

24          So in the end, we have just one facility and

25  one department for each employee for each week.

1    Q.   Thank you, Mr. Murray.  Let's put PX5 aside for a

2    moment.

3             I'll ask you at any point did you create a

4    summary of become back wages due using the methodology

5    we just discussed in PX5?

6    A.   Yes.

7    Q.   I'm going to show you a copy and the Court a copy

8    of what's been premarked as PX6.

9             MR. HERRERA:  Because of the nature of the

10   data, Your Honor, it is only electronic.

11            THE COURT:  Okay.  PX6.

12   Q.   Mr. Murray, I opened a folder called PX6.  Do you

13   see that on the screen?

14   A.   Yes, I do.

15   Q.   What do you see within the folder labeled PX6?

16   A.   I see three files, Excel files, spreadsheets.

17   Q.   Do you recognize these files?

18   A.   Yes.

19   Q.   What are they?

20   A.   These display the results of the back wage

21   computations in a readable format.

22   Q.   Who created these Excel sheets, Mr. Murray?

23   A.   I created the second one completely.  For the other

24   two, I provided the attorney tables which they cleaned

25   up because they weren't formatted nicely.

**Michael Murray - Direct by Mr. Herrera**

1  Q.   Did you provide the substantive figures -- well, I

2  guess identify for me which one you created entirely?

3  A.   The second one, the CHMS Wage Computations

4  September 2015 to March 2023.

5  Q.   So the other two Excel sheets, Summary Tables and

6  ED and Bonus Summary Tables, did you provide the

7  underlying data for those two spreadsheets?

8  A.   Yes, I did.

9  Q.   How did you create these Excel sheets, Mr. Murray?

10  A.   So in Microsoft Access, you can run a query.  You

11  get your set of results.  You can export that as an

12  Excel sheet.

13        When it's exported, it doesn't have any

14  format.  The fields are all very narrow.  You can't read

15  the data.  You have to take that spreadsheet and make it

16  readable and add some color to it and some text

17  formatting to make it easier.

18  Q.   Mr. Murray, in the process of creating these Excel

19  sheets from Microsoft Access, did you change any of the

20  underlying values in the pay and time data that the

21  defendants provided?

22  A.   No.

23  Q.   Do these Excel sheets in PX6, do they account for

24  all pay data that the defendants provided to you?

25  A.   Yes.

**Michael Murray - Direct by Mr. Herrera**

1  Q.   Do they account for all time data that the

2  defendants provided to you?

3  A.   Yes.

4  Q.   This CHMS wage computations underscore SEP 2015 to

5  MAR 2023 underscore 2024-01-08.  Did you create this

6  Excel sheet by yourself?

7  A.   Yes, I did.

8  Q.   When did you create it?

9  A.   January 8, the date stamped on it, on the

10  particular spreadsheet.

11  Q.   Did you review this spreadsheet to ensure its

12  accuracy?

13  A.   Yes.

14  Q.   When did you do that?

15  A.   Did you say when or why?

16  Q.   When.

17  A.   After I created it, I compared it to the data in

18  the database to make sure it was all there.

19  Q.   As far as you know, Mr. Murray, are the figures in

20  that spreadsheet that I just identified, are they

21  accurate?

22  A.   Yes.

23  Q.   Do you stand by them?

24  A.   Yes, I do.

25          MR. HERRERA:  Your Honor, we request PX6 be

Michael Murray - Direct by Mr. Herrera

 1   entered into the record.

 2             THE COURT:  Any objection?

 3             MR. SCHWARTZ:  No, sir.

 4             THE COURT:  It's admitted.

 5             MR. HERRERA:  For this one, Your Honor, we

 6   have a set of flash drives that contain JX52 to 58 and

 7   they will also include PX6 files.

 8             THE COURT:  Okay.  Have you given a copy of

 9   that to opposing counsel.

10             MR. HERRERA:  I did give them a copy.

11             THE COURT:  Whatever you are giving us, I just

12   ask you give them, too.

13             MR. SCHWARTZ:  This is the one where there

14   were SSNs?

15             MR. HERRERA:  No.  This is the PX6 documents

16   that we sent.

17             MR. SCHWARTZ:  The computations?

18             MS. PRESLEY:  The underlining data in the 50s

19   that you hid when you showed it on the screen, you are

20   not entering that?

21             MR. HERRERA:  The JX data?

22             MR. SCHWARTZ:  I think it was JX5.  There are

23   sheets that would have contained SSNs.  The document has

24   them.  Those need to be redacted before that could be

25   presented.

1          MR. HERRERA:  I think I understand.  Your

2     Honor, JX52 through JX58, all the payroll data, time

3     data in the original source from the defendants

4     contained Social Security numbers on some of the files

5     for the employees.

6          The DOL did not modify any of those documents

7     for any reason.  If Your Honor would prefer, the Court's

8     copy can be redacted to remove those SSNs.  As you saw,

9     we are not displaying any of that in open court or

10    filing it on the docket.

11         THE COURT:  It can be filed under seal.  If

12    there ir personal identifying information, rather than

13    going through the laborious process of redacting

14    everything, we can file it under seal.

15         MR. SCHWARTZ:  That's perfectly acceptable.

16         THE COURT:  Why don't we do this as a

17    housekeeping matter.  At the end of the day today, I'm

18    not sure if it's three exhibits or one exhibit that has

19    the personal identifying information.

20         MR. HERRERA:  So the personal identifying

21    information is contained not in every single sheet but

22    within at various points the spreadsheets contained in

23    JX52 through JX58.

24         THE COURT:  JX52 through JX58, any objection

25    to having those documents filed under sealed?

1          MR. SCHWARTZ:  Not at all.

2          THE COURT:  JX52 through JX58 are hereby

3   sealed.  The Court finds good cause to do so because of

4   the inclusion of personal identifying information

5   including but not limited to Social Security numbers.

6   So ordered.

7          MR. HERRERA:  Thank you, Your Honor.

8   Q.   Mr. Murray, I'm going to open this document that

9   you said you created.  It's 335,880 kilobytes.  Is that

10  consistent with your recollection of the file you

11  created?

12  A.   Yes.

13  Q.   The file on my other screen I'm going to move to

14  the monitor that is visible to everyone.

15         Mr. Murray, can you please explain what we're

16  looking at in sheet title CHMS underscore wage

17  underscore computations underscore SEP 2015 to MAR 2023

18  underscore 2024-01-08?

19  A.   The spreadsheet has multiple tabs or sheets within

20  it.  We are currently looking at the first sheet which

21  is all back wages by employee.  This is a list of

22  employees and the total amount of back wages computed

23  for each one.  Also, it includes a start date and an end

24  date taken from the data when they were working.

25  Q.   We'll start with row three of the sheet all back

1  wages by employee within the Excel sheet.  What does it

2  signify for the first name Paul Abayes, A-b-a-y-e-s,

3  column B and column C?

4  A.   That indicates -- this is actually from the pay

5  data they were paid from August 22, 2015 through May 9,

6  2020.

7  Q.   Mr. Murray, if I wanted to know what's the top line

8  number of back wages, where would I go in this document?

9  A.   The total was at the bottom would so you have to

10 scroll down.

11 Q.   I'll do that.  Can you tell me what is in row 7815

12 of this Excel sheet?

13 A.   Total back wages, 20,540,880.57.

14 Q.   Is that the total amount of back wages your summary

15 computes as being owed to the employees of these 15

16 facilities?

17 A.   Yes.

18 Q.   Can you tell us how much of this reflects unpaid

19 overtime wages, if any?

20 A.   It reflects about sixteen and a half million of

21 unpaid overtime.

22 Q.   What is the remainder, the difference between that

23 figure and the 20.548 million?

24 A.   The remainder is regular time owed, also called gap

25 time.

**Michael Murray - Direct by Mr. Herrera**

1   Q.   Why is regular time included in these back wages?

2   A.   That occurs when there's a week where the employee

3   was paid for less than 40 hours and they're owed

4   overtime.

5         So there's a figure for the regular wages due

6   and for the hours less than 40 that were unpaid and then

7   the overtime for the hours over 40.

8   Q.   Mr. Murray, are there instances that you saw where

9   an employee had regular time unpaid in a week where they

10  did not work an overtime hour?

11  A.   Yes.

12  Q.   Does this back wages figure include any of that

13  regular time that which occurred in a week where no

14  overtime was worked?

15  A.   No.

16  Q.   What time period does this summary cover,

17  Mr. Murray?

18  A.   August of 2015 through February, March 2023.

19  Q.   Which facilities have data contained of the 15

20  within this summary?

21  A.   All 15 facilities.

22  Q.   What is the total number of employees for which you

23  had sufficient records to determine if they were due

24  back wages?

25  A.   7,811.

1   Q.   According to your summary, Mr. Murray, of that

2   7,811, how many of the employees are due any amount of

3   back wages?

4   A.   Approximately 5,500.

5   Q.   I'll let you answer based on your knowledge, but

6   those employees, the 5,500 employees that you think are

7   owed back wages, do they have a consistent amount of

8   back wages or do the amounts vary?

9   A.   The amounts vary.

10  Q.   Why do they vary?

11  A.   It depends on how many weeks the employee worked,

12  the pay rate they were paid, whether or not they were

13  working overtime.

14  Q.   Mr. Murray, the back wages for each employee, are

15  they particular to that specific employee's pay and time

16  experience at these buildings within the time periods in

17  columns B and C?

18  A.   Yes.

19  Q.   Let's go through some of these sheets, Mr. Murray.

20  I'm going to go to the next sheet, all back wages by

21  facility.  I will zoom in to make it more readable.  Can

22  you tell me what I'm seeing here, please.

23  A.   Here you're seeing for each facility the total

24  amount of back wages are associated for employees

25  working at those facilities.

**Michael Murray - Direct by Mr. Herrera**

1  Q.   What do the start and end dates in columns B and C

2  indicate here?

3  A.   Here they are indicating the earliest pay period

4  for that facility which is in the data and the latest

5  date which is in the data.

6  Q.   Are the back wages depicted here, are they just

7  another representation of the figure that we just saw

8  that was split up by employee?

9  A.   Yes.  They are just grouped in a different way.

10  They are grouped by facility instead of by employee.

11  Q.   Let's go to the next sheet, Mr. Murray.  All back

12  wages by dept.  Can you tell me what we are seeing in

13  this sheet?

14  A.   Here the back wages are grouped by the primary

15  department the employees worked in.

16  Q.   How were you able to tell what the primary

17  department was for an employee?

18  A.   So I used a query looking at the time data.  If an

19  employee happened to be working in different departments

20  within one week, it takes the most common or the highest

21  number of records associated with that department, it

22  becomes the primary department.  If they happen to be

23  the same number of records for each department within

24  one week, then it's going to sort it alphabetically and

25  take the first.

**Michael Murray - Direct by Mr. Herrera**

1  Q.   For the back wages shown here in this sheet,

2  Mr. Murray, are they the same universe of back wages

3  that we previously saw that were identified by the

4  facility and by employee?

5  A.   Yes.

6  Q.   Let's go to the next sheet, Mr. Murray.  All back

7  wages combined.  Can you tell me what this sheet is,

8  please?

9  A.   This sheet lists for every employee every week pay

10 period they worked and shows back wages at the end and

11 it also has additional information.

12 Q.   What additional information does it have?

13 A.   It shows the rates that were used, the regular

14 rate, computed regular rate, also the OT straight

15 credit.  There was a field for OT straight credit

16 additional.  That's actually the regular hours that

17 would be paid over 80 and a total for the OT straight

18 credit and OT premium credit and we see the total hours

19 worked from the time data and the total overtime hours

20 from the time data as well.

21       Then there is a column showing the computed

22 overtime straight pay and premium pay earned.  There is

23 a column for total unpaid regular hours and wages and

24 then unpaid OT wages.  Those are added up for the total

25 back wages for each employee for each pay period.

1   Q.   Mr. Murray, does every value in this sheet all back

2   wages combined, does it originally come from the payroll

3   data the defendants provided?

4   A.   Yes.  It's computed using the numbers from the

5   payroll data.

6   Q.   You said their numbers?

7   A.   The numbers from the payroll data, yes, their

8   numbers.

9   Q.   At any point before reaching what we're seeing

10  here, did your summary or your process modify any of the

11  payroll data, the pay and time data that the defendants

12  provided that served as a basis for this summary?

13  A.   No, it didn't.

14  Q.   So, Mr. Murray, this sheet all back wages combined,

15  is it the beginning or the end of your process?

16  A.   This is the end.  So it's combining.  The reason

17  it's called combined, it takes query nine or the main

18  query, I think it's query eight from the subset of

19  queries that were used for the multiple facility

20  employees and it combines them together.  So we have all

21  the back wages across the entire sub data.

22  Q.   Mr. Murray, in this sheet all back wages combined,

23  if I wanted to find a specific employee at one of these

24  buildings, could I do that in this sheet?

25  A.   Yes.

Michael Murray - Direct by Mr. Herrera

1  Q.    How?

2  A.    You can scroll through alphabetically.  They are

3  sorted or you can do a find and search for the employee.

4          When you find the employee, you want to see

5  the details, you have to click the little plus sign next

6  to the employee's name and it will display the detail

7  records.

8  Q.    Is the plus sign at the very left-hand side of the

9  Excel sheet?

10  A.    Yes, it is.

11  Q.    Let the record reflect I'm going to click the plus

12  sign immediately to the left of row 1345, all back wages

13  combined.  What am I seeing here now after having done

14  that, Mr. Murray?

15  A.    You are seeing a list of pay periods for the

16  employee in question, Benjamin Adams, and it provides

17  the results of the query for each pay period.

18  Q.    If I selected a particular employee, would all the

19  information I needed to know the back wages for that

20  employee be contained in the columns on this sheet?

21  A.    Yes.

22  Q.    You said this is the end of your process,

23  Mr. Murray.  Where is the beginning?

24  A.    For that you have to scroll to the very last tab in

25  this spreadsheet, which would be a zero one.

**Michael Murray - Direct by Mr. Herrera**

1  Q.   I'm going to scroll to the right with all these

2  sheets in the spreadsheet.  Do you see the sheet you

3  were just referring to?

4  A.   Yes.  It's actually splitting the screen because

5  the number of rows is over two million so I have to

6  provide roughly 700,000 for each sheet.

7  Q.   How is it divided?

8  A.   Alphabetically by employee last name.

9  Q.   I'm going click in sheet 01 time data HRS by day

10 total A.  What are we looking at here, Mr. Murray?

11 A.   This is the results of query one and it shows the

12 employees with last names starting with A to G, each day

13 they worked and total hours by date.

14 Q.   Where do these total hours by date come from,

15 Mr. Murray?

16 A.   These come from the time data.

17 Q.   Where in the time data do they come from?

18 A.   The total hours by date is computed by subtracting

19 the in time punch from the out time punch for each

20 employee.

21         So this particular query only looks at records

22 that have both the in time punch and the out time punch.

23 Q.   Are you saying the total hours by date, column C,

24 directly correlate to the punches in the time data?

