IN THE UNITED STATES DISTRICT COURT

OF WESTERN PENNSYLVANIA


JULIE A. SU, Secretary of      CIVIL DIVISION
Labor, United
States Department of           No. 18-1608
Labor,
        Plaintiff,

    vs.

COMPREHENSIVE HEALTHCARE
MANAGEMENT SERVICES, LLC,
et al.

        Defendants.


------------------------------

    Transcript of BENCH TRIAL held on FEBRUARY 13, 2024
United States District Court, Pittsburgh, Pennsylvania
BEFORE: HONORABLE WILLIAM S. STICKMAN, IV, DISTRICT JUDGE

<u>APPEARANCES</u>:

For the Plaintiff:          Alejandro Alfonso Herrera, Esq.
                            Mohamed E. Seifeldein, Esq.
                            Eric Unger, Esq.
                            U.S. Department of Labor


For the Defendant:          Jeffrey Schwartz, Esq.
                            Marla N. Presley, Esq.
                            Jackson Lewis


Court Reporter:             Karen M. Earley, RDR-CRR
                            Joseph F. Weis, Jr.
                            U.S. Courthouse
                            Room 6260
                            700 Grant Street
                            Pittsburgh, PA 15219
                            412-201-2660



Proceedings reported by mechanical stenography.
Transcript produced by computer-aided transcription.

I N D E X

- - -

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DEFENDANTS' WITNESSES: | | | | |
| David Ferraro | 3 | 70 | -- | -- |
| Carlos Rivera | 79 | 114 | 138 | 139 |
| Michelle Kunselman | 141 | 160 | 176 | 177 |
| Jason Elmer | 180 | 185 | | |

```
 1                    P R O C E E D I N G S
 2     (February 13, 2024, 9:30 a.m.  In open court.)
 3               THE COURT:  Welcome back.
 4               Are you prepared?
 5               MR. SCHWARTZ:  Yes, Your Honor.
 6               THE COURT:  You may begin.
 7               MR. SCHWARTZ:  David Ferraro.
 8               DAVID FERRARO a witness herein,
 9     having been duly sworn, testified as follows:
10               THE COURT:  Have a seat.  Adjust the
11     microphone as needed.
12               Please state and spell your name for the court
13     reporter.
14               THE WITNESS:  David Ferraro, F-e-r-r-a-r-o.
15                       DIRECT EXAMINATION
16     BY MR. SCHWARTZ:
17     Q.   Good morning, Dave.  What I would like to do to
18     start is walk through with you your professional
19     background.  I find it may be easier to start with what
20     you do now and work backwards and then I will come back
21     and sort of ask you about each of the jobs.  What do you
22     do now?
23     A.   I currently am a consultant for Western PA
24     Consults.  Currently, I just started this role, I'm the
25     operator -- owner operator of Jefferson Hills
```

**David Ferraro - Direct**

1   Rehabilitation Center.

2   Q.   Let's talk about your position as consultant with

3   Western PA Consultants.  How long have you been in that

4   role?

5   A.   I started I think in 2019 and then in 2021, I went

6   to Brighton Nursing and Rehab in Beaver as the

7   administrator.  Brighton was having some problems and

8   through my career, kind of my forte is fixing nursing

9   homes that run into compliance issues or operational

10  issues.

11  Q.   So you went to Brighton -- you are working as a

12  consultant with Western PA Consultants from '19 to '21

13  and then you went to Brighton to serve as an interim

14  administrator?

15  A.   Well, it was supposed to be interim, but I ended up

16  being there for almost three years.

17  Q.   So you were there for about three years?

18  A.   Two and a half.  I started in February of '21 and

19  left in October of '23.

20  Q.   You are in your current role from October '23 until

21  today?

22  A.   Yes.

23  Q.   So prior to working as a consultant with Western PA

24  Consultants in 2019, what did you do?

25  A.   I was a senior vice president of operations for

1    Paramount.  It's also a long-term care company.  They

2    mostly do high-end assisted living.  They have some

3    skilled nursing facilities but mostly high end assisted

4    living.

5              Prior to that I was the chief operating

6    officer of Quality Life Services.  They have a mix of

7    assisted living but they are mostly skilled facilities.

8    Both of those companies, multiple facilities.  Quality

9    Life Services is in one state in Pennsylvania, Paramount

10   is in four different states.

11   Q.   Let me stop you there for a second, David.  What

12   years were you senior vice president for the Paramount

13   organization?

14   A.   2017 to 2019 I believe it was.  I don't know the

15   exact month.

16   Q.   Then in the role with Quality Life Services, what

17   years did that cover?

18   A.   2010 to 2017.

19   Q.   What did you do before that?

20   A.   I was a nursing home administrator at Hcr Manor

21   Care.

22   Q.   Where was that located?

23   A.   I worked at a couple different facilities.  I

24   worked at the McMurray building and also the -- I did

25   some work in multiple facilities.  Again, like if the

 1  facility was having trouble, I would go and help out
 2  that building.  I spent most of my time in the building
 3  in McMurray and also Bethel Park.
 4  Q.   What years did that cover?
 5  A.   Like 2005 to 2010.
 6  Q.   What did you do before that?
 7  A.   In that period also, I was also the director of
 8  nursing.  So if a facility needed a director of nursing,
 9  I would work in that capacity.  If it needed an
10  administrator, I would work in that capacity.
11          Prior to that, I was a director of nursing at
12  Beverly Healthcare in Canonsburg, Pennsylvania.
13  Q.   How long were you in that position?
14  A.   About three years.
15  Q.   So that's, what, about 2002 to 2005?
16  A.   Yes.  I started there in 2002.
17  Q.   What did you do before that?
18  A.   I worked for UPMC.  I was lucky enough to be chosen
19  to go work for UPMC and --
20          THE COURT REPORTER:  Can you slow down.
21          THE COURT:  I'm also a fast talker.  One of
22  the things you have to do when you are testifying in
23  court is realize your listeners, especially most
24  importantly our court reporter, have a limited capacity
25  to take that in.  That includes me as the finder of

 1   fact.

 2            Just go a little bit slower that would be

 3   great.

 4   A.   Going backwards, before I was at Beverly Healthcare

 5   in Canonsburg, I was at UPMC Shadyside and I also worked

 6   with UPMC corporate in Italy setting up a transplant

 7   center.

 8   Q.   What years were you with UPMC?

 9   A.   1998 to 2002.

10   Q.   I take it this role with UPMC in Shadyside and the

11   corporate aspect that took you to Sicily were during the

12   same time period?

13   A.   Yes.

14   Q.   What did you do before you were with UPMC?

15   A.   I was a unit director at Allegheny General Hospital

16   on post open heart unit.

17   Q.   What years did that cover?

18   A.   I graduated nursing school in '95, so '95 to '98 I

19   think and then I went to UPMC.

20   Q.   All of these positions that you've held since

21   graduating nursing school were in Western Pennsylvania?

22   A.   Yes.

23   Q.   So the breadth of your experience in healthcare

24   other than the time in Sicily takes place in this area?

25   A.   Yes.

**David Ferraro - Direct**

1  Q.   All right.  With regard to your experience in

2  healthcare, it looks to me that at least for the last 20

3  or so years, it has been in the nursing home business?

4  A.   Yes.

5  Q.   Fair to say you have a pretty good experience in

6  the nursing home industry?

7  A.   I think I'm pretty good at what I do.

8  Q.   Okay.  Let's talk about your current role

9  consultant for Western Pennsylvania Consultants.

10  A.   Yes.

11  Q.   You had two stints, 2019 to '21 and then October

12  '23 to present?

13  A.   Yes.

14  Q.   Aside from maybe what facilities you had

15  responsibilities for, were those roles the same?

16  A.   My roles as a consultant?  Yes.

17  Q.   So the period from 2019 to 2021 and then October

18  '23 to present, when I ask you to describe what you do

19  as a consultant, will that cover both times?

20  A.   Yes.

21  Q.   So tell us what you do.

22  A.   I'm an operations consultant.  I basically help the

23  administrator make decision, day-to-day operational

24  decisions dealing with compliance and obviously just

25  building the business, building the census and making

1   sure we are taking good care of people and our processes

2   are in place.

3         If they don't have a process, I'll help them

4   put a process in place for whatever issue they're

5   having.  Whether it be in a clinical meeting or

6   admissions or if there is a social service issue or what

7   have you.

8   Q.   That's a good 30,000 foot perspective but give us a

9   little bit more granularity.  Let's say you were not

10  here today, what will you be doing?

11  A.   I try to get out to every facility at least once a

12  week.  I'll sit there through their a.m. clinical

13  meeting which is a meeting where we review everything

14  that happened the previous day clinically.  Physician's

15  orders, if they got a new admission, double-check all

16  the orders to make sure everything is done right.

17        The information that needs shared with the

18  other departments is shared.  Social service knows they

19  need to work on whatever discharge plan or if we think

20  they are going to be there long term, make sure that

21  dietary has the right dietary slips, make sure that

22  housekeeping knows that there is someone now in that

23  bed.

24        That's what our stand-up meeting does.  Then I

25  usually tour the facility with the administrator just to

1   check on -- we're one of the most -- we have more

2   regulations I think than any other entity than nuclear

3   power plants.  A lot of those are what I call easy

4   fixes.  If somebody is holding a soda, it's an infection

5   control.

6           So we round the building looking for little

7   day-to-day things that can get you a citation.

8   Q.   As I offered if you weren't here today, what would

9   you be doing.  If you went to a facility that you had

10  responsibility for as a consultant -- let me ask before

11  I go into that.

12          As a consultant for Western PA Consultants, do

13  you have former responsibility for particular

14  facilities?

15  A.   I have -- I'm assigned -- yes.

16  Q.   As we sit here today from October 23 to present,

17  which facilities in the Comprehensive network do you

18  have responsibility for?

19  A.   I have North Strabane, Cheswick, I have my facility

20  obviously, Jefferson Hills.  I oversee moon in Wexford,

21  also.

22  Q.   Moon, Wexford, Jefferson Hills are not parties to

23  this case?

24  A.   Correct.

25  Q.   The parties to this case that you currently have

1   responsibility for are North Strabane and Cheswick?

2   A.   Yes.

3   Q.   So if going back to the question I was about to ask

4   you, if you weren't here today and let's say you went to

5   Cheswick, what time would you typically show up?

6   A.   I get up early.  So, I'm usually there by 7:30.

7   Q.   Would you attend the stand-up meeting?

8   A.   Yes.

9   Q.   And then how long would you be at the facility on a

10  typical day when you are visiting a facility that you

11  have responsibility for?

12  A.   Six to eight hours normally.

13  Q.   During that time, would you interface with

14  different people at the facility?

15  A.   Absolutely, yes.

16  Q.   The administrator obviously?

17  A.   The administrator, director of nursing, social

18  service director.  I help whatever department head has

19  whatever issue which is to try to solve whatever

20  problems -- I try to give them some ideas, how I solved

21  problems in that entity or that particular division of

22  the business.

23          It's not something that happens -- like the

24  same thing certainly doesn't happen every day and each

25  building has its own nuance.  It's a little bit

**David Ferraro - Direct**

1    different.  What I do is I schedule my week -- I

2    schedule my days and what building I'm going to be in

3    the week before so they know I'm coming.

4              Just a basic review of all the operations.  If

5    somebody has a particular issue in a particular

6    department that isn't -- they don't need to call me.

7    It's nothing emergent but we'll talk about that when I'm

8    there.

9    Q.   Do you have interactions with nonsupervisory staff?

10   A.   Sure, yes.

11   Q.   Describe for us how that would take place.

12   A.   Well, I make sure I answer call lights in every

13   building I'm in.  It's just something I do.  I'm a

14   nurse.  There is nothing I haven't seen or can't do.

15             Most of the time that leads me to have a

16   conversation with the nursing assistant and so forth.

17   They'll simply say because I'm usually dressed in

18   business, if they don't know me already, if it's a newer

19   facility, they'll say, can I help you.

20             I will say I'm David.  I'm a nurse.  I'm

21   allowed to do stuff.

22             MR. UNGER:  Your Honor, I going to object.  I

23   move to strike the testimony relating to what people

24   tell him.  It's hearsay.

25             THE COURT:  Response.

 1          MR. SCHWARTZ:  Just going through background.

 2    If you want to strike it, you can strike it.

 3          THE COURT:  I'm not going to strike it.  I

 4    will instruct the witness to refrain from giving

 5    responses based on what people told you.  I'm going to

 6    make an exception.  This is background.  You can move

 7    on.

 8    Q.   You mentioned a red light call, is that what you

 9    said, call light?

10    A.   A call light, yes.  When a resident presses their

11    bell, a light goes off.  It's a call light.

12    Q.   You happen to be there and that is just something

13    you are going to do because it's an interest of yours?

14    A.   Well, it gives me an opportunity to go in and talk

15    to the resident and whenever I go in, 90 percent of the

16    time they want their TV turned on or a pillow or

17    something.  It's not a direct care need.

18          It gives me an opportunity to say how are you

19    being treated here.  Do you like the food, just a quick

20    one-off, they get answered during surveys.

21          It's just a good customer service thing so

22    maybe I can uncover an issue that nobody else has.

23    Q.   Okay.  Now, in your tenure as a consultant with

24    Western PA consultants, I know you said currently, you

25    have Cheswick and North Strabane, have you had formal

1   responsibility for any other facilities in the
2   Comprehensive network?
3   A.    Yes.
4   Q.    Which ones are those?
5   A.    I had The Grove at Washington, South Hills,
6   Mt. Lebanon and obviously, Brighton.  I was the
7   administrator there for a while.
8   Q.    Okay.  And would this -- the responsibility for
9   these facilities that you just identified, was that
10  during the period of 2019 to 2021?
11  A.    Yes.
12  Q.    Now, are you aware of whether there are other
13  facilities in the Comprehensive network that are
14  defendants in this case that you have not had
15  responsibility -- direct responsibility for?
16  A.    I don't know exactly every building that is
17  involved in this case but I've had -- those are the
18  facilities that I had direct responsibility over but I
19  have been in a lot of facilities in that capacity
20  covering whenever another consultant is off and the
21  Department of Health comes in or if there is something
22  extraordinary that happens, I get called for help to
23  see.
24          For instance, in Murrysville, a gentleman hit
25  the transformer and the electric went out.  They were

1  evacuating the building and the other consultant Tom

2  gave me a call and said, hey, can you take a look at

3  this.

4          I went to Murrysville and spent the day there

5  just figuring out what we could do to get the electric

6  on.

7          It's actually pretty ridiculous.  They didn't

8  turn the generator on.  So we turned the generator on

9  and we were good to go, believe it or not.

10  Q.   David, I'm going to walk through facilities that

11  you have not identified as those that you have

12  responsibility for as a regional consultant and either

13  in your current tenure or during the period 2019 to 2021

14  and ask you if you have been to the facility.

15  A.   Okay.

16  Q.   Grove at Irwin?

17  A.   Yes.

18  Q.   Why would you have been to the Grove at Irwin just

19  generally?

20  A.   If John or Tom would be -- the buildings have

21  switched between the consultants a few times because a

22  building was added, so we changed the region and then

23  Jason came on and that mixes up the buildings a little

24  bit.

25          I would have been in those facilities for

1    either if the Department of Health came in and the

2    operations consultant wasn't available, they were on

3    vacation or something or they were in another building

4    or if there was, again, like something extraordinary

5    that happens.  I didn't go to those buildings a lot but

6    I was at Irwin more than once.

7    Q.   What about The Grove at Latrobe?

8    A.   I was at Latrobe one time.

9    Q.   The Grove at New Castle?

10   A.   I was at The Grove at New Castle one time.  I had

11   to pick something up there.

12   Q.   Monroeville?

13   A.   Yes, I was in Monroeville.

14   Q.   Murrysville?

15   A.   Yes, I was in Murrysville.

16   Q.   Have you been to The Grove at Harmony?

17   A.   No.

18   Q.   Have you ever been to The Grove at New Wilmington?

19   A.   No.

20   Q.   Have you ever been to The Grove at Greenville?

21   A.   No.

22   Q.   Let's step back for just a second.  I want to talk

23   about Western PA Consultants.  Is that your employer?

24   A.   Yes.

25   Q.   They write your checks?

1    A.    Right.

2    Q.    Tell us about Western PA Consultants?

3    A.    It's a group of people that specialize in one of

4    the areas of a nursing home.

5           So my expertise is obviously working with the

6    administrator and overall operations.  We have clinical

7    consultants that work with the director of nursing and

8    their responsibilities.

9           We have RNAC consultants.  For layman terms,

10   case managers that help with the case managers at the

11   facilities.  We have an HR consultant that helps with

12   the HR stuff.  We have a dietary consultant that helps

13   with the dietary stuff.

14          We have consultants that are -- Western PA

15   Consultants, they do marketing and try to bring business

16   to the facilities.

17   Q.    So as I understand your testimony, David, there are

18   consultants that have, for lack of a better term, sort

19   of specific portfolios?

20   A.    Yes.

21   Q.    Do you have a specific portfolio?

22   A.    I cover it all.

23   Q.    Okay.  So you touch every aspect of the home?

24   A.    Yes.  If you want to think of Western PA

25   Consultants set up kind of like nursing homes are set up

 1  with the administrator, director of nursing, case

 2  manager, dietary, you would think of that as there is a

 3  support service for all of those entities in the

 4  buildings.

 5  Q.   Yours would be the administrator level?

 6  A.   Yes.

 7  Q.   As I understand your testimony, in your capacity as

 8  a consultant for Western PA Consultants, do you do work

 9  for facilities that are not part of the Comprehensive

10  network?

11  A.   No.

12  Q.   But you do work for facilities that are not parties

13  to this case?

14  A.   Yes.

15  Q.   And in your 20-plus years working in the nursing

16  industry, based on your experience, is there something

17  unique about the defendant facilities in this case as

18  contrasted with other nursing homes you had experience

19  with?

20  A.   No.  The operations of a nursing home -- every

21  nursing home I have been in operates basically the same

22  way.

23  Q.   Some might do better with patient care than others?

24  A.   Yes.

25  Q.   So when you say they operate the same way, explain

1   for us what that means.

2   A.   So the administrator --

3              MR. UNGER:  Object to relevancy.  Speaking to

4   industry standard isn't relevant to this proceeding.

5              THE COURT:  Your response to that?

6              MR. SCHWARTZ:  He is going to be offering

7   testimony about what it is that the people in these

8   facilities do.

9              THE COURT:  The defendant facilities?

10             MR. SCHWARTZ:  The defendant facilities and I

11  want have him to be able to establish that he has

12  experiential time establishing that the nature of what

13  these people do is very consistent with the industry in

14  terms of the exempt classification.  It's our burden to

15  establish the exempt status.

16             THE COURT:  Based upon that offer of proof, I

17  will allow the testimony to go as background information

18  for the line of questioning that Mr. Schwartz is aiming

19  to adduce.

20  Q.   Do you remember my last question?

21  A.   I don't.  I don't remember exactly what you said.

22  The nuance of it is all nursing homes basically run the

23  same.  They have the same divisions.  They have the same

24  department heads.  The administrators sit on top of the

25  pile and they have -- each one of those department heads

David Ferraro - Direct

 1  have responsibilities and those are all very much alike

 2  in every facility I have ever been in or consulted with

 3  in my career.

 4  Q.   Earlier on in your testimony, I'm paraphrasing, but

 5  I think you said something like there may be variances

 6  within one facility versus another.  What did you mean

 7  by that?

 8  A.   Just variances in the way people manage.  For

 9  instance, like the judge has clerks and so forth and you

10  probably manage those a little bit different than

11  another judge manages their staff.

12           So although the responsibilities are the same,

13  the day-to-day nuances will depend on the personality of

14  the person in charge or the personality of the director

15  of nursing.

16           So what autonomy is given to each department

17  head will differ but the responsibility remains the

18  same.

19  Q.   The facilities, the defendant facilities in this

20  case are of different sizes, correct?

21  A.   Yes.

22  Q.   Would that kind of have a role in the various

23  functions of the directors or supervisors in a

24  particular facility?

25  A.   Yes.

David Ferraro - Direct

1  Q.   Explain that a little bit.

2  A.   So in a large facility, I'll go big and small so

3  that way it's easier to explain.

4          So at Brighton, the director of nursing's role

5  is different at Brighton because there are 594 beds

6  versus a director of nursing's role in a 50-bed

7  facility.  So the director of nursing is much more

8  involved with the frontline staff than a 50-bed facility

9  than the director of nursing at Brighton.  The roles are

10  same but just the sheer size of the facility dictates a

11  different management.

12          Does that make sense?

13  Q.   It does, at least to me.  It matters if it make

14  sense to the judge but he can't answer you.

15          What I want to do, David, is I want to walk

16  through the facilities where you have experience and

17  talk about the structure of management within the

18  facility.

19  A.   Okay.

20  Q.   So let's just start at Brighton where you have

21  been, you were the administrator.

22  A.   Yes.

23  Q.   It wasn't clear to me.  Did you also have a

24  regional role at Brighton at some point?

25  A.   No.

**David Ferraro - Direct**

1  Q.   So your experience at Brighton is the actual

2  administrator for a period of about two years?

3  A.   Yep.

4  Q.   Okay.  Are you familiar with the term "exempt

5  employee"?

6  A.   Yes.

7  Q.   What is your understanding of what that means?

8  A.   That they are not paid hourly.  They are paid

9  basically to cover a responsibility.  My thought process

10  of it is they are paid to cover a responsibility.  They

11  are not paid to be there hourly.

12  Q.   Do you know whether they are entitled to overtime

13  pay?

14  A.   They're not.

15  Q.   Let's just talk at Brighton first.  Is there a

16  director of nursing at Brighton?

17  A.   Yes.

18  Q.   Are you familiar with the duties and

19  responsibilities of the director of nursing at Brighton?

20  A.   Yes.

21  Q.   Does the director of nursing at Brighton have a

22  role in the hiring process?

23  A.   Yes.

24  Q.   What is that role?

25  A.   She's the final say so if somebody gets hired in

 1  the nursing department.

 2  Q.   So the director of nursing at Brighton makes the

 3  final decision as to whether someone is going to be

 4  hired or not?

 5  A.   Yeah.  Melissa could say yes or no.

 6  Q.   That's Melissa Hough?

 7  A.   Yes.

 8  Q.   Does the director of nursing at Brighton have the

 9  authority to discipline employees?

10  A.   Yes.

11  Q.   Is that based on your actual experience observing

12  the director of nursing exercising disciplinary

13  authority?

14  A.   Yes.  At Brighton, and, again, Brighton is a little

15  bit different.  It's a monster.  So the unit directors

16  can discipline nurse staff.  It doesn't have to go to

17  Melissa.  There's hundreds of employees there.  They

18  certainly can't all go through Melissa.

19          They will be reviewed with her and HR of

20  course, but she is not the one handing out every single

21  discipline.  She couldn't do it.

22  Q.   We'll talk about the lower levels as well.  Is

23  there an assistant director of nursing at Brighton?

24  A.   There's two.

25  Q.   Does the assistant director of nursing at Brighton

1   play a role in the hiring process?

2   A.   Yes.

3   Q.   What is the role of the ADON?

4   A.   They will vet -- again, so Brighton is a monster so

5   it's not like Melissa could interview every single

6   person.  They help her with doing that.  If she is not

7   available or she can't do it, the two ADONs will cover

8   that responsibility for her.

9   Q.   Just what happens in a court proceeding is there's

10  a record made which is what this woman is doing here.

11  When you say "it's a monster," just so the record is

12  clear, you mean it's a big place?

13  A.   Yes, it's a large facility.  I'm sorry about that.

14  Q.   That's okay.  I didn't want anyone to think that

15  you were saying something negative.

16  A.   No.

17  Q.   Does the ADON play a role in disciplining employees

18  underneath the director of nursing at Brighton?

19  A.   Yes.

20  Q.   What role is that?

21  A.   They can discipline an employee for whatever reason

22  if it escalates to them.

23  Q.   They would have the authority to issue the

24  discipline?

25  A.   Yes.

**David Ferraro - Direct**

1   Q.   Okay.   Just for purposes of the record, the

2   director of nursing supervises more than two people,

3   right?

4   A.   Yes.

5   Q.   And the assistant director of nursing supervises

6   more than two people?

