**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JULIE A. SU, Acting Secretary of Labor, United States Department of Labor,<br><br>Plaintiff,<br><br>v.<br><br>COMPREHENSIVE HEALTHCARE MANAGEMENT SERVICES, LLC; *et al.*,<br><br>Defendants. | ) | Civil Action No. 2:18-cv-01608-WSS<br><br>Honorable William S. Stickman IV |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S POST-TRIAL BRIEF AND PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The U.S. Department of Labor ("DOL") did not prove at trial that each Facility Defendant has engaged in continuous and ongoing violations of the Fair Labor Standards Act ("FLSA"), nor did it provide a reasonable calculation of damages, establish willfulness, or show that liquidated damages are appropriate.

In its briefing, and in an attempt to sidestep the holes in its evidence, DOL urges the Court to apply a relaxed burden of proof under *Mt. Clemens*, to treat the Facility Defendants as a single unit when considering potential liability on contested issues, and to comb through thousands of pages of documents that purportedly evidence some facial violations of the FLSA. The Court should reject these attempts.

**LEGAL ARGUMENT**

**A. DOL's regulations on the salary requirements for exempt positions and meal and rest breaks exceed its authority.**

On June 28, 2024, the Supreme Court overturned the *Chevron* doctrine of judicial deference to a federal agency's interpretation of an ambiguous statute. *Loper Bright Enters. v. Raimondo*, Nos. 22-451, 22-1219, U.S. LEXIS 2882 (June 28, 2024). Under *Loper Bright*, "Courts

must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Id.* This is because the Administrative Procedure Act ("APA") "directs that '[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.'" *Id*. (quoting 5 U.S.C. § 706). "[W]hen a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within in it. But courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id.* Courts are required to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." *Id.* citing 5 U.S.C. § 706(2)(A).

Courts have *already* found that DOL exceeded its authority by imposing salary requirements for exempt positions under FLSA. Just hours after the *Loper* decision was issued, the U.S. District Court for the Eastern District of Texas enjoined DOL from enforcing a final rule increasing the salary basis for the executive, administrative and professional exemptions ("EAP exemption") against the State of Texas. *See State of Texas v. United States Department of Labor, et al.*, Civil No. 4:24-cv-499-SDJ, 2024 U.S. Dist. LEXIS 114902 (E.D. Tex. June 28, 2024). Applying *Loper,* the court determined the changes to the minimum salary level "are likely 'in excess of statutory jurisdiction,'" because the plain text of the EAP exemption turns on an employee's duties, not their salary. *Id.*

Likewise, some of DOL's claims in this case hinge on unlawful regulations. DOL exceeded its authority by imposing a minimum salary level for exempt employees and by limiting the circumstances that an employer can lawfully deduct from an exempt employee's salary.

According, the Court should set aside those regulations and disregard DOL's arguments regarding any salary deductions of exempt employees.

DOL's meal and rest break regulations are similarly unlawful. There is nothing in the text of the FLSA that supports DOL's position that a meal break is compensable if it is interrupted or is not a specific length of time. DOL relied on its meal and rest break regulations in determining that Defendants failed to pay employees for all hours worked and when calculating alleged damages. DOL argues Defendants' meal break deduction is unlawful, in part, because some employees are allegedly interrupted during their meal breaks. DOL's damage calculation treats breaks of 20 minutes or less as compensable under 29 C.F.R. § 785.18. Defendants were not obligated to compensate employees for meal breaks, regardless of the length of the break. DOL's damage calculation is based on an unlawful agency regulation, and cannot be trusted as an accurate reflection of hours worked.

**B. DOL misapplies *Mt. Clemens*.**

*Mt. Clemens* outlines specific circumstances in which plaintiffs may be given leeway to the otherwise strict requirement that damages be precisely proven. Though this case falls from meeting those requirements, DOL has no choice but to rely on *Mt. Clemens* because—despite more than 9 years of investigation, discovery, and document production—it utterly failed to demonstrate that any particular individual is owed any particular amount of money. But no matter how strenuous DOL's attempts are, *Mt. Clemens* simply does not apply.

