## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JULIE A. SU, ) | |
| ACTING SECRETARY OF LABOR, ) | |
| UNITED STATES DEPARTMENT OF LABOR, ) | Civil Action No. 2:18-cv-01608-WSS |
| ) | |
| Plaintiff, ) | |
| ) | Honorable William S. Stickman |
| v. ) | |
| ) | |
| COMPREHENSIVE HEALTHCARE ) | |
| MANAGEMENT SERVICES, LLC, et al. ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## THE ACTING SECRETARY'S RESPONSE TO
## DEFENDANTS' PHASE II POST-TRIAL SUBMISSIONS

Defendants have not rebutted the Acting Secretary's *prima facie* case under *Mt. Clemens*,
have not proved that any FLSA exemption applies, and have not proved subjective good faith or
objective reasonableness. As such, they must restore all back wages, pay liquidated damages,
and face additional injunctive relief. Despite significant concessions and promising to prove
limited liability, Defendants now insist that ***no*** back wages are due. Their post-trial submissions
do not justify this stark reversal or the extraordinary position of admitting illegal conduct but
averring that there can be no consequence. Many of Defendants' assertions are irrelevant or
otherwise misstate the issues. Other claims fail because they attempt to resurrect positions that
Defendants waived, such as their about-face on Mr. Murray's methodology. Even if considered,
very few of Defendants' broad assertions have supporting citations—thus forcing the Court and
the Acting Secretary to sift through the record for them—and collapse under light scrutiny.
Taken as whole, the record proves out Defendants' FLSA liability. Because they have not shown

otherwise, the Acting Secretary respectfully requests that the Court enter judgment in her favor

and finally end Defendants' years-long, willful disregard of the Act.

I.    **The Acting Secretary Proved Defendants' Violations and Corresponding Back
      Wages Under *Mt. Clemens***

Defendants agree that the *Mt. Clemens* framework applies. The only questions are

whether the Acting Secretary met her minimal burden to prove a *prima facie* case and whether

Defendants rebutted that case through specific evidence that shows the "'precise amount of

work performed'" or which negatives the "'reasonableness of the inference to be drawn'" from

her evidence. *Hattabaugh v. TMS Int'l, LLC*, No. 2:20-cv-00801, 2022 WL 3100855, at *6

(W.D. Pa. Aug. 4, 2022) (citations omitted). The Acting Secretary prevails on both issues.

A.    The Acting Secretary Proved a *Prima Facie* Representative Case

The record demonstrates a *prima facie* case of liability and back wages. *See* Dkt. 464 at

pp. 3–8, 11–12. This case rests on representative evidence from: (1) 39 witnesses, ranging from

top management of Defendants' unified enterprise, to front-line employees at multiple

buildings who were harmed by identical or nearly identical illegal practices; (2) years of

accurately summarized time and pay data for each employee, for each pay period; (3) hundreds

of supporting emails and other records, and; (4) thousands of pages of deposition testimony.

Each of these evidentiary categories supports the others. *Id.*  Defendants' challenges to this

*prima facie* case fail on multiple grounds. Fundamentally, they misapprehend the consequences

of deploying unified, enterprise-wide illegal payroll processes (PFOF[1] 12, 69) and conceding

that time punches accurately reflect work time (Dkt. 462 at pp. 11–12; PFOF 163, 246).

Defendants' voluminous time and pay records—"good old-fashioned direct evidence" (Dkt.

464 at p. 12)—are the bedrock of the Acting Secretary's *prima facie* showing and distinguish

---

[1] "PFOF" refers to the Acting Secretary's Phase II Proposed Findings of Fact. Dkt. 465.

this case from Defendants' cited authorities. Taken together, these payroll records, the high-quality testimony, and other evidence prove the endemic mismatch between hours worked and compensation paid at each Facility Defendant during the relevant period. PFOF 137, 252, 317.

Defendants impugn this considerable proof by misstating the record[2] and by trying to isolate evidence and attack it separately. This approach is ineffective. *Su v. East Penn Mfg. Co., Inc.* No. 18-cv-1194, 2023 WL 7336368, at *4–5 (E.D. Pa. Nov. 7, 2023), *appeal docketed* 24-1046 (3rd Cir. Jan. 9, 2024) (rejecting employer's attempt to "dispose of each 'bucket' in isolated, piecemeal fashion"). Relatedly, Defendants are wrong to inveigh against the number of trial witnesses relative to the size of the workforce without considering the quality of that testimony and its place within the full record. *Id.*; *see also Reich v. Southern New England Telecomms. Corp.*, 121 F.3d 58, 67 (2d Cir. 1997) ("It is axiomatic that the weight to be accorded evidence is a function not of quantity but of quality . . . .") (citation omitted). Their emphasis on the administrative investigation and their mostly unsupported accusations against Mr. Shuey[3] are also misplaced. *Donovan v. Red Ball Interior Demolition Corp.*, No. 81-cv-

---

[2] These misstatements include: (1) declaring that proof of employees "actually work[ing] uncompensated hours" is "entirely absent," and; (2) accusing the Acting Secretary of taking "extreme positions" that Defendants paid "employees based on scheduled hours instead of punches" and did not "include shift differentials and bonuses in the regular rate calculation." Dkt. 462 at pp. 1–2. These claims are irreconcilable with Defendants' concessions.

