IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JULIE A SU, *Secretary of Labor, United States Department of Labor*,

                    *Plaintiff,*

    v.

COMPREHENSIVE HEALTHCARE MANAGEMENT SERVICES, LLC, *et al,*

                    *Defendants.*

Civil Action No. 2:18-cv-1608

Hon. William S. Stickman IV

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WILLIAM S. STICKMAN IV, United States District Judge

The Fair Labor Standards Act of 1938, 29 U.S.C. § 201 *et seq.* (the "FLSA" or "Act") mandates that each covered employee receive a "fair day's pay for a fair day's work." *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945) (citation omitted). The overwhelmingly consistent evidence adduced at trial by the Acting Secretary of Labor (the "Acting Secretary") credibly and conclusively established that Samuel Halper ("Halper"), CHMS Group LLC ("CHMS"), and all 15 facility defendants[1] (collectively, "Defendants") created and oversaw a

---

[1] Comprehensive Healthcare Management Services, LLC d/b/a Brighton Rehabilitation and Wellness Center ("Brighton Rehab and Wellness Center" or "Brighton"); Maybrook-C Briarcliff Opco, LLC, d/b/a The Grove at Irwin or The Grove at North Huntingdon ("The Grove at Irwin"); Maybrook-C Evergreen Opco, LLC, d/b/a The Grove at Harmony ("The Grove at Harmony"); Maybrook-C Kade Opco, LLC, d/b/a The Grove at Washington ("The Grove at Washington"); Maybrook-C Latrobe Opco, LLC, d/b/a The Grove at Latrobe ("The Grove at Latrobe"); Maybrook-C Overlook Opco, LLC, d/b/a The Grove at New Wilmington ("The Grove at New Wilmington"); Maybrook-C Silver Oaks Opco, LLC, d/b/a The Grove at New Castle ("The Grove at New Castle"); Maybrook-C Whitecliff Opco, LLC, d/b/a The Grove at Greenville ("The Grove at Greenville"); Monroeville Operations LLC, d/b/a Monroeville Rehabilitation & Wellness Center ("Monroeville"); Cheswick Rehabilitation and Wellness Center, LLC ("Cheswick"); Mt.

system whereby employees who had worked a fair day, and often more, did not receive their fair day's pay. Make no mistake, these were not occasional, innocent payroll errors. Rather, the Court finds that Halper, CHMS, and Facility Defendants created and intentionally maintained a system through which employees were consistently, systematically, and willfully subjected to payroll practices that did not remotely comply with the provisions of the Act. Defendants failed to fulfill their record-keeping duties under the Act, they failed to pay overtime mandated by the Act, and they failed to accurately classify employees as "exempt" from overtime under the Act. Halper and the rest of Defendants created and oversaw an "adversarial" payroll system wherein employees were regularly shortchanged amounts owed—their "fair day's pay"—then forced to "fight" and "battle" to receive just compensation. The mechanism to correct payroll errors can only be described as "a runaround"—often leading to error upon error in paycheck after paycheck. The frustration and futility of this process led many employees to simply give up, either by quitting their job altogether or making do with the incorrect pay. The evidence credibly establishes not only that Halper and other Defendants violated the FLSA, but that they did so willfully—if not maliciously.

For a number of years, the employees impacted by Halper, CHMS, and Facility Defendants' conduct were without a meaningful remedy. Congress intended the FLSA to be a remedial statute. Thus, at last, Defendants may now be held accountable for their willful, flagrant violations. After carefully considering the evidence presented at trial and the applicable law, the Court is prepared, indeed compelled, to provide a remedy for Halper, CHMS, and Facility

---

Lebanon Rehabilitation and Wellness Center, LLC ("Mt. Lebanon"); Murrysville Operation, d/b/a Murrysville Rehabilitation & Wellness Center ("Murrysville"); North Strabane Rehabilitation and Wellness Center, LLC ("North Strabane Rehab"); North Strabane Retirement Village, LLC ("North Strabane Retirement"); South Hills Operations LLC, d/b/a South Hills Rehabilitation and Wellness ("South Hills") (collectively, "Facility Defendants").

Defendants' misconduct.  The Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure and will accordingly award $35,804,438.20 to the Acting Secretary, as well as permanently enjoin Defendants from their ongoing FLSA violations.

## I.   FINDINGS OF FACT

A substantial amount of evidence was presented to the Court over the thirteen days of trial. During the Acting Secretary's case-in-chief, the Court heard witness testimony from 34 former and current employees of either CHMS or one of the Facility Defendants.  The Acting Secretary called at least one witness from 14 of the Facility Defendants to testify as to their knowledge and experience from working at that facility.  The job titles of these witnesses included: Maintenance Supervisor, Director of Nursing ("DON"), Nursing Home Administrator ("Administrator"), Certified Nursing Assistant ("CNA"), Business Office Manager, Registered Nurse ("RN"), Licensed Practical Nurse ("LPN"), Director of Rehabilitation ("Rehab Director"), Nursing Manager, Cook, Activity Aide, Medical Technician, Medical Records Technician, Human Resources Manager, Dietary Manager, and Director of Social Services.  The Court additionally heard from two corporate level CHMS employees—a Regional Director of Human Resources and a Regional Director of Operations.

Defendants called 11 witnesses to present their case.  These witnesses included the current Director of Payroll for CHMS, current regional consultants for a number of Facility Defendants, and current Facility Defendant employees, including Administrators, DONs, and a Maintenance Director.  Significantly, Halper also testified in his own defense.

The Acting Secretary called 5 witnesses to present rebuttal evidence.

In addition to the 50 total witnesses called to testify and 44 employees who submitted declarations in this matter, over 600 exhibits were introduced into evidence. As the finder of fact, the Court has carefully reviewed all of the evidence in this matter. It has made credibility determinations and given each particular piece of evidence the weight that it believes it warrants. The Court conclusively makes the factual findings set forth below.

### A.     Initial Observations on Credibility

In making its credibility determinations, the Court was guided by the principles that it provides to jurors as part of its standard charge. It considered the following when determining whether it found witnesses' testimony credible: "You may be guided by the appearance and conduct of the witness, by the manner in which the witness testifies, by the character of the testimony given and by evidence or testimony to the contrary." Third Circuit Model Civil Jury Instructions 1.7 (2020). Moreover, beyond *how* a witness presented testimony, the Court also considered the following factors from the jury charge relating to the substance of and the potential bias motivating a witness's testimony:

(1) the opportunity and ability of the witness to see or hear or know the things about which the witness testifies;

(2) the quality of the witness's knowledge, understanding, and memory;

(3) the witness's appearance, behavior, and manner while testifying;

(4) whether the witness has an interest in the outcome of the case or any motive, bias, or prejudice;

(5) any relation the witness may have with a party in the case and any effect that the verdict may have on the witness;

(6) whether the witness said or wrote anything before trial that is different from the witness testimony in court;

(7) whether the witness's testimony is consistent or inconsistent with other evidence that you believe; and

4

(8) any other factors that bear on whether the witness should be believed.

*Id.*

The Court will make specific credibility determinations, as necessary, in the course of explaining its findings of fact. However, as a general matter and guided by the factors above, the Court finds that the witnesses presented by the Acting Secretary were substantially more credible than those presented by Defendants. This conclusion rests on a number of considerations.

First, as to the potential for bias, the Court notes that *every one* of Defendants' witnesses were current supervisory-level employees of one of the Defendants (or, in the case of Carlos Rivera, a consultant company owned by co-owner of CHMS, Ephram "Mordy" Lahasky, which itself is closely affiliated with Defendants (*See* ECF No. 444, pp. 79–80, 125–26)). These witnesses all had a direct current stake in this litigation. Additionally, a number of them had to testify in the presence of Halper, who is directly or indirectly their boss.

On the other hand, the Acting Secretary called very few current employees. The former employees who testified represented a broad cross-section of job types—ranging from Facility Defendant Cooks and CNAs on one hand, to a former CHMS Regional Director of Operations and a Director of Human Resources, on the other. The employees called by the Acting Secretary also discussed their work experiences across the Facility Defendants over various years between 2014 and the present. Granted, some of the Acting Secretary's witnesses knew that they may be owed money if the Acting Secretary won. But most of the witnesses have moved on with their lives and did not—when asked—give the impression of being aware of the amount of money owed, if any, and surely did not express that they depended on receiving any amount. Further, the Court found most compelling the testimony of the former CHMS regional employees and properly classified supervisory-level Facility Defendant employees, none of whom stand to gain anything from a

judgment in favor of the Acting Secretary because they were not included in the Acting Secretary's schedule of payments.

The Court also took notice that all of the Acting Secretary's employee witnesses gave detailed testimony that was remarkably consistent with one another, despite the fact that they worked in different roles at different Facility Defendants a number of years ago (and for some, a few job roles ago).   Significantly, their testimony was also consistent with numerous contemporaneous emails addressing the same issues.   It was also in line with a number of declarations by other employees, who, notably, provided their sworn statements while employed at various Facility Defendants.   Because of the pervasive consistency, the Court finds that even when an individual witness struggled to remember an issue, or perhaps testified inaccurately, the testimony offered by the Acting Secretary was, as a whole, clear, consistent, and credible.

In stark contrast to the comprehensiveness and consistency of the testimony offered by the Acting Secretary, the testimony of Defendants' witnesses was narrow and inconsistent.   As to its narrow scope, Defendants called only current management-level employees of Facility Defendants or CHMS, as discussed above.   They did not call rank-and-file hourly employees who filled the broad array of jobs throughout the entities.   Moreover, Defendants' witnesses' testimony was inconsistent not only with the overwhelming consensus of the testimony offered by the Acting Secretary's witnesses and declarants, but also with an overwhelming number of contemporaneous communications introduced into evidence—including some of Defendants' witnesses' own communications.

The Court also observed Defendants' witnesses' seemingly selective memory when faced with difficult questions relating to overtime and pay issues on cross-examination.   When confronted about these issues, they had difficulty remembering key details—even when shown

emails on the topic that they themselves had previously authored—and even took positions at odds with their own communications. For example, Melissa "Missy" Hough is currently the DON at Brighton Rehab and Wellness Center. On direct examination, she minimized any pay issues at Brighton. She testified that she was not aware of *any* instances where employees were not paid for mealtime work (who had filled out the required missed lunch form) and was not aware of persistent pay errors. (*See* ECF No. 445, p. 68). While on cross examination, she was shown documents reflecting issues with her own pay, including an email stating that she had threatened to quit due to pay errors. (*Id.* at 99). When so confronted, Ms. Hough testified that she could not remember the situations detailed in the emails, and she "struggle[s] a little to remember last week sometimes." (*Id.* at 98). Another email she was shown reflected an instance where her pay was short by 49 hours. (*Id.* at 118–19). Again, she claimed to have no recollection. The Court found her testimony to be completely incredible. Ms. Hough's testimony was only one example of a pervasive issue with memory lapses that occurred throughout the cross examination of Defendants' witnesses.

The Defendants' witnesses' selective memory issues at times strained credulity. Like Ms. Hough, Mr. Rivera, discussed above, was confronted with an email exchange that he was a part of which detailed pay issues throughout Facility Defendants. (ECF No. 444, pp. 130–135 (discussing PX-375)). While Mr. Rivera recalled authoring the email and issues he memorialized therein, he distanced any direct involvement he may have had and generalized his understanding of the issues as being pervasive across nursing homes throughout the state. (*See id.*). His testimony on these issues was rehearsed, evasive, and defensive. Cody Hill, the current Administrator of Monroeville and a former employee at The Grove at Latrobe and North Strabane Rehab, struggled to recall anything certain about his own employment history, dates, roles, and chain of command. (*See*

ECF No. 445, pp. 153–58).  When pressed about his role in hiring and firing, he testified that he "consulted" and sought the "advice" of a consultant but did not know the name of the company who hires the consultants or where the idea came from that he needed to reach out to a consultant at all.[2]  (*Id.* at 160–63).  Jason Teitelbaum, the current Administrator of Brighton and previously a consultant for Western Pennsylvania Consultants (a firm that provides consultation to Facility Defendants and is/was partially owned by Halper), originally testified that he never previously worked for Defendants,[3] but on cross examination was confronted by, and conceded to, evidence that he had, in fact, worked at at least three Facility Defendants and even had and used a CHMS email address prior to his consulting role.  (*Id.* at 208–11).  When pressed, Mr. Teitelbaum claimed that he did not know that he had a CHMS email address nor how he got it (even though he used it for more than one year).  (*Id.* at 210–11).  He also had difficulty remembering who hired him to serve as a consultant.  (*Id.* at 215–16).

As a whole, Defendants' witnesses' selective memory leads the Court to find that, by and large, their testimony is simply unworthy of belief.

The Court would be remiss if it did not specifically address the testimony of Halper, the only individual defendant in this case.  For a number of reasons, the Court found him to be completely incredible.  A recurring theme in his testimony was his attempt to insert as much distance as possible between himself and Facility Defendants' operations.  He attempted to portray himself as a high-level executive with little day-to-day responsibility and even less day-to-day

---

[2] Mr. Hill admitted that Tom Lowden, a consultant for certain Facility Defendants, hired him to be the administrator at Monroeville.  (*Id.* at 164–65).

