**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JULIE A. SU, Acting Secretary of Labor, | ) | |
| United States Department of Labor, | ) | |
| | ) | Civil Action No. 2:18-cv-01608-WSS |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COMPREHENSIVE HEALTHCARE | ) | |
| MANAGEMENT SERVICES, LLC; *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO AMEND JUDGMENT

Pursuant to Federal Rule of Civil Procedure 59(e), Defendants[1] respectfully move the Court to amend the judgment issued against Defendants.

## I.   Introduction

On July 22, 2024, the Court issued a Findings of Fact and Conclusions of Law decision ("Decision") and a judgment against Defendants in the amount of $35,804,438.20.  The adverse judgment and enormous monetary award were premised on clearly flawed conclusions of law and fact, resulting in an erroneous judgment and an inflated damages award that is manifestly unjust.

***First,*** the Court concluded that the U.S. Department of Labor ("DOL") established a pattern and practice of multiple categories of wage violations at *all* 15 of the facilities at issue with respect to virtually *all* employees on *all* workdays for the *entire* time period of August 2015

---

[1] Defendants include Comprehensive Healthcare Management Services, LLC d/b/a Brighton Rehabilitation and Wellness ("Brighton"), Maybrook-C Kade OPCO, LLC ("Washington" or "Kade"), Maybrook-C Evergreen OPCO, LLC ("Evergreen" or "Harmony"), Maybrook-C Whitecliff OPCO, LLC ("Whitecliff" or "Greenville"), Maybrook-C Latrobe OPCO, LLC ("Latrobe"), Maybrook-C Overlook OPCO, LLC ("Overlook" or "New Wilmington"), Maybrook-C Silver Oaks OPCO, LLC ("Silver Oaks" or "New Castle"), Maybrook-C Briarcliff OPCO, LLC ("Briarcliff" or "Irwin"), Mt. Lebanon Operations, LLC ("Mt. Lebanon"), Murrysville Operations, LLC ("Murrysville"), South Hills Operations, LLC ("South Hills"), Cheswick Rehabilitation and Wellness Center ("Cheswick"), Monroeville Operations, LLC ("Monroeville"), North Strabane Rehabilitation and Wellness Center, LLC ("North Strabane Rehab"), and North Strabane Retirement Village, LLC ("North Strabane Retirement") (collectively "Facility Defendants"), Sam Halper ("Halper"), and CHMS Group, LLC ("CHMS Group").

through March 2023.  Defendants respectfully submit that the Court's sweeping finding of a pattern and practice of multiple categories of wage violations at all 15 facilities on all workdays is clear error for multiple reasons:

**1)**      The insufficient testimony of a mere 39 witnesses (.65% —less than 1%— of employees) failed to establish a pattern and practice of broad violations regarding all employees at all facilities.[2]  Not all these witnesses supported DOL's claims on all violations.  However, even if they had, the quantity and ratio of evidence regarding very few employees compared to the almost 6,000 employees for whom pattern and practice violations were extended—despite no evidence being presented regarding those thousands of employees—are far less than in other cases where courts have found pattern and practice violations.

**2)**      *No witness testimony or statements* were presented from current or former employees of the Latrobe facility.

**3)**      Most of the testimony and witness statements related to approximately one quarter of the facilities, with scant evidence presented regarding the majority of facilities.

**4)**      The uncontroverted evidence established that, from July 2019 and forward, Defendants correctly calculated employees' regular rates of pay for purposes of calculating overtime premiums.

**5)**      With respect to the finding of a sweeping pattern and practice of non-payment of wages for work performed during auto-deducted meal breaks, a multitude of evidence, including an abundance of testimony and employee sworn statements, established that: (a) many employees *never* worked through meal breaks; (b) many employees *were paid* on occasions where they worked during a scheduled meal break either by attesting to "no lunch" at the time clock when

---

[2] Even with the witness statements and declarations submitted as PX-1, the group is still less than 1.5% of the employees in Schedule A.

clocking out or by submitting a "no lunch" form.  Moreover, DOL's evidence almost entirely pertained to the years of 2016 through 2019, which is woefully insufficient to establish a pattern or practice of violations continuing through 2023, when it presented almost no evidence of such continuing violations.

   **6)**  With respect to misclassification of employees, the Court applied incorrect standards of construction and burden of proof of exemptions that were overruled by the U.S. Supreme Court in 2018.  Moreover, Defendants established the exempt status of the Assistant Director of Nursing position.

   ***Second,*** even if the broad finding of pattern and practice violations were supported, the enormous damages award requested by DOL and wholesale adopted by the Court is not supported by "just and reasonable inference" from the evidence, nor is the damages award remotely "approximate," both of which the U.S. Supreme Court required in *Mt. Clemens*.  In fact, multiple aspects of the damages award will result in many thousands of employees ***triple-dipping*** by being paid *again* at a 2x *liquidated damages* rate for wages that they already were paid. These individuals will also be paid for hours they did not perform work. Specifically:

   **1)**  DOL's damages calculations are premised on an incorrect assumption that, during the entire time period of 2015 through 2023, Defendants incorrectly calculated the regular rate of pay for overtime wages by not including all renumeration paid.  However, the clear testimony and tens of thousands of rows of employees' pay and hours data conclusively debunk this claim.  From July 2019 and forward, Defendants properly calculated employees' regular rate of pay and correctly paid overtime wage premiums based on that rate.  On the other hand, DOL's regular rate calculation was inflated.

2)      Most of the damages awarded were for claimed meal breaks pay violations. The Court awarded approximately $12,184,154.30 of unliquidated wage damages[3]—***$24,368,308.61 liquidated damages***—for claims of failing to pay wages for work performed during auto-deducted meal breaks.  The damages figures were based entirely on DOL's calculations, which the Court adopted wholesale, which were premised on a broad assumption that every employee at every facility worked through their meal break on every workday that had an auto-deducted meal break and was not paid for that work.  This sweeping assumption is not remotely supported by "just and reasonable inference" from the evidence.

To the contrary, a multitude of evidence, including employees' own testimony and sworn statements, established that: (a) some employees always were able to take a full meal break; (b) employees attested at the time clock on many days that they indeed took a full meal break; (c) employees were paid when following the procedures for attesting "no lunch" in the time clock or submitting "no lunch" exception forms; (d) even the employees who claimed to have worked through meal breaks without being paid agreed that they did not nearly do so on *every* workday; and (e) missed or interrupted meal breaks were uncommon for many roles and departments.  Thus, many of the premises of DOL's damages calculations, adopted wholesale by the Court, are neither reasonably inferred from the evidence, nor are the damages remotely "approximate."  In fact, the assumptions underlying DOL's calculations are outright *refuted* by the evidence.

3)      DOL's damages calculations awarded more than two million dollars of overtime wage damages to Assistant Directors of Nursing (ADONs) who properly were classified as exempt.[4]

---

[3] This figure reflects the DOL's calculation of total back wages less time data break deductions and includes all positions except administrator.

[4] The damages awarded for misclassification of ADONs was:

## II.     <u>Standard Of Rule 59(e) Motion</u>

Under Rule 59(e), a party may move to alter or amend a judgment "'to correct clear error [of law] or prevent manifest injustice.'" *Pediatrix Screening, Inc. v. TeleChem Int'l, Inc.*, 602 F.3d 541, 546 (3d Cir. 2010) (quoting *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995)). A motion to alter or amend judgment is subject to the "sound discretion of the district court." *Cureton v. National Collegiate Athletic Ass'n*, 252 F.3d 267, 272-73 (3d Cir. 2001). The purpose of such a motion is to correct manifest errors of law or fact or to present newly discovered evidence. *Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). The movant must demonstrate one of three grounds for such a motion to be granted: (1) an intervening change in controlling law; (2) the availability of new evidence not previously available; or (3) the need to correct a clear error of law or to prevent manifest injustice. *Stockport Mountain Corp. v. Norcross Wildlife Found., Inc.*, No. 3:11cv514, 2014 U.S. Dist. LEXIS 2833, *3-4 (M.D. Pa. Jan. 10, 2014) (citing *Max's Seaood Cafe*, 176 F .3d at 677).

Here, for the reasons described below, there is a need to correct both clear errors of law and fact, as well as multiple manifest injustices in the judgment issued against Defendants.