25 A.   That's correct.

**Michael Murray - Direct by Mr. Herrera**

1  Q.   I'm going to go to now what's marked as sheet 02

2  time data, employee average hours.  Can you tell me what

3  this sheet is, Mr. Murray?

4  A.   So this is showing using the results of query one

5  the average number of hours per date each employee

6  worked.

7  Q.   Just remind us, Mr. Murray, why is an average

8  relevant to what you do?

9  A.   So this is used in a later query, query No. 4, for

10  those instances where there is a day that is missing a

11  punch and it can't be determined exactly how many hours

12  the employee worked, we use this average for that

13  employee.

14  Q.   Each employee has their own specific average?

15  A.   Yes.

16  Q.   How is the average determined?

17  A.   If you look at the records in query one there, it's

18  the average of all the daily hours that were computed.

19  Q.   For that specific employee?

20  A.   For that specific employee.

21  Q.   Let's go to time data 03 time data hours by day A.

22  Can you identify what this sheet is, Mr. Murray?

23  A.   Yes.  This is the results of query three, again

24  group are sorted by employee's last name from A to G.

25          It's showing the total amount of hours worked

**Michael Murray - Direct by Mr. Herrera**

1  per day.  In this case, you see some blanks for days

2  where there was a missing punch and it couldn't be

3  determined how many hours.

4  Q.   The total hours, Mr. Murray, which is column eight,

5  do those exactly match the total hours for these

6  employees in query one other than where there is a

7  missing punch?

8  A.   Yes.

9  Q.   Is query three similarly divided by alphabetical

10  order?

11  A.   Yes.

12  Q.   Mr. Murray, immediately to left of 03 time data HRS

13  by day C, there is a sheet here.  A 03 time data hours

14  by day.  I'm going to click it now.  What is this sheet?

15  A.   This is one of the separate queries that were run

16  for employees working at multiple facilities.  It's

17  similarly just adding up the number of hours per day and

18  if there is a missing time punch for that day, it puts

19  in a blank.

20  Q.   Is this referring to the appendix F process?

21  A.   Yes, it is.

22  Q.   Let's go to the next sheet, 04 time data HRS by day

23  OT A.  Can you identify what this sheet is, Mr. Murray,

24  please?

25  A.   This sheet is showing all the employees with the

**Michael Murray - Direct by Mr. Herrera**

1  last name starting with an A through last name starting

2  with G.

3          Here we are computing using the

4  average -- taking the results of query three and query

5  two, where there is a missing value in query three, it

6  puts the average in query two.  I believe it also

7  computes the hours over eight for each day that can be

8  used for the 8/80 rule later on.

9  Q.   Let's get a specific example here, Mr. Murray.  If

10  you can go to row ten of this sheet.

11          Paul Abayes on August 26, 2015.  What is going

12  on here with respect to columns F and G?

13  A.   So column F is coming from query three.  There was

14  a missing punch so a blank value was inserted for the

15  total hours.

16          Then column G is showing that the average

17  hours you can see in column B and repeats because it's

18  the same employee.  That value gets substituted for the

19  blank and now you see the 7.25 average in place of a

20  missing value.

21  Q.   When you say this person was missing a punch on

22  this day, were they missing both punches, one punch?

23  A.   It could be either one or the other.  Rarely it

24  would be both.

25  Q.   If an employee does not have either an in and out

1  punch, would they be included in these queries?

2  A.   The rule was if they were missing the in punch and

3  missing the out punch and missing a value in the

4  exceptions field, then it was not included.

5          If they happened to have, and this rarely

6  happened, a value in the exception field and two blanks,

7  a blank in pouch and a blank out punch, it was included.

8  That's only about a couple thousand records out of two

9  million.

10  Q.   In the exception field, Mr. Murray, is that where

11  we saw those BD30 values earlier?

12  A.   That's correct.

13  Q.   Can you explain what is happening with columns J

14  and K, please?

15  A.   So J is computing any hours over eight.  So the row

16  three and four there you can see the employee worked

17  nine hours total.  So column J shows one hour and an

18  hour over eight and K is whether or not the 8/80 rule

19  should be applied in this case.

20          In this case, it false, so it will not be

21  applied later on when you compute overtime earned.

22  Q.   How does the summary determine whether the

23  application of the 8/80 rule is false or true?

24  A.   There are rules in the appendix.  Depends on the

25  facility the employee worked at and the department they

**Michael Murray - Direct by Mr. Herrera**

1  were working in and in case of Brighton, it depends on

2  when they were working.

3  Q.   Query four, Mr. Murray, is it similarly organized

4  alphabetically?

5  A.   Yes, it's into three.

6  Q.   This A04 time data hours by day OT, is that again

7  referring to the employees who worked in multiple

8  facilities in the same pay period?

9  A.   Yes, it is.

10  Q.   Let's go to 05 time data hours by week.  Can you

11  tell me what we are looking at now?

12  A.   Query five is building off of query four.  It is

13  taking all those daily values and summing them up by

14  week and it is also introducing the regular hours from

15  the pay data, regular hours that were paid using that

16  ratio that we see in column F.  The ratio is based on

17  total hours worked each week within a pay period.

18  Q.   Is this the prorating that you described earlier?

19  A.   Yes.

20  Q.   Again, why were you prorating regular hours for

21  purposes of this summary?

22  A.   So in order to determine whether there was gap time

23  applicable for each week, we need to know how many

24  regular hours were paid per week but that's not directly

25  knowable from the pay data because it's sum by two-week

**Michael Murray - Direct by Mr. Herrera**

1   periods.  The ratio is just dividing the regular hours

2   for the two-week period between each week trying to do

3   so based on how many hours they actually worked each

4   week.

5   Q.   This sheet, Mr. Murray, does not appear to be split

6   into three parts like the earlier ones.  Why?

7   A.   When the records are totaled by week, they are

8   going to be reduced roughly by a factor of five to one.

9   So two million records become 400,000 and that fits on

10  one sheet.

11  Q.   The sheet that is immediately to the left -- really

12  I should just ask you.  If one of the sheets in this

13  Excel sheet begins with lower case "a," what, if

14  anything, does it signify?

15  A.   Lower case "a" signifies it's the special queries

16  for the multi-facility employees.

17  Q.   This is appendix F?

18  A.   Appendix F.

19  Q.   While we're waiting for my computer,

20  Mr. Murray -- there it is.  I'm going to go now to 06

21  time data HRS by max W-E.  Can you identify what this

22  sheet is, please?

23  A.   So maximum WE stands for max week ending.  For each

24  pay period you have two weekend dates and the first one

25  and second one.  The second one is max weekend date.  So

1  we are grouping on that date to sum up the hours by the
2  two-week period.
3  Q.   Why did you do that?
4  A.   This is needed for the 8/80 rule.  So we need to
5  count the number of hours over 80 for the pay period.
6  That's primarily what this query does.
7  Q.   Mr. Murray, column C, total hours less break.  Is
8  that simply carrying forward the hours that had been
9  computed in the earlier queries?
10  A.   Yes.  It's the hours worked from the time data and
11  it carries over from each query.  Keeps getting summed
12  up by a longer period of time.
13  Q.   Let's go to 07 time data OT HRS 8-80 rule.  Can you
14  tell me what this sheet is, Mr. Murray?
15  A.   So in those cases where an employee's time record
16  shows the 8/80 rule applies, that's indicated by column
17  G, you would see a true.
18        The logic of this query would then look at the
19  column E, OT hours by date, and column F, OT hours by
20  maximum week ending date and it will determine which is
21  the larger of the two and that would be put in column H
22  which is OT hours by max WE date after 8/80 rule.
23        The 8/80 rule does not apply in the logic we
24  look at in column B which is OT hours by week and then
25  any hours over 40 would be counted as OT hours.

**Michael Murray - Direct by Mr. Herrera**

1  Q.   Again, Mr. Murray, column C in this sheet, total

2  hours less break, is it again carrying forward hours

3  determined from the earlier queries?

4  A.   Yes, it is.

5  Q.   Let's go to the next sheet.  08 pay data computed

6  r-e-g rate.  What is this sheet, Mr. Murray?

7  A.   It is the result of query eight which looks at the

8  payday table.  There is a lot of columns, maybe a

9  hundred.  I never counted them.  Goes into the double

10  letters.

11         Here it's showing all the information that was

12  used to compute the regular rate and the regular -- paid

13  regular rate.

14  Q.   Let's spend a moment going through this sheet.  I

15  see here, for example, in columns H and I something

16  called sum of reg and sum of reg pay.  Where do the

17  values in column H and I come from?

18  A.   Come from adding up the total hours for the pay

19  data for each pay period.  There are I think a few cases

20  where employees have a couple pay records.  It just

21  makes sure -- the sum combines them but typically, it is

22  one payroll record per pay data.

23  Q.   So, Mr. Murray, columns H and I, does it come

24  directly from the defendants' pay data without change?

25  A.   Yes.

**Michael Murray - Direct by Mr. Herrera**

1   Q.   Let's go through some of these categories.   What

2   values are contained within columns V and W?

3   A.   Columns V and W are showing a sum of vacation or

4   vac hours.   It doesn't say "hours" but that's what they

5   are and then sum of vac pay.

6   Q.   What relevance, if any, do columns V and W have to

7   the back wages calculation?

8   A.   They don't.   They weren't used in the back wages

9   calculation.   Just trying to show all the columns that

10  were in the pay data table.

11  Q.   Are you saying your summary imports all the data

12  even if it does not relate to the calculation of back

13  wages?

14  A.   That's correct.

15  Q.   Is the import of that data just on the face value

16  of the records themselves?

17  A.   Yes.

18  Q.   If I were to compare, Mr. Murray, the columns in

19  sheet 08 pay data computed reg rate to the defendants'

20  pay data, would I find each of these columns somewhere

21  in that pay data?

22  A.   Yes, you would.

23  Q.   Okay.   We are back, Mr. Murray, to all back wages

24  combined.   Just to be clear, those eight or more sheets

25  we just discussed, do all of the sheets that we

**Michael Murray - Direct by Mr. Herrera**

1   discussed feed into all back wages combined?

2   A.   Yes, it does or yes, they do.

3   Q.   Are all the values we discussed for time and pay,

4   do they culminate to the results displayed in this sheet

5   all back wages combined?

6   A.   Yes, they do.

7   Q.   Okay.  Let's go to examples.  I'm going to ask you

8   to refer back to the PowerPoint beginning at page 7,

9   please.

10          Mr. Murray, for purposes of demonstration, we

11   picked an employee named Donna Whitfield's March 28 2020

12   pay period.  I would like you to walk me through how

13   this summary determined if any back wages are due for

14   this person on this pay period.  Where would I start?

15   A.   You would start with the hours by day.  What is

16   missing from here is the week ending date but these

17   hours by day will be eventually totaled by week and then

18   later by weekend.

19   Q.   So where should I go in this Excel file if I wanted

20   to begin understanding what the data for this person is?

21   A.   From the Excel spreadsheet, you want to go all the

22   way back almost to the end of the tabs to query one

23   total C.

24   Q.   Why C, Mr. Murray?

25   A.   Alphabetically, the last name Wakefield will be on

**Michael Murray - Direct by Mr. Herrera**

1  that third sheet.

2  Q.   Okay.  I'm going to do that.  I'm going to now

3  search for Wakefield using the find tool in Excel.

4        Do you see this person's name in 01 time data

5  HRS by day total C, specifically Wakefield, Donna?

6  A.   Yes, I do.

7  Q.   Mr. Murray, I want to go to the March 28, 2020 pay

8  period.  If I search for it, will I find it?

9  A.   By the pay period?

10  Q.   By the date.

11  A.   Yes.  If you search for the date, you'll find it.

12  Q.   I'm going to do that now.  I'm going to search for

13  3-28-2020?

14  A.   I thought you meant one of the time dates there.

15  You may not find -- you do in this case.  Okay.

16  Q.   Let's find it.  So perhaps the easier way,

17  Mr. Murray, is if we are looking for the 3-28-2020 pay

18  period, where is that first time I would see that pay

19  period identified in these sheets, which query?

20  A.   You may have to go to query six where the hours are

21  added up by pay period.

22  Q.   Okay.  I'll go there now.  06 time data HRS by max

23  WE.  I'll search for Ms. Wakefield's name.  Here she is,

24  Mr. Murray.  Scroll down to 2020.  I'll highlight just

25  for demonstrative purposes.

**Michael Murray - Direct by Mr. Herrera**

1        MR. HERRERA:  The actual exhibit itself will

2   not be highlighted, Your Honor.

3   Q.   If I wanted to search for the dates contained

4   within the max week ending date for Ms. Wakefield for

5   this pay period, where would I go?

6   A.   From the original files or in this sheet?

7   Q.   In this sheet.

8   A.   You want to see each actual time data record.

9   Q.   I want to see which specific days are included in

10  this pay period?

11  A.   I don't know if you can find this in this

12  spreadsheet.

13  Q.   I'm going to go to time data hours 04 time data

14  hours by day, OTC and search for Ms. Wakefield's name.

15  Now I'm going to look for that pay period, 3-28-2020.

16  I'm going to highlight 556714 and row 556723.

17        What dates from what you can tell, Mr. Murray,

18  are included in the March 28, 2020 pay period for

19  Ms. Wakefield?

20  A.   March 16, 17, 18, 19, 20 and then March 23, 24, 25,

21  26, 27, all in the year 2020.

22  Q.   Let's go back to sheet one and search for those

23  dates.  Highlight for Ms. Wakefield total hours by May

24  16, 2020 to March 27, 2020.  What am I looking at?

25  A.   Looking for the total hours from her time punches

**Michael Murray - Direct by Mr. Herrera**

1    for each day.

2    Q.   Is that reflected in slide seven in the

3    presentation I handed you?

4    A.   Yes, it is.

5    Q.   Now, Mr. Murray, if I wanted to check you, if I

6    wanted to find where these numbers came from, where

7    would I go?

8    A.   You would have to go back to the original time

9    data.

10   Q.   Let's do it.  Where in the original time data would

11   I go to find the time punches for Ms. Wakefield for

12   March 2020?

13   A.   That was a data supplement received in 2021.  You

14   would have to go to one of the appropriate folders for

15   that data submission.

16   Q.   You're saying it's the latest set of data you

17   received?

18   A.   For time punches.  Sorry.  For the time punches

19   it's going to be in the March 2023 set, so the last data

20   set that we received.

21   Q.   I'm in JX58 which I believe is the latest set of

22   data.  Is that your memory as well?

23   A.   Yes.

24   Q.   I'm going to wait for my computer to not freeze.

25   Let's see if we can do this from memory while I wait.

Michael Murray - Direct by Mr. Herrera

1   The time data sheets, do you recall how they were

2   labeled?

3   A.    Time dates are linked, too.

4   Q.    The Excel files themselves, do you recall what

5   their nomenclature was within the time data the

6   defendants provided in raw form?

7   A.    It just has date, the name of the field.

8   Q.    Just to move things along, Your Honor, I'm going to

9   open this document 2020A.  Is this one of the updated

10  time data sheets that the defendants provided?

11  A.    Yes, it is.

12  Q.    If I wanted to find Ms. Wakefield's March 28, 2020

13  punches, would they be within this document?