7   A.   Yes.

8   Q.   Is there a maintenance director at Brighton?

9   A.   Yes.

10  Q.   Do you know how many employees the maintenance

11  director at Brighton supervises?

12  A.   Six, I believe.

13  Q.   Does the maintenance director at Brighton play a

14  role in hiring employees?

15  A.   He hires his staff.

16  Q.   Does the maintenance director at Brighton have the

17  authority to discipline his staff?

18  A.   Yes.

19  Q.   Is there a dietary director at Brighton?

20  A.   Yes.

21  Q.   How many employees does the dietary director

22  supervise?

23  A.   There's probably 40 people who work in dietary.

24  Q.   Dietary just so we're all clear is exactly what?

25  A.   They feed everybody in the facility, they put

1   out -- they make breakfast, lunch, and dinner and snacks

2   for all the residents.

3   Q.   They cook the food, deliver the flood, clean up the

4   food?

5   A.   (Witness indicates.)

6   Q.   Is that a yes?

7   A.   Yes.

8   Q.   When you nod your head, it doesn't get reported.

9        Does the dietary director play a role in the

10  hiring process of the people underneath the dietary

11  director?

12  A.   Yes.

13  Q.   What role do they play?

14  A.   They are the final say-so on whether somebody gets

15  hired in dietary or not.

16  Q.   Does the dietary director at Brighton have the

17  authority to discipline employees?

18  A.   Yes.  There's a little nuance, too, particularly in

19  a union facility because if somebody wants to transfer

20  in there, the director doesn't have a lot of say-so

21  whether or not if somebody has the seniority to bid for

22  a position, so unless there is some really extenuating

23  circumstances, the new hires, absolutely.

24        If it's a transfer via the union, then they

25  have a little bit less authority and less ability to not

David Ferraro - Direct

 1  hire anybody.

 2  Q.    Because the collective bargaining agreement is

 3  going to detail who has preference on that seniority?

 4  A.    Yes.

 5  Q.    Does the dietary directory have authority to issue

 6  discipline to the employees that he or she supervises?

 7  A.    Yes.

 8  Q.    Is there a rehab director at Brighton?

 9  A.    Yes.

10  Q.    And how many employees does the rehab director

11  supervise?

12  A.    19, I think.

13  Q.    Does the rehab director play a role in hiring

14  employees in that department?

15  A.    Yes.

16  Q.    What role do they play?

17  A.    They have complete autonomy to hire the therapist

18  they want to hire.  They are not union so they can make

19  whatever decisions they want.

20  Q.    When you say they are not union, so the union

21  contract with Brighton has what's called a bargaining

22  unit?

23  A.    Yes.

24  Q.    Some of the employees at Brighton are in the

25  bargaining unit and others are not?

**David Ferraro - Direct**

1   A.   Correct.

2   Q.   Does the rehab director have authority to

3   discipline the employees they supervise?

4   A.   Yes.

5   Q.   Is there an environment and housekeeping director

6   at Brighton?

7   A.   That is outsourced at Brighton.

8   Q.   So there isn't one in that position?

9   A.   Well, there is somebody in it but they are not a

10  Brighton employee.

11  Q.   Has it always been that way?

12  A.   For as long as I have been there.  The housekeeping

13  services group manages the laundry and housekeeping.  I

14  don't know how long.  They were there the entire time.

15  Q.   Just so we are clear, that department is contracted

16  out?

17  A.   Yes.  The management is, the employees are not.

18  Q.   Is there an activity director at Brighton?

19  A.   Yes.

20  Q.   How many employees does that person supervise?

21  A.   Around ten, I believe.

22  Q.   More than two?

23  A.   Yes.

24  Q.   Does the activities director have authority to hire

25  employees into that department?

1   A.   Yes, same boat.  If there is somebody from the

2   bargaining agreement is transferring in, a little bit

3   less say-so.  If nobody wants that position, she is

4   hiring outside, she has complete autonomy.

5   Q.   Does the activities director have the authority to

6   discipline employees?

7   A.   Yes.

8   Q.   Is there a position at Brighton called nursing

9   supervisor?

10  A.   Yes.

11  Q.   The nursing supervisor under the chain of command

12  would fall under the ADON, right?

13  A.   Yes.

14  Q.   What does the nursing supervisor do?

15  A.   So, I just want to make sure that I'm answering the

16  question.  So at Brighton, there are unit directors that

17  would be in most other facilities called nursing

18  supervisors on the unit.

19       So at Brighton they are called unit directors.

20  Then the nursing supervisor would also work on -- like

21  they're in charge of the building whenever, on three to

22  eleven, eleven to seven.  At Brighton I think they are

23  called ADNs.

24       That's just one thing about the industry.

25  People call people with the same responsibility

**David Ferraro - Direct**

1  different names.  I don't know why they are called

2  different things.  So whenever you say "nursing

3  supervisor," there's a couple different roles that could

4  fall underneath that nuance of that name.

5  Q.   What does "ADN" stand for?

6  A.   That is from what I understand an old term they use

7  in the county, assistant director of nursing because

8  they were in charge of the facility at three to eleven

9  and eleven to seven.

10  Q.   When you say three to eleven, eleven to seven, you

11  are referring to shifts?

12  A.   Yes, three to eleven, eleven to seven shifts.

13  Q.   So there is a position at Brighton called unit

14  director?

15  A.   Yes.

16  Q.   Who does the unit director report to?

17  A.   The assistant director of nursing and the director

18  of nursing.

19  Q.   How many unit directors roughly, I know it probably

20  changes maybe from some time to another time, are there

21  at Brighton?

22  A.   Nine to 12.

23  Q.   What are their duties and responsibilities?

24  A.   They're responsible for their individual units, the

25  operations of their individual units.

**David Ferraro - Direct**

1  Q.   Do they also provide actual nursing care or are

2  they a supervisor or a combination of both?

3  A.   They do both.

4  Q.   What do they do more of?

5  A.   They do more management than they do hands-on care

6  by far.

7  Q.   When you say they do management and I'm talking

8  about the unit directors, what does that mean?

9  A.   They manage the staff that is on their unit for the

10  day.  They make sure that the nurses are passing the

11  meds, that the nursing assistants are doing whatever

12  they need to do, their units are clean, that they have

13  their linen, they have their supplies that they need to

14  run the unit for the day.

15  Q.   So I want to kind of peal a little bit more of that

16  onion.  When you use the term "manage," what exactly

17  does that mean?  What is the unit director doing that

18  carries with it management responsibility for the

19  individuals underneath them in the chain of command?

20  A.   How I explain that role and how we wanted it done

21  was they are the unit director for that unit.

22          So, Melissa, they are the director of nursing

23  for that unit.  It's their unit to manage the way they

24  best see fit.  The expectations are set and the

25  standards are set and then we have our processes in

1  place.  It's their job to use those processes and manage

2  that unit so that way we provide good care and we run a

3  successful business.

4  Q.   I think it might be helpful, David, for us if you

5  can describe what a unit is at Brighton.

6  A.   Just like you would see in any healthcare facility,

7  a hospital where you go to a floor and it's a section of

8  the building that is designated as a unit.

9          At Brighton there's units that are 56 beds and

10  there are some that are 40 and the unit director sits

11  atop of that unit and has responsibility for that group

12  of patients.

13  Q.   So in lay terms, a unit is just kind of a segment

14  of the facility?

15  A.   Yes, usually a floor.

16  Q.   The typical way of Brighton it's a full floor?

17  A.   Yes.

18  Q.   So the unit director would have responsibility for

19  the nurses and CNAs on that floor?

20  A.   Yes.

21  Q.   Are there nursing supervisors at Brighton besides

22  unit directors?

23  A.   Those would be -- again, when you say "nursing

24  supervisor," what would be considered in another

25  facility a nursing supervisor would be considered a unit

1    director at Brighton.

2              So I don't know if there is anybody exactly

3    with that title is except for when they are three to

4    eleven, eleven to seven, they are called nursing

5    supervisors or ADNs.

6    Q.   So the ADN would be in charge of the unit if the

7    unit director is not there?

8    A.   The ADN is in charge of the building during the off

9    shits like a house manager and they are always an RN.

10   Q.   Let's go back to the unit director position for a

11   second.  Does the unit director have the authority to

12   discipline?

13   A.   Yes.

14   Q.   How many employees does a unit director typically

15   supervise at Brighton?

16   A.   So a 50-bed unit would have at least two LPNs and

17   six nursing assistants and then a couple housekeepers

18   are on their unit.

19              I think 30 maybe during the course of 24-hour

20   period.  Maybe a little bit less than that.  We don't

21   staff the same, 25 I would think.

22   Q.   Okay.  Great.  Thank you.

23              Let's move to Cheswick now.  We're going to go

24   through the same exercise.

25   A.   Okay.

**David Ferraro - Direct**

1  Q.   Before I do that, let's just talk with each

2  facility and we don't need a precise number, but just

3  for the judge's benefit, how many beds are at Brighton?

4  A.   596, I believe.

5  Q.   Okay.  How many beds are at Cheswick?

6  A.   120.

7  Q.   Is there a DON at Cheswick?

8  A.   Yes.

9  Q.   Does the DON at Cheswick play a role in the hiring

10 process?

11 A.   Yes.

12 Q.   Actually before I ask that, does the DON supervise

13 more than two people?

14 A.   Yes.

15 Q.   What role does the DON at Cheswick play in the

16 hiring process?

17 A.   They would hire the nursing staff.

18 Q.   Does the DON at Cheswick have authority to

19 discipline employees?

20 A.   Yes.

21 Q.   Is there an ADON at Cheswick?

22 A.   Yes.

23 Q.   Just one?

24 A.   I think there is just one there.

25 Q.   You said there were two at Brighton, that's why I

1  want to make sure that we're consistent.

2  A.   Yes.  Again, that varies on the size.  The amount

3  of staff you need obviously for the size of the facility

4  differs.

5  Q.   Does the ADON play a role -- actually how many

6  employees does the ADON supervise?

7  A.   All of the ones that are underneath the director of

8  nursing also.  Again, so I'm sorry.  Am I allowed to

9  explain more?

10  Q.   Well, I can ask you.  Do you want to offer more of

11  an explanation?

12  A.   Yes.  Just I have to answer these questions in kind

13  of like in broad terms simply because you might get

14  somebody up here that says Cheswick has two ADONs and

15  they might consider their infection control specialist

16  an ADON, right.  So different people call different

17  roles in the facility different things.

18         So it's just -- again, it's just the way that

19  easily the administrator or director of nursing will say

20  we are going to call this person an ADON but they cover

21  wounds, they cover infection control, whereas somebody

22  else might just say that's our infection control person

23  and they are not an ADON.

24  Q.   For purposes of my questions, David, let's just

25  focus on whether a person holds an actual title.

1  A.    Okay.

2  Q.    So there is an ADON at Cheswick?

3  A.    Yes.

4  Q.    Does that person play a role in the hiring process

5  at Cheswick?

6  A.    I would expect that.

7  Q.    You are not certain?

8  A.    I don't know for sure what their exact role is but

9  my expectation in the consulting -- what I would consult

10  and I would expect from the facility is that they do

11  have that role.

12  Q.    Do you know whether the ADON at Cheswick has the

13  authority to discipline employees?

14  A.    Yes.

15  Q.    Is there a maintenance director at Cheswick?

16  A.    Yes.

17  Q.    How many employees does that person supervise?

18  A.    I don't know if he got one or two.

19  Q.    Do you know whether it's two?

20  A.    I don't know.

21  Q.    Okay.  Is there a dietary director at Cheswick?

22  A.    Yes.

23  Q.    Do you know how many employees that person

24  supervises?

25  A.    I would think 15 or 20.

**David Ferraro - Direct**

1   Q.   More than two?

2   A.   Yes.

3   Q.   Do you know whether the dietary director at

4   Cheswick plays a role in hiring people in his or her

5   department?

6   A.   Yes.

7   Q.   Do you know whether the dietary director at

8   Cheswick has the authority to discipline employees?

9   A.   Yes.

10  Q.   Is there a rehab director at Cheswick?

11  A.   Yes.

12  Q.   Do you know how many employees that person

13  supervises?

14  A.   I would think 8 to 10 of that size of building.

15  Q.   Do you know whether the rehab director plays a role

16  in the hiring process?

17  A.   Yes.

18  Q.   Do you know whether the rehab director has the

19  authority to discipline employees in his or her

20  department?

21  A.   Yes.

22  Q.   Is there a housekeeping director at Cheswick?

23  A.   Yes.

24  Q.   So as contrasted with Brighton, there is actually a

25  person in that role?

1    A.    Yes.

2    Q.    Is it called housekeeping or environmental

3    housekeeping?

4    A.    I don't know exactly what they call it at Cheswick.

5    Q.    That's an example of different things at different

6    facilities?

7    A.    Exactly.

8    Q.    How many employees does the housekeeping director

9    at Cheswick supervise?

10    A.    Eight to ten.

11    Q.    Does the housekeeping director at Cheswick have the

12    authority -- play a role in the hiring process?

13    A.    Yes.

14    Q.    Does the housekeeping director at Cheswick have the

15    authority to discipline employees?

16    A.    Yes.

17    Q.    Let me ask you.  The role they play in

18    housekeeping, do you know what that role is in hiring?

19    A.    I would -- I guess "assume" is the wrong word.  The

20    HR director at Cheswick would review whatever applicants

21    come in, would set up the interviews and then the

22    housekeeping director, all the directors would take it

23    from there, interview them and the HR director would

24    help them get through the hiring process.

25    Q.    So the housekeeping director would be involved in

1  interviewing the employees?

2  A.   Yes.

3  Q.   At least playing some part of making decisions as

4  to whether a person is going to be hired or not?

5  A.   Yes.

6  Q.   Is there an activities director at Cheswick?

7  A.   Yes.

8  Q.   How many employees does that person supervise?

9  A.   I would think five or six.

10 Q.   Does the activity director at Cheswick play a role

11 in the hiring process?

12 A.   They are also in a bargaining unit so it would be

13 the same role as Brighton.  If it was outside, we had

14 posted it and nobody wanted it, we would hire somebody

15 from outside.  They would make that decision.

16 Q.   Does the activities director have the authority to

17 discipline employees in their department?

18 A.   Yes.

19 Q.   I forget if I asked that question in housekeeping.

20 Just so I cover my bases, does the housekeeping director

21 have authority to discipline employees in their

22 department?

23 A.   Yes.

24 Q.   Is there a title at Cheswick called nursing

25 supervisor?

David Ferraro - Direct

1    A.    I think they're called -- they might be called unit

2    director.  Somebody in that supervisor role.

3    Q.    Would the person in that position be it a nursing

4    supervisor or unit director, would your description of

5    that person's responsibilities at Brighton be similar to

6    what it is at Cheswick?

7    A.    Yes.

8    Q.    So there would be more than one unit at Cheswick?

9    A.    Yes.

10   Q.    And are there unit supervisors or nursing

11   supervisors that cover the different units?

12   A.    Yes.  I don't know exactly how it's split up.  If a

13   unit is smaller, maybe one covers two different units.

14   Some buildings have like eight-bed units because

15   somebody put a transient care unit in a facility years

16   ago.  So that's by itself, so a unit supervisor may have

17   two different units.  Unlike at Brighton, they just have

18   a floor.

19   Q.    I asked you a question, David, with regard to that

20   position at Brighton as to whether they also perform

21   actual nursing duties.  Do you know whether the unit

22   director or nursing supervisor at Cheswick performs

23   actual nursing duties and responsibilities?

24   A.    Yes.

25   Q.    Do you know whether the majority of their time is

1    spent in supervisor or management responsibilities?

2    A.    Supervisor management responsibilities.

3    Q.    Okay.  Does the nursing supervisor or unit

4    director, whatever the position is at Cheswick, have the

5    authority to discipline employees?

6    A.    Yes.

7    Q.    Let's move to North Strabane.  There are two North

8    Strabane defendants in this case.  North Strabane

9    Rehabilitation and North Strabane Retirement.  Are both

10   of those facilities operating as we sit here today?

11   A.    No.  North Strabane Retirement Center and Assisted

12   Living has closed.

13   Q.    When was that?

14   A.    I believe last year around this time.

15   Q.    So your regional consultant role at North Strabane

16   is for North Strabane Rehab?

17   A.    Right.  I had the Retirement Village my first time

18   around but when I was at Brighton, it closed.

19   Q.    Okay.  We're going to need to cover both even

20   though it's closed because this lawsuit covers a long

21   period of time.

22            How many beds are at North Strabane Rehab?

23   A.    63, I think.

24   Q.    How many were there at North Strabane Retirement?

25   A.    I don't know the exact number at Retirement.  It

 1  could vary because it's assisted living and a husband

 2  and wife could move into one room or somebody could have

 3  a private room.  So the total occupancy varies a little

 4  bit in assisted living.  It's not quitely defined as the

 5  skilled side.

 6  Q.   Give us a range.

 7  A.   I think 60.

 8  Q.   60 on the low or just average?

 9  A.   My best guess is 60.  We weren't able to admit the

10  times we were there so the census was only in its 20s.

11  I don't know what the max capacity was.

12  Q.   Let's take North Strabane Retirement first.  What

13  management positions exist there?

14  A.   There was the administrator and then the clinical

15  lead.

16  Q.   That's it?

17  A.   Yes.

18  Q.   What does the clinical lead do?

19  A.   You would liken it to a director of nursing in a

20  skilled facility.

21  Q.   Does the clinical lead play a role in hiring

22  employees?

23  A.   I would think they would hire the clinical staff.

24  Q.   How many employees would the clinical lead at North

25  Strabane Retirement supervise, roughly?

**David Ferraro - Direct**

1  A.   Like per day or all together?

2  Q.   Per day.

3  A.   Eight to ten, maybe a little bit less than that.

4  Six to eight I think.

5  Q.   Based on your experience as a regional consultant

6  for North Strabane Retirement, did the clinical lead

7  have authority to discipline employees?

8  A.   Yes.

9  Q.   All right.  Let's talk about North Strabane Rehab

10  and we're going to do the same exercise we did for

11  Brighton.

12       Does the North Strabane Rehab have a director

13  of nursing?

14  A.   Yes.  Just so you know, you have to have a director

15  of nursing.  It's a requirement to run a skilled

16  facility.  So every building has a director of nursing.

17  Q.   I understand.  It's just going through, we kind of

18  have to go through the pattern.

19  A.   Okay.

20  Q.   Would the director of nursing at North Strabane

21  Rehab supervise two or more people?

22  A.   Yes.

23  Q.   About how many?

24  A.   30.

25  Q.   Does the director of nursing at North Strabane

David Ferraro - Direct

1  Rehab play a role in the hiring process?

2  A.   Yes.

3  Q.   What is the role?

4  A.   They would hire the clinical staff.

5  Q.   Does the director of nursing at North Strabane

6  Rehab have the authority to discipline employees?

7  A.   Yes.

8  Q.   Is there an ADON at North Strabane Rehab?

9  A.   There is currently not.  So North Strabane because

10 it's only 62 beds has one of those roles that they were

11 never called ADONs, they were called nursing supervisors

12 and they did infection control responsibilities and the

13 wound care, like those nuances of management facilities.

14 They had those programs.

15 Q.   So there is somebody sitting in the chair of what

16 would be an ADON, perhaps another facility but didn't

17 carry that title?

18 A.   Correct.

19 Q.   Do you know what that title was or you are not

20 certain?

21 A.   They didn't have a title called assistant director

22 of nursing at North Strabane.  I think what they called

23 that was infection control specialist and wound care

24 nurse.

25 Q.   Is it your testimony that position is currently

1  vacant?

2  A.    Yes.  We're looking for one right now.

3  Q.    When somebody sits in that chair at North Strabane

4  Rehab, do they play a role in the hiring process?

5  A.    Usually not.

6  Q.    Do they have authority to discipline?

7  A.    Yes.

8  Q.    Do they supervise employees?

9  A.    Yes, they will oversee the aspects.  The infection

10  control nurse -- again, each building is a little bit

11  different -- at North Strabane, they would go out and do

12  audits on hand washing and so forth like that.  If

13  somebody is not following an infection control procedure

14  or somebody is not doing wound dressings correctly or

15  not doing them on time, they will follow up with

16  discipline.

17  Q.    Is there a maintenance director at North Strabane?

18  A.    Yes.

19  Q.    How many employees does that individual supervise?

20  A.    That's varied since I have been there, it's been

21  once or two.

22  Q.    It has been as many as two?

23  A.    Yes.  He also has responsibility over the

24  Retirement Village.

25  Q.    When it was there?

1  A.    Yes.

2  Q.    Were there employees working in the maintenance

3  department at the Retirement Village that the

4  maintenance supervisor supervised?

5  A.    Yes, they worked all over.  They worked in the

6  campus.

7  Q.    So there was one or two at all times that would

8  cover both facilities?

9  A.    Yes.

10 Q.    So there was never a maintenance director at North

11 Strabane Retirement that was a stand-alone position.  It

12 was the North Strabane Rehab maintenance director that

13 had responsibility for the other facility?

14 A.    Yes.

15 Q.    Does the maintenance director at North Strabane

16 play a role in the hiring process?

17 A.    Yes.

18 Q.    What is their role?

19 A.    He would hire the maintenance assistant.

20 Q.    Does the maintenance director at North Strabane

21 have authority to discipline employees?

22 A.    Yes.

23 Q.    Is there a dietary director at North Strabane?

24 A.    Yes.

25 Q.    How many employees does that person supervise?

 1  A.   I would think six to eight.

 2  Q.   Does the dietary director play a role in the hiring

 3  process?

 4  A.   Yes.

 5  Q.   What is their role?

 6  A.   He would hire staff or she.

 7  Q.   Does the dietary director at North Strabane have

 8  authority to issue discipline?

 9  A.   Yes.

10  Q.   Is there a rehab director at North Strabane?

11  A.   Yes.

12  Q.   One would expect at North Strabane Rehab to have a

13  rehab director?

14  A.   Yes.

15  Q.   How many employees does that person supervise?

16  A.   Five or six.

17  Q.   Does the rehab director at North Strabane play a

18  role in the hiring process?

19  A.   Yes.

20  Q.   What is their role in the hiring process?

21  A.   They would hire the therapists and therapy aides

22  that work in the therapy department.

23  Q.   Just for purposes of efficiency, when I ask if they

24  play a role, if you can say what that role is that would

25  be helpful in terms of what role they play in the hiring

David Ferraro - Direct

1   process.

2   A.   Oh, okay.  Sure.

3   Q.   Does the rehab director at North Strabane have

4   authority to discipline employees that they supervise?

5   A.   Yes.

6   Q.   Is there a housekeeping director at North Strabane

7   Rehab?

8   A.   Yes.

9   Q.   How many employees does that person supervise?

10  A.   Six.

11  Q.   Does the housekeeping director play a role in the

12  hiring process?

13  A.   Yes.

14  Q.   What is that role?

15  A.   They would hire their staff.

16  Q.   Does the housekeeping director at North Strabane

17  have the authority to discipline employees?

18  A.   Yes.

19  Q.   Is there an activities director at North Strabane?

20  A.   Yes.

21  Q.   How many employees does that person supervise?

22  A.   Three or four.

23  Q.   Does the activities director play a role in the

24  hiring process?

25  A.   Yes.  They're also in a Collective Bargaining

1    Agreement.

2    Q.    Does the activities director have the authority to

3    discipline employees?

4    A.    Yes.

5    Q.    Is there a position that we've called either unit

6    director or nursing supervisor at North Strabane Rehab?

7    A.    Yes.

8    Q.    How many folks are in that particular role?

9    A.    One.

10   Q.    How many employees does that person supervise?

11   A.    She oversees the daily staff on the unit.

12   Q.    How many would that be?

13   A.    At North Strabane, seven.

14   Q.    Does the nursing supervisor --

15   A.    That number would vary obviously on how much census

16   there is, how many people are in the building.

17   Q.    What is that title called at North Strabane Rehab?

18   A.    That is called the nursing supervisor.

19   Q.    Do they have authority to discipline employees?

20   A.    Yes.

21   Q.    So we have now covered the facilities that you have

22   current responsibility for as a consultant with Western

23   PA Consultants, and we covered the one facility where

24   you were an administrator.

25          I'm going to go through the other facilities

1  you identified where you had responsibility for your

2  first stint as a consultant at Western PA Consultants.