DOL contorts the holding in *Mt. Clemens* and contends that it applies in any case where there are inaccuracies in a defendant's payroll records. Here, for example, DOL points to limited pay calculation issues caused by Defendants' payroll program after the ownership transitions (i.e., paying to schedule, miscalculation of the regular rate, etc.). DOL ignores a crucial aspect of the

*Mt. Clemens* holding—that the use of representative data was appropriate because there *were no records* showing the extent of work performed. *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946). In stands to reason that, absent time records, there can be no other valid mechanism by which damages can be established beyond representative data. That holding was recently reaffirmed in *Acosta v. Central Laundry Inc.*, No. 18-cv-190, 2019 WL 3413514 (E.D. Pa. July 29, 2019) (a case cited by DOL in its brief), where the court explained that *Mt. Clemens* applies when the fact of damages is certain, "**and** the employer failed to keep employment records as required by the FLSA such that aggrieved employees relying on those inadequate or nonexistent records would have no way to establish the time spent doing uncompensated work." (emphasis added).

For DOL to reap the benefits of *Mt. Clemens*, it first must establish liability. Even if it does, it is not enough for DOL to show that Defendants' payroll records may contain some inaccuracies. Instead DOL must show that the inaccuracies actually *preclude* DOL from establishing the time that employees spent doing uncompensated work. *See Central Laundry Inc.*, No. 18-cv-190, 2019 WL 3413514 (E.D. Pa. July 29, 2019).

First, it is clear from the evidence presented at trial, and in Defendants' briefing, that DOL cannot establish liability based on Defendants' automatic meal break deduction. The consistent testimony of the witnesses, the lack of testimony from many years for many facilities, and the payroll records, belie DOL's position. Moreover, even if liability were established for some purported violations (paying to schedule through May 2018 and not including bonuses and shift differentials in the regular rate until July 2019), DOL could easily have calculated any such damages with near certainty because Defendants produced time records that reflect employee punches to the minute and records of the bonuses and shift differentials actually paid. *Mt. Clemens*

was not intended to ease the burden of proof for proving damages in such circumstances. Instead, DOL's applied baseless rules related to meal breaks that significantly altered the daily time calculations. *See* Defendants' Post-Trial Brief, p. 13-14.

Even if *Mt. Clemens* did apply, Defendants have already detailed the reasons that DOL's damage calculation is deficient. *See* Defendants' Post-Trial Brief, p. 15-19.

**C. DOL misrepresents the control that Halper, CHMS Group, and the Regional Consultants have over the Facility Defendants.**

DOL misrepresents the extent to which the Facility Defendants have uniform policies and procedures, as well as the oversight of each Facility Defendant by Sam Halper, CHMS Group, LLC, and the Regional Consultants who are contracted to support the Facility Defendants' management teams. This does nothing more than distract the Court from the lack of evidence that *each* Facility Defendant violated the FLSA with respect to its employees. The stipulation of joint employment does not excuse DOL from establishing violations occurred at each facility. It would be improper for the Court to ignore this distinction, particularly with respect to the issue of meal breaks.

As detailed below, DOL's focus on common control is misplaced for two reasons. First, common control does not equate to uniform working conditions. DOL cannot rely on alleged common control or the existence of similar policies to avoid the Court's required consideration of the evidence related to *each* Facility Defendant on issues such as meal breaks. Second, DOL grossly overstates the extent that Halper, CHMS Group, and/or the Regional Consultants controlled the Facility Defendants, as established at trial.

**i. DOL cannot establish meal break violations through alleged common control.**

DOL relies on the alleged common control of the Facility Defendants because it otherwise cannot establish liability for unpaid meal breaks on a facility basis. As established at trial, and laid

out in Defendants' findings of fact, DOL's evidence of unpaid meal breaks was entirely non-existent for many facilities and thin, at best, for others. For others still, it was contradicted by DOL's own evidence and witnesses.