[3] Mr. Shuey's testimony spans hundreds of pages and speaks to Defendants' illegal conduct throughout the full period. Their legal brief does not cite any of these pages to justify their accusation that he was "discredited" and that his testimony "cannot be considered" (Dkt. 462 at p. 6). Similarly, the claims that Mr. Shuey "conceded" that the back wages are "not supported by the witness statements," that "damages were assessed" for employees with no "pay issues," and that the back wages are "at odds with the pay data" (*id.*) are false. For example, Defendants are wrong that Mr. Shuey "confirm[ed]" that the "DOL's calculations ignored" employee statements describing uninterrupted meal breaks (Dkt. 463, ¶ 75). In fact, Mr. Shuey explained that such employee statements were accounted for in the back wages because those employees had meal-break time punches. 01/19/2024 Trial Tr. 135:17–138:5. As for evidence of on-the-clock meal breaks, the back wages summary reasonably accounted for these inaccurate records—which Defendants created—by reducing work time from 30 to 25 minutes. PFOF 309–11.

1302, 1982 WL 2052, at *1 (S.D.N.Y. Sept. 21, 1982) ("[T]he thoroughness and quality of the plaintiff's investigation will not be an issue at trial. The issues at trial with respect to whether violations of the [FLSA] occurred will depend on the evidence adduced at trial, not on the evidence uncovered or not uncovered during the course of the investigation."); *see also Walsh v. Ideal Homecare Agency, LLC*, No. 2:20-cv-732, 2023 WL 2393626, at *2 (W.D. Pa. Mar. 7, 2023) (denying protective order in part but agreeing that DOL's investigation was "not the focus" and that "inquiries about" what "could have been done differently or was not done is for the most part irrelevant"). The central issue is whether the Acting Secretary's *prima facie* case supports a just and reasonable inference that Defendants had a pattern and practice of failing to comply with the Act. Considering the full record and Defendants' concessions, it does.

      B.   <u>Defendants Cannot Abandon Their Concession That the Back Wages Methodology is Accurate or Carry Their Burden to Rebut Back Wages</u>

Defendants forfeited any challenge to the methodology. 01/11/2024 Trial Tr. 25:21–25 ("THE COURT: Am I correctly summarizing your position that you are not challenging the integrity of his methodology? You are only calling into question some of his conclusions? MR. SCHWARTZ: That's exactly right."); *id*. at 27:4–16. Their attempt to renege should fail.

Even if considered, their newfound critiques are baseless. For instance, they accuse Mr. Murray of "ignor[ing] the records" that show application of a no lunch code to some shifts (Dkt. 462 at pp. 5–6). However, if Defendants removed the deduction, what remains is work time calculated through time punches—identical to the Acting Secretary's method. PFOF 292, 302. Defendants also misapprehend the time records by arguing that Mr. Murray "added at least 25 minutes" for employees with no meal-break punches,[4] that the back wage computations rest

---

[4] Defendants highlight Mt. Lebanon CNA Katelin Fierens' shifts from January 1, 2019 to March 31, 2019 and the methodology's purported failure to capture payments for meal-break work. Dkt.

on "assumptions," and that there is "no evidence about how DOL determined whether an employee took a 'break'" (Dkt. 462 at pp. 15–16). The Acting Secretary did not "add" any time; she instead removed the artificial 30-minute deduction from shifts so that employee work time corresponds with time punches—which Defendants agree are accurate. Similarly, the meal-break calculations do not rest on "assumptions"—if an employee punched for their 30-minute break, they were not credited with any compensable time for that break. PFOF 308, 314. For employees with some meal-break punches, the Acting Secretary took their punches at face value. PFOF 292. For employees with no meal-break punches, the Acting Secretary weighed evidence that some employees got full breaks and ***credited*** Defendants with five minutes of work time, which substantially lowered back wages. PFOF 309–10, 313, 315. Defendants misstep in claiming "no evidence" (Dkt. 462 at p. 16) for the five-minute average break applied here; the methodology explains that it comes from thousands of time punches by employees who followed Defendants' purported rule requiring four punches each shift. PFOF 311; *see also* 01/11/2024 Trial Tr. 74:14–75:24 (Mr. Murray explaining method). Having failed to make and keep accurate records, Defendants' disapproval of averages and estimates "simply due to lack of complete accuracy [ignores] the central tenant of *Mt. Clemens*." *Monroe v. FTS USA, LLC*, 860 F.3d 389, 412 (6th Cir. 2017).

Defendants argue that Mr. Murray's computed regular rate ignores their supposed correction regarding bonuses and shift differentials. But the premise is false: they continue to miscalculate the regular rate. PFOF 212; *see also* PX-6 at "Summary Tables" Excel Sheet, Tab "AH-01," Columns M, O (identifying significant omissions of bonuses and/or shift differentials

---

463, ¶ 233. But there are no calculated unpaid hours or back wages for Ms. Fierens for those shifts. Back Wages Summary at Tab "All Back Wages Combined," Rows 76613–76619.

from regular rate between 2020 through 2023).[5] Defendants insist that a fluctuating "Paid OT Rate" after 2019 proves compliance. Dkt. 462 at p. 13. But in many post-2019 pay periods where an employee earned bonuses or shift differentials, there is no fluctuation. *See, e.g.¸* Back Wages Summary at Tab "08 Pay Data Computed Reg Rate," Rows 1592–93 (The Grove at Latrobe LPN Tammy Adams' 01/28/2023 and 02/11/2023 pay data showing identical "Paid OT Rate" of $35 despite distinct differential pay in each period), Rows 122770–771 (static "Paid OT Rate" of $25.63 for Brighton CNA Danica Jones' 12/17/2022 and 12/31/2022 pay data despite distinct differential pay in each period), Rows 215149–151 (same for The Grove at Irwin CNA Caroline Schneider's 3 pay periods in January - February 2023). And contrary to the claim that the Acting Secretary did not "review any example showing these alleged violations were ongoing" (Dkt. 462 at p. 12), Mr. Murray testified about Danica Jones' January 14, 2023 pay record, which understated her regular rate because her $33.96 differential and $212 bonus were missing. 01/11/2024 Trial 151:14–155:19; Back Wages Summary at Tab "All Back Wages Combined," Row 124571.