[3] "Q. Did you perform any functions for the Comprehensive group in Western Pennsylvania before being a regional consultant for Western PA Consultants?  A. No." (*Id.* at 194).

knowledge about the operations of Facility Defendants, in general, and their staffing and payroll issues, in particular.

First, related to the transition periods after the acquisitions of Facility Defendants, Halper testified that he played no role in payroll.[4] He also testified that he was not aware of the everyday operations of Brighton—even when he was physically present there—and had even less operational knowledge of the other Facility Defendants.[5] Specifically, he testified that it was "an absurd idea" and "completely impossible for [him] to have any idea what is going on in the facilities every day." (*Id.* at 111). Halper denied playing any substantial role in payroll post-transitions as well and attempted to express general ignorance of issues relating to Facility Defendants' payroll, staffing, and operations.

Halper's testimony regarding his level of knowledge about issues in Facility Defendants is not remotely credible. The problem with his testimony is not only that it conflicts with the testimony of a substantial number of witnesses—including former high-ranking CHMS

---

[4] Halper described the payroll transition as follows: "Q. Did you put in your own payroll system post-ownership transition? A. I honestly don't remember. I know at some point the CHMS entity got involved. I don't remember if it was from day one or not. I do remember that the lady that was handling payroll internally at the facility, her name was Janet Turbish, we hired her. So she was there and she was involved with the payroll process. ... Q. How did the transition of payroll go? Were there problems? A. I believe so, yes. Q. Do you know what problems existed at the transfer? A. I don't remember exactly but there were similar issues that happened there." (ECF No. 443, p. 61).

[5] "When we first purchased Brighton, I was going to Brighton every day for a period of time maybe up to year, might have been nine months, a year, so I did have an idea what was going on at that facility only and only during the time I was going into the building. I can't even say that I knew everything was going on at Brighton every day even while I was there. I was dealing with all sorts of issues not related to the day-to-day operation of Brighton. I wasn't attending most of the meetings. So it would be hard for me to even say I was aware of what was going on during the day-to-day operation at Brighton even during the time I was going to Brighton, but by the time we purchased The Grove facilities, that means that I was involved in ten nursing homes at the time, then 14 nursing homes and 16 nursing homes." (*Id.* at 111).

employees—but that it conflicts with the fact that Halper is on an overwhelming number of email exhibits highlighting every one of the issues central to this suit. Specifically related to these emails, Halper tried to minimize his involvement during his testimony, stating that he did not ask to be copied on emails but thought that people liked to include him so that he would be aware of what was going on in Facility Defendants. (*Id.* at 101). Yet, he did not mind the inclusion and even expressed that "I like to know how much of what is going on." (*Id.*). But his involvement was not limited to mere awareness. Halper directed,[6] controlled, and/or approved[7] nearly every aspect of how Facility Defendants operated. A glaring example of this is memorialized in an email exchange between Halper and Janice Kelly, a Human Resources Director at Brighton Rehab and Wellness Center. (PX-134). Ms. Kelly initiated the communication by seeking Halper's approval to hire "on-call employees" in the dietary department. (*Id.* at 2–3). Halper responded by asking if "we" were doing some layoffs in the kitchen and proposed that "we at least pull someone out of [the] stock room" and move them to the kitchen to avoid hiring additional employees for the dietary department. (*Id.* at 1–2).

Halper's testimony epitomized the overarching nature of all Defendants' witnesses' testimony—selective, self-serving, disingenuous, and not remotely credible.

---

[6] In response to an email highlighting new changes to the FLSA regarding exempt employees, Halper responded on November 7, 2016, "Nobody should be doing ANY overtime WHATSOEVER," and in a later email within this same chain directed the Brighton employee he was corresponding with to "lower [exempt employees'] hours to 37.5 immediately and NO OVERTIME." (PX-301, pp. 1–2).

[7] In an email dated April 15, 2015, from Janet Turbish, a Payroll Supervisor at Brighton, she stated "I have to have Sam's approval on all pay decisions." (PX-121, p. 2). On December 27, 2016, Mendy Gandl, a former Payroll Manager at CHMS, authored an email stating that working from home is not considered time worked per company policy, and that even if it was, "[a]nything like this needs to be pre-approved by Sam." (PX-314, p. 1).

## B.      Specific Findings of Fact

### 1.      Defendants did not maintain accurate records of employees' hours worked or employee pay records.

The Court finds that a substantial amount of credible evidence establishes that Defendants failed to maintain accurate employment records.  The evidence shows multiple ways in which Defendants' recordkeeping failed to accurately record the hours actually worked by employees, thus affecting the accuracy of the pay they received for their hours worked.  Taken as a whole, the record demonstrates that Defendants' failure to record actual hours worked was not only an FLSA violation in and of itself, but also a major contributing factor to their repeated violations of inaccurately compensating employees for overtime hours worked.

#### a)      *Defendants failed to produce accurate records in discovery.*

First, Defendants' discovery productions in this case (sometimes, the lack thereof) and their surrounding circumstances demonstrate the overarching, universal issue that CHMS and all Facility Defendants failed to keep accurate employment records.  Department of Labor Investigator Michael Shuey credibly testified that his investigation was complicated by Defendants' failure to produce accurate employee time and pay records.[8]  His testimony was corroborated by a number of witnesses and exhibits that show Defendants' ongoing and pervasive failure to accurately record employee time.  Significantly, Michael Murray, a Security IT Specialist with the Department of Labor, credibly testified about the substantial deficiencies, and the

---

[8] "Well, to start, the records weren't provided to us timely.  We made multiple efforts to actually get the records, the totality of the records and see the time punches.  So there were multiple communications over months to get those records to begin with.  Then upon reviewing those records, as they were obtained, seeing the discrepancies between the time records and the pay records consistently where the scheduled – only the scheduled hours were paid for and not the additional – none of the additional passed [sic] their scheduled hours."  (ECF No. 434, pp. 176–77).

sometimes entirely incomplete nature of Defendants' time and payroll records. He recounted that, even after significant efforts to fill in the gaps in Defendants' records through multiple data supplements, there were tens of thousands of missing time punch records.[9]

There are a number of reasons why Defendants had inaccurate pay and time records and were thus unable to provide comprehensive records during discovery. The most prevalent were the faulty time clock systems used in Facility Defendants; Defendants inaccurately calculating and subsequently erroneously paying an employee for their scheduled shifts, rather than the actual hours worked; and Defendants' use of an automatic deduction for mealtime breaks when an employee worked through their mealtime break. The problem was exacerbated, and seemingly never remedied, by Defendants' intentionally inefficient process to correct payroll errors.

> b)      *Defendants' inaccuracies were due, in part, to the time clock systems they utilized.*

Mr. Murray's testimony about Defendants' failure to maintain accurate time records relates, in part, to issues that employees encountered with the time clock systems used at Facility Defendants. Witnesses credibly testified that they would clock in and out from work at a Facility Defendant, but that an inaccurate time, or no time at all, was recorded.[10] Additionally, witnesses

---

[9] "Q. So prior to the most recent set, how many of these records you had of a missing punch, if you know, approximately? A. It would be before the most current one, it was around 46,000 records that were missing one or the other punch. There were some cases where the records were missing both, there was about 150,000 of those. Q. How many missing punches are there in the most recent time set? A. So where there's both missing time punches, there is over 200,000 and then for this one or the other time punch missing is about 26,000." (ECF No. 437, pp. 29–30); (*see also id.* at 16–19).

[10] Megan Swan from South Hills recalled "A lot of times the time clock was incorrect for punches." (ECF No. 438, p. 91). Shana Isenberg, a former employee of The Grove at Greenville, described similar issues: "I can remember three or four times that I would have to go to Debbie I was missing 10 or 12 hours on a paycheck where they claimed the time clock didn't pick me up or – but it said it scanned okay and it accepted it and all that…." (ECF No. 443, p. 33).

credibly described instances where the time clock system was malfunctioning or inoperable altogether.[11]

Further, related to employee meal breaks, which are discussed in greater detail below, the time clocks had a function that purportedly allowed employees to indicate whether they took a meal break that day. (*See* PX-1, p. 254); (ECF No. 443, pp. 159–60). Yet, even when an employee used the system to indicate they did not take a break, the system failed to adjust an employee's hours and thus an employees' pay records would still include the automatic deduction. (*See* ECF No. 438, p. 104).

> c)     *Defendants inaccurately calculated wages due to their employees.*

Regardless of whether the time clocks properly functioned, Defendants would not pay employees based on the hours the time clocks recorded. Instead, credible evidence established that Defendants paid employees based on their scheduled hours, not the hours actually worked. This resulted in consistently inaccurate paychecks essentially every pay period across Facility Defendants.

The email exchanges introduced as PX-341 and PX-555 illustrate Defendants' timekeeping failures and how those failures impacted employee pay. They also demonstrate that Defendants were aware of these issues. The first email on the exchange contained in PX-341 was from Barbara Moeller, a HR/Payroll Assistant at Brighton Rehab and Wellness Center, to Mendy Gandl, a

---

[11] Kathleen Lantzy, who worked at Monroeville, recounted "Sometimes the machine did not work … [p]robably like two to three times a week, three or four maybe." (ECF No. 441, p. 141). Ms. Lantzy described the time clock as saying "error a lot." (*Id.* at 142). Bradley Berardinelli, an employee at South Hills, also explained that there were instances where "sometimes the clock itself doesn't work." (PX-1, p. 156).

former CHMS Payroll Manager.  It expressed issues relating to inaccurate time being kept by

CHMS (which was responsible for payroll for all Facility Defendants):

**From:** Barbara Moeller [mailto:bmoeller@brightonwellness.com]
**Sent:** Thursday, February 09, 2017 12:49 PM
**To:** Mendy Gandl <mgandl@chmsgroup.com>; Mendy Katz <MKatz@chmsgroup.com>
**Cc:** Barbara Moeller <bmoeller@brightonwellness.com>; Janice Kelly <jkelly@brightonwellness.com>; Michael Neufeld <MNeufeld@chmsgroup.com>
**Subject:** Time Calc Issues
**Importance:** High

Mendy G...you were asking for some examples where the time does not calc correctly. You can look at any of the edited TC's we send back or when we send up for a payroll correction. Those are all samples. Below I listed a few employees for this pay period whose time did not calc correctly. The time not calculating correctly has been the bulk of my payroll errors so I feel that this needs some serious consideration that something is not working. I am providing you examples from different departments just to show you that it is not just one department but every department across the board.

Paula Mitrovich (Nursing)...specific dates to look at is 1/27, 1/28 & 2/4
    1/27/17-    311a-444p is not 8 Reg & 1.25 OT
    1/28/17-    325a-453p is not 7.5 Reg
    2/4/17-    307a-353p is not 8 Reg & .50 OT

Theresa Wright (Social Services)...specific dates to look at is 1/23 & 2/3
    1/23/17-    828a-5p is not 6.90 Reg
    2/3/17-    830a-513p is not 6.75 Reg

Stephanie Ewing (Nursing Admin)...specific dates to look at is 1/31, 2/1 & 2/4
    1/31/17-    151p-558a is not 7.5 Reg
    2/1/17-    215p-321a is not 7.5 Reg
    2/4/17-    301p-320a is not 0

Julie Hobbs (LTSR)...specific date to look at 1/30
      1/30/17-     1050a-501p is not 5.50 Reg

Larry Keyser (Laundry)...specific date to look at 1/31
      1/31/17-     752a-4p is not 7.0 Reg

Chad Anderson (Dietary)...specific dates to look at is 1/22 & 1/29
      1/22/17-     1209p-834p is not 4.5 Reg
      1/29/17-     1225p-830p is not 4.5 Reg

Mary Beck (Dietary)...specific dates to look at 1/22 & 2/1
      1/22/17-     518a-730p is not 7.5 Reg
      2/1/17-     522a-730p is not 7.5 Reg

Darren Chicka (Construction)...specific date to look at is 2/3
      2/3/17-     654a-339p is not 7.5 Reg

Best Regards,

Barbara Moeller

Mr. Gandl's response highlights that CHMS was not keeping accurate records of actual time worked by employees and, moreover, placed the onus of recording accurate actual time worked on the employees:

**From:** Mendy Gandl [mailto:mgandl@chmsgroup.com]
**Sent:** Tuesday, February 21, 2017 6:44 PM
**To:** Barbara Moeller <bmoeller@brightonwellness.com>; Mendy Katz <MKatz@chmsgroup.com>
**Cc:** Janice Kelly <jkelly@brightonwellness.com>; Michael Neufeld CHMS <mneufeld@chmsgroup.com>
**Subject:** RE: Time Calc Issues

Paula Mitrovich – There is no shift that starts at 3:00am.
Theresa Wright – She needs approval to work more hours than her scheduled shift.
Stephanie Ewing – RN Supervisor's should only be working 8 hours shifts.

I'm not going to check each one. The point is, we were given schedules for each position. Employees are expected to work their schedules based on position they fill. If an employee is needed to work different hours than the schedules for his/her position it needs approval by a supervisor/administrator.