## III.     <u>The *Mt. Clemens* Standard</u>

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946), and its progeny established a reduced burden of proof framework for employees to prove wage violations and resulting damages when record-keeping violations are established. However, within the framework of the *Mt. Clemens* standard, there are significant constrictions that limit a court's discretion when finding pattern or practice violations and awarding damages. First, findings of

| Unliquidated Damages | Liquidated Damages Awarded |
|---|---|
| $1,057,244.19 | $2,114,488.38 |

"pattern or practice" violations extended to employees for whom evidence was *not* presented, premised on representative evidence presented regarding *other* employees, must be limited to the scope of employees and time period for which the representative evidence actually establishes violations.  Second, damages awards must be proven "as a matter of just and reasonable inference" from the evidence presented and must be "approximate."

     **A.**    **A Court Must "Carefully Scrutinize" The Evidence To Limit Findings Of A "Pattern Or Practice" Of FLSA Violations To The Specific Employees And Scope Of Time For Which Violations Were Established By Representative Evidence.**

Under *Mt. Clemens*, "[t]he testimony and evidence of representative employees may establish prima facie proof of a pattern and practice of FLSA violations."  *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1297-98 (3d Cir. 1991).  However, a pattern or practice of FLSA violations is not established "where differing work situations make pattern evidence unpersuasive." *Murray v. Stuckey's*, 939 F.2d 614, 621 (8th Cir. 1991).  "Usually, an employee can only represent other employees only if all perform substantially similar work."  *Sec'y of Labor v. DeSisto*, 929 F.2d 789, 793 (1st Cir. 1991) (citing *McLaughlin v. Ho Fat Seto*, 850 F.2d 586 (9th Cir. 1988), *cert. denied*, 488 U.S. 1040 (1989); *McLaughlin v. DialAmerica Marketing, Inc.*, 716 F. Supp. 8l2 (D.N.J. 1989)).  Indeed, "[w]here the employees fall into several job categories . . . at a minimum, the testimony of a representative employee from, or a person with first-hand knowledge of, each of the categories is essential to support a back pay award."  *DeSisto*, 929 F.2d at 793 (citations omitted).  Moreover, where employees worked at various facilities, evidence pertaining to one facility is not necessarily representative of alleged violations at other facilities.  *See, e.g.*, *Sec. of Labor v. DeSisto*, 929 F.2d 789, 792 (1st Cir. 1991) (testimony of representative witness who worked at one facility insufficient to establish violations at another facility); *Donovan v. Simmons*

*Petroleum Corp.*, 725 F.2d 83, 86 (10th Cir. 1983) (noting that representative testimony sufficed because "at least one employee from every station testified or was deposed").

Moreover, and quite significant to this case, even when representative evidence establishes *some level* of pattern or practice FLSA violations, a court should "carefully scrutinize[] the evidence" to properly limit the "pattern or practice" findings only to: (1) those employees for whom the representational evidence established violations, and (2) the appropriate scope of time for which the representative evidence established violations. *See Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468, 472 (11th Cir. 1982).

In *New Floridian Hotel*, the trial court initially issued findings of FLSA wage and recordkeeping violations against three retirement facilities and broadly awarded back wages to more than 200 employees based upon the representative testimony of 23 employees and a DOL compliance officer, which the court found to establish a pattern or practice of violations. *Id.* at 469-70, 472. The trial court initially based its damages award on "the compliance officer's calculation of [employees'] entitlement to back wages." *Id.* at 470. However, upon consideration of the defendant's post-trial motion, the trial court reconsidered its broad reliance on the representative evidence and the DOL compliance officer's broad damages calculations and more carefully scrutinized the evidence and appropriate conclusions. *Id.* at 472. Upon reconsideration, the trial court properly "carefully scrutinized the [representational] evidence upon which the awards of back pay were based" and found "the record insufficient to support a finding of a pattern of working hours with respect to fifty-six employees," and therefore "denied these individuals back wages." *Id.* "Additionally, the district court reduced the awards of back pay to two individuals, refusing to award back wages for a period of time that predated the periods to which the evidence of a pattern of employment related." *Id.* The Eleventh Circuit affirmed, approving

7

the trial court's careful scrutiny limiting the pattern or practice finding to the appropriate employees and scope of time as the correct application of *Mt. Clemens*.

**B.**  **Damages Awarded Based On Representative Evidence Must Be "Approximate" And Proven "As A Matter Of Just and Reasonable Inference" From The Evidence Presented.**

The second important limitation imposed by the Supreme Court in *Mt. Clemens* is that the employee or DOL carries a burden to "produce[] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Selker Bros.*, 949 F.2d at 1297. In addition, although a damages award may be "imprecise," it still must be "approximate." Therefore, calculations of assumed amounts of unpaid work and resulting damages must be premised on evidence that supports such conclusions by "just and reasonable inference." Certainly, an award of damages cannot rest on assumed amounts of unpaid work that are outright contradicted by the evidence.

In *Mt. Clemens*, 328 U.S. at 687, the Supreme Court held that when an employer does not maintain adequate wage and hour records, the "remedial nature of [the FLSA] and the great public policy which it embodies ... militate against making" the burden of proving uncompensated work "an impossible hurdle for the employee." The Supreme Court did not create a framework for windfall awards to employees as a result of an employer's failure to maintain adequate records. Rather, the Supreme Court's intent was to create an outcome that does not "penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work." *Id.* Therefore, "an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.* If an employer does not rebut such evidence, "the court may then award damages

to the employee, even though the result may be only approximate." *Id.* The Court reasoned: "The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of § 11(c) of the Act." *Id.* at 688.

Significantly, *Mt. Clemens* and its progeny, ***still require a plaintiff to "produce sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference*."** *See also Selker Bros., Inc.*, 949 F.2d 1286, 1297 (3d Cir. 1991) (quoting *Mt. Clemens, supra*) (DOL carries burden to "produce[] sufficient evidence to show the amount and extent of that work ***as a matter of just and reasonable inference*"**) (emphasis added). Moreover, the Supreme Court expressly guarded that a court's discretion is limited to awarding damages that, although not "precise," are still, at a minimum, "***approximate*."**

Indeed, in *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 479-80 (2016), the Supreme Court specifically held that representative evidence that is statistically inadequate or based on implausible assumptions could not lead to a fair or accurate estimate of uncompensated work hours. Likewise, in *Selker Bros.*, 949 F.2d at 1298, a case that this Court cited in its decision, the Third Circuit reduced the damages awarded to an employee based on assumption of 98 hours of work per week because the employee testified that he only worked 83 hours per week. Thus, Supreme Court and Third Circuit precedent make clear that damages cannot exceed the reasonable inferences from the evidence—and certainly cannot exceed express *contradictory* evidence.

## IV.   ARGUMENT

### A.   The Evidence Did Not Establish A "Pattern Or Practice" Of Miscalculating Employees' Regular Rates of Pay At Any Time Subsequent To July 2019.

The Court found a pattern of not including all renumeration in calculations of employees' regular rate of pay for purposes of calculating overtime pay rates. ECF 471 at 30, 50. Based upon

this, the Court adopted DOL's damages calculations, which were premised on the assumption that the regular rate calculation errors continued through 2023.  Defendants acknowledge that there was a systematic error in the calculation of regular rates until July 2019.  But the uncontroverted evidence established that Defendant *corrected* the issue in July 2019.  No evidence was presented that a practice of regular rate calculation errors continued through 2023.  Therefore, it was error for the Court to find that these violations continued through 2023.

Mr. Pechman testified unambiguously that, "as a rule," from July 2019 and forward, differentials and bonuses were "included in the regular rate for overtime purposes."   2/22/24 Trans. at 162.  He explained that "[t]he calculation of the overtime rate is done in the payroll software," and that from July 2019 and forward, "there's no way someone could set up a differential that would not be included in the FLSA rate." 2/22/24 Trans. at 162-63.  Mr. Pechman also explained that, effective in July 2019, Defendants' policy and procedure was that, if a shift differential or a bonus inadvertently was not paid during the regular pay cycle, and a pay correction later was issued, "we have a template in Excel to recalculate the timecard with the bonus to correctly come up with the right overtime pay and in addition to the missed bonus being paid, the additional amount of overtime pay is supposed to be paid as well."  *See* 2/22/24 Trans. at 165.  Thus, the systematic error in regular rate calculations was corrected in July 2019.

Mr. Pechman acknowledged with honesty that he could not attest with certainty that, during the four and half years (and tens of thousands of employee workweeks) between July 2019 and his February 2024 testimony, there was not a single error in the calculation of any employee's regular rate for any workweek.  *See* 2/22/24 Trans. at 162-63, 194.  But he explained that such aberrations could only occur if a payroll processor was making manual adjustments (i.e.., a shift differential or a bonus was inadvertently not paid during the regular pay cycle, and the regular rate was not

10

subsequently re-calculated correctly when the differential was later paid).  *See* 2/22/24 Trans. at 162-63, 165.  Mr. Pechman did not testify that he was aware of any such errors in the calculation of an employee's regular rate after July 2019 or that the rule was not properly programmed in the system.  Rather, he merely acknowledged with honesty that he could not guarantee there was *never* an inadvertent human error post-July 2019.