14  A.    March 20, yes, they will be.

15  Q.    I search for Ms. Wakefield.  I found her but the

16  name is a little different.

17  A.    Yes.

18  Q.    Do you know why?

19  A.    I assume she changed her name.  Used to be Donna

20  Smith or used to be Donna Wakefield and now it's Donna

21  Smith.  This is some of the things we had to work with

22  for the employee name unique.  We had to pick one

23  version of the name to be the same across the data.

24  Q.    This is still the same Donna Wakefield that we saw

25  identified in your spreadsheet?

Michael Murray - Direct by Mr. Herrera

1   A.   Yes.

2   Q.   Let's try to find her punches, Mr. Murray.  We are

3   looking for March 2020, the range March 16, 2020 to

4   March 27, 2020.

5   A.   16 or 17?

6   Q.   16.  Just looking at this time data what, if

7   anything, can you tell me about Ms. Wakefield's work on

8   these dates?

9   A.   You can see when she started working.  On March 16

10  she punched in at 12:33 p.m. and then punched out at

11  8:37 p.m.  So subtract the in time from the out time,

12  you would have the total number of hours and minutes

13  that she worked that day.

14  Q.   Mr. Murray, if I lined up these punches in their

15  raw form next to the time value by day in your

16  spreadsheet, would they match?

17  A.   Yes.

18  Q.   Let's go to slide eight, Mr. Murray, of the

19  PowerPoint.

20  A.   I have it.

21  Q.   Do the punches which I had collected on one page

22  for simplicity, do the punches match the values for the

23  hours worked exactly?

24  A.   Yes.  You have to do a little math to get there.

25  When you subtract for the first one, as an example,

1    subtract 12:33 p.m. from 8:37 p.m., you have eight hours

2    and four minutes.  The four minutes you have to divide

3    by 60 minutes to get a decimal number.  In this case, it

4    results in 8.07 rounded to two decimal places.

5    Q.   Why do you have to convert the punches to a decimal

6    number?

7    A.   It makes it much easier to multiply the rate in

8    order to compute the total amount of dollars.  So it has

9    to be in decimal form.  If you gave it a time stamp and

10   tried to multiply it by number, the computer wouldn't

11   understand what you were trying to do.

12   Q.   Let's go to March 17 then.  Do the punches that we

13   have on the screen and in the PowerPoint match the data

14   your summary has for March 17, 2020?

15   A.   Yes, it does.

16   Q.   We see here, Mr. Murray, for these shifts that

17   BD30.  What, if anything, does it tell you how she was

18   compensated?

19   A.   It indicates 30 minutes were deducted each day for

20   each day she worked for purposes of the payroll data.

21   Q.   Does your summary maintain that 30-minute

22   deduction?

23   A.   The summary does not include the values in the

24   exception code.

25   Q.   Why not?

**Michael Murray - Direct by Mr. Herrera**

1   A.    I was instructed by the attorney to just look at

2   the in punch and the out punch in order to determine the

3   hours per day.

4   Q.    Are you saying that your summary relies entirely on

5   the punches as opposed to the deductions in column R in

6   order to determine the amount of time worked each day?

7   A.    That's correct.

8   Q.    So if Ms. Wakefield had punched out for lunch,

9   would the totals be based on those punches as well?

10  A.    Yes.  If she punched out, then the math would work

11  out to account for the time she wasn't on the clock.

12  Q.    All right.  Let's continue on with Ms. Wakefield.

13  So now let's step to query three, Mr. Murray.  We'll

14  return to your spreadsheet.

15        If I wanted to find Ms. Wakefield's values in

16  query three, where would I go?

17  A.    To find the source data for the values?

18  Q.    No.  The values in your sheet.  If I wanted to find

19  where in query three Ms. Wakefield is addressed on,

20  where would I go?

21  A.    You would click on the sheet 03 time data HRS by

22  day C.

23  Q.    I'm going to do that now.  I'm also going to search

24  for Ms. Wakefield.  Here she is.

25        Let's see if we can find the same pay period

1   for her, March 28, 2020.  I'll scroll a little more

2   carefully this time.

3                   (Pause in the proceedings.)

4   Q.   I'm going to highlight rows 556714 through 556723

5   and sheet 03 time data HRS by day and columns C, D, E

6   and F.

7                   Mr. Murray, are the values from query one

8   carried exactly into query three for Ms. Wakefield?

9   A.   Yes, they are for Ms. Wakefield.

10  Q.   What are we learning, if anything, from the

11  inclusion now of this week ending date?

12  A.   From the weekend date we know which of the two

13  weeks within the pay period the workdays were falling

14  into.

15  Q.   Let's continue moving forward, Mr. Murray.  If I

16  wanted to find any data for Ms. Wakefield in query four,

17  where would I go?

18  A.   For that you would need to go to the tab name 04

19  time data HRS by day OT C.

20  Q.   I'll do that now.  Looks like we did some

21  highlighting already so we saved ourselves some time.

22                  I'm going to highlight rows 556714 through

23  556723 for columns C, D, E and F.

24                  Okay, Mr. Murray, what do we know now about

25  Ms. Wakefield's work for this pay period?

1   A.   On this case we know the hours she worked each day

2   and know that there were no missing punches that had to

3   be replaced with an average.

4   Q.   I'm going to scroll to the right now.  There is a

5   column here J.

6   A.   That shows the number of hours over eight per day.

7   Q.   Referring now to slide ten, Mr. Murray.  Does

8   what's on slide ten accurately reflect the data

9   contained for Ms. Wakefield in this sheet?

10  A.   Yes, it does.

11  Q.   So according to this, if you were to add up these

12  hours for these days, Ms. Wakefield worked 82.36 hours

13  in this pay period.  Does that look right to you?

14  A.   Yes, it does.

15  Q.   If you just counted the amount of time over eight

16  of each of those days, she would have 2.44 hours

17  overtime if you were assessing it by day?

18  A.   That's correct.

19  Q.   Let's keep moving, Mr. Murray.  Let's go to query

20  five.  Where would I find Ms. Wakefield here?

21  A.   She'll be in the query of the tab named 05 time

22  data HRS by week.

23  Q.   I'm going to go ahead and search for her.  Here she

24  is.

25          Let's go down to the pay period we are

1  focusing on.  I'm going to highlight rows 471042 and row

2  471043 and columns B through E.

3            If you could, Mr. Murray, tell me know about

4  Ms. Wakefield's work now during these two weeks.

5  A.   We can see how many hours she worked each week as

6  well as total hours for the pay period.

7  Q.   Now, if Ms. Wakefield were subject to the 40 rule

8  for overtime, how much overtime would she have worked

9  this week?

10 A.   She would have 2.36 hours.

11 Q.   If she was subject to the 8/80 rule, how much

12 overtime would she have for this week?

13 A.   I would have to see the column for --

14 Q.   You can refer back to the earlier slide if you need

15 to?

16 A.   2.44.  In that case, the 2.44 hours would be used

17 for the overtime computation.

18 Q.   Only if --

19 A.   Only if 8/80 is true.

20 Q.   Let's go see if it is true.  Column M as in Mike,

21 based on what you see there, which rule would apply to

22 Ms. Wakefield for this pay period?

23 A.   The 40-hour rule.

24 Q.   What is Ms. Wakefield's overtime worked for this

25 pay period?

1  A.   2.36 hours.

2  Q.   We now see here these rows, Mr. Murray, in column G

3  sum of reg hours.  What, if anything, does that signify?

4  A.   If it is coming from payroll data, it signifies

5  that she was paid for 77 and a half hours for pay period

6  regular hours.

7  Q.   From what you can tell, are there missing hours for

8  Ms. Wakefield's regular time worked in this pay period?

9  A.   You would expect 80 hours for the full pay period

10 so there is two and a half hours missing.

11 Q.   So her punches say 82.36 but her reg hours paid is

12 77.5?

13 A.   Correct.

14 Q.   Do you know why?

15 A.   I don't know everything that happens when the time

16 data is put into the pay data by the CHMS payroll system

17 but there could be different reasons for it.  I don't

18 know.

19 Q.   You don't know?

20 A.   Right.

21 Q.   The difference here in the hours worked versus

22 hours paid, is it coming directly from the face of the

23 records that you reviewed?

24 A.   Yes.

25 Q.   Mr. Murray, if I didn't take your word for it that

1   she only got paid for 77 and a half regular hours, where

2   could I go check?

3   A.   You would have to look at the payroll data.

4   Q.   Let's do it.  Where do I go?

5   A.   That would be -- this one, the payroll would have

6   to be from the data supplement that included the March

7   2020 data.

8   Q.   I'm going to save ourselves some time, Your Honor,

9   I'm going to go to a sheet within JX53 called friends PR

10  totals.  Do you recognize this sheet, Mr. Murray?

11  A.   Yes.  It's one of the pay data sheets we were

12  provided.

13  Q.   Which facility, if you know, does it relate to?

14  A.   Brighton, also called Friends.  It's short for

15  something.

16  Q.   Based on the dates you see here at the top, would

17  you think Ms. Wakefield's March 28 2020 pay data is

18  here?

19  A.   Yes, if you scroll down.

20  Q.   I am going to represent to you that I looked before

21  we came and I know exactly which row it is in so we will

22  save ourselves some time.

23          Let the record reflect that I will highlight

24  4422 in the sheet friends PR totals which is contained

25  within JX53.

1      Mr. Murray, based on the data in your sheet,

2  is it accurate based on the pay that Ms. Wakefield was

3  paid for 77 and a half regular hours in the March 28,

4  2020 pay period?

5  A.   Yes.  In this case, you see the pay date April 8,

6  2020.  The pay period ended on March 28, but she wasn't

7  paid until April 8.

8  Q.   How do you know that?

9  A.   That's in the rules.  If you look in the appendixes

10  but it's in the methodology and is confirmed by the

11  CHMS.

12  Q.   So the pay period included on March 28, 2020 but

13  the paycheck was not issued until April 8?

14  A.   Correct.

15  Q.   If you can turn to slide 12, Mr. Murray.  Did I

16  accurately pull from what you can tell Ms. Wakefield's

17  data into that sheet to address the issue of reg hours

18  paid?

19  A.   It looks the same, yes.

20  Q.   Let's keep moving.  Let's go to query six in your

21  sheet, Mr. Murray.  I'm going to search for

22  Ms. Wakefield here as well.  Found her already.

23      So in row 246909 for Ms. Wakefield, what is

24  being shown on the screen in front of you for 06 time

25  data HRS by max WE?

1  A.   These are the totals by pay period, total hours

2  worked, as well as the regular hours, unpaid regular

3  hours that was found in the payroll data.

4  Q.   So, Mr. Murray, we saw earlier if you add up the

5  punches for Ms. Wakefield, she worked 82.36 hours this

6  pay period.  According to the rule for this facility at

7  this time, what should her overtime hours be for this

8  pay period?

9  A.   It should be the OT hours by week, which is

10  column D, 2.36 hours.

11  Q.   Column H, Mr. Murray, it says 2.5 there for unpaid

12  REG hours by max WE date.  Where does that come from?

13  A.   That's coming from the payroll data.  I looked at

14  the 77.5 REG hours, subtracted that from 80 and derived

15  2.5.

16  Q.   So you are saying because of the pay data for

17  Ms. Wakefield shows 77.5, your summary is showing that

18  there is a difference of 2.5 regular hours to get to the

19  80?

20  A.   That's correct.

21  Q.   Let's go to query seven for Ms. Wakefield.  I'm

22  going to search for her now.

23       Let's go to the relevant pay period March

24  2020.  I'm going to highlight row 246909 and 07 time

25  data OT HRS 8/80 rule.  Can you tell us what is

1    happening for Ms. Wakefield in query seven?

2    A.   Column H now shows the overtime hours computed

3    based on the 8/80 rule.  You can see the 2.36 because

4    the 8/80 rule does not apply to her.

5    Q.   Because it does not apply to her, what overtime

6    hour figure will be carried forward into the back wages

7    computation?

8    A.   It will pick up the value in column 2, OT hours by

9    week.

10   Q.   So the number of hours over 40?

11   A.   Yes or 80 for the pay period.  Each week hours over

12   40 added up to the pay period.

13   Q.   Mr. Murray, let's go to all back wages combined and

14   search for Ms. Wakefield.  She is here in row 255026.

15   Let's go to the relevant pay period March 28, 2020.

16   This is row 254952 and the sheet all back wages

17   combined.  Walk me through what we are seeing for

18   Ms. Wakefield, please.

19   A.   We see where she worked in that pay period, what

20   department, what is the primary department for that pay

21   period, paid regular rate as well as computed regular

22   rate which would have come from query eight and we see

23   the OT straight credit and OT premium credit and also

24   totals of those credits.

25           If you keep scrolling, you will see the

**Michael Murray - Direct by Mr. Herrera**

1  computed overtime hours and the computed straight pay,

2  overtime straight pay, computed overtime, premium pay

3  earned, as well as adding up those two values.

4       If you keep going, you will find back wages at

5  the very end, as well as unpaid regular wages based on

6  the 2.5 hours we were discussing earlier.

7  Q.   So the total back wages for Ms. Wakefield for this

8  pay period is column S?

9  A.   That's correct.

10  Q.   How much is it?

11  A.   $123.28.

12  Q.   Let's check the math, Mr. Murray.  Before we do

13  that, because Ms. Wakefield's pay regular rate, computed

14  regular rate are identical, $20.41, is query eight

15  applying here?

16  A.   Query eight creates this number.  She did not have

17  any bonuses or pay differentials.  It would have

18  increased the computed regular rate.

19  Q.   So for this pay period at least, her paid regular

20  rate equals the computed regular rate according to the

21  values you saw for pay received for hours worked?

22  A.   Correct.

23  Q.   Okay.  If you could refer down to slide 16,

24  Mr. Murray, as we go through this.  Using the slide, if

25  you can, walk me through how the math works.  How did we

**Michael Murray - Direct by Mr. Herrera**

1  get to $123.28 for Ms. Wakefield?

2  A.   We have the rate, $20.41 rate and we have 2.36

3  overtime hours due or earned.  Here this slide shows

4  that computing the straight time portion of the overtime

5  earned in the premium portion of the overtime earned in

6  both cases based on that $20.41 rate, straight time 2.36

7  hours times $20.41, we get $48 and round up to 17 cents.

8           For the premium portion of the overtime

9  earned, it's 2.36 hours times the rate times .5 so

10  that's $10.21 per hour and that yields $24.10 if we

11  round it up.

12           Then there is a separate computation for the

13  regular hours due.  That's going to be the two and a

14  half hours of unpaid regular hours times the regular

15  rate of $20.41 which is fifty-one dollars and two and a

16  half cents, round it up to three.

17           We take these three dollar amounts:  $48.17,

18  $24.10 and the $51.03, we add those all up, accounting

19  for the decimal places, you'll get a total of $123.28.

20  Q.   The math looks right?

21  A.   Yes.

22  Q.   Did I capture all the analyses in this line of

23  questioning for the back wages due to Ms. Wakefield for

24  this pay period?