3  I'm going to go through the same series of questions.

4  The first one is Grove at Washington.  How many beds are

5  there?

6  A.   63.

7  Q.   Is there a director of nursing at The Grove at

8  Washington?

9  A.   Yes.

10  Q.   How many employees does the director of nursing

11  supervise?

12  A.   40, 35 to 40.  That number varies on how many

13  part-time employees, there are PRN people.

14  Q.   It can change every day?

15  A.   Yes.  Roughly three-quarters of the bed size,

16  roughly three quarters of -- if you take the beds, if

17  you have 100 beds, take three-quarters of that, that's

18  roughly how many nursing staff in a 100-bed facility, 75

19  full time, part time, PRN, industry staff average.

20  Q.   Just to limit the number of words I use for The

21  Grove facilities, I'm going to refer to it as

22  Washington?

23  A.   Okay.

24  Q.   Or Latrobe or whatever one it is rather than just

25  repeating at The Grove at so and so.  The DON at

1    Washington, do they play a role in the hiring process?

2    A.    Yes.  They hire their staff.

3    Q.    Is there an ADON at Washington?

4    A.    At Washington -- it's called nursing supervisor and

5    ADON when I was there.  I don't know why.

6    Q.    So it's the same job?

7    A.    Yes.

8    Q.    But it carries with it different titles?

9    A.    Yes.

10   Q.    Does the ADON or nursing supervisor at Washington

11   play a role in the hiring process?

12   A.    Yes.

13   Q.    What is their role?

14   A.    They would be involved in hiring the staff,

15   interviewing them and deciding whether or not they want

16   to bring them on or not.

17   Q.    Does the ADON at Washington have the authority to

18   discipline employees?

19   A.    Yes.

20   Q.    Is there a maintenance director at Washington?

21   A.    Yes.

22   Q.    How many employees does that person supervise?

23   A.    I think one.

24   Q.    Has it ever been more than one?

25   A.    I can't remember.  I don't think so.

**David Ferraro - Direct**

1  Q.   Going back to the ADON just so I make sure I cover

2  my tracks.  How many employees does the ADON supervise?

3  A.   Everybody in nursing other than the director of

4  nursing.

5  Q.   Is there a dietary director at Washington?

6  A.   Yes.

7  Q.   How many employees does that person supervise?

8  A.   Six to eight.

9  Q.   Does the dietary director play a role in the hiring

10  process?

11  A.   Yes.

12  Q.   What is the dietary's director role?

13  A.   They would hire their staff.

14  Q.   Does the dietary director have the authority to

15  issue discipline?

16  A.   Yes.

17  Q.   Is there a rehab director at Washington?

18  A.   Yes.

19  Q.   How many employees does that person supervise?

20  A.   Four or five.

21  Q.   Does the rehab director play a role in the hiring

22  process?

23  A.   Yes, they would hire their staff.

24  Q.   Do they have authority to discipline?

25  A.   Yes.

**David Ferraro - Direct**

1    Q.    Is there a housekeeping director at Washington?

2    A.    Yes.

3    Q.    How many employees does that person supervise?

4    A.    Probably four or five.

5    Q.    Does the housing director play a role in the hiring

6    process?

7    A.    Yes.

8    Q.    What is their role?

9    A.    They hire staff.

10   Q.    Does the housekeeping director have authority to

11   issue discipline?

12   A.    Yes.

13   Q.    Is there an activities director at Washington?

14   A.    Yes.

15   Q.    How many employees does that person supervise?

16   A.    Two or three.

17   Q.    Does the activities director play a role in the

18   hiring process?

19   A.    Yes.

20   Q.    What is their role?

21   A.    They are also in the bargaining agreement.  So

22   depending on the bargaining agreement, if somebody is

23   going to transfer in or if they hire outside, it would

24   be their decision to bring that person in or not.

25   Q.    Does the activities director at Washington have the

1  authority to discipline?

2  A.   Yes.

3  Q.   Now, you indicated that the ADON at Washington is

4  also sometimes referred to as the nursing supervisor.

5        With that being said, is there another person

6  that plays the role of nursing supervisor or unit

7  director that we discussed in other facilities?

8  A.   No.

9  Q.   Let's talk about Mt. Lebanon.  How many beds are

10  there?

11  A.   121.

12  Q.   So similar in size to Cheswick?

13  A.   Yes.

14  Q.   Is there a director of nursing at Mt. Lebanon?

15  A.   Yes.

16  Q.   How many employees does the director of nursing

17  supervise?

18  A.   110.

19  Q.   Does the director of nursing at Mt. Lebanon play a

20  role in the hiring process?

21  A.   Yes.  They would hire their staff.

22  Q.   Does the director of nursing at Mt. Lebanon have

23  the authority to issue discipline?

24  A.   Yes.

25  Q.   Is there an ADON at Mt. Lebanon?

**David Ferraro - Direct**

1   A.   Yes.

2   Q.   How many employees does the ADON supervise?

3   A.   Everybody but the director of nursing.

4   Q.   And the administrator?

5   A.   And the administrator.

6   Q.   Does the ADON at Mt. Lebanon play a role in the

7   hiring process?

8   A.   Yes.

9   Q.   What is their role?

10  A.   They would interview staff, either hire them or say

11  to the director of nursing we should hire this person or

12  shouldn't hire this person.

13  Q.   Does the ADON has the authority to issue

14  discipline?

15  A.   Yes.

16  Q.   At Mt. Lebanon?

17  A.   Yes.

18  Q.   Is there a maintenance director at Mt. Lebanon?

19  A.   Yes.

20  Q.   How many employees does that person supervise?

21  A.   There was only one.

22  Q.   At all times?

23  A.   No.  Sometimes there was just him.

24  Q.   Is there a dietary director at Mt. Lebanon?

25  A.   Yes.

David Ferraro - Direct

1   Q.   How many employees does that person supervise?

2   A.   Six to ten.

3   Q.   Does the dietary director at Mt. Lebanon play a

4   role in the hiring process?

5   A.   Yes.

6   Q.   What is their role?

7   A.   They would hire their staff.

8   Q.   Does the dietary director at Mt. Lebanon have the

9   authority to issue discipline?

10  A.   Yes.

11  Q.   Is there a rehab director at Mt. Lebanon?

12  A.   Yes.

13  Q.   How many employees does that person supervise?

14  A.   Four to six.

15  Q.   Does the rehab director at Mt. Lebanon play a role

16  in the hiring process?

17  A.   Yes, they would hire their staff.

18  Q.   Okay.  Does the rehab director at Mt. Lebanon have

19  the authority to issue discipline?

20  A.   Yes.

21  Q.   Is there a housekeeping director at Mt. Lebanon?

22  A.   Yes.

23  Q.   How many employees does that person supervise?

24  A.   Five to six.

25  Q.   Does the housekeeping director at Mt. Lebanon play

1  a role in the hiring process?

2  A.   Yes.

3  Q.   What is their role?

4  A.   They would hire their staff.

5  Q.   Do they have authority to discipline?

6  A.   Yes.

7  Q.   Is there an activities director at Mt. Lebanon?

8  A.   Yes.

9  Q.   How many employees does that person supervise?

10  A.   Three.

11  Q.   Does the activities director play a role in the

12  hiring process?

13  A.   Yes.

14  Q.   What role would they play?

15  A.   They hire their staff.

16  Q.   Does the activity director at Mt. Lebanon have

17  authority to discipline employees?

18  A.   Yes.

19  Q.   Is there a position at Mt. Lebanon that we have

20  referred to either as unit director or nursing

21  supervisor?

22  A.   Yes.

23  Q.   What is it called there?

24  A.   They call them supervisors.

25  Q.   Just supervisors?

David Ferraro - Direct

1   A.    Just supervisors.

2   Q.    Going back to a question I asked about other

3   facilities, do they also perform nursing duties separate

4   from their role as a manager?

5   A.    Yes, very limited.

6   Q.    So most of their time is spent managing?

7   A.    Yes.

8   Q.    Do they play a role in -- do they have the

9   authority to discipline employees?

10  A.    Yes.

11  Q.    How many employees would the nursing supervisor

12  supervise?

13  A.    Mt. Lebanon is a little bit different.  Their units

14  are two floors.  So eight to ten a day each of them.

15  Q.    Okay.  All right.  Let's move to South Hills.

16  South Hills is actually not in South Hills, right?

17  A.    It's in Cannonsburg.

18  Q.    How many beds does South Hills have?

19  A.    104.

20  Q.    Is there a DON at South Hills?

21  A.    Yes.

22  Q.    How many employees does the DON supervise?

23  A.    All the nursing staff.

24  Q.    More than two?

25  A.    Yes.

**David Ferraro - Direct**

1  Q.  Does the DON play a role in the hiring process?

2  A.  Yes.

3  Q.  What role do they play?

4  A.  Hire staff.

5  Q.  Does the DON have authority to discipline

6  employees?

7  A.  Yes.

8  Q.  Is there an ADON at South Hills?

9  A.  Yes.

10  Q.  One or more than one?

11  A.  One.

12  Q.  Does the ADON play a role in the hiring process?

13  A.  Yes.

14  Q.  What role do they play?

15  A.  They would help the director of nursing hire the

16  staff.

17  Q.  Would they sit in interviews?

18  A.  Yes.

19  Q.  Does the ADON have authority to discipline

20  employees?

21  A.  Yes.

22  Q.  And the ADON presumably supervises the same number

23  of employees that the DON does?

24  A.  Yes.

25  Q.  Is there a maintenance director at South Hills?

**David Ferraro - Direct**

 1  A.   Yes.

 2  Q.   How many employees does that person supervise?

 3  A.   I don't believe he has any, just him.

 4  Q.   Is there a dietary director at South Hills?

 5  A.   Yes.

 6  Q.   How many employees does that person supervise?

 7  A.   Six to ten.

 8  Q.   Does the dietary director at South Hills play a

 9  role in the hiring process?

10  A.   Yes.  They hire their staff.

11  Q.   Do they have the authority to discipline?

12  A.   Yes.

13  Q.   Is there a rehab director at South Hills?

14  A.   Yes.

15  Q.   Does the rehab director -- actually, how many

16  employees does the rehab director supervise?

17  A.   At South Hills, four to six.

18  Q.   Does the rehab director play a role in the hiring

19  process?

20  A.   They hire their staff.

21  Q.   Does the rehab director have authority to

22  discipline employees?

23  A.   Yes.

24  Q.   Is there a housekeeping director at South Hills?

25  A.   Yes.

1  Q.   How many employees does that person supervise?

2  A.   Four or five.  They oversee housekeeping and

3  laundry.  I think they are called housekeeping

4  supervisor but they do laundry, also.

5  Q.   So environmental and housekeeping?

6  A.   I don't know exactly what the title is but they

7  oversee both.

8  Q.   How many employees did you say they supervise?

9  A.   Four or five.

10  Q.   Does the housekeeping director play a role in the

11  hiring process?

12  A.   They would hire their staff, yes.

13  Q.   Do they have authority to discipline?

14  A.   Yes.

15  Q.   Is there an activities director at South Hills?

16  A.   Yes.

17  Q.   How many employees does that person supervise?

18  A.   I'm unsure.

19  Q.   Would you say it's at least two?

20  A.   It's one or two.  I don't know.

21  Q.   Does the activity director have authority to

22  discipline employees?

23  A.   Yes.

24  Q.   Does the activity director play a role in the

25  hiring process?

**David Ferraro - Direct**

1    A.    Yes.

2    Q.    What role do they play?

3    A.    They would hire staff.

4    Q.    Is there a position at South Hills that we referred

5    to either as unit director or nursing supervisor?

6    A.    Their ADON does most of that stuff.  There is an

7    ADON, nursing supervisor, unit director.

8    Q.    I'm going to now walk through the facilities where

9    you testified you have not had formal responsibility but

10   that you have been to as a stand-in for the regional

11   consultant who would have had normal responsibilities?

12   A.    Okay.

13   Q.    So with regard to this series of facilities and we

14   are talking about Irwin, Latrobe, New Castle,

15   Monroeville, and Murrysville.  Based upon your time at

16   each of these facilities, do you feel that you are able

17   to answer the same questions I've asked for the

18   facilities that you had responsibility for?

19   A.    I feel comfortable answering those type of

20   questions for any facility in the country whether I have

21   been in it or not.  It's just the way they run.

22           I have consulted for a lot of companies and

23   the idea is that person is responsible for their

24   department.  So they have the autonomy and that's what I

25   tell people and that's what I suggest and that's what I

David Ferraro - Direct

1    consult people on how to run their facilities.

2         A dietary manager hire their staff because

3    they are responsible for them.  That's the best practice

4    and that's the way it's done in every facility that I

5    ever consulted with or worked with.

6         Again, tiny nuances where the administrator

7    says I want the final say-so, so they get the final

8    checkmark but I feel comfortable answering that question

9    about a facility I have never walked in and I would

10   answer it the same way.

11        The expectation is the department head is

12   responsible for their unit, they are responsible to hire

13   their employees and they are responsible to discipline

14   them.

15        I don't know if that helps.  I can't

16   answer -- again, like I said, one judge is going to give

17   staff autonomy versus someone else.  Same way in this

18   room the people treat their staff, everybody is a little

19   bit different.  As an industry standard, that's what

20   happens.

21   Q.   That's fair.  So given that clarification, David,

22   the testimony you have given thus far at the facilities

23   that you have responsibility for or the one that you

24   actually were administrator at, was your testimony with

25   regard to the role that these various managers play

1  based on personal knowledge?

2  A.   Yes.

3  Q.   Okay.  So now as we turn to facilities where you

4  have been to but you don't have formal responsibility, I

5  just want you to answer if you have personal knowledge.

6  A.   Okay.

7  Q.   So at Irwin, do you know whether there's a director

8  of nursing?

9  A.   Yes.

10 Q.   Do you know whether the director of

11 nursing -- actually how many beds are at Irwin?

12 A.   I don't know exactly.  I want to say 119 but I

13 don't know exactly.

14 Q.   Is there a director of nursing at Irwin?

15 A.   Yes.

16 Q.   Do you know how many employees that person

17 supervises?

18 A.   I would guess 65.

19 Q.   Do you know whether the director of nursing at

20 Irwin plays a role in the hiring process?

21 A.   I don't know exactly how -- I don't know how they

22 couldn't but I have never been there when they hired

23 somebody.

24 Q.   That's fair.  I don't want to belabor your

25 testimony with what you know to be the customary and

David Ferraro - Direct

1  routine procedure at a nursing home.  We are just going

2  to focus on actual knowledge here.

3  A.   Okay.

4  Q.   So at Irwin for all the positions we have gone to,

5  do you have actual knowledge of the level of supervisory

6  authority that anybody there has?

7  A.   Well, so Irwin is unique because the administrator

8  there, his name is Cody and he was an administrator in

9  training of mine.  So, Cody reaches out to me and asks

10 me questions all the time.  My advice to Cody is let the

11 director of nursing make that decision.

12          MR. UNGER:  Objection, Your Honor.  It's not

13 responsive to the question.  Move to strike.

14          THE COURT:  Well, it's not responsive to the

15 question.  It's also not your question.  So he answered

16 a different question than was asked.  I will strike it.

17          MR. UNGER:  Thank you, Your Honor.

18 Q.   Let me ask the question again and just answer what

19 I'm asking and then there will be a follow-up if the

20 answer is yes.

21 A.   Okay.

22 Q.   With regard to these various manager positions at

23 Irwin, do you possess actual knowledge of whether they

24 have authority to perform supervisory responsibilities?

25 A.   No.

David Ferraro - Direct

1  Q.   All right.  Let's talk about Latrobe --

2           THE COURT:  Let's take our break now,

3  five-minute break.  We'll reconvene in five to seven

4  minutes.

5           (Whereupon, a break was taken.)

6           THE COURT:  You remain under oath and you may

7  begin.

8  BY MR. SCHWARTZ:

9  Q.   David, let's move to Latrobe, not literally.  How

10  many beds are there in Latrobe?

11  A.   I don't know exactly.

12  Q.   It's a small facility?

13  A.   Yes.

14  Q.   Based upon your experience at visiting Latrobe as a

15  stand-in for another consultant, are you able to answer

16  with personal knowledge regarding the various types of

17  questions I have been asking about other facilities?

18  A.   No.

19  Q.   What about New Castle, do you know how many beds

20  are there?

21  A.   New Castle is a small facility, also.  I don't know

22  the exact number.

23  Q.   Same question.  Based upon your experience visiting

24  New Castle as a stand-in for other consultants, are you

25  able to answer with personal knowledge about differing

1   responsibilities that supervisors have?

2   A.   No.

3   Q.   What about Monroeville?

4   A.   No.

5   Q.   What about Murrysville?

6   A.   No.

7   Q.   Just talk for a couple minutes about Western PA

8   Consultants.  You described the various people that are

9   under its umbrella.  Is it part of CHMS Group?

10  A.   No.  It's its own entity.

11  Q.   Do you know who owns it?

12  A.   I don't know who owns Western PA Consultants.

13  Q.   Do you interface in any way with Sam Halper?

14  A.   He hired me.

15  Q.   But do you interface with him in your current role

16  as a regional consultant?

17  A.   Yes.

18  Q.   Did you interface with him in your role as a

19  regional consultant in your prior stint?

20  A.   Yes.

21  Q.   Based upon your experience as a consultant and as

22  an administrator at Brighton and your testimony today

23  regarding the various roles that different managers and

24  directors had in the hiring process, were they able to

25  make those decisions without having to consult with

1  Mr. Halper?

2  A.   Yes.

3  Q.   Same with discipline, were the various supervisors

4  able to level or exact discipline against employees

5  without having to consult Mr. Halper?

6  A.   Yes.  Sam was never made aware of that.  If we were

7  hiring somebody and they were not part of the bargaining

8  agreement, Sam would set the rate of pay.

9  Q.   And those you don't have personal knowledge of,

10  these other facilities, based upon your experience in

11  the industry, you would expect that it would be

12  consistent with what you described on facilities you do

13  have responsibilities?

14  A.   Yes.

15            MR. UNGER:  Objection.

16            THE COURT:  What is objection?

17            MR. UNGER:  He prefaced the question even if

18  you don't have personal knowledge.

19            MR. SCHWARTZ:  If I may, I think the Court

20  would benefit from the testimony of a person who has

21  been in this industry for 25 plus years.

22            THE COURT:  I don't think I will benefit on

23  what is a question that in my view is an invitation to

24  speculate.  I listened very carefully to HIS experience

25  and testimony based on his firsthand experience on

David Ferraro - Direct

1   facilities, about what he knows and does not know but

2   for a question that specifically says would you

3   expect -- he is not being proffered as an expert in the

4   industry.  He hasn't been qualified as such, not that he

5   is not qualified if you would proffer him as such.  He

6   has not been proffered as such.

7        I'm going to limit his testimony to the

8   testimony limitation under the rules his direct

9   firsthand knowledge, not what his expectation of other

10  facilities he does not have firsthand knowledge of.

11        Sustained.

12        MR. SCHWARTZ:  If I may, Your Honor, might I

13  have him answer the question -- I understand it's been

14  overruled -- but just for record purposes, what his

15  answer would be.

16        THE COURT:  No.  It's fundamental he can

17  testify about what he knows for the finder of fact but

18  what he expects other facilities that he does not have

19  firsthand knowledge about is beyond his ken as a witness

20  as proffered.  So sustained.

21        MR. SCHWARTZ:  I think there is a relevance to

22  industry custom and that is what I was trying to get

23  through them.  If Your Honor is not going to allow that,

24  I understand.

25        THE COURT:  I'm not going to allow it.

```
 1              MR. SCHWARTZ:  Then I tender the witness.

 2              THE COURT:  Okay.  Cross-examination.

 3              MR. UNGER:  Thank you, Your Honor.

 4                      CROSS-EXAMINATION

 5   BY MR. UNGER:

 6   Q.    Good morning, Mr. Ferraro.

 7   A.    Good morning.

 8   Q.    Mr. Ferraro, you said you joined Western PA

 9   Consultants in 2019?

10   A.    I believe November 2019.

11   Q.    You joined Western PA Consultants in November 2019?

12   A.    Yes, I believe so.

13   Q.    So you have no personal knowledge of any pay

14   practices or policies that existed before that time,

15   correct?

16   A.    No, sir.  No.  Correct.  Yes, you're right.

17   Q.    Before coming to testify today, you didn't review

18   any time and pay records at issue in this case, correct?

19   A.    Correct.

20   Q.    I just want to take a moment to talk about how you

21   came to testify today.  Who asked you to come to

22   testify?

23   A.    It was -- when I started here in November, it was

24   December I got asked to come down to be deposed.  I

25   believe Sam said you're going to get deposed by Marla,
```

**David Ferraro - Cross**

1    and there was another attorney.  Mr. Rodriguez, I think.

2    Q.   Are you referring to the depositions that took

3    place in this case?

4    A.   Yes.

5    Q.   I'm talking about your testimony today.  Who asked

6    you to come testify today at trial?

7    A.   Marla reached out to me via email.

8    Q.   When did she do that?

9    A.   She reached out like since '19 on occasion asking

10   questions and so forth, but to be down here today on

11   this day, Jeffrey and Marla reviewed that last week, I

12   think.  I don't know the exact day.

13   Q.   How many times did you meet before testifying

14   today?

15   A.   We had a phone conversation last week.  Well, I met

16   Marla whenever I got deposed.  I'm assuming that's all

17   part of the same case.

18   Q.   I'm just talking about your testimony today.

19   A.   Okay.

20   Q.   How many times did you meet regarding your

21   testimony today?

22   A.   Twice.

23   Q.   For how long did you meet?

24   A.   About an hour on a Zoom call and then yesterday for

25   about ten minutes telling me where it was and where to

**David Ferraro - Cross**

 1  park and stuff.

 2  Q.   And what did you discuss about what your testimony

 3  should be like today?

 4  A.   Just that we were going to go through the

 5  facilities and the different roles I had, my background,

 6  what roles were.  Like what a dietary manager does,

 7  director of nursing, that sort of thing.

 8  Q.   Did you talk to anyone else about your testimony

 9  today?

10  A.   No.

11  Q.   Did you talk to Mr. Halper about your testimony

12  today?

13  A.   No.

14  Q.   Have you talked to Mr. Halper about this case?

15  A.   Just -- not about coming down and testifying, just

16  like whenever we were setting up the depositions and so

17  forth.  I was new to the company and didn't really know

18  what was going on.

19  Q.   Understood.  Let's talk about the deposition

20  testimony you gave.  You said you were hired in November

21  of 2019?

22  A.   Yeah.

23  Q.   Then you were asked to testify as a corporate

24  designee for five facilities, correct?

25  A.   I think it was five.  It was the facilities I was

David Ferraro - Cross

1  overseeing whenever I was hired.

2  Q.   That deposition took place a little less than two

3  months after you were hired, right?

4  A.   Correct.

5  Q.   You had testified before that you worked in a lot

6  of different places, lot of different entities and your

7  experience.  Have you ever been asked to testify as a

8  corporate designee for any of those past businesses

9  before two months of hire?

10  A.   Never.  I was never asked to testify in this manner

11  ever.

12  Q.   You said Mr. Halper hired you, correct?

13  A.   Yes.

14  Q.   When he was hiring you, did he tell you, you would

15  have to testify as a corporate designee in this case?

16  A.   No.

17  Q.   Were you asked to testify as a corporate designee

18  in this case because you didn't have any firsthand

19  knowledge of pay practices that existed before you were

20  hired?

21  A.   Can you ask -- I didn't understand what you meant

22  by that.

23  Q.   Were you asked to testify as a corporate designee

24  because you had no previous firsthand knowledge of what

25  had transpired in any of the facilities you were asked

**David Ferraro - Cross**

1   to testify for?

2   A.   I don't know why I was asked.

3   Q.   You had spent a lot of time preparing for those

4   depositions, correct?

5   A.   I'm sorry?

6   Q.   You had to spend a lot of time preparing for those

7   depositions?

8   A.   No.

9   Q.   During your deposition, you said you spent

10  approximately 10 to 12 hours preparing for those

11  depositions, do you recall that?

12  A.   I reviewed the facilities.  I was relatively new so

13  I didn't know what I was going to be answering.  I

14  wasn't exactly sure as to how many beds, how many

15  employees or anything like that.

16  Q.   But you don't believe spending 10 to 12 hours to

17  prepare for a deposition is a lot of time?