DOL tries to salvage its claim by asserting that Defendants had a formal policy requiring employees to punch in and out for meal breaks, that Defendants did not enforce that policy, and that some members of management understood the lack of punches to mean an employee worked through lunch. PFOF ¶¶ 64, 163, 162. DOL also claims that employees were unable to take meal breaks due to "severe" understaffing across the facilities. None of these assertions are supported by the evidence or hold water.

Defendants did not have a formal policy requiring employees to clock in and out for meal breaks. DOL cites solely to Abraham Pechman's August 12, 2020 deposition on this point. Mr. Pechman never stated there was a policy requiring employees to clock in and out for meal breaks– he testified that employees would "ideally" have four punches each shift and the Facility Defendants "wanted" employees to clock in and out for breaks, but "[m]ost employees are punching in at the beginning of their shift and punching out at the end of their shift, and are relying on the automatic deduction when they take their break and they don't punch out for lunch." PX28, 128:1-5 (August 12, 2020).

Defendants' written policies do not require employees to clock in and out for every meal break. Rather, each Facility Defendant's employee handbook directs employees to punch in and out for meal breaks if they leave the building. *See e.g.* JX1 at p. 20 (Cheswick Employee Handbook stating, "Employees may leave the building during their lunch period, but if an employee does leave the building, he/she will be required to punch out and punch in and to notify his/her immediate supervisor.") DOL's own evidence supports Defendants' position, and conflicts

with its own. Multiple witnesses testified that they were only required to clock out for meal breaks if they left the premises. *See* Defendants' Proposed Findings of Fact at ¶¶ 133, 155, 1/17/24 Trans. 131:11-17 (J. Meiss). And, time records submitted to the Court confirm that some DOL witnesses who testified under oath that they always took a meal break *never* clocked out for breaks. *See* Defendants' Proposed Findings of Fact at ¶¶ 96(c), 153(f).

DOL's claim that Defendants failed to enforce this nonexistent policy is also unsupported. *See* Plaintiff's Proposed Findings of Fact at ¶ 162. DOL cites to testimony from Catherine Matlack, Denise Cox and Joyce Meiss. Dr. Matlack testified about whether employees were disciplined for failing to take a meal break, not whether they failed to clock in or out for a meal break. *See* 1/9/24 Trans. 156:14-18 (Q. "Dr. Matlack, did you ever here [sic] that a CHMS employee was disciplined for working through their lunch break? A. No. Q. Or meal break. A. No."). Ms. Meiss was asked whether there were any policies related to meal breaks at New Castle. 1/17/24 Trans. 131:11-12. Ms. Meiss said that employees were required to clock out if they left the building and did not otherwise clock out. 1/17/24 Trans. 131: 13-17. She did not testify that employees were generally required to clock in and out for meal breaks, nor did she offer any testimony on whether employees were disciplined for failing to do so. 1/17/24 Trans. 131:11-21. Ms. Cox is employed by the union and only supports the bargaining unit employees for certain Facility Defendants. The question posed to Ms. Cox did not solely relate to discipline for punching out for meal breaks. 1/17/24 Trans. 78:18-21 ("Q. Do you recall ever seeing a member disciplined because they worked through a meal break or didn't punch for a meal break? A. No.").

The management personnel who purportedly understood that an employee only took a meal break if they punched in/out, James Martis and Margaret Zapor Reichard, were not reliable on that point. Mr. Martis worked at Mt. Lebanon for just seven months out of the seven years at issue,

and he did not work at any other facility. In addition, Mt. Lebanon employees' personal interview statements indicated that some employees always took a meal break and never clocked out. *See* PX1 p. 259 (statement of Renee Laux) JX58, 2017a at Lines 11979-136377 (time records for Renee Laux); ¶ 144 (g). Ms. Reichard was a Regional Consultant and she had no recollection of whether Defendants required employees to clock out for meal breaks, calling into question why she would assume an employee did not take a meal break unless they clocked out. 1/10/24 Trans. 126:4-8.