Defendants believe that the back wage calculations include $20,000 due for administrators. Dkt. 463 at p. 63 n. 8. There are no such back wages. *See* Back Wages Summary at Tab "All Back Wages by Dept" (no Administrator positions listed); 01/11/2024 Trial Tr. 34:15–18 (M. Murray). The misstatement stems from their apparent reliance on a prior version of the Back Wages Summary that was replaced before trial—specifically to remove the Administrator positions from the computations—rather than the admitted version. *See also*

---

[5] Defendants are wrong that the Court "cannot rely" on the summary tables. Dkt. 462 at p. 15. Mr. Murray testified about them (01/11/2024 Trial Tr. 103:5–17) and they were admitted. These percentages arise from counting each pay period during which an employee had a bonus and/or shift differential, had paid overtime, and had a paid overtime rate that was less than the computed regular rate. *See* PX-5 at p. 4 (explaining methodology for determining computed regular rate).

*infra* at p. 16 n. 11 (noting mis-citation of Ms. Costic's pay record, which matches the prior version). Defendants' carelessness is notable, given that they cross-examined Mr. Murray on his revision of the computations to remove Administrators. 01/11/2024 Trial Tr. 171:22–173:5.

Defendants are also incorrect that overtime should be calculated differently for misclassified employees who supposedly received a "salary." Dkt. 462 at pp. 16–17 (citing 29 C.F.R. § 778.113). This rule does not apply because whether the regular rate should be based on a salary versus hourly rate is "contingent on the parties' intent" as to how many hours the salary is "'intended to compensate.'" *Seymour v. PPG Industries, Inc.*, 891 F. Supp. 2d 721, 734 (W.D. Pa. 2012) (quoting 29 C.F.R. § 778.113). Defendants have not identified evidence in the record "from which this intent can be gleaned" for each "salaried" employee. *Mazzarella v. Fast Rig Support, LLC*, 823 F.3d 786, 793 n. 11 (3d Cir. 2016) (holding that employer failed to carry burden to prove Motor Carrier Act exemption under the Act). The contention also fails because the Acting Secretary proved Defendants' pattern and practice of paying fluctuating amounts for employees classified as exempt (*see* PFOF 231–235), meaning those wages can "hardly be deemed a salary." *Stewart v. Nanouh*, No. 17-cv-1458, 2021 WL 794936, at *7 (E.D. Pa. Mar. 2, 2021) (rejecting executive exemption where, *inter alia*, the employee testified that he was paid hourly and that his pay was "reduced when he leaves a shift early").

Even if the Court considers Defendants' meritless claims, it does not matter. *Mt. Clemens* prohibits employers from leveraging the "difficulty of precisely determining damages" to their advantage. *Southern New England Telecomms. Corp.*, 121 F.3d at 70 n. 3; *see also Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1297 (3d Cir. 1991) ("The burden of any consequent imprecision from the absence of an employer's records must be borne by that employer."). A *prima facie* case can be defeated only through specific, detailed evidence, not

merely trying to "poke holes in the manner and method in which Plaintiff went about calculating damages . . . ." *Su v. Nursing Home Care Mgmt. Inc.*, No. 21-cv-02583, 2023 WL 3440237, at *14 (E.D. Pa. May 12, 2023). Defendants chose: (1) not to introduce any documentary evidence; (2) not to offer their own analysis of the time and pay records, and; (3) not to challenge the back wages methodology at trial. The lack of a competing analysis bolsters the "reasonableness of the DOL's proposed calculation," as that turns in part on if there are "other, more reasonable alternatives to that proposal." *Acosta v. Off Duty Police Servs., Inc.*, 915 F.3d 1050, 1065 (6th Cir. 2019). Because Defendants have not introduced specific evidence of their own or otherwise proven that the methodology is "so deficient that inferences arising from its analysis cannot be trusted" (*Scalia v. Paragon Contractors Corp.*, 957 F.3d 1156, 1163 (10th Cir. 2020)), they have not met their *Mt. Clemens* burden.

## II.    Defendants' Meal Break Policies Do Not Absolve Them

The core issue is whether the automatic meal-break deduction created a knowing pattern and practice of underpaying workers. It did. The Acting Secretary proved this *prima facie*, representative case through testimony spanning Defendants' enterprise, detailed time and pay records, and a robust record of supporting documentary evidence. Defendants misstate things and silo portions of the record—another inadequate counter to representativeness—to deflect from records signaling clear liability. First, the Acting Secretary's theory is not that "most of the Facility Defendants' employees have been unable to take one bona fide meal break in the last 7+ years," or that Defendants never repaid employees for any missed meal breaks. PFOF 292, 314 This case is about relief for unpaid work; it does not seek recovery for periods during which there was no work according to the records,[6] does not seek to redress other working conditions,

---

[6] Defendants point to examples of employees punching out for a full break or payment for meal-break work. Dkt. 462 at p. 5. For instance, they discuss 6 months of 2018 employment for Ms.

and does not turn on Defendants' alleged varying compliance with the Act. At bottom,

Defendants must compensate employees for unpaid work that appears on the face of the records.