In her reply, Ms. Moeller fervently disagreed with Mr. Gandl. She explained the general frustrations at all levels within Brighton regarding CHMS's systemic timekeeping and payroll failures:

**From:** Janice Kelly [mailto:jkelly@brightonwellness.com]
**Sent:** Tuesday, February 21, 2017 6:58 PM
**To:** Mendy Gandl <mgandl@chmsgroup.com>; Mendy Katz <MKatz@chmsgroup.com>
**Cc:** Michael Neufeld <MNeufeld@chmsgroup.com>; Barbara Moeller <bmoeller@brightonwellness.com>; Janice Kelly <jkelly@brightonwellness.com>
**Subject:** RE: Time Calc Issues
**Importance:** High

Hi Mendy,

I disagree with you. The supervisor is signing off on the time card giving you their approval. You also have the swipes for the days in question. Not having a system that calculates hours worked is providing a big issue here at Brighton and upsetting a lot of my employees. They are terminating their employment because of not being paid for hours worked. Based on swipes, your system should do the calculations. This is very time consuming for the Directors, Managers and Barb to review each swipe to verify the accurate calculation.

Again, please get your program to calculate hours based on hours worked.

The final email in the exchange further addressed the record-keeping failures:

| From: | Janice Kelly [jkelly@brightonwellness.com] |
|---|---|
| Sent: | 2/22/2017 7:32:33 AM |
| To: | Michael Neufeld CHMS [mneufeld@chmsgroup.com]; Mendy Gandl [mgandl@chmsgroup.com]; Mendy Katz [MKatz@chmsgroup.com] |
| CC: | Sam Halper Gmail [samhalper@gmail.com]; Michael Jordan [mjordan@brightonwellness.com]; Eva Hamilton [ehamilton@brightonwellness.com]; Janice Kelly [jkelly@brightonwellness.com] |
| Subject: | RE: Time Calc Issues |

Hi Michael,

It is not a free for all.  We are hurting for nursing staff.  As you are aware we are paying staff gift cards to stay over and work extra shifts.  Eva signs off on all Nursing Time Cards, justifying hours worked.  It would be helpful if the  system would calculate the hours worked appropriately.

Remember,  schedules change based on staffing needs.  Nursing and dietary schedules are not cookie cutter like office staff.

Thank you. ---Jan

Another instance of timekeeping failure is memorialized in PX-555.  It highlights that when the time clock recorded accurate hours worked, it was not then used for employee compensation. An email exchange between Matt Morris, Administrator of North Strabane Rehab at the relevant time, and key players within CHMS's payroll operations (including Mr. Gandl), summarized the continuing discrepancies between hours worked from the time clock and corresponding paystubs as follows: "Please understand that the time clock says that person X should be paid 64 hours…but then the pay stub shows they were paid for 54… … Your time clock totals one figure, yet [the employees] were paid a different figure."  (PX-555, p. 1).

The communications in these exhibits are corroborated by a substantial number of testifying witnesses[12] and declarants who recounted that scheduled time was used in place of actual time worked to substitute for accurate recordkeeping.  In their declarations, employees described how their paychecks were not reflective of the time recorded on Facility Defendants' time clock

---

[12] One witness was Ann Walter, a former DON at The Grove at Harmony.  Ms. Walter recounted that she and the facility payroll manager, Jodie Wilson, "very quickly realized that the employees were getting paid by their schedule instead of their punches because we were missing some overtime and we could not account for why it was missing."  (ECF No. 435, p. 90).

systems. They recounted that while they believed that the time punches themselves were accurate, the totaling of the hours worked per day was inaccurately calculated. (PX-1, pp. 129, 153, 224, 228–29, 231, 234, 241, 247, 253, 258–59, 270, 272–73, 277). That inaccurate calculation was then used for employee paychecks. Employees agreed that all time inaccuracies were always in the employer's favor. (*Id.* at 152, 226, 253, 276–77).

Melia Black, an employee at Mt. Lebanon, recounted a specific instance of this: "[O]ne day I clocked in from 8:16 AM to 4:46 PM and was docked for the one minute for clocking in late but not paid the minute after. We were advised that hourly employees are only paid for hours worked within their scheduled times." (*Id.* at 228).[13] Timothy Green, also from Mt. Lebanon, corroborated these statements: "[I]f someone clocks out prior to the end of their scheduled shift, they are paid accurately to the minute. However, if someone clocks in prior to their scheduled time or clocks out after their scheduled time, the time keeping system only pays up to the scheduled time." (*Id.* at 252).

Also, on direct examination, Abraham Pechman, current Director of Payroll for CHMS, admitted that prior to his late May 2018 start, there was no automatic system in place to ensure that employees were being paid punch to punch, rather than scheduled shift. (ECF No. 443, pp. 147–48, 158–59). John Reichard, a regional consultant for CHMS, highlighted this in an email exchange between him and Mr. Pechman, stating that "[t]he issue of paying on [employees'] schedule rather than actual hours worked has always been the issue." (PX-673, p. 1).

---

[13] Jeffrey Keslar, who works at Murrysville, described a similar occurrence. "For example, if I clock out at 7:25 AM, I am paid to the minute, but if I clock out any time after 7:30 AM, I am only paid until 7:30 AM." (*Id.* at 257).

d)      *Inaccuracies due to mealtime work.*

The record also credibly demonstrates Defendants' pervasive failure to keep accurate records of time worked related to meal breaks.   Credible testimony established that missed or interrupted breaks were necessary and constant due to understaffing, workplace emergencies, and obligations to ensure proper patient care.[14]   The record leads the Court to the unavoidable conclusion that work during employee meal breaks was ubiquitous in Facility Defendants.  Almost every witness who worked in any capacity within any of the Facility Defendants testified that working through meal breaks was such a common occurrence that their superiors, all the way up to Halper himself, knew it.[15]

The testifying employees recognized that Defendants' official policy was that employees must take meal breaks.  If employees have to work through their break, they must seek advance permission.[16]  However, the testifying employees also credibly stated that patients' needs made it

---

[14] (*See, e.g.* ECF No. 438, p. 40) ("Sometimes working off the clock like if I would go for a lunch break, they would call us back because we were short staffed.  They would say, you are not able to get a lunch right now, try to wait until later, stuff like that."); (ECF No. 441, p. 91) ("Q. What sorts of things would you have to do when you would have to work through your lunch break? Why were you working through your lunch breaks? A. It was due to short staffing. The way I am, I will not go and take a lunch break unless my patients are going to be taken care of and I'm not going to leave one person on the floor or two persons on the floor to take care of a whole bunch of people."); (PX-1, pp. 130, 195, 221).

[15] The testimony of Margaret (Zapor) Reichard was particularly illuminating and powerful.  As a former regional consultant for CHMS, she regularly had her finger on the pulse of multiple Facility Defendants.  Based on this knowledge, she credibly testified that employees worked through lunch. (ECF No. 436, p. 125).  She also recounted that complaints surrounding unpaid hours for this work occurred frequently during her tenure.  (ECF No. 436, p. 142).  Additionally, she stated that this recurring issue was known by Halper and CHMS because employees of Facility Defendants submitted biweekly payroll corrections to them, specifically the missed punch forms discussed below.  (ECF No. 436, p. 126).

[16] (*See, e.g.*, PX-581); (ECF No. 436, p. 35); (ECF No. 440, p. 133).  The Court also notes that despite this mandated policy, no witness was able to identify a single time that an employee was disciplined for not taking his or her meal break.  (*See* ECF No. 435, p. 156).

impossible for them to take an uninterrupted break, or seek permission before skipping meal breaks.[17]   A non-exhaustive list of employees who testified that they, and/or their coworkers,[18] regularly worked through or had interrupted meal breaks includes: Corena Langham,[19] Sarah Pentek,[20] Richard Wolarov,[21] Thomas Slagle,[22] Brenda Leffler,[23] Kathryn Miller,[24] Janet Shadle,[25]

---

[17] Employees credibly testified that the chronic understaffing of Facility Defendants was a major contributing factor to their inability to take an uninterrupted lunch break.  The evidence showed that this understaffing was a result of the systemic and pervasive failure of Defendants to properly pay employees for hours worked—including, but not limited to, missed meal breaks.  In other words, Defendants' payroll deficiencies created what can only be described as a vicious cycle where their failure to pay for time worked caused understaffing, which caused mealtime work, which was not appropriately compensated, and so on.

[18] The Court particularly notes that each of these witnesses was able to not only generally testify that a number of other employees had these issues, but also give either specific positions or specific names of people who would consistently miss their meal break to perform job functions.

[19] "Q. Did you work through your lunch break?  A. Yes.  Q. How often?  A. Quite often on three to eleven.  Q. Why did you work through your lunch break?  A. Because I worked on a lockdown unit with only one other aide.  It's completely unsafe to leave 42 patients with one person.  Q. This is an understaffing issue?  A. Yes."  (ECF No. 436, p. 185).

[20] "Q. How often did Cheswick employees work through their meal breaks?  A. Often.  I don't know for sure but I believe it was often."  (ECF No. 436, pp. 216–17).

[21] "Q. How often did you work through your meal breaks?  A. Almost constantly.  Q. So how many days are you working again, five, is that right?  A. Yes.  Q. Out of those five days, how many days would you work through your meal break?  A. Practically every one of them."  (ECF No. 436, pp. 233–34).

[22] "Q. When you were able to take a lunch break, where would you go?  A. Typically I wasn't able to.  Q. Let's go into that.  So you were eligible to take a lunch break as part of your usual shift?  A. Yes, 30-minute lunch, two 15-minute breaks.  Q. And you said there were times that you wouldn't be able to take lunch?  A. Almost every day."  (ECF No. 437, p. 191).

[23] "Q. Were there ever times you had to work through your lunch break?  A. Maybe not the whole break but it was interrupted.  Q. How often would your lunch break get interrupted?  A. That would vary.  Maybe at least once or twice a week."  (ECF No. 438, pp. 10–11).

[24] "Q. Did you work through your meal breaks?  A. Yes.  Q. How often did you work during your meal breaks?  A. About two or three times a week."  (ECF No. 438, p. 41).

Patricia Henline,[26] Denver Henline,[27] Joyce Meiss,[28] Margaret Edwards,[29] Linda Shuppas,[30]

Christal Simmons,[31] and Edith Bainbridge[32].[33] The Court observed their testimony. It finds that

---

[25] "Q. Understood. We were talking about lunch breaks before. Were there times you had to work through your lunch break? A. There were. Q. How often would that occur? A. At least a few times a month." (ECF No. 438, p. 155).

[26] "Q. Were there times where you worked off the clock? A. All the time like through lunch. Q. Okay. How often did you work through lunch? A. Approximately about five times a week at least." (ECF No. 440, p. 13).

[27] "Q. Were you able to take a lunch break? A. No. Q. Why not? A. We didn't have enough employees to cover our breaks. Q. How often did you work through your meal break? A. About four times a week, four to five." (ECF No. 440, p. 26).

[28] "A. The times that I worked through a meal, it was mainly because I was either doing one on one or couldn't take my lunch break at that particular time for another reason but there's been many times where I didn't take my lunch break." (ECF No. 440, pp. 139–40).

[29] "Q. Were you always able to take your lunch breaks? A. No. Q. Why not? A. Staffing. There weren't enough people on the floor for me to leave the floor." (ECF No. 440, pp. 226–27).

[30] "Now if I'm busy with setting someone up, somebody falls or meds have to be passed or whatever, we are short staffed or trying to put people in bed, I don't have time to take a lunch. I don't. Q. How often did that happen? A. That was a lot. I'm not going to lie to you, it was a lot. Q. On average in a week, how many days did you work through your lunch? A. Probably three, four. I'm not going to lie to you, we were down on staff. It was bad. We didn't take a lunch. We worked." (ECF No. 441, p. 15).

[31] "Q. Were there times that you had to work through your lunch break? A. Yes. It happened quite often. Q. How often would it occur? A. I would say probably three days a week." (ECF No. 441, p. 91).

[32] "… Were you eligible to take lunch breaks as a CNA? A. If they found somebody on the floor, you had to go help them. You usually didn't get your lunch. If they went down the hall and found somebody all nasty, you weren't getting your lunch until that person was cleaned up. Q. Were there times you had to work through your lunch? A. Yes. … Q. Were there ever times your lunch would be interrupted because your help was needed? A. Yes. They would come and get you and say your residents need cleaned." (ECF No. 441, pp. 161–62).

[33] In addition to those that testified, a number of employees discussed missed meal breaks in their declarations. Robin Williams, who worked at The Grove at Greenville, relayed "I regularly work through lunch, particularly during periods when the facility is short-staffed. During flu season, I work through roughly 80% of my lunch breaks. Outside of flu season, I work through roughly two lunches a month." (PX-1, p. 130). Jaime Brown from The Grove at Washington stated "Ten percent of the time, my lunch break is interrupted due to being called away to work. My lunch

each of them, individually, were credible. The Court's credibility determination is bolstered by the fact that each of them told the same story—despite working at different times and in different Facility Defendants. As a result of this unaccounted-for mealtime work, Defendants' computation of total hours worked by employees was inaccurate.

e)     *Defendants employed inefficient processes for correcting time and payroll errors.*

There was a method, however, through which employees could request pay for meal break work. A similar method was also used for paycheck errors. But this system shifted the burden of keeping accurate time onto the employees, who had to fight and prove their time worked in order to receive their earned compensation. The evidence shows that the system was unwieldly, inaccurate, and frequently ineffective. It is best described as a runaround, with varying results. The overarching flaw of the process is that everything had to be run up the chain to CHMS, which many employees simply referred to as "New York," where CHMS payroll employees would then seek Halper's approval. Facility Defendant employees did not have access to time or payroll records, even upon request to see them.[34] CHMS and Halper controlled it all.