Mr. Pechman's testimony is confirmed by *voluminous* wage and hour records in evidence, which conclusively demonstrate that, from July 2019 and forward, Defendants correctly included all forms of pay within calculations of employees' regular rate of pay.  Detailed hours and pay records for Defendants' employees were admitted into evidence.  *See* JX52-58.  Mr. Pechman's detailed testimony explaining the records, including the meanings of the various columns in the records, also was admitted into evidence.  *See* PX 28 at pages 222-256.

The following are but a few examples of data in the records proving that employees' regular rates were calculated correctly.  Trial Exhibit JX-56 contains bi-weekly pay records for employees at Cheswick during 2019 through mid-August 2020.  There are *many* examples of differentials and bonuses pay, which correctly *were* included in the calculation of employees' regular rate of pay, resulting in correct overtime wages paid.

Each line in the records displays an employee's bi-weekly hours and pay data.

Attached to this Brief as Exhibit 1 are 17 rows of data excerpted from Trial Exhibit 56 with references in Column A to the lines in Exhibit JX56 from which the rows were excerpted.  In each of these 17 pay periods, the employees were paid multiple types of differentials and bonus pay.  A cursory review of employees' regular and overtime hours and pay columns clearly demonstrates that Defendants did not pay overtime premiums based solely on employees' base hourly pay.

An employee's base hourly pay rate is easily calculated by dividing the employee's regular pay (Column F) by regular hours worked (Column E).  An employee's overtime pay rate is easily calculated by dividing the employee's overtime pay (Column H) by overtime hours worked (Column G).  If the overtime pay rate is more than 1.5x the employee's base hourly rate, then obviously the overtime pay rate was not based solely on the employees' base hourly rate.  The following chart demonstrates that every employee was paid overtime based on a regular rate higher than his/her base hourly rate.  The penultimate column on the right displays the actual 1.5x hourly rate at which overtime hours were paid.  The most right-hand column displays what the overtime rate would have been had it been calculated solely based on the employee's base hourly rate.  ***Every*** employee was paid overtime wages at a greater rate than simply 1.5x his/her base hourly rate.

| Employee Name | REG Hours | REG pay | Base Hourly Pay Rate (REG pay/REG Hours)[5] | OT Hours | OT pay | *Actual* .5x Overtime Premium Paid(OT pay/OT Hours)[6] | .5x OT Premium If It Were Based Solely on 1.5x Base Hourly Rate |
|---|---|---|---|---|---|---|---|
| GREEN,ANGELINA | 70.75 | $1,242.37 | $17.56 | 38.75 | $1,046.52 | $9.45 | $8.78 |
| KVIETKUS,LINDA M. | 70.5 | $1,237.98 | $17.56 | 24.25 | $653.45 | $9.39 | $8.78 |
| LICHVARCIK,DREW | 68 | $1,194.08 | $17.56 | 29.5 | $800.40 | $9.57 | $8.78 |
| LINDGREN,MARY F. | 55.25 | $1,140.36 | $20.64 | 19.5 | $622.34 | $11.27 | $10.32 |
| NEALER,RHIANNON R. | 62.5 | $1,097.50 | $17.56 | 17.75 | $482.16 | $9.60 | $8.78 |
| GREEN,ANGELINA | 56 | $991.76 | $17.71 | 35.25 | $969.28 | $9.79 | $8.86 |
| HORRELL,KIMBERLY | 68 | $1,204.28 | $17.71 | 9.25 | $258.16 | $10.20 | $8.86 |
| LINDGREN,MARY F. | 63.5 | $1,320.17 | $20.79 | 27.5 | $896.35 | $11.80 | $10.40 |
| NEALER,RHIANNON R. | 60.75 | $1,075.88 | $17.71 | 17 | $466.49 | $9.73 | $8.85 |
| HORRELL,KIMBERLY | 69 | $1,221.99 | $17.71 | 7 | $194.34 | $10.05 | $8.86 |
| LINDGREN,MARY F. | 63 | $1,309.77 | $20.79 | 20.5 | $661.67 | $11.49 | $10.40 |
| FLEMING,SONJAH L. | 53.5 | $947.49 | $17.71 | 7.75 | $215.24 | $10.06 | $8.86 |

---

[5] Column E divided by Column F.

[6] To determine the employee's overtime pay rate, divide Column H (OT pay) by Column G (OT Hours). To determine the half-time overtime premium portion out of her overtime pay rate, subtract the employee's base hourly pay rate from the overtime pay rate.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| GREEN,ANGELINA | 72 | $1,275.12 | $17.71 | 39.5 | $1,101.97 | $10.19 | $8.86 |
| HORRELL,KIMBERLY | 72.5 | $1,283.98 | $17.71 | 12 | $338.42 | $10.49 | $8.86 |
| KVIETKUS,LINDA M. | 75.25 | $1,332.68 | $17.71 | 31.5 | $858.40 | $9.54 | $8.86 |
| LICHVARCIK,DREW | 71 | $1,257.41 | $17.71 | 35.75 | $972.17 | $9.48 | $8.86 |
| NEALER,RHIANNON R. | 69 | $1,221.99 | $17.71 | 22 | $613.61 | $10.18 | $8.86 |

Defendants refer the Court to a multitude of hours and pay data in Exhibits JX52-58, which show the same—Defendants properly calculated employees' regular rates for overtime pay purposes from July 2019 and forward.

DOL, in contrast, did not present any evidence that, after July 2019, Defendants miscalculated employees' regular rates.  DOL's regular rate calculations do not align with Defendants' calculations because DOL did not properly isolate the straight time portion of overtime paid post-2019.  By way of example, during the pay period in which Angelina Green worked 38.75 hours of overtime and 8 hours of HOT, the straight time portion of Ms. Green's overtime should have been calculated by multiplying her OT hours by her base wage (46.75 hours x $17.56), which is $820.93.  DOL instead multiplied Ms. Green's overtime pay by 2/3.  This resulted in treating $838.16 of Ms. Green's overtime pay as straight time.  In other words, $17.23 of the OT premium that Defendants already paid was included toward the regular rate calculation.

 Nevertheless, based upon Mr. Pechman's honest testimony that he could not *guarantee* that there had not been a single human error since July 2019, the Court concluded that "the problems with overtime compensation were not remedied."  ECF 471 at 30-31 and n. 45. Defendants respectfully submit that this factual conclusion was clear error, rebutted by a multitude of evidence.

Defendants accept the Court's conclusion that there were FLSA violations with respect to calculation of the regular rate until July 2019.  However, Defendants respectfully submit that the Court's sweeping conclusion that the violation continued as a "pattern and practice" through 2023

is refuted by the evidence.  The Court should "carefully scrutinize the evidence" to properly limit the "pattern or practice" findings only to the appropriate scope of time for which the representative evidence established violations.  *See New Floridian Hotel, Inc.*, 676 F.2d at 472.  Here, the scope of time when Defendants incorrectly calculated the regular rate should be limited to the time period of July 2019 and earlier.

> **B.** **The Evidence Did Not Establish A "Pattern Or Practice" Of Meal Break Violations With Respect To *Every* Employee At *Every* Facility For The *Entire* Time Period Of 2015 Through 2023.**

The Court concluded that the representative testimony of 39 witnesses as well as documentary exhibits "established that Defendants engaged in patterns and practices of FLSA violations," and thus concluded that FLSA violations occurred with respect to "nearly 6,000" employees.  ECF 471 at 49.  For multiple reasons, the Court's sweeping pattern and practice finding stretches the doctrine well beyond the careful scrutiny necessary to guard its limits.  First, the testimony of a mere .65% of the relevant employees—just 39 witnesses—is not nearly quantitatively sufficient to establish violations with respect to almost 6,000 employees.  Indeed, a court must "carefully scrutinize[] the evidence" to properly limit "pattern or practice" findings only to: (1) those employees for whom the representational evidence established violations, and (2) the appropriate scope of time for which the representational evidence established violations.  Here, the evidence did not establish "pattern or practice" violations with respect to the meal breaks pay for all employees at all 15 facilities during the entire time period of 2015 through 2023.