25  A.   Yes, overtime, regular hours due and the different

Michael Murray - Direct by Mr. Herrera

1    rates.

2              MR. HERRERA:  Your Honor, I have another

3    example for the Court.  I don't know if you want to take

4    a break.  It's going to be a while.

5              THE COURT:  We're a little earlier.  Let's do

6    it now.  We'll take ten minutes.  We are going to 4:30

7    today.  Do you have a witness to go on the Zoom?

8              MR. HERRERA:  I do, Your Honor.

9              THE COURT:  I'm going to get my Zoom iPad,

10   too.  We'll take our ten minutes.

11             (Whereupon, a break was taken.)

12             THE COURT:  Are you ready to continue?

13             MR. HERRERA:  Yes, Your Honor.

14             THE COURT:  You may proceed.

15   Q.   All right, Mr. Murray, we are going to do another

16   example.  If you could jump ahead to slide 27 in the

17   PowerPoint, please.

18             This time, Mr. Murray, I want to focus on an

19   employee named Danika, D-a-n-i-k-a, Jones, J-o-n-e-s for

20   a pay period ending January 14, 2023.

21   A.   Okay.

22   Q.   Let the record reflect I found Ms. Jones' record

23   and all back wages combined at row 124573.  I'm going to

24   open it up and I'm going to highlight row 124571.

25             Mr. Murray, I'm going to scroll to the right

1  to column S, is Ms. Jones according to your summary owed

2  any back wages for this pay period?

3  A.   Yes.  It shows $107.04 in back wages.

4  Q.   I going to try to move this through quickly.  If I

5  wanted to find her, to find her hours by day, where

6  would I go?

7  A.   That should be in the tab named 01 time data HRS by

8  day total B.

9  Q.   Before we go there, I want to found out what the

10  workdays are.  Go to query four and go to the day data.

11  I'm going to search for Ms. Jones in query four.  In B

12  04 time data HRS by day OTB.

13          Her data begins at 222 -- row 222373.  I'll

14  scroll down.  If I wanted to find a pay period for

15  Ms. Jones on that date, which column would I look at?

16  A.   You would look at column C max week ending date.

17  Q.   I'm going to highlight rows 223524 through row

18  5223527 and the sheet 04 time data HRS by day OTB.

19          Based on this, Mr. Murray, which days did

20  Ms. Jones work during this pay period?

21  A.   She worked January 11, 2023 through January 14,

22  2023.

23  Q.   Just those four days?

24  A.   Yes.

25  Q.   Lets go back to query one.  I'm going to search for

**Michael Murray - Direct by Mr. Herrera**

1   her in the sheets you identified earlier, sheet B for

2   query one.  I'm going to scroll down.  Time data for

3   January 2023.  I'm going to highlight rows 219938

4   through 219941.

5            Tell me what does the data I highlighted

6   signify to you?

7   A.   It is showing total number of hours worked each day

8   from the time data.

9   Q.   Is this saying Ms. Jones worked for 16.57 hours on

10  January 1, 2023?

11  A.   January 11, 2023.

12  Q.   January 11.  Thank you.  Is that accurate?

13  A.   Yes.

14  Q.   This comes from where, these figures 16.57 through

15  16.27 in the last row?

16  A.   It comes from the time punch data.

17  Q.   Let's go find it, Mr. Murray.  If I wanted to find

18  her punches for these four days, where would I go?

19  A.   You would go to data supplement from March 2023,

20  JX58.

21  Q.   I'm in JX58 and going to go to time data.  Which

22  file, Mr. Murray?

23  A.   The 2023, last one.

24  Q.   I'm going to open it now.  I'm going to search for

25  Ms. Jones' name.  Here she is, Mr. Murray, beginning at

**Michael Murray - Direct by Mr. Herrera**

1    row 2718.  Let's find her punches.  January 11, 2023

2    through January 14, 2023.  I'm going to highlight rows

3    2718 through 2721 in columns O, P, Q and R in

4    spreadsheet title 2023 from JX58.

5              What, if anything, can you tell me about

6    Ms. Jones' work from the punches we are seeing?

7    A.   I see she worked four days, they were overnight

8    shifts roughly 2:30 in the afternoon on the beginning

9    day to seven a.m. the following day.

10   Q.   What is happening in the exceptions cells for

11   Ms. Jones here?

12   A.   Because she is working long shifts, there were two

13   break deductions you see DB30 and DB30.

14   Q.   How much time was deducted from Ms. Jones' punch

15   time in the defendants' time data according to this?

16   A.   It would have been for the first three days one

17   hour each day on the 14 -- I think you need to highlight

18   one more record, row 2723.  There are two records for

19   the 14.

20   Q.   Thank you.

21   A.   That indicates that there was one 30-minute break

22   deduction for that day.

23   Q.   Let's compare it to what's in your sheet,

24   Mr. Murray.  Can you go to slide 28, please.

25   A.   Okay.

**Michael Murray - Direct by Mr. Herrera**

1   Q.   Do the values in your sheet match the punches shown

2   on the screen?

3   A.   Yes.  If you do the math and subtract the times,

4   you'll get the numbers indicated in the slide.

5   Q.   All right.  Let's walk forward.  Let's go back to

6   your computations sheet.  We'll go to query three.  Time

7   data HRS by day B and look for Ms. Jones.

8           I'm going to highlight rows 223524, 223527.

9   What are we seeing here on the screen, Mr. Murray?

10  A.   We're seeing here the total hours per day for the

11  four days in question, January 11 through January 14.

12  Q.   Does that match what we saw in query one?

13  A.   Yes.

14  Q.   Let's keep moving forward.  Let's go to query four,

15  the B section of query four.  We highlighted this

16  earlier, if you recall?

17  A.   Yes.

18  Q.   What can you tell me about Ms. Jones' overtime

19  hours for these four days according to query four?

20  A.   So if you're looking at the hours over eight per

21  day, she actually has over eight hours of overtime, over

22  eight hours per day.

23  Q.   If you look at slide 30, Mr. Murray, does that

24  accurately aggregate the hours she worked on these four

25  days and the overtime hours, at least as you consider

1    it, by day for Ms. Jones?

2    A.    Yes, it looks accurate.

3    Q.    Let's go now to query five.   Search for Ms. Jones

4    here.   Let's find her January 2023 values.

5              I'm going to highlight row 229170 for

6    Ms. Jones.   Because if you believe the punches, she

7    worked 65.44 hours.   Based on the rule for her facility,

8    what would her overtime hours be for this week?

9    A.    The 8/80 rule does not apply so it would be 25.44

10   hours of overtime.

11   Q.    Not the by day figure we just saw in the slide?

12   A.    Yes.

13   Q.    Let's focus on column G.   According to what is in

14   column G, what can you tell me about the number of

15   regular hours Ms. Jones was paid for this pay period?

16   A.    She was paid for 40 regular hours for this pay

17   period.

18   Q.    Because of that, will your summary calculate any

19   unpaid regular hours for Ms. Jones for this week?

20   A.    It should not.   The logic will consider 40 hours

21   for one week.   There are certain records in the pay data

22   that are just one week long.   It adjusts.   It will not

23   subtract from 80.   It will subtract the regular hours

24   from 40.   In this case, there is zero as a result.

25   Q.    If I wanted to check you on this, where would I go

1    in the pay data to see how many hours Ms. Jones was paid

2    for this week?

3    A.   For that you would have to go back to the 58

4    folder, the Z58 --

5    Q.   JX?

6    A.   The JX.  You go into the pay data sub folder.

7    Q.   Which folder within JX58 pay data should I be going

8    to?

9    A.   I think Jones is in Brighton.

10   Q.   Yes.

11   A.   It would be the friends OL file.

12   Q.   Friend DOL?

13   A.   Friends DOL.

14   Q.   I'll open that.  I have found Ms. Jones' record.

15   I'm going to highlight row 9372, Mr. Murray.

16           The pay period ends January 14, 2023.  Does

17   that pay date look accurate for that pay period?

18   A.   The pay date would have occurred after the pay

19   period ended.

20   Q.   If you would like, we can scroll up.  Does this

21   look consistent to you, pay period ended January 14 and

22   pay date occurred about nine days letter?

23   A.   Yes, about 11 days.

24   Q.   What can you tell us about what money Ms. Jones

25   actually received according to the face of defendant's

**Michael Murray - Direct by Mr. Herrera**

1  pay data from this?

2  A.   This is showing she was paid for 40 regular hours,

3  676.22 and she was also paid for 21.75 overtime hours,

4  595.85.

5  Q.   So for this pay period, Ms. Jones actually did

6  receive some overtime pay?

7  A.   Yes.

8  Q.   Let us go back to your sheet to see how it accounts

9  for that, if at all.  Let's go quickly to sheet No. 6

10  and search for Ms. Jones for that pay period.

11  A.   You need to pick just one cell, not the whole row.

12  Q.   User error.  Here she is.  Here is the pay period,

13  Mr. Murray, January 14, 2023.  These values the 65.44

14  hours and 25.44 OT hours by week.  Are these carried

15  forward from the earlier figures we looked at?

16  A.   Yes, they are.

17  Q.   Let's go to your back wages sheet.  Let's find

18  Ms. Jones yet again where we started.  This is row

19  124571.

20          What can you tell me about how your summary

21  accounts for the pay data we just looked at?

22  A.   So we can see that in -- you can see the overtime

23  that was paid in the OT straight credit and OT premium

24  credit fields.  If you add them up, it should equal the

25  amount of overtime that was paid.

**Michael Murray - Direct by Mr. Herrera**

1          You can see there are 25.44 hours of overtime

2   earned and then if you scroll over to the right, we can

3   see how many dollars she earned.  She earned $430.19 in

4   overtime straight pay plus $271.70 overtime premium pay,

5   and if you add those together and subtract the credit,

6   there is still some back wages left over, $107.04.

7   Q.   So the back wages for Ms. Jones is the difference

8   between the OT overtime, the 25.44 you calculated

9   according to her rate, and the amount that the

10  defendants actually paid?

11  A.   Yes.

12  Q.   $107.04?

13  A.   That's correct.

14  Q.   Now, for Ms. Jones for this pay period, is her

15  regular rate the computed regular rate?

16  A.   No.  They are different.

17  Q.   Let's go to query eight then, Mr. Murray.  Let's

18  find the relevant pay period.  I'm going to highlight

19  row 122772.  Can you walk me through what is happening

20  here, please?

21  A.   We see the paid regular rate which would have been

22  computed by dividing the regular pay by the regular

23  hours at $16.91.  Then there's a computed regular pay

24  rate of $21.36.  So that implies there is some

25  additional differentials or bonus pay that was paid to

1  her during this pay period.  You have to scroll over to

2  the right to find it.

3  Q.   Let's see if we can find it.  What's the sum of PU

4  in column R?

5  A.   The sum of PU is not actually used in the

6  computations.  PU pay is.

7  Q.   We have a value in column AM, Mr. Murray, what is

8  it?

9  A.   It's $33.96.  It's for differ pay, which stands for

10  differential.

11  Q.   Let's keep scrolling.  We're now in column BM.

12  What do you see there?

13  A.   I see $212.  That is sum of PU pay.

14  Q.   Mr. Murray, from what you saw, did the defendants'

15  regular rate include, factor in the PU pay and differ

16  values as it was run at the facility?

17  A.   Given that the computed regular rate is higher, I'm

18  going to say no.  I have to do the actual math to see

19  exactly.

20  Q.   Well, I did the actual math, Mr. Murray.  Can we go

21  to slide 35, please.  Can you walk me through what is on

22  slide 35, please?

23  A.   Sure.  Slide 35 shows paid regular rate the $16.91

24  which we saw before, and the paid regular pay 40 hours

25  at $16.91 is $676.22.

**Michael Murray - Direct by Mr. Herrera**

1          Then we are looking at the computed regular

2    rate which is $21.36.  This is based on the $594.85 in

3    OT pay that has been backed out by two-thirds.  So we

4    get $396.57 rounded.

5          We also see the $33.96 in differential pay and

6    the $212 in PU pay.  So all these dollar amounts would

7    have been added up, including the regular dollar amounts

8    and then divided by the total worked hours to get the

9    computed regular rate.

10   Q.  So let's go to the next slide, Mr. Murray.  That's

11   slide 36.  Is that what is happening on that slide?

12   A.  So it says hours worked from time data.  It's

13   actually from the pay data.

14   Q.  I must have made that mistake.

15   A.  There's 40 regular hours, 21.7 hours overtime, so

16   the total of 61.75 hours worked in the pay data paid

17   for.

18          So you take that number and you divide it into

19   the total dollar amounts on the previous slide we looked

20   at and that should yield the $21.36.

21   Q.  Does the math look right, Mr. Murray?

22   A.  Yes, it looks about right, 1,300 divided by 61,

23   it's just over $20.

24   Q.  Let's tie this all together, Mr. Murray.  Let's go

25   back to your back wages sheets.  Beginning on slide 37,

1  walk me through how we get from the data we just talked

2  about, the OT credit amounts, the amounts you say

3  actually paid to Ms. Jones and back wages due of

4  $107.04.

5  A.   So, using the computed regular rate and the paid

6  regular rate, we can compute the overtime dollars

7  earned, again being overtime straight earned and

8  overtime premium earned.  So those calculations are

9  using the $16.91 regular rate for the straight time

10  earned and $10.68 for the premium .5 part which is half

11  of 21.36.

12          So we see $430.19 plus $271.70 equals $701.89

13  in total overtime pay earned.

14          If you go to the next slide 38, you can see

15  the OT credit which is based on the pay data.  Again,

16  split between the straight portion and the premium

17  portion, the total comes out to $594.85.  Subtract that

18  from the $701.89 earned and there's back wages left over

19  of 107.04.

20  Q.   So, again, Mr. Murray, it's amount earned according

21  to the time data and the person's rate minus the amount

22  actually paid?

23  A.   That's correct.

24  Q.   Let's go back to slide 37 for just a moment.  I

25  know this window.  The calculation for the overtime, can

**Michael Murray - Direct by Mr. Herrera**

1   you explain the two rates that are being used there to

2   multiply against 25.44?

3   A.   So the rule that was used when determining the

4   overtime earned, overtime dollars earned is when you are

5   using one and a half times the pay rate, the one part of

6   that one and a half you are using the regular rate,

7   which is regular pay divided by regular hours.  In this

8   case it's, $60.91.  That computes the straight time

9   overtime earned and then for the .5 part of that

10  calculation, we are using the computed regular rate

11  which is a little bit higher in this case of $21.36.

12  Multiply by .5 and then times the same number of

13  overtime hours.  Then we add that together for the

14  total.

15  Q.   Mr. Murray, are you saying that the computed

16  regular rate, the regular rate you derived after

17  factoring in the shift diffs and bonuses, it's only used

18  to calculate the premium portion of overtime hours?

19  A.   That's correct.

20  Q.   Just a few questions left, Mr. Murray.  I would

21  like to look at a couple examples, no math, just a

22  couple examples in your model where it illustrate the

23  rules you mentioned.

24          I want to find somebody and I think I have for

25  the person that had unpaid regular hours but no overtime

**Michael Murray - Direct by Mr. Herrera**

1  and, therefore, no back wages are due.