18          MR. SCHWARTZ:  I'm going to object.

19          THE COURT:  What is the objection?

20          MR. SCHWARTZ:  I don't understand the

21  relevance of these questions.

22          THE COURT:  Where are you going with this?

23          MR. UNGER:  Goes to credibility, Your Honor,

24  and relates to the testimony he just gave today.

25          THE COURT:  Let him go.  Overruled.

**David Ferraro - Cross**

1  A.    I'm sorry.

2  Q.    So the 10 to 12 hours you spent preparing to be

3  deposed, it wasn't a lot of time to you?

4  A.    No.

5  Q.    During those 10 to 12 hours, how did you spend your

6  time?

7  A.    I can't remember.

8  Q.    You mentioned you are employed by Western PA

9  Consultants, correct?

10  A.    Yes.

11  Q.    You don't know who runs Western PA Consultants?

12  A.    I don't know who owns it.  I answer to Sam.

13  Q.    You consider yourself to be a valuable employee for

14  Western PA Consultants?

15  A.    Yes.

16  Q.    You do good work for Western PA Consultants?

17  A.    I like to think so.

18  Q.    Has your pay increased with the good work you have

19  been doing for western PA consultants?

20  A.    My pay has increased since I started because of the

21  additional responsibilities I took on whenever I took on

22  Brighton.

23  Q.    Are you compensated on a salary or hourly basis?

24  A.    Salary.

25  Q.    Are you paid any bonuses or any other incentive

1  payments?

2  A.    Not from Western PA Consultants.  Whenever I was

3  administrator at Brighton, we had made an arrangement

4  that if I got Brighton straightened out, that they would

5  sell me Jefferson Hills.

6  Q.    So part of your compensation package was being sold

7  a nursing home you could run on your own?

8  A.    Right.

9  Q.    For the sale of Jefferson Hills, who was involved

10  in that transaction?

11  A.    Morty.  I dealt with Morty -- actually, I'm leasing

12  it.  I have a three-year option to buy it.

13  Q.    It's like a car?

14  A.    Right.  Well, hopefully things go well.

15  Q.    Are things going well at Jefferson?

16  A.    Yes, things are going well at Jefferson.  Just to

17  make -- because I had those two different roles, I was

18  the administrator at Brighton whenever that occurred.

19         So my paycheck was from Brighton, it wasn't

20  from Western PA Consultants.  I worked for Western PA

21  Consultants, then I worked for Brighton Nursing and

22  Rehab and then I worked for Western PA Consultants.

23  Q.    So you worked for Brighton from 2021 to 2023

24  approximately?

25  A.    Yes.

**David Ferraro - Cross**

1    Q.   During that time you weren't visiting other

2    facilities through Western PA Consultants?

3    A.   No, sir.

4    Q.   You testified before about your knowledge as to how

5    those facilities operated.  You weren't visiting them on

6    any basis between the time period 2021 to 2023?

7    A.   Correct.

8    Q.   Just so the record is clear, the facilities that

9    you were not visiting because you were working at

10   Brighton between 2021 and 2023 includes Latrobe?

11   A.   Yes.

12   Q.   Includes Cheswick?

13   A.   Yes.

14   Q.   Includes North Strabane?

15   A.   Yes.

16   Q.   Does that include both North Strabane facilities?

17   A.   Yes.

18   Q.   And includes Washington?

19   A.   Yes.

20   Q.   And includes Mt. Lebanon?

21   A.   Yes.

22   Q.   Includes South Hills?

23   A.   Yes.

24   Q.   Are there any other facilities that I left off that

25   list that you were not visiting during that time period?

David Ferraro - Cross

1  A.   I wasn't visiting any other facilities except for

2  Brighton during the time I was the administrator at

3  Brighton.

4  Q.   Understood.  So really your own firsthand knowledge

5  relating to the operations of any of these facilities is

6  limited from November 2019 to when you started working

7  at Brighton in 2021, correct?

8  A.   That's correct.

9  Q.   That's a little more than a year approximately?

10  A.   Yes.

11          MR. UNGER:  I have no further questions at

12  this time, Your Honor.

13          THE COURT:  Any redirect?

14          MR. SCHWARTZ:  No, Your Honor.

15          THE COURT:  You may step down.

16          Next witness.

17          MR. SCHWARTZ:  Defendants call Carlos Rivera.

18          THE COURT:  Please raise your right hand.

19          CARLOS RIVERA a witness herein,

20  having been duly sworn, testified as follows:

21          THE COURT:  Have a seat.  You can adjust the

22  microphone accordingly.  Please state and spell your

23  full name for the court reporter.

24          THE WITNESS:  My name is Carlos Rivera,

25  C-a-r-l-o-s, R-i-v-e-r-a.

Carlos Rivera - Direct

```
 1                    DIRECT EXAMINATION
 2  BY MR. SCHWARTZ:
 3  Q.   Good morning, Carlos.  Where do you work?
 4  A.   I currently work for Core Long Care Services.
 5  Q.   You said Core, C-o-r-e?
 6  A.   Correct.
 7  Q.   What do you do for that entity?
 8  A.   I'm a labor relations director.
 9  Q.   Where do you live?
10  A.   I live 260 Maple Loop, East Strassburg, Poconos.
11  Q.   So that's northeast, Pennsylvania?
12  A.   Pretty much.
13  Q.   What do you do for -- you said you were a laborer
14  relations consultants.  What type of work does that
15  involve?
16  A.   It involves representing clients, nursing home
17  operators and pretty much consulting on union activity,
18  negotiations, how to deal with ULPs, grievance settling
19  and things like that.
20  Q.   How long have you worked for this company?
21  A.   I just made a year.
22  Q.   Who do you report to?
23  A.   I report to Alex Cross.
24  Q.   Do you know who owns Core Long Time Services, LLC?
25  A.   It's a sister company for Diversicare, which Morty
```

**Carlos Rivera - Direct**

1   owns Diversicare.

2   Q.   Core is part of Diversicare which is owned by Morty

3   Lahasky?

4   A.   Correct.

5   Q.   I want to have you explain with a little bit more

6   specificity, Carlos, the nature of your current work.

7   So how are you engaged?

8   A.   I'm engaged because I'm meeting with the unions and

9   dealing with grievances, actually bargaining contracts.

10  Administrators call me and ask me how to interpret the

11  contract as their, you know, legitimacy on union issues

12  that they bring up.

13  Q.   Who hires you?

14  A.   Who hired me?

15  Q.   Let me ask it a little bit better.  When you are

16  performing these services for Core, somebody is coming

17  to you to ask you to consult, right?

18  A.   Correct.

19  Q.   Who is coming to you to ask you to consult?

20  A.   Some nursing home operators I reached out to and

21  some of them have reached out to me and I have a

22  contract with each client.

23  Q.   Where are those various facilities located?

24  A.   They are all over Pennsylvania, most of them in the

25  Philadelphia area.

**Carlos Rivera - Direct**

1  Q.   Do you have familiarity with facilities in Western

2  Pennsylvania that I'm going to refer to as part of

3  Comprehensive, right?

4  A.   Yes.

5  Q.   In your current role with Core, are you providing

6  any services for the Comprehensive facilities in Western

7  Pennsylvania?

8  A.   No, I'm not.

9  Q.   So prior to starting your engagement with Core,

10 where did you work?

11 A.   I worked for SEIU Healthcare Pennsylvania.

12 Q.   SEIU Healthcare Pennsylvania is a labor

13 organization, correct?

14 A.   Correct.

15 Q.   I'm going to just to refer to it as a union.  What

16 is the scope of representation SEIU Healthcare

17 Pennsylvania has?

18 A.   It represents over 110 nursing homes in the state.

19 They bargain contracts, they enforce contract provisions

20 with grievances, arbitrations and things like that.

21 Q.   Is it fair to say they're the primary union in the

22 nursing home industry in Pennsylvania?

23 A.   Yes.

24 Q.   There are SEIUs that exist outside of Pennsylvania.

25 This entity for Pennsylvania is part of SEIU

**Carlos Rivera - Direct**

1  International?

2  A.   Correct.

3  Q.   It serves sort as a local?

4  A.   It is a local.

5  Q.   How long did you work for SEIU Healthcare

6  Pennsylvania?

7  A.   14 years.

8  Q.   What I want to do with you, Carlos, is walk through

9  your tenure there.  So 14 years, doing some quick math,

10  you with your current job for about a year, is that what

11  you said?

12  A.   Yes.

13  Q.   So we are going back to what, 2008, 2009?

14  A.   2008, June I started with them.

15  Q.   Let's do this.  Let's walk back through your

16  employment with SEIU Healthcare Pennsylvania, what

17  positions you held with your most recent going backwards

18  to when you started.  Do you follow me?

19  A.   Yes.  So when I left there, I was the vice

20  president for long-term care which I was overseeing the

21  whole state when it came to all the nursing homes.  So I

22  supervised over 12 organizers.

23         Before that, I was the director for long-term

24  care.

25  Q.   Let's go one at a time.  So VP for long-term care

 1  covers what years?

 2  A.   It covered from 2019 to when I left.

 3  Q.   Okay.  Then you were a director of long-term care?

 4  A.   Correct.

 5  Q.   What years does that cover?

 6  A.   That was maybe a year prior, two years prior.  I

 7  got promotions like every other year or year and a half.

 8  Q.   Okay.  What did you do before you were director of

 9  long-term care?

10  A.   I was the assistant director for long-term care.

11  Q.   What years does that cover?  It's okay if you are

12  off a little bit.

13  A.   That covered around '16, '17.

14  Q.   What were you doing before that?

15  A.   I was the lead organizer which had no supervisory

16  responsibilities.  I was just a mentor.

17  Q.   What years were you lead organizer?

18  A.   That was about '14, '15.

19  Q.   Okay.  We're getting close to the beginning.  We

20  still have a ways to go.  What were you before lead

21  organizer?

22  A.   I was administrative organizer at that point.

23  Q.   What years does that cover?

24  A.   That covered 2008 until I got my first promotion to

25  lead.

**Carlos Rivera - Direct**

 1  Q.   Let's go through -- I'm going to ask you about

 2  these various positions in a moment.  Let's just kind of

 3  discuss the makeup of SEIU Healthcare Pennsylvania sort

 4  of from the bottom up.

 5  A.   Okay.

 6  Q.   You with me?

 7  A.   Yes.

 8  Q.   Give us the various jobs that are within the

 9  umbrella of the union from the bottom as it goes up to

10  the top?

11  A.   So, there's different departments.  So the

12  department I come from, the first position is an

13  organizer and then you're able to move up the ranks but

14  before you become an organizer, usually you're an

15  employee at a nursing home before you start working for

16  a union.

17       Then you move up the ranks which is the scale

18  I went up, lead, assistant, and all the way up to an

19  officer which is an elected position.

20  Q.   So it is fair to say, Carlos, that the pipeline for

21  union employees is former nursing home employees?

22  A.   Yes.

23  Q.   And when I use the term "union employees," I'm

24  referring to people who worked for the union?

25  A.   Correct.

**Carlos Rivera - Direct**

1   Q.   Their paycheck comes from SEIU Healthcare?

2   A.   Before they start working, they are working for the

3   nursing home as an employee.  When they get on payroll,

4   then they work for the union.

5   Q.   So at the bottom of the chain is an organizer?

6   A.   Correct.

7   Q.   Then what comes up next?

8   A.   Then a lead organizer.

9   Q.   So is the chain what you just described as your

10   experience?

11   A.   Yes.

12   Q.   So organizer, lead organizer, assistant director,

13   director, VP?

14   A.   Correct.

15   Q.   I think you said VP is an elected position?

16   A.   It is.

17   Q.   Who elects you?

18   A.   The membership.

19   Q.   Does the whole membership of SEIU Healthcare

20   Pennsylvania or a particular segment of it?

21   A.   The long-term, the nursing homes.

22   Q.   So everybody who is a dues paying member working in

23   Pennsylvania long-term facilities cast a vote for the

24   officer?

25   A.   Correct.

**Carlos Rivera - Direct**

1  Q.   Is there something within the SEIU system or

2  structure that I think is called an MRC?

3  A.   MRC.

4  Q.   What is that?

5  A.   Member Resource Center.  If there is an alleged

6  violation of the contract, they would call.  It's the

7  call-in center to deal with grievances.

8  Q.   Who staffs the MRC?

9  A.   Member Resource Center representatives that are

10  sometimes considered like organizers but they are on the

11  phone dealing with grievances and contract enforcement.

12  Q.   So the job position of organizer in my mind is

13  somebody who is out there trying to organize people to

14  join the union but within the SEIU role, there are other

15  functions of that job?

16  A.   So there's two roles for an organizer.  One is an

17  internal organizer and one is a new organizer which is

18  considered external.

19            So the enforcing of contracts and

20  administering the contracts, those are internal

21  organizers where I was.

22  Q.   An external organizer is engaged to try to take a

23  non-union facility and make it union?

24  A.   Correct, grow the union.

25  Q.   This is only for my personal benefit, in the SEIU

1  hierarchy, an organizer is sort of like a business

2  agent?

3  A.   Yes.

4  Q.   So the internal organizer is a role that you filled

5  for about six years?

6  A.   Yes.

7  Q.   What were your job duties and responsibilities as

8  an administrative organizer?

9  A.   Visiting nursing homes and enforcing the contracts,

10  organizing actions against employers, things like that.

11  Q.   Did you have geographical responsibility?

12  A.   Yes.

13  Q.   What was your -- that was not an artfully worded

14  question.  Did you have an assigned geographical area

15  when you were an administrative organizer?

16  A.   Yes, but it would change.

17  Q.   Okay.  The State of Pennsylvania is a pretty big

18  state?

19  A.   Yes.

20  Q.   In 2008, where were you working as an

21  administrative organizer?

22  A.   I was working in Reading, the Poconos, it was

23  throughout the state.

24  Q.   Did there come a time in your tenure as an

25  administrative organizer where you had responsibilities

1   for Western Pennsylvania?

2   A.   No.

3   Q.   So your role as an administrative organizer did not

4   include what I refer to as the Comprehensive facilities?

5   A.   Correct.

6   Q.   Did that ever change?

7   A.   As I got promoted, it became part of my

8   responsibility.

9   Q.   When did the Western Pennsylvania defendant

10  facilities in this case -- when did your role with SEIU

11  involve some responsibilities for those facilities?

12  A.   When I became a lead organizer.

13  Q.   So around 2014?

14  A.   Correct.

15  Q.   What were your duties and responsibilities as a

16  lead organizer?

17  A.   I mentored organizers.  I walked through with them

18  how to bargain a contract.  I dealt with a lot of

19  contractual issues, grievances, how they should deal

20  with them and things to that effect because I mentored

21  like newly hired organizers.

22  Q.   In the period when you were a lead organizer, which

23  was a year or two, were you, aside from your mentoring

24  responsibilities, were you interfacing at all in your

25  capacity as an SEIU representative with any of the

1  defendant facilities in this case?

2  A.   The person that I supervise -- that I mentored had

3  them in her assignment.

4  Q.   Who was that?

5  A.   Her name was Molly Brechtal.

6  Q.   As you moved into your assistant director role, did

7  you have any -- what were your responsibilities and

8  duties as an assistant director?

9  A.   They pretty much stayed the same.  Now I'm

10 supervising people versus mentoring.  So I actually was

11 able to enforce our work rules and hold them accountable

12 but it's pretty much the same, grievances, monitoring

13 what they are doing in the field and things like that,

14 dealing with complaints from workers and stuff like

15 that.

16 Q.   What about your role as director of long-term care,

17 what were your duties and responsibilities there?

18 A.   Everything.

19 Q.   What do you mean?

20 A.   It means I was in charge of the whole team.  I knew

21 everything that was happening, I dealt with them or see

22 on a regular following-up on arbitrations because

23 members would reach out to us complaining.  I was always

24 worried about the DFRs.

25 Q.   What is a DFR?

**Carlos Rivera - Direct**

1  A.   It's a duty to fairly represent members which by

2  law we have to represent them because they are paying

3  dues.

4  Q.   I'm going to talk about the DFR aspect of the

5  representation responsibility in a couple moments.

6           I want to go back.  When you were lead

7  organizer 2014 to 2015, did you have any direct

8  involvement with the defendant facilities in this case?

9  A.   Not direct like I spoke to them or whatever, but I

10  would have meetings with supervision on things that were

11  happening, there were bargaining contracts, they were

12  buying nursing homes and things like that, yes.

13  Q.   When was the first time you had direct involvement

14  with any of the defendant facilities in this case?

15  A.   I think when I was lead assistant director, I think

16  it was the big nursing home -- I don't remember the name

17  off the top of my head, but I know Denise Cox was an

18  employee there and she actually became an organizer at

19  that building.

20  Q.   Is that Brighton?

21  A.   Yes.

22  Q.   What role or what was the purpose of your first

23  contact with any of the defendant facilities, in

24  particular Brighton?

25  A.   It was because there was a layoff after it was

 1  being purchased and they were negotiating the contract

 2  there and I know that there were a couple people laid

 3  off, one of them being Denise Cox.

 4  Q.   As your tenure went on with SEIU Healthcare

 5  Pennsylvania, did you have any additional contacts with

 6  the defendant facilities in this case?

 7  A.   Yes.   Through my tenure there, yes.

 8  Q.   Generally speaking, tell us about what connection

 9  you had as an SEIU officer or director with the

10  defendant facilities in this case?

11  A.   Well, I had to supervise the organizers that

12  represented those nursing homes so they were constantly

13  calling me and meeting with me to discuss grievances and

14  things to that effect, bargaining contracts.

15          So I would supervise the people that actually

16  bargained the contract.   It was a Rich Goff that

17  bargained a few of them and I supervised him during that

18  process.

19  Q.   Did you ever participate in any bargaining with the

20  defendant facilities in this case?

21  A.   Yes.

22  Q.   Tell us about that.

23  A.   So I think it was in 2017 when he bought a

24  couple -- the Golden Living Center Buildings sold or

25  whatever.   They got rid of them.   They were leased under

Carlos Rivera - Direct

1   the Comprehensive name.  There were four of them that I

2   remember and we bargained those in the barn, which was

3   in Carlisle, and I remember being the co-negotiator.

4   Kathy Brady was the chief negotiator for that

5   bargaining.

6   Q.   On the union side?

7   A.   Correct.

8   Q.   Who was there from the employer side?

9   A.   There were several owners there because there were

10  several contracts being done at the same time.  Sam was

11  there and there were several other people.  I think one

12  session Morty participated, their attorney, Lou Capozzi,

13  who did most of the talking.

14  Q.   When you said "Sam," are you referring to Sam

15  Halper?

16  A.   Yes.

17  Q.   Do you see Mr. Halper in the courtroom today?

18  A.   Yes.

19  Q.   Do you know him?

20  A.   Yes.

21  Q.   You met him before today?

22  A.   Yes.

23  Q.   How many times have you met him?

24  A.   Too many to count.

25  Q.   What would be the reason for you to be talking with

**Carlos Rivera - Direct**

1  Sam either in person -- I assume there were also phone
2  calls?
3  A.   Yes.
4  Q.   What purposes would underlie you having meetings or
5  conversations with Mr. Halper?
6  A.   Trying to settle issues, trying to resolve them
7  because we have these members we are representing.  They
8  are attacking the union and I'm just trying to resolve
9  it and put it to bed.
10 Q.   That could be just about anything?
11 A.   Yes.
12 Q.   And did you typically resolve them?
13 A.   Most of the time, yeah.  We barely had any
14 arbitrations.
15 Q.   We are going to talk about the role of grievance
16 and arbitration in a minute.  These interactions you had
17 with Mr. Halper, were they formal in terms of things
18 that you were doing pursuant to a CBA, were they
19 informal or a combination of the two?
20 A.   A combination because the process had already
21 probably started.  I was just trying to just get
22 involved to try to squash it if possible.
23 Q.   These were my words, using an informal process
24 versus a formal process.  When I say "formal process,"
25 the collective bargaining agreements have what is called

1   a grievance and arbitration provision, correct?

2   A.   Correct.

3   Q.   Anything that is being addressed through that

4   process, would you agree that is formal?

5   A.   Yes.

6   Q.   So were there other times when you were engaging

7   with Mr. Halper outside of the grievance and arbitration

8   process?

9   A.   Yes.   Trying to get a resolution before it becomes

10  a big expensive issue.

11  Q.   I'm using the expression "cutting it off at the

12  pass," that's what you were trying to accomplish?

13  A.   Hmm-umm.

14  Q.   Is that a yes?

15  A.   Yes.

16  Q.   I just want to make sure for the court reporter

17  when you're not giving a verbal response.  I'm not

18  directing you to the answer.

19  A.   Yes.

20  Q.   Now, I know you testified a moment ago that you did

21  participate in negotiations for some facilities that

22  were Comprehensive facilities.

23          I assume given your breadth of experience and

24  tenure, that you have sat in collective bargaining in

25  other instances?

**Carlos Rivera - Direct**

1  A.   Yes.

2  Q.   Rough estimate how many times you bargained a

3  contract?

4  A.   With the company?

5  Q.   In total.

6  A.   Oh, I have bargained over hundreds of contracts.

7  Q.   Are there certain common themes within nursing

8  homes, in particular we'll focus on SEIU Healthcare

9  Pennsylvania, that are kind of regular within the

10  contracts?

11       MR. HERRERA:  Objection, Your Honor.

12  Relevance and ambiguity on this.  I'm not sure which

13  contracts.  I also don't know what relevance other

14  negotiations of non-defendants play here.

15       THE COURT:  Let's talk about the relevance of

16  the general non-defendant contract and what that would

17  have on the claims at issue in this case.

18       MR. SCHWARTZ:  That's fair.  It's sort of

19  similar, Your Honor, to what I was doing with

20  Mr. Ferrara in establishing that these contracts are

21  sort of common within the industry.

22       There's nothing unique here and it extends the

23  breadth of his experience to his experience with these

24  particular facilities, that there is nothing unique

25  about the Comprehensive facilities.

1          THE COURT:  Here is what we'll do.  Based upon

2    that offer of proof, I will allow him to lay the

3    groundwork to establish the witness' knowledge of the

4    way these types of proceedings play out in the industry

5    and how that specifically relates to his experience in

6    the role.

7          I'm not going to let you go too far down this

8    road if it looks like you are trying to tender this

9    witness as a backdoor expert that we talked about

10   before.

11         I will allow you to do that.  The objection is

12   overruled.

13         MR. SCHWARTZ:  Respectfully, it's a short

14   journey.

15         THE COURT:  Understood.

16   Q.  The question that was objected to, do you need me

17   to ask it again?

18   A.  Yes.

19   Q.  In your experience negotiating the contracts in the

20   nursing home industry, are there certain common themes?

21   A.  Yes.

22   Q.  Would that include your experience with the

23   Comprehensive facilities?

24   A.  Yes.

25   Q.  Okay.  Now, are you familiar with the term "first

1   contract"?

2   A.   Yes.

3   Q.   What is a first contract?

4   A.   It's usually when they first get organized or if a

5   building is sold and a new purchaser is coming in, it's

6   considered a first contract even though they had one

7   with the prior owner.

8   Q.   If it's not a first contract, what is it?

9   A.   Successor agreement.

10  Q.   Or renewal?

11  A.   Right.

12  Q.   A successor agreement has certain connotations on

13  it.  When there's an existing CBA with an employer and

14  CBAs usually have a term, do they not?

15  A.   Yes, they do.

16  Q.   Is it fair to say they are usually three years?

17  A.   Correct.

18  Q.   When a contract expires, are there negotiations for

19  a new term?

20  A.   Yes, there is.

21  Q.   Would it be fair to say as a general rule, Carlos,

22  that negotiations over a renewal are easier than a first

23  contract?

24  A.   Yes, they are.

25  Q.   The contracts that you sat at the table for with

**Carlos Rivera - Direct**

1  the defendant facilities in this case, were they first

2  contracts or renewals or both?

3  A.   Well, they were first contracts because they were

4  new owners taking over the buildings.

5  Q.   So when a new owner takes over a building where

6  there's a union, they could assume the contract that's

7  in place, could they not?

8  A.   They can.

9  Q.   And in this instance, that didn't happen?

10  A.   No.

11  Q.   So they were first contracts?

12  A.   Yes.

13  Q.   But there was an existing template?

14  A.   There was.

15  Q.   Just generally speaking, Carlos, we don't need to

16  get into all the nuts and bolts, what happens at the

17  bargaining table?