Even if Defendants had a formal policy requiring employees to clock in/out for meal breaks, it would not warrant a different result. The overwhelming evidence at trial unequivocally proved that employees across all the facilities regularly took meal breaks and relied on the auto-deduction.

DOL's arguments regarding understaffing also fall flat. Defendants provided evidence that it paid employees who were unable to take meal breaks, including DOL witnesses who claimed employees were unable to take meal breaks. There were also multiple facilities that required employees to confirm at the end of a shift whether they took a meal break, which further detracts from DOL's uniform approach.

Ironically, the United States Department of Justice ("DOJ") pursued criminal charges against Halper, Mt. Lebanon, and Brighton, among others, based on representations regarding staffing levels. *See United States v. Halper, et al.,* (the "Criminal Case"), Case No. 2:21-cr-00079-RJC. Filings by the defendants in the Criminal Case confirm that action was based on "allegations that employees were *not* working through lunch breaks and *not* providing resident care," and that DOJ was taking a "diametrically opposite" position to DOL. (Criminal Case at ECF No. 241). DOL has done nothing to reconcile this inconsistency.

The Court should consider the evidence regarding meal breaks on a facility-by-facility basis, and DOL has clearly failed to offer representative evidence that each Facility Defendant had a pattern and practice of failing to pay employees for missed meal breaks.

**ii. DOL exaggerates the alleged common control.**

DOL wildly overstates the control Halper and the Regionals Consultants exerted over the day-to-day operations of the Facility Defendants. DOL makes broad assertions regarding Halper's role, but its citations often offer little support. Most of DOL's proposed findings of fact depend exclusively on the testimony of one or two witnesses. Those witnesses often worked at a single facility for only a few months or speculated on matters outside their personal knowledge. Yet DOL applies their testimony wholesale. For example, DOL claims that no hiring decisions could be made without Halper's approval. Plaintiff's Proposed Findings of Fact at ¶ 20. DOL cites to SEIU president Matthew Yarnell's testimony, which speculated that Halper had to approve all hires because his signature appeared on some offer letters. Plaintiff's Proposed Findings of Fact at ¶ 20.

Even crediting the cited testimony as accurate, which Defendants dispute, it does not support DOL's sweeping conclusions. Jennifer Shaffer was just one, of many, witnesses who testified that she interviewed candidates and made hiring recommendations. 1/17/24 Trans. 178:7-10. She acknowledged that Halper did not approve the wage rates for nonunion employees, and that she only needed Halper or a Regional Consultant's approval as to non-union pay rates, not the hire itself. 1/17/24 Trans. 214:15-18, 215:1-6. Ms. Reichard also testified that while Halper weighed in on compensation for leadership positions, she had no recollection of Mr. Halper participating in decisions to hire specific employees. 1/10/24 Trans. 103:12-25, 104:1-5.

DOL also claims that that Halper had to approve payments to employees who performed work "without specific, prior approval from Halper," relying on a 2018 email chain and testimony from Michael Shuey. Plaintiff's Proposed Findings of Fact at ¶ 21. The email chain involved a new hire who had been working at North Strabane Retirement Village. PX627. Mr. Shuey characterized the email as "an instance where an employee was hired and began work at a facility and was not paid because Mr. Halper's approval had not been obtained." 1/8/24 Trans. 134:11-135:15. Mr. Shuey offered no additional testimony beyond his personal interpretation of that email.