Second, the meal-break violations are not based only on a "handful" of witnesses or

"limited testimony" that was "nonsensical, clearly exaggerated, and unreliable." Dkt. 462 at

pp. 4, 6. Defendants' brief does not support their categorical denunciations with evidence and

does not engage with the relevant witness testimony. That testimony sheds light on conditions

affecting thousands of employees, across the facilities—including The Grove at Latrobe

(01/09/2024 Trial Tr. at 150:2–12 (C. Matlack); 01/10/2024 Trial Tr. at 91:6–11 (M. Zapor-

Reichard)—throughout the relevant period (*e.g.*, Michael Shuey, Michael Murray, Margaret

Zapor-Reichard, Catherine Matlack, the NHAs, and the SEIU witnesses). Yet again, Defendants

try to isolate the testimony from other evidence, including the careful, thorough comparison of

each employee's daily time punches (which Defendants concede reflect time spent working (Dkt.

462 at pp. 11–12; PFOF 163, 246)) to the pay records. This record proves a pattern and practice

of unpaid meal-break work, which Defendants either expressly asked for or knew about. *See*

PFOF 249; *see also*, *e.g.*, 01/09/2024 Trial Tr. 157:4–7 (C. Matlack: "Q. Within the CHMS

---

Bainbridge to argue that she was paid for such work. *Id*. But she has been employed since
August 2016, and only about 8% of her back wages accrued during the 6-month period. Back
Wages Summary at Tab "All Back Wages Combined," Rows 8505–17. Defendants' narrow
discussion is misleading, as they routinely removed 30 minutes from Ms. Bainbridge's other
shifts. *See, e.g.*, JX-58 at "Time Data" folder, Sheet "2019 b," Rows 96962–97106 (showing 30-
minute meal-break deductions for most of Ms. Bainbridge's shifts between July 2019 and
December 2019). Ultimately, though, the argument makes no difference, as the back wages do
not include time spent off the clock and they credit pay issued on a pay-period basis. Inasmuch
as Defendants posit a pattern and practice in their favor, they are doing a much weaker version of
what they falsely accuse the Acting Secretary of doing: unduly extrapolating the limited
experience of some to establish enterprise-wide proof. But only plaintiffs, and not employers,
can rely on representative evidence. *Mt. Clemens* demands that employers offer specific, precise
proof of time worked or evidence to negative the inferences' reasonableness. Sporadic instances
of compliance do not satisfy that burden. And, ultimately, the face of the records shuts the door
on the contention that employees routinely got meal breaks or were paid for meal-break work.

Group, the regional management company, was there any awareness that employees were working through their meal breaks at these 15 buildings? A. Yes."); 01/10/2024 Trial Tr. 33:11–14, 34:2–14 ("Q. Mr. Martis, if an employee did not punch out for a meal break, was it your understanding that the employee worked through their meal break? A. That is correct"); 01/10/2024 Trial Tr. 124:1–6, 126:9–12 (M. Zapor-Reichard: "Q. In all the buildings that you had knowledge of, were there instances where employees would work through lunch? A. Work through lunch, yes. . . . Q. So if a time record . . . showed that somebody did not punch out for lunch, for example, was it your understanding that person worked? A. Yes."); 01/16/2024 Trial Tr. 93:15–95:21 (M. Yarnell describing routine meal-break work and Defendants' awareness); 01/17/2024 Trial Tr. 193:17–197:21 (J. Shaffer testifying that Murrysville employees had to stay on the clock during breaks unless they left building and the regular occurrence of unpaid meal-break work).

Third, Defendants hold up their work rules to justify not paying for work. *See* Dkt. 462 at pp. 5–6, 12. That is no defense. "Under the FLSA, an employer may not 'suffer' work and not pay for it." *Campbell v. Victory Sec. Agency, L.P.*, No. 2:11-cv-00489, 2014 WL 1317574, at *3 (W.D. Pa. Mar. 31, 2014) (citing 29 C.F.R. §§ 785.11, 785.13). "Employers must . . . pay for all work they know about, even if they did not ask for the work, even if they did not want the work done, and even if they had a rule against doing the work. If the employer does not want to pay overtime, its management must exercise its control and see that the work is not performed." *Allen v. City of Chicago*, 865 F.3d 936, 938 (7th Cir. 2017) (citation and quotations omitted).

Defendants' conduct confirms that they cannot hide behind their policies. The Acting Secretary proved, among other things, that: (1) Facility Defendant employees frequently worked beyond scheduled shift times, often to ameliorate severe staffing shortages and often at