Defendants' process required employees who had worked some or all of their meal break to procure, fill out, and submit a payroll adjustment form to record time worked through their break—even in circumstances where supervisors had actual knowledge of the work. Before

---

breaks are interrupted due to a shortage of staff and patient needs." (PX-1, p. 195). Olivia Smith, an employee at Murrysville, wrote "I normally work through my lunch and do not get paid for the time." (PX-1, p. 277).

[34] Kristine Hoke, former Administrator of Murrysville, explained "Payroll was handled through New York. We had a payroll person in the facility but we could not see punches when employees clocked in, we could not see clock-in times, clock-out times. They were not available for us to view or the payroll person to view or the actual employee to view." (ECF No. 446, p. 11); (*see also* PX-379, p. 1) ("Is there any statute showing that the employer needs to provide punch details to employees?"); (PX-1, pp. 224, 226, 229, 235–36, 238, 257, 261–63, 271, 273, 288–89, 293).

submission, employees had to obtain a signature from his or her supervisor demonstrating the supervisor's knowledge and approval of the missed break or pay error. The Facility Defendant-level payroll employee would then send the completed form to CHMS for processing. Once sent to CHMS in New York, a wide range of results occurred.[35]

Some employees had their pay fixed either through an immediate check being issued or the inclusion of the owed amount in their next paycheck, although the accuracy of this amount varied. (*See, e.g.*, ECF No. 438, p. 46); (ECF No. 439, pp. 221–22); (PX-1, pp. 130, 153, 224, 238, 257, 261, 264, 293); (JX-62). The overwhelming evidence, however, demonstrates that this was not the norm. Rather, the evidence shows that this system was inconsistently administered and not remotely accurate.[36]

There were instances where CHMS refused to pay employees for work performed during meal breaks. (*See, e.g.*, PX-213). Additionally, even though CHMS required a supervisor's signature on the missed punch form, it did not always take this signature as "proof" that the employee worked the hours claimed. (*See, e.g.*, ECF No. 440, pp. 184–85, 197); (PX-300). CHMS would instead move the goal posts on employees and require additional documentation in order to approve pay for alleged hours worked.[37] For example, Melissa Hough, who during the relevant

---

[35] (*See, e.g.*, ECF No. 436, p. 37) ("Q. After the slip was sent up to CHMS Group, what would happen, if anything? A. Some of them were rejected, some of them were ignored, some of them were paid.").

[36] Jennifer Shaffer, a former Administrator at Murrysville, said that "[i]t was very frequent" that missing punch forms would be prepared, signed, and submitted but then not honored. (ECF No. 440, p. 196).

[37] Sarah Pentek, a former Business Office Manager at Cheswick, described the effectiveness of submitting the forms to request that paycheck errors be corrected as follows: "A. It was a battle usually. There was never a time, to my knowledge, that I witnessed that a correction form had been sent and then the response was, oh, okay. We'll fix it. It was always a question of can you prove it basically." (ECF No. 436, pp. 223–24).

time was working as an hourly employee, was the subject of an email exchange between Barbara Moeller and Mendy Gandl for missing pay for overtime hours worked. (PX-265). In the correspondence, Ms. Moeller and Mr. Gandl go back and forth about Ms. Hough's actual hours worked and her failure to punch the time clock. (*Id.*); (*see also* PX-284); (PX-275). Even when her supervisor, Ms. Eva Hamilton, approved the time she worked, Mr. Gandl sought approval from Mr. Michael Neufeld and Halper as to whether they could "just trust Eva on this" and authorize payment. (PX-265, p. 1). Without any additional documentation, Halper directed Mr. Gandl "Then dont [sic] pay[.]" (*Id.*).[38]

Employees quickly realized that the process was futile most (if not all) of the time. Many excuses were given to employees as to why they never heard back from CHMS.[39] Errors continued to mount pay period after pay period. Some employees at Facility Defendants created and maintained multiple spreadsheets to track the continuous payroll errors. (PX-269); (PX-525); (PX-384); (JX-65); (PX-349); (PX-75); (PX-398). Many employees would still be fighting for pay from multiple prior pay periods when another paycheck would arrive.[40] It became so overwhelming for some employees to track all of their missing pay that they simply gave up the fight.[41]

---

[38] Notably, as discussed above, Ms. Hough, who testified on behalf of Defendants, does not remember situations where her time and corresponding pay were incorrect. If she did recall a particular instance, she minimized its severity.

[39] Richard Wolarov, a current RN at Brighton, testified "It's just a runaround. There was always an excuse why. Somebody is on vacation. Somebody was fired at their out-of-state facility or corporate office or they're on vacation. You'll have to come back. You'll have to come back. After a short time of that, I just gave up. I did continue to fill the sheets out. Then eventually, I gave that up, too." (ECF No. 436, p. 236).

[40] Thomas Slagle, who previously worked as an LPN at Cheswick, recounted "After multiple pay periods where it becomes difficult to keep track after a certain point because you have been submitting multiple papers, requests, corrections for multiple pay periods." (ECF No. 437, p. 198).

Accordingly, in all of the ways detailed above, Defendants failed to accurately record employees' actual hours worked and their corresponding pay was continuously and repeatedly negatively impacted by the inaccuracies plainly demonstrated in Defendants' records.

2.    Defendants failed to pay employees all overtime wages due.

Overwhelming credible evidence leads the Court to find that Defendants routinely failed to properly compensate employees' overtime wages.  On many occasions, employees were simply not paid for overtime worked (either by undercounting hours worked as part of an employee's regular shift or by not counting shifts worked as overtime).  On other occasions, employees would be paid an incorrect premium for their overtime work, such as paying employees' straight time rate rather than the minimum 1.5 times the straight time rate mandated.  But even this straight time rate calculation would be incorrect because Defendants continuously failed to include employees' shift differentials and bonuses in their calculations.  Defendants also avoided paying overtime by misclassifying certain employees as exempt from the overtime requirements of the FLSA.  The Court finds that issues related to overtime pay were pervasive and occurred at every Facility Defendant.

    *a)*    *Defendants failed to accurately calculate employees' total hours worked.*

As discussed above related to Defendants' recordkeeping violations, Defendants failed to maintain accurate records of all hours worked by employees.  Defendants did not accurately account for mealtime work, nor did they have systems in place that accurately recorded and

---

[41] "Q. So you kind of gave up on it or what happened there?  A. Yeah.  You get frustrated after continuously going down and not getting answered.  You get told the same thing over and over and over.  It's taken up to New York.  It's taken up to New York."  (ECF No. 436, p. 183).  "A. I'm just going to be honest.  The residents were wonderful.  It just got -- I basically got tired of working and not getting my full payments or trying to fight to get what I worked.  So, yeah, I just gave up."  (ECF No. 438, p. 52).

computed total hours worked.   Upon receiving complaints of these discrepancies and miscalculations, Defendants failed to correct the computations of compensable hours.  This not only affected the number of regular hours an employee worked, but also any overtime hours earned.  Defendants then paid employees based on these inaccurate calculations.

Substantial, indeed overwhelming, credible evidence establishes that unaccounted-for mealtime work was a major issue that led to Defendants' miscalculations.  The evidence shows 1) that mealtime work was ubiquitous in Facility Defendants; 2) that Defendants knew that employees were working through some or all of their meal breaks; 3) that Defendants' timekeeping systems automatically deducted for an unpaid meal break; 4) that the burden of seeking compensation for meal break work was shifted onto the employees; and 5) that even with Defendants' system for seeking compensation for mealtime work, many employees were simply not paid.

Similarly, Defendants used other inefficient systems to track and calculate employee time and corresponding pay.   Time clocks within Facility Defendants, when operational, did not calculate total hours worked correctly, even when employees confirmed that the punch times were accurately recorded.   When employees raised these issues with their supervisors through completion of the time adjustment forms, both within Facility Defendants and CHMS, inconsistent results occurred.

Margaret (Zapor) Reichard, a former Regional Director of Operations for CHMS, confirmed that it was Defendants' policy to not combine the hours worked by an employee in more than one Facility Defendant per pay period.  (ECF No. 436, p. 164).  She explained that the Facility Defendants were different limited liability companies and thus all treated as separate entities.  (*Id.*).  This was a pervasive practice that Defendants admit occurred.  (ECF No. 360, p. 5).  Without

combining these hours, the calculation of employees' total hours worked was inaccurate, and thus overtime was not properly paid when earned.

The email exchange introduced at PX-311 addresses, in relevant part, the non-payment of overtime for employees who worked in multiple Facility Defendants in the same pay period:

| Message | |
|---|---|
| **From:** | Heather Meadows [HMeadows@embracepremier.com] |
| **Sent:** | 12/21/2016 5:11:06 PM |
| **To:** | Sam Halper (Gmail) [samhalper@gmail.com]; Erin Comport [ecomport@embracepremier.com]; Margaret Ann Zapor [MZapor@chmsgroup.com] |
| **Subject:** | RE: Gretchen Herzberger Payroll |

Sam
Please help us respond to this email. We have an ee that splits buildings. She worked over 40 hours because we needed her to treat these patients. She is now being told she will not get overtime bc both buildings function as separate companies. I understand this concept however, therapist are going to be less willing to work over if not paid the overtime. Overtime is a rarity. We do everything in our power to avoid overtime but sometimes it is the only choice so that a patient admitted late or on wkend gets evaluated.
Your thoughts?

**From:** Maranda Monsman [mailto:mmonsman@thegrove.net]
**Sent:** Wednesday, December 21, 2016 11:16 AM
**To:** Margaret Ann Zapor <MZapor@chmsgroup.com>; Heather Meadows <HMeadows@embracepremier.com>; Erin Comport <ecomport@embracepremier.com>
**Cc:** Ellen Perry <Eperry@thegrove.net>; Henry Vansickles <HVansickles@thegrove.net>
**Subject:** Fw: Gretchen Herzberger Payroll
**Importance:** High

Margaret, Heather, and Erin

It was brought to my attention last week that Gretchen Herzberger is owed overtime hours for the time she has been putting in between Greenville and New Wilmington over the past few months. When Deb asked the payroll coordinator (Suzy Levy) for Greenville about the overtime she said that Gretchen can't be paid any overtime because they consider the buildings to be separate buildings. We would really appreciate your help in resolving this matter ASAP. This has been an issue as well as missing hours for Gretchen as well.

Maranda Monsman
Human Resource Director
The Grove at Wilmington
520 S New Castle St
New Wilmington, PA 16142
Main: 724-946-3511  Fax: 724-946-8059
MMonsman@thegrove.net

Other testifying witnesses corroborated this. Megan Swan, the former Rehab Director at South Hills, stated "Our employees at South Hills were getting paid but if they traveled to another

facility, they were not getting paid their time while they were at other facilities." (ECF No. 438, p. 77). As a result of this, "employees started refusing to go to other facilities because they weren't getting paid to cover another building." (*Id.* at 97). Dr. Catherine Matlack, former Human Resources Director for CHMS, saw this issue on a regional level[42] and explained that it was typically due to "a lack of understanding through the payroll process that [employees'] hours should be combined for overtime purposes in determining their regular rate." (*Id.* at 171). She recounted that this occurred "[e]ach time [employees] worked in a sister facility." (*Id.*).

> b)      *Defendants did not pay for overtime hours worked.*

There is also substantial credible evidence that demonstrates that even when time records showed employees worked more than forty hours in one week (or eighty in a pay period, depending on the rule applied), they were not paid beyond their regular wages. (PX-1, pp. 130–31, 152, 156, 224, 227, 229, 236–37, 242–43, 247, 257, 265). Former key CHMS employees testified about Defendants' failure to pay overtime due to employees. Dr. Matlack testified that there were often missing hours on an employees' paycheck—*i.e.*, uncounted and unpaid time. Ms. Reichard, in addition to the evidence detailed above, testified that employees were paid according to their scheduled shift, rather than the hours actually worked. (ECF No. 436, p. 121). As a result, any time worked outside an employees' scheduled shift, *i.e.,* overtime, was simply not counted. Ms. Reichard confirmed that employees "often" were "not being paid overtime for time worked over 40 [hours]." (*Id.* at 141).

Hourly employees' testimony explained what would transpire. Patricia Henline, a former Cook at The Grove at Irwin, credibly testified that while she frequently worked more than forty

---

[42] Dr. Matlack's responsibilities gave her a role in all fifteen Facility Defendants. (ECF No. 435, pp. 122–23).

hours, her paychecks would not include overtime pay.  (ECF No. 440, pp. 18–19).  When this happened, she would go to human resources at The Grove at Irwin, where she would be told that they would "check into it."  (*Id.* at 19).  Ms. Henline recounted, however, that nothing became of her complaints and human resources' "check[ing] into it."[43]

The credible testimony of Corena Langham and Kathryn Miller, former CNAs at Brighton Rehab and Wellness Center, shows not only the ubiquity of non-payment of overtime across Facility Defendants, but also the regularity at which it occurred.  Ms. Langham testified that she worked overtime almost every week, but she was not paid for these hours worked "[m]ore than 75 percent of the time."  (ECF No. 436, pp. 181–82).  Ms. Miller similarly recounted that her paychecks would be "short" after working overtime in the corresponding pay period.  (ECF No. 438, p. 51).  She explained "Sometimes the overtime didn't reflect at all on my paycheck or it would be a couple hours short."  (*Id.*).  Consistent with other witnesses, both Ms. Langham and Ms. Miller would complain to the Facility Defendant-level payroll director, who would then have to relay the complaint to CHMS in New York.  (ECF No. 436, p. 182); (ECF No. 438, p. 51).  Eventually, these employees, as well as many others, got tired of fighting for the pay they earned.  (*See* ECF No. 436, p. 183); (ECF No. 438, p. 52).