> **1.** **The Quantity And Ratio Of Representative Evidence Presented By DOL Was Far Less Than In Other Cases Where A Pattern Or Practice Has Been Found.**

The Court noted in its Decision that "[t]here is no bright-line guidance for what amount of evidence is required for representativeness."  ECF 471 at 42.  In so holding, the Court cited *United*

*States ex rel. IBEW Local Union No. 98 v. Farfield Co.*, 5 F.4th 315, 353 (3d Cir. 2021), which

collected cases in which representative evidence was found to establish a pattern or practice.  Yet

in *Fairfield* and all the cases cited therein, there were *significantly* higher percentages of employees

who testified.   In *Fairfield* itself, "witnesses testified about the work of 22 of the 42 affected

groundmen and laborers (*i.e.*, a 52-percent sample)."  *Id.*  The Third Circuit held that 52% sample

"evidence is quantitatively representative."  *Id.*  The Third Circuit cited the following cases with

sufficient representative evidence in which the percentage of employees who testified was

significantly higher than this case.

| | | |
|---|---|---|
| *Reich v. Gateway Press*, 13 F.3d 685, 701  (3d Cir. 1994) | Testimony from 22 out of 70 employees for whom back wages were sough | 31% |
| *McLaughlin v. Ho Fat Seto*, 850 F.2d 586, 589 (9th Cir. 1988) , *cert. denied*, 488 U.S. 1040 (1989) | Testimony from 5 of 28 employees | 18% |
| *New Floridian Hotel*, 676 F.2d at 472 | 23 employees testified out of 207 receiving an award | 11% |
| *Mt. Clemens*, 328 U.S. at 680 | 8 out of 300 employees testified | 2.66% |
| *Reich v. S. New Eng. Tel. Corp.*, 121 F.3d 58, 66-68 (2d Cir. 1997) | 39 of 1,500 employees representative | 2.6% |

In contrast, the following cases held that representative evidence offered by employees was

quantitatively insufficient to establish violations with respect to other employees.

| | |
|---|---|
| *Reich v. Southern Md. Hosp.*, 43 F.3d 949, 952 (4th Cir. 1995) | Testimony from 1.6 percent of the employees, or 54 of 3,368, did not fairly represent the employee population |
| *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770 (7th Cir. 2013) | Evidence from 42 of 2,341 employee technicians insufficient for drawing conclusions regarding all employees |
| *Baouch v. Werner Enters.*, 244 F. Supp. 3d 980 (D. Neb. 2017) | Representative evidence from 16 out of 52,000 employees (approximately .0003 percent) insufficient |

Here, DOL presented testimony from a mere .65% (less than 1%) of the employees for whom pattern or practice violations were found.  The quantitative amount of representative evidence offered by DOL, and the ratio of employees who testified to employees for whom violations were found, is *far* less than the cases upon which the Court relied.  The dearth of quantitative evidence to establish broad pattern and practice violations is further compounded by the fact that most of the testimony and other evidence pertained to a minority of Defendants' facilities, there were no current or former employees presented from one facility, there are dozens of positions at issue, and there was a multitude of evidence presented regarding employees who *were* properly paid.

### 2. No Testimony Or Statements Were Presented Regarding *Any* Meal Breaks Violations At Latrobe.

DOL failed to introduce *any* testimony or statements regarding unpaid meal breaks at Latrobe.  In contrast, Defendants offered the testimony of Cody Hill, who was an Assistant Nursing Home Administrator and then Administrator, at Latrobe.  2/14/24 Trans. 125.  Mr. Hill testified that he would confirm with department heads whether an employee worked through lunch, and he would ensure that employees were paid for such work.  2/14/24 Trans. 178-179.  Thus, there was *no representative evidence* from which the Court properly could conclude that there was a pattern or practice of meal breaks violations at Latrobe.  Although not every employee at every location need testify, at a minimum, evidence must be presented regarding each location at which violations are found.  *See, e.g.*, *Donovan v. Simmons Petroleum Corp.*, 725 F.2d 83, 86 (10th Cir. 1983) (noting that representative testimony sufficed because "at least one employee from every station testified or was deposed").  Here, without any representative testimony or statements offered

regarding Latrobe, the Court awarded $1,303,253.14 of liquidated meal breaks damages.[7]  This is not consistent with the careful application of the pattern and practice doctrine intended by the Supreme Court.

3.    **Most Of The Evidence Of Meal Breaks Violations  Pertained To Just A Handful Of The Fifteen Facilities.**

The vast majority of DOL's witnesses who were current or former employees of Defendants worked at and testified regarding just four of the 15 facilities.  With respect to the other facilities, there were four facilities for which only one witness testified, three facilities for which only two witnesses testified, and another facility for which only three witnesses testified.  This is displayed in the chart below.

| Facility | Number of Witnesses |
|---|---|
| Latrobe | 0 |
| Washington | 1 |
| New Wilmington | 1 |
| Harmony | 1 |
| New Castle | 1 |
| Murrysville | 2 |
| South Hills | 2 |
| Cheswick | 2 |
| Greenville | 2 |
| Monroeville | 1 |
| Mt. Lebanon | 4 |
| North Strabane Rehab/ North Strabane Retirement | 4 |
| Irwin | 5 |
| Brighton | 6 |

---

[7] *See* PX6 BD & Bonus Summary Tables.  DOL's total back wages calculation for Latrobe was $1,307,157.80.  The non meal breaks portion was $655,531.23.   DOL's unliquidated meal breaks damages calculation was thus $651,626.57.  Liquidated was $1,303,253.14.

Similarly, with respect to contemporaneous employee statements, DOL did not obtain or present statements from any employees at the vast majority of the fifteen facilities.  In fact, more than 90% of the statements offered into evidence were from employees at two facilities—Mt. Lebanon and Murrysville.  This is displayed in the chart below.

| Facility | Number of Statements | Citation |
|---|---|---|
| Brighton | None | NA |
| Washington | 2 | PX1 at pp. 242-243; 274-275 |
| Monroeville | 1 | PX1 at pp. 255-256. |
| South Hills | 1 | PX1 at pp. 245-246 |
| Murrysville | 16 | PX1 at pp. 152-154; 226; 229; 230-232; 237-240; 241; 253; 257; 262; 265-267; 270; 276; 277; 289; 290-292; 293 |
| Mt. Lebanon | 19 | PX1 at pp.224; 227-228; 233; 234-235; 236; 244; 247-250; 251; 252; 254; 258; 259-260; 261; 263; 264; 271; 272; 273; 278 |
| Latrobe | None | NA |
| Cheswick | None | NA |
| Harmony | None | NA |
| North Strabane Retirement Village | None | NA |
| North Strabane Rehab | None | NA |
| New Castle | None | NA |
| New Wilmington | None | NA |
| Greenville | None | NA |
| Irwin | None | NA |

There is no evidence that DOL even visited nine of the 15 facilities named in this lawsuit. Mr. Baron visited only five of the facilities he investigated.  1/19/24 Trans. 58:22-24.  In sum, the Court's sweeping conclusions of meal breaks violations with respect to almost 6,000 employees at all facilities based on limited evidence pertaining to a few of the facilities is a significant overreach in the application of the pattern or practice standard and is clear error.

### 4.  There Was a Multitude of Conflicting Evidence Demonstrating That Many Employees Always Or Usually Took Full Meal Breaks.

A significant evidentiary issue that makes the Court's sweeping pattern and practice finding clearly erroneous is that a multitude of evidence was presented—including *many* contemporaneous employee statements obtained by DOL as well as witness testimony at trial— that *many* employees either *always* or usually took a meal break.  Indeed, even DOL investigator Michael Shuey admitted that numerous employees provided sworn statements to DOL confirming that they always took a meal break, and that DOL's calculations ignored those statements.  1/19/24 Trans. 54:24-55:15. Yet Mr. Shuey made broad representations about the Facility Defendants' practices at trial, including that employees worked through meal breaks every day. 1/8/24 Trans. 151:9-152:17.

Numerous employees signed sworn statements or testified that they took full meal breaks, and/or that there was an attestation procedure within the time clock when clocking out through which employees confirm whether they took a meal break.  Examples of such testimony and sworn statements from *26* different employees who worked in a wide range of positions at various facilities include:

### Employees at Mt. Lebanon

- Former receptionist/accounts payable Elaine Abbott: "I always take a 30 minute lunch break that is completely free from duty."  PX1 p. 224.

- Former activities director Susan Gerard: "I always take a 30 minute lunch break that is completely free from duty." PX1 p. 247.