2  A.   Okay.

3  Q.   I'm going to search for someone named Jennifer

4  Klinger, K-l-i-n-g-e-r.  I'm in all back wages combined

5  sheet row 133950.  I'm going to go to the pay periods

6  for January 4, 2020 and January 18, 2020.  I'm going to

7  highlight rows 133919 and 133920.

8        So for this first pay period, Mr. Murray, the

9  one in 133919, do you see Ms. Klinger has unpaid regular

10  hours?

11  A.   Yes, she does.

12  Q.   Why isn't she not given any back wages?

13  A.   You see the unpaid OT wages are equal to zero.  So

14  if there are no overtime wages owed, then unpaid regular

15  hours is not computed or the unpaid regular wages is not

16  computed.

17  Q.   This summary does not attribute back wages to pure

18  unpaid regular time divorced from overtime, is that what

19  you're saying?

20  A.   Yes.

21  Q.   What about the next pay period?

22  A.   The next pay period does have overtime -- unpaid

23  overtime wages earned.  So the total regular hours are

24  used to compute the unpaid regular wages, which in this

25  case is 4.63 hours which computes to $92.59.

1    Q.   Mr. Murray, I want to find an example of a person

2    who was subject to that I think you said five minutes

3    but the average break deduction for someone who never

4    punched out for lunch at any point.

5          I'm going to go to query four, section A.  I'm

6    going to search for someone named Mary Cottrill,

7    C-o-t-t-r-i-l-l.  Do you see someone by that name, sir.

8    A.   Yes, I do.

9    Q.   So, for Ms. Cottrill, do you see any indication

10   that break time or an amount was deducted from her wages

11   for break time?

12   A.   Yes.  That's in column H.  It's called computed

13   break time.

14   Q.   What is column H?

15   A.   This is used for -- this query uses a sub query to

16   determine if an employee never punched out for a break.

17   If that is the case, then it subtracts about five

18   minutes which is .0816 minutes in decimal form.  It

19   subtracts that from their time determined from the

20   timestamps to come up with a total hours less break

21   column which is column I.

22   Q.   So, Mr. Murray, are you saying even though

23   Ms. Cottrill 's punches, for instance, show she worked

24   eight hours on August 22, 2016, your summary only

25   credits her with 7.29 hours?

Michael Murray - Direct by Mr. Herrera

1   A.   Yes.

2   Q.   Why?

3   A.   The attorney instructed me in those cases where

4   employees never clocked out, to apply this deduction for

5   a break time.

6   Q.   Mr. Murray, did this application of break time ever

7   mean the difference between an employee receiving some

8   back wages and no back wages?

9   A.   It could in some close cases.

10  Q.   Let's look at one.  Let's go to row 373979.  Do you

11  see any indication here that the deduction of those five

12  minutes .0816 reduced OT hours for Ms. Cottrill to zero?

13  A.   Yes.  She went from 8.03 hours less the break to

14  7.95 hours.  So if we were calculating for the 8/80

15  rule, this would yield zero hours for that day.

16  Q.   Mr. Murray, I'm going to close these sheets now and

17  do a couple of final questions.

18        Can you tell me, Mr. Murray, where in your

19  summary do you account for the issue of unpaid hours

20  worked?

21  A.   Can you repeat the question.

22  Q.   Of course.  If there are unpaid hours worked at any

23  of these 15 buildings, where in your summary is that

24  reflected?

25  A.   So the final sheet will show unpaid overtime hours

Michael Murray - Direct by Mr. Herrera

1  and unpaid overtime hours owed and then, of course,

2  minus the credit if there is any back wages left.

3  Q.   Speak into the microphone, please.

4  A.   So the final spreadsheet will show the overtime

5  hours that were unpaid.  It accounts for that really for

6  the whole model for all the queries, mainly 4, 5 and 6.

7  Q.   Mr. Murray, if I wanted to know if an employee at

8  one of these 15 nursing homes had unpaid overtime, could

9  I find it in your summary?

10  A.   Yes, you could.

11  Q.   Where?

12  A.   The quickest way would be that final sheet -- can't

13  think of the name of it now.

14  Q.   I think it was back wages combined.

15  A.   Back wages combined sheet would show that.

16  Q.   Mr. Murray, if I thought that an employee's regular

17  rate was incorrect because it did not account for shift

18  diffs, bonuses, or other forms of pay for work

19  performed, could I find that in your model?

20  A.   Yes, you could.

21  Q.   Where?

22  A.   Most easily found in query eight.

23  Q.   Mr. Murray, if I had a concern that I worked at

24  more than one building in the same pay period, could I

25  find data on that issue reflected within your summary?

Michael Murray - Direct by Mr. Herrera

1   A.   Yes, you could.

2   Q.   Where?

3   A.   You would have to look at the sheets prefixed with

4   a letter A.  Those were indicating employees who worked

5   in multiple buildings.

6   Q.   Mr. Murray, I'll ask you to do the math.  If for

7   some reason the amount of back wages you calculated

8   totaled were doubled, what would the total amount due

9   be?

10  A.   The total back wages doubled would be about 41

11  million.

12  Q.   Mr. Murray, how hard was this task?

13  A.   It was -- took a lot of time, over a five-year

14  period.

15  Q.   I understand it took a lot of time.  How much time

16  did it take?

17  A.   A conservative estimate, at least 100 hours a year,

18  probably more than that.  Some years -- some periods of

19  time were less busy.  The case wasn't front and center

20  but I would say between 500 and a thousand hours total.

21  Q.   Over the years, Mr. Murray, how many tweaks or

22  modifications have you made to your summary?

23  A.   So, dozens.  Every time we received data, we would

24  have to incorporate the new data.  There might be new

25  fields.  Some of that data might require tweaks to some

**Michael Murray - Direct by Mr. Herrera**

1   of the criteria that was used.

2   Q.   Why did you make these modifications?

3   A.   If we had any difficulty getting new data in, we

4   would have to change the database to fit it, usually

5   adding extra columns, most likely the pay data table.

6         There were other things that we realized as we

7   went on like people were working at different facilities

8   and we had to add some logic for that.

9         When you started talking about the gap time, I

10  realized there was no way to tell definitively how many

11  regular hours were paid per week so we had to come up

12  for criteria addressing that.  There were a lot of

13  issues like that that contributed to making changes.

14  Q.   Was the ultimate goal here, Mr. Murray, to get an

15  accurate figure for the time worked versus the pay

16  received for that work?

17  A.   Yes, that was the ultimate goal.

18         MR. HERRERA:  Nothing further, Your Honor.

19         THE COURT:  Cross-examination.

20                  CROSS-EXAMINATION

21  BY MR. SCHWARTZ:

22  Q.   Good afternoon, Mr. Murray.  My name is Jake

23  Schwartz.  We met briefly in the hall.

24         I want to see if I can sort of simplify if not

25  for the judge's benefit but for my for purposes of this

1  cross-examination what exactly it is you did.

2  A.   Okay.

3  Q.   Let me do my best to try to really kind of winnow

4  this down.

5          No. 1, you needed to look to see if an

6  employee worked more than 40 hours in a week?

7  A.   That was part of it, yes.

8  Q.   If the answer to that was yes, then the next

9  question is, is this an employee who is entitled to be

10  compensated for the hours worked over 40 at time and a

11  half under the Fair Labor Standards Act, correct?

12  A.   Yes, for those employees subject to the 40 hour

13  rule as opposed to 8/80.

14  Q.   Either over 40 or over 80, such that they would

15  have been entitled to overtime by virtue of the fact

16  they were not exempt?

17  A.   Yes.

18  Q.   If the answer to No. 1 is yes, the person worked

19  more than 40 or 80 and the answer to No. 2 is yes, this

20  is a person under the law who is entitled to be paid

21  overtime, the next step is what was the regular rate

22  that they should be paid for those hours over 40, right?

23  A.   Yes.

24  Q.   And the final step was just calculating hours

25  worked by the regular rate?

**Michael Murray - Cross by Mr. Schwartz**

1   A.   The final final step would be that and then seeing

2   if any overtime was already paid and using that as a

3   credit compared to what was earned.

4   Q.   Generally speaking, was a person owed overtime, are

5   they nonexempt, what is the regular rate, and then what

6   are they owed?

7   A.   Correct.

8   Q.   That's basically what you did?

9   A.   Yes.

10  Q.   Let's take No. 1 first.  Is the person -- did that

11  person work more than 40 compensable hours, right?

12  A.   Yes.

13  Q.   Or 80.  I'm just going to use 40.  We know we are

14  talking 40, 80.  Was that person entitled to overtime

15  for a particular workweek or weeks because they worked

16  more than the threshold?

17  A.   Yes.

18  Q.   That could happen one of two ways from I see it for

19  purposes of your role.  The first way is the document

20  itself, the hours shown in the document established that

21  the person worked more than 40, that would be one way to

22  make that determination, right?

23  A.   From the time records?

24  Q.   Yes.

25  A.   Yes.

1  Q.   The second way that determination could be made is

2  that based on the Department of Labor's investigation

3  even if the person worked less than 40 on the records if

4  somehow there was uncompensable time worked, that should

5  be added to the total such that it brings it over 40?

6  A.   So you're saying there was time not shown in the

7  time data and somehow we know about it, we can add that

8  to the employee's total for the week and that can take

9  it over 40?

10  Q.   Right.

11  A.   Sounds right.

12  Q.   And in your work in coming to the conclusions you

13  came to as to No. 1, did the person work over more than

14  40, you found that that was the case based on both

15  models, the hours showed more than 40 and two, the

16  Department of Labor's findings in its investigation

17  regarding unpaid time also supported employees working

18  over 40 being paid for work over 40?

19  A.   Referring to the rate reduction, I'm not familiar

20  with the investigation part.

21  Q.   Thank you for the clarification.  So as I

22  understand it, correct me if I'm wrong, there are two

23  different ways that the employee by virtue of the

24  Department of Labor's investigation could have worked

25  more than 40 despite the document itself saying they

1  didn't, okay.

2          One way is the investigation established that

3  employees were denied their full 20-minute paid breaks

4  and an average of 15 was reached and when multiplied

5  over days and weeks, that brought some people over 40?

6  A.   So for the work I did, I simply looked at the time

7  sheets and subtracted -- just the timestamps.  I didn't

8  consider the rate reductions in the exceptions field.

9          In many cases, that would have the effect of

10  adding 30 minutes for each workday where there was maybe

11  30 minutes deducted in the exceptions field from the

12  number of hours indicated by the timestamps.

13  Q.   Okay.  You tripped me up a little bit there and

14  that might be me.

15          As I understand it, there are two different

16  categories of -- primarily two different categories of

17  uncompensable time that was ultimately added to the

18  hours recorded as worked such that it would bring it

19  over 40.

20          One way was that employees were deprived of

21  their full 20-minute paid breaks and the DOL, therefore,

22  averaged that down -- there was a five-minute shave off

23  there that was added into the time they should have been

24  paid for.

25  A.   The five minutes had to do with -- I don't

**Michael Murray - Cross by Mr. Schwartz**

1   understand the legal reasoning behind it but there was a

2   requirement for my work that if it was indicated that

3   the employee never clocked out for an unpaid break, they

4   just had an in timestamp and out timestamp each day for

5   the entire they worked there, never clocked out for a

6   break, in those cases, I was to subtract about five

7   minutes.  I don't know the legal reason but that was the

8   instruction I was provided.

9   Q.   That subtraction increased the amount of time that

10  it appeared the employee wasn't paid for?

11  A.   It would decrease the amount of time it appeared

12  they worked.

13  Q.   Correct.

14  A.   So that would have the effect of decreasing the

15  amount of time that it would appeared to have been

16  unpaid by five minutes per day.

17  Q.   We'll come back to that because I'm still a little

18  confused.  Let's talk about the lunch then.  I think

19  that's easier.

20          We know that there were times where employees

21  had an automatic lunch break deducted from their hours

22  but the Department of Labor determined that employees

23  had worked through their lunch and, therefore, weren't

24  paid for that time?

25  A.   That's my understanding.

**Michael Murray - Cross by Mr. Schwartz**

1   Q.   In your analysis in those instances, therefore,

2   gave the employee another half-hour for that day, for

3   each day of that week coming to 2.5, that would have

4   brought some of the folks over the threshold to the

5   point where even though the records said they worked

6   less than 40, add the 2.5 lunch brought them over 40?

7   A.   Yes.  If you are looking at the time data, the raw

8   timestamps, if you don't have that 2.5 hour deduction --

9   let's take an example.

10          Let's say the time punches show you worked 41

11  hours but then you subtracted two and a half hours lunch

12  time, you would end up with 38.5 hours.  So in the pay

13  records it would show 38.5 hours of paid regular time

14  but no overtime.

15          Now, if we put the two and a half hours back

16  in, we are now at 41 hours, now the computations would

17  say they were owed one hour of overtime, in addition

18  there would be one and half hours unpaid.

19  Q.   I think we're on the same page.  So if the payroll

20  records showed the person was paid for 38.5 hours in

21  that workweek and wasn't paid any overtime but the

22  assumptions you were asked to do said bring in 2.5 hours

23  of lunch for that 38.5 to bring them to 41, thus

24  entitles them to unpaid overtime for that one hour, as

25  well as the gap for regular time from the 38.5 to 40?

**Michael Murray - Cross by Mr. Schwartz**

1    A.    Correct.    Exactly.

2    Q.    So in your assumptions then, Mr. Murray, if that

3    was a mistake, that you shouldn't have included those

4    lunchtime hours in there, then your ultimate conclusion

5    would be reduced?

6    A.    So if the attorney changed their instructions and

7    asked me to go ahead and subtract that time, you would

8    end up with less back wages computed.

9    Q.    Now, I think the document you were shown to

10    establish your refreshing your recollection regarding

11    certain percentages, I think it was, had in it a line

12    item of how many employees with a plural possessive pay

13    records did you review and I think it said something

14    like 9,000, something like that?

15    A.    That sounds small.    The most current data as of

16    2023, there were 2,600,000 or so time records and it's

17    going to be in the hundreds of thousands for the payroll

18    records.    It's probably 400,000.

19    Q.    I thought I heard you say it was about 17,000

20    different employee units but I was told maybe you didn't

21    say that.

22    A.    17,000 might refer to just those employees who were

23    working in multiple locations because that was a small

24    subset.

25    Q.    Whatever that number ends up being, Mr. Murray, for

1    purposes of the line of questioning, we know it's in the

2    thousands, right?

3    A.    Okay.

4    Q.    Do you know as part of the Department of Labor's

5    investigation that led to this lawsuit how many

6    employees the Department of Labor spoke with to

7    come -- to gain the information that they gave to you?

8    A.    No, I don't know how many.

9    Q.    If I told you it was less than 50, would that

10   surprise you?

11   A.    If you are talking to individual people, it would

12   be hard to talk to thousands.

13   Q.    So it wouldn't surprise you?

14   A.    It would not surprise me.

15   Q.    You understand that part of the government's theory

16   of why this number of damages is owed is based on what's

17   generally referred to as a representative case?  Are you

18   familiar with that term?