18  A.   Well, it's a lot of economic discussions.  There's

19  a lot of things that get slashed because of the cost of

20  them.  That's why they are selling because it was a

21  financial impact to that nursing home when it couldn't

22  operate anymore.

23        We negotiate wages, negotiate time off and

24  sometimes it gets lowered.  We negotiate overtime, hours

25  of work, all of those type of things, work rules.

**Carlos Rivera - Direct**

1   Q.   Would it be fair to say, Carlos, that as a general

2   rule of thumb, collective bargaining involves give and

3   take by both sides?

4   A.   Yes.

5   Q.   Typically, there's kind of a separation between

6   language and economics?

7   A.   There is.

8   Q.   Do you usually bargain over language first?

9   A.   Yes, that's hashed out first.

10  Q.   So when we are talking about language, we are

11  talking about non wage and benefit stuff?

12  A.   Correct.

13  Q.   Language could be important, right?

14  A.   It can.

15  Q.   Grievance and arbitration provision is part of

16  language?

17  A.   Yes, so is seniority.

18  Q.   Each side has certain legal responsibilities in

19  negotiating a collective bargaining agreement, is that

20  fair?

21  A.   Yes.

22  Q.   What is your understanding of what those legal

23  obligations are?

24  A.   It's pretty much to do the best you can for the

25  workers and hopefully get to an agreement and avoid

Carlos Rivera - Direct

1    strikes.

2    Q.    Would it be fair to say that the employer has a

3    duty to bargain in good faith?

4    A.    Yes, they do.

5    Q.    In your experience with Comprehensive, did they

6    meet that duty?

7    A.    Yes.

8              MR. HERRERA:    Objection, Your Honor.    Improper

9    opinion testimony.

10             THE COURT:    I'm going to overrule based upon

11   the foundation that has already been laid.    I'll weigh

12   it as I see fit.

13             You may proceed.

14   Q.    If an employer is not engaging in good faith

15   bargaining, are there any tools that the union has to

16   utilize if that happens?

17   A.    Oh, yes.    I would file -- the union would have

18   filed a ULP in a heartbeat.

19   Q.    An ULP, what is that?

20   A.    Unfair labor practice.

21   Q.    And you file that with whom?

22   A.    With the National Labor Relations Board.

23   Q.    Have you filed bad faith bargaining ULPs?

24   A.    Many.

25   Q.    Did you file them against the Comprehensive

**Carlos Rivera - Direct**

1  defendants?

2  A.    In the past, yes.

3  Q.    Were they resolved?

4  A.    Always.

5  Q.    Let me just cover one thing before we go into a

6  little bit more CBA-related stuff.  Why did you leave

7  the SEIU?

8  A.    I left because it was time.  There were certain

9  internal changes that I wasn't okay with.  So I

10  resigned.

11  Q.    And did you have a job lined up when you resigned?

12  A.    No.  I was going to school to get a CDL license at

13  the time.

14  Q.    Did you have any employment between leaving SEIU

15  and starting with Core?

16  A.    No.  I was unemployed for three months.

17  Q.    So when you left SEIU, you did not have an offer in

18  hand from Core?

19  A.    No.

20  Q.    It wasn't on your radar?

21  A.    No.

22  Q.    Then at some point an offer was made to you?

23  A.    Yes.

24  Q.    Who made that offer?

25  A.    I was called by Morty and actually he asked me if I

1  was interested in work because there might be a position

2  that Core was looking to fill regarding labor relations.

3  Q.  When you say "Morty," is that Morty Lahasky?

4  A.  Yes, Morty Lahasky.

5  Q.  Just so it's clear, you did not leave SEIU to go

6  work for Core?

7  A.  Absolutely not.

8  Q.  That was just sort of a good fortune for you?

9  A.  Yes.  If not, I would have been driving 18-wheelers

10  across the country right now.

11  Q.  Not that there is anything wrong with that.

12  A.  Not at all.

13  Q.  In your tenure with SEIU, have you seen, and I

14  think you already answered this, but just so it's clear,

15  instances where a unionized owner sold a facility to

16  another owner?

17  A.  Yes.

18  Q.  That happened with the defendant facilities in this

19  case?

20  A.  Yes.

21  Q.  Do you have experience in overseeing or having some

22  knowledge of when that takes place that there are

23  transition-related issues?

24  A.  Yes.

25  Q.  What type of transition-related issues and we can

1  even limit this to the defendant facilities in this case
2  are common?
3  A.   So what I witnessed within the first 30 days,
4  there's always like payroll issues.  There's date of
5  hire issues, transferring vacation, PTO time from old
6  owner to new owner.  So it takes a good month or so to
7  actually get resolved.
8  Q.   Based upon your experience, Carlos, why does that
9  happen?
10  A.   I think it's a lot -- in my opinion, it's because
11  of recordkeeping.  A lot of times they use outside
12  payroll companies that are based out of New York City or
13  other states and they don't have all the information to
14  really get everything done.
15          MR. HERRERA:  Objection, Your Honor.  Move to
16  strike for lack of personal knowledge and speculation.
17          THE COURT:  Why don't you clarify the
18  question.  Looking at his actual answer based upon the
19  question that was asked as it is in the transcript, that
20  is not clear it was based on his personal knowledge.
21          Before I strike, I will allow you to lay a
22  foundation to clarify that.  If he can't clarify it was
23  personal knowledge, I will strike.
24          MR. SCHWARTZ:  Okay.
25  Q.   Based upon your experience, do you have personal

**Carlos Rivera - Direct**

1  knowledge as to why these issues arise in a transitional

2  situation?

3  A.   It's hard to answer.  I'm not part of operations,

4  right, so I know when I speak to the administrators to

5  follow up why this person didn't get paid the correct

6  rate, they tell us it's payroll, right.

7         I find out later on payroll is based out of

8  New York City and at times, I would call Sam to try to

9  rectify.

10  Q.   Okay.

11         MR. HERRERA:  Your Honor, at this point I

12  renew the motion to strike.

13         THE COURT:  Yes.  Based upon that, I am going

14  to have to strike it as being speculative in nature.

15         MR. SCHWARTZ:  I thought he said precisely

16  that he had personal knowledge.  He talked to the

17  administrator, they said it was payroll and then he

18  called payroll.

19         THE COURT:  I don't read it as such.  Here's

20  the thing.  We'll keep the answer he just gave.  I will

21  strike the prior answer he gave as clarified as such.

22         MR. SCHWARTZ:  That's fine.

23  Q.   You discussed earlier having a relatively frequent

24  number of instances of trying to work through things

25  with Sam, is that fair?

Carlos Rivera - Direct

 1  A.   Yes.

 2  Q.   Would you say that that happened more frequently

 3  during transition periods?

 4  A.   In the beginning, yes.

 5          MR. SCHWARTZ:  Your Honor, I'm going to -- are

 6  the joint exhibits already introduced?

 7          MR. HERRERA:  Yes.  We did that on day one.

 8          THE COURT:  Yes, we did.

 9  Q.   I'm going to show you what is marked as Joint

10  Exhibit 37.

11          MR. SCHWARTZ:  Your Honor, do you have it at

12  the ready or do you want a copy?

13          THE COURT:  I do not have it at the ready.  If

14  you have a copy.

15  Q.   I'm going to represent to you, Carlos, that this is

16  a collective bargaining agreement between The Grove at

17  Washington and SEIU Healthcare Pennsylvania and it has a

18  term of looks like almost five years, August '16 to June

19  2021.  Have you seen this document before?

20  A.   Yes.

21  Q.   Take a moment.  I'm going to ask about specific

22  provisions.  Just take a moment to familiarize yourself

23  with it.

24          (Pause in the proceedings.)

25  A.   I'm good.

**Carlos Rivera - Direct**

1   Q.   Were you involved in the negotiations of this

2   contract?

3   A.   Yes.

4   Q.   What was your role?

5   A.   I was the co-chair.

6   Q.   You sat at the table?

7   A.   Yes.

8   Q.   Do you know generally how many sessions there were?

9   A.   It went beyond six.

10  Q.   And this would be what we described earlier as a

11  first contract?

12  A.   Correct.

13  Q.   Because they were acquiring a new facility?

14  A.   Yes.

15  Q.   All right.  Let's move to page 6, article 8.  This

16  is the grievance procedure, correct?

17  A.   Yes.

18  Q.   The grievance procedure contains within it, if you

19  look at page 9, the arbitrations option.

20  A.   Correct.

21  Q.   Sometimes a contract will have separate grievance

22  and arbitration or they will be culled together but this

23  is consuming both, is that fair?

24  A.   Yes.

25  Q.   So let's just walk through this a little bit.  This

1  provision obviously was negotiated and agreed to by both

2  sides?

3  A.    Yes.

4  Q.    8.1 on page 6 is the purpose of the grievance

5  procedure.  At least that's what it's called?

6  A.    Yes.

7  Q.    The language is what it is but in your

8  understanding, Mr. Carlos, why is the purpose of the

9  grievance procedure even detailed here?

10  A.    So that everyone is aware of what needs to be done,

11  what it is.

12  Q.    Is it fair to say that the reason why you put the

13  purpose in here and what it is trying to say is that

14  both sides are going to try to work things out?

15  A.    Yes.

16  Q.    8.2 is a definitional provision that defines what a

17  grievance is, right?

18  A.    Correct.

19  Q.    Just in regular terms, the contract obviously says

20  what it says.  What is a grievance?

21  A.    It's pretty much when an employee feels that they

22  were wronged and the contract is not being followed.

23  Q.    Okay.  Does the union at some point educate its

24  members on what's in a collective bargaining agreement?

25  A.    They do.  They are supposed to.

**Carlos Rivera - Direct**

1   Q.   From your experience, are members generally

2   acquainted with the grievance process?

3   A.   Yes.

4   Q.   They ought to be able to know what remedies are

5   available to them if something happened that wasn't

6   proper, right?

7   A.   Correct.   The --

8                MR. HERRERA:  Objection, Your Honor.  Leading.

9                THE COURT:  It is a leading question.  I'll

10   sustain the objection and allow you to rephrase.

11                MR. SCHWARTZ:  It's of no matter.  The witness

12   can testify on his own.

13   Q.   Is it customary, Carlos, as it is in this contract,

14   for there to be different steps in the grievance

15   process?

16   A.   Yes.

17   Q.   Again, generally speaking, we'll go through this

18   CBA in a moment, what are the various steps that are

19   generally outlined in a CBA?

20   A.   Usually the first step, they try to resolve it by

21   themselves talking to a supervisor or anyone that could

22   actually resolve the issue.  If it doesn't get resolved

23   at that point, it escalates to the other levels and then

24   we start putting it in writing and actually going

25   through the whole grievance process.

**Carlos Rivera - Direct**

1  Q.   Okay.  Generally speaking, again, at the first

2  step, who is involved -- is there a meeting at the first

3  step?

4  A.   There can be.

5  Q.   It could be just like a passing conversation?

6  A.   Correct.  It could be a worker going to the

7  supervisor to address the issue.

8  Q.   So as a general matter, the first step, is the

9  outside union representative involved?

10  A.   They can be.

11  Q.   Generally speaking, are they?

12  A.   Sometimes not.

13  Q.   Within a unionized environment at a nursing

14  facility, is it customary that there is somebody who is

15  designated as the steward?

16  A.   Yes.

17  Q.   And in the facilities that were the Comprehensive

18  facilities that are defendants in this case, where the

19  SEIU had a CBA, was there always a shop steward?

20  A.   They were called delegates or officers.  They also

21  had secretary treasurers, presidents and vice presidents

22  in the building.

23  Q.   These are employees who are paid by the employer?

24  A.   Correct.

25  Q.   Who also wear a union hat?

Carlos Rivera - Direct

1    A.    Yes.

2    Q.    Are they being paid by the union as well?

3    A.    No.

4    Q.    So are they typically involved at the first step?

5    A.    Yes.

6    Q.    Then if it isn't resolved at the first step, is

7    there a second step?

8    A.    Yes, there is.

9    Q.    Again, we can go through the CBA but generally

10   speaking, what happens at the second step?

11   A.    The second step is usually the director, which can

12   be the DON or the director of housekeeping, could be any

13   of the directors in the building.

14   Q.    So if it's a grievance filed by a nurse, the DON

15   might sit in at step two?

16   A.    Correct.

17   Q.    If it's a grievance filed by a cook, the dietary

18   director would be the person at the grievance meeting?

19   A.    Correct.

20   Q.    We can go through the whole thing but one more I'll

21   do.  Somebody working in maintenance, the maintenance

22   director would be there?

23   A.    Yes.

24   Q.    Is there usually a step three?

25   A.    Usually that's an administrator or HR

1  representative.  It all differs depending on the

2  contract.

3  Q.  Going back to step two for a second.  Is there

4  typically an outside union president in step two?

5  A.  No.  They usually get involved with step three with

6  the administrators.

7  Q.  So somebody who would fill the role of I think you

8  referred to it as inside organizer or administrative

9  organizer, they would be involved in step three?

10  A.  Yes.

11  Q.  If an employee believes that they have been

12  wronged, they want to initiate a grievance process, what

13  do they do?

14  A.  So there are two options.  They either call the MRC

15  or they actually deal with the internal reps.

16  Q.  Okay.  If they call the MRC, who answers the phone?

17  A.  They have several representatives.  They either

18  were organizers that transferred into there but they

19  call them MRC reps.

20  Q.  I would assume the MRC reps have all the CBAs?

21  A.  Yes.

22  Q.  With them?

23  A.  Yes.  It's all on the system where they can pop

24  them up in a few seconds to review it.

25  Q.  So in a hypothetical situation, Carlos, a CNA at

**Carlos Rivera - Direct**

1  Grove at Washington is ticked off about something, they

2  call the MRC, the MRC will assist them in determining

3  that whatever ticked them off is the basis for a

4  grievance?

5  A.    Yes.

6  Q.    And I assume there are times where somebody at the

7  MRC might hear the complaint and say I hear you but it's

8  not a contract violation?

9  A.    Yes.

10  Q.    And other times the MRC person might say that

11  sounds kind of serious, let's move forward with the

12  grievance process?

13  A.    Yes.

14  Q.    If it happens in the second scenario, does the MRC

15  person have a responsibility at that point to push the

16  grievance ahead?

17  A.    Yes, they usually do.

18  Q.    Okay.  You talked about the DFR a few moments ago.

19  Does the duty of fair representation, the person

20  answering the phone at the MRC has a responsibility, do

21  they not, under the law, to ensure that if the member is

22  presenting a legitimate grievance, to push that forward?

23  A.    Yes, they do.

24  Q.    If they didn't do that and an employee felt like

25  they weren't -- or a member felt like they wouldn't be

**Carlos Rivera - Direct**

1  fairly represented, what could happen?

2  A.   The member could file a ULP against the union.

3  Q.   That's an unfair labor practice, right?

4  A.   Yes.

5  Q.   That gets filed with the National Labor Relations

6  Board?

7  A.   Yes.

8  Q.   And that happens?

9  A.   Yes, it does.

10  Q.   It's not something the union likes to have happen?

11  A.   No, we don't.  No, we didn't.

12  Q.   I assume there is some training given to organizers

13  on their responsibilities to fairly represent the

14  members?

15  A.   Yes.

16  Q.   Because they're the frontline?

17  A.   Yes.

18        THE COURT:  We're going to break for lunch in

19  a few minutes.  Is this a nice breaking point?

20        MR. SCHWARTZ:  Yes.  For my own personal

21  breaking benefit, this is my personal preference.

22        THE COURT:  Okay.  Then we'll reconvene at one

23  o'clock.

24        (Whereupon, a luncheon recess was taken.)

25  (Afternoon session.  In open court.)

 1              THE COURT:  I remind you, you are still under

 2    oath.

 3              You may proceed.

 4              MR. SCHWARTZ:  Thank you.

 5              DIRECT EXAMINATION (Cont.)

 6    BY MR. SCHWARTZ:

 7    Q.   I want to continue going through Joint Exhibit 37,

 8    the CBA for The Grove at Washington.  I would like to

 9    direct you to page 14.

10              Let's just start at the very beginning of this

11    particular article, Article 11, Workweek and Hour

12    Regulations.

13              11.1 reads:  Time and one half, and then

14    there's a number thereafter in parenthesis one and one

15    half, will be paid for all hours worked in excess of 40

16    hours per week.

17              So that would apply to every bargaining unit

18    member, is that fair?

19    A.   That's correct.

20    Q.   This was a negotiated item?

21    A.   Yes.

22    Q.   If that isn't done, the employer fails to pay a

23    bargaining unit member time and a half for hours worked

24    over 40, would that be the basis for a grievance?

25    A.   Yes.

**Carlos Rivera - Direct**

1  Q.   Let's turn to 11.6.  It's at the bottom of the

2  page.  I'm about halfway through the paragraph where it

3  reads:  An employee shall be given a one half-hour

4  unpaid lunch for every four hours worked.

5  A.   Yes.

6  Q.   What does that mean?

7  A.   It means that they would get a half-hour unpaid

8  lunch, in a minimum they would have to work four hours.

9  So, in other words, if someone comes in that works five

10  hours, they would get that half-hour.

11  Q.   So someone who works a full day, this would apply

12  to them?

13  A.   Correct.

14  Q.   Do you know whether for purposes of this provision

15  that lunch is supposed to be uninterrupted?

16  A.   It is.

17  Q.   This was another negotiated item between the

18  company and the union, this particular clause here about

19  the unpaid lunch?

20  A.   Yes.

21  Q.   So if an employee was denied an unpaid lunch and

22  had worked a minimum of four hours, would that be the

23  basis for a grievance?

24  A.   Repeat the question.

25  Q.   If an employee didn't get their unpaid lunch on a

**Carlos Rivera - Direct**

1  workday where they worked more than four hours, would

2  that be the basis for a grievance?

3  A.   Yes.

4  Q.   Let's turn to page 15, 11.9A:  A daily

5  determination shall be made to test whether staffing

6  will fall below minimum for a 24-hour period.  Again,

7  that's a negotiated term, correct?

8  A.   Yes.

9  Q.   What does that mean?

10  A.   It was all based off of staffing ratios and things

11  like that in the building.

12  Q.   So if the employer failed to maintain minimum

13  staffing requirements and the union observed that during

14  one of these tests, would that form the basis for a

15  grievance?

16  A.   Yes.

17  Q.   Let's turn to page 28, Article 20.1:  The employer

18  agrees all conditions of employment relating to wages,

19  hours of work, overtime, differentials, and general

20  working conditions shall be maintained at not less than

21  the highest standards in effect at the time of the

22  signing of this agreement.

23        If any of those elements, Carlos, identified

24  in Article 20, wages, hours of work, overtime,

25  differentials, are not being applied as of the highest

1  standards at the time of the agreement, would that form

2  the base for a grievance?

3  A.    Yes.

4  Q.    Let me ask you to turn to page 40, and it's

5  actually part of wages generally but there's No. 3 here

6  on page 40.  It's something called shift differentials.

7  What is your understanding of what a shift differential

8  is?

9  A.    It's an additional amount of money for working on a

10  specific shift.

11  Q.    Under this contract, that has to be paid if that

12  shift is being worked?

13  A.    Yes.

14  Q.    It gets added to the regular rate?

15  A.    Correct.

16  Q.    If the employer failed to do that, either paid the

17  shift differential or included it in the regular rate,

18  would that form the basis of a grievance?

19  A.    Yes, it would.

20  Q.    In your various positions with SEIU Healthcare

21  Pennsylvania during the time period where you had some

22  contact with the Comprehensive facilities, which I think

23  you said began in 2016, that would run through the end

24  of your tenure, 2023, right?

25  A.    Correct.

**Carlos Rivera - Direct**

1   Q.   Employees filed grievances?

2   A.   Yes.

3   Q.   Probably a lot of them?

4   A.   Yep.

5   Q.   Now, let's go back to the grievance provision.  It

6   starts on page 6 and carries forward to page 10.  I want

7   to focus on page 9 with regard to arbitrations.

8            I take it, Carlos, that the union would like

9   to avoid arbitration?

10  A.   Yes.

11  Q.   There's a cost associated with it?

12  A.   Correct.

13  Q.   Is that the same for the employer?

14  A.   Yes.

15  Q.   So is it fair to say that the parties do everything

16  they can to try to resolve things before it goes to

17  arbitration?

18  A.   Yes.

19  Q.   Has it been your experience with regard to the

20  grievances that you had some interaction with, that the

21  sides work hard to try to resolve it?

22  A.   Yes.

23  Q.   Are you familiar as to whether there have been

24  instances with the defendants in this case and the SEIU

25  where a matter ended up having to be arbitrated?

1  A.   There were a few we went to arbitrations for.

2  Q.   Which issues do you recall going to arbitrations?

3  A.   I know two of them were regarding 8/20 rule that

4  was in their handbook regarding workmen's compensation

5  and there were two terminations that I can remember.

6  Q.   So discipline and discharge issues that you have a

7  recollection of going to arbitration?

8  A.   Yes.

9  Q.   And a worker's compensation related issue?

10  A.   Correct.

11  Q.   At any point in time did a dispute over employees

12  being paid for missed lunches ever go to arbitration?

13  A.   No.

14  Q.   At any time did an issue involving failure to

15  include shift differentials in their regular rate go to

16  arbitration?

17  A.   No.

18  Q.   At any time did an issue of an employee being paid

19  time and a half for hours worked over 40 go to

20  arbitration?

21  A.   No.

22  Q.   At any time did an issue of not including bonuses

23  in the regular rate go to arbitration?

24  A.   No.

25          MR. SCHWARTZ:  Tender the witness.

**Carlos Rivera - Cross**

```
1              THE COURT:  Cross-examination.

2              MR. HERRERA:  Yes, Your Honor.

3                      CROSS-EXAMINATION

4    BY MR. HERRERA:

5    Q.   Good afternoon, Mr. Rivera.

6    A.   Hi.

7    Q.   Were you subpoenaed to be here, sir?

8    A.   Off the top of -- I think they asked me if I needed

9    a subpoena for work.

10   Q.   Were you actually subpoenaed?

11   A.   I don't remember.  I don't think so.

12   Q.   So they asked you to come, the lawyers I assume?

13   A.   Yes.

14   Q.   And you're here?

15   A.   Correct.

16   Q.   Do you remember, sir, that you and I spoke about

17   two years ago about this case?

18   A.   Yes, when I was working for the union?

19   Q.   Yes.

20   A.   Yes.

21   Q.   You and I had a conversation with Ryma Lewis, my

22   former colleague, about this case?

23   A.   Yes.

24   Q.   Do you remember what that conversation was about,

25   sir?
```

Carlos Rivera - Cross

1   A.    It was about this case, I know that.

2   Q.    You were going to testify for the Acting Secretary

3   in the phase one trial of this case, weren't you?

4   A.    Yes.  I don't know what phase, but I know I was

5   supposed to testify.

6   Q.    You and Matt Yarnell, right?

7   A.    Correct.

8   Q.    Do you recall, sir, the issues in that part of the

9   case were Mr. Halper's role in these buildings?

10  A.    Yes.

11  Q.    If my memory serves, you were going to come testify

12  that Mr. Halper played an extensive role in these

13  buildings, weren't you?

14  A.    Yes.

15  Q.    He was involved in the day-to-day affairs of many

16  of the buildings that are defendants in this case?

17          MR. SCHWARTZ:  Objection, Your Honor?

18          THE COURT:  What's the objection?

19          MR. SCHWARTZ:  Beyond the scope of direct.

20          THE COURT:  Where are you going with this?

21          MR. HERRERA:  I'm trying to establish bias

22  but, also, as I just mentioned, we are going to be

23  talking about Mr. Halper's role in the buildings which

24  is at issue in this case.