In the email, the Executive Director stated the employee had not yet been paid and there was "talk" about transferring the employee to North Strabane skilled nursing facility. PX627. CHMS Group's Director of Payroll asked Halper whether he approved "to pay out of retirement [village]." *Id.* An isolated request for clarification on how to allocate an employee's wages is far from a blanket requirement that Halper had to approve payments to any employee who performed work without his prior approval. And this one email questioning pay allocation for one employee out of thousands, does not evidence that employees were refused pay checks unless approved by Halper. This notion is also easily dispelled by even a cursory review of the pay records.

The same is true for the Regional Consultants. DOL relies on the testimony of Mr. Shuey, Ms. Matlack, Mr. Martis, Ms. Reichard, Mr. Yarnell, Anthony Molinaro, and Ms. Shaffer for its claim that the Regional Consultants have "broad, day-to-day supervision over multiple Facility Defendants." *See* Plaintiff's Proposed Findings of Fact at ¶ 24. Mr. Shuey's testimony is not credible for reasons outlined in Defendants' post-trial brief. Ms. Cox and Mr. Yarnell are not employed by any of the Facility Defendants and lack firsthand knowledge of the interplay, if any, between the facilities and the Regional Consultants. Dr. Matlack, Mr. Molinaro, Ms. Shaffer, and

Mr. Martis were each employed by Defendants for less than a year at less than a handful of the facilities.

The use of regional consultants or regional directors of operations is not unique to Defendants. Ms. Reichard was the regional director of operations for Reliant Senior Care when Halper and his partners acquired the Reliant homes. 1/10/24 Trans. 85:9-14. Ms. Reichard worked in regional positions for Presley Healthcare Group and AON Healthcare. 1/10/24 Trans. 85:24-86:4. Ms. Reichard testified that the regional team provided the Facility Defendants with "support, education, guidance, discipline, if necessary," as well as performance metrics. 1/10/24 Trans. 102:17-103:1.

The record regarding common control and practices does not justify DOL's failure to offer representative evidence that violations occurred at every facility, in all positions, and for the full relevant time period.

**D. Defendants have established that Department Heads are exempt from overtime.**

DOL argues that Defendants have failed to meet their burdens of proof to establish any positions were properly classified as exempt. It specifically claims that Defendants only offered general statements of job expectations for the relevant positions, Halper exerted too much oversight over department heads for them to be exempt, and Defendants made improper deductions from exempt employees' salaries. Each of these arguments fails.

DOL relies on cases that found a job title or job description was insufficient to prove an exemption applied. DOL apparently attempts to analogize Defendants' evidence on exemptions to the reliance on job titles or job descriptions alone. Defendants did not rely on job descriptions or job titles to establish that a particular position was exempt from the overtime rules. Instead, Defendants presented evidence from the Regional Consultants, administrators, and individuals

who worked in management positions (i.e., Renae Jordan and Melissa Hough) regarding the roles that departments head play with respect to hiring, firing, assigning work, and disciplining. DOL's witnesses also corroborated much of this testimony. *See e.g.*, 1/16/24 Trans. 8:2-4 (testimony of Julie Pattison describing her DON duties as being "responsible for the day-to-day operations on the clinical side" and managing the nursing staff.). The testimony about the department heads' job functions—which extend far beyond a job description—establish that the exemptions apply.

DOL next claims that Halper "tightly controlled numerous critical day-to-day functions of Facility Defendants and their employees," such that Defendants' employees rarely engaged in management duties. A similar argument was raised in *Itterly v. Family Dollar Stores, Inc.*, 606 Fed. Appx. 643 (3d Cir. 2015). In *Itterly*, a store manager argued that he was non-exempt due to the "active supervision" of his direct supervisor. *Id.* The Court highlighted the fact that the supervisor oversaw 19 locations and visited the plaintiff's location once or twice a week. *Id.* Although the supervisor gave instructions to the plaintiff and the plaintiff consulted with the supervisor on hiring and disciplinary decisions, the Court concluded the plaintiff retained discretion to manage his location. *Id.* at 648. The Court reasoned that the plaintiff was the highest-ranking employee at his location for the vast majority of the time. *Id.* The Court also found that "detailed corporate policies" are commonplace and do not render managers subject to those policies nonexempt. *Id.*