Defendants' request (PFOF 88–95, 156–59, 161, 164–65); (2) Defendants' payroll correction policies were globally ineffective and did not ensure payment for this work time (PFOF 184–207); (3) Defendants sometimes instructed their personnel to ignore pay errors absent a complaint (PFOF 263); (4) Defendants often refused to pay for work, either because of their general aversion to overtime or because they found a supposed rule violation (PFOF 244, 251, 265–266); (5) Defendants disclaimed affirmative efforts to find out if their practices were legal and instead made employees responsible for tracking work time and pay due (PFOF 262, 278, 283); (6) Defendants knew that employees routinely performed additional work without pay (PFOF 99–102, 151–155, 160, 162–63, 166, 169, 170(A)-(B), 171, 174–78, 243, 249, 252, 264, 273–75), and; (7) despite this knowledge, Defendants rarely, if ever, disciplined employees for meal-break work or unauthorized overtime (PFOF 130, 162, 250, 253). Formal policies do not shield employers, like Defendants, who "actively discourage[] accurate time reporting." *Hall v. Guardsmark, LLC*, No. 11-cv-213, 2013 WL 4855328, at *12 (W.D. Pa. Sept. 11, 2013). And because the Acting Secretary proved that Defendants "certainly knew that [their employees] were performing the duties they had been assigned," their written protocols prohibiting such work are beside the point. *Beasley v. Hillcrest Medical Center*, 78 F. App'x 67, 70–71 (10th Cir. 2003); *see also Reinig v. RBS Citizens, N.A.*, No. 2:15-cv-010142, 2017 WL 8941219, at *6 (W.D. Pa. Aug. 2, 2017) ("[I]f an employer has actual or constructive knowledge that its employees are not recording all of their overtime, whatever the reason for the under-reporting might be, the employer cannot sit back or stand idly by and allow the employee to under-report his time . . . .") (citation and quotations omitted) (first alteration in original).

If employees were violating work rules, Defendants' recourse was to "discipline or terminate the employee[s]—not to withhold compensation." *Secretary U.S. Dep't of Labor v.*

*American Future Systems, Inc.*, 873 F.3d 420, 432 (3d Cir. 2017) (citation and quotations omitted). In June 2018, John Reichard, a Regional Director of Operations, explained that Defendants could not "afford to terminate staff members for missing punches" because of staffing deficiencies. But he said that their alternative—using payroll to enforce work rules, *i.e.* withhold payment for work—was causing the facilities to "struggle," including because of resignations "over payroll." PX-673 at pp. 1–2. Defendants cannot have it both ways. By regularly and knowingly acquiescing to work that ran afoul of their policies, they cannot now seek refuge in them.

Fourth, despite highlighting the union's supposed inaction at trial, Defendants muster only a few sentences of passing, unsupported argument as to the union. Dkt. 462 at pp. 6–7. This does not change the score. The Acting Secretary proved that union officials consistently raised the alarm about Defendants' pay practices and supported related employee grievances. PFOF 174–78. She also proved that arbitrations were less likely to occur because Defendants' personnel repeatedly promised to fix issues and because employees often abandoned grievances or quit rather than go through a resource-intensive, years-long arbitration process. PFOF 179–182. Also, Defendants' theory has always been flawed, as "[a]n employee's right to relief under the FLSA . . . is distinct from an employee's contractual rights as provided in a collective bargaining agreement." *Bell v. SEPTA*, 733 F.3d 490, 494 (3d Cir. 2013) (citing *Barrentine v. Arkansas–Best Freight System, Inc.*, 450 U.S. 728 (1981)); *see also Brewer v. City of Waukesha, Wis.*, 691 F. Supp. 160, 163 (E.D. Wis. 1988) (rejecting argument based on union's failure to appeal arbitration because it was "the individual firefighters and not the union who possess[ed] the FLSA rights at issue in this action . . . ."); *Williams v. Tri-County Growers, Inc.*, 747 F.2d 121, 129 (3d Cir. 1984) ("The fact that an employer has broken the law for a long time without complaints from employees" does not prove good faith).

### III.     Defendants Have Not Proven Any FLSA Exemptions

Defendants did not meet their exemption burden. The submissions clarify their defense's narrowness—they argue only a few positions at some locations. However, because they did not confer as required (02/15/2024 Trial Tr. 127:20–128:3), one must parse through their unclear, internally inconsistent papers[7] to find out which positions are supposedly exempt. These seem to be: (1) ADON; (2) Dietary Supervisor; (3) Director of Activities, for only 10 locations;[8] (4) DON; (5) Housekeeping Supervisor; (6) Maintenance Supervisor, for only 11 locations;[9] (7) Rehab Coord – Direct of Rehab; (8); RN Supervisor (ADN); (9) Social Work Director, and; (10) Unit Director. Dkt. 462 at p. 9. Employees in the other departments (*see* Back Wages Summary at Tab "All Back Wages by Dept"), are therefore hourly. *See* 02/15/2024 Trial Tr. 94:12–16 ("THE COURT: You're conceding just so the record is absolutely clear that the HR directors should not have been classified as exempt employees? MR. SCHWARTZ: We didn't present any evidence on that, so we have no choice but to concede.").

Defendants' limited defense is fatally flawed. It is cast in general terms and focuses on "assigned" duties and "expected" performance—essentially a job description. *See, e.g.*, Dkt. 462 at p. 9 (nursing management employees "generally assist" with management"); PFOF 220

---

[7] Defendants' brief and their proposed findings are sometimes inconsistent. *Compare* Dkt. 462 at p. 9 (no exemption for The Grove at Washington's Director of Activities) *with* Dkt. 463, ¶ 102 (assertions regarding Director of Activities duties at that facility); *compare* Dkt. 462 at pp. 8–9 (asserting exemptions at Murrysville); *with* Dkt. 463, ¶¶ 157–58 (discussing only Murrysville Rehabilitation directors and saying that building "hires employees through department heads").

[8] Brighton; The Grove at Harmony; The Grove at Greenville; The Grove at New Wilmington; The Grove at New Castle; The Grove at Irwin; North Strabane Rehab.; North Strabane Ret., Monroeville, and; Cheswick. Dkt. 462 at p. 9.