> c)  *Defendants failed to accurately calculate and pay the required overtime premium.*

Defendants' FLSA violations, as they relate to paying employees the mandated minimum 1.5 times premium, is two-fold.  First, Defendants did not accurately compute hourly employees' regular rate.  This regular rate is to be paid to employees for hours worked within 40 during a

---

[43] Ms. Henline recounted the impact of Defendants' payroll errors on her life.  She explained that short checks made it difficult for her to keep up with her bills, so much so that her car was repossessed.  (*Id.* at 19–20).

workweek or 80 during a pay period.  This rate is then used to calculate the premium to be paid

for overtime worked.  Second, Defendants would pay an employee's regular rate, not the mandated

premium, for overtime hours the employee worked.

Taking the issue of the regular rate first, the Court finds that overwhelming credible

evidence establishes that Defendants did not include bonuses, shift differentials, gift cards, and all

other forms of additional pay into their calculations of employees' regular rate of pay.[44]  Michael

Shuey described how the bonuses and shift differentials were nondiscretionary, and thus

Defendants could not refuse to pay them to employees once offered.  (ECF No. 434, pp. 115–22).

Still, it was Defendants' policy to not include them when determining an employee's regular rate

for purposes of overtime.  (*Id.* at 121–24); (*see also* PX-352); (PX-608); (PX-1, pp. 254, 257, 262,

273, 276).  Even though Halper and Abraham Pechman, current CHMS Payroll Director, testified

that these additional forms of pay are now automatically factored into these calculations,[45]

---

[44] Not including these forms of payments in the regular rate calculation was not the only issue. Defendants also routinely failed to pay out the promised additional forms of compensation. (*See, e.g.*, ECF No. 435, pp. 96–99, 151–53); (ECF No. 436, pp. 53–54); (ECF No. 438, p. 110).  As one example, Ms. Langham testified that because Brighton was frequently short-staffed, people within the facility would induce employees to work extra shifts by offering bonuses and, when that failed, gift cards for retailers, such as Amazon or Target.  This is consistent with the testimony of multiple other employees from various Facility Defendants.  Ms. Langham credibly recounted an instance where employees were offered gift cards to work because they had become suspicious of the offer of bonuses due to Defendants' history of non-payment.  However, when the employees went to get their promised gift cards, they were told that they got lost or were stolen.  She was never given a single promised gift card.  (ECF No. 436, pp. 189–90).

[45] Halper testified that though he now knows the miscalculation of employees' overtime rate occurred, he "believes" the practice has been corrected, yet does not know when the correction occurred.  (ECF No. 443, pp. 81–82, 92–93).  He believed "that for some period of time" each Facility Defendant was not factoring in bonuses and shift differentials into the overtime calculation.  (*Id.* at 120–21).  Mr. Pechman also acknowledged the company-wide issue related to overtime rate calculation.  Though he discovered the miscalculations in June or July 2018, payroll "got distracted" and did not get a system in place to correct the error until July 2019.  (*Id.* at 161–62).  Even after the calculation rule was fixed, Mr. Pechman could not guarantee that no errors have been made related to overtime rate calculations.  (*See id.* at 162, 194).

testimony from employees in recent years demonstrates that the problems with overtime compensation were not remedied.[46]

The other issue relates to Defendants paying hourly employees their regular rate for overtime hours worked.  Witnesses, including hourly employees and former CHMS regional personnel, described that even when overtime was properly recorded and paid, employees would receive that overtime pay at the same rate at which their regular shifts were compensated.  (ECF No. 435, pp. 165–66); (ECF No. 436, pp. 53, 240); (ECF No. 438, pp. 107–08); (PX-1, pp. 195, 237).  RNs, LPNs, and CNAs were the employees who were most affected by these consistent errors.  (ECF No. 438, pp. 107–08); (ECF No. 435, pp. 165–66).  James Martis, a former DON at Mt. Lebanon, relayed that this issue also affected employees that worked at different Facility Defendants during a pay period.  He explained that these employees were paid straight time, even though they worked more than 40 hours a week, or 80 in a pay period.[47]

Mr. Pechman, however, attempted to correct this by explaining that this is likely due to how the payroll system corrects errors in previous pay periods.  Under the assumption that an employee worked 80 hours in a pay period, was compensated for 72 hours, and subsequently raised the pay issue to CHMS, Mr. Pechman explained:

---

[46] Sarah Pentek was an employee at Cheswick from November 2017 to January 2020.  (ECF No. 436, p. 202).  She testified that payroll issues related to overtime occurred every pay period throughout her tenure.  (*Id.* at 220–22).  Cami Dziak, who previously worked as a Human Resources Director at The Grove at Washington from May to December 2019, recalled "Every paycheck that I dealt with while I was there, there was an issue, yes."  (ECF No. 446, pp. 107–08, 111–12).

[47] Mr. Martis recounted an instance where an employee from North Strabane Rehab came to Mt. Lebanon to pick up an extra shift, which in doing so, would result in this employee working overtime.  As Mr. Martis recalled, even though this employee was to be compensated at a premium rate for the overtime hours he worked, "he only got paid straight time on that."  (ECF No. 436, p. 55).

So pay period A will have 72 hours in error because it should have been 80 hours. Pay period B will have in it an eight-hour correction check and 80 hours of regular pay, but the overall payroll record for that week will show 88 hours.

It's possible, also, that the employee was willing to wait until the next regular pay date in order to receive the missed pay, in which case the time and attendance record records that under a code called reg[ular] owed meaning reg[ular] hours were owed for a prior pay period. When that exports into the payroll system, it just comes in as reg[ular] hours.

So the payroll record will show 8/80, but the time and attendance record will show 80 hours of regular and eight hours of reg[ular] owed.

(ECF No. 443, pp. 171–72). The Court is not persuaded by the explanation. Given Defendants' numerous errors in accurately recording, calculating, and compensating employees for actual hours worked, coupled with the voluminous witness testimony describing these repeated failures, it is unlikely that the repeated issues were anything but systemic errors.

*d)      Defendants misclassified employees' exempt status.*

Finally, Defendants failed to pay employees overtime due because they improperly classified certain employees as exempt from the FLSA's overtime requirements. Credible evidence firmly establishes that Defendants engaged in a pattern and practice of inconsistently and/or inaccurately classifying employees to avoid the FLSA's mandates. Dr. Matlack's testimony was most illustrative of this. Based on her previous knowledge and experience, she believed at least four to five positions in all Facility Defendants were misclassified. (ECF No. 435, p. 200); (*see also* PX-640); (PX-656); (PX-679); (PX-635). Many of these misclassified exempt positions lacked some combination of the following: 1) their primary duty was not supervising other employees; 2) they did not always supervise at least two full-time employees; 3) they did not have true independent authority separate and apart from other roles in the Facility Defendants and were instead subject to oversight; or 4) they were not always consulted related to staffing needs nor were their opinions on such matters given particular weight.

Defendants sought to establish proper classification by calling current and former Administrators, a Maintenance Director, and a DON as well as consultants with Western Pennsylvania Consultants to testify as to their knowledge of each purportedly exempt position. Defense counsel first established the witness's knowledge as to particular Facility Defendant(s). Each witness then answered generally as to whether the exempt position in question had a role in the hiring and/or firing process, had the ability to discipline, and supervised more than two individuals. (ECF No. 444, pp. 22–67, 144–159); (ECF No. 445, pp. 4–16, 23–33, 126–148, 199–204). No additional evidence was presented at trial to corroborate any of their generalized testimony. Defendants questioned witnesses related only to the following positions: Administrator, DON, Assistant Director of Nursing ("ADON"), Maintenance Director, Dietary Director, Rehab Director, Activities Director, Nursing Supervisor/Unit Director, and Housekeeping Director.[48] The Court reiterates its previous determination that none of Defendants' witnesses were credible.

Administrators were the highest-ranking positions within Facility Defendants. They oversaw operations for their entire building, including each department included therein, and as a result, regularly supervised more than two employees. (ECF No. 439, pp. 159–60); (ECF No. 440, p. 155); (ECF No. 446, p. 6). Administrators retained some ability to supervise and manage Facility Defendant operations, although their independent authority was significantly limited due to the nature of CHMS's regional oversight.[49] For example, Administrators did not have the ability

---

[48] Of the remaining purportedly exempt positions at issue, Defendants did not present any evidence as to their proper classification. Additionally, Defendants explicitly conceded at trial that Human Resources Directors were misclassified as exempt during the relevant period. (ECF No. 446, p. 94).

[49] Anthony Molinaro from South Hills stated "I really had no control of anything in the facility while I was there. I was told to pretty much report anything to the regional directors of each

to independently hire and fire employees.[50]  However, at the very least, Administrators were still involved in the processes and conveyed their recommendations for such actions to regional consultants, who largely followed their suggestions.  (*See, e.g.*, ECF No. 440, pp. 215–16).

Facility Defendant DONs were responsible for day-to-day clinical operations.  This included overseeing all nursing staff, which were comprised of ADONs, Nursing Supervisors, Unit Directors, RNs, LPNs, and CNAs.  (ECF No. 435, p. 70); (ECF No. 436, p. 5); (ECF No. 439, pp. 8–9).  This oversight allowed the DON to ensure that proper patient care was being administered and the facility remained in compliance with all regulatory guidelines, especially those related to required staffing levels.  (*See* ECF No. 435, pp. 111–12).  DONs, however, did not have the independent authority to hire, fire, or set wages for nursing employees.  Instead, they would be involved in the hiring or firing process, but ultimately the matter needed to be raised with the DON's supervising Administrator and/or CHMS regional consultant for final approval.  (*See id.* at 111); (ECF No. 436, pp. 17, 75); (ECF No. 439, pp. 40–41).

Defendants called three witnesses who were current or former ADONs at Facility Defendants.  The Court does not find any of them to be credible.  The Court instead considers other evidence, including Vivian Miller's, an ADON at Mt. Lebanon, declaration.  In her

---

department that they had brought in from Comprehensive Healthcare Management."  (ECF No. 439, p. 163).  Kristine Hoke, who worked at Murrysville, similarly testified "You didn't know what was happening.  You had no control over anything because you always had to get approval through the system which made it very difficult to manage the day-to-day operations."  (ECF No. 446, p. 10).

[50] Anthony Molinaro testified "Nobody could be hired at any facility unless Mr. Halper approved it.  We had to wait to hear from Mr. Halper to approve every single employee that would be hired and we were losing so many employees at that time because they weren't being paid."  (ECF No. 439, p. 171).  Jennifer Shaffer, who was also employed at Murrysville, recounted "[The regional consultant] would have to approve anyone that I needed to hire.  He would have to give me their pay rate.  He would tell me if they were going to be exempt or nonexempt.  If I needed capital equipment, I would have to get permission from him."  (ECF No. 440, p. 161).

declaration, Ms. Miller states "My primary duty is management of nursing staff.  I typically manage about 16 full time employees.  I do not have any authority to hire, fire, or setting rates of pay.  My input into hiring/firing is given particular weight; I conduct interview, give write-ups, etc." (PX-1, p. 264).

Related to Maintenance Directors, testimony demonstrated that these directors sometimes supervised at least two full-time employees but other times were the only person who comprised the maintenance department.  (*See* PX-1, p. 155); (ECF No. 435, pp. 28, 55, 200); (ECF No. 439, pp. 29–30).  Similarly, Maintenance Directors would spend the majority of their time working alongside maintenance staff performing the same manual labor.  (*See* PX-1, p. 155); (ECF No. 435, pp. 28, 200); (ECF No. 439, p. 29).  And even though the directors assigned tasks to other maintenance workers, it was implied that the directors themselves did not conjure up the duties and were instead delegated tasks by someone else within the Facility Defendant.  (*See* ECF No. 435, pp. 42, 59).  Additionally, they did not have the authority to hire, fire, or set wages.  (PX-1, p. 155).

Apart from Defendants' witnesses' generalized testimony related to Dietary Directors, the only other testimony heard was from Chad Anderson, a former Dietary Director at Brighton Rehab and Wellness Center.  He described his primary duties as:

> [helping] with ordering, overseeing operations, overseeing day-to-day operations, just making sure the residents were cared for in regards to dietary needs.  Making sure -- I oversaw union staff, so making sure we had enough staff to run the departments, like scheduling as well, just making sure operations were running as best they could have been.

(ECF No. 441, p. 105).  He also "ma[de] sure the food was getting out to all the residents, making sure their specific dietary needs were met, just making sure the department was staffed, all the cooks were there, all the dietary aides were there." (*Id.*).  He stated that he oversaw between 30

and 35 dietary department employees during his time at Brighton. (*Id.* at 106). Timothy Green, a current Director of Dining Services at Mt. Lebanon, similarly defined his role in a submitted declaration: "My primary duties are to oversee the day to day functions of the dietary department which has 12 employees. I do have authority to hire, fire, schedule, and direct the work of the employees." (PX-1, p. 252).