- Former social services coordinator Melia Black "I usually take my full lunch break; about once every two weeks, I work through lunch…When clocking out, the time clock prompts employees with the question "Did you take a lunch?" and we respond yes or no." PX1 pp 227-228.

- Former LPN Lynn Polziani: "I always take a 30 minute lunch break that is completely free from duty…I clock in/out both at the beginning and end of my work day and for my lunch breaks." PX1 p. 273.

- Former physical therapist Seth Stoddard: "Every day, I take at least 30 minutes for a lunch break that is completely free from duty. I…clock in/out for my lunch breaks; and indicate that "yes" I took a lunch at the end of the day when clocking out." PX1 p. 288.

- Former business office specialist Renee Laux: "I usually take a 30 minute lunch break that is free from duty and recorded." PX1 p. 259.

- Former LPN Sal Boffoli: "I clock in/out at the beginning and end of the day; clock in/out for my lunch breaks and indicate that "yes" I took a lunch break at the end of the day when clocking out." PX1 p. 233.

- Former CNA Carol Clark: "I usually take a 30 minute lunch break that is free from duty and recorded." PX1 p. 236.

- Former director of social services Jamie Folkens: "I clock in/out at the beginning and end of my work day, but not for a lunch. Instead I was advised to indicate "Yes or No" if I took a lunch at the end of the day." PX1 p. 244.

- Former director of dining services Timothy Green: "While clocking out, the time clock prompts employees with the question "Did you take a lunch?" and we respond yes or no. … [A]ll of my employees working daylight take a full 30 minute, uninterrupted lunch break." PX1 p. 252.

- Former wound nurse Janet Shadle testified that she was "usually" able to take a lunch break. 1/12/24 Trans. 151:7-12. Ms. Shadle worked at Mt. Lebanon when Halper acquired the facility and left in 2018. 1/12/24 Trans. 142:22-143:4. Ms. Shadle estimated that she worked through lunch a few times a month. 1/12/24 Trans. 155:4-8. Ms. Shadle also testified that she tried to encourage nurses to take a lunch break and they usually did so. 1/12/24 Trans. 155:21-156:1. Ms. Shadle testified that CNAs only occasionally worked through lunch, but it was even less frequent than nurses. 1/12/24 Trans. 156:12-17.

- Former staff nurse Margaret Edwards testified that she was able to take a meal break, and punched in and out for meal breaks. 1/17/24 Trans. 226:13-18. Ms. Edwards worked at Mt. Lebanon from November 2017 to January 2018. 1/17/24 Trans. 220:6-14. Ms. Edwards estimated that she worked through lunch once or twice a week. 1/17/24 Trans. 228:11-12.

**Employees at Murrysville**

Nearly every employee at Murrysville from whom DOL obtained statements during its investigation indicated that he/she always or regularly took meal breaks, including when not clocking out for a meal break. Examples include:

- Former HR/PR/receptionist Cynthia Bankosh: "I always take a 30 minute lunch break that is completely free from duty." PX1 p. 152.

- Former speech pathologist Angela Bioni: "I always take a 30 minute lunch that is free from duty." PX1 p. 226.

21

- Former maintenance assistant Jerry Boarts: "I always take a 30 minute lunch break that is completely free from duty." PX1 p. 229.

- Former RN supervisor Melinda Dedmon: "I always take a 30 minute lunch that is free from duty." PX1 p. 237.

- Former rehab director Heather Dempsey: "I always take a 30 minute lunch break that is completely free from duty. I clock in/out at the beginning and end of my work day but not for my lunch breaks." PX1 p. 241.

- Former RN supervisor Jeffrey Kester: "I always take a 30 minute lunch break that is completely free from duty…I clock in/out at the beginning and end of my work day but not for my lunch breaks. When clocking out, the time clock prompts employees with the question "Did you take a lunch?" and we respond yes or no." PX1 p. 257.

- Former nurse's aide Barb Mardis: "I always take a 30 minute lunch break that is free from duty." PX1 p. 262.

- Former CNA Kristi Tunder: "I always take a 30 minute lunch break that is completely free from duty." PX1 p. 289.

- Former CNA Debbie Wilk: "I always take a 30 minute lunch break that is completely free from duty." PX1 p. 293.

- Former business office manager Melissa Boarts: "Monday through Friday, I generally take a 30 minute lunch break that is completely free from duty." PX1 p. 230.

- Former therapy aide Carol Hollis: "I started taking a lunch after being told I was required to; any lunch breaks were 30 minutes and completely free from duty." PX1 p. 253.

- Former activities director Holly Morrison: "I generally take a 30 minute lunch break that is completely free from duty." PX-1 p. 270.

**Employees at South Hills Operations**

During DOL's investigation, former CNA Kathlyn Geneco stated: "I always take a lunch break that is at least 30 minutes and completely free from duty.  I punch in/out at the beginning and end of my shift as well as for my lunch breaks.  I also indicate 'Yes' that I took a lunch when clocking out for the day."  PX1 p. 246.

**Employees at North Strabane Rehab**

Beverly Perkins worked for North Strabane in medical records from 2017 until early 2019. 1/18/24 Trans. 50:18-20.  In early 2019, Ms. Perkins began working in HR but separated from the facility later the same year.  1/18/24 Trans. 50:25-2.  Ms. Perkins testified that she was able to take meal breaks while working in both positions.  1/18/24 Trans. 80:22-23, 82:1-2.

The Court's sweeping pattern and practice finding regarding meal breaks work entirely ignores the above-cited testimony and sworn statements.  Defendants submit that it was clear error for the Court to entirely disregard the testimony and sworn statements of the numerous witnesses recounted above, who swore that they always or usually took full meal breaks.

> **5.      There Was A Multitude of Evidence That Employees Who Worked During Meal Breaks Submitted "No Lunch" Overrides And *Were* Paid.**

Similarly significant, a multitude of evidence was presented—including *many* contemporaneous employee statements obtained by DOL as well as witness testimony at trial— that employees *were paid* on the occasions on which they did not take a meal break.  This occurred via multiple methods, including employees attesting to "no lunch" on the time clock when clocking out and by submitting "no lunch" forms to process an override of the deduction.

**Employees at Murrysville**

Multiple employees at Murrysville attested that, on the occasions on which they were unable to take a meal break, they were paid for the time by indicating "no lunch" on the time clock when punching out:

- Personal Interview Statement of former staffing coordinator/ward clerk/medical records Chris Miskanic: "I usually take a 30 minute lunch break that is completely free from duty. About 3 days out of every two weeks, I do not get a lunch break and indicate "no lunch" on the time clock when punching out." PX1 p. 265.

- Personal Interview Statements of former RN supervisor Krystal Schneider: "If I take a lunch break, I punch out for it, if not, I indicate 'no lunch' on the time clock at the end of my shift." PX1 p. 276.

**Employees at Cheswick**

LPN Thomas Slagle worked at Cheswick for approximately three months in late 2017 or early 2018.  1/11/24 Trans. 209:1-14.  Mr. Slagle's time records show that he received compensation for eight meal breaks during his brief employment at Cheswick.  *See* JX58, 2017b.

**Employees at Irwin**

- Edith Bainbridge worked at Irwin as a CNA.  1/18/24 Trans. 154:5-9.  Ms. Bainbridge testified that she was paid for missed or interrupted meal breaks after submitting no lunch forms.  1/18/24 Trans. 163:19-164:2, 167:14-168:1.  Ms. Bainbridge also testified that co-workers who missed meal breaks were paid when they submitted the no lunch forms.  1/18/24 Trans. 168:15-22.

- Patricia Henline worked as a cook for Irwin from September 2016 to February 2017. 1/17/24 Trans. 20:18-22.  Ms. Henline's 2017 time records show that Irwin deducted a meal

break from just 8 of 36 shifts.  *See* JX58, 2017a, Lines 102381-102416.  Ms. Henlin thus was paid for many meal breaks.

- Denver Henline worked as a cook/aide at Irwin from November 2016 through June 2017.  1/17/24 Trans. 34:25-35:2.  Mr. Henline's 2017 records show that Irwin rarely took break deductions from Mr. Henline's time.  *See* JX58, 2017a, Lines 101632-101728.   He was paid for many meal breaks.

**Employees at North Strabane Retirement**

Med Tech Linda Shuppas agreed that she was paid when her meal breaks were interrupted. 1/18/24 Trans. 17:6-8.

In sum, the Court's sweeping finding of a pattern and practice of not paying employees for work performing during meal break time entirely ignores the multitude of evidence that employees were paid on such occasions.  The finding is clear error.