19   A.    Like a sampling or representative sample?

20   Q.    Yes.

21   A.    Okay.

22   Q.    So in doing that if there isn't substantial

23   evidence to support the notion of representative status

24   talking about the lunch deductions for now, then the

25   vast number that you applied that to would no longer be

1  appropriate based on the evidence because you don't know

2  whether everybody took a lunch or not?

3  A.   The data won't show, no.

4  Q.   Right.  Now, let's go to No. 2, the issue of is the

5  employee exempt or not.  You had nothing to do with

6  making those determinations?

7  A.   So the attorney at the time way back in the

8  beginning, she provided a list of departments she said

9  were exempt and I should exclude from the back wage

10  computations.

11        To the best of my recollection, they were the

12  administrator departments, there are three

13  administrators but there were two that had some

14  additional letters after them, so I put logic in there,

15  I added a field to exclude these records and ran a query

16  to update that field.  If they were administrator, when

17  they were doing the time.  They could have been a

18  different position at other times.

19        For those time data records, it would indicate

20  exclude and then they were no longer part of the

21  calculations.

22  Q.   So it sounds like to me -- let me go back to my

23  earlier question.  The determination as a legal issue of

24  whether someone should have been exempt or not, you had

25  no role in that?

1    A.    That's right.

2    Q.    You were just told don't count these people in your

3    calculations?

4    A.    That's correct.

5    Q.    Leaving you with no choice but to include every

6    other classification?

7    A.    Yes, that's the reverse.

8    Q.    So every classification was included as being

9    nonexempt other than administrators in your final

10   analysis?

11   A.    Yes.

12   Q.    So if it is determined that there wasn't

13   substantial evidence to support a representative status

14   in each category that was determined to be nonexempt,

15   your final calculations would be wrong?

16   A.    They would change.  The numbers -- the math would

17   still be right.

18   Q.    If certain people were not entitled to be included

19   in your overtime calculations, that number would come

20   down?

21   A.    Yes.

22   Q.    In the course of this litigation, we were provided

23   with three different versions of the ultimate summary.

24          When I say the "ultimate summary," I'm talking

25   about the document that you were shown early on in

1  your -- not early on in your testimony but sometime in

2  your testimony that there was roughly $20.5 million of

3  unpaid wages owed to a certain number of employees.

4  A.   Yes.

5  Q.   We saw three separate versions of that.  The first

6  version included the administrators in it?

7  A.   It included a few of them.  There were so records I

8  was using the department field and the pay data to

9  indicate what department people were working for a

10 particular pay period.  Sometimes it was no value there.

11 It was just blank.

12        So the way that Microsoft Access works is if

13 it says pick all the records that are not

14 administrators, it would pick records that are blank

15 because it is not administrator but it turned out those

16 were administrator records.  I had to look at the time

17 data to see where they were clocking in as what

18 department and then I was able to update the pay data,

19 an additional field I added so I could have more

20 complete indication of what departments they were paid

21 for and then after that, the logic worked to exclude

22 them completely.

23 Q.   That's fair.  Just like my earlier question if a

24 group of folks should not have been included as

25 nonexempt and they came out, once you brought out the

1    administrators that should have been included, the

2    subsequent summary had a lower number on it.  It wasn't

3    significant but it had a lower number on it because of

4    the errors of them being included in the first instance?

5    A.   Yes, it did go down.

6    Q.   Kind of a little bit off topic.  I think you

7    testified when you were providing your credentials, that

8    you have been at this game for some time?

9    A.   Yes.  It goes back to the early 2000s when I first

10   started working.  I was a contractor with the

11   solicitor's office at the time when they started asking

12   my company to help them with these large files.

13   Q.   I was impressed with your credentials.  I am trying

14   to establish you have been doing this for a while?

15   A.   Not full time, though.

16   Q.   I would imagine, Mr. Murray, in the annals of you

17   doing this and looking at pay records, it's pretty

18   ordinary, isn't it, that the pay records that you are

19   given come from a payroll processor?

20   A.   Some kind of computerized system.

21   Q.   Like an ADP?

22   A.   Could be.  I had some paychecks.

23   Q.   The entities that do that sort of work, other than

24   maybe a mom and pop operation, people aren't just

25   determining what people are paid by looking at their

1   cash register?

2   A.   I would assume so.

3   Q.   It's pretty typical there is some other entity that

4   is processing the payroll?

5   A.   Few cases, I imagine so.

6   Q.   It's just not out of the ordinary is what I am

7   trying to say?

8   A.   A large company would use a payroll processor

9   wouldn't be surprising.

10  Q.   Now, I think you said somebody told you -- I

11  apologize if I got your testimony down wrong -- that

12  employees were supposed to punch out when they took a

13  lunch?

14  A.   I recall hearing that from the attorney.

15  Q.   When you were told that, was it noted that that

16  practice/policy is in place only if an employee leaves

17  the building as opposed to just going to lunch within

18  the building and not leaving the premises?

19  A.   I don't have that distinction.

20  Q.   You just don't know one way or the other?

21  A.   You certainly can't tell from the data.

22  Q.   I think that you sort of answered this on direct

23  but I want to make sure the Court is clear.  If somebody

24  didn't work 40 or more than 40 in a workweek or more

25  than 80 in an 8/80 and they received shift differential

1  or bonuses that week for that two-week period but they

2  didn't work overtime, there would be no need to

3  recalibrate the regular rate?

4  A.   Correct.  If they weren't working overtime, it

5  won't matter.

6  Q.   The regular rate only becomes relevant for purposes

7  of having the time and a half formula?

8  A.   Yes, that half-hour cut in half.

9  Q.   So anybody on the records who didn't work 40 and

10  anybody who the evidence doesn't support should have

11  added in lunch breaks, it wouldn't matter what -- you

12  don't get to that No. 3 when I walk you through the four

13  steps of having to calculate regular rate?

14  A.   If it doesn't go over 40, that's correct.

15  Q.   We're early on in this case.  There hasn't been

16  that many witnesses but we have heard some witnesses say

17  that they weren't paid the promised bonus for taking on

18  an extra shift or they weren't paid a shift differential

19  that they would have been entitled to.  Did that factor

20  into your analysis at all?

21  A.   No.  The only data I had to work with is what they

22  were actually paid in the pay data.  If there was

23  supposed to be something there, I have no idea.

24  Q.   The only way you could have recalculated the

25  regular rate by virtue of shift differential and/or

1    bonus for taking an extra shift would be if it's

2    reflected on the payroll data?

3    A.    Exactly, yes.

4    Q.    When it was reflected on the payroll data, you are

5    operating on an assumption that the money was actually

6    received by the employee?

7    A.    Yes.  My assumption is the payroll data reflects

8    actual paychecks that has all the FICA.

9    Q.    So if the paycheck stub shows that information was

10   there, you included it in the regular rate regardless of

11   whether the employee put the money in their pocket?

12   A.    So if they didn't get paid what the payroll was

13   saying they got paid?

14   Q.    Right.

15   A.    The assumption is they got paid all bonuses and

16   differentials.

17   Q.    I think you said, and, again, I know it's been a

18   rather long and tedious day, but I think you said there

19   were three different types of miss punch, either a

20   missed punch in, a missed punch out or both?

21   A.    Right.  If you are looking at the data, that's the

22   three different combinations you would come up with.

23   Q.    Okay.  Is there a way a person could have been a

24   missed punch out if there was no punch in?

25   A.    So both punches are missing in that case?

1  Q.   No.   If somebody didn't punch in but punched out,

2  wouldn't that punch out show as a punch in?

3  A.   It depends on the clock system.   I don't know if

4  there's like a slot for in and out or you just punch the

5  clock.

6  Q.   You just don't know?

7  A.   I don't know.   I didn't recall a pattern where

8  there is only missing punch outs, not any missing punch

9  ins.

10 Q.   I thought you say there could be a missing punch

11 out if there was a punch in.

12 A.   I think so but I would have to confirm by looking

13 at the data to see if there are some instances of that.

14 Q.   But would you agree with me generally speaking in

15 your experience that if someone didn't punch in, then

16 there wouldn't be a punch out?

17 A.   I concede if they punch out at the end of the day,

18 the machine might mistake that as punch in.

19 Q.   That would be typical, wouldn't it?

20 A.   I guess so.   It had to be a pretty sophisticated

21 machine to know you intended to punch out.   It would

22 have to have a button for out.

23 Q.   In your analysis, Mr. Murray, did you account for

24 any employees who might have punched in and punched out

25 but never worked?

1  A.   No.  I couldn't tell that from the data.  Two punch

2  times.

3  Q.   If there was evidence that included in your

4  conclusions there was an employee who did punch in and

5  didn't punch out and didn't work, you would agree with

6  me they should not have been paid for that time?

7  A.   That sounds like a human resources issue but yes.

8  Q.   The rules require you have to work to be paid,

9  don't they?

10  A.   That's the general understanding, work exchange for

11  pay.

12  Q.   I want to kind of wrap my head a little bit around

13  the evidence regarding employees who worked at two

14  different facilities and how you calculated overtime in

15  those instances because that was one I really struggled

16  with.

17  A.   Yes.

18  Q.   No. 1, we can agree that if the combination of

19  those hours worked at the two facilities didn't exceed

20  the overtime threshold, then it doesn't matter that they

21  worked the two different facilities?

22  A.   Right.  They would be owed overtime.

23  Q.   The only time that becomes germane to your

24  conclusions is if it brings them over the threshold?

25  A.   Yes.

1  Q.   This is where I'm a bit confused by your

2  methodology.  Let's say Mary Jones is an 8/80 person and

3  in week one, she worked 25 hours at North Strabane and

4  20 hours in Mt. Lebanon bringing her to 45 in that

5  workweek but the next week, she only worked 24 hours

6  total.  The combined of the two would bring her under

7  80.  In your methodology is she owed overtime?

8  A.   So just those cases where people are working in

9  different facilities too complicated to figure out

10  whether or not to apply for each week the 8/80 rule, so

11  in this case, this scenario, it would default to the

12  40-hour week rule.  So yes, for the week that she worked

13  45 hours, she would have five hours overtime.

14  Q.   So even if technically speaking she satisfied the

15  8/80 pay formulation and didn't exceed 80, what is her

16  workweek in essence, in your conclusion she still

17  revolvers overtime pay?

18  A.   Yes.  In that instance is one 8/80 and the other

19  not or both?

20  Q.   Let's assume for my hypothetical both are 8/80s.

21  A.   Yes.  It's simplification for that scenario.

22  Q.   Now, I want to go back to No. 2.  So No. 1, did the

23  person work more than 40 such that they're entitled to

24  be compensated for those work hours at the appropriate

25  rate.

1              No. 2, are they nonexempt from the Fair Labor

2    Standards Act overtime rules.

3              So you have found yes to No. 1 and you're

4    applying the analysis to No. 2 to everyone but the

5    administrators.

6              Let's assume that the Department of Labor

7    satisfies its burden of representative status and every

8    one of those people that you classified as nonexempt and

9    found are owed money.  Let's say that holds up as an

10   issue of law.

11   A.   Okay.

12   Q.   When you look at those individuals, some of them

13   were paid a salary as opposed to an hourly wage,

14   correct?

15   A.   I understand some were paid a salary but from the

16   pay data, I can't tell because it's by hour on the pay

17   data.

18   Q.   Let's do this through a hypothetical.  Let's say

19   you have somebody who's in the position of the director

20   of nursing and that classification in your computations

21   was determined to be nonexempt, okay?

22   A.   Okay.

23   Q.   Let's say that they're paid a salary of $60,000 a

24   year for purposes of the hypothetical I'm walking you

25   through.

1          If they were paid that salary and it meets the

2    salary basis test, and let's say in a workweek, they

3    worked, make math easy, ten overtime hours.  The person

4    is properly classified as nonexempt but receives a

5    legitimate salary for purposes of the FLSA of $60,000

6    and worked ten hours in overtime in a particular

7    workweek.  We'll go with 40-hour type of an employee.

8          Walk us through how -- and put aside for the

9    second whether there was any computed premium time at

10   issue.

11          So let's say in my hypothetical, no premium

12   time, person is misclassified as having worked as an

13   exempt employee but was paid a salary of $60,000 and in

14   a particular workweek, worked ten hours overtime.  How

15   would that work in your methodology?

16   A.   In the methodology I didn't have to consider

17   whether they were salaried because the pay data would

18   show their salary.  The pay data would show as hourly.

19   So we would say $30 an hour is roughly 60,000 a year.

20   For regular hours for one week would be for 40 hours,

21   $1,200.

22          The methodology would just go for that $1,200

23   regular pay, 40 hours, say their rate is $30 an hour.

24          Then the overtime premium rate for the

25   overtime hours we are saying they worked would be $45

1  for each of the overtime hours in this scenario.

2  Q.   Isn't it a fact, though, Mr. Murray, that if it is

3  a legitimate salary and they have been compensated for

4  all hours worked except for the premium, aren't they

5  only entitled to halftime for the hours worked over 40?

6       You are giving them full time and a half for

7  every hour worked over 40 and if it's a true salary

8  person, they are already essentially paid for that time

9  as straight time, aren't they only entitled to the .5?

10 A.   That's a legal question.  I'm not familiar with.

11 Q.   Fair enough.

12      THE COURT:  Let me interrupt for one question

13 from our IT department here.  I guess the question is --

14 look I'm not holding you to anything but the way the

15 remote video testimony works is IT has to be the one to

16 facilitate that.  The question is where are we in the

17 day?  Will we get there?  If not today, will they

18 testify tomorrow and what time so they can facilitate?

19      MR. HERRERA:  They will not testify today.  I

20 will let Your Honor know what time when we leave today.

21      MR. SCHWARTZ:  I don't have much more on my

22 cross.

23      THE COURT:  I didn't want to interrupt.  It's

24 just for IT.

25      MR. SCHWARTZ:  You helped me clarify things in

**Michael Murray - Cross by Mr. Schwartz**

1    my head.

2            THE COURT:  You may continue.

3    Q.   You don't know as a legal issue what the

4    appropriate rate is to pay for that time spent over 40

5    if the employee was paid a legitimate salary but was

6    misclassified as exempt, is that accurate?

7    A.   That's accurate.

8    Q.   In your calculations then, I think you already

9    answered this but I want to make sure that the record is

10   clear.  In my hypothetical the person was classified as

11   exempt by the company, Department of Labor determined it

12   wasn't an exempt position but they were paid a salary,

13   your numbers would reflect that $45 number for each hour

14   over 40, not just the .5 piece of it?

15   A.   That's correct.

16           MR. SCHWARTZ:  Bear with me, Your Honor.

17           (Pause in the proceedings.)

18   Q.   This will be really quick.  In that same rubric,

19   $60,000 and legitimate salary, work more than 45 in a

20   regular workweek, we were operating on a set of

21   assumptions that there was no premium pay.  When you

22   came to your $45 number that was our assumption.  Are

23   you with me?

24   A.   My assumption?

25   Q.   Our assumption together.

1  A.   That's right.

2  Q.   Let's now put in premium pay.  That would still in

3  the way that you calculated that $15 or $30 rate would

4  go up based upon the premium pay they were entitled to,

5  whatever number it ends up being, and then it would be

6  calculated at the 1.5 rate for the overtime hours?