25          THE COURT:  Bias is always at issue, as is

 1  credibility, and is presumed to be the scope of any
 2  direct.
 3          So I'll take these for that purpose and that
 4  purpose alone, which is to establish -- well, to use in
 5  my examination of the witness' credibility even though
 6  it's not technically within the four corners of the
 7  topics you limited to.  This is relevant and overruled.
 8          MR. SCHWARTZ:  Just so I'm clear, Your Honor,
 9  because the issue of bias, is that the basis for
10  overruling the objection?
11          THE COURT:  I think it's pretty clear that
12  there's no question it's textbook evidence law that
13  issues relating to credibility and bias are always at
14  issue and they are always fair game in the course of
15  cross-examination even if they are not within the four
16  corers of the topics which were addressed on direct
17  examination.
18          That is what this is being tendered for
19  pursuant to Mr. Herrera's offer of proof, what he is
20  doing this for and I think it is a justifiable basis
21  under the rule of evidence.
22          MR. SCHWARTZ:  The point of my clarification
23  is not that I disagree with that but the questions of
24  Mr. Halper's engagement or involvement in the running of
25  the facilities, I don't see where that goes to bias.

**Carlos Rivera - Cross**

1           THE COURT:  Well, I think he couched it on

2    what this witness was prepared to testify about in the

3    phase one trial.  I think that's fair game when it goes

4    to how this witness ended up in this seat at this stage.

5    So again, overruled.

6    Q.   Mr. Rivera, during phase one, you were going to

7    testify, were you not, that Mr. Halper had an extensive

8    role in the day-to-day affairs of the defendants in this

9    case?

10   A.   Right.

11   Q.   He was on emails?

12   A.   Yes.

13   Q.   He was on emails with you?

14   A.   Yes.

15   Q.   He spoke day to day with the processors for payroll

16   in the buildings, right?

17   A.   Yes.

18   Q.   He was intimately involved in CBA negotiations,

19   right?

20   A.   Yes.

21   Q.   He was intimately involved in pay issues that arose

22   in these buildings, correct?

23   A.   Yes.

24   Q.   As a general matter, Mr. Halper knew what was

25   happening in these 15 buildings while you interacted

1   with him as to pay issues, correct?

2   A.   If there was an issue, yes.

3   Q.   That included instances where the member would

4   complain about their pay, right?

5   A.   A specific member?

6   Q.   Just generally speaking, if a member complained

7   about a payroll error that they alleged, Mr. Halper was

8   generally included on that correspondence, wasn't he?

9   A.   By the administrators at times, yes.

10  Q.   You were prepared to testify I think, sir, that

11  Mr. Halper's role was so intimate that he actually

12  should be considered an employer as a matter of law in

13  this case, correct?

14  A.   I don't know what that means.

15  Q.   Fair enough.  Suffice it to say, sir, you were

16  going to help my side establish a couple years ago at

17  least that Mr. Halper is properly considered an employer

18  for the 6,000 or so employees who are seeking recovery

19  in this case, right?

20  A.   Well, his involvement in the operations, that's

21  what I was always questioning on when you guys were

22  questioning me.

23  Q.   Is that a yes, sir, his involvement in the

24  operations was enough to establish that idea, that

25  concept that he was the employer?

**Carlos Rivera - Cross**

1          MR. SCHWARTZ:  Objection.

2          THE COURT:  What's the objection?

3          MR. SCHWARTZ:  He is asking the witness for a

4    legal conclusion.

5          THE COURT:  I will let you ask him about what

6    he was prepared to testify in phase one trial but I am

7    not going to allow you to try to elicit from him what is

8    a legal determination for the Court.  Move on.

9    Q.   Now, sir, you're here, though, testifying for

10   Mr. Halper, are you not?

11   A.   I'm testifying based off of my experience.  They

12   asked me to come in, so I'm coming in.

13   Q.   Mr. Halper asked you to come in?

14   A.   No, Mr. Halper did not discuss this case with me at

15   all.

16   Q.   Not even in the hallway just about an hour ago, he

17   didn't discuss the case with you?

18   A.   Not this case, no.

19   Q.   Different case?

20   A.   Correct.

21   Q.   You know that Mr. Lahasky, he is an owner of these

22   15 buildings in part, right?

23   A.   I know he has an involvement.  I don't know to what

24   extent.

25   Q.   He is the owner of the entity that you work for,

**Carlos Rivera - Cross**

1  right?

2  A.   That's correct.

3  Q.   Can you tell me just in general terms, Mr. Rivera,

4  what did you do to prepare to testify today?

5  A.   What did I do to prepare for this?

6  Q.   Yes.

7  A.   Spoke to the attorney and told me what the process

8  is going to be.

9  Q.   When did you speak to the attorney?

10  A.   A few days ago.

11  Q.   Did they have a session to discuss what the topics

12  of your testimony would be?

13  A.   Discussed possible questions.

14  Q.   What kinds of questions did they say were possible?

15  A.   Regarding my experience.

16  Q.   Specifically with the SEIU and your role?

17  A.   Correct.

18  Q.   Did they tell you to emphasize a particular theme

19  or talk about a certain experience you had?

20  A.   Absolutely not.

21  Q.   Did you review any documents before coming here

22  today?

23  A.   No.

24  Q.   Did you review any pay records before your

25  testimony?

**Carlos Rivera - Cross**

1    A.    No.

2    Q.    Mr. Rivera, you mentioned a thing, the way you put

3    it was you had some disagreements with the SEIU as to

4    internal issues?

5    A.    Correct.

6    Q.    That's why you left?

7    A.    Correct.

8    Q.    You didn't leave on good terms with the SEIU?

9    A.    Yes, I did, absolutely 100 percent good term.

10   Q.    So if I had a witness come in, say, Thursday, they

11   would agree with you that you left on good terms?

12   A.    A hundred percent.

13   Q.    There was no dispute with Mr. Yarnell as to why you

14   should or should not stay, is that what you're saying?

15   A.    Yes.

16   Q.    In terms of your interaction with Mr. Halper and

17   these buildings, it's true, is it not, that in your long

18   tenure with the SEIU, you became aware of pay errors in

19   these buildings, right?

20   A.    In the first -- within the first -- when they first

21   purchased it and found out through the organizers that I

22   supervised, yes.

23   Q.    That knowledge continued throughout your tenure at

24   the SEIU, did it not?

25   A.    No.

Carlos Rivera - Cross

1   Q.   Are you saying that you were not aware of any pay
2   errors beyond when the buildings were first purchased?
3   A.   Pay errors like every now and then where someone
4   was missing a day's pay or overtime you mean?  I'm not
5   clear what you're asking.
6   Q.   Just in general, you were aware, weren't you, in
7   your role in the SEIU, that members in these buildings
8   regularly complained about their paychecks?
9   A.   Whatever the organizers made me aware of.  So I
10  can't say yes, I was aware of them.
11  Q.   Does that concept sound familiar to you at all,
12  that members would routinely complain about their
13  paychecks in these 15 buildings?
14  A.   On a regular basis, no.
15  Q.   Again, if I had a witness come in two days who had
16  worked with you, would he agree with you?
17  A.   You can have whoever you want.
18  Q.   Would he agree with you, sir, that you were not
19  aware --
20  A.   I don't know what anyone would agree to.  I can
21  talk to you about what I witnessed.
22  Q.   And your testimony is that you are not aware of a
23  general issue with payroll in these buildings past the
24  transition of a purchase?
25  A.   There were mistakes in every nursing home popping

**Carlos Rivera - Cross**

1  up where someone worked overtime and wasn't paid or

2  there was a bonus that was missed.

3  Q.   In these nursing homes, right?

4  A.   In every nursing home I represented.

5  Q.   Including these?

6  A.   Probably.  I can't tell you off the top of my head,

7  yeah, it was The Grove or whatever.

8  Q.   You were on emails, were you not, sir, where you

9  would have to get involved at your level of seniority to

10  try to resolve these pay errors, right?

11  A.   I don't really get involved much unless it's

12  something that is ready to go to arbitration and is

13  going to cost the union money.

14  Q.   You would be cc'd on emails from time to time?

15  A.   Yes, a hundred percent.

16  Q.   This included, for example, from Christie Meyers.

17  Do you know who she is?

18  A.   Yes.

19  Q.   Ms. Meyers or Ms. Paganine -- am I pronouncing that

20  correct -- Andrea?

21  A.   Yes.

22  Q.   Andrea and other organizers in SEIU, they would

23  copy you on emails to the administrators and Mr. Halper

24  to get issues resolved with pay, right?

25  A.   Yes -- hold on.  Not for me to get involved and

Carlos Rivera - Cross

1  resolve them.  Just that I was copied on them.

2  Q.  You were copied on them?

3  A.  Correct.

4  Q.  So with respect to the transition, just clarify for

5  me what is your memory with respect to payroll errors

6  during the transitions as you described them?

7  A.  So once they purchased some buildings, there were

8  issues where people were not paid the correct amount or

9  they were missing hours or PTO time getting transferred

10  over, things like that.

11  Q.  I think you said this on direct, but do you

12  remember hearing administrators complain that they

13  couldn't fix these errors themselves?

14  A.  Yes.

15  Q.  They would complain it's payroll in New York,

16  they're the ones controlling things?

17  A.  Yes, correct.

18  Q.  I just want to go through one quick document with

19  you, sir.  This is PX375.  I believe it has been

20  admitted.  I'm just going to hand you a copy and put it

21  up on the screen.

22         MR. HERRERA:  Do you want a paper copy, Your

23  Honor?

24         THE COURT:  Please.

25  Q.  Take a minute -- you are already reading it.

**Carlos Rivera - Cross**

1    Great.

2               (Pause in the proceedings.)

3    A.    Yes, I'm aware of this.

4    Q.    This email, it looks like you are referencing

5    perhaps a call with Mr. Halper, Mr. Lahasky, and I can't

6    tell based on the email, but there is a Nick Lieberman.

7    Do you know who that is?

8    A.    That is someone who used to work for I think it was

9    Priority.

10   Q.    So you're sending a summary of issues discussed

11   with your email to Mr. Halper and others, correct?

12   A.    Correct, because these are nursing homes that had

13   issues come up through organizers and some of these

14   aren't even a part of that group.

15   Q.    Correct, some of these are not Comprehensive

16   buildings, but you would agree with me that there are

17   some Comprehensive homes in this list of issues,

18   correct?

19   A.    Yes.

20   Q.    So let's go to page 2.

21   A.    Yes.

22   Q.    We're talking on the top of the page -- I'll just

23   start reading here.  There were employees from the

24   Reliant Homes, Priority and Maybrook.

25               So my understanding how this case is

 1  structured is we are going to focus on Reliant and

 2  Maybrook.  Why did you say in this list of notes that

 3  employee morale is at an all time low?

 4  A.    Because that is what the organizers informed me of.

 5  This is right around the time they purchased.

 6  Q.    Is that your independent recollection as well that

 7  employee morale was at an all time low?

 8  A.    I didn't speak to the employees.  That's what I got

 9  from meeting with the organizers.

10  Q.    You didn't doubt it though, did you?

11  A.    I followed whatever my organizers said.

12  Q.    It's true, is it not, that as you wrote here, all

13  the homes are in encountering, quote, unquote, staffing

14  issues?

15  A.    That's an ongoing statewide industry issue.

16  Q.    It was also an issue in these 15 homes, was it not?

17  A.    In every nursing home.

18  Q.    Including these?

19  A.    Every nursing home.

20  Q.    There was an issue here, quote unquote, shift

21  differentials being changed, right?

22  A.    Correct.

23  Q.    So in other words, the payroll office in New York

24  was not correctly paying the shift differentials for

25  these Comprehensive employees, right?

Carlos Rivera - Cross

1  A.   Because there was a grandfather agreement that was

2  a higher rate and a lower rate.

3  Q.   And they weren't paying the correct rate, were

4  they?

5  A.   According to the organizers, yes.

6  Q.   There were also, as you list here, payroll issues,

7  right?

8  A.   Whatever is in there, yes, that's what I got from

9  Monroeville, from the organizer.

10 Q.   From the other ones listed in this email as well,

11 right?

12 A.   Yes.

13 Q.   And, finally, that first paragraph, it says,

14 members feel that they cannot provide quality care for

15 the residents, right?

16 A.   Where do you see that?

17 Q.   The last sentence of the first paragraph.

18 A.   Yes.

19 Q.   That was an issue in these homes as well, right,

20 the issues with payroll and other operation issues were

21 so bad that it was affecting patient care, right?

22 A.   From what the organizers tell me, yep.

23 Q.   So let's go to Murrysville, the second home listed

24 here.   There were issues in Murrysville, at least at

25 this point, that employees are missing days and aren't

**Carlos Rivera - Cross**

1    corrected timely, correct?

2    A.   I'm looking for Murrysville.  I see it.

3    Q.   That was an issue in this building at this time,

4    was it not, that, quote, employees are missing days and

5    aren't corrected timely?

6    A.   If that's what I typed up, that's what was going on

7    there.

8    Q.   It goes on, unable to cash checks in several

9    locations.  OT and regular days continue to be missing

10   from employees' checks, right?

11   A.   Yes, that's in there, yes.

12   Q.   So, again, Mr. Rivera, your memory is your memory

13   and that's fine, but I want to ask you again are you

14   really saying that there wasn't a persistent issue with

15   payroll in these buildings?

16   A.   All these issues from my understanding were

17   resolved.  If not, I would have filed a grievance or

18   directed the organizers to file a grievance.

19   Q.   I appreciate that.  That's a separate question.

20   Whether they were resolved or not is a different issue.

21   Did they come up?

22   A.   Of course.

23   Q.   There were times in your role as the SEIU contact,

24   at a high level at least, you became frustrated with

25   Mr. Halper and his payroll company, didn't you?

**Carlos Rivera - Cross**

1    A.    I can't recall that.

2    Q.    There was an issue in these homes of getting pay

3    corrected timely, wasn't there?

4    A.    Not that I recall except for these issues every now

5    and then.

6    Q.    So your general memory is that pay issues were

7    corrected promptly, is that what you're saying?

8    A.    We didn't file grievances, so I left it up to the

9    organizers to deal with the individual chapters.  I got

10   involved when it was to approve arbitrations.  That was

11   my role.

12   Q.    Understood.  So you're saying there was never a

13   point where you were exasperated because of how many

14   issues came up in these buildings that were not timely

15   corrected, is that what you are saying?

16   A.    There's a lot of issues with all nursing homes.

17   Staffing is the biggest one.  I can't tell you if that

18   was a reason but I don't think so.

19   Q.    Okay.  Ultimately, with respect to the CBAs -- you

20   can put this document aside for now.  I think you said

21   that you bargained several of the nursing homes in this

22   case at various points, right?

23   A.    I had a role in them.

24   Q.    In those negotiations, I think you said that you

25   dealt sometimes with Lou Capozzi, the labor attorney?

**Carlos Rivera - Cross**

1    A.    Yes.

2    Q.    Ultimately, however, Mr. Halper and his ownership

3    team would have to approve whatever agreement had been

4    reached, correct?

5    A.    I don't know what they did behind the scenes.  I

6    know we had to ratify it for members.  I don't know what

7    they did.

8    Q.    You don't know one way or the other if Mr. Halper

9    had to approve the CBA as negotiated?

10   A.    He was there.

11   Q.    Right, but he was there for a reason, right?

12   A.    Right.  So I don't know what their agreement

13   between Lou and him were.

14   Q.    Okay.  That's fine.  It's true, is it not, sir,

15   that there were many grievances filed in these buildings

16   over pay when you were involved in this?

17   A.    Grievances?

18   Q.    Correct.

19   A.    I don't know because that's at the chapter level.

20   Like I said, I dealt with it when it got to me for

21   arbitrations.

22   Q.    You heard from your organizers, though, that

23   employees, the members would complain to their

24   supervisors about the pay, right?

25   A.    I know they complained about issues.  I can't tell

Carlos Rivera - Cross

1    you specifics.  I would talk to an organizer how to
2    strategize and get members to take action.
3    Q.   And that would include going to their supervisor or
4    the local payroll office, right?
5    A.   Well, that would include doing like a picket or
6    something like that.  If members went to payroll because
7    they felt they needed to get paid, that was their right
8    under the contract.
9    Q.   Finally, sir, in terms of your role with the
10   members, I think you said this but I just want to be
11   sure, if your organizers or the members would pass
12   complaints up to you, you had no reason to doubt what
13   they were saying, did you?
14   A.   No, but we would need proof, right.  Just like an
15   employee has to show just cause.  We need to proof to be
16   able to go further because arbitrations are expensive.
17   Q.   Understood.  Separate and apart from the
18   arbitration procedure, you didn't have any doubt that
19   what these workers were telling you was false right off
20   the bat, did you?
21   A.   At times we found out that it wasn't 100 percent
22   what the employees would say it was.
23   Q.   As a general matter, sir, you didn't have a reason
24   to disbelieve your members, did you?
25   A.   No, but I would look into it further instead of

Carlos Rivera - Redirect

 1  just taking their word for it as being an issue.

 2  Q.    You verified it, but you didn't have a reason to

 3  think they were being dishonest when they complained,

 4  did you?

 5  A.    No.  Maybe confused, maybe not accurate.

 6  Q.    But never malicious, right?

 7  A.    No.

 8              MR. HERRERA:  Nothing further.

 9              THE COURT:  Redirect.

10                    REDIRECT EXAMINATION

11  BY MR. SCHWARTZ:

12  Q.    Just a couple of questions for you, Carlos.  The

13  document that counsel handed you, do you still have that

14  in front of you?

15  A.    Yes.

16  Q.    What is the date on that?

17  A.    March 16, 2017.

18  Q.    If I told you that CHMS acquired the Monroeville

19  and Murrysville facilities that are identified on that

20  document on February 1, 2017, would the date on that

21  document cover in your mind what you refer to as the

22  transition?

23  A.    Yes, it would.

24  Q.    You mentioned that you would occasionally speak

25  with Mr. Halper to try to resolve issues?

Carlos Rivera - Recross

1  A.   Yes.

2  Q.   In those instances, were the issues resolved?

3  A.   As far as I knew, yes.

4  Q.   If they weren't resolved, they would have escalated

5  to arbitration, right?

6  A.   Yes.

7          MR. SCHWARTZ:  Nothing further.

8          THE COURT:  Recross.

9          MR. HERRERA:  Briefly, Your Honor.

10              RECROSS-EXAMINATION

11  BY MR. HERRERA:

12  Q.   Mr. Rivera, I think you said that your

13  understanding was the issues would be resolved after

14  bringing them to Mr. Halper.  You didn't know one way or

15  another except what other people told you about that,

16  right?

17  A.   Correct, because there was no grievance followed

18  through.

19  Q.   No.  What I'm saying is whether or not it was

20  resolved, a grievance might be one indication, but you

21  didn't know independently know whether an issue was

22  fixed or not?

23  A.   Well, I had an indication if the organizer didn't

24  come back with a grievance saying we have to push

25  through because it wasn't resolved.

**Carlos Rivera - Recross**

1  Q.   That's a possibility.  It could also be that the

2  member quit, right?

3  A.   That could happen.

4  Q.   It could also be because the member said it's not

5  worth going to court over a $50 pay dispute, right?

6  A.   I've had members actually want to arbitrate over

7  $25, so I wouldn't agree with that.

8  Q.   So it's a possibility but in general, members are

9  not arbitrating over $25, are they?

10 A.   They push for it.  Whether I approve it or not is a

11 different story.

12 Q.   Not every member is going to do that, are they?

13 A.   No.

14 Q.   You didn't independently confer with CHMS Group's

15 payroll to make sure pay errors were fixed, did you?

16 A.   No.

17          MR. HERRERA:  Nothing further, Your Honor.

18          THE COURT:  You are finished.  You may step

19 down.

20          MR. SCHWARTZ:  We have our next witness ready,

21 Your Honor, Michelle Kunselman.  I'm just going to step

22 out for one second.

23          THE COURT:  Please raise your right hand.

24          MICHELLE KUNSELMAN, a witness herein,

25 having been duly sworn, testified as follows:

1          THE COURT:  Have a seat.  You can adjust the

2     microphone.  Please state and spell your name for the

3     record.

4          THE WITNESS:  Michelle Kunselman,

5     M-i-c-h-e-l-l-e, K-u-n-s-e-l-m-a-n.

6                    DIRECT EXAMINATION

7     BY MR. SCHWARTZ:

8     Q.   Good afternoon, Michelle.

9     A.   Hello.

10    Q.   Where do you work?

11    A.   The Grove at New Wilmington.

12    Q.   How long have you worked there?

13    A.   Three years.

14    Q.   What is your job?

15    A.   The administrator.

16    Q.   Does that mean you are the head person at The Grove

17    at New Wilmington?

18    A.   Yes.

19    Q.   What I want to do with you, if you don't mind, is

20    just walk through a bit of your work history with you,

21    okay?

22    A.   Sure.

23    Q.   We are going to go backwards from earliest to

24    furthest.

25    A.   Okay.

**Michelle Kunselman - Direct**

1  Q.   So before you were an administrator at The Grove at
2  New Wilmington, what did you do?
3  A.   I was the administrator at The Grove at New Castle.
4  Q.   I think you said you have been the administrator in
5  your current spot for three years?
6  A.   Yes.
7  Q.   How long were you the administrator at The Grove at
8  New Castle?
9  A.   Almost three years.
10 Q.   I'm just going to refer to these as New Wilmington
11 and New Castle and leave out "The Grove"?
12 A.   Okay.
13 Q.   But you know what I'm talking about.
14 A.   Yes.
15 Q.   Before you were the administrator at New Castle,
16 what did you do?
17 A.   I was director of nursing.
18 Q.   How long were you director of nursing?
19 A.   I believe four years.
20 Q.   Prior to being the director of nursing at New
21 Castle, what did you do?
22 A.   I was the assistant director of nursing at New
23 Castle.
24 Q.   What period does that cover?
25 A.   I believe 2013 and '14 until I became the director

**Michelle Kunselman - Direct**

1    of nursing.

2    Q.   So is it fair to say, Michelle, you were working at

3    New Castle when the Comprehensive group became the

4    owner?

5    A.   Yes.

6    Q.   So your employment at New Castle predated and

7    postdated Comprehensive's ownership of that home?

8    A.   Yes.

9    Q.   And the time that you have been at New Wilmington,

10   the entirety of that time has been Comprehensive?

11   A.   Yes.

12   Q.   Just for background purposes, Michelle, what did

13   you do before you were the ADON at New Castle?

14   A.   I started there as the RN supervisor in 2012.

15   Q.   Before that you were in nursing school?

16   A.   Yes.

17   Q.   So your entire work history has been either at New

18   Castle or New Wilmington?

19   A.   As a nurse, yes.

20   Q.   Did you do something before you were a nurse?

21   A.   I was a waitress, different jobs like that, worked

22   in a luggage company.

23   Q.   All right.  Why don't you just tell us just

24   generally speaking, Michelle, what do you do as the

25   administrator at New Wilmington?  What is your job?

1   A.   I'm the head of operations.  I oversee the whole

2   building, each department, head up the meetings, make

3   sure we do our QAPI, make sure everything is operating

4   correctly, make sure we have everything we need.

5   Q.   How many beds are at New Wilmington?

6   A.   115.

7   Q.   What is the total number of employees that work,

8   and if it's not exact, close to?

9   A.   The average is about 116 right now.

10  Q.   An employee per bed just about?

11  A.   Just about.

12  Q.   So underneath you, and we are going to talk first

13  about New Wilmington and then talk about New Castle.  At

14  New Wilmington under you, are there other folks who

15  manage or supervise a department?

16  A.   Yes.

17  Q.   Is there a director of nursing?

18  A.   Yes.

19  Q.   There's been a director of nursing during your

20  three years at New Wilmington?

21  A.   Yes.

22  Q.   Is it the same person?

23  A.   No.

24  Q.   Who is the current director of nursing?

25  A.   Christina George.

**Michelle Kunselman - Direct**

1    Q.    Does Ms. George as the director of nursing play any

2    role in hiring of employees?

3    A.    Yes.

4    Q.    What is her role?

5    A.    She will interview them.  If she decides to hire

6    them, she would make up their schedule.  If they needed

7    schedule changes, she would do all of that.

8    Q.    Is there somebody -- does she have the authority to

9    discipline employees?

10   A.    She does but we would talk about it.

11   Q.    But if she sees something that happened that

12   warrants an employee being counseled about it and came

13   to you and said that person needs to be warned or

14   counseled, would you accept her recommendation?

15   A.    Yes.

16   Q.    How many employees does the DON supervise?

17   A.    I don't know the exact number.

18   Q.    Roughly?

19   A.    50.

20   Q.    The authority that you just testified to for the

21   DON in terms of hiring and disciplining, has that

22   authority existed for whoever held that position while

23   you have been administrator?