The same holds true here. Halper did not have significant oversight of the day-to-day operations of the Facility Defendants. Halper was rarely present in the facilities for most of the relevant period. Multiple DOL witnesses, including department heads, only knew Halper as an owner. For example, former DON Ann Walter identified Halper as "one of the owners," and said that her interactions with Mr. Halper consisted of "tour[ing]" him through the building on several

occasions. 1/9/24 Trans. 74:9-21. Former Ms. Pattison similarly identified Halper as an owner. 1/16/24 Trans. 7:5-11. If Halper truly exerted control of the day-to-day operations of each Facility Defendant, such that department heads had no meaningful authority, those department heads would certainly identify Halper as more than "one of the owners." Ms. Reichard also testified that Mr. Halper did not have oversight of the day-to-day operations of the Facility Defendants. 1/10/24 Trans. 169:9-11. There is nothing in the record suggesting that Halper had a meaningful physical presence at any of the facilities.

While Defendants dispute that Halper exerted significant control over all decisions regarding compensation and finances, even if he did, that would not preclude Defendants from establishing exemptions. Setting rates of pay is an indicia of management status, but it is not a required duty to establish exempt status. 29 CFR § 541.102(b).

DOL did not provide any convincing evidence regarding Defendants' alleged practice of deducting from exempt employees' salaries. As noted above, DOL's rule on salary deductions also exceeds DOL's authority and should be set aside.

**E. The face of Defendants' records and Mr. Murray's summaries do not demonstrate liability on outstanding issues or support DOL's damage calculations.**

DOL admitted thousands of pages of records into evidence that purported show some FLSA violations. But it is not this Court's responsibility to comb through these voluminous documents to try to pinpoint an error. That burden falls squarely on DOL and that burden was far from met.

Rather than identify any specific examples of Defendants paying to schedule instead of punches, DOL relies on a summary created by Mr. Murray and testimony of Mr. Shuey and Ms. Dziak. Plaintiff's Findings of Fact at ¶ 153-154. But Mr. Murray could not offer any explanation of how he determined that an employee was paid to schedule instead of punches, and there is no

evidence suggesting that Mr. Murray had any information regarding employee schedules (rendering any finding of paying to schedule speculative at best, concocted at worst). Mr. Shuey's testimony about his post-litigation investigation efforts was simply not credible. Ms. Dziak's testimony was similarly unreliable. She worked at Washington for less than six months in 2019. 2/15/24 Trans. 89:10-14, 112:3-8. She testified that she believed Defendants were paying based on scheduled hours because she would have to send schedules to CHMS Group. 2/15/24 Trans. 107:7-12. She was unable to coherently articulate why that lead her to believe employees were paid based on scheduled hours. 2/15/24 Trans. 107:13-22.

DOL also fails to provide any solid evidence that Defendants have continued to properly calculate the regular rate. DOL relies on Mr. Murray's testimony, Mr. Murray's summary, and testimony from Cody Hill and Mr. Pechman that has been taken out of context. Mr. Murray's testimony and summary are addressed in Defendants' post-trial brief. *See* Defendants' Post-Trial Brief at p. 12-14. DOL misrepresents Mr. Pechman's testimony. Mr. Pechman acknowledged that isolated errors were possible in specific circumstances (i.e., a differential was missed and a payroll processor paid out the shift differential without going back to confirm whether the employee had overtime hours). 2/12/24 Trans. 163:4-12. However, Mr. Pechman also confirmed that if an employee clocks in and out "and the system is calculating everything automatically," then "the FLSA overtime rate will calculate correctly." 2/12/24 Trans. 163:16-24. In other words, the system is programmed correctly. A review of Mr. Hill's testimony shows that he did not understand the questions posed by counsel.