[9] Brighton; The Grove at Harmony; The Grove at Greenville; The Grove at New Wilmington; The Grove at New Castle; The Grove at Irwin; North Strabane Rehab.; North Strabane Ret., Murrysville, The Grove at Latrobe, and; Cheswick. Dkt. 462 at p. 9

(describing Mr. Ferraro's testimony that he "expected" or "would think" that allegedly exempt employees engaged in certain activities); 02/14/2024 Trial Tr. 142:12–15 (C. Hill: "Q. Did that activities director have the ability to play some role in hiring, firing and disciplining the employees? A. Yes."); 02/14/2024 Trial Tr. 199:13–204:21 (Mr. Teitelbaum describing various roles at The Grove at Washington in terms of whether they have "authority" over certain areas or "play a role" in them). "A job title alone is insufficient to establish the exempt status of an employee." 29 C.F.R. § 541.2; *see also Cooke v. General Dynamics Corp.*, 993 F. Supp. 56, 61 (D. Conn. 1997) ("Whether an employee is exempt is determined by the employee's actual work activities, not by the employer's characterization of those activities through a job title or job description.") (citing *Goldstein v. Dabanian*, 291 F.2d 208, 209 (3d Cir. 1961)); *Acosta v. Heart II Heart, LLC*, No. 2:17-cv-1242, 2019 WL 7629239, at *2 (W.D. Pa. Oct. 3, 2019) ("The proffered job descriptions . . . do not prove that [employees] ***actually performed*** the duties listed therein.") (emphasis in original). Defendants cannot use generalized descriptions or, in the case of Social Work Directors, just the cross-examination of one witness, to prove that entire departments are exempt; the evidence must be "***particular***" to each claimed employee. 29 C.F.R. § 541.2 (emphasis added); *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 906 (3d Cir. 1991) ("[W]hether inside salespersons perform work of substantial importance to the management or operation of [the] business must be addressed in terms of the consequences of each employee's efforts alone, not the effect of the salespeople as a group.") (citation omitted). Defendants also do not factor in their witnesses' significant limitations. For example, Mr. Ferraro has "no personal knowledge of any pay practices or policies that existed before" November 2019. 02/13/2024 Trial Tr. 70:8–16. Subsequently, he only had personal knowledge of the circumstances at some locations for only certain times. PFOF 136(C). Defendants' other witnesses either spoke to only

one or a few locations and/or limited time periods. *See* PFOF 136(D)-(K). This is too slender a reed to carry Defendants' claimed exemptions.

The Court need not proceed any further. But even if it did, it would find a failure to "plainly and unmistakably" demonstrate any exemptions. *Barba v. New Century Chinese Buffet, Inc.*, No.2:20-cv-01557, 2023 WL 6348825, at *4 (W.D. Pa. Sept. 29, 2023). For example, as to the executive exemption, Defendants needed to show: (1) the employee's "primary" duties, which looks at the "relative importance of managerial/non-managerial duties, frequency of discretionary decisions, freedom from supervision by others, and the relationship of the employee's salary to wages of non-exempt employees," and; (2) whether the employee's "suggestions and recommendations are given 'particular weight,'" which evaluates "whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the suggestions are relied upon." *Id*. at *4–5 (citations omitted). This careful analysis, grounded in the trial record, is absent. Defendants' post-trial brief does not cite evidence or their own proposed findings, which are mostly scattershot, sometimes unreliable[10] assertions rather than a reasoned, employee-specific analysis. By relying on "bald pronouncements" instead of "particular evidence," Defendants did not meet their burden. *Holt v. Jefferson Cnty. Comm. for Economic Opportunity*, No. 2:17-cv-00683, 2019 WL 1239855, at *9 (N.D. Al. Mar. 18, 2019).

Defendants' weakness is also reflected in their lack of response to the Acting Secretary's evidence (even though she had no burden here) that they mishandled employees classified as exempt. *See, e.g.*, PFOF 221–22, 236. They muster only a few conclusory statements to respond

---

[10] For example, Defendants claim that Mark Gildea supervised "two or three maintenance employees." Dkt. 463, ¶ 201. However, he said that he supervised only one full-time employee and one part-time employee. 01/09/2024 Trial Tr. 40:20–41:13 (M. Gildea). Also, many proposed findings have no cited evidence. *See, e.g.*, Dkt. 463, ¶¶ 60, 83, 91, 101–102, 231, 243.

to proof of Mr. Halper's tight control over Facility Defendants and employees' corresponding

lack of authority over critical day-to-day functions (PFOF 223–230). *See* Dkt. 462 at pp. 8–9.

Irrespective of duties, Defendants cannot prevail because they paid supposedly exempt

employees fluctuating amounts based on hours. *See Higgins v. Bayada Home Health Care Inc.*,

62 F.4th 755, 760 (3d Cir. 2023) (citing 29 C.F.R. § 541.603). Rather than take on the significant

evidence that they issued smaller paychecks to allegedly exempt employees based on hours

worked (PFOF 231–35), Defendants largely ignore it and insist that their practices are legal. Dkt.