The only testifying witness who worked as a Rehab Director was Megan Swan from South Hills. She explained that her duties in this position were "[t]o provide patient care under physician orders, provide a safe environment for the residents and staff and … follow through with financial reports, staffing, any call-offs." (ECF No. 438, p. 64). Management of the rehabilitation department was a vital aspect of her position as a director. (*See id.* at 128); (PX-1, pp. 241, 251). She stated that she had between 8 to 12 employees in the department but did not have any ability to hire, fire, or set wages for any of them. (ECF No. 438, pp. 64, 82–83, 127–28, 130). Jeremy Gormon, a Rehab Director at Mt. Lebanon, detailed his similar inability to "have the final say" when it came to hiring and firing but explained that he is still involved in the process. (PX-1, p. 251).

Related to Activities Directors, both witness testimony and employee declarations demonstrated that the activities departments within Facility Defendants were small, meaning that the director did not always oversee two or more individuals. (ECF No. 439, pp. 29–30); (PX-1, pp. 247, 270). The directors' primary duties were to schedule and oversee all activities offered to Facility Defendant residents and ensure they complied with state guidelines, not managing other employees. (PX-1, pp. 247, 270). Nor did Activities Directors have any other independent discretion, such as making decisions or providing input related to hiring, firing, or setting wages for their staff. (*See id.* at 270).

36

While Nursing Supervisors/Unit Directors oversaw nursing staff, they did not have independent authority to manage the staff. Janet Shadle, a former Nursing Supervisor at Mt. Lebanon, testified that she was responsible for making sure nursing staffing was correct, but this did not include any ability to hire or fire employees, nor did she directly discipline individuals. (ECF No. 438, pp. 145–46, 174); (*see also* ECF No. 446, p. 116); (PX-1, pp. 237, 254, 257, 276). Rather, Ms. Shadle focused on day-to-day operations and made sure that proper staffing was achieved to ensure adequate patient care.[51] She also performed nursing responsibilities such as seeing the residents, talking to their families and discussing treatment options, speaking to doctors, determining care planning, attending and participating in care conferences, and ordering tests and lab work. (ECF No. 438, p. 145). Declarants expressed similar responsibilities and also stated they did not "make any decisions with respect to matters of significance" and are sometimes the only RN on staff, meaning there is no one else for them to direct or manage. (PX-1, pp. 237, 257, 276).

No witness that held the sole title of Housekeeping or Environmental Director testified at trial nor submitted a declaration. The only evidence presented was the trial testimony of Jason Elmer, a witness for Defendants who dually held the roles of Maintenance Director and Housekeeping Director while he was employed at The Grove at New Castle. He testified that during his time serving in both roles, he oversaw 11 to 13 employees but did not specify how many

---

[51] "Q. For your staffing responsibilities, what staffing did you need to make sure was in place when you were working? A. Well, for example, we had generally three nurses on the first floor, two nurses on the second floor. If someone called in sick or whatever, if I couldn't find another nurse to come in, I would have to divide the staff so it was more appropriate for the patient, the resident to get proper care." (ECF No. 438, p. 145); (*see also id.* at 173–74).

worked in the maintenance department versus the housekeeping department.  (ECF No. 444, p. 181).  As a whole, the Court does not find his account credible.

  3.  <u>Defendants willfully violated the FLSA.[52]</u>

   Finally, the evidence compels the Court to find that Halper, CHMS, and Facility Defendants were not only aware that employees were routinely wrongly paid, but also that their actions were willful.  Several exhibits undoubtedly display, at the bare minimum, an awareness that all of the issues discussed above related to staffing and pay were ubiquitously occurring across Facility Defendants.

   The most evident demonstration of this knowledge is Facility Defendant employees' continual sending of detailed lists and spreadsheets documenting each and every payroll issue in a given period to CHMS and Halper.  (*See, e.g.*, PX-87); (PX-160) (Halper responding to errors saying, "These are some bad mistakes for us."); (PX-270); (PX-349); (PX-384); (PX-269); (PX-525); (PX-403); (JX-65); (PX-75); (PX-355); (PX-371).  The Court finds it significant (and entirely consistent with the evidence of record as a whole) that in a single pay period at a single Facility Defendant, a given spreadsheet would detail dozens of pay errors, and Defendants had knowledge of them.

   More specifically, the Court finds that Defendants knew that employees were working outside of their scheduled shifts and were not compensated based on their actual time worked captured by the time clock systems in Facility Defendants.  (*See* ECF No. 436, pp. 151–53); (PX-673); (ECF No. 443, pp. 158–59).  The evidence also establishes that Defendants were aware that employees frequently worked through their meal breaks.  Several hourly employees testified that

---

[52] In their joint stipulations, Defendants admit that at all relevant times, they were aware of the FLSA's requirements.  (ECF No. 360, pp. 3–4).  And at trial, Defendants conceded that they are liable for some violations, although they dispute the degree and extent.  (ECF No. 434, p. 38).

it was well known by their supervisors that circumstances required them to work through some or all of their meal breaks. Their work, for example, was easily observable to supervisors in Facility Defendants. (*See, e.g.*, ECF No. 440, pp. 13, 38, 79). Additionally, by the nature of the missed lunch forms, supervisors' signatures were required in order to indicate to CHMS that supervisors knew of and approved an employee's missed meal break.

High-ranking agents of Defendants—CHMS in particular—confirmed that Defendants were aware of mealtime work. Dr. Matlack testified that she knew that employees worked through their meals in at least some of the Facility Defendants. (ECF No. 435, p. 160). She also testified that building supervisors, as well as CHMS regional consultants, were well aware of mealtime work. (*Id.* at 156–57). Ms. Reichard corroborated this and confirmed that Halper too knew of this unpaid work.[53] Therefore, Defendants knew that employees were frequently working through meal breaks, yet CHMS's payroll system was based on the presumption that employees would take a meal break. And even when Facility Defendant-level employees would raise pay issues related to mealtime work to CHMS, they intentionally refused to pay.

Defendants also knew of potential misclassifications of employees as demonstrated by Dr. Matlack's emails to her CHMS colleagues. (PX-656); (PX-635); (PX-640). In one email to Mr. Pechman, she states:

> We have a number of positions that are mis-classified. For example, about half of the facility receptionists are exempt and they should not be. There are some others that are also problematic, such as maintenance workers listed as exempt. … I wanted you to be aware as this is a serious concern of mine.

---

[53] "Q. To your knowledge, were the building managers, the department heads were they aware that employees were regularly working through lunch? A. Yes. Q. How do you know? A. They would submit biweekly payroll corrections, missed punch forms for employees who worked through their lunches. Q. Ma'am, do you know if Mr. Halper was aware that CHMS employees at these buildings were regularly working through their lunches? A. Yes." (ECF No. 436, p. 126).

(PX-679).  Dr. Matlack also raised the recurrent issue with exempt employees punching a time clock and the subsequent docking of their pay as a result of their punched time.  (PX-635).  She sent an email discussing this issue and its ramifications to multiple CHMS regional employees as well as Halper.  (*Id.*).

## II.    SUMMARY OF THE ACTING SECRETARY'S CLAIMS

The Acting Secretary brought this action pursuant to the FLSA.  She first seeks to permanently enjoin Defendants from violating §§ 207, 211(c), 215(a)(2), and 215(a)(5) of the FLSA.  (ECF No. 1, p. 7).  Second, the Acting Secretary requests back wages for Defendants' failure to accurately pay the overtime compensation due to the employees listed in Schedule A (PX-7) for the period of December 14, 2014, through March 8, 2023.  (*Id.*); (ECF No. 343). Finally, the Acting Secretary requests liquidated damages be awarded in an amount equal to the back wages owed as allowed for under § 216(c) of the Act.  (ECF No. 1, p. 7).

Prior to the Phase II bench trial, the parties submitted their Joint Stipulations.  (ECF No. 360).  Defendants conceded that each Defendant "has been an enterprise engaged in commerce or in the production of goods for commerce" and that all Defendants are "joint employers"[54] in relation to the individual employees listed in Schedule A.  (ECF No. 360, pp. 2–3).  Defendants admitted that they were aware of the FLSA's requirements regarding overtime compensation, employee classifications as exempt or non-exempt from overtime, and compensation for all hours worked.  (*Id.* at 3–4).  Additionally, the parties stipulated that Defendants knew that some employees did not obtain prior approval before working overtime hours, and Defendants did not subsequently discipline employees for failing to obtain this prior approval, except in rare cases.

---

[54] As a result of this stipulation, the parties have agreed that all Defendants may be held jointly and severally liable for the FLSA violations of the other.  *See Thompson v. Real Est. Mortg. Network*, 748 F.3d 142, 148 (3d Cir. 2014).

(*Id.* at 4).  Defendants also admitted that they failed to "aggregate the hours of employees who worked at two or more Facility Defendants in the same pay period for purposes of payroll." (*Id.* at 5).

## III.   SUMMARY OF THE FLSA

The FLSA "was designed 'to aid the unprotected, unorganized and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage.'" *Symczyk v. Genesis HealthCare Corp.*, 656 F.3d 189, 192 (3d Cir. 2011) (citation omitted), *rev'd on other grounds*, 569 U.S. 66 (2013). "Among the bedrock principles of the FLSA is the requirement that employers pay employees for all hours worked." *Smiley v. E.I. Dupont De Nemours & Co.*, 839 F.3d 325, 330 (3d Cir. 2016) (citing 29 C.F.R. § 778.223).  To ensure that employees are properly compensated for their work, the nature of the FLSA is remedial, as it was designed to ensure that each employee covered by the Act would receive a "fair day's pay for a fair day's work" and be protected from "the evil of overwork as well as underpay." *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 578 (1942) (internal quotations omitted).

### A.  Recordkeeping Requirements

The FLSA mandates that employers "make, keep, and preserve" accurate employment records.  29 U.S.C. § 211(c).  This duty is non-delegable.  *Walsh v. Fusion Japanese Steakhouse, Inc.*, 548 F. Supp. 3d 513, 527 (W.D. Pa. 2021) (citations omitted).  Section 516.2(a) of the FLSA regulations enumerates twelve specific groups of information that an employer is required to maintain and preserve related to every employee.  29 C.F.R. § 516.2(a).  Among these are: the "[r]egular hourly rate of pay for any workweek in which overtime compensation is due," the "[h]ours worked each workday and total hours worked each workweek," the "[t]otal daily or

weekly straight-time earnings or wages due for hours worked during the workday or workweek, exclusive of premium overtime compensation," and the "[t]otal premium pay for overtime hours." *Id.*

"In the absence of adequate employer records of employees' wages and hours, as required by the FLSA, the solution is not to penalize the employees by denying recovery based on an inability to prove the extent of undercompensated work, but rather to allow the employee or the Secretary to submit sufficient evidence from which violations of the Act and the amount of an award may be reasonably inferred." *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1297 (3d Cir. 1991). If a plaintiff meets this *prima facie* showing, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negat[e] the reasonableness of the inference to be drawn from the employee's evidence." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687–88 (1946).

To satisfy its initial burden in light of an employer's recordkeeping violations, a plaintiff need only submit "sufficient evidence to show the amount and extent of [unpaid wages] as a matter of just and reasonable inference." *Selker Bros.*, 949 F.2d at 1297 (quoting *Mt. Clemens*, 328 U.S. at 687–88). When a plaintiff seeks unpaid wages on behalf of numerous employees, "[i]t is not necessary for every single affected employee to testify in order to prove violations or to recoup back wages." *Id.* at 1298. Instead, a plaintiff may present "testimony and evidence of representative employees" to establish "prima facie proof of a pattern and practice of FLSA violations." *Id.* (collecting cases). There is no bright-line guidance for what amount of evidence is required for representativeness. *See U.S. ex rel. Int'l Bhd. of Elec. Workers Loc. Union No. 98 v. Farfield Co.*, 5 F.4th 315, 353 (3d Cir. 2021) (collecting cases); *see also Sec'y U.S. Dep't of Labor v. Central Laundry Inc.*, 790 F. App'x 368, 373 (3d Cir. 2019) ("Together with

documentation, such as time cards, the testimony of coworkers who observed such employees at the jobsite provides a basis to infer the amount of time an employee worked.").

Once established, the burden then shifts to the employer "to come forward with evidence of the precise amount of work performed or with evidence to negat[e] the reasonableness of the inference to be drawn from the employee's evidence." *Selker Bros.*, 949 F.2d at 1297 (quoting *Mt. Clemens*, 328 U.S. at 687–88). This requires the employer to submit accurate and detailed records in order to defeat the inference. *See id.* at 1297–98. The employer cannot rely on a plaintiff's imprecision in its back wages calculation to satisfy its burden. *See id.* at 1297 (quoting *Mt. Clemens*, 328 U.S. at 688) ("The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of § [2]11(c) of the Act."). "Unless the employer can provide accurate estimates, it is the duty of the trier of facts to draw whatever reasonable inferences can be drawn from the employees' evidence...." *Mt. Clemens*, 328 U.S. at 693. Thus, if the employer cannot satisfy its burden, a court may award damages to the affected employees, "even though the result may be only approximate." *Selker Bros.*, 949 F.2d at 1297 (quoting *Mt. Clemens*, 328 U.S. at 687–88).