6. **The Evidence Did Not Establish A Pattern Or Practice Of Violations Continuing Through 2023.**

The Court specifically noted that, based upon the representative evidence, it found a pattern and practice of violations from 2019 through 2023 to the tune of $12,003,606.61 of unliquidated back wages damages for meal breaks.  ECF 471 at 57.  However, there was virtually no evidence presented to establish meal breaks violations at any facilities beyond 2019.

The chart below displays the dates of employment of the employee witnesses presented by DOL.  The vast majority of the employees did not work for Defendants beyond 2019.  Of the 32 witnesses, 12 last worked for any defendant in 2016 or 2017.  Of the remaining witnesses, eight last worked for any Defendant in 2018.  Another four last worked for Defendant in 2019.  Thus, 24 of the 32 witnesses—***75 percent***—did not work at all for Defendants beyond 2019.  Only five witnesses worked at any time beyond 2019.  Yet the Court found, based upon representative

testimony consisting almost exclusively of testimony regarding the years of 2016 through 2019, that a pattern and practice of violations continued through 2023.

| Facility | Witness | Period of Employment[8] |
|---|---|---|
| Latrobe | No Witnesses | N/A |
| Washington | Cami Dziak | June–December 2019 |
| South Hills | Anthony Molinaro | February–August **2017** |
| South Hills | Megan Swan | February–October **2017** |
| New Wilmington | Camille Clark | October–December **2016** |
| Harmony | Ann Walter | August 2016–April **2017** |
| Monroeville | Kathleen Lantzy | February–March **2017** |
| Murrysville | Kristine Hoke | July 2016–May **2017** |
| Murrysville | Jennifer Shafer | August 2021-March 2022 |
| New Castle | Joyce Meis | August 2016-present |
| Cheswick | Thomas Slagle | September 2017–January 2018 |
| Cheswick | Sarah Pentek | November 2017–January 2020 |
| Greenville | Brenda Leffler | August 2016–August 2021 |
| Greenville | Shana Isenberg | July 2017–May 2019<br>September 2020 –July 2023 |
| Mt. Lebanon | James Martis | February–August **2017** |
| Mt Lebanon | Margaret Edwards | November 2017 – January 2018 |
| Mt. Lebanon | Janet Shadle | February 2017–August 2018 |
| Mt. Lebanon | Janet Thomas | February 2017–April 2018 |
| North Strabane Rehab | Julie Pattison | September 2017–November **2017** |

---

[8] Periods of employment are based on the date range of alleged damages for each employee as stated in PX6, or the employee's testimony.

| North Strabane Rehab/ North Strabane Retirement | Mark Gildea | September 2017–June 2018 |
|---|---|---|
| North Strabane Rehab/ North Strabane Retirement | Beverly Perkins | September 2017–June 2019 |
| North Strabane Retirement | Linda Shuppas | September 2017–November 2019 |
| Irwin | Edith Bainbridge | August 2016-present |
| Irwin | Katherine Costic (Russo) | November 2017–July 2018 |
| Irwin | Patricia Henline | October 2016–March **2017** |
| Irwin | Denver Henline | November 2016–June **2017** |
| Irwin | Brenda Tissue | August 2016–January **2017** |
| Brighton | Christal Simmons | June–December 2018 |
| Brighton | Chad Anderson | April 2016–March **2017** |
| Brighton | Corena Langham | May 2017–August 2019 |
| Brighton | Kathryn Miller | February 2016–June 2018 |
| Brighton | William Schwartz | August 2015–March 2020 |
| Brighton | Richard Wolarov | August 2015–present |

Indeed, Brighton is roughly five times larger than most of the other facilities and has the greatest number of employees. However, only one DOL witness worked at Brighton beyond 2019. Likewise with respect to contemporaneous employee statements introduced into evidence, the majority of the statements were from 2017. *See* PX1. The most recent statements were from 2020—nearly four years before trial.

Similarly, Mr. Shuey attempted to portray his investigation as ongoing and continuing through recent years, his investigation file belies this claim. Mr. Shuey initially testified that he spoke to at least 100 employees of the Facility Defendants after the wage and hour investigation

formally concluded in 2018, and that these individuals confirmed the Facility Defendants were engaging in ongoing violations of the FLSA.  1/19/24 Trans. 120:22 – 123:18. Mr. Shuey indicated that the notes from these conversations were encompassed in the interview statements referenced in PX1.  1/19/24 Trans. 147:19-148:4. However, only five employee post-litigation statements dated from 2018 to the present were admitted into evidence:

| Facility | Number of Post-Litigation Statements | Citation |
|---|---|---|
| Brighton | 1 | PX1, pp 132-138 |
| Washington | 1 | PX1, pp 194-196 |
| Monroeville | None | NA |
| South Hills | 1 | PX1, pp 155-157 |
| Murrysville | None | NA |
| Mt. Lebanon | 1 (duplicate)[9] | PX1, pp 132-138 |
| Latrobe | None | NA |
| Cheswick | None | NA |
| Harmony | None | NA |
| North Strabane Retirement Village | None | NA |
| North Strabane Rehab | None | NA |
| New Castle | 1 (duplicate) | PX1, pp 132-138 |
| New Wilmington | None | NA |
| Greenville | None | NA |

---

[9] Brittany Edgerton's statement covered positions she held at New Castle, Brighton, and Mt. Lebanon.

| Irwin | 2 | PX1, pp 128-131; 220-223 |
|---|---|---|

In sum, the Court's broad finding of a pattern and practice of meal breaks violations at every facility, affecting virtually every employee for the entire time period of 2015 through 2023 is not supported by the evidence.  DOL presented virtually no evidence to establish that any violations continued past 2019.[10]  Therefore, even if there was representative evidence to support a finding of pattern and practice violations through 2019, there was no evidence presented that could establish that such a pattern or practice continued through 2023.

**C.** **The Court's Findings Of Misclassification Of Employees As Exempt Contain Both Clear Errors of Law And Fact.**

**1.** **The Court Applied Incorrect "Narrowly Construed" And "Plainly and Unmistakably" Burden Of Proof Standards For Construing Exemptions.**

In determining that Defendants failed to establish that a number of positions were exempt from overtime wages, the Court applied two intertwined—and incorrect—standards for proving and construing exemptions.  The Court held:

(1)  "The burden of proof lies with the employer to demonstrate that an employee 'plainly and unmistakably' falls within an exemption to the FLSA's overtime pay requirements." ECF 471 at 45-46 (citing *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392 (1960); *Corning Glass Works v. Brennan,* 417 U.S. 188, 196-97 (1974)).

(2)  "Exemptions should be construed narrowly against the employer." ECF 471 at 46 (citing *Lawrence v. City of Phila., Pa.*, 527 F.3d 299, 310 (3d Cir. 2008) (citing *Arnold*, 361 U.S. at 392)).

---

[10] DOL's IT specialist Michael Murray testified that his damages calculations ran through 2023.  1/11/24 Trans. 152:14-18.  But Mr. Murray did not offer any evidence that any *violations* continued through 2023.

These incorrect intertwined standards were overruled by the Supreme Court in 2018.  In *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 88-89 (2018), the U.S. Supreme Court expressly struck down the "narrowly construed" standard and made clear that exemptions must be construed with "a fair reading":

> The Ninth Circuit also invoked the principle that exemptions to the FLSA should be construed narrowly.  845 F. 3d, at 935-936.  ***We reject this principle as a useful guidepost for interpreting the FLSA.  Because the FLSA gives no "textual indication" that its exemptions should be construed narrowly, "there is no reason to give [them] anything other than a fair (rather than a 'narrow') interpretation."***  Scalia, Reading Law, at 363.  The narrow-construction principle relies on the flawed premise that the FLSA "'pursues'" its remedial purpose "'at all costs.'"  *American Express Co.* v. *Italian Colors Restaurant*, 570 U. S. 228, 234, 133 S. Ct. 2304, 186 L. Ed. 2d 417 (2013) (quoting *Rodriguez* v. *United States*, 480 U. S. 522, 525-526, 107 S. Ct. 1391, 94 L. Ed. 2d 533 (1987) (*per curiam*)); see also *Henson* v. *Santander Consumer USA Inc.*, 582 U. S. 79, 89, 137 S. Ct. 1718, 198 L. Ed. 2d 177, 184 (2017) ("[I]t is quite mistaken to assume . . . that whatever might appear to further the statute's primary objective must be the law" (internal quotation marks and alterations omitted)). But the FLSA has over two dozen exemptions in §213(b) alone, including the one at issue here.  Those exemptions are as much a part of the FLSA's purpose as the overtime-pay requirement. See *id.*, at 89, 137 S. Ct. 1718, 198 L. Ed. 2d 177, 184 ("Legislation is, after all, the art of compromise, the limitations expressed in statutory terms often the price of passage").  ***We thus have no license to give the exemption anything but a fair reading.***

(Emphases added.)