7  A.   Yes, the model as it is now.

8  Q.   So in your calculations that bring us to the

9  $20.5 million, it would include for people who might

10  have been exempt, it would include for those same people

11  a calculation of time over 40 even if salaried at that

12  1.5 rate?

13  A.   Yes, 1.5 across.

14          MR. SCHWARTZ:  Nothing further.

15          THE COURT:  Any redirect?

16          MR. HERRERA:  Yes.

17          THE COURT:  You may proceed.

18                  REDIRECT EXAMINATION

19  BY MR. HERRERA:

20  Q.   Mr. Murray, opposing counsel stated during your

21  cross-examination something to the effect of hours

22  worked in your summary was based on your assumption.  Is

23  that accurate, sir?

24  A.   It doesn't sound accurate.

25  Q.   What are the hours worked on your summary based on?

1    A.    The hours worked from the time data is based on the

2    time punches.  So punch out minus punch in, that's the

3    number of hours worked.  For each record you have those

4    up per day, per week, per pay period.

5    Q.    Mr. Murray, are any of the substantive values that

6    are output in your summary purely based on your

7    assumption?

8    A.    No.  They're based on the numbers in the data and

9    the rules that were applied to them.

10   Q.    Is that another way of saying, Mr. Murray, that

11   your summary is based entirely on the face of the

12   records from the defendants' payroll system?

13   A.    Yes.

14   Q.    Mr. Murray, opposing counsel brought up the issue

15   of multi-employee facilities?

16   A.    Yes.

17   Q.    Remind again how many employees are we talking

18   about in that category?

19   A.    I don't know the number of employees but the number

20   of time records is somewhere around 30,000 I think,

21   maybe less.  So a small percentage of the 2.6 million

22   time records.

23   Q.    Less than one percent?

24   A.    Yes.

25              MR. HERRERA:  Nothing further, Your Honor.

1           THE COURT:  Any recross?

2           MR. SCHWARTZ:  No, sir.

3           THE COURT:  Okay, sir.  You may step down.

4    You are released.  Thank you.

5           Counsel, your next witness.

6           MR. UNGER:  The Acting Secretary will call

7    Thomas Slagle.

8           THE COURT:  Please approach, sir.  Raise your

9    right hand.

10          THOMAS SLAGLE, a witness herein,

11   having been duly sworn, testified as follows:

12          THE COURT:  Have a seat.  Adjust the

13   microphone.  Please state and spell your full name for

14   our court reporter.

15          THE WITNESS:  Thomas M. Slagle, S-l-a-g-l-e.

16                      DIRECT EXAMINATION

17   BY MR. UNGER:

18   Q.   Good afternoon, Mr. Slagle.

19   A.   Hello.

20   Q.   Mr. Slagle, where do you currently reside?

21   A.   Kittanning.

22   Q.   Are you currently employed?

23   A.   Yes.

24   Q.   Was there ever a time you were employed at a

25   facility known as Cheswick Rehabilitation and Wellness

1   Center?

2   A.   Yes, sir.

3   Q.   Do you know what the purpose of today's trial is?

4   A.   Not a hundred percent but to deal with unpaid

5   overtime, stuff like that.  I'm sure there's other

6   stuff.

7   Q.   You mentioned you worked at a facility known as

8   Cheswick Rehabilitation and Wellness.  What period of

9   time did you work there?

10  A.   2012 to '17 or '18.  I believe that was the

11  timeframe.

12  Q.   Approximately five to six years?

13  A.   Yes.

14  Q.   Why did you leave?

15  A.   Working conditions, not getting paid what I was

16  owed and actually found a better position.

17  Q.   We'll talk more about that in a second.  What was

18  your job title at Cheswick?

19  A.   LPN.

20  Q.   What does that stand for?

21  A.   Licensed practical nurse.

22  Q.   As an LPN, what were your daily job

23  responsibilities?

24  A.   To pass medications, do treatments such as wound

25  care, respiratory, whatever else was assigned to me at

Thomas Slagle - Direct by Mr. Unger

1  that time, start an IV, help the CNAs with their duties

2  as needed.

3  Q.   What kind of -- what is the type of patient that

4  you would see at Cheswick?

5  A.   A lot of long-term care, respiratory issues, a lot

6  of infectious wounds depending on what floor, on also

7  depending what you saw.

8        If you were on the second floor, there was a

9  lot more morbidly obese patients you would see there.

10 Q.   What floor did you work on?

11 A.   Typically the third.

12 Q.   What types of patients were on the third floor?

13 A.   That would be the infectious wounds, respiratory,

14 lot of dementia.  We had like a secure track system so

15 if patients weren't able to use the elevator for their

16 own safety.

17 Q.   What level of service did these patients need?

18 A.   Well, skilled nursing.

19 Q.   You mentioned you are an LPN, do you have to have a

20 license to be an LPN?

21 A.   Yes.

22 Q.   Where do you get your licensing done, is that

23 through the state?

24 A.   Through the state.

25 Q.   Were you hourly or salaried as an employee?

1   A.    Hourly.

2   Q.    Do you recall what your final rate of pay was when

3   you left Cheswick?

4   A.    I think around $17 an hour.  I'm not like sure on

5   that.

6   Q.    Did you ever work overtime hours while you were at

7   Cheswick?

8   A.    Constantly.

9   Q.    Were you a full-time employee?

10  A.    Yes.

11  Q.    What was your typical work schedule?

12  A.    40 hours a week plus overtime.

13  Q.    Did you have a particular shift that you would

14  usually work?

15  A.    Seven to three.

16  Q.    Seven a.m. to three p.m.?

17  A.    Yes.

18  Q.    Were there any particular days of the week that you

19  would work?

20  A.    It was every other weekend and filled in from

21  there.

22  Q.    Did you ever work weekends?

23  A.    Every other.

24  Q.    Were you required to punch in and punch out?

25  A.    Yes, sir.

1   Q.   Why did you have to do that?

2   A.   To keep track of our time.

3   Q.   Did you ever work when you were not punched in?

4   A.   No.

5   Q.   While you were at Cheswick, who was your

6   supervisor, if any?

7   A.   It would depend on who the RN was at the time or

8   the DON and ADON.

9   Q.   Do you remember any of their names?

10  A.   Pat Maher was one of the RNs I worked with.

11  Unfortunately, our DON and ADON, they changed quite

12  often.  It's kind of hard to keep remembering them.

13  Q.   Understood.  Are you familiar with an individual

14  known as Sam Halper?

15  A.   Not offhand.

16  Q.   Are you familiar with an entity known as CHMS

17  Group?

18  A.   No.

19  Q.   Are you familiar with any entities that owned

20  Cheswick?

21  A.   I just know it changed hands multiple times from

22  the time I was there, even as far as who owns it.  I

23  have no idea.

24  Q.   While you were working at Cheswick, were you

25  eligible to take lunch breaks?

 1   A.   Yes.

 2   Q.   When you were able to take a lunch break, where

 3   would you go?

 4   A.   Typically I wasn't able to.

 5   Q.   Let's go into that.  So you were eligible to take a

 6   lunch break as part of your usual shift?

 7   A.   Yes, 30-minute lunch, two 15-minute breaks.

 8   Q.   And you said there were times that you wouldn't be

 9   able to take lunch?

10   A.   Almost every day.

11   Q.   Why wouldn't you be able to take lunch every day?

12   A.   Staffing issues.  We were shorthanded, level of

13   patient care.  Typically I had to help with the CNAs

14   duties a lot of times, feeding, changing their briefs,

15   stuff like that.

16   Q.   Did you just leave the unit and take lunch if you

17   wanted to?

18   A.   You could.

19   Q.   What would happen if you did?

20   A.   Patient care would suffer.

21   Q.   How would it suffer?

22   A.   They wouldn't be able to provide patient care for

23   what was needed.  If we have people that are -- I'm

24   trying to think of the best way to put this.  If they

25   had issues with diarrhea, constantly being wet, things

1   that can cause skin breakdown, feeding, you can only

2   feed one, maybe two people at a time and if you have

3   multiple people there, you have to have someone else to

4   pitch in.

5   Q.   So if you left the unit to take lunch regardless of

6   how the patients were doing, would that have an adverse

7   effect, if at all, on any of the patients?

8   A.   It could.

9   Q.   What sort of adverse effect could it have?

10  A.   Dietary.  If you left during the times for feeding,

11  they could instead of getting a hot meal and things like

12  that, they would end up with maybe a cold meal and

13  reject the meal.  So dietary concerns would not be met.

14         If they have potential for skin breakdown,

15  turning them every two hours, stuff like that, you have

16  to kind of keep up on that.  If your aides are

17  overloaded, you have to pitch in.

18  Q.   Any other health issues that you can think of that

19  would arise?

20  A.   I'm sure there are but right now, I just can't

21  think of any.

22  Q.   You had mentioned you frequently had to work

23  through your lunch breaks.  Was that every week, every

24  biweekly period?  How often?

25  A.   Pretty much daily.

Thomas Slagle - Direct by Mr. Unger

1    Q.   But there were times you were able to take a lunch

2    break, though, correct?

3    A.   Maybe once a week.

4    Q.   You had mentioned staffing being an issue.  Can you

5    explain what those issues were?

6    A.   Not enough staff for the amount of patients to

7    provide proper care.

8    Q.   How often was that an issue?

9    A.   Per shift.

10   Q.   Would this occur on a daily basis that there were

11   staffing issues?

12   A.   Quite often.

13   Q.   Did the staffing issues have any effect for your

14   ability to take lunch breaks?

15   A.   Yes.

16   Q.   What was that effect?

17   A.   If there's not enough people there to provide care,

18   you have to stay on to continue the care.

19   Q.   Were there any minimum staffing levels required for

20   the floor you were on?

21   A.   The state has minimum staffing for X amount of

22   patients.  You must have a certain amount but that does

23   not take into account acuity, the level of care needed.

24   Q.   Explain acuity within the context of the unit you

25   worked on?

**Thomas Slagle - Direct by Mr. Unger**

1   A.   The level of care.  You could have a unit where

2   everyone walks, talks, goes to the bathroom and a nurse

3   and two aides is more than enough or you could have a

4   unit where there is high dementia, behavioral issues,

5   infected wounds, things that take a long time to deal

6   with a lot of times and that same amount will not cover

7   what is needed.

8   Q.   How many on the third floor where you typically

9   worked, how many LPNs would there be on the floor?

10  A.   There should be two.

11  Q.   You mentioned there were CNAs on your floor that

12  you worked.  How many CNAs would there typically be

13  there?

14  A.   There should be three to four.

15  Q.   Were there always two LPNs and three to four CNAs

16  on the floor when you worked your shifts?

17  A.   No.

18  Q.   Level higher or lower?

19  A.   Lower.

20  Q.   When those numbers were lower, that would affect

21  your ability to take a lunch break, correct?

22  A.   Correct.

23  Q.   I just want to talk about meal breaks generally.

24  Would you have to punch in and out for your meal breaks?

25  A.   No.  It was automatically deducted.

Thomas Slagle - Direct by Mr. Unger

1  Q.   When you say "automatically deducted,"

2  automatically deducted from what?

3  A.   On the time clock they would automatically deduct

4  it from your time.

5  Q.   So when you worked through your lunch, the time

6  punches reflect you had actually punched out for your

7  lunch?

8  A.   Yes.

9  Q.   Even though you physically didn't punch in or out

10 for your lunch?

11 A.   Yes.

12 Q.   Were you aware of any other co-workers on the third

13 floor who would also have to work through your lunch

14 breaks?

15 A.   We all did.

16 Q.   How frequently?

17 A.   Almost every day.  We would fill out a paper that

18 said that we did not get our time for our lunch and we

19 would turn it into whoever the supervisor was.

20 Q.   We'll talk about that in a second.  This is a

21 frequent occurrence that your co-workers would also have

22 to work through lunch?

23 A.   Yes.

24 Q.   Are you aware of that being the issue on any other

25 floors?

**Thomas Slagle - Direct by Mr. Unger**

1   A.   Yes.

2   Q.   Which floors?

3   A.   All of them.

4   Q.   But there were times when your co-workers would

5   have the ability to take a lunch?

6   A.   Occasionally.

7   Q.   When your co-workers would have to work through

8   lunch, if you know, what sort of duties would they have

9   to do when they worked for lunch?

10  A.   Continue what they were assigned to do, patient

11  care.

12  Q.   When you worked through lunch, did you ever try to

13  get paid for the time that you worked through lunch?

14  A.   Yes.

15  Q.   What would you have to do to get paid for the time

16  you spent working through your lunch?

17  A.   We would have to fill out a sheet that said that we

18  did not get our lunch and turn it in to whoever was the

19  supervisor that night.  They would turn it into the

20  office.

21  Q.   Who said you had to fill out a sheet?

22  A.   We were told that was policy.

23  Q.   Policy, who said that?

24  A.   Whoever set policy.

25  Q.   Do you know HR, direct supervisor?

1   A.   We were just handed a memo one day and we were told

2   that's policy.

3   Q.   Did that policy come into effect after a change in

4   ownership, if you recall?

5   A.   Yes.

6   Q.   Do you recall approximately what year that change

7   in ownership occurred?

8   A.   No.  I know it was towards the end of my work

9   there.

10  Q.   The change in ownership we were just discussing,

11  that occurred briefly before the time that you left

12  Cheswick, is that what you're saying?

13  A.   A couple years.

14  Q.   Were there times you would fill out the form,

15  submit it to where it needed to go and you weren't paid

16  for the hours you worked when you worked through lunch?

17  A.   Yes.

18  Q.   Approximately how often would that occur?

19  A.   Quite a bit, between that and unpaid overtime.

20  Q.   We'll get to unpaid overtime in a second.  Just

21  relating to the unpaid lunch breaks, when you went and

22  you submitted a form and you weren't paid for the

23  requested time you spent working through your lunch,

24  what would you then do?

25  A.   We would have to go to HR and payroll and have to

**Thomas Slagle - Direct by Mr. Unger**

1  fill out a form for them to correct it.

2  Q.  The second form you would have to fill out?

3  A.  Yes.  We would also have to tell them as well.

4  Usually, they would give us a piece of paper to fill out

5  with dates and stuff.

6  Q.  Did they ever give you reasons why they would

7  reject the first form you submitted?

8  A.  No.

9  Q.  The times you submitted a second form, were you

10  always paid when you submitted that second form?

11  A.  Sometimes.  After multiple pay periods where it

12  becomes difficult to keep track after a certain point

13  because you have been submitting multiple papers,

14  requests, corrections for multiple pay periods.

15  Q.  More often than not were you paid for the time you

16  spent working through lunch and had to submit forms?

17  A.  No.  Usually shorted.

18  Q.  And you said you would have to give up in those

19  instances is that your testimony?  Did I understand that

20  correctly?

21  A.  I'm sorry.  What do you mean?

22  Q.  If you were rejected a second time, what would you

23  do?

24  A.  We would continue to go in and ask for the

25  corrections.