24   A.    Yes.

25   Q.    Is there an ADON?

1   A.   Yes.

2   Q.   Who is that?

3   A.   Jackie Collar.

4   Q.   How long has Jackie been in that position?

5   A.   This time, almost three years.  She came right

6   after me, but she was there previously.

7   Q.   She has been the ADON at New Wilmington as long as

8   you have been an administrator?

9   A.   Just about.

10  Q.   Does Jackie as the ADON play a role in the hiring

11  process?

12  A.   No.

13  Q.   Does she have authority to discipline?

14  A.   No.

15  Q.   Does she manage employees?

16  A.   Yes.

17  Q.   Tell us about that.

18  A.   She comes in earlier.  So if midnight is having an

19  issue, they will go to her.  If they have any issues,

20  they can speak to her about it and she would talk to the

21  director of nursing.  Again, they would speak but she

22  can't manage.

23  Q.   The number of folks that the DON supervises is

24  different for the ADON?

25  A.   No.

**Michelle Kunselman - Direct**

1   Q.   Other than the DON supervises the ADON?

2   A.   Yes.

3   Q.   But everyone else that the DON supervises, the ADON

4   would also supervise?

5   A.   Yes.

6   Q.   Are there times where the ADON is the highest

7   manager in the building?

8   A.   At times, yes.

9   Q.   There's times when she or he is there and you're

10  not there?

11  A.   In the mornings, yes.  Jackie comes in the

12  earliest.

13  Q.   When Jackie comes in, you're not there and the DON

14  is not there?

15  A.   Yes.

16  Q.   So if there was an incident during that time

17  period, would Jackie have the authority to act on that?

18  A.   She would.

19  Q.   Is there a person in the role of dietary manager?

20  A.   Yes.

21  Q.   Who is that?

22  A.   Deb Blackburn.

23  Q.   How long has she been there?

24  A.   About two years.

25  Q.   So was there another dietary manager under your

```
 1  tenure as administrator?

 2  A.   Two others at New Wilmington.

 3  Q.   What did I say?

 4  A.   I was just clarifying.

 5  Q.   Okay.  How many people does the dietary manager

 6  supervise?

 7  A.   Around 10 to 12.

 8  Q.   Does the dietary manager play a role in the hiring

 9  of the people in her department?

10  A.   Yes.

11  Q.   What is her role?

12  A.   The same.  She can interview them.  If she likes

13  them, she would make their schedule.  If she had

14  schedule changes, she would be in charge of that.

15  Q.   Does the dietary manager at New Wilmington have the

16  authority to discipline the employees under her

17  supervision?

18  A.   Yes.

19  Q.   Those answers to that question as it pertains to

20  the current dietary manager, do your answers also apply

21  to the people who held those positions prior?

22  A.   Yes.

23  Q.   Is there a director of maintenance at New

24  Wilmington?

25  A.   Yes.
```

1    Q.    How many employees does that person supervise?

2    A.    There's three right now.

3    Q.    Is the current director of maintenance the same

4    director of maintenance that's been there during your

5    tenure?

6    A.    Yes.

7    Q.    Does that director of maintenance play a role in

8    hiring people in that department?

9    A.    Yes.

10    Q.    What is their role?

11    A.    It's the same.  He does the interviews, makes their

12    schedule, does schedule changes.

13    Q.    Does the director of maintenance have authority to

14    discipline the employees in that department?

15    A.    Yes.

16    Q.    Is there a person who serves as director of

17    housekeeping?

18    A.    Yes.

19    Q.    How many people does that person supervise?

20    A.    Five to eight.

21    Q.    Is the person in that position now the same one

22    that has been in that position during your tenure as

23    administrator?

24    A.    No.

25    Q.    How many others have held that role?

**Michelle Kunselman - Direct**

1  A.    Two.

2  Q.    For the purpose of my questions as the current

3  person, I'm going to ask whether that applied to the

4  prior to as well?

5  A.    Yes.

6  Q.    Does the director of housekeeping play a role in

7  hiring people?

8  A.    Yes.

9  Q.    What is that role?

10 A.    She is able to interview, she does schedules, does

11 schedule changes.

12 Q.    Does the director of housekeeping have the

13 authority to discipline employees under their

14 supervision?

15 A.    Yes.

16 Q.    Those answers to those questions would be the same

17 for the person who held that position during the

18 entirety of your tenure?

19 A.    Yes.

20 Q.    Is there an activities director at New Wilmington?

21 A.    Yes.

22 Q.    How many employees does that person supervise?

23 A.    Four.

24 Q.    Does the activities director play a role in hiring

25 people in that department?

**Michelle Kunselman - Direct**

 1    A.    Yes.

 2    Q.    What is the role?

 3    A.    Same.  She interviews them, makes their schedule,

 4    schedule changes.

 5    Q.    Does the activity director have the authority to

 6    discipline?

 7    A.    Yes.

 8    Q.    Is the person currently in that position the same

 9    person that has been there throughout your tenure?

10    A.    No.

11    Q.    How many others held that job?

12    A.    One other.

13    Q.    Did the other person who held the job have the same

14    authority to hire and discipline?

15    A.    Yes.

16    Q.    Is there a director of rehab?

17    A.    Yes.

18    Q.    How many employees does the director of rehab

19    supervise?

20    A.    Four to five.

21    Q.    Does the director of -- is the person currently in

22    that role the same person that's been there through the

23    your tenure?

24    A.    No.

25    Q.    Does the person who currently holds that position

Michelle Kunselman - Direct

1  play a role in the hiring process for people in that

2  department?

3  A.   Yes.

4  Q.   What is the role?

5  A.   Interviewing, making schedules, schedule changes.

6  Q.   Do they participate in the decision of whether to

7  hire somebody or not?

8  A.   Yes.

9  Q.   Does the director of rehab have the authority to

10  discipline employees in that department?

11  A.   Yes.

12  Q.   For those who held that same position during your

13  tenure as administrator at New Wilmington, did those

14  folks have the same role in hiring and discipline?

15  A.   Yes.

16  Q.   The person I identified as director of

17  housekeeping, is that title environmental housekeeping?

18  A.   Yes, environmental.

19  Q.   So prior to taking on the position of administrator

20  at New Wilmington, you were the administrator at New

21  Castle, correct?

22  A.   Correct.

23  Q.   Were your duties and responsibilities at New Castle

24  any different than they are at New Wilmington?

25  A.   The only difference I can think of, there was a

Michelle Kunselman - Direct

1   union at New Castle and there is not a union at New
2   Wilmington but the duties were the same.
3   Q.   At New Castle you would occasionally have to
4   interact with the union?
5   A.   Yes.
6   Q.   If there was a grievance or some sort of issue?
7   A.   Yes.
8   Q.   Other than that, same duties and responsibilities?
9   A.   Yes.
10  Q.   You are the head person at the facility?
11  A.   Yes.
12  Q.   Is there a director of nursing at New Castle?
13  A.   Yes.
14  Q.   Actually, let me make sure I'm clear on my
15  questions from a timing part.  I just want to focus on
16  what was happening when you were there.
17  A.   Okay.
18  Q.   2015 to 2018?
19  A.   As the director of nursing, yes.
20  Q.   No, I'm sorry.  As the administrator, 2018 to 2021?
21  A.   Yes.
22  Q.   And that period would cover when Comprehensive
23  owned it, right?
24  A.   Correct.
25  Q.   So let's focus on '18 to '21.  Was there a DON

1  there during those three years?

2  A.   Yes.

3  Q.   Was it the same person?

4  A.   Yes.

5  Q.   Who was that?

6  A.   Karen Klingensmith.

7  Q.   I'm going to ask you the same basic questions I

8  asked about the role of the managers at New Castle

9  versus -- the same questions I asked about New

10  Wilmington.

11  A.   Okay.

12  Q.   Does the director of nursing at New Castle

13  supervise employees?

14  A.   Yes.

15  Q.   How many?

16  A.   I'm going to estimate 40.

17  Q.   I should have asked you.  How many beds are at New

18  Castle?

19  A.   62.

20  Q.   Was that the number when you were there?

21  A.   That's the number of beds, yes.

22  Q.   Do you know again roughly how many employees were

23  there during your tenure?

24  A.   It would be a guess.

25  Q.   Best guess?

**Michelle Kunselman - Direct**

1    A.    70.

2    Q.    So the director of nursing during the period of

3    2018 to 2021, did she play a role in the hiring process

4    at New Castle?

5    A.    Yes.

6    Q.    What was her role?

7    A.    Interviewing, scheduling, schedule changes.

8    Q.    Would she play a role in deciding whether someone

9    should be brought on or not?

10   A.    Yes.

11   Q.    Did the director of nursing at New Castle have the

12   authority to discipline employees?

13   A.    Yes.

14   Q.    Was there an ADON at New Castle?

15   A.    Yes.

16   Q.    And was it the same person during your three years?

17   A.    Yes.

18   Q.    Who is that?

19   A.    Lori Weir.

20   Q.    Did Lori play a role in the hiring process?

21   A.    No.

22   Q.    Did Lori have the authority to discipline

23   employees?

24   A.    Yes.

25   Q.    Your testimony about the way that the ADON managed

**Michelle Kunselman - Direct**

1  the people they supervised at New Wilmington, is it the
2  same at New Castle?
3  A.   Yes.
4  Q.   Was there a dietary manager during your tenure at
5  New Castle?
6  A.   Yes.
7  Q.   Was it the same person?
8  A.   No -- I'm thinking.  I believe there were two
9  different ones.
10          MR. SCHWARTZ:  Your Honor, one second.
11          THE COURT:  You may.
12          (Pause in the proceedings.)
13  Q.   There were two different dietary managers, you
14  said?
15  A.   Well, it could have been when I was director of
16  nursing to be honest.  I know there was more than one
17  when I was at New Castle.
18  Q.   Let me ask you this.  How many people did the
19  dietary manager supervise when you were administrator at
20  New Castle?
21  A.   Around eight.
22  Q.   Did the dietary manager at New Castle during your
23  tenure have the authority to hire?
24  A.   Yes.
25  Q.   Did they play a role in the hiring process?

**Michelle Kunselman - Direct**

1  A.   Yes.

2  Q.   Did the dietary manager have the authority to

3  discipline the employees under her supervision?

4  A.   Yes.

5  Q.   Was there a director of environmental services at

6  New Castle?

7  A.   Yes.

8  Q.   In the period of 2018 to the 2021, did that person

9  play a role in the hiring process?

10 A.   Yes.

11 Q.   And what was the role?

12 A.   Interviewing, scheduling, schedule changes.

13 Q.   Did they play a role in deciding whether someone

14 would be brought on or not?

15 A.   Yes.

16 Q.   Did the director of housekeeping have the authority

17 to discipline at New Castle?

18 A.   Yes.

19 Q.   Was there a director of maintenance at New Castle?

20 A.   Yes.

21 Q.   How many employees did that person supervise?

22 A.   One to two.

23 Q.   Sometimes there were two?

24 A.   I believe so.

25 Q.   Did the director of maintenance play a role in

1  hiring the people in that department?

2  A.   Yes.

3  Q.   What role did they play?

4  A.   Interviewing, scheduling, deciding to bring them

5  on.

6  Q.   Did the director of maintenance have authority to

7  discipline employees at New Castle?

8  A.   Yes.

9  Q.   And was there an activities director at

10  New Castle?

11  A.   Yes.

12  Q.   How many employees did that person supervise?

13  A.   Two.

14  Q.   Did the activities director play a role in hiring

15  people at New Castle for that department?

16  A.   Yes.

17  Q.   What was the role?

18  A.   Interviewing, deciding to bring them on, making

19  their schedule.

20  Q.   Did the director of activities at New Castle have

21  the authority to discipline employees?

22  A.   Yes.

23  Q.   Is there a director of rehab at New Castle?

24  A.   Yes.

25  Q.   How many persons did that person supervise?

**Michelle Kunselman - Direct**

1  A.    Three to four.

2  Q.    Do they play a role in hiring people in that

3  department?

4  A.    Can you repeat that.

5  Q.    Does the director of rehab play a role in hiring

6  people in that department?

7  A.    Yes.

8  Q.    Does the director of rehab have the authority to

9  discipline?

10  A.    Yes.

11  Q.    Following up on hiring, what is the role of hiring

12  for the director of rehab?

13  A.    Interviewing, deciding if we are bringing them on,

14  making schedules.

15  Q.    Is it fair to say everybody in the director

16  position had the same level of authority in terms of

17  hiring except maybe the ADON?

18  A.    Yes.

19  Q.    And all had the authority to discipline?

20  A.    Yes.

21  Q.    So prior to becoming -- I'm sorry, Your Honor.

22          (Pause in the proceedings.)

23          MR. SCHWARTZ:  I'll tender the witness.

24          THE COURT:  Okay.  Cross-examination.

25          MR. SEIFELDEIN:  Yes, Your Honor.

**Michelle Kunselman - Cross**

|       |                                                           |
|-------|-----------------------------------------------------------|
| 1     | <u>CROSS-EXAMINATION</u>                                   |
| 2     | <u>BY MR. SEIFELDEIN</u>:                                  |
| 3     | Q.   Good afternoon, ma'am.                                |
| 4     | A.   Hi.                                                   |
| 5     | Q.   You have been an admin for about six years?          |
| 6     | A.   Yes.                                                  |
| 7     | Q.   To be an admin, you need to receive some sort of     |
| 8     | license?                                                   |
| 9     | A.   Yes.                                                  |
| 10    | Q.   Is that correct?                                      |
| 11    | A.   Correct.                                              |
| 12    | Q.   Part of you obtaining the license, did you get any   |
| 13    | sort of Fair Labor Standards Act training, what that      |
| 14    | entailed?                                                  |
| 15    | A.   The training through work, through the schooling.    |
| 16    | Q.   Did it cover the Fair Labor Standards Act?           |
| 17    | A.   I honestly don't remember.                           |
| 18    | Q.   As part of your duties as an admin, did you have    |
| 19    | the authority to hire and fire you said?                  |
| 20    | A.   Yes.                                                  |
| 21    | Q.   Is that correct?                                      |
| 22    | A.   Yes.                                                  |
| 23    | Q.   That decision does not ultimately lie with you if   |
| 24    | you are not in a role of supervisor, is that right?       |
| 25    | A.   We would make that decision together.                |

**Michelle Kunselman - Cross**

1  Q.   And your supervisor would be the regional, correct?

2  A.   Yes.

3  Q.   And is there someone higher that you report to as

4  well?

5  A.   I just report to the regional.

6  Q.   Okay.  Say you want to hire someone.  The regional

7  says, well, they're asking for too much.  They may be a

8  good fit, but we don't want them.  You can't overrule

9  that, can you?

10 A.   No.

11 Q.   That goes for every person you just discussed with

12 defendant's counsel, the DON, dietary manager, all of

13 them, they can be overruled by you, correct?

14 A.   Yes.

15 Q.   And the regional, correct?

16 A.   Correct.

17 Q.   So, ultimately, they don't have the independent

18 authority to hire, is that correct?

19 A.   Correct.

20 Q.   The same goes for discipline, right.  You as the

21 administrator could discipline?

22 A.   Yes.

23 Q.   You as admin could potentially fire, correct?

24 A.   Yes.

25 Q.   Do you have to go to your regional to accomplish

**Michelle Kunselman - Cross**

```
 1  that specifically if there is a union employee?
 2  A.   If there's a union employee, I would go to my
 3  regional.
 4  Q.   And your regional could override you?
 5  A.   Yes.
 6  Q.   And you are the highest person in this facility?
 7  A.   Yes.
 8  Q.   Both facilities we are talking now?
 9  A.   Correct.
10  Q.   Now you mentioned that these managers, dietary,
11  maintenance people have the authority to discipline,
12  correct?
13  A.   Correct.
14  Q.   Does that include firing?
15  A.   They would talk with me.
16  Q.   They would speak with you?
17  A.   Yes.
18  Q.   And make you aware of the situation but they can't
19  independently say I'm firing this person, correct?
20  A.   Correct.
21  Q.   They would have to get your approval?
22  A.   Correct.
23  Q.   You would have to get someone else's approval,
24  correct, for firing?
25  A.   I understand.  I'm just making sure I have it right
```

1    in my head.  Can you repeat that question.

2    Q.    Absolutely.  We are talking about disciplining.

3    Within disciplining, we are talking about firing an

4    employee, letting them go, severing the relationship,

5    yes?

6    A.    Yes.

7    Q.    Okay.  Let's talk about the maintenance supervisor.

8    They are having an issue with an employee for whatever

9    reason and they determine I want to fire this person.

10   Can this maintenance supervisor independently make that

11   decision?

12   A.    No.

13   Q.    They would have to go through you, yes?

14   A.    Yes.

15   Q.    And you, in turn, if that member or employee is a

16   union member, would you have to go to your supervisor?

17   A.    Yes.

18   Q.    And your supervisor could override your decision to

19   terminate that person, correct?

20   A.    Correct.

21   Q.    You, yourself, do not have independent authority to

22   fire?

23   A.    Correct.

24   Q.    Okay.  That goes for every manager that you just

25   discussed with the defendant counsel, correct?

**Michelle Kunselman - Cross**

1    A.    Can I explain?  Correct.

2    Q.    And that is throughout your tenure for six years

3    you mentioned at New Wilmington and New Castle, correct?

4    A.    Correct.

5    Q.    Let's go back to the Fair Labor Standards Act.  As

6    an admin, you have to be aware of certain things within

7    your facility and comply with the law, correct?

8    A.    Correct.

9    Q.    One of those things is making sure that employees,

10   as you noted, are properly taken care of or everything

11   is done right, your words?

12         Did I mischaracterize your testimony?  One of

13   your responsibilities and duties is to make sure

14   everything must be done correctly and that's why you are

15   there?

16   A.    Correct.

17   Q.    One of those things is making sure, you would

18   agree, that the employees are properly compensated?

19   A.    Yes.

20   Q.    What knowledge do you have about that particular

21   duty, where does it come from?

22   A.    We have an employee handbook that we follow.

23   Q.    So when it comes to what you discussed with

24   Mr. Schwartz here regarding some of these managers, did

25   you hire these managers?

**Michelle Kunselman - Cross**

1   A.   Some of them.

2   Q.   Did you have to get approval from someone else to

3   hire them?

4   A.   It goes up with their rates, it all goes up to the

5   regional.

6   Q.   So, for example, to your credit, if you were to

7   hire a union member, that is on the CBA, correct?

8   A.   Yes.

9   Q.   But the market is also tough, right?

10  A.   Correct.

11  Q.   Sometimes you have to pay a member or employee more

12  than the union rate in the CBA, right?  If you get an

13  employee that you need, a nurse or let's say an LPN, you

14  need an LPN.  Assume they are part of the union.  It

15  says pay them $10 an hour.  Hypothetically this person

16  says I'll work for you but I need $12.  You would have

17  to go up to someone to get approval --

18  A.   We would follow the union book.  We wouldn't ask

19  for more.

20  Q.   Then let's say a nonunion member.  That would have

21  to be approved by somebody else beside you, correct?

22  A.   Correct.

23  Q.   Your supervisor?

24  A.   Yes.

25  Q.   Okay.  Now, when it comes to the managers, moving

1  away from employees, let's stick with dietary for a
2  moment.  Do you make that decision independently?
3  A.   Which decision?
4  Q.   To hire a manager like a dietary manager or
5  supervisor, however you want to label it.
6  A.   I would make the decision to hire them, yes.
7  Q.   But you would need approval from the top, is that
8  right, from the regional?
9  A.   I would send an email up with their name and I
10  would like to hire them and get their rate.
11  Q.   Get the rate what?  Approved?
12  A.   Yes.
13  Q.   And that could be rejected, yes?
14  A.   Yes.
15  Q.   All right.  When that determination is made to
16  hire, like you said you have the authority to do, do you
17  make an exemption determination?  Do you know what that
18  means?
19  A.   Can you explain.
20  Q.   That's a bad question.  Let me take a step back.
21  I'm not trying to trick you.
22         So when you hire a manager like a dietary
23  manager, interview them, résumé is great, great fit, you
24  make that decision.  I know what my facility needs.
25  Let's get them in there.  You shoot it up to the

 1  supervisor.  Hey, I need approval for this person.

 2          When you send that email to the supervisor, do

 3  you include the rate how much this person will be paid?

 4  A.   Yes.

 5  Q.   And do you make that decision independently

 6  yourself how much they would be paid?

 7  A.   No.

 8  Q.   Okay.  Where would you make that -- what

 9  information would you get to make that decision?

10  A.   If I'm filling a spot, I would most likely look at

11  what the current rate was and go from the current rate.

12  Q.   In doing so, do you determine whether this person

13  is exempt from the Fair Labor Standards Act which means

14  they are not entitled to be paid overtime if they work

15  more than 40 hours in a workweek?  Do you make that

16  determination?

17  A.   I don't think I understand your question.  I'm

18  sorry.

19  Q.   That's fine.

20  A.   If it's a manager -- can I explain why I don't

21  understand.

22  Q.   I can rephrase it and you can let me know if you

23  don't understand my question.

24          We are hiring a dietary manager.  You are

25  trying to determine how much to pay this person and you

1    know what their duties are.  One of the determinations

2    that you make for a manager is whether they would be

3    paid hourly or salary, right?

4    A.    I do not make that decision.

5    Q.    Okay.  You don't make that decision?

6    A.    No.

7    Q.    Who does?

8    A.    The managers are salary.

9    Q.    Who makes that decision?

10   A.    That was made before I came -- the ownership.

11   Q.    I'm talking about people you are hiring.

12   A.    The managers?

13   Q.    Yes.

14   A.    I'm sorry.  I'm not following you.

15   Q.    Sure.  I'll take a step back.  If I understood you

16   correctly, and correct me if I'm wrong, you told me that

17   you make hiring decisions when it comes to managers?

18   A.    I do.

19   Q.    Very good.  And you shoot that up to your

20   supervisor, the regionals?

21   A.    Yes.

22   Q.    But you within that email that you shoot up say

23   this is how much this person is making either based on

24   the prior person you are filling or what have you,

25   correct?

**Michelle Kunselman - Cross**

1    A.    Correct.

2    Q.    Okay.  And that determination, how is it made by

3    you?  We are talking about a particular manager.

4    Dietary is the example I'm using.  You are determining

5    this person if they work more than 40 hours in a

6    workweek, should they get overtime or not?  Do you make

7    that decision?

8    A.    No.

9    Q.    Who makes it?

10   A.    I don't know.

11   Q.    How do you know whether you pay this person --

12   A.    That is what was said.

13   Q.    By whom?

14   A.    Corporate.

15   Q.    So you don't make these decisions?

16   A.    If they're salary?

17   Q.    Yes.

18   A.    No.

19   Q.    And it sounds to me, and correct me if I'm wrong,

20   you're not familiar with the exemption within the Fair

21   Labor Standards Act whether someone should be

22   qualify -- strike that.

23          Whether someone should be paid overtime or not

24   is not something you know of personally, how to make

25   that determination?

**Michelle Kunselman - Cross**

1  A.   I know that managers get paid salary.

2  Q.   What makes a manager, just a title?

3  A.   What are you asking me?

4  Q.   You told me managers get a salary.  I'm trying to

5  understand what you mean by manager.  Is it the title

6  that is given to them?

7  A.   Well, some of the managers manage people and some

8  of the managers are head of their department.

9  Q.   So that's how you make that decision?

10 A.   There were managers in these roles.  If I'm hiring

11 somebody, I'm replacing somebody else that was in that

12 role that got paid a salary.

13 Q.   That's just made by managers and not you?  You

14 don't have personal knowledge of it.  You just told me

15 you can't make that determination yourself.  Management

16 does, corporate does, is that correct?

17 A.   Yes.

18 Q.   So when you were testifying to what Mr. Schwartz

19 was asking you about the duties or what these managers

20 did, that is based on what you were told from corporate,

21 you were following corporate policies and procedures?

22 A.   Yes.

23           MR. SCHWARTZ:  Objection, Your Honor.

24           THE COURT:  What's the objection?

25           MR. SCHWARTZ:  Mischaracterizes her testimony.

1          MR. SEIFELDEIN:  She just answered.

2          THE COURT:  I'm going to overrule the

3   objection.  I think it's within the four corners of the

4   testimony that you asked her and she testified to.  I am

5   the fact finder.  I have the transcript.