> Q. So these bonuses that are paid to the employees, they are paid in lieu of an hourly rate, is that correct?
> A. Correct.
> Q. So the hourly rate is not included in the payment when they work that extra shift, correct?
> A. I don't think I understand your question.

> Q. …When these workers are paid a bonus and they are now working overtime, which means they work more than 40 hours in a workweek, that bonus is not included in their hourly rate when they work overtime correct?
> A. Correct.
> ***
> Q. So in those instances where the bonuses weren't included in the overtime, how often did that happen?
> A. Where bonuses weren't paid into overtime?
> Q. That never happened actually, right. That was in the policy.
> A. Again, I don't understand what you're asking me.

2/14/24 Trans. 171:12-172:14.

Mr. Hill was then asked about complaints regarding bonuses not being included in the overtime rate and Mr. Hill replied, "Occasionally, people would complain about not getting a bonus which, again, as I said earlier, would be paid out accordingly." 2/14/24 Trans. 172:17-24.

**F. DOL did not establish that Defendants willfully violated the FLSA.**

To establish that Defendants willfully violated the FLSA, DOL must prove that Defendants "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). A willful violation is not established by showing that an employer acted unreasonably, negligently, or on a good-faith but incorrect assumption that its practice complied with the FLSA. *Id.* at 135.

DOL highlights the delay between the discovery that Defendants' software was not programmed to include shift differentials and bonuses in the regular rate and the alleged damages that accrued after the initiation of this lawsuit. The fact that CHMS Group did not instantly have its payroll program reprogrammed does not establish willfulness. *See Angelo v. United States*, 57 Fed. C.I. 100 (Fed. Cl. 2003) (finding that 10-month delay between acknowledging liability and beginning to pay for the overtime status it was conceding did not establish willfulness).

DOL also points to the general payroll complaints. However, many of those complaints were about issues that are beyond the purview of the FLSA, such as vacation, sick pay, expense

reimbursements, benefits, or delayed payments. This type of evidence is not relevant to DOL's FLSA claims nor the allegation of willfulness. *See Raymond v. Renew Therapeutic Massage, Inc.*, Case No. 18-13760, 2022 U.S. Dist. LEXIS 196908 (E.D. Mich. Oct. 28, 2022).

Moreover, the record is full of examples demonstrating Defendants' intent to comply with the FLSA, including Defendants' period updates to its policies and procedures. PX172 is a 2015 email from Halper to CHMS Group's former Director of Payroll instructing CHMS Group to pay exempt employees for their full work week if they work enough days, and not to dock for early-ins or late outs. PX413 contains notes from a call on May 3, 2017 regarding exempt employees. The "agreed upon points" include that exempt employees should be paid 40 hours per week and not be deducted pay. *Id.*

In November 2017, former CHMS Group Director of Payroll David Bernstein and Halper exchanged emails about ways to expedite the bonus approval process, and Halper specifically stated that payroll did not need to await his approval. JX72.

Between February and April 2018, CHMS Group CFO Michael Neufeld and Halper exchanged emails about language to display near or on the timeclocks regarding meal breaks. JX75. This exchange occurred several months before the DOL lawsuit, and Neufeld also referenced the plans to change the system to pay to punch rather than to schedule. *Id.*

In June 2018, Pechman, Neufeld and Halper worked on a communication entitled "Clarification of Time Card Policy." *See* JX76. The policy contained reminders about the meal break policy, and the requirement to submit a form to Human Resources if an employee missed a meal break. *Id.*

The record also contains many examples evidencing Defendants efforts to correct payroll errors. *See* JX71, JX69 (Halper directing Gandl to resolve a bonus issue the same day it was raised

to him), JX67 (September 2016 email from CHMS Group printing checks to address payroll issues), JX66 (December 2015 email showing Gandl printing checks same day as pay discrepancies, including missed lunch break, reported), JX61 (September 2015 email chain showing CHMS Group working with Brighton to resolve payroll errors), JX62 (September 2015 email chain confirming that employees will be paid for missed meal breaks), JX64 (Gandl confirming payroll errors to be corrected on next paycheck), JX65 (November 2015 email from CHMS Group responding to payroll errors and showing many had been resolved). A finding of willfulness is not appropriate given these efforts.