462 at p. 11. They attempt to show that Catherine Costic (née Russo)[11] was not deducted pay for

partial-day absences. *See* Dkt. 463, ¶ 222. This analysis is cursory and incorrect. Defendants aver

that pay periods for Mrs. Costic that show 72 paid hours are legitimate reductions for a "full-day

absence." *Id*. Her time records, which Defendants ignored, tell a different story. For example,

Mrs. Costic was compensated for 72 REG hours in the May 12, 2018 pay period. Back Wages

Summary at Tab "08 Pay Data Computed Reg Rate," Row 210931, Column H. Her weekly hours

were 44.35 in the first week and 36.3 in the second week, for a total of 80.65 hours. *Id*. at Tab

"05 Time Data Hrs by Week," Rows 394575–76, Columns D-E. Why was she credited with only

72 REG hours in a period where she worked over 80? It is because, consistent with the evidence

introduced at trial, Defendants' payroll system did not credit her with any hours worked on the

day where she was on the clock for only 4.02 hours (May 6, 2018). *Id*. at Tab "04 Time Data Hrs

---

[11] Defendants' citations to the Back Wages Summary do not match the Excel line numbers in the admitted version of PX-6. Instead, they align with a prior version that included back wages for Administrators. Because Defendants erroneously claim that back wages are sought for Administrators (*see supra* at p. 6), they apparently used the wrong summary for their briefing.

by Day OT C," Row 232446, Columns F. By reducing pay based on daily hours worked,

Defendants deprived Mrs. Costic of a guaranteed minimum salary.[12]

### IV.     Defendants Cannot Sidestep the Act by Failing to Pay Overtime Gap Time

Defendants pin their overtime gap time argument on the Second Circuit's decision in

*Lundy* and some district courts in this Circuit who adopt the same approach. Dkt. 462 at pp. 17–

18. They fail to mention this District's longstanding acceptance of overtime gap time. *See*

*Barvinchak v. Indiana Regional Medical Center*, No. 3:06-cv-69, 2007 WL 2903911, at *5–8

(W.D. Pa. Sept. 28, 2007); *see also Platek v. Duquesne Club*, 961 F. Supp. 835, 840 (W.D. Pa.

1995). Defendants also do not grapple with decisions accepting overtime gap time after the Third

Circuit's confirmation that the issue remains open. *See Davis v. Abington Memorial Hosp.¸* 765

F.3d 236, 244 (3d Cir. 2014)*; Copley v. Evolution Well Servs. Operating, LLC*, No. 2:20-cv-

1442, 2021 WL 3370058, at *6 (W.D. Pa. Aug. 3, 2021); *Greene v. Cnty. of Essex*, No. 23-cv-

572, 2023 WL 3932851, at *5 (D.N.J. June 9, 2023).

Defendants do not address the Fourth Circuit's recent rejection of *Lundy*. *See Conner v.*

*Cleveland Cnty., N.C.*, 22 F.4th 412, 425–26 (4th Cir. 2022). Multiple district courts outside the

Fourth Circuit have adopted or credited *Conner*. *See, e.g.*, *Garcia v. Jac-Co Constr., Inc.*, No.

2:23-cv-2485, 2024 WL 2303962, at *4 (W.D. Tenn. May 21, 2024) ("[T]he overarching

remedial purpose of the FLSA make [plaintiffs'] claims viable in federal court, and persuasive

overtime gap guidance from the Fourth Circuit makes their regular wages recoupable as well.");

*Ferguson v. Smith*, No. 3:18-cv-00372, 2023 WL 4741649, at *19 (D. Or. July 25, 2023), *appeal*

*docketed* 24-1046 (9th Cir. Aug. 21, 2023) (reviewing *Conner* and awarding overtime gap time);

---

[12] Mrs. Costic is not the only Social Worker with fluctuating pay. For example, the records for longtime Brighton Social Workers Susan Raymond and Brittany Taddy show pay that corresponds with hours when they worked fewer than 80 hours. Back Wages Summary at Tab "08 Pay Data Computed Reg Rate," Rows 199776–199884, Rows 239007–239168.

*Roberts v. Baptist Healthcare System, LLC*, No. 1:20-cv-00092, 2022 WL 16702811, at *3 (E.D. Tex. Oct. 18, 2022) ("[T]he undersigned finds [*Conner*] well-reasoned and persuasive.").

If Defendants' position were accepted, it would enable employers to easily sidestep Section 7 by artificially recording overtime wages as fully paid. A straightforward example shows why. Assume that an hourly employee with a $10 regular rate works for 50 hours, *i.e.*, 40 hours of regular time and 10 hours of overtime. Under the Act, $400 in regular wages and $150 in overtime wages are owed, for a total of $550. Under Defendants' theory, if the employer paid only $500 but labeled that payment as being $150 for the 10 overtime hours, $350 for 35 regular hours, and $0 for the other 5 regular hours (the unpaid "gap time"), the employee would be effectively denied an overtime premium because in reality they received their regular rate of $10 for all 50 hours worked (50*$10=$500), and there would be no Section 7 remedy. The Court should reject an interpretation of Act that contravenes its broad, humanitarian purposes by "'exalt[ing] ingenuity over reality'" and "'open[ing] the door to insidious disregard of the rights'" it protects. *Watkins v. Hudson Coal Co.*, 151 F.2d 311, 319 (3d Cir. 1945) (citation omitted); *see also Donovan v. Crisostomo*, 689 F.2d 869, 876 (9th Cir. 1982) (approving restitution for "kickbacks from straight time pay during overtime weeks" because to hold otherwise would allow employers to "effectively eliminate the premium paid for overtime by taking kickbacks out of straight time wages in an amount equal to or greater than" overtime due).