**B. Overtime Requirements**

Section 207(a) of the FLSA requires employers to either (1) limit their employees' workweek to 40 hours or (2) pay their employees an overtime premium for hours worked in excess of 40 in a workweek, calculated at no less than 1.5 times the employees' standard rate of pay, or "regular rate." 29 U.S.C. § 207(a). "The regular rate at which an employee is paid for 'straight time'—or the first forty hours of work in a week—is integral to the issue of overtime payment under the FLSA" because an inaccurate regular rate will lead to an inaccurate calculation and

payment of the overtime premium due. *Smiley*, 839 F.3d at 330. This rate "is a readily definable mathematical calculation that is explicitly controlled by the FLSA," which "by its very nature must reflect all payments which the parties have agreed shall be received regularly during the workweek, exclusive of overtime payments." *Id.* (quoting *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424–25 (1945)). Non-discretionary bonuses must be included in the regular rate calculation. *See* 29 C.F.R. §§ 778.208–09.

       1.    <u>Section 207(e) calculation of an employee's regular rate of pay</u>

Section 207(e) of the Act deems "all remuneration for employment paid to, or on behalf of, [an] employee" is to be included in the calculation of the regular rate. 29 U.S.C. § 207(e). The provision also sets forth narrow carveouts for payments that shall not be included in an employee's regular rate determination. *Id.*; *see also Minizza v. Stone Container Corp. Corrugated Container Div. E. Plant*, 842 F.2d 1456, 1459 (3d Cir. 1988) (citations omitted) (explaining that the several exceptions set forth in § 207(e) "are narrowly construed"). Given this, "there is a statutory presumption [] that remuneration in any form is included in the regular rate calculation," where "[t]he burden is on the employer to establish that the remuneration in question falls under an exemption." *Madison v. Res. for Hum. Dev., Inc.*, 233 F.3d 175, 187 (3d Cir. 2000).

Various forms of incentive pay are among the types of remuneration that need to be included in the regular rate computation. Bonuses are one example. "Bonus payments are payments made in addition to the regular earnings of an employee." 29 C.F.R. § 778.208. This does not include "discretionary bonuses, gifts and payments in the nature of gifts on special occasions …." *Id.*

Another form of incentive pay is shift differentials. Shift differentials are "[w]here an employee receives a higher wage or rate because of undesirable hours or disagreeable work," and

this higher wage is "because of the character of work done or the time at which he is required to labor rather than an overtime premium." *Bay Ridge Operating Co. v. Aaron*, 334 U.S. 446, 468–69 (1948); *see also Burke v. Mesta Mach. Co.*, 79 F. Supp. 588, 604 (W.D. Pa. 1948) (citation omitted) (stating that a shift differential "is not an overtime premium and should be included in the computation for determining the 'regular rate' of pay.").

## 2.    Section 213 exemptions from the FLSA's overtime mandates

Some employees, however, may be exempted from the Act's overtime pay requirement. Section 213(a)(1) of the Act sets forth that § 207 shall not apply to "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). Those working in a bona fide executive capacity include any employee:

> (1) Compensated on a salary basis pursuant to § 541.600 at a rate of not less than $684 per week … exclusive of board, lodging or other facilities;
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
> (3) Who customarily and regularly directs the work of two or more other employees; and
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a). An employee's job is examined as a whole in order to determine his or her "primary duty." § 541.700(a). The following nonexclusive list sets forth factors to consider in establishing "primary duty:"

> the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id.*

The burden of proof lies with the employer to demonstrate that an employee "plainly and unmistakably" falls within an exemption to the FLSA's overtime pay requirements. *Arnold v. Ben*

*Kanowsky, Inc.*, 361 U.S. 388, 392 (1960); *see also Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97 (1974) ("[T]he application of an exemption under the [FLSA] is a matter of affirmative defense on which the employer has the burden of proof."); *Perez v. Express Scripts, Inc.*, No. 23-1730, 2024 WL 957978, at *2 n.4 (3d Cir. Mar. 6, 2024) (citations omitted) ("The employer bears the burden of showing that the employee is exempt from receiving overtime."). These exemptions should be construed narrowly against the employer. *Lawrence v. City of Phila., Pa.*, 527 F.3d 299, 310 (3d Cir. 2008) (citing *Arnold*, 361 U.S. at 392).

### 3.    Overtime gap time

In order to properly compensate employees for overtime hours worked, an employer must first accurately pay employees for all straight time hours in a given pay period. *See* 29 C.F.R. § 778.315 ("This extra compensation for the excess hours of overtime work under the Act cannot be said to have been paid to an employee unless all the straight time compensation due him for the nonovertime hours under his contract (express or implied) or under any applicable statute has been paid."). Gap time

> refers to time that is not covered by the overtime provisions because it does not exceed the overtime limit, and to time that is not covered by the minimum wage provisions because, even though it is uncompensated, the employees are still being paid a minimum wage when their salaries are averaged across their actual time worked.

*Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 243 (3d Cir. 2014) (quoting *Adair v. City of Kirkland,* 185 F.3d 1055, 1062 n.6 (9th Cir.1999)). "In other words, 'gap time' is non-overtime hours worked for which an employee is not compensated." *Id.* at 244.

The United States Court of Appeals for the Third Circuit recognizes two subsets of gap time—"pure" gap time and "overtime" gap time. *See id.* Pure gap time claims are not cognizable under the FLSA, however, the Third Circuit has not explicitly ruled on the viability of "overtime"

gap time claims. *See id.* "Overtime" gap time claims are those brought "by an employee who exceeds the overtime threshold, but whose employment contract does not compensate him or her for all non-overtime hours." *Id.*

    4.    <u>Damages owed by an employer</u>

If an employer fails to properly pay employees for hours worked in excess of a 40-hour workweek and does not sufficiently demonstrate that an employee is exempt from overtime pay, § 216(b) of the FLSA permits the Secretary of Labor to recover not only the unpaid wages, but also an additional equal amount of liquidated damages. 29 U.S.C. § 216(b); *Sec'y U.S. Dep't of Lab. v. Am. Future Sys., Inc.*, 873 F.3d 420, 433 (3rd Cir. 2017). Liquidated damages awarded under § 216 are compensatory and are imposed to "ease any hardship endured by employees who were deprived of lawfully earned wages." *Am. Future Sys.*, 873 F.3d at 433. These damages are also mandatory and are consistently enforced as a result of the violations described in § 216. *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 907–08 (3d Cir. 1991) (quoting *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 310 (7th Cir. 1986) ("Double damages are the norm, single damages the exception….")).

An employer may, however, avoid these damages. To do this, an employer must sufficiently establish the difficult "plain and substantial" burden that it is entitled to discretionary relief from a liquidated damages award. *Id.* at 907 (citations omitted). To carry this burden, an employer "must show that [it] took affirmative steps to ascertain the Act's requirements, but nonetheless, violated its provisions," and that its actions were objectively reasonable. *Id.* at 907–08. "[I]f a court finds that the employer acted in good faith and had reasonable grounds for believing the act or omission was not a violation of the FLSA, the court may use its discretion to

not award liquidated damages." *Sec'y U.S. Dep't of Lab. v. Mosluogu, Inc.*, No. 22-2749, 2023 WL 5972044, at *4 (3d Cir. Sept. 14, 2023) (citing 29 U.S.C. § 260).

> 5.   <u>Injunctive relief</u>

A district court may enjoin an employer's violations of the FLSA.  Section 217 of the Act directs that a court

> shall have jurisdiction, for cause shown, to restrain violations of section 215 of this title, including in the case of violations of section 215(a)(2) of this title the restraint of any withholding of payment of minimum wages or overtime compensation found by the court to be due to employees under this chapter.

29 U.S.C. § 217; *see also Solis v. A-1 Mortg. Corp.*, 934 F. Supp. 2d 778, 815 (W.D. Pa. 2013) (citation omitted) ("The FLSA authorizes district courts to issue injunctive relief 'restrain[ing] violations' of §§ 206, 207, and 211(c) upon a showing of cause.").  "Whether to grant an injunction is within the court's sound discretion." *Id.* (citation omitted).  District courts consider "the employer's past conduct, current conduct, and, most importantly, whether the employer can be counted on to comply with the FLSA in the future" to determine whether injunctive relief is warranted. *Id.* (citing *Reich v. Petroleum Sales, Inc.*, 30 F.3d 654, 657 (6th Cir. 1994)).

**C. Willful Violations**

Willful violations of the FLSA extend the statute of limitations from two to three years.  29 U.S.C. § 255(a); *Stone v. Troy Constr., LLC*, 935 F.3d 141, 148 (3d Cir. 2019) (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 129 (1988)).  Willfulness requires that an employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA.]" *McLaughlin*, 486 U.S. at 133.  A showing of egregiousness is not required. *Stone*, 935 F.3d at 150 (citing *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 617 (1993)).  Indifference, however, is acknowledged "as a marker of willful conduct." *Solis*, 934 F. Supp. 2d at 810 (citations omitted).

## IV.   CONCLUSIONS OF LAW

The Acting Secretary proved that Defendants willfully maintained patterns and practices of FLSA violations over the course of several years.   In reaching its conclusions, the Court incorporates by reference its extensive factual findings above.

The Court holds that Defendants violated § 211(c) of the FLSA.   29 U.S.C. § 215(a)(5) (declaring that it is unlawful "to violate any of the provisions of section 211(c) of this title").   As discussed extensively above in Section B.1., Defendants failed to maintain accurate employment records, including records of all hours worked by employees and employees' corresponding pay. These failures are attributable to Facility Defendants' time clock systems; Defendants' recording of time worked based solely on an employee's predetermined schedule; and Defendants' enforcement of an automatic deduction for mealtime breaks regardless of whether an employee worked through his or her break.

As a result of Defendants' recordkeeping violations, the *Mt. Clemens* burden-shifting framework applies.   The Acting Secretary satisfied her initial *prima facie* burden by "submit[ting] sufficient evidence from which violations of the Act and the amount of an award may be reasonably inferred." *Selker Bros.*, 949 F.2d at 1297 (citing *Mt. Clemens*, 328 U.S. at 687).   On behalf of the nearly 6,000 employees listed in Schedule A, the Acting Secretary representatively demonstrated Defendants' pervasive failures to properly compensate employees.   The totality of the evidence she presented, through the testimony of 39 current or former employee witnesses and introduction of over 500 exhibits, credibly established that Defendants engaged in patterns and practices of FLSA violations. *See id.* at 1298.

The Acting Secretary first met her *prima facie* burden of Defendants' FLSA violations for failing to properly compensate overtime hours worked in violation of § 207 of the Act.   29 U.S.C.

§ 215(a)(2) (declaring that it is unlawful "to violate any of the provisions of … section 207 of this title"). The evidence proved that Defendants routinely failed to properly compensate employees for straight time hours worked; sometimes failed to pay any amount for overtime hours worked; paid overtime work at an inaccurate rate (either at an employee's straight time rate or at a premium determined by using an inaccurate calculation of an employee's regular rate); did not combine hours for employees who worked at multiple Facility Defendants during a pay period; and misclassified employees as exempt from the FLSA's overtime requirements.

By failing to accurately pay employees for straight time hours worked, any compensation for overtime work accrued in the same pay period was also inaccurate. *See* 29 C.F.R. § 778.315. Defendants' failures to properly maintain time and pay records, in addition to their nonpayment for hours worked, created "overtime gap time." *See Davis*, 765 F.3d at 243–44. The Acting Secretary's back wage computations specifically account for this gap time only when an employee exceeded the overtime threshold in a given pay period. (*See* ECF No. 437, pp. 108–09, 167–68, 174–75). Though the viability of overtime gap time claims has not explicitly been ruled upon within the Third Circuit, the Court finds that not awarding these calculated amounts would run afoul of the FLSA's core remedial purposes. Thus, in order to properly ensure an employee receives a "fair day's pay for a fair day's work," the Court must factor the unpaid overtime gap time into its award. *See Overnight Motor Transp.*, 316 U.S. at 578.

Defendants also had a pattern of excluding all renumeration in the calculation of an employee's regular rate of pay in violation of § 207(e). Defendants not only failed to include bonuses and shift differentials in employees' regular rate computations, they also consistently failed to outrightly pay these promised amounts to employees. Whether paid or not, the FLSA mandates Defendants to include the amount in its regular rate calculation for the purposes of

determining the rate at which to calculate overtime due. *See* 29 U.S.C. § 207(e). Defendants failed to establish that any renumeration in question was properly exempted from its calculations. *See Madison*, 233 F.3d at 187.

As a result, under *Mt. Clemens*, the burden then shifted to Defendants "to come forward with evidence of the precise amount of work performed or with evidence to negat[e] the reasonableness of the inference to be drawn from the employee's evidence." *Selker Bros.*, 949 F.2d at 1297 (quoting *Mt. Clemens*, 328 U.S. at 687–88). Defendants did not satisfy their burden as to their failure to properly pay employees. Defendants submitted no time or pay records. They did not present any evidence that cast into doubt the totality of the Acting Secretary's evidence.