Based on *Encino*, courts within the Third Circuit have made clear that the Third Circuit's former standard that an employer must "plainly and unmistakably" prove that an exemption applies was *overruled* by the Supreme Court and no longer the standard.  Citing cases from various courts within the Third Circuit, the Eastern District of Pennsylvania explained this clearly:

> **Although the Third Circuit has previously stated that "exemptions from the FLSA are construed narrowly against the employer, with the employer bearing the burden to prove plainly and unmistakably that its employees are exempt,"** *id.* **(cleaned up)), the Supreme Court later ruled otherwise,** *see Encino*, **138 S. Ct. at 1142.**  Specifically, the Court rejected "the principle that exemptions to the FLSA should be construed narrowly . . . as a useful guidepost for interpreting the FLSA."  *Id.*  The Court explained that since "the

FLSA gives no textual indication that its exemptions should be construed narrowly, there is no reason to give them anything other than a fair (rather than a narrow) interpretation." *Id.* The Court reasoned: "The narrow-construction principle relies on the flawed premise that the FLSA pursues its remedial purpose at all costs. But the FLSA has over two dozen exemptions, including the one at issue here. Those exemptions are as much a part of the FLSA's purpose as the over-time pay requirement. We thus have no license to give the exemption anything but a fair reading." *Id.; see also Green v. Lazer Spot, Inc.*, Civil Action No. 1:20-CV-495, 2021 U.S. Dist. LEXIS 244483, 2021 WL 6063590, at *4 (M.D. Pa. Dec. 22, 2021) (**"Courts are no longer to construe FLSA exemptions narrowly against the employer; instead, we now simply give exemptions a 'fair reading.' A fair reading is 'neither narrow nor broad' and recognizes both that employee rights are not the only rights at issue in FLSA cases and that employees' interests 'are not always separate from [or] at odds with their employers' interests.'"** (citations omitted)); *Depalmva v. The Scotts Co., LLC*, Civ. No. 13-7740 (KM) (JAD), 2019 U.S. Dist. LEXIS 97036, 2019 WL 2417706, at *5 n.7 (D.N.J. June 10, 2019) ("The Third Circuit has long held that exemptions to the FLSA are to be 'narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit.' ***Encinco***, **however, clearly overturns that former narrow-construction approach. Thus, employers are no longer bound to prove that an exemption is 'plainly and unmistakably' within the statute.**" (cleaned up)).

*Robinson v. Pottstown Area Rapid Transit, Inc.*, No. 22-655-KSM, 2022 U.S. Dist. LEXIS 230254,

at *10-12 (E.D. Pa. Dec. 22, 2022) (bold added).

The Court thus applied incorrectly stringent standards for Defendants to establish

exemptions. There should not be any narrow construction of exemptions against an employer.

Nor does an employer need to prove that an exemption "plainly and unmistakably" applies.

Rather, construction and application of FLSA exemptions should be "fair."[11]

---

[11] The U.S. Supreme Court recently granted *certiorari* to consider "[w]hether the standard of proof that employers must satisfy to demonstrate the applicability of a Fair Labor Standards Act, 29 U.S.C. 201 *et seq.*, exemption is a preponderance of the evidence or clear and convincing evidence." *See E.M.D. Sales, Inc. v. Carrera*, No. 23-217, 2024 U.S. LEXIS 2649 (June 17, 2024).

**2.** **Based On Fair Readings Of the Exemptions And The Evidence, Defendants Established That The ADONs Were Exempt.**

The Court determined that DONs were properly classified as exempt, but other nursing department supervisors, such as ADONs were not.  The Court discounted Defendants' witnesses who were current or former ADONS even though that testimony was consistent with DOL's witnesses.  *See* Findings of Facts and Conclusions of Law at pp. 34-35, 51.  The credible evidence at trial demonstrated that ADONs properly were classified as exempt under multiple EAP exemptions.

Registered nurses typically meet the duties test of the learned professional exemption.  29 CFR § 541.301(e)(2).  The individuals who worked as ADONs are also RNs and are exempt learned professionals.  *See* 2/14/24 Trans. 80:18-81:13 (Melissa Hough); 2/14/24 Trans. 23:19-22 (Renea Jordan).  ADONs also are exempt under the executive and administrative exemptions.[12]

---

[12] The executive exemption applies to any employee:

> (1) Compensated on a salary or fee basis at not less than the level set forth in § 541.600;
> (2)  Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
> (3) Who customarily and regularly directs the work of two or more other employees; and
> (4)  Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 CFR § 541.100(a).

The administrative exemption applies to any employee:

> (1) Compensated on a salary or fee basis at not less than the level set forth in § 541.600;
> (2)  whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 CFR § 541.200.

Vivian Miller, whose declaration the Court cited as credible, testified that as ADON, her primary duty was "management of nursing staff." PX-1 at p. 264. Miller indicated that she did not have independent authority to hire or fire, but her input into hiring and firing was given "particular weight." *Id.* She also stated that she conducted interviews and gave write-ups. *Id.*

A declaration submitted by former CNA Jamie Brown identified her direct supervisor as the ADON of her facility. PX-1 at p. 194. Brown stated that her ADON assigned her patients and tasks. *Id.*

The testimony from Defendants' witnesses about ADON duties aligned with DOL's witnesses. Renea Jordan confirmed that she did not issue discipline during her time as ADON, but she had the authority to do so. 2/14/24 Trans. 31:11-15. Jordan also testified that she was the highest-ranking employee in the building after the DON and administrator left for the day. 2/14/24 Trans. 31:19-25. Melissa Hough testified that she had the authority to issue discipline as ADON and exercised that authority. 2/14/24 Trans. 70:3-7. She explained that she would first review her recommendations regarding discipline with the DON but could not recall any time when her recommendation was rejected. 2/14/24 Trans. 70:3-15.

This evidence confirms that ADONs met the duties test of the executive exemption, including providing input on hiring decisions and issuing discipline.

ADONs are also exempt under the administrative exemption. Jordan summarized her duties as ADON as follows, "Infection control, restorative, nursing, staffing, management, making sure there's staff, call-offs and things like that. If I had to work with staffing, I worked with staffing." 2/14/24 Trans. 30:17-22.

This work directly relates to the management or operation of Defendants' facilities – ADONs oversee employees in the nursing department and the care of the facilities residents. They

also have discretion and independent judgment with respect to matters of significance, such as maintaining staffing levels, overseeing care, and infection control for their facility.

For these reasons, Defendants established that ADONs were exempt.

**D.**  **The Overly Broad Damages Award Is Not Supported By "Just And Reasonable Inference," Nor Is It Remotely An "Approximate" Estimate Of Damages Based On The Evidence.**

Even if the evidence supported a finding of a pattern or practice of violations at every facility during the entire time period of 2015 through 2023—which it certainly did not—the enormously inflated damages award sought by DOL, which the Court adopted virtually wholesale, is not reasonably inferred from the evidence, nor is it even remotely close to being an "approximate" amount of damages that possibly could be owed.  To the contrary, the Court's liquidated damages award will result in employees either being paid double damages for work that they did not perform or receiving windfalls by being paid a total of *three times* for work for which they already were paid.

**1.**  **DOL's Damages Calculations, Adopted By The Court, Erroneously Assumed That *Every* Employee Is Owed Wages For Miscalculation Of The Regular Rate In *Every* Workweek From 2015 Through 2023.**

DOL's broad damages calculations assumed that Defendants failed to properly calculate regular rates beyond July 2019.  As demonstrated above, Defendants' records establish that overtime wages were paid correctly based on correct calculations of regular rates incorporating all renumeration.  *See* Section IV.A.  DOL's calculations, adopted wholesale by the Court, erroneously awarded employees damages based on an absolutely incorrect assumption of miscalculation of the regular rate.  DOL's calculations, adopted by the Court, are *refuted* by the evidence.  The Court's liquidated damages award will result in employees being paid ***three times*** for wages they already were paid correctly.