1   Q.   You would go back?

2   A.   Go back to HR and ask for them to go back through

3   it and correct it.

4   Q.   Approximately how many times would you have to go

5   back to HR?

6   A.   I couldn't tell you.  It was often.

7   Q.   Was there ever a time you stopped going to HR?

8   A.   Usually by that point the next checks were coming

9   out and we would have to start getting those corrected.

10  Q.   Did you ever try to track your time --

11  A.   We tried.  The time clocks would just spew out

12  random to us.  It looked like random numbers.  It was

13  kind of hard to understand or read.

14  Q.   Did you ever try to keep track of the time you

15  weren't paid for?

16  A.   For a while, yeah.

17  Q.   Were you ever paid for that time that you kept

18  track of?

19  A.   Not that I'm aware of.

20  Q.   Are you aware of other co-workers that had the same

21  issue you were experiencing?

22  A.   Yes.

23  Q.   Do you remember who those people were?

24  A.   Just about all of us.

25  Q.   Do you remember anyone by name?

**Thomas Slagle - Direct by Mr. Unger**

1   A.   Sandra Fleming I know had issues with that, a

2   couple supervisors I know, Pat.  She had some issues

3   with that.  It's been quite a few years.

4   Q.   Approximately how many employees do you recall

5   having this issue or co-workers?

6   A.   Most of the people I worked with.  On my unit a lot

7   of people in the second unit had some issues as well.

8   Q.   So you worked with another LPN and three to four

9   CNAs, correct?

10   A.   Usually it was two CNAs and usually another LPN but

11   not always.

12   Q.   If you know, what would they do when they had

13   issues of not getting paid for the lunch break?

14   A.   Same thing as everybody else, go to HR and

15   complain.

16   Q.   What, if anything, would happen when they would go

17   down to HR and complain?

18   A.   I never really discussed it with them.

19   Q.   Was there ever a time you had the opportunity to

20   elevate the complaint elsewhere?

21   A.   We were also told to refer to HR and payroll.

22   Q.   Did HR and payroll ever give you any substantive

23   information about why they were not paying you for the

24   time you were working?

25   A.   They just told us they would look into it.

**Thomas Slagle - Direct by Mr. Unger**

1  Q.   To your knowledge, did they look into it?

2  A.   I don't know.

3  Q.   You had mentioned you had issues with overtime.

4  What were those issues?

5  A.   It wasn't always correct.

6  Q.   What wasn't correct about it?

7  A.   The time or the pay.

8  Q.   Let me ask you this.  How did you come to work

9  overtime hours, how would that come about?

10 A.   People would not show up for the next shift or they

11 didn't have enough people to cover shifts.  Those are

12 typically the two.

13 Q.   So let me walk through this.  You would finish your

14 shift?

15 A.   Yes.

16 Q.   And then somebody wouldn't show up for the shift

17 following yours?

18 A.   Yes.

19 Q.   That's when you would pick up the shift in which

20 somebody didn't show up for?

21 A.   They would start asking people to stay or they

22 would mandate you.

23 Q.   What does mandate mean?

24 A.   Mandatory overtime basically.

25 Q.   How often did that happen to you, the mandatory

**Thomas Slagle - Direct by Mr. Unger**

1  overtime?

2  A.   Once a month or so, maybe more, depends.  Usually I

3  would just take the shift.

4  Q.   How often were you offered the opportunity to take

5  on another shift?

6  A.   Almost daily basis.

7  Q.   When you picked up those extra shifts, were you

8  always paid for the hours you worked?

9  A.   That's where we would have to go to HR.  No, we

10  weren't.

11  Q.   How often were you not paid for those extra shifts

12  you would pick up?

13  A.   After a certain point, it became a little difficult

14  to keep track of that with going to HR on a constant

15  basis.

16  Q.   When you would pick up an extra shift, would you

17  have to punch in and punch out again?  How would they

18  work?

19  A.   No.  You would just stay on.

20  Q.   Was there any paperwork you had to fill out when

21  you worked an extra shift?

22  A.   No.

23  Q.   Who would ask you to pick up the extra shift?

24  A.   Whoever was the supervisor at the time.

25  Q.   When you weren't paid for the extra shift you

1   picked up, what would you do?

2   A.   You would go to HR, payroll and ask them to go back

3   through and correct it.

4   Q.   Were there any forms you had to fill out?

5   A.   Usually it was just your name and whatever pay

6   period that was, piece of paper or something, same as

7   with lunch break.

8   Q.   So you would submit the form when you weren't paid

9   for the extra shift you picked up.  Were you always paid

10  when you submitted that form when you picked up the

11  extra shift?

12  A.   Not always.  It became difficult to track after

13  several paychecks.

14  Q.   Were there times that you were paid when you picked

15  up the extra shift?

16  A.   Sometimes, yes.

17  Q.   When you picked up an extra shift, would that be

18  your total hours worked in a week to over 40?

19  A.   Yes.

20  Q.   Would you ever if you did pick up an extra shift

21  reduce your weekly hours meaning if you picked up an

22  extra shift, you would take a day off?

23  A.   No.

24  Q.   So typically when you picked up an extra shift, you

25  were, in fact, entitled to receive overtime for the week

1    in which you worked, picked up the extra shift?

2    A.    Yes.

3    Q.    Are you aware of any other co-workers who had this

4    similar issue?

5    A.    Yes.

6    Q.    Do you recall who those co-workers were?

7    A.    Not off the top of my head.  It's been quite a few

8    years.

9    Q.    Were there CNAs that had this issues?

10   A.    CNAs, LPNs, RNs.

11   Q.    Was this a frequent issue that you observed?

12   A.    From my understanding, yes.

13   Q.    Approximately how often would those unpaid overtime

14   hours go unresolved for you meaning they were never

15   paid?

16   A.    Like one or two, usually one per pay period, maybe

17   two, depending on how much I worked over.

18   Q.    Did you ever discuss the issue with any other

19   co-workers?

20   A.    Yes, we did, a group of us would discuss it.  We

21   would usually go down together.

22   Q.    When you say go down together?

23   A.    To HR, do the same thing every week, ask them to

24   correct it.

25   Q.    What, if anything, were you told by HR when you

Thomas Slagle - Direct by Mr. Unger

1   went --

2   A.   That would --

3   Q.   Let me finish the question so that she can write

4   down your answer.  So you would go down to HR and

5   complain with your co-workers.  Do I understand that

6   correctly?

7   A.   Yes.

8   Q.   Do you know if the co-workers had their pay issues

9   resolved?

10  A.   I don't know.

11  Q.   Did you have any other pay issues while you were at

12  Cheswick?

13  A.   Not that I recall, off the top of my head at least.

14  Q.   Was there ever a time you stopped picking up extra

15  shifts because you weren't getting paid?

16  A.   No.

17            MR. SCHWARTZ:  Objection.

18            THE COURT:  What's the objection?

19            MR. SCHWARTZ:  Leading.  He asked him if there

20  were any other pay issues.  He said not that I recall.

21            THE COURT:  First of all, he answered.

22  Secondly it's not a leading question.  Overruled.

23  Q.   Were you ever eligible to receive -- let me ask you

24  this.  Were you ever offered any bonuses for picking up

25  extra shifts?

**Thomas Slagle - Direct by Mr. Unger**

1   A.   We were offered gift cards.

2   Q.   Explain that.  How would that work?

3   A.   If you pick up an extra shift, you would get like a

4   $25 gift card to Walmart or Target or something.

5   Q.   Who would offer that?

6   A.   Whoever like the DON usually or whoever was in

7   charge of the facility.

8   Q.   That when that gift card was offered, were there

9   times you took a shift to receive a gift card?

10  A.   Yeah.  But it wasn't for the gift card.  It was to

11  pick up the shift.

12  Q.   If you know, was that gift card ever included in

13  your pay stub or your pay records?

14  A.   No.

15  Q.   Were there times you were offered a gift card but

16  you never received it?

17  A.   No.

18  Q.   This gift card bonus program, was that offered to

19  other employees as well?

20  A.   Yes.

21  Q.   Who was offered to it, if you know?

22  A.   Anybody that picked up overtime.

23  Q.   Approximately how many hours of overtime a week

24  would you work and then not get paid for?

25  A.   At least a shift, sometimes two.  So eight to 16.

1   Q.   Again, there were times that you were paid for the

2   hours?

3   A.   Yes, there was.  There were times of the pay

4   periods where everything was correct.

5   Q.   You had mentioned you left Cheswick.  Was that

6   because of the pay issues you were experiencing?

7   A.   Among, yes.

8   Q.   You had mentioned that there was a change in

9   ownership approximately one to two years before you

10  left, do you recall that?

11  A.   Yes, something around that timeframe.  It may be

12  more.  I'm not sure.

13  Q.   These pay issues, would they arise as frequently

14  before that change in ownership occurred?

15  A.   No.

16  Q.   After the change in ownership, why did you stay at

17  Cheswick for as long as you did despite having the pay

18  issues you just testified to?

19  A.   Patient care.  A lot of us stayed to provide to the

20  patients that we had.  It was more about them than

21  anything.

22  Q.   Is there anything else you would like to tell the

23  Court today?

24  A.   I don't believe so.

25          MR. UNGER:  I have no further questions at

1    this time.

2         THE COURT:  Cross-examination, counsel.

3              CROSS-EXAMINATION

4    BY MR. SCHWARTZ:

5    Q.   Good afternoon.  It's Slagle?

6    A.   Yes, sir.

7    Q.   My name is Jake Schwartz.  I'm an attorney for the

8    defendants in this case.  I just have a few questions

9    for you.

10             I'm sorry but I didn't catch what you said was

11   your final date of employment.

12   A.   2017, I believe.

13   Q.   Do you remember which month?

14   A.   No, sir.

15   Q.   Was it before or after Christmas?

16   A.   I couldn't tell you.  I would actually have to look

17   at my résumé.

18   Q.   But it would be fair to say it was either late '17

19   or early '18?

20   A.   Somewhere in that neighborhood.

21   Q.   As I understand your testimony in response to

22   counsel's questions, you aren't certain as to when CHMS

23   became the -- when the ownership changed in the Cheswick

24   Rehab facility?

25   A.   Not a hundred percent sure.

**Thomas Slagle - Cross by Mr. Schwartz**

1   Q.   If I told you the evidence would show that date was

2   September 18 of 2017, do you have reason to believe

3   that's not true?

4   A.   If you have -- if that's what it was, I'll have to

5   believe you.  I do not have that record.

6   Q.   I'm not compelling you to believe something you

7   don't know.  You have no reason to disbelieve that?

8   A.   I don't believe so.

9   Q.   So given your -- if you assume I'm right that date

10  September 18, 2017 is the date of the ownership change

11  and you ended your employment there in either late '17

12  or early '18, you only worked there a few months after

13  the ownership changed.  Does that refresh your

14  recollection at all?

15  A.   I do not know.

16  Q.   So if I'm right and you only worked there for a few

17  months, the totality of your testimony regarding working

18  lunches and not being paid the overtime that you believe

19  you should have been paid occurred during that

20  three-month period?

21          MR. UNGER:  Objection.  Assuming facts not in

22  evidence.

23          THE COURT:  What are the facts not in

24  evidence?

25          MR. UNGER:  He is making conclusions and

1   asking questions about when his time period of

2   employment ended without that fact actually being in

3   evidence.

4            THE COURT:  I think he provided testimony

5   enough as to -- he specified he was unable to give a

6   precise date.  It's enough for me to understand where he

7   is going on this.  There is no jury to risk confusion.

8   You may proceed.  Overruled.

9   Q.   I just want to make sure the testimony you are

10  giving today -- I think the counsel for Secretary asked

11  this question but the missed lunches and the other

12  instances where you were not paid for your overtime

13  occurred in the limited time after the ownership and

14  your separation?

15  A.   I can't agree with that.

16  Q.   The issue about the minimum number of nurses that

17  needed to be there, there's two separate parts of that.

18  One is potentially the staffing shortages but not

19  necessarily below the state minimum, you would agree

20  with that, right?

21  A.   I'm not sure.  I would have to -- I don't remember

22  exactly what the state minimums are.  It's been a long

23  time since I had to look at that.

24  Q.   That's fine.  You agree the state does have a

25  minimum?

**Thomas Slagle - Cross by Mr. Schwartz**

1   A.   Yes, sir.

2   Q.   You just don't know what it is?

3   A.   Not off the top of my head anymore.

4   Q.   When you referred to staff shortages in your

5   testimony, you don't know whether that means from what

6   you said they are actually state minimum staff shortages

7   as you saw it?

8   A.   Yes, sir.

9   Q.   The only place that you worked at between September

10  18, 2017 and when you left was the Cheswick Rehab

11  facility, correct?

12  A.   Could you repeat that, the ending of it.

13  Q.   It's been a long day.  I'm probably not being as

14  clear in my questions as I should.  I want to make sure

15  your testimony today accepting my date of September 18,

16  2017 until you left your employment, all of those weeks

17  you worked at the Cheswick Rehabilitation facility,

18  correct?  You didn't work anywhere else?

19  A.   I had a second job.

20  Q.   Fair enough.  For purposes of my question, you

21  didn't work for any of the other entities that were

22  owned by the same entity that owned the Cheswick

23  facility?

24  A.   Not that I'm aware of.

25  Q.   Were you in your employment after the ownership

**Thomas Slagle - Cross by Mr. Schwartz**

1  change represented by a union?

2  A.   No.

3  Q.   You were not okay.  That's all I have.

4         THE COURT:  Any redirect?

5         MR. UNGER:  No, Your Honor.

6         THE COURT:  Sir, you are finished.  You may

7  step down and leave.

8         Counsel, we have now reached the end of

9  today's trial day.  Again, I think both sides did a good

10  job to keep things moving today.  We are now heading

11  into tomorrow.

12         Remember, we'll go from 8:30 tomorrow.  You

13  requested to be released at or around 3:00.  Okay.

14         MR. HERRERA:  The question as to the Zoom.  To

15  ensure -- I hope you will convey my apologies to the

16  staff -- to avoid having to do that again, she will

17  testify tomorrow.

18         THE COURT:  Do you have any idea what time,

19  what order generally?

20         MR. HERRERA:  Why don't we say she will be the

21  first witness assuming not there's not one off, the

22  first witness after lunch.

23         THE COURT:  Approximately one p.m.?

24         MR. HERRERA:  Yes, Your Honor.

25         THE COURT:  I'll let them know.  I don't know

1    what we'll do with it.  I'll let them know.  This is a

2    beautiful courtroom but Judge Hardy, Judge Bissoon,

3    theirs are much more functional with the technology.  We

4    have old grade school style for us in here.

5            Well done.  I thank you for the collegiality

6    you worked for today.  We are adjourned for the day.

7            (Whereupon, court was adjourned for the day.)

8                         - - -

9

10           I hereby certify by my original signature

11   herein, that the foregoing is a correct transcript, to

12   the best of my ability, from the record of proceedings

13   in the above-entitled matter.

14

15

16          S/ Karen M. Earley

17             Karen M. Earley

18             Certified Realtime Reporter

19

20

21

22

23

24

25