6   Q.   Ms. Kunselman, let me take a step back and ask you

7   about being present here today.  Were you subpoenaed to

8   appear?

9   A.   No.

10  Q.   You voluntarily came?

11  A.   Yes.

12  Q.   Who asked you to come to testify today?

13  A.   My attorney.

14  Q.   You have an attorney that is representing you?

15  A.   Well, the attorney for Comprehensive.

16  Q.   When did they reach out to you to come to testify?

17  A.   We talked prior.

18  Q.   When?

19  A.   We talked last week.

20  Q.   For how long?

21  A.   For how many minutes we talked?

22  Q.   Yes.

23  A.   Half an hour.

24  Q.   What did you talk about?

25  A.   We talked about coming here.

**Michelle Kunselman - Cross**

1  Q.   What specifically about coming here?

2  A.   About if I knew if there were any employees that

3  did not get paid for their lunch or any employees that

4  did not get paid for their overtime.

5  Q.   Did you answer that question?

6  A.   I did.

7  Q.   And what was the answer?

8  A.   No.

9  Q.   No, they were not paid?

10  A.   No, I did not know of an employee that did not get

11  paid.

12  Q.   Just not knowing.

13  A.   Correct.

14  Q.   When you were speaking with defendants' attorneys,

15  did you discuss your time as a DON from August 2016 to

16  2018?

17  A.   Yes.

18  Q.   What was that discussion about?

19  A.   Just how long I worked there and the different

20  roles.  That's what we went over.

21  Q.   As an employee at the time, as a DON from 2016 to

22  2018, you were paid per hour, is that right?

23  A.   I was salary.

24  Q.   You were salary.  You had to clock in and out even

25  though you were salary, correct?

1    A.    Correct.

2    Q.    And when you received the paycheck although --

3              MR. SCHWARTZ:  Your Honor, objection.  Beyond

4    the scope of the direct.  I di not ask her any question

5    about her tenure as a DON.

6              THE COURT:  I'm going to sustain the objection

7    unless you can lay a foundation as to where you're going

8    with this.

9              MR. SEIFELDEIN:  Your Honor, actually I have

10   notes that he did ask her whether she worked as a DON

11   from 2016 to 2018 when he was going through her history.

12             THE COURT:  She did.  She did mention that,

13   what she did.  I'm not sure he went into specific

14   questions of the conditions of her own employment while

15   she was there.

16             To the extent you are asking questions to

17   elicit condition about her own employment, I'm going to

18   sustain the objection.

19   Q.    So, Ms. Kunselman, you just brought up talking with

20   the attorneys about whether there were pay issues and

21   your understanding was there was not?

22   A.    Correct.

23   Q.    At all these facilities that you worked in, there

24   were zero pay issues?

25   A.    That wasn't the question.

Michelle Kunselman - Cross

1   Q.   Were there pay issues during your tenure at both

2   facilities?

3               MR. SCHWARTZ:  Objection.  Also beyond the

4   scope of direct.  My questions were strictly limited to

5   the roles of the various managers.  I didn't ask a

6   single question about pay practices.

7               THE COURT:  Where are you going with this one?

8               MR. SEIFELDEIN:  Well, Your Honor, we are

9   talking about exemptions to a degree and what these

10  managers knew.

11              THE COURT:  I mean the thing is he elicited no

12  testimony from this witness about any issues with

13  payment practices at any of the facilities that she

14  worked in.

15              The testimony that Mr. Schwartz elicited from

16  this witness was limited to the question of who was

17  working at those facilities and what the

18  responsibilities of those workers were.

19              So this witness' direct examination was

20  carefully circumscribed by those issues.  Unlike the

21  proceeding witness, who was asked about those topics,

22  she did not testify about them on direct.  I do believe

23  it is fairly outside the scope of direct.

24              MR. SEIFELDEIN:  I understand, Your Honor.

25  Q.   Last question, Ms. Kunselman.  I appreciate your

1    time and patience here.  Your testimony that you gave

2    regarding your admin work began in 2018, specifically

3    around November, October of 2018 when you became an

4    admin?

5    A.   Yes.

6    Q.   Nothing relating to prior to October of 2018,

7    correct?

8    A.   Correct.

9    Q.   You have no personal knowledge regarding what

10   happened within these facilities, correct, prior to 2018

11   in your role as an admin?

12   A.   Again, I don't understand your question.

13   Q.   Sure.  I apologize.

14   A.   No understanding of what?

15   Q.   You became an admin on or around November 2018?

16   A.   Correct.

17   Q.   And you have been an admin at two facilities?

18   A.   Yes.

19   Q.   And your testimony today with Mr. Schwartz was your

20   knowledge from November 2018 through the present, right?

21   A.   As the admin, yes.

22   Q.   So it did not include anything prior to November

23   2018, correct?

24   A.   As to admin, correct.

25            MR. SEIFELDEIN:  That's it.  Thank you.

Michelle Kunselman - Redirect

1          THE COURT:  Any redirect?

2          MR. SCHWARTZ:  Briefly.

3                    REDIRECT EXAMINATION

4    BY MR. SCHWARTZ:

5    Q.   When we walked through, Michelle, all of the roles

6    that the managers played in hiring or discipline, in

7    your experience when the managers would present to you

8    somebody that they wanted to hire, did you typically

9    bless that?

10   A.   Yes.

11   Q.   Their recommendations are followed?

12   A.   Yes.

13   Q.   Same with discipline?

14   A.   Yes.

15   Q.   Same with firing?

16   A.   Yes.

17   Q.   And this vertical approval that goes up to the

18   regional from you for potential hire, is the regional

19   evaluating the credentials of the person?

20   A.   No.

21   Q.   Are they involved in the interview?

22   A.   No.

23   Q.   Is the role limited to rate of pay?

24   A.   Correct.

25            MR. SCHWARTZ:  That's all I have.

**Michelle Kunselman - Recross**

```
 1              THE COURT:  Recross.

 2                   RECROSS-EXAMINATION

 3   BY MR. SEIFELDEIN:

 4   Q.  Ms. Kunselman, just to be clear, when we talk about

 5   discipline and you just answered Mr. Schwartz's

 6   question, if a dietary manager wants to fire someone,

 7   they can't independently do it, correct?

 8   A.  Independently, no.

 9   Q.  They need your approval, correct?

10   A.  Correct.

11   Q.  And you need regional's approval, correct?

12   A.  I wouldn't say approval.  I would let them know

13   what the situation was.

14   Q.  You need their sign-off, correct?

15   A.  They don't sign off on anything.

16   Q.  I'm talking about a union member here potentially

17   being fired.  Can the dietary manager on their own make

18   that decision independently?

19   A.  No.

20   Q.  Okay.  With regards hiring, can you hire someone

21   that wants to work for $15 an hour but regional says

22   only $12 an hour?

23              MR. SCHWARTZ:  Your Honor, this is beyond the

24   scope of my redirect.

25              THE COURT:  I don't think it is.  I think this
```

1    goes directly to what you brought up on redirect.

2    Overruled.

3    A.    Can you -- $15 for what?  I'm not understanding

4    what the question is and in which building.

5    Q.    I apologize again.  My fault.  Let's step back and

6    take it one by one.

7            Let's talk about New Wilmington.  You want to

8    hire someone.  They are a great fit.  They ask for $15

9    per hour.  You make a recommendation or based on your

10   papers, you can only offer $13.  You push that up to the

11   email you are talking about.  Do you follow so far?

12   A.    Yes.

13   Q.    Regional says no, we can only do $13.  Can you

14   still make that hire with the $13 hour if the potential

15   employer does not accept it?

16   A.    I could hire at $13?

17   Q.    Right.  That's correct.  So if regional says no to

18   $15, you can't make that hire?

19   A.    Correct.

20   Q.    To be very clear and sure, the dietary manager

21   themselves could not make that determination whatsoever

22   independently?

23   A.    Of the rate?

24   Q.    Yes.

25   A.    Correct.

**Michelle Kunselman - Recross**

1    Q.   Therefore, they can't hire someone?

2    A.   They are very involved in the process.

3    Q.   That wasn't my question.

4    A.   Okay.

5    Q.   The question is whether they can make that decision

6    on their own.  They can't, right?

7    A.   Correct.

8              MR. SEIFELDEIN:  Thank you.

9              THE COURT:  Okay.  Ma'am, you may step down.

10              We're going to take our midafternoon break.

11    We'll reconvene in about ten minutes.

12              (Whereupon, a break was taken.)

13              THE COURT:  Ready for your next witness.

14              MR. SCHWARTZ:  Jason Elmer.

15              JASON ELMER, a witness herein,

16    having been duly sworn, testified as follows:

17              THE COURT:  Have a seat.  You can adjust the

18    microphone so you are speaking into the end.

19              State and spell your name for the court

20    reporter.

21              THE WITNESS:  My name is Jason Elmer.

22    J-a-s-o-n, E-l-m-e-r.

23                      DIRECT EXAMINATION

24    BY MR. SCHWARTZ:

25    Q.   Hi, Mr. Elmer.

1  A.   Hi.

2  Q.   Looks like you're wearing your work garb?

3  A.   That is correct.

4  Q.   What is your job?

5  A.   Maintenance director at New Wilmington.

6  Q.   How long have been there?

7  A.   The three years.

8  Q.   What did you do before that?

9  A.   I was maintenance director at The Grove at New

10 Castle.

11 Q.   When did you hold that job?

12 A.   I was employed at that position July of 2015.

13 Q.   Until 2020?

14 A.   I started July 2015 to 2020.

15 Q.   So is it fair to say you left New Castle to go to

16 New Wilmington?

17 A.   That is correct.

18 Q.   That coincided with Michelle Kunselman going from

19 administrator?

20 A.   She came there to New Wilmington after I did.

21 Q.   You were actually there before she got there?

22 A.   That is correct.

23 Q.   Let's talk first about your job at New Wilmington.

24 A.   Okay.

25 Q.   Do you supervise employees?

1    A.    I do.

2    Q.    How many?

3    A.    I have three.

4    Q.    What do you do?

5    A.    I do all of the life safety books and I also make

6    sure that everything that we do on the scale of our work

7    is done according to regulation, make sure all of our

8    inspections are completed in a prompt manner, make sure

9    there is no harm or anything on the physical standing in

10   the building side toward residents or any employees.  We

11   fix things as needed in a timely manner as well.

12   Q.    Let's talk about your time at New Castle for a

13   moment.  Did you supervise employees there?

14   A.    I did.

15   Q.    How many?

16   A.    Roughly between 11 and 13.

17   Q.    Why so many more at New Castle than at New

18   Wilmington?

19   A.    At New Castle I was also the housekeeping director.

20   Q.    So you wore two hats at New Castle?

21   A.    That is correct.

22   Q.    Let's talk about your time now at New Wilmington.

23   Have you been involved in hiring any maintenance

24   employees at New Wilmington?

25   A.    Yes.

Jason Elmer - Direct

1   Q.   Tell us about that.

2   A.   So if I was to be looking for a member to join our

3   team, I would -- HR would typically set up to do like

4   Indeed or something like that and people would apply for

5   the position.

6           I would review their application and the

7   résumé.  We would set them up for an interview.  I would

8   be part of the interview process.

9           If everything went well for that, then I would

10  put my recommendation to the administrator and HR that I

11  think this person is eligible for hiring.

12  Q.   Have you, in fact, done that?

13  A.   Yes.

14  Q.   Have you ever made a recommendation for somebody to

15  be hired in the maintenance department at New Wilmington

16  and your recommendation was rejected?

17  A.   No.

18  Q.   In your time as maintenance director at New

19  Wilmington, have you ever disciplined employees under

20  your supervision?

21  A.   Yes.

22  Q.   Can you recall any examples?

23  A.   I can.

24  Q.   Tell us one or two times where you disciplined

25  somebody.

1    A.    I had an employee that would take breaks during

2    times that breaks were not permitted or longer than what

3    they were supposed to be in areas that were not

4    officially break areas.  Can I give an example?

5    Q.    Let's talk about that example.  There was an

6    employee who was either taking unauthorized or extended

7    breaks, correct?

8    A.    Yes.

9    Q.    Then you disciplined that employee?

10   A.    Correct.  I would educate them and tell them this

11   is where you should be taking your breaks at or during

12   this period and this is the time period you were to have

13   breaks.

14   Q.    Did you make a note of that?

15   A.    Yes.

16   Q.    Would that go into the employee's file?

17   A.    Yes.

18   Q.    That would constitute discipline under the

19   company's policy?

20   A.    That is correct.

21   Q.    Did you have the authority to do that on your own?

22   A.    I would communicate that with HR and I would do the

23   education with HR as well.

24   Q.    Were you able to do the discipline on your own?

25   You met with the employee, right?

1  A.  Yes.

2  Q.  You told him what he did wrong?

3  A.  That is correct.

4  Q.  And the effort to try to correct the behavior?

5  A.  Yes.

6  Q.  Let's talk about your time at New Castle.  You said

7  you supervised 11 to 13 people?

8  A.  That is correct.

9  Q.  Did you play a role in the hiring process at New

10  Castle?

11  A.  Yes, the same as I do at New Wilmington.

12  Q.  What you described at New Wilmington was equally

13  applicable at New Castle?

14  A.  Yes.

15  Q.  What about discipline?

16  A.  The same.

17  Q.  Did you ever discipline an employee at New Castle?

18  A.  Yes.

19  Q.  Do you recall any specific examples?

20  A.  I cannot.

21  Q.  In your current role as maintenance director,

22  Jason, at New Wilmington, how were you paid?

23  A.  I'm salary.

24  Q.  Does that salary -- do the hours that you work play

25  into what your salary is?

Jason Elmer - Direct

1   A.   My amount that I make does not change depending on

2   the hours that I work.

3   Q.   You answered it better than I asked it.  In your

4   time at New Wilmington, has your salary ever been

5   deducted if you worked less than 40 hours a week?

6   A.   No.

7   Q.   Same question.  Were you paid salary at New Castle?

8   A.   Yes.

9   Q.   During your time at New Castle, was your salary

10  ever deducted if you worked less than 40 hours a week?

11  A.   No.

12          MR. SCHWARTZ:  One second, Your Honor.

13          (Pause in the proceedings.)

14          MR. SCHWARTZ:  I'll tender the witness.

15          THE COURT:  Okay.  Cross-examination.

16          MR. SEIFELDEIN:  Yes, Your Honor.

17                  CROSS-EXAMINATION

18  BY MR. SEIFELDEIN:

19  Q.   Good afternoon, Mr. Elmer.

20  A.   Good afternoon.

21  Q.   I asked you briefly about your background.  Before

22  you became a maintenance supervisor or housekeeping

23  supervisor, you were a maintenance person, correct?

24  A.   That is correct.

25  Q.   And you were paid an hourly rate, is that right?

**Jason Elmer - Cross**

1  A.   That is correct.

2  Q.   That was roughly around 2016 is when you started

3  working for the defendants, is that right?

4  A.   That is correct.

5  Q.   You continued your role as a maintenance person

6  from 2016 to at least December 2017, does that sound

7  right?

8  A.   That is correct.

9  Q.   When you worked as a maintenance person -- let me

10  back up.

11        Did you review any documents before you came

12  to testify here today?

13  A.   No.

14  Q.   Did you speak with anyone before you came to

15  testify here today?

16  A.   I spoke with their attorneys and just to inform me

17  of that, that I will be here.

18  Q.   How many times did you speak with the defendants'

19  attorneys?

20  A.   Before today, once.

21  Q.   How long did that call last?

22  A.   A few minutes.

23  Q.   What was discussed, what did you discuss?

24  A.   General observation of what potentially would be

25  discussed here which was relative to whether or not I

Jason Elmer - Cross

1  had the ability to hire, discipline other employees,

2  breaks, break times, whether or not my employees were

3  allocated those break times, whether or not they got

4  paid for that period, whether or not they had lunches or

5  no lunches to be paid for.

6  Q.   That was it?

7  A.   That I can recall at this moment, yes.

8  Q.   During your discussions with defendants' attorneys,

9  did they advise you that you are potentially testifying

10 against your interest?

11 A.   I'm not sure I understand.

12 Q.   Did they advise you that some of the things you may

13 say here today may not be in your best interest

14 regarding your employment at the facility?

15 A.   I did not get that impression when I was speaking

16 with them.

17 Q.   My question isn't very clear.  Did they say

18 that -- let me take a different route just to be clear.

19 Do you know what this case is about?

20 A.   I know that you work for the state and they work

21 for the company and it has to do with people and money.

22 Q.   I work for the U.S. Department of Labor, not the

23 state.  You are aware this case is about the defense's

24 alleged failure to pay employees money when they worked?

25 A.   Okay.

Jason Elmer - Cross

1  Q.  You would agree that if someone worked, they should

2  be paid for the work they performed, yes?

3  A.  I would say if somebody is working and they are on

4  the clock, they should be paid for their time.

5  Q.  Did the defendants advise you that you may be one

6  of those people that worked but was not paid properly?

7  A.  I am not under any understanding that the company

8  owes me money that I have not put forth in my time and

9  effort.

10  Q.  I understand that.  I understand that's why you are

11  here.  Did they advise you that you could potentially be

12  doing so?

13  A.  No.

14  Q.  So if the Department of Labor were to recover money

15  for employees in this particular case and you happened

16  to be one of those employees who is owed money, say,

17  $21,000, would you want that money?

18  A.  If I worked and I was owed that money, then I would

19  see that you should probably do what is necessary to

20  make that happen.

21  Q.  Were you aware that just yesterday that defendants

22  said that from -- when they bought the facilities to at

23  least 2019, they were paying employees based on their

24  scheduled time and not the actual time they clocked in?

25  A.  I was not aware.

Jason Elmer - Cross

1    Q.   So now that you are aware of it and you could

2    potentially be owed money when you worked as a

3    maintenance person, do you think the defendants should

4    pay you for that, pay you for that?

5    A.   Even with our conversation?

6    Q.   Yes.

7    A.   That does not prove they owe me money from not

8    paying me.

9    Q.   I totally understand that.

10   A.   Until I have that proof, I wouldn't think they owed

11   me anything.

12   Q.   I would submit to you that's what they said

13   yesterday.  In this hypothetical, if that is the case,

14   would you want that money if it's owed to you?

15   A.   If I were to do a job for somebody and I'm on the

16   clock doing that job, I would want that person to pay

17   me.

18   Q.   Just to be clear for the record.  We want a clear

19   answer.  If the defendants owe you money for hours that

20   you worked and you weren't paid for it, you would expect

21   to get paid for it?

22   A.   Yes.

23           MR. SCHWARTZ:  Your Honor, he has asked the

24   question four or five times.

25           MR. SEIFELDEIN:  I'm done.

```
 1              THE COURT:  I don't think the answer was
 2   necessarily clear the time he answered either.
 3              MR. SCHWARTZ:  I'm not certain the question
 4   was clear.
 5   Q.   So let's go back to your duties as -- I would note,
 6   also, and submit to you based on the defendants, your
 7   current employee's record, you are listed only has
 8   housekeeping supervisor from December 2017 to June 2020
 9   but I understand that you are saying you were holding
10   two roles?
11   A.   That is correct.
12   Q.   Now, let's talk about your work as a maintenance
13   supervisor.  You testified you participate in hiring
14   decisions?
15   A.   That is correct.
16   Q.   You sit with HR doing interviews?
17   A.   Yes.
18   Q.   You make recommendations?
19   A.   Yes.
20   Q.   You testified your recommendations you believe are
21   accepted?
22   A.   Yes.
23   Q.   But you would agree with me that your
24   recommendations have to be approved by HR at least,
25   correct?
```

Jason Elmer - Cross

1  A.    Typically, we are in agreement, yes.

2  Q.    And that also may include Ms. Kunselman, the

3  administrator as well?

4  A.    Yes.

5  Q.    And it's possible that Ms. Kunselman could reject a

6  recommendation that you made?

7  A.    It is possible but it has not happened.

8  Q.    That's perfectly fine.  But it's possible?

9  A.    Yes.

10 Q.    You would agree with me then you independently

11 cannot hire someone without management's approval?

12 A.    I would agree with that.

13 Q.    That was the case actually, right?

14 A.    Meaning?

15 Q.    You can only make recommendations, you cannot

16 independently hire someone as a matter of fact?

17 A.    Yes.

18 Q.    Let's move on to discipline.  You mentioned you

19 discipline and you have made it at least with New

20 Wilmington, is that correct?

21 A.    That's correct.

22 Q.    You cannot recall an example of disciplining

23 someone at New Castle, correct?

24 A.    That is correct.

25 Q.    Let's go to New Wilmington first.  Let's say --

1  were some of the people that worked with you union

2  members?

3  A.    I'm sorry?

4  Q.    Were some of the people that worked with you union

5  members?

6  A.    No, not at New Wilmington.  At New Castle there

7  was.

8  Q.    Let's go to New Castle first then.  An employee

9  makes an error that you think is worth discipline,

10  termination.  You cannot independently terminate

11  someone, correct?

12  A.    Without communicating to HR and the administrator

13  on what is going on, I feel that it's more of a joint

14  kind of situation.  So like you would work with your

15  colleagues on that type of recommendation on what you

16  feel is necessary.

17  Q.    Sure.  I totally understand that.  It's a

18  collaboration, that's what you are trying to say?

19  A.    Yes.

20  Q.    In this collaboration, there is someone that has

21  the authority to say yes or no, yes?

22  A.    Yes.

23  Q.    And you're not that person, correct?

24  A.    I feel like I have that equal voice that I could,

25  yes.

1   Q.   So you can independently without consulting with HR

2   or the administrator, Ms. Kunselman, fire someone who is

3   a union member at New Castle?

4   A.   With them being union, they have to have

5   representation from the union as well.

6   Q.   Let me know if my question isn't very clear and

7   I'll try my best to clarify it for you.

8   A.   Sure.

9   Q.   I'm talking about a union member that works with

10  you and you want to terminate them.  You cannot

11  independently on your own without doing anything else

12  fire that person, correct?

13  A.   That is correct.

14  Q.   Now, at New Wilmington, the same thing happens,

15  right?  You collaborate with HR or the administrator?

16  A.   That is correct.

17  Q.   But they have the authority to say yeah or nay,

18  correct?

19  A.   Yes.

20  Q.   So, ultimately, you don't have the independent

21  authority at New Wilmington to fire someone?

22  A.   Yes.

23           MR. SEIFELDEIN:  I'll pass.

24           THE COURT:  Redirect.

25           MR. SCHWARTZ:  Nothing further, Your Honor.

1              THE COURT:  Sir, you can step down.

2              MR. SCHWARTZ:  As I noted a moment ago, we do

3    have another witness but I don't believe she adds

4    anything given what we elicited today.  So I just think

5    it would be a waste of the Court's time.  We have no

6    reason to call her just to fill up time.

7              THE COURT:  Well, this Court never shies away

8    from anyone wasting time.  If you characterize it as a

9    waste of time, I will take your word on it.  It's now

10   five to three.  Anything for the record before we

11   adjourn for today?

12             MR. HERRERA:  No, Your Honor.

13             THE COURT:  Let's talk about tomorrow.  You

14   have your witnesses lined up for tomorrow?

15             MR. SCHWARTZ:  That is Ms. Presley's task.

16   She stepped out.

17             THE COURT:  I'm just trying to plan out the

18   rest of the week.  I want you both to get your flights

19   Thursday at three.

20             MR. SCHWARTZ:  If we can finish Thursday, I'll

21   leave on Friday.

22             MR. HERRERA:  Same offer, Your Honor.  If we

23   can wrap on Thursday, we don't need an early dismissal.

24             All of that will depend on -- I'm reasonably

25   confident we can get all our rebuttal witnesses here on

1    Thursday.  If we can start rebuttal tomorrow, I can

2    guarantee it but I don't have a great sense of it.

3            THE COURT:  Okay.  Meet and confer on that.

4    We'll do our best to wrap it up on Thursday.  With that

5    being said, we will adjourn for the day and reconvene

6    tomorrow at 8:30 a.m.

7            (Whereupon, court was adjourned for the day.)

8                    - - -

9

10           I hereby certify by my original signature

11   herein, that the foregoing is a correct transcript, to

12   the best of my ability, from the record of proceedings

13   in the above-entitled matter.

14

15

16               S/ Karen M. Earley

17                  Karen M. Earley

18                  Certified Realtime Reporter

19

20

21

22

23

24

25