**G. Liquidated damages are not appropriate given the evidence presented at trial.**

Though the FLSA allows for liquidated damages to plaintiffs, it does not guarantee them. Indeed, a court has discretion to <u>not</u> award liquidated damages "[i]f the employer shows . . . that the act or omission giving rise to such action **was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation** of the Fair Labor Standards Act." 29 U.S.C. § 260 (emphasis added). It is the employer-defendant's burden to prove it is entitled to discretionary relief from liquidated damages. *Brooks v. Village of Ridgefield Park*, 185 F.3d 130, 137 (3d Cir. 1999). This burden requires only a showing that an employer took "affirmative steps to ascertain the Act's requirements, but nonetheless, violated it provisions." *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 908 (3d Cir. 1991).

The good faith requirement subjectively "requires that the employer have an honest intention to ascertain and follow the dictates of the Act." *Id.* at 907. To determine this intent, courts look to the defendant's affirmative steps taken to understand the law. *Id* at 908. Reasonableness, however, is an objective standard, *Martin*, at 907-908, and to satisfy this standard, "the employer

should act 'as a reasonably prudent man would have acted under the same circumstances.'" *Brooks*, 185 F.3d at 137, quoting *Addison v. Huron Stevedoring Corp.*, 204 F.2d 88, 92 (2d Cir. 1953).

Defendants' policies and procedures are designed to ensure that employees are properly compensated. To the extent there were errors brought to Defendants' attention, they investigated and corrected such errors. The examples referenced above in the section regarding willfulness also support a finding against liquidated damages. Defendants maintain that they properly calculate the regular rate or pay to punch (subject to rounding). However, if the Court were to determine such errors are ongoing, liquidated damages should not apply. Defendants took affirmative steps to reprogram the payroll software in 2018 and again in 2019. Accordingly, liquidated damages are not appropriate.

**H. DOL is not entitled to injunctive relief.**

The relevant factors for determining whether DOL is entitled to injunctive relief include "the employer's past conduct, current conduct, and, most importantly, whether the employe can be counted on to comply with the FLSA in the future." *Sec'y United States DOL v. Mosluoglu, Inc.*, Case No. 22-2749, 2023 U.S. App. LEXIS 24385 (Sept. 14, 2023).

Defendants' payroll software was programmed to pay to schedule and to exclude bonuses and shift differentials from the regular rate calculation. However, Defendants modified the program to pay to punch before DOL brought this lawsuit, and they corrected the regular rate calculation issue approximately five years ago. DOL did not prove that Defendants have engaged in ongoing violations of the FLSA. Accordingly, the Court should deny DOL's request for injunctive relief.

**CONCLUSION**

For the reasons fully addressed above, Defendants respectfully request that the Court enter judgment in their favor on all claims.

Date: July 1, 2024

Respectfully submitted,

JACKSON LEWIS P.C.

*/s/ Catherine A. Cano*

Marla N. Presley (PA ID No. 91020)
marla.presley@jacksonlewis.com
1001 Liberty Avenue, Suite 1000
Pittsburgh, PA 15222
(412) 232-0404
(412) 232-3441 Facsimile

Jeffrey A. Schwartz (admitted *pro hac vice*)
jeffrey.schwartz@jacksonlewis.com
171 17th Street, NW, Suite 1200
Atlanta, GA 30363
(404) 525-8200
(404) 525-1173 Facsimile

Catherine A. Cano (admitted *pro hac vice*)
catherine.cano@jacksonlewis.com
10050 Regency Circle, Suite 400
Omaha, NE 68114
402-391-1991
402-391-7363 Facsimile

*Attorneys for Defendants*

4874-7329-2237, v. 6