## V.    Defendants Effectively Forfeit Willfulness and Liquidated Damages

Other than five paragraphs in the proposed conclusions of law, with no citations, Defendants' post-trial submissions do not discuss willfulness or liquidated damages. Dkt. 463-1, ¶¶ 23–27. This effort falls well short. As to willfulness, the Acting Secretary proved that Defendants knowingly violated the Act and otherwise had reckless disregard for the legality of their practices. Dkt. 464 at pp. 16–17. Defendants, in contrast, offer three conclusory sentences,

two of which aver that the admitted emails discuss issues "outside of the purview of the FLSA." Dkt. 463-1, ¶ 27. It is not clear why this matters. Defendants do not back up their claim that "the evidence does not show that [they] knew they were violating the FLSA," nor can they.

Defendants' four paragraphs on liquidated damages are even worse. They begin by misstating the law: they fault the Acting Secretary for not having "established that liquidated damages would be appropriate." Dkt. 463-1, ¶ 23. But it is *their* "plain and substantial burden" to prove entitlement "to discretionary relief from liquidated damages." *American Future Systems, Inc.*, 873 F.3d at 433 (citation and quotations omitted). Oddly, Defendants also declare, without evidence, that the Court "has determined that [they] did not engage in any additional violations" beyond paying according to schedule and miscalculating the regular rate. Dkt. 463-1 at p. 7, n. 2. The Court has never limited Defendants' liability in this way.

Defendants' remaining points do not carry their "difficult" burden. *Cooper Elec. Supply Co.*, 940 F.2d at 908. Without citing evidence, they seem to blame "how their payroll system was programmed." Dkt. 463-1, ¶ 24. But employers "cannot deflect their responsibilities under the FLSA to payroll processing companies." *Acosta v. Heart II Heart*, No. 2:17-cv-1242, 2019 WL 5197329, at *7 (W.D. Pa. Oct. 15, 2019). *See also Souryavong v. Lackawanna Cnty.*, 159 F. Supp. 3d 514, 519 (M.D. Pa. 2016), *aff'd* 872 F.3d 122 (3d Cir. 2017) ("Defendant's mere assertion that the computer system failed to capture overtime hours of Plaintiffs fails to establish good faith.") (citation omitted). They also insist that liquidated damages are not justified given their payroll correction process. Dkt. 463-1, ¶ 25. That is no response to the proof that this process consistently failed, often because Defendants refused to adjust pay under the pretense that their policies were violated. PFOF 137, 139–150, 184–207, 265–267.

Defendants do not otherwise attempt to prove objective reasonableness or subjective good faith. It does not matter—on this record, they cannot. *See* Dkt. 464 at pp. 17–19. If their response brief tries to remedy this lack of argument, the Court need not consider such belated efforts. *Williams v. Williams*, No. 2:23-cv-00715, 2023 WL 4042733, at *5 (W.D. Pa. June 16, 2023) ("'Arguments raised for the first time before a district court in a reply brief are deemed forfeited.'") (quoting *In re Niaspan Antitrust Litig.*, 67 F.4th 118, 135 (3d Cir. 2023)).

**VI.   An Injunction is Vital to Stopping Defendants' Unceasing Disregard of the Act**

Defendants' claims of present compliance are hollow and ultimately irrelevant. As explained above, they have not ended their pattern and practice of omitting bonuses and shift differentials from the calculation of the regular rate. *See supra* at p. 5. And even if they now pay according to time punch instead of schedule, removing one facially illegal policy is not enough to prove compliance with the Act in all respects, as reflected by the approximately $12 million in back wages that accrued between 2019 and 2023. PX-6 at "Summary Tables" Excel Sheet, Tab "AH-01." And regardless of present compliance, Defendants' longstanding, illegal conduct justifies an injunction. *Walsh v. Fusion Japanese Steakhouse, Inc.*, 548 F. Supp. 3d 513, 533 (W.D. Pa. 2021) ("Even if [Defendants] are currently complying with the requirements of the Act, their word that they will continue to comply is called into serious doubt by their established history of promising compliance and then returning to practices that violate the FLSA."). Despite years of recognition that back wages are due (PFOF 279) but justifying delay in paying them because of this action (PFOF 281), Defendants now wish to pay nothing. This confirms that their brazen disregard of the Act will not cease unless the Court stops it.

Respectfully Submitted,

**UNITED STATES DEPARTMENT OF LABOR**

Mailing Address:

U.S. Department of Labor
Office of the Regional Solicitor
1835 Market Street
Mailstop SOL/22
Philadelphia, PA 19103-2968

(215) 861-5136 (voice)
(215) 861-5162 (fax)

herrera.alejandro.a@dol.gov

Seema Nanda
Solicitor of Labor

Samantha N. Thomas
Regional Solicitor

Adam Welsh
Wage and Hour Counsel

_/s/ Alejandro A. Herrera_
Alejandro A. Herrera
Senior Trial Attorney
PA 326897; NY 5235601

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 1, 2024, I electronically filed the foregoing Acting

Secretary's Response to Defendants' Phase II Post-Trial Submissions.


Date: July 1, 2024                                            _/s/ Alejandro A. Herrera_
                                                             Alejandro A. Herrera
                                                             Senior Trial Attorney
                                                             PA 326897; NY 5235601

                                                             U.S. Department of Labor
                                                             Office of the Regional Solicitor
                                                             1835 Market Street
                                                             Mailstop SOL/22
                                                             Philadelphia, PA 19103-2968
                                                             herrera.alejandro.a@dol.gov
                                                             (215) 861-5136 (voice)
                                                             (215) 861-5162 (fax)