However, Defendants did meet their burden as to some of the exempt positions at issue. The Acting Secretary argues, and her back wages calculations reflect, that all Facility Defendant employees were non-exempt except the Administrators/Executive Directors. The Court does not reach the same sweeping conclusion. While Halper had his hand in nearly every aspect of day-to-day operations of CHMS and each Facility Defendant, some Facility Defendant-level employees exercised at least some degree of autonomy in order to properly perform their duties. These include Administrators, DONs, Dietary Directors, and Rehab Directors. Management of employees was the primary duty of each of these positions in addition to being involved in the hiring process to some degree. Thus, these positions are properly exempt from the Act's overtime requirements and are not due back wages. The Court finds that Defendants did not "plainly and unmistakably" demonstrate that ADONs, Maintenance Directors, Activities Directors, Nursing Supervisors/Unit Directors, and Housekeeping/Environmental Directors were properly classified as exempt and all are accordingly due back wages. *See Arnold*, 361 U.S. at 392; *Corning Glass Works*, 417 U.S. at 196–97; *Perez*, 2024 WL 957978 at *2 n.4.

Lastly, the Court holds that Defendants' FLSA violations were without question willful. This was not a situation of if Defendants knew of their ongoing violations, rather, to what extent did Defendants know. Credible evidence established that Defendants, Halper especially included, were aware of all the issues discussed above. Any lack of awareness was due solely to Defendants' own reckless disregard of and/or indifference to the continual issues raised by employees. A glaring example of this is CHMS's implemented payroll error correction process. Pay period after pay period, employees at Facility Defendants informed CHMS and Halper of payroll errors through the use of their missed lunch forms. Each time a form was submitted, Defendants were aware of continual pay issues, yet errors persisted without any sufficient remedy. Additionally, perpetual pay errors continued to accumulate even after the Department of Labor initiated this suit in 2018. (*See* PX-6 ("Summary Tables" file, AH-01 tab, itemizing $12,003,606.61 in back wages due for the years of 2019 to 2023)); (PX-6 ("Summary Tables" file, AH-04 tab, showing that each Facility Defendant owes back wages for every year after this suit was filed)). Still, Defendants continued to feign ignorance. Therefore, the statute of limitations is extended from two years to three years from the filing of this suit.

## V.   DAMAGES AND INJUNCTIVE RELIEF

The Acting Secretary presented overwhelmingly comprehensive calculations of the back wages due to the employees listed in Schedule A. (*See generally* PX-6). Michael Murray, an IT Security Specialist with the Department of Labor, carefully guided the Court through his methodology from start to finish. (ECF No. 437, pp. 4–161); (*See also* PX-5 (written document explaining Mr. Murray's methodology)). His calculations, and summaries thereof, were based entirely on the face of the records provided by Defendants. (ECF No. 437, p. 185).

It was Defendants' burden to rebut the Acting Secretary's extensive calculations and figures. Defendants largely failed to do this. They did not object to Mr. Murray's methods during his testimony. (*Id.* at 25–26). On cross-examination, they sought to poke holes in his conclusions but did not succeed. Defendants failed to introduce any accurate and detailed records or any specific evidence that contradicted Mr. Murray's calculations. *See Selker Bros.*, 949 F.2d at 1297–98. Therefore, the Court adopts the Acting Secretary's calculations, draws all reasonable inferences from them, and will award damages to the affected employees in Schedule A, even if this award "may only be approximate." *Id.* at 1297 (citation omitted).

The Acting Secretary requests $20,548,880.57 in back wages for all employees listed in Schedule A (PX-7). This figure reflects all back wages owed to employees in all positions in Facility Defendants except Administrators. However, based on the Court's ruling as to certain employees' exemption statuses, the Acting Secretary's damages award must be decreased accordingly. Below is her requested back wages award according to job positions across Facility Defendants.

**Back Wages by Primary Department**

| Primary Department | Start Date | End Date | Total Back Wages |
|---|---|---|---|
| Activity Aides | 8/22/15 | 2/11/23 | $157,718.68 |
| Admissions | 9/23/17 | 2/11/23 | $43,763.44 |
| Admissions Director | 8/22/15 | 2/11/23 | $238,347.56 |
| ADON | 8/22/15 | 2/11/23 | $1,140,500.84 |
| Asst Administrator | 12/23/17 | 1/28/23 | $25,668.08 |
| Business Office | 8/22/15 | 2/11/23 | $232,507.40 |
| Business Office (Regional) | 4/8/17 | 1/26/19 | $0.00 |
| Central Supply | 8/22/15 | 2/11/23 | $55,614.85 |
| Chaplain | 8/22/15 | 3/14/20 | $485.81 |
| CNA | 8/22/15 | 2/11/23 | $4,150,064.93 |
| CNA (RELO) | 9/14/19 | 2/11/23 | $481,156.45 |
| CNA (Temp) | 5/2/20 | 2/11/23 | $69,843.58 |

| | | | |
|---|---|---|---|
| CNA Baylor | 8/12/17 | 2/11/23 | $14,883.08 |
| CNA ICF | 8/20/16 | 2/11/23 | $107,793.52 |
| CNA Vent | 6/11/16 | 7/9/16 | $7.73 |
| Construction | 8/22/15 | 8/13/22 | $66,789.02 |
| Cook | 8/22/15 | 2/11/23 | $280,373.74 |
| Cook 2 | 9/19/15 | 1/28/23 | $9,979.85 |
| Cooks | 2/4/17 | 1/29/22 | $2,467.15 |
| Dietary Aides | 8/22/15 | 2/11/23 | $548,121.50 |
| Dietary Supervisor | 9/5/15 | 2/11/23 | $727,152.08 |
| Dietician | 9/19/15 | 2/11/23 | $103,852.81 |
| Director of Activities | 8/22/15 | 2/11/23 | $257,617.49 |
| DON | 8/22/15 | 2/11/23 | $1,577,061.88 |
| Driver | 8/22/15 | 2/11/23 | $77,262.38 |
| Hospitality Nursing Aide | 4/1/17 | 9/12/20 | $5,432.71 |
| Housekeeping | 10/15/16 | 2/11/23 | $368,430.33 |
| Housekeeping Supervisor | 10/15/16 | 2/11/23 | $98,620.32 |
| In Service (Nursing) | 8/22/15 | 1/28/23 | $100,457.75 |
| Laundry | 8/22/15 | 2/11/23 | $171,863.85 |
| LPN | 8/22/15 | 2/11/23 | $2,642,373.10 |
| LPN - Infection Control | 10/9/21 | 1/28/23 | $53,382.98 |
| LPN (RELO) | 10/26/19 | 12/31/22 | $20,427.33 |
| LPN Baylor | 7/29/17 | 2/4/23 | $11,050.50 |
| LPN Charge | 8/22/15 | 1/16/21 | $21,502.94 |
| LPN ICF | 8/20/16 | 5/19/18 | $2,217.11 |
| LPN Special | 8/19/17 | 9/30/17 | $0.00 |
| LPN Supervisor | 6/19/21 | 1/28/23 | $12,531.92 |
| LPN Vent | 8/6/16 | 5/22/21 | $12,193.85 |
| LPNAC (MDS) | 2/18/17 | 2/11/23 | $273,099.60 |
| LTSR | 8/22/15 | 1/28/23 | $116,051.25 |
| Maintenance | 8/22/15 | 2/11/23 | $147,027.76 |
| Maintenance Supervisor | 8/22/15 | 2/11/23 | $311,240.69 |
| Marketing | 8/22/15 | 11/10/18 | $0.00 |
| MDS Coordinator (RNAC) | 8/22/15 | 2/11/23 | $639,792.11 |
| Medical Records | 8/22/15 | 2/11/23 | $157,064.73 |
| Nursing Coord | 8/22/15 | 2/4/23 | $65,950.56 |
| Nursing Secretary | 8/22/15 | 1/28/23 | $50,305.89 |
| Office | 8/20/16 | 2/11/23 | $54,699.30 |
| Office Employee | 10/15/16 | 2/18/17 | $0.00 |
| Office/Receptionists | 5/4/19 | 2/4/23 | $4,376.89 |

| OT | 7/23/16 | 2/11/23 | $75,278.51 |
| OT Assistants | 8/20/16 | 2/11/23 | $136,063.45 |
| Payroll | 8/22/15 | 1/28/23 | $31,160.18 |
| Personnel | 8/22/15 | 2/11/23 | $291,719.35 |
| PT | 8/20/16 | 2/11/23 | $119,582.76 |
| PT Assistants | 8/20/16 | 2/11/23 | $114,311.39 |
| Purchasing | 8/22/15 | 3/16/19 | $1,120.29 |
| Receiving (Dietary) | 8/22/15 | 1/28/23 | $17,658.47 |
| Receptionist | 8/22/15 | 2/11/23 | $32,321.14 |
| Rehab Aides | 8/20/16 | 1/28/23 | $4,799.68 |
| Rehab Coord- Director of Rehab | 8/20/16 | 2/11/23 | $342,447.51 |
| Residential Assistant | 9/23/17 | 4/30/22 | $15,632.29 |
| Respiratory Therapy | 10/17/15 | 6/5/21 | $88,098.84 |
| Restorative CNA | 8/22/15 | 2/11/23 | $99,169.79 |
| RN | 8/22/15 | 2/11/23 | $990,502.97 |
| RN - Infection Control | 9/26/20 | 1/28/23 | $19,536.72 |
| RN Baylor | 11/4/17 | 2/11/23 | $18,455.60 |
| RN Supervisor - Baylor | 8/27/22 | 2/11/23 | $702.68 |
| RN Supervisor (ADN) | 8/22/15 | 2/11/23 | $1,046,768.59 |
| RN Vent | 5/28/16 | 5/22/21 | $12,395.48 |
| Security | 8/22/15 | 6/23/18 | $10,446.75 |
| Social Work Director | 8/22/15 | 2/11/23 | $137,086.24 |
| Social Workers | 8/22/15 | 2/11/23 | $249,388.75 |
| Speech Therapist | 8/20/16 | 2/11/23 | $92,412.95 |
| Unit Directors | 8/22/15 | 1/28/23 | $716,092.85 |
| Wound Care LPN | 1/1/22 | 2/11/23 | $59,188.53 |
| Wound Care RN | 8/22/15 | 2/11/23 | $117,411.48 |

**Total**                                              **$20,548,880.57**

PX-6 ("Summary Tables" file, AH-03 tab).[55]  In finding that DONs, Dietary Directors, and Rehab

Directors were properly classified as exempt from the Act's overtime requirements, the Court will

reduce the Acting Secretary's back wages award as follows:

---

[55] The Court notes that in PX-6, the Acting Secretary calculated that $20,548,880.57 in back wages are owed.  In this exhibit, the Acting Secretary extends her calculations of dollar amounts out to multiple decimal places.  As a result, when rounding these amounts to two decimal places and subsequently adding them, a different amount of back wages due is computed.  The table above

Requested Total:            $20,548,880.57

- DON: $1,577,061.88
- Dietary Supervisor: $727,152.08
- Rehab Director: $342,447.51

---------------------------------------------------------------

**Court's Total:**          **$17,902,219.10**

The Court will also award the Acting Secretary liquidated damages equal to this amount in accordance with § 216(b) of the FLSA. Defendants have not demonstrated that they acted in good faith nor in an objectively reasonable way. *See Cooper Elec. Supply Co.*, 940 F.2d at 907–08; *Mosluogu, Inc.*, 2023 WL 5972044 at *4. As discussed at length above, the evidence as a whole conclusively demonstrates exactly the opposite—that Defendants acted with malicious self-interest by taking advantage of their employees, despite clear knowledge of the FLSA's requirements. They continually feigned ignorance, always with a willful eye towards enriching themselves at the expense of their employees. The Court finds that the compensatory nature of the liquidated damages award in this case is especially warranted in light of the facts established. Therefore, the Acting Secretary will be awarded $17,902,219.10 in liquidated damages.

Additionally, the Court will impose the Acting Secretary's requested injunctive relief. The evidence of Defendants' past conduct shows the Court that they flagrantly disregarded the FLSA's mandates for years. They admitted their knowledge of the Act at all relevant times, (ECF No. 360, p. 3–4), and conceded that, to some extent, they are liable for FLSA violations. (ECF No. 434, p. 38). Ever since ownership of these entities transferred to Defendants, employees have not been properly paid for the overtime hours they worked.

---

demonstrates this. Given the amounts listed above, rounded only to two decimal places, the total amount of back wages calculated is $20,548,880.56. However, when adding the figures as extended by the Acting Secretary, the correct amount of back wages owed is her requested $20,548,880.57.

And they continue to fail to meet the Act's requirements.  (*See* PX-6 ("Summary Tables" file, AH-01 tab, itemizing $12,003,606.61 in back wages due for the years of 2019 to 2023)); (PX-6 ("Summary Tables" file, AH-04 tab, showing that each Facility Defendant owes back wages for every year after this suit was filed))).  They have provided nothing to show that they have come into and will remain in compliance.  Nothing before the Court indicates that Defendants will willingly comply with the FLSA in the future.  Therefore, the Court, in its discretion, holds that injunctive relief is warranted.  29 U.S.C. § 217; *see Solis*, 934 F. Supp. 2d at 815.

## VI.   CONCLUSION

For the reasons set forth above, judgment will be entered in favor of the Acting Secretary and against Defendants in the amount of $35,804,438.20.  Defendants will be enjoined from their ongoing violations of the FLSA, specifically of §§ 207, 211(c), 215(a)(2), and 215(a)(5).  An Order of Court will follow.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

7/22/2024
Dated