**2.** **DOL's Meal Breaks Damages Calculations, Adopted By The Court, Erroneously Assumed That *Every* Employee Is Owed Wages For Auto-Deducted Meal Breaks On *Every* Workday From 2015 Through 2023.**

DOL's damages calculations for alleged meal break violations, which were adopted wholesale by the Court, broadly assumed that on every single workday of every single non-exempt employee for which meal break time was auto-deducted, the employee worked through the meal break and is owed damages. Accordingly, with the exclusion of five minutes per day for employees who never clocked out for a "break" (for an unintelligible reason that even the DOL's statistician admitted he did not understand), DOL calculated that each employee was owed at least 25 minutes of pay on every workday during the broad eight-year period of August 2015 through March 2023. *See* DOL Proposed Findings of Facts, Doc. 465 at p. 113, ¶ 309. DOL's far-reaching assumptions are not "reasonably inferred" from the evidence, nor are the figures remotely "approximate." Indeed, DOL's own evidence contradicted DOL's fabricated assumptions.

Nevertheless, the Court wholesale adopted DOL's calculations and awarded approximately ***$24,368,308.61 liquidated damages*** for claims of failing to pay wages for work performed during auto-deducted meal breaks. Indeed, DOL calculated $12,184,154.31 of unliquidated meal breaks damages. *See* PX6 – BD & Bonus Summary Tables.[13] Thus, almost 70% of DOL's calculated damages are the result of Mr. Murray's meal break calculations. The damages award is clearly erroneous and manifestly unjust.

Mr. Murray prepared DOL's damages calculations based on instructions and assumptions given to him by attorneys from the DOL Solicitor's office. DOL's instructions guided him to calculate at least 25 minutes of damages for every workday of every employee on which meal

---

[13] Total's total claimed unliquidated damages was $20,568,768.25. The non meal breaks portion was $8,384,613.95 ("Total Back Wages Less Time Data BD"). Thus, DOL calculated the unliquidated meal breaks damages as $12,184,154.31.

break time was auto-deducted.  Mr. Murray testified that approximately 4,800 employees never punched out for a single meal break during their employment, and about 3,100 employees punched out for at least one meal break during their employment.  1/11/24 Trans. 43:2-4.  For the 4,800 employees who never clocked out for a meal break, Mr. Murray calculated 25 minutes of meal break damages for *every single workday*.[14]  For the 3,100 employees who clocked out for at least one "break" during their employment, Mr. Murray likewise calculated damages based on an assumption that they worked through meal breaks on *every single workday* on which a meal break was auto-deducted.  Given that Mr. Murray calculated the average "break" to be less than five minutes, Mr. Murray assumed that an employee who clocked out for just a few minutes during any particular shift did not take any breaks without clocking in and out.  For these 3,100 employees, DOL essentially calculated 30 minutes of meal break damages for virtually every single workday that Defendants applied an auto-deduction.

The basic premise of DOL's damages calculations—that every employee worked through auto-deducted meal break time on every *single workday* between August 2015 and March 2023, and was not paid for such work—is refuted by a multitude of evidence, much of which was detailed above.  DOL's sweeping assumptions underlying its broad damages calculations *were not* "reasonably inferred" from the evidence, nor are they even remotely "approximate."

### a. Many Employees Stated Under Oath That They "Always" Or "Usually" Took a Meal Break

Numerous employees testified that they "always" or "usually" took a 30-minute meal break.  *See supra* Sec. IV.B.4, pp. 20-25.  In fact, DOL itself collected much of this testimony from employees.  *See id.*  Nevertheless, DOL's calculations did not incorporate any analysis of the

---

[14] Mr. Murray readily acknowledged that he did not understand the rationale for the Solicitor's office's instructions to deduct five minutes and award 25 minutes of damages per workday.  1/11/24 Trans. 75, 165-66.

meal break attestations, nor did DOL deduct any damages based on workdays on which an employee attested that he/she took a meal break.  DOL's calculations, adopted by the Court, are *refuted* by the evidence.

### b. Undisputed Evidence Established That Employees at Five Facilities Attested At The Time Clock That They Took Meal Breaks.

DOL admits that some facilities utilized a meal break attestation procedure through which employees attested each day when clocking out whether they took a meal break.  2/12/24 Trans. 159:23-160:4.  Specifically, there was evidence that at least four facilities utilized such an attestation: Mt. Lebanon, Monroeville, Murrysville, and South Hills.  PX1 pp 227-228, 233, 244, 252, 261,  (Mt. Lebanon); PX1 pp. 257, 265, 276 (Murrysville), PX1 p. 256 (Monroeville), PX1 246 (South Hills).  If an employee attested that he/she took a meal break, the employee obviously did not work during the meal break and is not owed wages.  Yet DOL's damages calculations assumed that *all* employees worked through meal breaks on *every* workday.  DOL's calculations, adopted by the Court, are *refuted* by the evidence.

### c. Many Employees Stated Under Oath That They Were Paid When They Did Not Take A Meal Break.

A multitude of evidence was presented regarding workdays on which an employee did not clock out for a meal break, but the auto-deduct was not applied because either (a) the employee indicated "no lunch" via the time clock attestation, or (b) the employee informed management of his/her inability to take a break.  *See supra* Sec. IV.B.5, pp. 25-27.  Those employees were *paid* for their work on those days.  As just one example, Katelin Fierens was a CNA at Mt. Lebanon.  *See* PX6.  Ms. Fierens worked 30 shifts from January 1, 2019 to March 31, 2019.  *See* JX58 2019a, Lines 140101-140124.  The time records show that Defendants paid Ms. Fierens for five missed

meal breaks because she attested on those days to not taking a break.[15]  Yet DOL's damages calculations assumed that *all* employees are owed for meal breaks on *every* workday where a break was auto-deducted.  DOL's calculations, adopted by the Court, are *refuted* by the evidence.

### d. The Majority Of Employees Who Testified That They Worked Through Meal Breaks Stated That This Occurred A Few Times Per Month Or Per Week—But Not *Every Day*.

Many of the employees who testified or signed sworn statements that they worked through breaks without being paid explained that this occurred a few times a month or a week—but not on every single workday.  These were DOL's own witnesses.  Yet DOL's damages calculations assumed that *all* employees worked through meal breaks on *every* workday.  DOL's calculations, adopted by the Court, are *refuted* by the evidence.

### e. The Evidence Did Not Establish Any Meal Breaks Damages For The Years of 2020 Through 2023.

DOL's damages calculations were premised on a broad assumption that the alleged meal breaks pay violations continued through 2023, despite DOL presenting almost no evidence of meal break violations occurring past 2019.  DOL calculated meal breaks damages for the years of 2020 through 2023 assuming that violations occurred every day for every employee.  This flawed assumption is ***not*** a reasonable inference from the evidence.

\* \* \*

In sum, DOL's overly broad damages calculations entirely ignored broad categories of evidence that significantly reduce damages.  DOL's damages calculations are neither reasonably inferred from the evidence nor are they even close to approximate.  The Court's wholesale adoption of DOL's calculations was thus a clear error and manifest injustice.

---

[15] Mr. Pechman testified that "NL" is short for "no lunch."  2/12/24 Trans. 152:24-153:2.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, Defendants request that the Court reconsider its findings of broad, sweeping pattern and practices of multiple types of wage violations.  The evidence did not support findings of:

1)      Regular rate calculation errors past July 2019;

2)      Meal breaks pay violations for every employee at every facility for 2015 through 2023; or

3)      Misclassification of all ADONs.

Furthermore, the Court's enormous damages award, adopting virtually wholesale DOL's calculations is not supported by the reasonable inference of the evidence.  Specifically,

1)      $24,368,308.61 of liquidated damages for alleged unpaid wages for work performed during auto-deducted meal breaks is outright refuted by the evidence;

2)      Damages for allegedly miscalculated regular rates is refuted by the evidence; and

3)      More than two million dollars of overtime wage damages to Assistant Directors of Nursing employees is not supported because the evidence demonstrated that they were exempt.

Defendants therefore respectfully request that the Court amend its judgment.

**JACKSON LEW PC**

*/s/ Marla N. Presley*
Marla N. Presley, Esq. (PA I.D. No. 91020)
marla.presley@jacksonlewis.com
1001 Liberty Avenue, Suite 1000
Pittsburgh, PA 15222
Telephone: (412) 232-0404
Facsimile: (412) 232-3441

*Catherine A. Cano (admitted pro hac vice)*
catherine.cano@jacksonlewis.com
10050 Regency Circle, Suite 400
Omaha, Nebraska   68114

Telephone: 402-391-1991
Facsimile: 402-391-7363

*Jeffrey A. Schwartz (admitted pro hac vice)*
Jeffrey.Schwartz@jacksonlewis.com
171 17th Street, NW, Suite 1200
Atlanta, GA 30363
(404) 525-8200 telephone
(404) 525-1173 facsimile

*Counsel for Defendants*